Philip J. Nathanson (AZ Bar #013624)
**THE NATHANSON LAW FIRM**
8765 E. BELL ROAD, SUITE 101
SCOTTSDALE, AZ 85260
(480) 419-2578
(480) 419-4136-Fax

*Attorney for Defendants-Counter-Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| BEST WESTERN INTERNATIONAL, INC., | No.  CV 08 - 2274 - PHX-DGC |
| Plaintiff, | **DEFENDANTS-COUNTER-PLAINTIFFS' NOTICE OF FILING RULE 26 EXPERT REPORT AND DAMAGE DISCLOSURE.** |
| vs. | |
| AV INN ASSOCIATES 1, LLC, and HOOSHANG HAROONI, | (Assigned to Judge David G. Campbell) |
| Defendants. | |

Please take notice that defendants-counter-plaintiffs, AV INN ASSOCIATES 1, LLC, and HOOSHANG HAROONI, filed the attached Rule 26 Expert Report and Damage Disclosure.

DATED this 6th day of November, 2009.

Philip J. Nathanson

# ELIAS AZIZ LAVI
## CERTIFIED PUBLIC ACCOUNTANT
**7000 Santa Monica Blvd.**
**Los Angeles CA 90038**
**Tel (323) 463-2600**
**Fax (323) 871-2600**

November 6, 2009

Mr. Philip Nathanson
Philip J. Nathanson & Associates
33 North Dearborn Street, Suite 1930
Chicago, IL 60602

## Re: A.V. Inn Operations Group, Inc. vs Best Western

Dear Mr. Nathanson,

At the request of A.V. Inn Operations Group, Inc., I have reviewed the documentation provided in the above captioned matter. My findings are as follows:

### 1 - Loss incurred by A.V Inn Operations Group, Inc (A.V. Inn) due to non-renewal of corporate accounts:

The failure of Best Western (BW) to inform A.V. Inn to renew the corporate accounts in September 2005 resulted in a substantial decrease in room sales from October 2005 to December 2006 with corresponding decrease in restaurant and bar sales.

An analysis was performed on the room sales of A.V Inn from the period March 2005 to June 2009 based on the general ledgers provided to us. Our analysis shows that room sales from the period Oct 2005 to December 2006 is significantly lower than the sales for 2007 as a result of the non-renewal of corporate accounts for that period. Based on our computation total loss suffered by the company for that period is $299,969. Our computation considered also the corresponding increase in restaurant and bar sales. In addition, the company incurred additional expense for the salary of the general manager and sales associates hired to obtain sales from the corporate accounts. This amounts to $168,000. See attached **Schedule A** showing detailed computation of the above.

Mr. Philip Nathanson
A.V. Operations Group Inc.
November 6, 2009
Page Two

### 2 - Loss incurred by A.V. Inn due to malfunctioning of Best Western's reservation system:

A.V. Inn detected a malfunctioning in the reservation system of Best Western sometime in August 2006. The reservation system showed that the hotel was fully booked while actual occupancy was about 20% to 30%. It was not determined when this malfunctioning started, but it continued until August 2007. As a result, room sales did not increase in 2007, room sales in 2007 increased only by about 14% in comparison to banquet sales which increased in 2007 by as much as 53%. Our computation showed that A.V Inn, lost income from room sales and corresponding restaurant & bar sales for one year due to this malfunctioning amounting to $564,549. See attached **Schedule B.**

### 3 - Loss incurred by A.V. Inn due to withdrawal of Best Western name, reservation system and computer softwares:

Using the same analysis performed above, room sales for the period April 2008 to June 2009 also decreased in comparison to 2007 as a result of the withdrawal of Best Western name in April, 2008. Based on our computation total loss suffered by A.V. Inc. for that period is $807,249. See attached **Schedule C**.

The Company had to incur additional expenses to comply with the standards required by BW and they had to close the bar and restaurant for two months at the request of BW to update the bar and restaurant area. The closure of the bar and restaurant resulted in loss in restaurant and bar sales and, in turn, the non-availability of the bar and restaurant resulted in loss in room sales. The repairs were superfluous and were made out in accordance with BW design and standards.

### 4- Loss on sale of property at lower market value due to withdrawal of Best Western name

The company sold the property in July, 2009 to avoid incurring additional losses on the operations of the hotel. The property was not sold on the basis of its best use which is a hotel property as a result of the withdrawal of Best Western name but was sold to a medical college. Lost income on the sale of the property amounted to $1,300,000. See attached **Schedule D.**

Mr. Philip Nathanson
A.V. Operations Group Inc.
November 6, 2009
Page Three

In summary, A.V. Inn total losses from this property amounted to $3,139,767 as follows:

| | |
|---|---:|
| Loss due to non-renewal of corporate accounts | $ 299,969 |
| Additional expense incurred to renew corporate accounts | 168,000 |
| Loss due to malfunction of reservation system | 564,549 |
| Loss due to withdrawal of Best Western name | 807,249 |
| Loss on sale of property at lower market value | 1,300,000 |
| | $ 3,139,767 |

In addition to the schedules mentioned above, enclosed herewith are the following exhibits to provide additional information on the above matter:

Exhibit 1 – Antelope Valley Inn Room Sales – 2005 to 2009
Exhibit 2 – Antelope Valley Inn Banquet Sales – 2005 to 2009
Exhibit 3 – Antelope Valley Inn Restaurant & Bar Sales – 2005 to 2009
Exhibit 4 – Antelope Valley Inn Average Daily Rate
Exhibit 5 – Declaration of Cheryl Duggan
Exhibit 6 – Declaration of Lisa Wilkerson
Exhibit 7 – Purchase and Sale Agreement & Escrow Instructions dated June 18, 2008 between AV Inn Associates I, LLC and Mr. Shanti Dawan.

I appreciate this opportunity to serve you in this matter. If you have any questions or require additional information, please contact me.

Very truly yours,

ELIAS AZIZ LAVI

ANTELOPE VALLEY INN
LOST INCOME - BEST WESTERN

## SCHEDULE A

**Loss due to non-renewal of corporate accounts**
**Period covered - October 2005-December 2006**

| | | | |
|---|---|---:|---|
| Actual average monthly room sales - 2007 | | $ 173,105 | **A |
| Actual average monthly room sales - Oct-Dec 2005 | | 103,320 | **B |
| | | 69,785 | |
| | | x 3 mos | |
| Loss room sales - Oct to December 2005 | | $ 209,356 | **C |
| (A-B) x 3 months | | | |
| | | | |
| Actual average monthly room sales - 2007 | | $ 173,105 | **D |
| Actual average monthly room sales - 2006 | | 152,323 | **E |
| | | | |
| | | 20,782 | |
| | | x 12 mos | |
| Loss room sales - Jan - Dec 2006 | | $ 187,038 | **F |
| (D-E) x 12 months | | | |
| | | | |
| Total loss in room sales - Oct 2005-Dec 2006 | | $ 396,394 | |
| (C + F) | | | |
| Loss in restaurant & bar sales (17% of room sales) | | 67,387 | |
| | | | |
| **TOTAL LOST INCOME** | | $ 463,781 | |

**DIRECT EXPENSES**
ROOM SALES

| | | | | |
|---|---|---:|---:|---|
| # of Rooms ($396,394 /$70.45) | | | 5,627 | |
| Direct expenses per room | | | | |
| Janitorial | $ | 20.00 | | |
| Materials & supplies | | 5.00 | | |
| Utilities & others | | 1.00 | | |
| | $ | 26.00 | | |
| Total direct expenses-room sales | | | $ 146,292 | |
| FOOD & LIQUOR- Restaurant & bar | | | 17,521 | |
| (26% of restaurant & bar sales) | | | | |
| **TOTAL DIRECT EXPENSES** | | | $ 163,812 | |
| | | | | |
| **NET** | | | **$ 299,969** | |

**ADDITIONAL EXPENSES INCURRED**
Salary of general manager and sales associate hired
to obtain corporation accounts in 2006
($7000 per month for 2 yrs)                                    **$ 168,000**

ANTELOPE VALLEY INN
LOST INCOME - BEST WESTERN

## SCHEDULE B

**Loss due to malfunctioning of reservation system**
**Period covered - August 2006-August 2007**

| | |
|---|---:|
| Percentage increase in banquet sales in 2007 | 53% |
| Percentage increase in room sales in 2007 | 14% |
| Difference | 39% |
| | |
| Average monthly room sales in 2006 | 152,323 |
| Percentage increase in banquet sales in 2007 | 53% |
| | |
| Projected increase in monthly room sales for 2007 | 80,261 |
| Actual increase in average room sales | 20,782 |
| ($173,105-152,323) | |
| Monthly difference | 59,479 |
| | |
| Lost room sales for one year ($59,479 x 12 months) | 713,749 |
| Loss in restaurant & bar sales (17% of room sales) | 121,337 |
| **TOTAL LOST INCOME** | 835,087 |

**DIRECT EXPENSES**
ROOM SALES

| | | | | |
|---|---|---:|---|---:|
| # of Rooms ($713,749 /$90.85) | | 9,192 | | |
| Direct expenses per room | | | | |
| Janitorial | $ | 20.00 | | |
| Materials & supplies | | 5.00 | | |
| Utilities & others | | 1.00 | | |
| | $ | 26.00 | | |
| Total direct expenses-room sales | | | $ | 238,990 |
| FOOD & LIQUOR- Restaurant & bar | | | | 31,548 |
| (26% of restaurant & bar sales) | | | | |
| **TOTAL DIRECT EXPENSES** | | | $ | 270,538 |
| | | | | |
| **NET** | | | **$** | **564,549** |

ANTELOPE VALLEY INN
LOST INCOME - BEST WESTERN

## SCHEDULE C

**Loss due to withdrawal of Best Western name, reservation system**
**and computer softwares**
**Period covered - April 2008-June 2009**

| | | | |
|---|---|---|---|
| Actual average monthly room sales - 2007 | | $ | 173,105 |
| # of months (April 2008-June 2009) | | | 15 |
| | | $ | 2,596,575 |
| Actual room sales | | | |
| April 2008-Dec 2008 | $1,116,198 | | |
| Jan 2009-June 2009 | 529,254 | | 1,645,452 |
| Loss room sales - April 2008-June 2009 | | $ | 951,123 |
| Loss in restaurant & bar sales (17% of room sales) | | | 161,691 |
| **TOTAL LOST INCOME** | | $ | 1,112,814 |
| **DIRECT EXPENSES** | | | |
| ROOM SALES | | | |
| # of Rooms ($951,123 /$93.84) | 10,136 | | |
| Direct expenses per room | | | |
| Janitorial | $   20.00 | | |
| Materials & supplies | 5.00 | | |
| Utilities & others | 1.00 | | |
| | $   26.00 | | |
| Total direct expenses-room sales | | $ | 263,525 |
| FOOD & LIQUOR- Restaurant & bar | | | 42,040 |
| (26% of banquet & restaurant sales) | | | |
| **TOTAL DIRECT EXPENSES** | | $ | 305,565 |
| **NET** | | **$** | **807,249** |

ANTELOPE VALLEY INN
LOST INCOME - BEST WESTERN

## **SCHEDULE D**

**Loss on sale of property at lower market value due to
withdrawal of Best Western name**

| | | |
|---|---|---:|
| Previous buyer's offer for the property 6/15/08 | $ | 6,100,000 |
| Actual selling price  (sold to a medical college) | | 4,800,000 |
| | **$** | **1,300,000** |

# EXHIBIT 1

ANTELOPE VALLEY INN
ROOM SALES

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Jan | 71,492 | 71,981 | 146,044 | 113,885 | 57,215 |
| Feb | 100,435 | 109,419 | 135,899 | 150,420 | 58,914 |
| March | 133,019 | 134,956 | 137,568 | 195,211 | 132,222 |
| April | 179,253 | 151,102 | 196,470 | 195,864 | 88,727 |
| May | 158,728 | 119,305 | 130,000 | 145,621 | 66,508 |
| June | 133,571 | 151,234 | 207,377 | 160,520 | 125,668 |
| July | 164,908 | 184,438 | 194,353 | 155,326 |  |
| August | 177,942 | 165,121 | 230,000 | 99,797 |  |
| September | 138,870 | 202,169 | 179,153 | 97,771 |  |
| October | 129,759 | 219,404 | 230,312 | 91,216 |  |
| November | 108,762 | 182,404 | 180,617 | 59,238 |  |
| December | 71,438 | 136,343 | 109,463 | 110,845 |  |
| TOTAL | 1,568,177 | 1,827,876 | 2,077,256 | 1,575,714 | 529,254 |
| AVERAGE | 130,681 | 152,323 | 173,105 | 131,310 | 88,209 |

AVERAGE OCT TO DEC     103,320

% INCREASE IN AVERAGE SALES
2006 TO 2007                                        14%

# **EXHIBIT 2**

ANTELOPE VALLEY INN
BANQUET SALES

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Jan |  | 29,942 | 47,567 | 73,604 | 29,903 |
| Feb |  | 37,061 | 59,178 | 41,066 | 23,671 |
| March | 36,052 | 48,765 | 66,566 | 54,541 | 27,090 |
| April | 56,673 | 42,038 | 57,395 | 43,512 | 30,511 |
| May | 54,892 | 34,033 | 54,512 | 38,789 | 39,136 |
| June | 34,104 | 45,126 | 65,538 | 60,882 | 44,835 |
| July | 21,881 | 33,248 | 35,736 | 22,541 |  |
| August | 36,612 | 32,296 | 50,000 | 22,429 |  |
| September | 47,191 | 34,276 | 72,674 | 29,752 |  |
| October | 65,297 | 62,654 | 93,058 | 61,474 |  |
| November | 40,177 | 35,987 | 54,575 | 41,391 |  |
| December | 84,950 | 88,244 | 142,793 | 102,821 |  |
| TOTAL | 477,829 | 523,670 | 799,592 | 592,802 | 195,146 |
| AVERAGE | 39,819 | 43,639 | 66,633 | 49,400 | 32,524 |

% INCREASE IN AVERAGE SALES                      53%
2006 TO 2007

# EXHIBIT 3

ANTELOPE VALLEY INN
RESTAURANT & BAR SALES

|  | 2005 | 2006 | 2007 | 2008 | 2009 | |
|---|---|---|---|---|---|---|
| Jan | | 19,262 | 34,143 | 32,050 | 26,523 | |
| Feb | | 20,988 | 38,389 | 35,219 | 9,323 | |
| March | 23,815 | 23,595 | 34,508 | 42,125 | 8,381 | |
| April | 37,478 | 29,071 | 44,207 | 37,228 | 8,033 | |
| May | 29,590 | 26,871 | 33,817 | 29,860 | 6,583 | |
| June | 26,185 | 31,067 | 34,112 | 30,736 | 13,753 | |
| July | 25,606 | 35,365 | 32,500 | 31,965 | | |
| August | 28,233 | 39,659 | 40,662 | 34,959 | | |
| September | 16,127 | 47,092 | 32,947 | 39,001 | | |
| October | 26,391 | 47,575 | 42,712 | 39,459 | | |
| November | 32,757 | 36,632 | 34,613 | 40,918 | | |
| December | 25,201 | 34,317 | 26,002 | 24,114 | | |
| | | | | | | |
| TOTAL | 271,383 | 391,494 | 428,612 | 417,634 | 72,596 | |
| | | | | | | |
| AVERAGE | 22,615 | 32,625 | 35,718 | 34,803 | 12,099 | |
| % OF ROOM SALES | 17% | 21% | 21% | 27% | | |
| | | | | | | |
| TOTAL BANQUET & RESTAURANT SALES | 749,212 | 915,164 | 1,228,204 | 1,010,436 | 3,903,016 | 2005-2008 |
| | | | | | | |
| COST -BANQUET, RESTAURANT & BAR | 146,964 | 330,249 | 345,480 | 185,698 | 1,008,391 | 2005-2008 |
| | | | | | | |
| % OF COST TO SALES | 20% | 36% | 28% | 18% | 26% | 2005-2008 |

# EXHIBIT 4

ANTELOPE VALLEY INN
AVERAGE DAILY RATE

|           | 2005   | 2006   | 2007     | 2008   | 2009  |
|-----------|--------|--------|----------|--------|-------|
| Jan       |        | 59.10  | 97.00    | 94.00  |       |
| Feb       |        | 66.11  | 97.00    | 99.70  |       |
| March     |        | 67.98  | 93.00    |        |       |
| April     |        | 73.69  | 89.00    |        |       |
| May       |        | 74.56  | 81.00    |        |       |
| June      |        | 68.89  | 92.00    |        |       |
| July      | 56.25  | 69.30  | 91.50    |        |       |
| August    | 65.77  | 72.39  | 89.00    |        |       |
| September | 69.32  | 82.74  | 90.00    |        |       |
| October   | 78.80  | 85.76  | 93.00    |        |       |
| November  | 72.53  | 84.78  | 86.65    |        |       |
| December  | 60.56  | 79.00  | 91.00    |        |       |
| TOTAL     | 403.23 | 884.30 | 1,090.15 | 193.70 |       |
| AVERAGE   | 67.21  | 73.69  | 90.85    | 96.85  | 90.82 |

70.45  AVE RATE 2005 & 2006
93.84  AVE RATE 2008 & 2009

**EXHIBIT 5**

## DECLARATION OF CHERYL DUGGAN

I, Cheryl Duggan, under penalty of perjury of the laws of the United States, hereby declare the following:

1.      I was employed by Mr. Harry Harooni as the General Manager of the Best Western Antelope Valley Inn for approximately two years (April 2006 – April 2008).

2.      During the first inspection by Best Western where I was present, I was informed by Mitch, the inspector, that he was sent to take away the hotel's membership. However, the hotel passed with one of the highest scores ever received due to the multi-million renovation that was taking place.

3.      As I recall, there were no items on the inspection list during that inspection and after the renovation was completed that would put the membership of the hotel at risk.

4.      Mr. Harooni and I attended a Best Western convention in San Francisco in 2006 where I encountered many top level executives of Best Western who were familiar with Mr. Harooni by sight. The conversation with all of them was one of promising support and individual attention to his hotel for sales and marketing support.

5.      At the San Francisco convention, I got the impression that Best Western's policy was to weed out older properties to showcase newer ones for the purpose of generating higher revenues, even to the older properties' detriment.

6.      Both myself and Lisa Wilkerson (Director of Sales) discovered that the property was closed out of the Best Western reservation system in approximately May 2006, therefore, not allowing any reservations to be made. No one at the corporate level discovered this malfunction even after Mr. Harooni implored Best Western's management help to determine the reason behind drastically low occupancy rates. Best Western was very slow to respond to this problem and fix it and reservations could not be booked for a long period of time.

7.      Both myself and Lisa Wilkerson (Director of Sales) went out on our own and solicited corporate accounts even though they were supposed to be contracted through Best Western. Best Western's Corporate Sales informed me that they only assisted the hotels that have high producing corporate accounts. The hotel was one of the leading corporate hotels in the Antelope Valley for many years. When Mr. Harooni purchased the hotel it was in a very bad condition and Best Western had discontinued any marketing for the property while still collecting the membership fees.

8.      Mr. Harooni did not receive adequate support from Best Western. Best Western's management made it very difficult to receive any help and was uncooperative in many instances.

9.    When I left my employment at the hotel in approximately April 2008, the hotel had high scores and its occupancy was at its highest.

Executed this 30 day of April, 2009 at Los Angeles, California.

Cheryl Duggan

## DECLARATION OF LISA WILKERSON

I, Lisa Wilkerson, under penalty of perjury of the laws of the United States, hereby declare the following:

1.      I have been in the hotel business for the last 15 years. I have worked at Oxford Inn & Suites, Essex House Hotel, Carlson Hotels, Holiday Inn and Best Western Antelope Valley Inn. I have held positions of Director of Sales, Director of Catering, Sales Manager, Wedding Coordinator, Corporate and Government Sales Director.

2.      When I first started working for Best Western Antelope Valley Inn as Director of Sales, I found many discrepancies when I started looking into the reservation system. Mitch (the hotel inspector) offered to come to the hotel to sort out the issues with the reservation system. While going through the system it was discovered, that the hotel had been closed out for at least 3 months prior. The problems with the reservation system continued for the next two years.

3.      In July of 2006, during the RFP (request for proposal for corporate accounts) season, a time when the hotel was getting all of its new accounts, we were constantly having problems getting the proper information loaded into the Best Western system so the companies could book the hotel in year 2007. As a result of these problems, some companies were unable to make the reservations with our hotel.

4.      As the time got close to the end of the RFP season, Cheryl Duggan and I went on a ten day sales trip and visited fifteen different companies and came back with 14 new accounts. Best Western made no attempts to solicit new accounts on the hotel's behalf.

5.      Best Western did not solicit the Aerospace Industry in Lancaster for potential clients and seemed unaware of its existence. Once Best Western Antelope Valley Inn solicited that industry on its own, it attributed to approximately 80% of the hotel's business.

6.      I attended the Chicago NBTA Conference during which Best Western was supposed to meet with different company representatives who made the decision whet er they would use Best Western as the hotel for their employees. I was told by Scott (last name unknown) from Best Western's corporate that I was not allowed to speak to the company representatives myself and that only sales people from Best Western could contact them. When I got back to Best Western Antelope Valley Inn, I submitted to Best Western all the companies I wanted to solicit. Best Western didn't know about these companies or their contact persons and I had to provide all of that information myself. Most of the companies would not talk to Best Western sales people. Subsequently, when no progress was made by Best Western in soliciting these clients, I called them myself and majority of the companies ended up choosing our hotel for their corporate travel.

7.      It is my opinion, that Best Western provided very little or no support in soliciting new business for Best Western Antelope Valley Inn. In addition, the ongoing problems with the reservation system interfered greatly with the hotel's business.


Executed this 30 day of April, 2009 at Lancaster, California.

Lisa Wilkerson



Property: Antelope Valley Inn - Lancaster, CA

## PURCHASE AND SALE AGREEMENT & ESCROW INSTRUCTIONS

This Purchase and Sale Agreement is made and entered into this __12th__ day of June, 2008, by and between A.V. Inn Associates I, LLC, its successors and assigns ("Seller") and Mr. Shanti Dewan, its successors and assigns. ("Buyer").

### RECITALS:

WHEREAS, Seller owns the Fee Simple interest in a 144 unit Hotel commonly known as the Antelope Valley Inn & Conference Center located at 44055 N. Sierra Highway, Lancaster, CA 93534 (APN# 3132-013-005) and Assignment of Ground Lease dated December 2nd, 2004 Exhibit "G", between Kennapohl Investment Company (Landlord) and Antelope Valley Inn, Inc. (Lessee) APN # 3132-013-008 together with all improvements, furniture, fixtures, equipment, linens, thirty (30) day operating supplies and all other ancillary items pertaining to the daily operation of the Hotel. A legal description (Exhibit A) and a personal property inventory (Exhibit B) will be supplied in escrow.

The real and personal property above described is hereinafter referred to as "Subject Property."

WHEREAS, Buyer desires to buy from Seller, and Seller desires to sell to Buyer, all of Seller's interest in and into the Subject Property and it is hereby agreed as follows:

*1. PURCHASE AND SALE OF ASSETS:* On the "Closing Date" (as defined in Paragraph 6A. hereof) and subject to the terms and conditions set forth in this Agreement, Seller agrees to sell, assign, transfer and deliver to Buyer, and Buyer agrees to purchase, acquire and accept from Seller the following assets and properties (being referred to hereinafter, individually and collectively, as the ("Subject Property"), in each case free and clear of all liens, leases, financial encumbrances and security interests of any kind or character except as may be provided herein:

    (a)  The Fee Simple interest (described more particularly in Exhibit A), including all buildings, structures and improvements located thereon, fixtures contained therein, appurtenances and hereditaments thereunto belonging full assignment of the Ground Lease dated December 2nd, 2004 between Kennapohl Investment Company (landlord) and Antelope Valley Inn, Inc. (lessee);

    (b)  The Personal Property (described more particularly in Exhibit B) including all furniture, furnishings, equipment, operating supplies, and other items of personal property used by Seller in the operation of the hotel, including inventories of cleaning supplies and other consumables used in the guest rooms operating and existing at closing.

    (c)  All contracts and agreements (if any) pertaining to the Hotel (Exhibit C), such as cable television, pest control, maintenance agreements etc. shall be subject to the approval of Buyer, and if approved, shall be assigned to Buyer at the close of escrow free and clear of encumbrances and adverse claims except as may be provided for herein and Buyer shall assume all obligations of Seller thereunder. Seller warrants that said contracts shall at the close of escrow be in full force and effect and not in default.

    (d)  All equipment leases (if any) pertaining to Hotel (Exhibit E) shall be assigned to Buyer at close of escrow.

    (e)  The Liquor License Transfer, License # 47-422531, 58-422531-1, 68-422531-1 (Exhibit F) through a separate bulk sales escrow.

    (f)  Seller to sub-lease Conference Center from Buyer under a lease to be drawn within the Due Diligence Period, see other terms #35 page 7 herein.

Except as otherwise specifically provided herein, the Assets to be sold by Seller to Purchaser shall not include cash and cash equivalents, including credit card charges in the process of collection, accounts receivable, stocks, bonds, corporate securities, refundable deposits held by utility companies for service provided to the Assets or other intangible assets owned by Seller. The Subject Property shall be delivered to Buyer at close of escrow unless otherwise agreed, together with executed copies of all agreements, contracts and other commitments pertaining to said hotel.

*2A. PURCHASE PRICE:* The purchase price, which Buyer agrees to pay to Seller for the Subject Property shall be Six Million One Hundred Thousand Dollars ($6,100,000) all cash, payable as follows:

  $ 700,000    **Approximately cash down payment**
  $ 440,000    **Seller Financing as portion of down payment described herein item #35 page 8**
  $4,960,000    **Approximately in the form of new Trust Deed(s) and Note(s) to be secured by Buyer at rate and terms acceptable to Buyer.**

*2B. EARNEST MONEY DEPOSIT:* To secure Buyer's prompt and faithful performance of its obligations hereunder, Buyer will, within two (2) days after the Effective Date, deposit with Chicago Title Company ("Escrow Company") the amount of Fifty Thousand Dollars ($50,000) (the "Earnest Money"). The Earnest Money will be invested in such investment as Buyer shall determine through Chicago Title Company and such Earnest Money and all interest thereon shall be credited against the purchase Price.

*3. CONDITION OF PROPERTY:* Buyer acknowledges that this is an "As-Is – Where Is" sale of all real and personal property covered by this Agreement "with all faults", except as expressly set forth in this Agreement, in their present state and condition. The Buyer further acknowledges that it is purchasing the property without any warranty, representation or guarantee, either express or implied of any kind,

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes Page 1 of 10 pages. Buyer_____ Seller_____

**Purchase & Sale Agreement cont'd.**                          **Property:  Antelope Valley Inn – Lancaster, CA**

3. *CONDITION OF PROPERTY (cont'd.):* nature, or type whatsoever from or on behalf of the Seller, except as expressly set forth in this Agreement. The Buyer further acknowledges that Buyer has not relied, and is not relying, upon any information, document, sales brochures or other literature, maps or sketches, projection, proforma, statement, representation, guarantee or warranty (whether express or implied, or oral, or written, or material or immaterial) that may have been given by or made by or on behalf of the Seller, except as set forth in the documents delivered to Buyer pursuant to Paragraphs 5 and 9 of this Agreement or as expressly set forth in this Agreement. Buyer further acknowledges Seller has not, does not and will not make any warranty or representation, express or implied, as to the merchantability, habitability or fitness for a particular use, or with respect to the value, profitability or marketability of the Property. Buyer shall rely solely on its own independent investigation of the Property in exercising its rights under this Agreement, except only for the information set forth in the documents provided to Buyer pursuant to Paragraphs 5 and 9 of this Agreement and the express warranties and representations made herein. Buyer agrees that, except as specifically provided in paragraphs 4A of this agreement, Buyer will not attempt to assert any liability against Seller and/or its Agents for furnishing such information, and Buyer agrees to indemnify and hold Seller and/or its Agents free and harmless from any and all such claims of liability. This indemnity shall survive the closing or the cancellation of this agreement.

4A. *SELLER WARRANTIES:* Seller hereby represents, warrants and covenants as follows:
- a) Seller has full power and authority to enter into and perform this agreement in accordance with its terms;
- b) To the best of Seller's knowledge no governmental agency has notified Seller of any violations of any requirements of law pertaining to said Hotel or its contents, which has not been remedied;
- c) To the best of Seller's knowledge there are no current pending lawsuit(s), investigation(s), inquiry(ies), actions affecting the Property or the right to use and occupy it;
- d) To the best of Seller's knowledge there are no unsatisfied mechanic or materialmen lien(s) affecting the Property or that any tenant of the property is the subject of a bankruptcy. If Seller receives any such notice prior to close of escrow, Seller shall immediately notify Buyer. Buyer, within the time specified in paragraph 5 shall provide to Seller written notice of disapproval.
- e) The information set forth in the documents delivered pursuant to paragraph 5 of this agreement is true and accurate in all material respects.
- f) To the best of Seller's knowledge, all equipment and personal property used in the operation of the Hotel will at the time of delivery of possession be in working order and operating condition.

4B. *SURVIVAL: BREACH BY SELLER:* With respect to conditions, facts and matters that a reasonably observant person should have discovered within 30 days after the Closing Date, the representations and warranties by Seller set forth in subparagraph 4A above shall survive the Closing Date for 30 days, and shall be of no force or effect thereafter. If Buyer discovers a breach of warranty or representation made by Seller in subparagraph 4A within 30 days after Closing, Buyer shall notify Seller, in writing, of the specifics of such breach and Seller shall promptly mitigate the breach if possible to do so.

4C. *NO REPRESENTATION AS TO PERMITS, LICENSES, TRADE NAMES:* Seller makes no representation or warranty with respect to the transferability of any permits, license, trade name, certificate, approval or other instrument of right Seller may have, except as expressly set forth herein. Buyer acknowledges that it will have to apply for and obtain any and all licenses, permits, approvals, franchises and other such instruments or rights as may be needed to use and operate the Property.

5A. *CONTINGENCY PERIOD:* Buyer shall have forty five (45) days from the effective date of this agreement (the "initial contingency period"), to inspect and approve property and complete all due diligence including but not limited to:  A).  Title Review B). Financial Review C). Environmental Review D).  Property Inspection B). Receipt of items on Due Diligence List Exhibit "D". On or before expiration of the initial contingency period, Buyer to notify Seller in writing of its approval or disapproval of said inspection. In the absence of any written notice to the contrary, Buyer's inspection will be deemed approved. Buyer agrees to indemnify and hold Seller harmless from and against any and all claims, demands, liabilities, liens, judgments, costs and expenses, including, without limitation, reasonable attorneys fees and disbursements, arising out of the conduct of Buyer, its employees, agents, contractors and consultants in conducting its inspection of the Property.

5B. *FINANCING CONTINGENCY PERIOD:* The Earnest Money Deposit shall remain fully refundable through the 28th day of the contingency periods. Following expiration of the initial contingency period only a Buyer's contingency for financing approval will remain for a maximum of seventy five (75) days from the effective date, upon expiration of which, Buyer's earnest money deposit shall be non-refundable and will be applied to the Purchase Price at closing.

Seller shall agree to cooperate with Buyer and provide those documents that are necessary for Buyer to complete its due diligence. Attached hereto as (Exhibit D), is the list of documents to be provided by Seller if available, within seven (7) days from the "effective date".

6A. *ESCROW & CLOSING DATE:* Within two (2) days from the effective date the undersigned broker shall forthwith cause an escrow to be opened at Chicago Title Company and shall cause escrow instructions to be prepared embodying the sale herein provided for. The undersigned broker shall deposit in said escrow the sum received from Buyer as above set forth. The Escrow Agent be authorized to close said escrow within One Hundred (100) days or sooner, from the effective date (date to be determined in escrow) or such later date as mutually agreed between Buyer and Seller. Possession of the Property shall be delivered to Buyer on the Date of Recordation.

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes **Page 2 of 10 pages. Buyer** _____  **Seller** _____

Purchase & Sale Agreement cont'd.                    Property:  Antelope Valley Inn – Lancaster, CA

*6B. CLOSING COSTS:*  All county and city transfer taxes (if applicable) and a Standard Owner's Policy of Title Insurance shall be paid by Seller. Buyer shall pay for lender's ALTA title policy. All other closing costs including escrow fees to be shared by Buyer and Seller as is customary in the County of recordation.

*7A. PRORATIONS:*  Current real property taxes (including, without limitation, all currently due special district levies, assessments and/or improvement bonds), all personal property taxes and any intangible or use taxes to be prorated in escrow. Buyer is aware that real and personal property taxes are determined by the sales price and may increase or decrease after sale.

Outside of escrow, all Owner's Taxes and all income and expenses relating to the Property (including, without limitation, all Employee Costs and Employee Taxes) shall be prorated between Seller and Buyer as of the Close of Escrow and assumed by Buyer. Other items to be prorated outside of escrow shall include, without limitation:  (i) all income from coin lock and vending machines and guests services (if any); (ii) all premiums on insurance policies, if any, assumed by Buyer, Seller being charged with the responsibility of canceling all other insurance policies effective at the Close of Escrow and paying any premium surcharges or early termination payments imposed in connection with such cancellations; (iii) advertising expenses and unused advertising contracts and due bills; (iv) all trade publications, subscriptions and trade association dues; (v) all credit information service charges; (vi) all music and entertainment charges, including satellite programmer's fees; (vii) all charges related to licenses and permits for the Property which are transferred to Buyer at the Close of Escrow; (viii) all charges for postage meters and unused meter postage; (ix) all travel agent commissions; and (x) all commissions of credit organizations. All prorations, unless otherwise provided in this Agreement, shall be on an accrual basis, shall be based upon actual elapsed calendar days and shall be done as of 12:01a.m. on the date of Close of Escrow.

*7B.*  Without limiting the generality of Paragraph 7A above, the following provisions shall apply:

(1) Notwithstanding the 12:01A.M. Proration time: (i) Seller shall be charged with all Employee Costs and Employee Taxes accrued through 12:00 P.M. (noon) on the day of the Close of Escrow and payable by Buyer after the Close of Escrow; (ii) Seller shall retain all guest room rentals, miscellaneous hotel income and telephone revenue earned for the night before the Close of Escrow (meaning the night period beginning on the preceding day and ending at 12:01 A.M. of the day of the Close of Escrow)

(2) The income and expenses to be so prorated shall include, without limitation, the monthly payments payable under any Service Contracts if any, which Buyer agrees to assume and the Operating Agreements if any, for the month in which the Close of Escrow occurs, whether such payments have been paid by Seller in advance or shall be owed by Buyer in arrears.

(3) Guest deposits and any advance room rentals paid under Advance Booking Agreements for the periods after the Close of Escrow shall belong to Buyer.

(4) On or before the closing, Seller shall have terminated, effective as of the Closing Date the employment of all employees at the Hotel, and Seller shall have fulfilled all obligations relating to compensation of said employees at or prior to such termination; in addition, Seller shall defend, at Seller's sole expense, and save and hold harmless Buyer from all claims by such employee(s) by reason of such employment or termination of employment at the hotel by Seller, if such claim has been made by the employee by the time employees' employment terminates with the Seller.

(5) Seller shall terminate all light and power and other such utilities for the Property, effective at the Close of Escrow, shall be responsible for all utility charges and termination fees to the Close of Escrow, and be entitled to receive the refund of all refundable deposits previously made by Seller for such utilities. It shall be Buyer's responsibility to contract with the various utilities for the provision of service following the Close of Escrow, and to make any required deposits.

(6) Seller shall be charged with all accounts payable relating to the Property accrued as of the Close of Escrow and payable by Buyer after the Close of Escrow. Buyer shall be responsible for all accounts payable relating to the Property, which accrue after the Close of Escrow. The accounts payable shall include, without limitation, accrued but unpaid charges for electricity, gas, telephone, water, sewage, cable and other utilities; all amounts payable by Seller to creditors from whom Operating Supplies and other purchases have been made in connection with the ownership of the Property or the operation of the Property, including, without limitation, amounts then owing under open purchase orders for operating supplies; and accrued but unpaid amounts payable with respect to any Operating Agreements if any, and with respect to all maintenance, cleaning, security and other services performed in connection with the operation of the Property.

(7) To the extent that, after the Close of Escrow, the parties discover within sixty (60) days following the Close of Escrow that the prorations (or the adjustments made under this Section) were incorrect, each party agrees to make any necessary corrective payment promptly upon the request of the other.

*8.  ACCOUNTS RECEIVABLE:*  Seller shall retain all accounts receivable relating to the Property accrued as of the Close of Escrow (including past due amounts), and shall have the right to collect the same, and Buyer hereby agrees to cooperate with Seller in the collection of said receivables.

*9.  TITLE AND VESTING:*  Seller, at Seller's expense, shall furnish Buyer at the close of escrow a standard policy of title insurance issued from Chicago Title Company written on its standard form, with a liability equal to the purchase price, showing fee simple title to the real property covered hereby to be vested in Buyer free of encumbrances except current taxes not yet payable, conditions, restrictions,

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes Page 3 of 10 pages.  Buyer  Seller_____

Purchase & Sale Agreement cont'd.                                    Property:  **Antelope Valley Inn – Lancaster, CA**

easements and rights of way of record and any deed of trust or notes provided for herein. Buyer shall have until the later of twenty (20) days after the effective date or fifteen (15) days after receipt of the Title Report to review said Title Report, and to either: (i) approve the

*9. TITLE AND VESTING (cont'd.):* Title Report, in which event all exceptions set forth therein shall be thereafter deemed Permitted Exceptions (ii) reasonably disapprove the Title Report, in which event this Agreement shall terminate, or (iii) reasonably disapprove specified exceptions in the Title Report (those not disapproved being Permitted Exceptions). In the event the Buyer fails to either approve the Title Report, disapprove or disapprove only specified exceptions in writing within the time period set forth above, this Agreement shall immediately terminate and the rights and obligations of the parties hereto shall terminate. In the event any exceptions not shown in the Title Report are reported or discovered by the Title Insurer after the date of the Title Report, which exceptions could adversely affect in a material way the current use and operation of the Property, Buyer shall give Seller written notice of such exceptions within ten (10) days after receipt of notice of any such additional exceptions. Seller shall have the right, but no obligation whatsoever, to cure or cause any such objectionable exceptions to be cured within thirty (30) days after the original date set for closing pursuant to Paragraph 6 hereof, in which event the closing of this transaction shall be extended to a date which shall be the earlier of (i) ten (10) days after Seller notifies Buyer in writing that all such exceptions shall have been cured or (ii) thirty-five (35) days after the original date set for closing pursuant to Paragraph 6 hereof. If Seller fails to so cure all such objectionable exceptions, then Buyer, as its sole remedy, may either (i) terminate this Agreement by written notice given promptly to the Seller, and the rights and obligations of the parties hereunder shall terminate, or (ii) proceed to close subject to such exceptions, but without any reduction in the Purchase Price hereunder.

If Buyer wishes to upgrade coverage to an ALTA Owner's Extended Coverage Policy providing, among other things, an assurance of the correct location of the property boundaries, and an absence of any unrecorded easements or encroachments affecting the title of the property, then Seller will cooperate in arranging such coverage, and Buyer will pay any increased premium or survey or investigative cost to obtain such additional coverage. Seller shall use all reasonable efforts to locate and provide any existing record of survey affecting the parcel, and which may assist in the issuance of such an ALTA extended coverage policy. Title shall vest as designated in Buyer's escrow instructions. (THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT AND TAX CONSEQUENCES; THEREFORE, BUYER SHOULD GIVE THIS MATTER SERIOUS CONSIDERATION.)

*10. PERSONAL PROPERTY:* A complete inventory of all personal property of Seller currently used in the operation of the Property and included in purchase price shall be delivered to Buyer during contingency period (Exhibit "B"). Buyer, within the time specified in paragraph 5, shall notify Seller in writing of disapproval. Seller shall deliver title to the personal property by Bill of Sale, free of all liens and encumbrances, and without warranty either express, implied, written or oral regarding condition.

*11. OPERATING SUPPLIES:* A complete physical inventory of the Operating Supplies shall be taken by Purchaser and Seller jointly on the morning of the day of the Close of Escrow. The joint inventory taken on the morning of the Close of Escrow shall disclose all such supplies, which Seller represents as being customarily normal and sufficient for normal operation of the Property for the next thirty (30) day period, including minimum two (2) turns of linen.

*12. SERVICE AGREEMENTS:* Seller, within the time specified in paragraph 5, shall make available to Buyer for inspection and review: All current service contracts and other agreements pertaining to the operation of the hotel (Exhibit "C"). Seller represents that the documents to be furnished are those maintained in the ordinary and normal course of business. Seller warrants that said contracts and agreements shall at the close of escrow be in full force and effect and not in default. All such contracts pertaining to the hotel, such as cable television and pest control, etc., shall be subject to Buyer's approval, assigned to Buyer at the close of escrow free and clear of encumbrances and adverse claims except as may be provided for herein. Buyer, within, the time specified in paragraph 5, shall notify Seller in writing of disapproval.

*13. INCOME/EXPENSE STATEMENTS:* Seller, within the time specified in paragraph 5, shall make available to Buyer a statement of income and expenses pertaining to the Subject Property. Seller represents that income and expense statements are based upon records maintained in the ordinary and normal course of business and used by Seller in the computation of federal and state income tax returns. Buyer, within the time specified in paragraph 5, shall notify Seller in writing of disapproval.

*14. SURVEY, PLANS AND ENGINEERING DOCUMENTS:* Seller, within the time specified in paragraph 5, shall deliver to Buyer copies of surveys, plans, specifications and engineering documents, if any, prepared on Seller's behalf or in Seller's possession. Buyer, within the time specified in paragraph 5, shall notify Seller in writing of disapproval.

*15. PERMITS:* If in Seller's possession, Seller, within the time specified in paragraph 5, shall deliver to Buyer copies of all permits and approvals concerning the Property obtained from any governmental entity, including but not limited to, Certificates of Occupancy, Conditional Use Permits, Development Plans, and licenses and permits pertaining to the operation of the Property.

*16. AMERICANS WITH DISABILITIES ACT:* The Americans with Disabilities Act ("ADA") prohibits discrimination against individuals with disabilities. The ADA affects almost all commercial facilities and public accommodations. The ADA can require, among other things, buildings to be made readily accessible to the disabled. Different requirements apply to new construction, alterations to existing buildings, and removal of barriers in existing buildings. Compliance with the ADA may require significant costs. Monetary

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes Page 4 of 10 pages. Buyer _____ Seller _____

Purchase & Sale Agreement cont'd.                     Property: Antelope Valley Inn – Lancaster, CA

and injunctive remedies may be incurred if the Property is not in compliance. A real estate broker does not have the technical expertise either to determine whether a building is in compliance with ADA requirements, or to advise a principal on those requirements. Buyer and Seller are advised to contact an attorney, contractor, architect, engineer, or other qualified professional of his/her own choosing to determine to what degree, if at all, the ADA impacts upon that principal or this transaction.

*17. RISK OF LOSS:* In the event the improvements on said real property or the personal property covered hereby or a substantial part thereof shall be destroyed or materially damaged between the date hereof and the consummation of this transaction, this contract may be terminated by Buyer by notice in writing to Seller and the undersigned broker, and this contract shall thereupon be at an end and said deposit shall be returned to Buyer.

*18. TAX WITHHOLDING:* Foreign Investment and Real Property Tax Act. The Foreign Investment and Real Property Tax Act requires a buyer purchasing real property from a foreign person to withhold tax from the sale proceeds unless an exemption app.'es. Seller agrees to provide Buyer with a certification establishing that no federal income tax is required to be withheld under the act, or to consent to withholding of tax from the proceeds of sale as required, unless it is established that the transaction is exempt because the purchase price is $300,000 or less and Buyer intends to use the property as his residence.

*19. LIQUIDATED DAMAGES:* THE PARTIES AGREE THAT IT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER, IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF $50,000 PLUS INTEREST, IF ANY, ACCRUED THEREON. UPON PAYMENT OF SAID SUM TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER LIABILITY TO SELLER, AND ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES SHALL BE PAID BY BUYER.

Buyer(s) Initials _____/_____   Seller(s) Initials _____/_____

**20. DISPUTE RESOLUTION:**

**A.    MEDIATION:** Buyer and Seller agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action, subject to paragraphs 20C and D below. Mediation fees, if any, shall be divided equally among the parties involved. If any party commences an action based on a dispute or claim to which this paragraph applies, without first attempting to resolve the matter through mediation, then that party shall not be entitled to recover attorney's fees, even if they would otherwise be available to that party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.

**B.    ARBITRATION OF DISPUTES: Buyer and Seller agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration, subject to paragraphs 20C and D below. The arbitrator shall be a retired judge or justice, or an attorney with at least five years of real estate transactional law experience, unless the parties mutually agree to a different arbitrator, who shall render an award in accordance with substantive California Law. In all other respects, the arbitration shall be conducted in accordance with Part III, Title 9 of the California Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered in any court having jurisdiction. The parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05.**

**"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SEPCIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY." "WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION."**

Buyer(s) Initials _____/_____   Seller(s) Initials _____/_____

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes Page 5 of 10 pages. Buyer _____ Seller_____

06/17/2008  21:45      7149741122                                                    PAGE  06/10

**Purchase & Sale Agreement cont'd.**                               **Property: Antelope Valley Inn – Lancaster, CA**

     **C.**   **EXCLUSIONS FROM MEDIATION AND ARBITRATION:** The following matters are excluded from Mediation and Arbitration: (a) A judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sale contract as defined in Civil Code §2985; (b) An unlawful detainer action; (c) The filing or enforcement of a
     **C.**   **EXCLUSIONS FROM MEDIATION AND ARBITRATION (cont'd):** mechanic's lien; (d) Any matter which is within the jurisdiction of a probate, small claims, or bankruptcy court; and (e) An action for bodily injury or wrongful death, or for latent or patent defects to which Code of Civil procedure §337.1 or §337.15 applies. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a violation of the mediation and arbitration provisions.

     **D.**   **BROKERS:** Buyer and Seller agree to mediate and arbitrate disputes or claims involving Broker, provided Broker shall have agreed to such mediation or arbitration prior to or within a reasonable time after the dispute or claim is submitted to Broker. Any election by Broker to participate in mediation or arbitration shall not result in Broker being deemed parties to the Agreement.

*21. ATTORNEY'S FEES:* In any action, proceeding, or arbitration between Seller, Buyer or Broker arising out of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs therein.

*22. GOVERNING LAW:* This Agreement shall be governed, enforced, and construed in accordance with the laws of the State of California.

*23. AGENCY CONFIRMATION:* The following agency relationship(s) are hereby confirmed for this transaction:

    Listing Agent: **Brown Hotel Group, Inc.** is the agent of (**CHECK ONE ONLY**):

    __ the Seller exclusively, or                **X**___ both the Buyer and Seller

    Selling agent: **Brown Hotel Group, Inc.** is the agent of (**CHECK ONE ONLY**):

    __ the Buyer exclusively, or                  **X**___ both the Buyer and Seller

*24. BROKERAGE:* Neither Buyer nor Seller has utilized the services of, or for any other reason owes compensation to, a licensed real estate broker (individual or corporate), agent, or finder, or other entity, other than as specified in this Agreement, in connection with any act relating to the Property, including, but not limited to, inquiries, introductions, consultations, and negotiations leading to this Agreement. Buyer and Seller each agree to indemnify and hold harmless the other, and the Brokers specified herein, and their agents, from and against any costs, expenses, or liability for compensation claimed inconsistent with the warranty and representation in this paragraph. Notwithstanding, Buyer shall have no responsibility whatsoever for the payment of any fees or commissions to any Brokers involved in this transaction.

*25. AUTHORITY:* Any person or persons signing this Agreement represents that such person has full power and authority to bind that person(s) principal and that the designated Seller and Buyer have the full authority to enter into and perform this Agreement. Entering into this Agreement and the completion of the obligations pursuant to this contract does not violate any Articles of Incorporation, Bylaws, Partnership Agreement, or other document governing the activity of either Seller or Buyer.

*26A. PROFESSIONAL CONSULTATION:* BUYER AND SELLER ACKNOWLEDGE THAT THEY ARE ADVISED TO CONSULT APPROPRIATE PROFESSIONALS CONCERNING ANY AND ALL EXISTING OR POTENTIAL LEGAL, TAX, AND ENVIRONMENTAL RESPONSIBILITIES, IMPLICATIONS, AND IMPACTS TO THEM RESULTING FROM THIS AGREEMENT. BROKER HAS MADE NO REPRESENTATIONS REGARDING THE ABOVE MATTERS.

*26B.* The parties acknowledge that with respect to the transaction contemplated herein (a) each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits thereto; (b) neither party has received from the other any accounting, tax, legal or other advice, and (c) each party has relied solely upon the advice of its own accounting, tax, legal and other advisors.

*27. COPIES:* Seller and Buyer each represent that copies of all reports, documents, certificates, approvals, and other documents which are furnished to the other are true, correct and unaltered copies of the original documents if the originals are in the possession of the party furnishing same.

*28. 1031 EXCHANGE:* Buyer and Seller agree to cooperate with each other in effecting a tax free exchange of property pursuant to Section 1031 of the Internal Revenue Code and the regulations promulgated thereunder, including a deferred or delayed exchange;

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes Page 6 of 10 pages. Buyer_____ Seller_____

Purchase & Sale Agreement cont'd.                     Property: **Antelope Valley Inn – Lancaster, CA**

provided that such cooperation shall not extend the Closing Date and such cooperation shall be at no expense or risk to the party not
benefiting from such an exchange. Either or both parties may take advantage of this provision.

**29A. _INDEMNITIES:_** From and after the closing date Seller shall indemnify, defend and hold harmless Buyer from and against any and
all actions, suits, claims, proceedings, investigations, audits, demands, assessments, fines, judgments, settlements, costs and other
expenses (including, without limitation reasonable attorneys fees and expenses and costs of investigation incurred in defending against or
settling any of the foregoing and any amounts paid in settlement thereof) incurred or resulting from a breach by Seller of any of its
representations, covenants and warranties which survive the Closing Date, and as to which a claim is made within any applicable period
specified in this Agreement.

**29B.** From and after the closing date Buyer shall indemnify, defend and hold harmless Seller from and against any and all actions, suits,
claims, proceedings, investigations, audits, demands, assessments, fines, judgments, settlements, costs and other expenses (including,
without limitation reasonable attorneys fees and expenses and costs of investigation incurred in defending against or settling any of the
foregoing and any amounts paid in settlement thereof) incurred or resulting from a breach by Buyer of any of its representations,
covenants and warranties which survive the Closing Date.

**30. _SUCCESSORS AND ASSIGNS:_** Neither Buyer nor Seller shall assign this Agreement without the prior written consent of the other
party, except that Buyer may assign Buyer's rights hereunder to any qualified immediate family member or a special purpose entity
formed to own the hotel ("Permitted Assignee"). No permitted assignment shall relieve Buyer of its obligations hereunder.

**31. _TIME OF ESSENCE; ENTIRE CONTRACT:_** Time is of the essence. No extension of time or waiver for performance of any act
or obligation shall be deemed an extension of time or waiver for any other act or obligation. All prior agreements between the parties are
incorporated in this Agreement, which constitutes the entire contract. Its terms are intended by the parties as a final, complete and
exclusive expression of their agreement with respect to its subject matter and may not be contradicted by evidence of any prior agreement
or contemporaneous oral agreement. The captions in this Agreement are for convenience of reference only and are not intended as part of
this Agreement. This Agreement may not be extended, amended, modified, altered, or changed in any respect whatsoever except by a
further agreement in writing executed by Buyer and Seller.

**32. _NOTICES:_** Whenever any Party shall give notice pursuant to this Agreement, each such notice shall be in writing and shall be
delivered personally or by facsimile or by mail, postage prepaid, addressed as set forth below.

| | | | |
|---|---|---|---|
| **To Seller:** | A.V. Inn Associates 1, LLC<br>c/o Harry Harooni<br>Best Western Antelope Valley Inn<br>44055 N. Sierra Highway<br>Lancaster, CA 93534 | **To Buyer:** | Mr. Shanti Dewan<br>6540 E. Carnegie Avenue<br>Anaheim Hills, CA 92807 |
| **With Copy to:** | | **With Copy to:** | |
| **With Copy to:** | Chuck Nester – President, CHB, CHA<br>BROWN HOTEL GROUP, INC.<br>4500 East Thousand Oaks Blvd. Ste. 104<br>Westlake Village, CA 91362<br>Ph: (805) 496-9797<br>Fx: (805) 496-2710<br>Email: lcnester@brownhotels.com | **With Copy to:** | Brandon D. Van Gieson – Sales Associate<br>BROWN HOTEL GROUP, INC.<br>4500 East Thousand Oaks Blvd. Ste. 104<br>Westlake Village, CA 91362<br>Ph: (805) 496-9797<br>Fx: (805) 496-2710<br>Email: brandon@brownhotels.com |

If either notice address above has been left blank, notice shall be delivered to the address set forth below the recipient's signature of
acceptance. Either party may change its notice address by providing notice thereof to the other party.

**33. _COUNTERPARTS:_** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but
all of which together shall constitute one and the same instrument.

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes **Page 7 of 10 pages.** Buyer _____ Seller _____

Purchase & Sale Agreement cont'd.                              Property:  **Antelope Valley Inn – Lancaster, CA**

*34.  THE "EFFECTIVE DATE"* shall be the last date this Agreement was signed by Buyer or Seller.

*35.  OTHER TERMS & CONDITIONS:* Sellers 2nd Trust Deed Promissory Note; Buyer will execute, in favor of Seller a Trust Deed & Promissory Note to be secured by lien on the fee simple parcel # 3132-013-005 under the following terms;

An amount not to exceed Four Hundred Forty Thousand Dollars ($440,000) if and only when required by Buyer's lender a consideration applied to Buyer's cash down payment. If Buyer's cash required or via a partner's cash required, the amount of Seller's note will be reduced by the amount of cash required by Buyer or Buyer's partner to qualify for Buyer's financing. The then balance will be for a term of 96 months (8 years) with interest only payment of 8% ($2,933.33) per month for the 1st 24 months, then fully amortized bearing interest at 6% with principals and interest payments of $7,292.07 a month until paid. Note to hold Due on Sale Clause against any and all principal reduction, refinance or payoff on Buyer's Purchase Money Mortgage.

Conference Center Sublease: Seller will sub-lease from Buyer the Conference Center Sierra Highway, Lancaster, CA. A free standing building, situated on the Ground Lease parcel #3132-013-008 for an initial term of 6 years with a Lessee option of an additional 3 years, with a Triple Net Lease payment of $10,000 per month payable on the 1st of each month in advance. The Conference Center sub-lease will be drawn within the "initial contingency period" and executed by Seller and Buyer. Said Lease will be adjusted on triple net Loan based on the Los Angeles County CPI. Buyer to have minimum of 500 sq.ft. office space in front of Conference Center.

THIS STANDARD DOCUMENT IS FOR USE IN SIMPLE TRANSACTIONS. NO REPRESENTATION IS MADE AS TO THE APPROVAL OF THE FORM OF SUPPLEMENTS, THE LEGAL VALIDITY OF ANY PROVISION, OR THE ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. IT SHOULD NOT BE USED IN COMPLEX TRANSACTIONS OR WITH EXTENSIVE RIDERS OR ADDITIONS.

INTENTIONALLY LEFT BLANK

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes Page 8 of 10 pages.  Buyer _____  Seller _____

Purchase & Sale Agreement cont'd.                    Property: **Antelope Valley Inn – Lancaster, CA**

## OFFER

When signed by Buyer this instrument shall constitute an offer by Buyer to Seller to purchase the Subject Property at the price and on the terms and conditions herein stated, which offer shall be deemed to be revoked unless Seller shall accept this offer by signing below prior to **5:00 P.M.** on ___6/24/08___. If Seller shall so accept Buyer's offer at or before the time aforesaid, then this instrument shall constitute an agreement between Seller and Buyer that Seller shall sell and convey to Buyer and Buyer shall purchase from Seller the Subject Property at the price and on terms and conditions herein stated.

Buyer(s): **MR. SHANTI DEWAN, and or assignee**

By: _____            ___6/16/08___
     JHANTI DEWAN                                   Date

By: _____            _____
                                                              Date

## ACCEPTANCE

The undersigned Seller approves and agrees to the terms and provisions of the foregoing offer, accepts the aforesaid offer of Buyer, and agrees to sell the Subject Property to Buyer at the price and upon the terms and conditions hereinabove stated. Upon close of escrow, the undersigned Seller agrees to pay a commission to Brown Hotel Group, Inc., per separate Agreement.

Seller authorizes said broker to open the escrow herein above provided for at Chicago Title Company, c/o Joyce Duff, Senior Certified Escrow Officer, 500 E. Esplanade Drive #102, Oxnard, CA, Tel: (805) 477-5208, Fax: (805) 658-2277, email: duffj@ctt.com

Seller (s): **A.V. INN ASSOCIATES 1, LLC**

By: _____            _____
   Its:                                                   Date

By: _____            _____
                                                              Date

**Real Estate Broker(s)**

(Listing)          **Brown Hotel Group, Inc.**          By: _____
                   **4500 E. Thousand Oaks Blvd., 104**      Chuck Nester – President, CHB, CHA   Date
                   **Westlake Village, CA 91362**
                   **Tel. (805) 496-9797 Fax (805) 496-2710**
                   **E-mail:** cnester@brownhotels.com

(Selling)          **Brown Hotel Group, Inc.**          By: _____  6-17-08
                   **4500 E. Thousand Oaks Blvd., 104**      Brandon D. Van Gieson – Sales Associate   Date
                   **Westlake Village, CA 91362**
                   **Tel. (805) 496-9797 Fax (805) 496-2710**
                   **E-mail:** brandon@brownhotels.com

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes **Page 9 of 10 pages.** Buyer _____ Seller _____

Purchase & Sale Agreement cont'd.                    Property:  Antelope Valley Inn – Lancaster, CA

## LIST OF EXHIBITS

| | |
|---|---|
| Legal Description | Exhibit "A" |
| Personal Property | Exhibit "B" |
| Contracts and Agreements | Exhibit "C" |
| Due Diligence List | Exhibit "D" |
| Equipment Leases | Exhibit "E" |
| Liquor License | Exhibit "F" |
| Land Lease | Exhibit "G" |

Buyer and Seller acknowledge receipt of a copy of this page, which constitutes Page 18 of 18 pages.  Buyer_____ Seller_____

ELIAS AZIZ LAVI, CPA

7000 SANTA MONICA BLVD.
LOS ANGELES CA 90038

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/6/2009 | 110609AVINN |

| Bill To |
|---------|
| A.V INN OPERATIONS GROUP, INC. |

| Description | Amount |
|-------------|--------|
| Review of accounting records and preparation of report | 7,200.00 |

| | **Total** | $7,200.00 |
|--|-----------|-----------|

**CERTIFICATE OF SERVICE**

     I, Philip J. Nathanson, an attorney, certify that I caused a copy of this Notice of Filing and Rule 26 Expert Report to be served upon the above named parties, electronically, by filing the same with the District of Arizona's CM-ECF online system on November 6, 2009.


                            /s/   Philip J. Nathanson
                  Philip J. Nathanson