**LAW OFFICES**
**SHERMAN & HOWARD L.L.C.**
2800 NORTH CENTRAL AVENUE, SUITE 1100
PHOENIX, ARIZONA  85004-1043
TELEPHONE  (602) 240-3000
FACSIMILE  (602) 240-6600
(AZ BAR FIRM NO. 00441000)
Arthur W. Pederson (AZ Bar No. 002821)
(apederson@shermanhoward.com)
David W. Garbarino (AZ Bar No. 022452)
(dgarbarino@shermanhoward.com)
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BEST WESTERN INTERNATIONAL, INC., an Arizona non-profit corporation, | No. CIV08-02274-PHX-DGC |
| Plaintiff, | **PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| AV INN ASSOCIATES 1, LLC., a California limited liability company; HOOSHANG HAROONI, | |
| Defendants. | |

Plaintiff Best Western International, Inc., an Arizona non-profit corporation ("Best Western" or "Plaintiff"), hereby submits the following Statement of Facts in support of its Motion for Summary Judgment against defendants AV Inn Associates 1, LLC, a California limited liability company ("AV Inn Associates"), and Hooshang Harooni ("Harooni") (AV Inn Associates and Harooni collectively, "Defendants").

### Statement of Facts

1.     Best Western operates as a membership association of independently owned and operated hotels (i.e., its members).  (*See* Ex. A ¶ 3 attached hereto (Declaration of Cheryl Pollack).)

2.     Exhibit B hereto is a true and correct copy of the Membership Application and Agreement (the "Membership Agreement") executed by Defendants. (*Id*. ¶ 4; Ex. B.)

3.     The only parties to the Membership Agreement are Best Western,

Harooni, and AV Inn Associates.  (*See* Exs. A ¶ 5 & B.)

4.     The only parties to this litigation are Best Western, Harooni, and AV Inn Associates.  (*See* Dkt. ## 1 (Compl.), 14 (Defendants' Answer), 26 (Harooni's Counterclaim).)

5.     Harooni and AV Inn Associates were members of Best Western with respect to the property formerly known as the Best Western Antelope Valley Inn, located in Lancaster, California and referenced in Best Western's records as property T-05050 (the "Hotel").  (*See* Exs. A ¶ 6  & B.)

6.      AV Inn Operations Group, Inc., a California corporation ("AV Inn Operations") is not a party to the Membership Agreement (*see* Ex. B.), or this litigation (*see* Dkt. ## 1 (Compl.), 14 (Defendants' Answer), 26 (Harooni's Counterclaim).)

7.     Exhibit C hereto is a true and correct copy of the Best Western Bylaws and Articles ("Bylaws").  (*See* Exs. A ¶ 7 & C.)

8.     Exhibit D hereto is a true and correct copy of the Best Western Rules and Regulations (the "Rules and Regulations").[1]  (*Id*. ¶ 8; Ex. D.)

9.     The relationship, duties, and obligations of Best Western and its members, including Defendants, are created and governed by the Governing Documents.  (*Id*. ¶ 10; *see generally* Exs.  B, C, & D.)

10.     The Governing Documents require members to adhere to certain quality standards with respect to cleanliness of guestrooms and bathrooms and permit the Best Western Board of Directors (the "Board") to terminate a membership for failure to meet cleanliness quality standards.  (Ex. C Art. II, § 7; Ex. D Ch. V-XII.)

11.     Best Western's quality standards insure that each Best Western member is offering quality products and services to customers and further perpetuating the goodwill attributable to and benefiting all Best Western members.  (Ex. A ¶ 15.)

12.     Exhibit E is a true and correct copy of the October 25, 2007 Quality

---

[1]     The Membership Agreement, Bylaws, and Rules and Regulations are collectively referred to as the "Governing Documents" in this Statement of Facts.

Assurance Assessment Report wherein Defendants received a Guest Room and Public Area ("GRPA") score of 750.  (*Id*. ¶ 16; Ex. E.)

13.    Exhibit F is a true and correct copy of the January 31, 2008 Quality Assurance Assessment Report wherein Defendants received a GRPA score of 681.  (Ex. A ¶ 17; Ex. F.)

14.    Defendants received two GRPA inspection scores of less than 800 points on two consecutive inspections on October 25, 2007 and January 31, 2008.  (*See* Exs. E and F.)

15.    Pursuant to the Governing Documents, Defendants' membership was subject to termination by the Board as a result of Defendants' receipt of two GRPA inspection scores less than 800 on two consecutive inspections on October 25, 2007 and January 31, 2008.  (*See* Ex. D Ch. XI, § 1100.7.)

16.    After Defendants received the second GRPA score less than 800 points, a hearing was held wherein the Board considered termination of Defendants' membership.  (Ex. A ¶ 18.)

17.    Harooni attended that hearing and was given an opportunity to address the Board.  (*Id*.)

18.    At the hearing, the Board decided to terminate Defendants' Best Western membership.  (*Id*.)

19.    Subsequent to termination, Defendants failed to pay outstanding amounts owed to Best Western.  (*Id*. ¶ 20.)

20.    Best Western sued Defendants for breach of contract, breach of open account, and breach of stated account to collect the unpaid amounts.  (*See* Dkt. # 1 (Compl.).)

21.    When Defendants filed their Answer, Defendants were not represented by counsel.  (*See* Dkt. # 14 (Defendants' Answer).)

22.    Before Defendants retained counsel, Defendants sought leave to assert a counterclaim against Best Western styled "BREACH OF CONTRACT, BREACH OF

1  IMPLIED CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH

2  AND FAIR DEALING."  (*See* Dkt. ## 22 (Defendants' Motion and Memorandum for

3  Leave to File Counterclaim)  23 (Harooni's Counterclaim).)

4       23.  The Court only permitted the counterclaim to be asserted by Harooni,

5  however, because AV Inn Associates, a corporate entity, was not represented by

6  counsel.  (Dkt. # 25.)

7       24.  Months after Defendants retained counsel, Best Western sought

8  clarification of which parties had pending counterclaims against Best Western.  (Dkt. #

9  37.)

10       25.  The Court ruled that AV Inn Associates had no counterclaim and that

11  Harooni was ***the only party*** with a counterclaim pending against Best Western:

12
13      Plaintiff has filed a motion asking the Court to clarify that no

    counterclaim has been filed by Defendant AV Inn Associates 1,

14      LLC ("AV Inn"). Defendants have not responded, and the time

    for responding has passed. The Court's Case Management Order

15      (Dkt. #18) set a 60-day deadline for amending pleadings and

    adding parties. Defendants moved before this date for leave to

16      file a counterclaim. The Court granted the motion with respect

    to Defendant Harooni, but denied it with respect to Defendant

17      AV Inn because AV Inn was not represented by counsel in this

    matter. Dkt. #25. Counsel later appeared on behalf of

18      Defendants (Dkt. #28), but no further effort was made to assert

    a counterclaim on behalf of AV Inn. The pending counterclaim

19      in this case, therefore, has been asserted only on behalf of

20      Defendant Harooni, not on behalf of Defendant AV Inn. Signed

    by Judge David G Campbell on 1-4-10.

21
22  (Dkt. # 45.)

23       26.  Harooni testified during his deposition on December 4, 2009, that AV

24  Inn Associates owned the real property and leaseholds at the Hotel, and that AV

25  Inn Operations owned and operated the businesses located on that property, i.e. the Hotel,

26  restaurant, bar and banquet hall:

27               [BY MR. GARBARINO]

28

1    Q.    And is it fair to say that AV Inn purchased the hotel or
2  title to the hotel and -- can you answer that question?

3    A.    Yes.

4    Q.    You yourself did not have any interest in the
5  property or the hotel?

6        MR. NATHANSON:  Object to form.

7        One second, Harry.  Object to form.

8        MR. GARBARINO:  Fair enough.

9

10   Q.    You can answer.

11   A.    The LLC owned the property.  And a corporation
12  owned the businesses inside the hotel.

13   Q.    What was the name of that corporation?

14   A.    AV Inn Associates -- no.  AV Inn something
15  corporation.  I don't remember.

16   Q.    Okay.  So I guess -- let me back up.

17        When I use the term "AV Inn" in this deposition, I'm
18  going to change that and use the term AV Inn, LLC.  It seems
19  here that you are telling me there is another entity that may be
20  AV Inn Corp.  I am not familiar with that entity.  So I may be
   misnaming it.  But I'm going to call it AV Inn Corp. if that is
21  okay with you.

22   A.    That is okay.

23   Q.    Is it your understanding that AV Inn, LLC had title to
24  the property under the hotel?

25   A.    Most of the property.

26   Q.    What do you mean by most of the property?

27   A.    It was two different parcels.  One, I was renting, and
28  one, I bought.

1

2      Q.     And AV Inn Corp., what was its role in the hotel?

3      A.     It owned all the businesses inside the hotel.

4      Q.     And what were those businesses?

5      A.     Bar, restaurant.  Basically, that is it.

6

7      Q.     The banquet hall?

8      A.     I don't believe so.

9      Q.     So the banquet hall was part of the operations
       of AV Inn, LLC?

10

11     A.     Actually, no.  All of the businesses, I think even the
       hotel business, was with the corporation.  LLC just owned the
12     land.  That was the -- that was the only function.

13 (Ex. G at 10 l.8 – 11 l.25.).

14     27.    Harooni reconfirmed the fact that that AV Inn Associates owned the real

15 property and leaseholds at the Hotel, and that AV Inn Operations owned and operated

16 the businesses located on that property, i.e. the Hotel, restaurant, bar and banquet hall,

17 during his continued deposition on December 11, 2009:

18             [BY MR. GARBARINO]

19

20     Q.     Okay.  Something that we discussed last Friday was the
       difference between AV Inn Associates 1, LLC and another
21     company that you testified operated the businesses on the
       property; is that correct?
22

23     A.     Correct.

24     Q.     Does the name AV Inn Operations Group, Inc., ring a
       bell to you?
25

26     A.     Yes, sir.

27     Q.     Is that the company that owns and operates the
       businesses on the property where the hotel is located?
28

A.      Correct.

Q.      And does that include the hotel itself, the operations of the hotel –

A.      Yes, sir.

Q.      I'm sorry.  Let me finish my question.

A.      Oh, I'm sorry.

Q.      Does that include the operations of the hotel?

A.      I believe so.

Q.      Okay.  And do you file different tax returns for AV Inn Associates 1, LLC and AV Inn Operations Group, Inc.?

A.      I believe so.

(Ex. H at 8 ll.4-25.).

28.     Harooni is a 50% interest holder in AV Inn Associates, and Harooni's spouse, Jila Harooni, who is not a party to this litigation, holds the other 50% interest in AV Inn Associates.  (*See* Ex. B at BW0012.)

29.     Article II, § 7(B) of the Bylaws permits certain transfers of ownership where the control does not change if specific procedures are followed.  (*See* Ex. C, Art. II, § 7(B).)

30.     The procedures outlined in Article II, § 7(B) were not followed in this case by Harooni, AV Inn Associates, or AV Inn Operations.  (Ex. A ¶ 13-14.)

31.     Best Western propounded written discovery upon Defendants on July 9, 2009.  (*See* Ex. I (excerpts of Plaintiff's Interrogatories to Defendants) & Dkt. # 30.)

32.     Defendants' responses to Best Western's discovery were due on August 9, 2009.  *See* Fed. R. Civ. P. 32(b)(2).

33.     Best Western agreed to an extension of time through September 17, 2009 due to personal matters of Defendants' counsel, and the Court entered an order

1  reflecting Defendants commitment to serve Defendants' discovery responses no later

2  than that date.  (Dkt. # 31.)

3      34.    Despite Defendants' commitment and the Court's order, Defendants did

4  not serve their discovery responses until September 29, 2009, twelve days late.  (*See* Ex.

5  J (excerpts of Defendants' Answers to Plaintiff's Interrogatories).

6      35.    At Best Western's request, Defendants supplemented their responses on

7  October 28, 2009, but Defendants still could not quantify the amount of damages sought

8  or adequately describe the measure of their damages.  (*See* Ex. K (excerpts of

9  Defendants Supplemental Answers to Plaintiff's Interrogatories.)

10      36.    In response to an interrogatory asking "how much Defendants seek to

11  recover from Best Western in the Litigation," Harooni responded that "Defendants aver

12  that Defendants purchased the Hotel for $8.9 million and sold it for $4.8 million. Mr.

13  Harooni spent close to $2 million in renovations, and defendants are attempting to

14  determine how much money they lost due to the malfunctioning reservation system and

15  after the membership was terminated."  (Exs. I ¶ 27 & J ¶ 27.)

16      37.    When asked by interrogatory how damages were calculated, Harooni

17  responded "[b]y assessing expenditures."  (Exs. I ¶ 28 & J ¶ 28.)

18      38.    When asked for an itemized list of specific amounts sought to be

19  recovered, Harooni responded that "Defendants claim damages due to the

20  malfunctioning reservation system and losses sustained as a result of the Hotel's loss of

21  affiliation with Best Western."  (Exs. I ¶ 29 & J ¶ 29.)

22      39.    When asked to identify evidence supporting their claimed damages,

23  Defendants responded as follows:  "Defendants are in the process of acquiring and will

24  produce the Escrow Statements for the purchase and sale of the Hotel.  Defendants are

25  in the process of obtaining the additional financial records from their accountant and

26  will update this answer at that time."  (Exs. I ¶ 30 & J ¶ 30.)

27      40.    After the discovery conference held on October 29, 2009, the Court

28  entered an order stating as follows:

Plaintiff's counsel expressed concern that Defendants have not fully disclosed the damages they will be seeking in their counterclaim. Defense counsel agreed that there have been some problems in Defendants' disclosures due in part to unforeseen health problems, but stated that Defendants will produce a complete expert report by the Court's deadline of November 6, 2009, that will set forth Defendants' damages claims. In light of that coming disclosure, the Court concluded that ordering additional discovery responses is not warranted. The expert reports produced by the parties shall be full and complete expert reports in compliance with Rule 26. The Court stated that if Defendants do not produce an expert report by November 6, 2009, Defendants will not be permitted to present a damages expert.

(Dkt. #35.)

41.    On November 6, 2009, Defendants disclosed a report prepared by Elias Aziz Lavi ("Lavi"), a Certified Public Accountant (the "Lavi Report").  (Dkt. # 36.)

42.    The Lavi Report revealed that alleged damages sought by Harooni were incurred by AV Inn Operations, and entity that is not a party to this case, and is not a party to the Membership Agreement.  (*Id.*)

43.    The Lavi Report stated as follows:

At the request of A.V. Inn Operations Group, Inc., I have reviewed the documentation provided in the above-captioned matter.  My findings are as follows:

1 –    Loss incurred by A.V Inn Operations group, Inc. (A.V. Inn) dues to non-renewal of corporate accounts:

. . . .

2 –    Loss incurred by A.V. Inn due to malfunctioning of Best Western's reservation system:

. . . .

3 –    Loss incurred by A.V. Inn due to withdraw of Best Western name, reservation system and computer software:

. . . .

4 –   Loss on sale of property at lower marker value due to
withdrawal of Best Western name

(Dkt. # 36.)

44.    The Lavi Report makes no reference to losses allegedly incurred by Harooni or AV Inn Associates.  (*See generally id*.)

45.    Harooni disclosed no other expert witness or report other than Lavi and the Lavi Report.  (*See generally id*.)

46.    During his deposition, Lavi testified that his client was only AV Inn Operations:

> [BY MR. GARBARINO]
>
> Q.    Sir, can you tell me who your client was in this matter?
>
> A.    My client in this matter is AV Inn Operations Group, Inc.

(Ex. L at 75 ll.17-20 (Excepts of the transcripts of the deposition of Lavi).)

47.    On December 4, 2010, almost one month after disclosure of the Lavi Report, Harooni testified that the only evidence he could offer with respect to damages was the testimony of Lavi:

> [BY MR. GARBARINO]
>
> Q.   Are you able to testify as to how much you are seeking to recover from Best Western?
>
> A.   Well, I can prepare myself.  Yes.
>
> Q.   But as you sit here today, do you know how much you are seeking to recover from Best Western?
>
> A.   Should I answer that?
>
> MR. NATHANSON:  If you can answer it yourself as a nonexpert –
>
> THE WITNESS:  No.

1

2          MR. NATHANSON:  -- then answer it.

3          THE WITNESS:  Honestly, no.

4          MR. NATHANSON:  Okay.

5          THE WITNESS:  As much as I can

6          BY MR. GARBARINO:

7

8     Q.     Can you explain to me what the measure of the amount
is you are seeking to recover from Best Western?

9

10    A.     I will tell you -- can I answer you in a phrase, please.

11    Q.     Absolutely.

12
      A.     My taxes for the last 10 years showed I made 20 percent
13    return every year on my money.  I could have made that $2
million to $20 million by now.  But I lost everything.  So who
14    can put a price tag on that.

15
          MR. NATHANSON:  Your expert.
16
          BY MR. GARBARINO:
17

18    Q.     Okay.  As you sit here today, you can't tell me today
what the measure of your damages are that you seek to recover
19    from Best Western?

20
      A.     No.
21

22    Q.     And it is my understanding that the damages you are
going to seek to recover from Best Western, the only evidence
23    that you are going to offer is your expert's testimony; correct?

24        MR. NATHANSON:  Object to the form because the
25    expert relies on documents.

26        THE WITNESS:  I would answer it like this.  If you
27    allow for me to bring the broker that has 40 years' experience, if
you allow other witnesses or other names of hotel owners, I can
28    try to get them.  If not, your answer is correct.

1   (Ex. G at 112 l.9 through 113 l.23.)

2       48.    Harooni has made no attempt to seek to amend the pleadings to include

3   AV Inn Operations as a party.  (*See* Dkt. generally.)

4       49.    Harooni has made no attempt to amend his pleadings in an attempt to

5   allege that he is seeking to recover damages incurred by AV Inn Associates or AV Inn

6   Operations.  (*See* Dkt. generally.)

7       50.    Harooni disclosed the Lavi Report, but not Lavi's qualifications or a list

8   of other cases in which Lavi has testified at trial or by deposition during the last four

9   years.  (*See* Dkt. # 36.)

10       51.    The Lavi Report only stated that Lavi considered "the documentation

11   provided in the above-captioned matter" and "general ledgers" without describing with

12   any specificity of what Lavi actually considered.  (*Id.*)

13       52.    Lavi testified that he had not provided counsel for Defendants a

14   curriculum vitae or a list of recent litigation:

15                  [BY MR. GARBARINO]

16

17       Q.    Okay.  Sir, did you provide Mr. Nathanson with your
        CV?

18

19       A.    No.  I have not prepared one for a very long time.  And
        as far as I remember, I couldn't -- I don't have it on file.

20

21       Q.    Okay.  Did you provide Mr. Nathanson with a list of all
        of your litigation experience?

22

23       A.    No.

        Q.    Sir, do you have a listing of your litigation experience
24       for the last ten years?

25

26       A.    No.

    (Ex. L at 16 l.16 through 17 l.1.)

27       53.    Lavi testified, however, that he was most recently deposed as an expert

28   witness 2-3 years earlier.

1

2          [BY MR. GARBARINO]

3          Q.     Do you remember when the last time was that you were
           deposed as an expert?
4

5          A.     I believe it was -- when was it?  I think it was two and a
           half years ago or three years ago.  I'm not sure.
6

7    (*Id*. at 24 ll.10-14.)

8          54.    When Lavi produced the documents he considered in response to Best

9    Western's subpoena, the documents included more than 2200 pages of tax returns and

10   other documents and records disclosed to Best Western for the first time on December

11   4, 2009, almost one month after disclosure of Lavi as an expert witness.   (Ex. M

12   (Declaration of David W. Garbarino).)

13         55.    Despite the fact that the real property under the Hotel was owned by AV

14   Inn Associates, Lavi reported as to AV Inn Operations as follows:

15
           The company sold the property in July, 2009, to avoid incurring
16         additional loss on the operations of the hotel.  The property was
           not sold on the basis of its best use which is a hotel property as a
17         result of the withdrawal of Best Western name but was sold to a
           medical college.   Lost income on the sale of the property
18         amounted to $1,300,000.00.

19   (*See* Dkt. # 36.)

20         56.    Lavi calculated the $1,300,000.00 loss of AV Inn Operations as follows:

21

22   **Loss on sale of property at lower market value due to withdrawal of**
     **Best Western name**
23

24   Previous buyer's offer for the property 6/15/08          $     6,100,000
     Actual selling price (sold to medical college)                 4,800,000
25
                                                              $     1,300,000
26   (*Id*.)

27         57.    Exhibit N hereto is a true and correct copy of the April 8, 2008 letter from

28

1  Best Western to Defendants stating that the Board terminated Defendants' Best

2  Western's membership.  (Ex. A ¶ 19; Ex. N.)

3         58.     Harooni testified that he rejected the $6,100,000.00 offer to purchase the

4  Hotel because it was too low:

5                    [BY MR. GARBARINO]

6

7        Q.     Now, there was an offer to purchase the property, I
   believe, in 2008 which was approximately $6.1 million.  Do you

8  recall that?

9        A.     Yes.

10       Q.     And that was relied upon by Mr. [Lavi] in his report.

11 Do you recall that?

12       A.     Yes.

13       Q.     What happened to that sale?

14

15       A.     Okay.  I tell you what happened to that sale.  I picked
   that because that was the lowest sales amount that I was offered.

16 And the guy was an Indian guy.  I have his name and number
   maybe somewhere.  And he was lowballing me.  And he was

17 ready to take Best Western, buy my place with the Best Western
   headache.  And stood by me for eight, nine months.  And he

18 gave up and left.

19
         Q.     So all that needed to be done to consummate that deal

20 was for you to accept the offer?

21       A.     Yes.  I wouldn't.  It was so cheap.

22

23       Q.     But did you have other offers?

24       A.     Yes.  I had -- I listed it for 8.9 million.

25       Q.     And what was the highest offer you received?

26
         A.     Seven million.
27

28       Q.     Do you recall when you received the $7 million offer?

A.      Shortly after listing it.

Q.      When did you list it?

A.      January or February of 2008.

Q.      So somewhere between January and February of 2008, from the time you actually sold the property, you had an offer for $7 million?

A.      Yes.

(Ex. G at 61 l.17 through 62 l.22.)

59.     The Hotel was not sold until July of 2009.  (*Id.* at 61 ll.12; Dkt. # 36.)

60.     During his deposition, Lavi testified that he had no specific qualification to testify regarding the value of real property:

[BY MR. GARBARINO]

Q.      Okay.  Sir, do you have any background in real estate appraisal?

A.      As an accountant, I come across real estate very often.

Q.      Do you have any qualifications to testify regarding the value of real property?

A.      The value of property?  I don't have a specific qualification for this purpose, and I often am consulted by my clients when they want to go through a purchase or sale of real estate.

Q.      I'm sorry, You said you did have specific qualifications.

A.      I don't have a specific qualification.

(Ex. L at 72 l.l13-25.)

61.     The Membership Agreement contains a limitation of damages provision:

Applicant agrees that Applicant shall be limited to actual damages for any breach or default by Best Western of any obligation or duty owed to Applicant, and Applicant further agrees that Best Western's liability for any damages shall be

> limited to the amount of the membership fees actual paid by Applicant in connection with the Hotel, during a single fiscal year in which the breach or default occurred.

(Ex. B ¶ 33.)

62.     Harooni claims that Terry Wininger, Best Western District Manager, "induced Mr. Harooni to purchase the hotel after 2 other buyers backed out," and "promised to provide support because of his inexperience in the hotel business."  (Ex. J ¶ 11.)

63.     Harooni claims that "[s]ome of the services that Plaintiffs promised Defendants were pursuant to oral agreement."  (*Id*. ¶¶ 18, 25, K ¶¶ 11, 18.)

64.     In supplemental responses to Best Western's discovery, Harooni stated as follows:

> Ms. Wininger stated Best Western had various support that would be available to Mr. Harooni to aid him in running the hotel, including money management, account management, design help. These representations were made orally during the initial interview and there are no documents containing these promises.
>
> . . . .
>
> The oral agreement was between Terry Wininger and Hooshang Harooni made on the day of the initial interview for the membership. Ms. Wininger promised various support to help Mr. Harooni in running the hotel if he was to purchase the hotel. Those promises included money management, account management, design help, and general help with day to day operations of the hotel.

(Ex. K at ¶¶ 11, 18.)

65.     Harooni testified that the alleged oral agreements/promises were made before Harooni executed the Membership Agreement.  (Ex. H at 16 ll.19-21.)

66.     The Membership Agreement states that "[i]f the application is approved in writing by Best Western, the Membership Agreement and License Agreement sections will control the relationship between Applicant and Best Western."  (Ex. B at ¶

1.)

67.     The Membership Agreement further states as follows:

> This Membership Application and Agreement embodies the whole agreement of the parties.  There are no promises, terms, conditions or obligations other than those contained herein.  This Membership Application and Agreement shall supersede all previous communications, representations, or agreements, either verbal or written, between the parties hereto.

(*Id.* ¶ 43.)

68.     When asked to identify the terms of the alleged oral agreements and promises, Harooni could only testify in vague indefinite terms:

> BY MR. GARBARINO:
>
> Q.    So, specifically, what support did Terri Wininger tell you Best Western would provide?
>
> A.    Specifically, what I recall was three items.  She said three or four items.  She said we have design people standards.  She showed me all of the room, design room, and people working on design and stuff.  That  wasn't part of her sales pitch.  And she said we have money manager who monitor your accounts at all times.  That was good just in case anything goes wrong.  They are there to help you.  And like Mitch type of a person that comes there all the time.  And she said we give you -- all the help we can give you, we will give you.

(Ex. G at 52 ll.4-16.)

69.     When asked what the terms of the oral agreements/promises were, Harooni responded as follows:

> A.    Having the two major diseases and working for 30 years and not even -- I didn't even have one time defeat, so I wasn't going to make a mistake, so I went for interview with Terry Wininger to qualify me, and she assured me that "Don't worry, everything is going to be okay, we have money manager, we have people that come in to monitor your revenue for you, we have a field officer, anytime you want, he'll be there to help you with any questions that you have."  And the other chain -- and at that time, I said, "I like Best Western name myself too," so I

thought it would be a good name for that location, so I went for it.

    Q.    So what are the terms of the actual oral agreement that you just discussed?

    A.    I didn't know it was supposed to be a term.  What do you mean by that?

    Q.    What obligation did Best Western have to you under the agreement that you just set forth?

    A.  To help me with the account.

(Ex. H at 12 l.20 through 13 l.13)

    70.    Kamyar Refoua ("Refoua"),[2] Harooni's assistant, who was present at the initial meeting between Harooni and Best Western, testified that Wininger explained the services "[v]ery vaguely" stating that Wininger was simply explaining the services Best Western offered members, "[it] was not specific for us," but rather "service they provided to all the members."  (Ex. O at 23 ll.8-15, 25 ll.15-22 (excerpts of transcript of deposition of Refoua).)

    71.    Refoua testified that the account monitoring was not specific for the Hotel, but was a service offered to all Best Western members.  (*Id.* ¶ 25 ll.15-22.)

    72.    When asked whether he paid additional amounts for the support to be provided above and beyond that guaranteed by the governing documents, Harooni testified that he had no idea and could not remember:

    [BY MR. GARBARINO]

    Q.    So what are the terms of the actual oral agreement that you just discussed?

    A.    I didn't know it was supposed to be a term. What do you mean by that?

    Q.    What obligation did Best Western have to you under the

---

[2]    Refoua also goes by the name Kevin.

agreement that you just set forth?

    A.    To help me with the account.

    Q.    What consideration did you give Best Western for that obligation?

    MR. NATHANSON:  Objection.  You're asking for a legal opinion of the witness.

    A.    I gave my life, my time, my effort, my experience, money, everything that I had and promised, and I was always in contact with Terry.  She was nice to me, and Mitch was very nice up to the last appraisal that he did for us, last thing, then nobody ever saw him again.

    BY MR. GARBARINO:

    Q.    Do you know if you paid any more than any other Best Western under the membership agreement and application?

    A.    Honestly, I have no idea.  I was happy.  I paid 50-some. I don't know how much was the money -- 5   or 35-.  I don't even remember.

(Ex. H at  13 l.7 through 14 l.5.)

73.    During the time Defendants were Best Western members, Best Western neither assessed nor charged Defendants, nor received payment from Defendants above and beyond the amounts permitted to be assessed and/or charged to Defendants as a Best Western member per the Governing Documents.  (Ex. A ¶ 12.)

74.    Defendants claimed, in response to an interrogatory, that the inspections resulting in termination of Defendants' Best Western membership were "capricious" and that the Best Western inspector, Mitch Van Wormer ("Van Wormer"), took points off for items previously approved.  (Ex. J ¶ 15.)

75.    In a supplementing response to Best Western's interrogatories, Defendants claimed that previously approved items resulted in deductions on the October 25, 2007 inspection. but made no similar claim with respect to the January 31,

2008 inspection.  (Ex. K ¶ 15.)

76.    In response to interrogatories expressly requesting Defendants to "[i]dentify each and every fact that Defendants rely upon to allege that any inspection score was unjustly issued or given by Best Western with respect to the Hotel," Defendants disclosed no evidence that the January 31, 2008 inspection score was unjustly issued.  (*See* Exs. I ¶ 15, J ¶ 15, K ¶ 15.)

77.    Defendants' own head housekeeper, Lina Eseltine ("Eseltine"), testified that Van Wormer's inspections were consistent:

[BY MR. GARBARINO]

Q.    Is it fair to say that, when Mitch saw a problem, he deducted a point?

A.   Yes.  Yes, he did deduct points.

Q.    Did Mitch ever see problems when he didn't deduct points?

A.    If it was something little -- if it was something little, he would say, you know, this doesn't make any sense.  He would say like if he would find a little stain on a chair or something like that.  But he would always take a picture of it.

Q.  But it would have to be a very small problem?

A.   Very little, very small.  I would say, please don't take any points off.

(Ex. P at 46 l.16 through 47 l.3 (excerpts of transcript of deposition of Lina Eseltine).)

78.    The General Manager of the Hotel, Cheryl Duggan ("Duggan"), who also observed several inspections performed by Van Wormer, testified that Van Wormer would not overlook problems, and that he would mark down deficiencies he saw and deduct points for such deficiencies:

[BY MR. GARBARINO]

Q.    Did you have the impression that Mitch would overlook

1    any problems that he saw?

2        A.    No.

3

4        Q.    Was your impression, if Mitch saw a problem, he
     marked it down on his inspection report?

5

6        A.    Yes.

7        Q.    And he would deduct points for that problem?

8        A.    Yes.   I know how the process goes.   I did cite
     inspections a lot.

9

10

     (Ex. Q at 42 ll.3-11 (excerpts of transcript of deposition of Cheryl Duggan).)

11

12        79.    Eseltine, who was present for each of the two failing inspections, as well

13   as previous inspections, verified the existence of numerous physical conditions giving

     rise to each of the failing scores:

14

15            [BY MR. GARBARINO]

16        Q.    If we can look at Exhibit 10,[3] which is a similar
     inspection report for October 25th, 2007.   If we turn to
17   BW0173, the inspection report lists a number of rooms that
     were inspected.

18

19        A.    Yes.

20

21        Q.    Do you specifically recall the inspection of these rooms
     on October 25th of 2007?

22        A.    Yes.

23

24        Q.    One of the rooms inspected is 393.

25        A.    Yes.

26   _____

     [3]    For the sake of clarity and efficiency, the same deposition Exhibits and assigned Exhibit
27   numbers were used for the depositions of Eseltine, Duggan, Lisa Wilkerson, Refoua, and
     Harooni.  Exhibits 10 and 12 to the Eseltine deposition transcripts are the same as Exhibits 10
28   and 12 to the Harooni deposition transcripts which are filed herewith as Exhibits E and F to
     Plaintiff's Statement of Facts in Support of Motion for Summary Judgment.

Q.      Do you recall the last time this room was inspected?

A.      I think the last time was with the woman because she was the last one that came to inspect.

Q.      But before October 25th of 2007, do you recall that this room had been previously inspected?

A.      I don't remember.

Q.      Fair enough.

        Turn to page BW00175 under the heading Bed Coverings, Linens, and Pillows.  It states that the inspector found hair on bed sheets in 293 and 267.

A.      He found one hair on the edge of the sheet, but I think it was the maid's.

Q.      So you recall seeing hair on the sheet in room 293 or 267?

A.      Yes.

Q.      In both rooms?

A.      In 393.

Q.      She recall seeing hair on the bed in 393, not 293?

A.      Oh, yes, yes.  In this one.

Q.      In 293?

A.      Yes.  It was on the edge of the sheet.

Q.      And did you also see hair on the bed in room 267?

A.      The maid did change that room, but the blanket did have a little hair.

Q.      Did Mitch previously find hair in his inspection of the hotel rooms and not deduct points?

A.     I think he did deduct points.  He would say that hair was very -- no.  He didn't like it, and neither did I.  No.

Q.     So Mitch would deduct points every time he found hair in an inspection of the room?

A.     Yes.  I'm going to get marshal.  What is marshal?  What does that mean?  It was either too few points or too little points.

But he would always tell me that the rooms were excellently cleaned.   I always passed the inspections for cleaning always, always.   And he would tell me that I did excellent work.

Q.     On that same page just above where we were discussing before, there is a heading Beds, Box Springs and, Mattress.  It states that the bed sets are showing visible sagging in mattress and/or box spring in 393.

A.     Well, if I didn't turn them every three months, they would get a little saggy.  I always brought the young men in to turn the mattresses over.  But that time he just happened to go into that room.  And those rooms were not made.  They were not made up.

Q.     So you agree that in room 393 there was a sagging mattress?

A.     Yes, a little bit.  Very little.  It was just wavy.  The guest would not know, but Mitch did.

Q.     If we go to the next page BW0176.

A.     Okay.

Q.     There is a heading called Tubs, Showers, Surround, Grout.

A.     Yes.

Q.     And there is a statement that there is a rust stain on tub bottom in 267.  Do you recall seeing this rust stain?

A.     Yes.  I tried to take it off with several chemicals, but they wouldn't go away because those tubs were very old.

Q.     And just moving down a bit there, it says vanity, counter, wash basin.  Vanity top outside the bathroom has a worn finish in 134.

A.     The window.

Q.     Do you recall seeing that worn finish?

A.     I do remember it, but we did fix it.  And then afterwards he put marble on it.  He put marble in all of the rooms.

Q.     Do you recall when he put marble in all of the rooms?

A.     That was almost the last thing he did when he remodeled.

Q.     If we can go to the next page, BW0177.

A.     Yes.

Q.     You agree under the heading Buildings, Roofs that the inspector noted the roof is damaged in this building.

A.     Yes.

Q.     And would you also agree that under the heading parking lot, trash areas, delivery, et cetera, that the inspector noted that the parking lot surface is very cracked and damaged?

A.     Yes.

Q.     And do you agree that the parking lot surface was very cracked and damaged at that time?

A.     Yes.

Q.     And, again, this report notes that the trash area door at the rear of the property is broken.

A.     Yes.

1    Q.     Do you recall that being true?

2    A.     Yes.  But he repaired it later.  The trucks would break it
3    when they would pick up the garbage.  So he fixed it like three
4    times.  About two or three times he sent maintenance in to fix it.
     Put new ones.  (In English.)

5    Q.     Fair enough.  If we could take a look at Exhibit 12.

6
7           (Plaintiff's Exhibit 12 marked.)

8           THE INTERPRETER:  Counsel, can go off the record.

9           (Recess.)

10          BY MR. GARBARINO:

11
12   Q.     Exhibit 12 is a summary report dated January 31st,
     2008.  Do you recall specifically attending this inspection?

13
14   A.     Yes.  She was very hard.

15   Q.     And the inspector this time was different; right?

16   A.     Yes.  She was very picky.

17   Q.     And on BW428 the report states that rooms 105, 115,
18   134, 163, 258, 157, 180, 286, 388, and 264 were inspected.

19          Do you recall the inspections of those individual rooms?

20
21   A.     Yes.

22   Q.     Turning to BW430, there is a heading entitled
     Equipment.  And under that heading it says, Top of A/C
23   scratched in room 180.  Do you recall that scratch?

24   A.     Yes.

25   Q.     Turning to the next page BW0431, under the heading
26   chrome, it says the tub chrome was tarnished in room 180 and
     388.  Do you recall that tub chrome tarnished?
27

28   A.     It wasn't tarnished.  It was like worn out.  But he put

them in new later.

Q.     Fair enough.  A little further down, it says is Toilet Seat, Bowl, Tank.  Under that it says toilet bowl has hard water build up in room 258.

A.     Yes.

Q.     Do you recall seeing that?

A.     Yes.  There was a liquid that I would put on to remove it, but then it would come back.  Once the room was vacant for one or two weeks, it would build up again.

Q.     So was that a common problem in all of the hotel rooms?

A.     No, no.  It was more of a problem or more of a problem in the two story because it was older.  But they installed all new toilets.

Q.     Do you know when they installed all new toilets?

A.   It was in 2007, I think.  When was this inspection?  I think that, when she inspected, they hadn't all been changed yet. Some but not all.

Q.     Turn to the next page BW0432.   Under the heading Buildings, Roofs, it states, "Roof edge damaged on overhang near Japanese garden."

A.     Yes, yes, yes.  I know.

Q.     Do you recall seeing that damage?

A.     Yes.  After that actually my brother fixed it because he worked --We didn't put my brother on the list.  (In English.)

Q.     I understand.  Not a problem.

Is this the same roof edge damage that had been noted on the previous inspection reports?

A.     Yes.  But it was actually on both sides.  It first got it on

1   one side.  And then that was fixed.  And then it went to the other
2   side.

3       Q.    Go down a little further.   There is a heading
4   Elevators/Lifts Interior or Exterior.   And it says, "Elevator
    panels have holes and scratches."   Do you recall seeing the
5   holes and scratches?

6       A.    Yes.

7       Q.    Are these the same defects with the elevator that had
8   been noted in the previous inspection reports?

9       A.    I think the scratches were, yes, but not the holes.  I think
10  that people are very mischievous, and they do things.

11      Q.    Maybe some of those children from the soccer and
12  baseball teams.

13      A.    Exactly.  The soccer.  They destroy the hotel when they
14  come.  (In English.)

15      Q.    And if we go further down, there is a heading, Parking
16  Lot, Trash Areas, Delivery et cetera.  And the inspection report
    says that the parking lot has numerous cracks.

17          Is that an accurate description of the parking lot on the
18  date of this inspection?

19      A.    Well, there was some pavement that was cracked.  But
20  as far as the borders and the lines, my brother painted some.
    My brother was the painter for the hotel.
21

22      Q.    And did he paint those after January 31st, 2008?

23      A.    Yes.  They were painted, yes.

24      Q.    After January 31st?

25      A.    Yes.  After she was inspecting, they painted them, yes.
26
    (Ex. P at 33 l.3 through 41 l. 6 (excerpts of transcript of deposition of Lina Eseltine).)
27
        80.    Harooni also testified that he has no first hand knowledge or basis to
28

1   contest the October 21, 2007 inspection score:

2                      BY MR. GARBARINO:

3

4       Q.      I have Exhibit 10 sitting before you.  Do you agree that
        that is the inspection report dated October 25th of 2007?

5

6       A.      Correct.

7       Q.      And you believe you were present for this inspection?

8       A.      Definitely.

9       Q.      And the inspector was Mitch?

10

11      A.      Correct.

12      Q.      Turn to the next page.  And I'm going to refer to the
        Bates numbers at the bottom.  We will start with BW when I am
13      referring to a page number.  And we are looking at BW0173.

14      A.      Correct.

15

16      Q.      It has a heading there stating "names of participants and
        position titles."  And it names Christina, the manager.  And
17      Lina, the head housekeeper.  Do you agree with that?  A.    I
        know I talked to him at the end before he leaves.

18

19      Q.      So you weren't present for the entire inspection.

20      A.      That could be correct.

21      Q.      Do you remember actually going to any rooms with
22      him?

23      A.      No.  I have foot problem.  So I probably didn't walk all
        the time, especially when Mitch comes in.
24

25      Q.      Okay.  So the extent of your contact with Mitch during
        this inspection was possibly talking to him briefly after the
26      inspection?

27      A.      Correct.  I make the correction.

28

Q.     So with respect to any particular point deduction Mitch deducted off, how do you have a basis to challenge that point deduction?

A.     Okay.   The only thing I have to say, from day one, whenever Mitch came in, he came out as a friend and was the nicest guy in the world.   And he was friendly enough.   And he was there all the time, I thought, not only as an inspector more as a friend and a person who patted me on the shoulder and check up on progress report to see what more have I done.

And he in the whole two-and-a-half years, three years not even once he said you are doing a bad job.   And then the last time that he was there, and he never showed up.   He turned his face around.   And I said, Mitch, what are you doing?   I'm selling the place.   He said that is what it is.   And he walked away.   And that wasn't him at that time, I'm thinking.

And then I called the headquarters and said to talk to Terri.   I said, Terri, please don't do this to me.   What are you doing?   She said.   Sorry.   The 48 hours has passed.   I called him two, three days later and said you had only 48 hours to get a reinspection.   And I said Terri, you can -- it is out of my hand.   What do you mean out of your hands?   That is how it works.

Q.     My question to you was, what basis do you have to object to any particular deduction?

A.     That is what I'm objecting because he never treat us like that to just take off every little point and walk away.

Q.     But you also heard the testimonies of Lina.

A.     Correct.

Q.     Correct?

A.     No, no.   I wasn't here for Lina.

Q.     And Cheryl; correct?

A.     Yes.

Q.     Who testified that every time Mitch was there, if he saw

a problem, he deducted a point.  Do you disagree with that now?

A.   Yes.

Q.   But you weren't with Mitch when he conducted this inspection?

A.   No.  Well, this is how Mitch was doing it.  He would forgive and forget some of the things when we were remodeling.  He said, I should take a deduction out of this.  But he won't take it and, he would go.  And he comes back.  But then the last time he did not do that.


. . . .

Q.   So other than what you have stated here today, you have no other basis to objecting to the inspection scores?

A.   No, because he was a good friend to the last minute.

(Ex. G at 88 l.15 through 92 l.16.)

81.    Harooni also verified the existence of numerous physical conditions leading to point deductions in the January 31, 2008 as well:

[BY MR. GARBARINO]

Q.   Okay.  Let's start on BW0431.

A.   Okay.

Q.   Actually –

A.   The next page.

Q.   -- the previous page, 430.  The first deduction was for visible patch on ceiling.  Do you disagree that this condition existed?

A.   What is the English word for it?  It is like optional.  I mean, one worker would say I fixed it.  One worker would say it shows.

Q.   But my question is fairly straightforward.  Do

1    you disagree that this condition existed?

2            A.      Yes.

3            Q.      You have reason to dispute the existence of this
4    condition?

5            A.      How can I be fair?  Yes.

6
7            MR. NATHANSON:  Just answer the question.

8            THE WITNESS:  Yes, it did.

9            BY MR. GARBARINO:

10
11           Q.      Yes, it did exist?

12           A.      Yes.

13           Q.      Let's go to the next point deduction.  Scratches
14   and damage to surface of furniture in 388.  Do you disagree
     with the description?

15
16           A.      No.

17           Q.      The next one A/C grill vent dusty.   Do you
18   disagree with the existence of that condition?

19           A.      Maybe.

20           Q.      What is your basis for disagreeing with that?

21           A.      Okay.   Because we have like -- Cheryl put a
22   system that every three months or two months somebody goes
     and clean all of those.  I don't know whether the lady came at
23   like a month and a half afterward or two days after.

24           Q.      Okay.  But do you have reason to disagree –

25           A.      No.  I have no reason to disagree.

26
27           Q.      And to be clear, you have no reason to disagree
     with the existence of A/C grill vent dusty on the date that the
28   inspection was performed?

1

2          A.      No.  They took a picture.

3          Q.      And the same with top of A/C scratched in 180,

4    do  you  have  any  disagreement  with  the  existence  of  that

     condition on the date the inspection was performed?

5

6          A.      No.

7          Q.      Next page hairdryer vent has lint build up on it,

8    388.  Do you have any reason to disagree with the existence of

     that condition?

9

10         A.      No.

11         Q.      Tub chrome tarnished, 180, 388.  Do you have

     any reason to disagree with the existence of that condition?

12

13         A.      No.

14         Q.      Exhaust fan dusty, 105, 134.  Do you have any

     reason to disagree with the existence of that condition?

15

16         A.      No.

17         Q.      Mirror desilvered, 105.  Do you have any reason

18   to disagree with the existence of that condition?

19         A.      Maybe.

20         Q.      What is your basis for disagreement?

21         A.      I mean, it doesn't make sense.  Mirror desilvered,

22   what does that mean?  Can you show me the picture.

23         Q.      I will try to find it.  Let's keep moving here.

24              The next one is toilet bowl has hard water build

25   up, 258.  Do you have any disagreement with that condition?

26         A.      No.

27         Q.      Next one, "part of plastic holder glued to tilew in

28   tub, 258."

Do want to see a picture of that one?

A.     No, I don't want to see it, but I want to explain something.  When the first time -- the last time that Mitch was there, I called.  And I said that inspection was not fair to send somebody else to reinspect.

Terri Wininger herself told me that 48 hours has passed. And she cannot send somebody else.  And I turned around and told her then -- I was up to what she is trying to do.  And I told her then I will do it the next time.  I remember for next time.

The next time the minute she left, I called.  And you know what they told me.  They say we are not coming back unless you pay a few thousand dollars and request.  And then the only -- we only come to look at our pictures to prove that we were right.

Then why didn't she tell me that before the last time talking.  So now I object to every single thing that she took off because Mitch never did that to us.  Now the pictures might say something.  But I disagree the way they did the business.

(Ex. G at 105 l. 25 through 109 l. 17.)

Moreover, with respect to the January 31, 2008 inspection report (Ex. F hereto), Harooni agreed that the conditions described in the January 31, 2008 inspection report could have existed:

[BY MR. GARBARINO]

Q.     Do you disagree with the description or the existence of any of the items that Ms. Bree noticed in the January 31st, 2008 inspection report?

A.     According to the past, yes.

Q.     Okay.

A.     Whether they existed or not, to her opinion, no.

Q.     Do you have any basis to dispute the existence of the physical conditions noted –

A.      Yes.

Q.      -- in Cindy Bree's report?

A.      Yes.

Q.      What basis do you dispute the physical existence of these conditions?

A.      Okay.  For example, what do you call a 2-by-10 area of three roses in the middle of winter that is there when it is blooming?  Is that a crime?

Q.      I'm not trying to get to –

A.      No, no.  I understand.  I'm just nervous.

Q.      Let me finish my question.

I'm not trying to get to your opinion whether it was right or wrong.  I'm simply asking you whether, as she has described in the inspection report, whether those conditions actually existed.

A.      Yes.

Q.      Are there any conditions in the inspection report that you dispute as actually in existence, putting aside your personal feelings as to whether it was right or wrong, whether the actual condition did not exist?

A.      Well, the curb appeal that nobody can – and the landscaping.  Those two are.  But everything else could exist without me having heard anything about it before.

(Ex. G at 97 l.11 through 98 l.19.)

82.      When asked about the Board meeting when the Board considered whether Defendants' membership should be terminated, Harooni failed to identify any conduct that would demonstrate bad faith by the Board:

[BY MR. GARBARINO:]

Q.     Can you tell me what happened during the [board] meeting.

A.     Yes.  I have to act.  Okay.  There is a big guy standing at the door.  There is a security guard, but he doesn't tell you because, apparently, they have too many people trying to kill them or something.  He opens the door.  He touches you.  He does, come on in.  Have a sit.  He sits you.  And he stands right behind you.

And the people ask you questions.  90 percent of the questions they ask was how much your hotel is worth?  You want to sell it?  Or you don't want to sell it?  They were trying to get information out of me to see if they have a buyer if they can put me down so somebody buys it cheap if you are asking me.

I told them in that meeting I have money.  I do anything that is necessary to fix the place.  I kiss your foot.  I do anything.  Please don't take my livelihood away.  I am sick the minute I said I am sick, I guess they saw the ring.  And they put the knife through my back.

And they said, thank you very much.  Have a nice day.  We let you know.  And I got this letter from Terri saying as of immediately we are taking everything out.  And you are done and finished.

Q.     How long did the meeting last?

A.     15 minutes max.

Q.     Do you recall who on the board asked you questions?

A.     A couple of ladies and a guy.

Q.     You don't remember the names?

A.     No.

Q.     Do you remember any specific question they asked you?

A.     Yeah.  How many rooms have your hotel?  How much

do you want to sell it?  How much your bottom line is?  All of the questions that the buyer would ask to buy a place, not to find out how much you think it would cost you to finish the remodeling.

I said 2-, $300,000.  And they said, no.  We think it is more than $1 million.  I said, whatever it takes, I have the money.  I spend it.  What do you care?  I will do it right away. Have a nice day.  And they should have a transcript of that.

Q.      And did you present anything to the board?

A.      Well, I present -- I don't remember.  I took some document.  And I said whatever is missing from whatever you want, I get it done in less than a couple of months.  And give me six months everything will be perfectly done.

(*Id*. at 116 l.1 through 117 l.25.)

83.      The Governing Documents include provisions relating to Best Western's reservation system.  (*See* Exs. B ¶ 16, D Ch. IV.)

84.      The Governing Documents did not guarantee that Best Western's reservation system, including the software and hardware used at the hotel level, will be free of errors and malfunctions at all times.  (*See generally* Exs. B, C, and D.)

85.      The Membership Agreement recognizes that errors and malfunctions are bound to occur when it states that the member shall "participate in the troubleshooting process" should a failure or interruption occur, and that "[i]t shall be the sole responsibility of Best Western to make final problem determination and dispatch technical resources as needed to achieve problem resolution," thereby eliminating any unrealistic expectation that Best Western's reservation system may error be proof all of the time.  (*See* Ex. B ¶ 16.)

86.      The Hotel's Director of Sales, Lisa Wilkerson ("Wilkerson"),  testified as follows:

[BY MR. GARBARINO:]

Q.      Now, it is my understanding that you personally encountered problems with the reservation system.

1

2        A.      Yes.

3        Q.      Can you tell me what those problems were.

4        A.      When I was trying to figure out how to work their
5    system with having a basic idea how the usual system works,
6    when I got into it and started poking around, there were some
7    things that didn't make any sense.  No one at the property left
     could answer it.

8                And they called Best Western.  And they said Mitch --
9    I have no idea what his last name is.  He showed up.  And we
     sat down together.  And we went through some things.  And
10   when we got into the system, there was a problem with not
11   getting any reservations.  And Mitch found that problem when
     we stumbled across the -- that the reservation system had been
12   closed out for the previous three months.

13       Q.      When did you first notice that there was a problem?

14       A.      Three weeks after I started.

15       Q.      So in terms of months, in March, 2005 –

16       A.      March, well, February.

17       Q.      When you did call Mitch?

18

19       A.      I called him as soon as I got in and realized I didn't
20   know what I was doing and nobody could help me.  And they
     offered to send him.  I just needed somebody to show me.

21

22       Q.      Do you know when you placed that call to Best
     Western?

23

24       A.      I have no idea.

25       Q.      Was it in February of 2005?

26       A.      Could have been, probably.

27       Q.      Could it have been in March of 2005?

28

A.      Could have been, probably.   I called him constantly every day for weeks.

Q.      Okay.  What I'm trying to figure out is the first time that you called to discuss the problem with Best Western?

A.      It wasn't a problem.  I didn't know there was a problem because I didn't know what I was looking at. He came to teach me, to understand what it was I was looking at.  He was my only training that I had.  So it wasn't an official training.

Q.      So do you think you called him in February of 2005?

A.      Sure.

Q.      And how soon after you requested assistance did Mitch come down?

A.      One week later.

. . . .

Q.      Now, when Mitch came to work with you in the reservation system, what did he do to help you out?

A.      I needed to learn how to open and close out dates. Showed me how to monitor the TDS that they have, how to block dates, how to make reservations, how to tell how many rooms we had available, how to tell what dates were available. Just the general everyday use of our reservation system.

Q.      Had you been trying to do all of these tasks before Mitch came out to give you some help?

A.      (No audible response.)

Q.      Is that a yes?

A.      Sorry.  Yes.

Q.      Did you continue to have problems with the system even after Mitch came out and helped you out?

A.      Once he helped me get it fixed and back to where it

was, the year I was there, it seemed to work fine from then own
on as long as it was monitored.  Passwords were given to people
so only certain people could get in.

(Ex. R at 17 l. 13 through 20 l.19 (excerpts of deposition of Lisa Wilkerson).)

87.   While Wilkerson testified she started to work at the Hotel in 2005, defendants' other witness, Cheryl Duggan testified that Wilkerson did not start with the Hotel until 2006, approximately one year after AV Inn Associates purchased the Hotel. (*See* Ex. R at 72 l. 18 through 74 l.4)

88.   The Hotel's General Manager, Duggan, testified that the issue was actually resolved within a day or less by the Hotel's own personnel:

[BY MR. GARBARINO:]

Q.   Okay.  So once you discovered there was a problem,
how long did that take to get it fixed?

A.   A day, an hour, whatever it takes to go in and open it
up.

(*Id*. at 37 ll. 2-5.)

89.   Harooni did not retain professional sales staff until early 2006 believing that he could do it himself with his assistant Refoua (Ex. G at 29 ll.4-7).

90.   The Governing Documents contain no provision obligating Best Western is to inform its members of deadlines to submit RFP's to potential customers.  (*See* generally Exs. B, C, and D.)

91.   Defendants agreed to pay Best Western "fees, dues, charges, and assessments imposed generally on the membership by the Board, and the cost of all goods or services provided or by or ordered through Best Western," and that "[p]ast dues amounts shall bear interest at the rate of one and one half percent (1.5%) per month from the due date until paid."  (*See* Ex. B ¶ 12.)

92.   The Best Western Bylaws provide that "[a]ny member may resign from [Best Western] at any time but if the Member resigns or is terminated, fees and dues for the remainder of the fiscal year will become immediately due and payable."  (*See* Ex. C

Art. 2 § 5(B).)

93.    As of December 1, 2008, Defendants owed Best Western $75,219.59 representing certain fees and other charges imposed on Defendants pursuant to the Governing Documents as demonstrated by Exhibit 2 to Best Western's Compliant (Dkt. # 1-2).  (*See* Ex. A ¶ 21.)

94.    Exhibit 2 to Best Western's Complaint  (Dkt. #1-2) is a true and correct copy of the Statements reflecting the amounts owed by Defendants to Best Western as of December 1, 2008.  (*Id*. ¶ 22.)

95.    All of the charges, fees, dues, and assessments reflected upon the Statements filed with Best Western's Complaint (Dkt. #1-2) are charges, fees, dues, and assessments permitted to be charged to Defendants pursuant to the Governing Documents, and only pertain to activity occurring in 2008.  (*Id*. ¶ 23.)

96.    When asked to identify each and every fact that Defendants' relied upon to deny the allegations contained in paragraph 21 of Best Western's Complaint (alleging in part that "[a]s of December 1, 2008, there remains due and owing by Defendants to Best Western the sum of $75,219.59, representing certain fees and other charges imposed upon Defendants as Best Western members"), Defendants' responded in part that "Defendants further deny that they owe Best Western "certain fees and other charges" for services that were not satisfactorily provided by Best Western," but offered no specific examples.  (*See* J at ¶ 1.)

**DATED** this 19th day of March 2010.

SHERMAN & HOWARD L.L.C.


By /s/ David W. Garbarino
    Arthur W. Pederson
    David W. Garbarino
    2800 North Central Avenue, Suite 1100
    Phoenix, AZ 85004-1043
    Attorneys for Plaintiff

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 19, 2010, the foregoing was electronically transmitted to the Clerk's Office of the U.S. District Court for the District of Arizona using the CM/ECF System for filing and service upon the following individual via email:

Kira A. Schlesinger
The Schlesinger Conrad Law firm
11811 N. Tatum Blvd., Ste. 3037
Phoenix, AZ 85028
kira@schlesingerconrad.com

/s/ David W. Garbarino