# EXHIBIT G

**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

        Plaintiff,

    vs.                       CASE NO. CV082274PHXDGC

AV INN ASSOCIATES 1, LLC; and
HOOSHANG HAROONI,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**HOOSHANG HAROONI**

December 4, 2009
10:33 a.m.

1875 Century Park East, Suite 500
Los Angeles, California

MARYAM T. SALAHUD-DIN, CSR No. 9669



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

## 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

    Plaintiff,

    vs.          CASE NO. CV082274PHXDGC

AV INN ASSOCIATES 1, LLC; and
HOOSHANG HAROONI,
    Defendants.
-------------------------------

DEPOSITION OF
HOOSHANG HAROONI

December 4, 2009
10:33 a.m.

1875 Century Park East
Suite 500
Los Angeles, California

MARYAM T. SALAHUD-DIN, CSR No. 9669

## 3

INDEX OF EXAMINATION

WITNESS: HOOSHANG HAROONI
EXAMINATION            PAGE
By Mr. Garbarino         5

## 2

APPEARANCES OF COUNSEL

For the Plaintiff:

SHERMAN & HOWARD
BY:  DAVID W. GARBARINO
Attorney at Law
2800 North Central Avenue, Suite 1100
Phoenix, Arizona 85004-1043
602.240.3000

For the Defendants:

THE NATHANSON LAW FIRM
BY:  PHILIP J. NATHANSON
Attorney at Law
120 North LaSalle Street, Suite 1000
Chicago, Illinois 60602
312.782.3322

## 4

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 1 | Document titled "Brief Two-Year History for Current Owner | 19 |
| 2 | Chart | 81 |
| 3 | Document titled "Best Western Profit & Loss January through December 2005" | 71 |
| 4 | Document titled "Best Western Profit & Loss January through December 2006" | 71 |
| 5 | Document titled "Best Western Profit & Loss January through December 2007" | 71 |
| 6 | Document titled "Best Western Profit & Loss January through June 2008" | 71 |
| 7 | Best Western International, Inc. Membership Application and Agreement | 67 |
| 10 | Document titled "Summary Report North American Quality Assurance Assessment," dated 10/25/2007 | 64 |
| 12 | Document titled "Summary Report North American Quality Assurance Assessment," dated 1/31/2008 | 65 |
| 17 | Letter dated March 21, 2008 to The Board of Directors Best Western International, Inc. from Hooshang Harooni, Bates stamped BW0562 through 579 | 118 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

### 5

1    DEPOSITION OF HOOSHANG HAROONI
2              December 4, 2009
3
4          HOOSHANG HAROONI,
5    having been first duly sworn, testifies as follows:
6
7            EXAMINATION
8    BY MR. GARBARINO:
9        Q. Good morning, Mr. Harooni. How are you doing
10   this morning?
11       A. Fine.
12       Q. You have attended several of the depositions
13   that I have taken here to date. And I assume you have
14   heard the ground rules that I went over in those
15   deppsitions. I'm going to go over them briefly to make
16   sure that we have them on the record here today.
17           Do you have any previous depo experience, or
18   have you ever been deposed before?
19       A. No.
20       Q. Do you understand that the court reporter is
21   taking down everything that I say here today,
22   and it is easier for her to take down things when only
23   one person is speaking at a time?
24       A. Yes.
25       Q. So I will do my best to let you finish any

### 6

1    answer to my question. And I will ask the same, that
2    you wait until I finish the question before you begin to
3    answer it. Is that okay?
4        A. Yes.
5        Q. And as I have said before, head shaking,
6    nodding, uh-huhs, huh-uhs don't make it on to the record
7    very well. So please don't be offended -- it is
8    obviously human nature to answer questions in that way.
9            But if I ask you for a yes or no, don't feel
10   embarrassed. I'm just trying to make sure that the
11   record is clear on that issue.
12       A. That is clear.
13       Q. If at any time you need to take a break, feel
14   free to let us know. You are more than welcome to take
15   a break at any time. My only caveat is that, if I have
16   a question and I have asked you a question, I will want
17   an answer to that question before we go on break. Once
18   I have an answer, you can obviously go on break; okay?
19       A. I understand.
20       Q. If there is any question that I ask you that
21   you do not understand, please feel free to ask me to
22   rephrase the question. I will do my best to rephrase it
23   in an understandable manner.
24           I sometimes get questions poorly phrased, and
25   it is no offense to me. I understand. I just want to

### 7

1    make sure that you understand the question.
2        A. Thank you.
3        Q. Are you currently taking any medication that
4    may affect your ability to understand my questions
5    and/or answer my questions here today?
6        A. Maybe.
7        Q. Okay. Can you tell me what that medication
8    is.
9        A. I take medication for Parkinson's disease and
10   arthritis.
11       Q. Do you know the names of those medications?
12       A. Yes.
13       Q. Can you tell me what the names of those
14   medications are.
15       A. Selegiline.
16       Q. Do you happen to know how to spell that?
17       A. S-e-l-e-g-n-e-n-e (sic).
18           Klonopin, Lexapro, Artane, Sinemet,
19   Methotrexate, Humira, and something to reduce
20   inflammation, ibuprofen basically.
21       Q. Are you currently on these medications as we
22   sit here today?
23       A. Yes.
24       Q. Each one of these medications?
25       A. No.

### 8

1        Q. Which ones are you on here today?
2        A. Parkinson's.
3        Q. Which one of those?
4        A. Selegiline, Sinemet, Lexapro, and Artane.
5        Q. Do you know if those medications affect your
6    ability to understand speech?
7        A. No. It gives me dry mouth and, basically --
8    and speech. Parkinson's disease can affect speech. But
9    that is about it. And short memory loss is a part of
10   all of these medications.
11       Q. Okay. If at any time today you have
12   difficulty understanding one of my questions or
13   answering it, because of any affects of any medications
14   that you are on, can you please let us know so that we
15   are aware of that.
16           And if you need to take a break because of
17   that, obviously, please let us know. Again, the only
18   caveat I have is if you would finish the question that
19   is posed.
20       A. I understand.
21       Q. Okay. Have you ever been involved as a party
22   to litigation in the past?
23       A. Never.
24       Q. Okay. And as with the other depositions, I'm
25   going to use the term "hotel" today. And I'm going to



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

## 9

1  be referring to the hotel that is located in Lancaster,
2  California located at 44055 North Sierra Highway.  Is
3  that okay?
4      A.  Yes.
5      Q.  AV Inn Associates 1, LLC, I think I understand
6  that is a California limited liability company.
7      A.  Correct.
8      Q.  Did you form AV Inn -- and I'm going to refer
9  to it now on out as AV Inn.
10          Were you one of the founding members of AV
11  Inn?
12      A.  Yes.
13      Q.  Were there any other members of AV Inn when
14  you founded it?
15      A.  I don't recall.
16      Q.  Why was AV Inn formed?
17      A.  To purchase the Best Western Hotel.
18      Q.  Was it formed for any other reason?
19      A.  No.
20      Q.  Were there any other members at any point in
21  time other than you?
22      A.  Maybe.
23      Q.  Do you recall who those members were?
24      A.  Originally, I don't know if there were any
25  more in the thing or not.  But my two friends, they were

## 10

1  supposed to be my partners and may have been on the
2  thing.  And then we removed them, perhaps, or not.  I
3  don't remember.
4      Q.  But as of the point in time that you purchased
5  the hotel and, as you sit here today, is it your
6  understanding that you are the only member of AV Inn?
7      A.  Correct.
8      Q.  And is it fair to say that AV Inn purchased
9  the hotel or title to the hotel and -- can you answer
10  that question?
11      A.  Yes.
12      Q.  You yourself did not have any interest in the
13  property or the hotel?
14      MR. NATHANSON:  Object to form.
15      One second, Harry.  Object to form.
16      MR. GARBARINO:  Fair enough.
17      Q.  You can answer.
18      A.  The LLC owned the property.  And a corporation
19  owned the businesses inside the hotel.
20      Q.  What was the name of that corporation?
21      A.  AV Inn Associates -- no.  AV Inn something
22  corporation.  I don't remember.
23      Q.  Okay.  So I guess -- let me back up.
24          When I use the term "AV Inn" in this
25  deposition, I'm going to change that and use the term AV

## 11

1  Inn, LLC.  It seems here that you are telling me there
2  is another entity that may be AV Inn Corp.  I am not
3  familiar with that entity.  So I may be misnaming it.
4  But I'm going to call it AV Inn Corp. if that is okay
5  with you.
6      A.  That is okay.
7      Q.  Is it your understanding that AV Inn, LLC had
8  title to the property under the hotel?
9      A.  Most of the property.
10      Q.  What do you mean by most of the property?
11      A.  It was two different parcels.  One, I was
12  renting, and one, I bought.
13      Q.  And AV Inn Corp., what was its role in the
14  hotel?
15      A.  It owned all the businesses inside the hotel.
16      Q.  And what were those businesses?
17      A.  Bar, restaurant.  Basically, that is it.
18      Q.  The banquet hall?
19      A.  I don't believe so.
20      Q.  So the banquet hall was part of the operations
21  of AV Inn, LLC?
22      A.  Actually, no.  All of the businesses, I think
23  even the hotel business, was with the corporation.  LLC
24  just owned the land.  That was the -- that was the only
25  function.

## 12

1      MR. NATHANSON:  Can we go off the record for
2  second.
3      MR. GARBARINO:  Certainly.
4      (Discussion off the record.)
5      MR. GARBARINO:  Back on the record.
6      Q.  So there are two entities, AV Inn, LLC and
7  what we are calling AV Inn Corp.  Were the accounting
8  records for these two entities maintained separately or
9  together as consolidated statements?
10      A.  Together.
11      Q.  Do you know the reason that you had two
12  different entities, one that owned the property and one
13  to operate the businesses on the property?
14      A.  Yes.
15      Q.  What was that reason?
16      A.  My accountant said, as far as the -- it is
17  better for tax purposes to do and liability to do it
18  this way.  And I said okay.
19      Q.  Did you set up AV Inn Corp. and AV Inn LLC at
20  or around the same time?
21      A.  I must have.
22      Q.  Who is the accountant that you referred to
23  that advised you to set up these two different entities?
24      A.  Scott Evans.
25      Q.  Is he with an accounting firm?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

29

1     But Mitch has been there many times.  I talked
2  to him many times.  Nobody ever told me anything about
3  this on the contrary of what they promised.
4     Q.  Did you have anybody in the sales position
5  during the year 2005?
6     A.  Except my own ability and Kevin, no, I didn't
7  think it was necessary.
8     Q.  I'm curious about the deadline.  It was a
9  deadline to do what?
10     A.  This is how I understand the system works.  If
11  you want to have Boeing --
12     MR. NATHANSON:  Stop.
13     MR. GARBARINO:  Let's go off the record.
14     (Recess.)
15     (Record read.)
16     THE WITNESS:  Let's say you are -- in my hotel
17  I'm in an area that heavily depends on government or
18  like NASA or Boeing, which I'm not really familiar with
19  all of the companies.
20     So every September you have to fill out a form
21  that they ask you about your rates.  They ask you many
22  questions about this and that, how is your property.
23  And maybe they come and inspect it.  If they approve
24  you, then you go on the list.
25     But since I had no knowledge of that, we miss

30

1  it for the whole year.
2  BY MR. GARBARINO:
3     Q.  You missed the deadline of asking these folks
4  to come to your property?
5     A.  Correct.  Or fill out the application.  Or you
6  put it any way you want.  It is a whole process.  I
7  mean --
8     Q.  Let me ask you this..  Is this process for
9  each -- and let's call it, I guess, target customers or
10  potential customers.  Is the process for each customer
11  different?
12     A.  Correct.  No.  The same format but different
13  companies.  But to individually address each big
14  companies and get them -- like she explained yesterday,
15  Cheryl, like Holiday Inn gets it automatically.  They
16  didn't have to do it.  The corporate office would get
17  it.  I guess every people have their own different
18  view.
19     But when we try -- after I find and we tried,
20  as she explained yesterday, Best Western tried to even
21  stop us.  They say you can't go individually.  You have
22  to go through us to get it.
23     Q.  You say that Best Western told you you
24  couldn't go individually.  Did that apply to all
25  potential customers or just certain potential

31

1  customers?
2     A.  What do you think?
3     Q.  I'm asking you.
4     A.  Well, when they say -- somebody tells you you
5  can't go individually after these big companies, that
6  means -- I interpreted it like any or all companies.
7  And, also, we -- I personally got Lisa, got three new
8  customers for the whole Best Western chain because she
9  knew.
10     She was one of the best salespeople in the
11  industry that used to work for Essex House.  And she
12  knew everybody from inside.  And that is why I hired her
13  to go around the country and everywhere because she knew
14  Lisa Bliss or these people that I never heard of their
15  names in the companies.
16     And she had good rapport to get those accounts
17  for us.  And that made -- and I have -- Best Western
18  mad.  And I have no idea why.
19     Q.  What makes you believe it made Best Western
20  mad?
21     A.  If you hear the two ladies' testimony.  And
22  Mary Ann told that you are not on our list, preferred
23  list, number one.
24     And the other guy said, sorry, we dropped the
25  ball.  And I don't know.  As a businessman, you have to

32

1  calculate every possibility.  And, to my knowledge, I
2  would say it was a deliberate action.  And I have an
3  argue why.  But I will leave it at that.
4     Q.  What evidence do you have that there was a
5  deliberate action taken by Best Western?
6     A.  Well, I don't know what you call telling us
7  you can't go after the corporate account.  You have to
8  go through us.  And they deliberately delayed things.
9  And they didn't follow up.  And they say sorry.  We
10  dropped the ball.  What do you think?
11     Q.  What evidence do you have that you were
12  treated differently than any other member of Best
13  Western?
14     A.  I have no evidence except I talked to a few
15  owners.  And nobody wants to go on the record because
16  everybody is scared that they will be in jeopardy.
17     Q.  Can you give me the names of the owners you
18  have spoken to.
19     A.  No.
20     Q.  You refuse to give me the name as you sit here
21  today?
22     A.  Exactly.  I swear to them not to give it.
23     MR. NATHANSON:  I better confer with
24  Mr. Harooni.
25     MR. GARBARINO:  Fair enough.  Go off the



# ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

## 49

1  are going to take your license away. And that is why
2  they interviewed me. And Terri said she is the head
3  honcho, and she makes all the decisions. And she gave
4  me -- she interviewed me. And I went to Arizona. And
5  she said okay. You are approved.
6      Q. Did you actually see the notice that they gave
7  to the prior owners?
8      A. I think it was obvious. It was in the
9  listing. I can ask Robert, my friend. Maybe he can
10 find it because everybody knows that. The Best Western
11 knows that.
12     Q. My question is, did you see the notice
13 yourself?
14     A. Not that I recall. My broker told me. Is not
15 something to see the notice on or not. They gave me the
16 booklet of things to repair.
17     Q. At the time you purchased the hotel, were you
18 concerned that it was in such poor condition?
19     A. I was very glad, actually.
20     Q. Why is that?
21     A. Because I saw tremendous potential to make
22 money.
23     Q. Did you have any concern that you may not be
24 able to meet Best Western's standards?
25     A. No. I had money. I had power. I had

## 50

1  praying. I thought I have all the knowledge and backing
2  necessary to go on.
3      Q. At the time that you purchased the hotel, did
4  you know what Best Western's quality standards were?
5      A. I believe so to some extent. Not
6  100 percent.
7      Q. You talk about an initial interview that you
8  had with Terri Wininger that occurred before you
9  purchased the hotel.
10     A. Yes.
11     Q. Did you -- you said you traveled to Arizona
12 for that interview?
13     A. Yes.
14     Q. Can you tell me what Ms. Wininger told you to
15 the best of your recollection as you sit here today
16 during that interview?
17     A. Yes. Actually, that was one of the things
18 that I found last night.
19     MR. NATHANSON: What are you referring to,
20 Harry?
21     THE WITNESS: Well, the ticket. I found the
22 ticket and the date that I went there. It was three
23 months before I buy the hotel.
24     MR. NATHANSON: Okay.
25     THE WITNESS: Well, mostly, she was

## 51

1  interviewing me to see if I'm qualified to have the Best
2  Western. That is what the meeting was all about and, of
3  course, charging me money for 3,000 -- I don't know how
4  many thousand regardless of whether it goes through or
5  not. I took the chance. And I went there. And she
6  approved me.
7      And I asked some question. What kind of
8  support? She says we have money manager. We have
9  people coming there visiting you if you have any help.
10     And even though Mitch was very nice guy and I
11 think he is a very nice guy and everything, every time I
12 call him for help, he didn't say no, but he came on his
13 regular schedule. Like, he is not like they -- like you
14 said, they have 4,000 hotels. Who am I to pay
15 attention. They just want the $10,000 a month.
16     Q. Were you aware at the time that Best Western
17 had -- you said 4,000 hotels?
18     A. Well, they were using that as a sales pitch.
19 And I believed them. And, honestly, I never thought a
20 franchise company that is so --
21     MR. NATHANSON: Harry, you answered the
22 question.
23     THE WITNESS: Okay. Say that again, please.
24     (Record read.)
25     THE WITNESS: Yes.

## 52

1      MR. NATHANSON: Please answer the question.
2      THE WITNESS: Yes.
3  BY MR. GARBARINO:
4      Q. So, specifically, what support did Terri
5  Wininger tell you Best Western would provide?
6      A. Specifically, what I recall was three items.
7  She said three or four items. She said we have design
8  people standards. She showed me all of the room, design
9  room, and people working on design and stuff. That
10 wasn't part of her sales pitch.
11     And she said we have money manager who monitor
12 your accounts at all times. That was good just in case
13 anything goes wrong. They are there to help you. And
14 like Mitch type of a person that comes there all the
15 time. And she said we give you -- all the help we can
16 give you, we will give you.
17     Q. So did you take that to mean that Best Western
18 would run and operate the hotel for you?
19     A. If they wanted to do that, why would they
20 interview me?
21     Q. Well, I'm trying to -- on the spectrum of
22 support, there is the support that you received --
23     A. She said any --
24     Q. Let me finish my question. There is the
25 support you received. There is total running and



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

---

**61**

1    Q.  What would happen to the improvements on the
2    property?  Would those pass to the actual owners of the
3    property?
4    A.  If I wanted.
5    Q.  And the only way for that situation to change
6    would be for either you to purchase the leased parcel
7    itself or release it for a term, who knows when, into
8    the future?
9    A.  Exactly.
10    Q.  When you sold the property -- I understand you
11    sold it in 2009; is that correct?
12    A.  Correct.
13    Q.  Did you sell both parcels?
14    A.  Yes.
15    Q.  Did you sell both parcels to the same buyer?
16    A.  Correct.
17    Q.  Now, there was an offer to purchase the
18    property, I believe, in 2008 which was approximately
19    $6.1 million.  Do you recall that?
20    A.  Yes.
21    Q.  And that was relied upon by Mr. Labbie in his
22    report.  Do you recall that?
23    A.  Yes.
24    Q.  What happened to that sale?
25    A.  Okay.  I tell you what happened to that sale.

---

**62**

1    I picked that because that was the lowest sales amount
2    that I was offered.  And the guy was an Indian guy.  I
3    have his name and number maybe somewhere.  And he was
4    lowballing me.  And he was ready to take Best Western,
5    buy my place with the Best Western headache.  And stood
6    by me for eight, nine months.  And he gave up and left.
7    Q.  So all that needed to be done to consummate
8    that deal was for you to accept the offer?
9    A.  Yes.  I wouldn't.  It was so cheap.
10    Q.  But did you have other offers?
11    A.  Yes.  I had -- I listed it for 8.9 million.
12    Q.  And what was the highest offer you received?
13    A.  Seven million.
14    Q.  Do you recall when you received the $7 million
15    offer?
16    A.  Shortly after listing it.
17    Q.  When did you list it?
18    A.  January or February of 2008.
19    Q.  So somewhere between January and February of
20    2008, from the time you actually sold the property, you
21    had an offer for $7 million?
22    A.  Yes.
23    Q.  And what needed to be done to consummate that
24    offer or consummate -- make that offer into a contract?
25    A.  Get rid of Best Western headache.

---

**63**

1    Q.  When you say "get rid of Best Western
2    headache," what do you mean?
3    A.  Get a blessing and get two good numbers.  As
4    you know, that when you get two numbers below 900, then
5    it will not be an automatic sale.  And they can demand
6    anything they want.
7    Q.  So when you put the property up for sale, you
8    had already received the second inspection score below
9    800?
10    A.  Above 800.  No.  I had good grades.  Let me
11    explain to you how it is.  When I had no idea -- I had
12    no idea what does automatic transfer mean.
13    The company who listed my property is three
14    generations, most famous brokers in -- hotel brokers in
15    America.  And they are so famous.  He put in his listing
16    automatic transfer.
17    And then should I explain?  Go on?
18    MR. NATHANSON:  No.  You should answer his
19    question.
20    THE WITNESS:  Okay.  I'm sorry.
21    MR. NATHANSON:  Do you need the question read
22    back.
23    THE WITNESS:  Yes, please.
24    (Record read.)
25    THE WITNESS:  No.

---

**64**

1    BY MR. GARBARINO:
2    Q.  But you received that second inspection score
3    below 800 on January 31st of 2008?
4    A.  Say that again.
5    Q.  You received the second inspection score below
6    800 on -- and let me just verify it by looking at the
7    inspection report -- January 31st, 2008.
8    A.  Okay.  What were the scores below that, the
9    last two scores before that?
10    Q.  The score previous to that -- let me look at
11    the inspection report.  But the inspection report will
12    be dated, I believe, October 25th of 2007.  And it was
13    less than 800 as well.
14    If you can -- I will pull it out for you
15    here.  Exhibit 10.
16    (Plaintiff's Exhibit 10 marked.)
17    BY MR. GARBARINO:
18    Q.  Is this the inspection report dated 10-25 --
19    let me finish my question -- 2007.
20    A.  What does it say?  Okay.  October 25th, 2007.
21    Q.  Correct.
22    A.  Yes.
23    Q.  And the score -- and I'm, again, going to use
24    the term GRUPA.  And that is short for guest room public
25    areas assessment -- was 750 correct?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

## 85

1    A.   It was monthly.  About $3,000 a month.  Pretty
2  much fixed.
3    Q.   The entire banquet center lease was $3,000 a
4  month?
5    A.   Yes.  That was a great lease.
6    Q.   And was it dependent anything on revenue?
7    A.   No.
8    Q.   It was a flat $3,000 a month payment?
9    A.   3,100.  They had every year or two just a
10  touch of increase.
11    Q.   Do you have a statement of occupancy prepared
12  for the hotel, or did you have a statement of occupancy
13  prepared for the hotel?
14    A.   What do you mean by that?
15    Q.   A statement showing a percentage of occupancy
16  during any specific period of time -- daily, monthly,
17  yearly.
18    A.   Yes.
19    Q.   Could you disclose that to us if you do have
20  it.
21    MR. NATHANSON:  Where is it, Harry.
22    THE WITNESS:  This is -- that shows pretty
23  much occupancy too.  But you can get that from me
24  actually.  But let me see.  I have to --
25  BY MR. GARBARINO:

## 86

1    Q.   If you find it, can you disclose that to us as
2  well.
3    MR. NATHANSON:  Yes.
4  BY MR. GARBARINO:
5    Q.   Okay.
6    A.   Daily or monthly occupancy.
7    Q.   Whatever you have.
8    A.   Go ahead, please.
9    Q.   Do you have any statement that reflects the
10  rates that were being charged during your ownership of
11  the hotel?
12    A.   I can tell you.
13    Q.   Okay.
14    A.   2005 we were charging average about $70 a
15  person per night.
16    Q.   Uh-huh.
17    A.   2006 we were charging average of $75.  And
18  2007 an average of 85 to $90.
19    Q.   Okay.
20    A.   And that is pretty much it.
21    Q.   Now, Mitch performed a number of inspections
22  at the hotel; correct?
23    A.   Correct.
24    Q.   Were you present for any of those
25  inspections?

## 87

1    A.   At least maybe five or six.
2    Q.   Five or six inspections.  Do you remember
3  which ones you were present for?
4    A.   No.  I was there for -- the last one I was
5  there, the last one that he ever showed up.  And they
6  switched him to another territory.
7    Q.   So let's back up for just a second.  You were
8  present for --
9    A.   That I know for sure.
10    Q.   -- the last two inspections?
11    A.   The last inspection that he did on my
12  property.
13    Q.   You were there for the October 25th, 2007
14  inspection?
15    A.   If that is the time that was the last one
16  before the lady comes.
17    Q.   Did you disagree with any of the items that he
18  noted in that inspection report?
19    A.   Pretty much.
20    Q.   Let's go through them and tell me what you
21  disagreed with.
22    A.   Okay.
23    Q.   And let's go through.
24    MR. NATHANSON:  He is going to ask you the
25  questions.

## 88

1    THE WITNESS:  Okay.
2  BY MR. GARBARINO:
3    Q.   It is going to be Exhibit 10.
4    MR. NATHANSON:  Can we go outside.
5    THE WITNESS:  10 seconds.
6  BY MR. GARBARINO:
7    Q.   Do you want to take a minute to review that?
8    A.   No.  I need to consult with him 10 seconds and
9  then come back.
10    MR. GARBARINO:  Let's go off the record.
11    (Recess.)
12    MR. GARBARINO:  Back on the record.
13    MR. NATHANSON:  Can you repeat the question,
14  please.
15  BY MR. GARBARINO:
16    Q.   I have Exhibit 10 sitting before you.  Do you
17  agree that that is the inspection report dated October
18  25th of 2007?
19    A.   Correct.
20    Q.   And you believe you were present for this
21  inspection?
22    A.   Definitely.
23    Q.   And the inspector was Mitch?
24    A.   Correct.
25    Q.   Turn to the next page.  And I'm going to refer



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

## 89

1  to the Bates numbers at the bottom. We will start with
2  BW when I am referring to a page number. And we are
3  looking at BW0173.
4      A. Correct.
5      Q. It has a heading there stating "names of
6  participants and position titles." And it names
7  Christina, the manager. And Lina, the head
8  housekeeper. Do you agree with that?
9      A. I know I talked to him at the end before he
10  leaves.
11     Q. So you weren't present for the entire
12  inspection.
13     A. That could be correct.
14     Q. Do you remember actually going to any rooms
15  with him?
16     A. No. I have foot problem. So I probably
17  didn't walk all the time, especially when Mitch comes
18  in.
19     Q. Okay. So the extent of your contact with
20  Mitch during this inspection was possibly talking to him
21  briefly after the inspection?
22     A. Correct. I make the correction.
23     Q. So with respect to any particular point
24  deduction Mitch deducted off, how do you have a basis to
25  challenge that point deduction?

## 90

1      A. Okay. The only thing I have to say, from day
2  one, whenever Mitch came in, he came out as a friend and
3  was the nicest guy in the world. And he was friendly
4  enough. And he was there all the time, I thought, not
5  only as an inspector more as a friend and a person who
6  patted me on the shoulder and check up on progress
7  report to see what more have I done.
8          And he in the whole two-and-a-half years,
9  three years not even once he said you are doing a bad
10  job. And then the last time that he was there, and he
11  never showed up. He turned his face around. And I
12  said, Mitch, what are you doing? I'm selling the
13  place. He said that is what it is. And he walked
14  away. And that wasn't him at that time, I'm thinking.
15         And then I called the headquarters and said to
16  talk to Terri. I said, Terri, please don't do this to
17  me. What are you doing? She said. Sorry. The 48
18  hours has passed. I called him two, three days later
19  and said you had only 48 hours to get a reinspection.
20  And I said Terri, you can -- it is out of my hand. What
21  do you mean out of your hands? That is how it works.
22     Q. My question to you was, what basis do you have
23  to object to any particular deduction?
24     A. That is what I'm objecting because he never
25  treat us like that to just take off every little point

## 91

1  and walk away.
2      Q. But you also heard the testimonies of Lina.
3      A. Correct.
4      Q. Correct?
5      A. No, no. I wasn't here for Lina.
6      Q. And Cheryl; correct?
7      A. Yes.
8      Q. Who testified that every time Mitch was there,
9  if he saw a problem, he deducted a point. Do you
10  disagree with that now?
11     A. Yes.
12     Q. But you weren't with Mitch when he conducted
13  this inspection?
14     A. No. Well, this is how Mitch was doing it. He
15  would forgive and forget some of the things when we were
16  remodeling. He said, I should take a deduction out of
17  this. But he won't take it and, he would go. And he
18  comes back. But then the last time he did not do that.
19     Q. Would you agree that your testimony is
20  inconsistent with that of Cheryl Duggan?
21     A. No, that is not.
22         MR. NATHANSON: Hold on, Harry. Let me
23  object.
24         Object to the form.
25         THE WITNESS: Can I answer now?

## 92

1  BY MR. GARBARINO:
2      Q. Yes.
3      A. If you would have heard Cheryl Duggan, your
4  answer if you -- if this is correct, she wasn't walking
5  with the guy. Say if that is the number you say is
6  correct, it is correct. But she didn't -- you didn't
7  ask do you have any objection or do you know if it is
8  true or not. That is not what you asked.
9      Q. Okay. We will just rely on the transcript of
10  what I asked and what her answer was.
11     A. Okay. That is fine.
12     Q. So other than what you have stated here today,
13  you have no other basis to objecting to the inspection
14  scores?
15     A. No, because he was a good friend to the last
16  minute.
17     Q. Were you present for the inspection conducted
18  by Cindy Bree?
19     A. I was there that day, yes.
20     Q. Did you go out with her to the rooms?
21     A. I have to explain.
22     Q. Can you just answer my question. Did you go
23  out to the rooms with Cindy Bree that day?
24     A. No. But I was outside with her and outside of
25  the inspection for half of it I was and half of it I



**ESQUIRE**

an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

97

1  integrity and privacy at any cost. I didn't want to
2  jeopardize his business because he has to sell hotels
3  and he. Might have problems with Best Western later to
4  come and testify on my behalf. I have no right to ask
5  him that.
6      But when I asked him that, he said he will be
7  happy to do it. Now, if you want to call him, call him.
8      Q. Okay. Let's go back to my original question.
9  I'm not sure we got an answer to it yet.
10     A. Okay.
11     Q. Do you disagree with the description or the
12 existence of any of the items that Ms. Bree noticed in
13 the January 31st, 2008 inspection report?
14     A. According to the past, yes.
15     Q. Okay.
16     A. Whether they existed or not, to her opinion,
17 no.
18     Q. Do you have any basis to dispute the existence
19 of the physical conditions noted --
20     A. Yes.
21     Q. -- in Cindy Bree's report?
22     A. Yes.
23     Q. What basis do you dispute the physical
24 existence of these conditions?
25     A. Okay. For example, what do you call a 2-by-10

98

1  area of three roses in the middle of winter that is
2  there when it is blooming? Is that a crime?
3      Q. I'm not trying to get to --
4      A. No, no. I understand. I'm just nervous.
5      Q. Let me finish my question.
6      I'm not trying to get to your opinion whether
7  it was right or wrong. I'm simply asking you whether,
8  as she has described in the inspection report, whether
9  those conditions actually existed.
10     A. Yes.
11     Q. Are there any conditions in the inspection
12 report that you dispute as actually in existence,
13 putting aside your personal feelings as to whether it
14 was right or wrong, whether the actual condition did not
15 exist?
16     A. Well, the curb appeal that nobody can -- and
17 the landscaping. Those two are. But everything else
18 could exist without me having heard anything about it
19 before.
20     Everything in the report -- Mitch has been
21 there every single time. And he never picked on it. So
22 how do I know?
23     Q. Are you telling me that Mitch never picked on
24 anything that is contained in this report?
25     A. Nothing. No, sir.

99

1      Q. And if we go back and look at his other
2  inspection reports --
3      A. Go ahead.
4      Q. -- you are telling me we won't find?
5      A. Curb appeal for those --
6      Q. Excuse me. You just said that everything in
7  this inspection report was new. Is that a fair
8  statement?
9      A. Not everything. The things that I explained
10 to you.
11     Q. So you are talking about the roses and the
12 curb appeal issue and the dust build up and the people
13 are not work --
14     A. I have four people at each time on my property
15 either painting or fixing or everything. How could you
16 just say I didn't see anybody working. It is six-acre
17 land. I guess, how did I get all of this accomplished?
18     Q. Let's go -- one of the ones you complained
19 about is dust in the corner.
20     A. Yes.
21     Q. Can you show me in this report where Cindy
22 Bree noted that there was dust in the corner?
23     A. From my understanding from Lina, you should
24 have asked that from Lina, but it is never too late.
25     MR. NATHANSON: Do you know, Harry?

100

1      THE WITNESS: Yes. They told me that she went
2  all the way in the corner. That even the broom or
3  anything cannot get there. And put her hand in the
4  corner and said dust build up.
5  BY MR. GARBARINO:
6      Q. But my question to you is where in this
7  inspection report --
8      A. Hallway, one of the hallway, two-story hallway
9  or -- two-story hallway.
10     Q. Okay. So what you are referring to -- and if
11 you will look at the report, I can't find a number on
12 it.
13     A. It doesn't matter. Just read it.
14     Q. It says under the heading corridors, building
15 three carpet has dust build up in the corners of hall.
16 Is that what you are referring to?
17     A. That is what I was referring to.
18     Q. And that was a five point deduction; correct?
19     A. Correct.
20     Q. So we have five points for one of the items
21 you just viewed; correct? Is that fair to say?
22     A. On that item, yes.
23     Q. And the other item was the bare landscaping;
24 is that correct?
25     A. Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

---

**105**

1    Q.  That would be under doors, frames, and
2  hardware where it says, all doors, trim and threshold in
3  public areas have scratching, peeling paint?
4    A.  Maybe.
5    Q.  And you agree she deducted 20 points for that
6  one as well?
7    A.  Definitely not.
8    Q.  But you agree that she deducted 20 points for
9  it?  You may not agree to the deduction; right?
10    MR. NATHANSON:  Object to the form.  We got to
11  be clear.  I know what you are driving at, Dave.  But
12  no --
13    THE WITNESS:  Okay.  If the aluminum door is
14  30 years old, would you agree that it would have some
15  scratches on it outside of the cold, that cold -- I
16  mean, do you catch cold if you sleep nude for one month
17  in Chicago weather in the winter?  Yes.  If you say no,
18  then the answer is --
19    MR. NATHANSON:  I'm not sure where we are at,
20  Dave.
21    MR. GARBARINO:  I'm not sure either.  Can we
22  just go off the record for a minute.
23    (Recess.)
24  BY MR. GARBARINO:
25    Q.  Okay.  Let's start on BW0431.

---

**106**

1    A.  Okay.
2    Q.  Actually --
3    A.  The next page.
4    Q.  -- the previous page, 430.  The first
5  deduction was for visible patch on ceiling.  Do you
6  disagree that this condition existed?
7    A.  What is the English word for it?  It is like
8  optional.  I mean, one worker would say I fixed it.  One
9  worker would say it shows.
10    Q.  But my question is fairly straightforward.  Do
11  you disagree that this condition existed?
12    A.  Yes.
13    Q.  You have reason to dispute the existence of
14  this condition?
15    A.  How can I be fair?  Yes.
16    MR. NATHANSON:  Just answer the question.
17    THE WITNESS:  Yes, it did.
18  BY MR. GARBARINO:
19    Q.  Yes, it did exist?
20    A.  Yes.
21    Q.  Let's go to the next point deduction.
22  Scratches and damage to surface of furniture in 388.  Do
23  you disagree with the description?
24    A.  No.
25    Q.  The next one A/C grill vent dusty.  Do you

---

**107**

1  disagree with the existence of that condition?
2    A.  Maybe.
3    Q.  What is your basis for disagreeing with that?
4    A.  Okay.  Because we have like -- Cheryl put a
5  system that every three months or two months somebody
6  goes and clean all of those.  I don't know whether the
7  lady came at like a month and a half afterward or two
8  days after.
9    Q.  Okay.  But do you have reason to disagree --
10    A.  No.  I have no reason to disagree.
11    Q.  And to be clear, you have no reason to
12  disagree with the existence of A/C grill vent dusty on
13  the date that the inspection was performed?
14    A.  No.  They took a picture.
15    Q.  And the same with top of A/C scratched in 180,
16  do you have any disagreement with the existence of that
17  condition on the date the inspection was performed?
18    A.  No.
19    Q.  Next page hairdryer vent has lint build up on
20  it, 388.  Do you have any reason to disagree with the
21  existence of that condition?
22    A.  No.
23    Q.  Tub chrome tarnished, 180, 388.  Do you have
24  any reason to disagree with the existence of that
25  condition?

---

**108**

1    A.  No.
2    Q.  Exhaust fan dusty, 105, 134.  Do you have any
3  reason to disagree with the existence of that
4  condition?
5    A.  No.
6    Q.  Mirror desilvered, 105.  Do you have any
7  reason to disagree with the existence of that
8  condition?
9    A.  Maybe.
10    Q.  What is your basis for disagreement?
11    A.  I mean, it doesn't make sense.  Mirror
12  desilvered, what does that mean?  Can you show me the
13  picture.
14    Q.  I will try to find it.  Let's keep moving
15  here.
16    The next one is toilet bowl has hard water
17  build up, 258.  Do you have any disagreement with that
18  condition?
19    A.  No.
20    Q.  Next one, "part of plastic holder glued to
21  tilew in tub, 258."
22    Do want to see a picture of that one?
23    A.  No, I don't want to see it, but I want to
24  explain something.  When the first time -- the last time
25  that Mitch was there, I called.  And I said that

---



**ESQUIRE**

an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

109

1  inspection was not fair to send somebody else to
2  reinspect.
3      Terri Wininger herself told me that 48 hours
4  has passed. And she cannot send somebody else. And I
5  turned around and told her then -- I was up to what she
6  is trying to do. And I told her then I will do it the
7  next time. I remember for next time.
8      The next time the minute she left, I called.
9  And you know what they told me. They say we are not
10 coming back unless you pay a few thousand dollars and
11 request. And then the only -- we only come to look at
12 our pictures to prove that we were right.
13     Then why didn't she tell me that before the
14 last time talking. So now I object to every single
15 thing that she took off because Mitch never did that to
16 us. Now the pictures might say something. But I
17 disagree the way they did the business.
18     Now, if you want to get angry, go ahead.
19     Q.  No.  I'm not going to get angry with you.
20 Your testimony is what it is.
21     A.  It is the truth. Why didn't she tell me that
22 we are not coming for an inspection. Why did they
23 charge me money.
24     Q.  Let's back up a second. Are you indicating
25 that you didn't have notice of inspection?

110

1      A.  I had the notice of inspection. She came out,
2  but I called her and said to come back again. She said,
3  we are not coming back. You have to pay money. You
4  have to do this. And if we come out -- they are going
5  to try to discourage me. If we come out, we are only
6  going to come out and check the pictures that we took to
7  prove we are right.
8      I said, thank you for charging me money.
9      Q.  There was a point in 2007 when you were
10 interested in closing down part of the hotel; is that
11 correct?
12     A.  Yes.
13     Q.  Okay. Can you tell me a little bit about
14 that?
15     A.  Yes. Again, I have to explain. Like, how I
16 told you before, I thought I had a genius plan. And it
17 would have worked if they would have let me. I had an
18 idea because I was getting certain reservation from Best
19 Western. And I had my own customer.
20     One side of the hotel was 100 rooms. And the
21 other side was 48 rooms, plus convention center. I said
22 to myself, if I sell the 100 unit, the occupancy would
23 go higher. And it will sell faster at the lower price.
24 And I can keep the convention center with 48 rooms for
25 $3,000 a month.

111

1      And I can sell them separately for 5, $6
2  million each and make tons of money. And they destroyed
3  my plan to. They played game with me.
4      Q.  They wouldn't let you separate the hotel?
5      A.  They say, oh, it is a good idea, and left.
6      Q.  Did they tell you you couldn't do it?
7      A.  No.  They told me I can't do.
8      Q.  Do you have any written documentation
9  saying --
10     A.  Ask Terri.
11     Q.  Okay. I'm asking you, do you have any written
12 documentation where they specifically denied --
13     A.  I shake too much. I don't type. I get -- for
14 every single documentation, I have to get somebody to
15 type for me.
16     Q.  I understand that. But you are telling me
17 that Best Western told you, you couldn't do it?
18     A.  Correct.
19     Q.  Do you have that in writing from Best
20 Western?
21     A.  I might have in some files if I get lucky.
22     Q.  Is there any way we can get a copy of the
23 actual purchase agreement between you and the party that
24 eventually did purchase the hotel?
25     A.  I think I brought it.

112

1      Q.  So we will get that disclosed to us?
2      MR. NATHANSON:  Yes, sir. Is it here in the
3  room, Harry?
4      THE WITNESS:  I hope so.
5      MR. NATHANSON:  Why don't you look for it
6  while I walk out for a minute.
7      (Recess.)
8      MR. GARBARINO:  Back on the record.
9      Q.  Are you able to testify as to how much you are
10 seeking to recover from Best Western?
11     A.  Well, I can prepare myself. Yes.
12     Q.  But as you sit here today, do you know how
13 much you are seeking to recover from Best Western?
14     A.  Should I answer that?
15     MR. NATHANSON:  If you can answer it yourself
16 as a nonexpert --
17     THE WITNESS:  No.
18     MR. NATHANSON:  -- then answer it.
19     THE WITNESS:  Honestly, no.
20     MR. NATHANSON:  Okay.
21     THE WITNESS:  As much as I can
22 BY MR. GARBARINO:
23     Q.  Can you explain to me what the measure of the
24 amount is you are seeking to recover from Best Western?
25     A.  I will tell you -- can I answer you in a



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

| 113 | 115 |
|---|---|

**113**

1  phrase, please.
2  Q.  Absolutely.
3  A.  My taxes for the last 10 years showed I made
4  20 percent return every year on my money.  I could have
5  made that $2 million to $20 million by now.  But I lost
6  everything.  So who can put a price tag on that.
7      MR. NATHANSON:  Your expert.
8  BY MR. GARBARINO:
9  Q.  Okay.  As you sit here today, you can't tell
10  me today what the measure of your damages are that you
11  seek to recover from Best Western?
12  A.  No.
13  Q.  And it is my understanding that the damages
14  you are going to seek to recover from Best Western, the
15  only evidence that you are going to offer is your
16  expert's testimony; correct?
17      MR. NATHANSON:  Object to the form because the
18  expert relies on documents.
19      THE WITNESS:  I would answer it like this.  If
20  you allow for me to bring the broker that has 40 years'
21  experience, if you allow other witnesses or other names
22  of hotel owners, I can try to get them.  If not, your
23  answer is correct.
24  BY MR. GARBARINO:
25  Q.  Do you know who prepared Lina Eseltine's

**114**

1  declaration?
2  A.  Yes.
3  Q.  Who prepared that?
4  A.  Well, if you recall, at that time I did not
5  have any counsel.
6  Q.  Okay.  Can you just tell me the name of the
7  person who prepared the declaration.
8  A.  I don't remember.
9  Q.  Was there anybody to your recollection at the
10  hotel that could read English and translate it into
11  Spanish?
12  A.  That is what I was trying to tell you.  Yes.
13  Q.  Was there somebody at the hotel that could do
14  that?
15  A.  Yes.
16  Q.  Who was that?
17  A.  We have numerous -- I think I asked the lady
18  named Rosa, our banquet manager, banquet head server.
19  I'm not sure.
20  Q.  Were you present when Rosa translated Lina's
21  declaration from the written English to Spanish for
22  her?
23  A.  Can I explain?
24  Q.  Were you present?
25      MR. NATHANSON:  Can you answer?

**115**

1      THE WITNESS:  Yes.
2  BY MR. GARBARINO:
3  Q.  You were present?
4  A.  I wasn't there, no.
5  Q.  You were not there?
6  A.  No.
7  Q.  In your disclosure statement, you noted
8  somebody by the last name of Blank.  Who is that person,
9  and what are they?
10  A.  That is a big blank on my head.  I don't
11  know.
12  Q.  Okay.  We will talk to you about it in a
13  minute --
14  A.  Okay.
15  Q.  -- off the record.
16      When you attended the board meeting in Phoenix
17  where your membership was discussed, did anybody attend
18  that with you?
19  A.  I don't think if they let anybody -- I took
20  somebody with me.  I think my wife.  They did not let
21  anybody in with me.
22  Q.  Who did you take with you?
23  A.  I think maybe my -- if I tell you, I don't
24  remember.  I think I took my wife because she doesn't
25  let me drive.

**116**

1  Q.  Can you tell me what happened during the
2  meeting.
3  A.  Yes.  I have to act.  Okay.  There is a big
4  guy standing at the door.  There is a security guard,
5  but he doesn't tell you because, apparently, they have
6  too many people trying to kill them or something.  He
7  opens the door.  He touches you.  He does, come on in.
8  Have a sit.  He sits you.  And he stands right behind
9  you.
10      And the people ask you questions.  90 percent
11  of the questions they ask was how much your hotel is
12  worth?  You want to sell it?  Or you don't want to sell
13  it?  They were trying to get information out of me to
14  see if they have a buyer if they can put me down so
15  somebody buys it cheap if you are asking me.
16      I told them in that meeting I have money.  I
17  do anything that is necessary to fix the place.  I kiss
18  your foot.  I do anything.  Please don't take my
19  livelihood away.  I am sick the minute I said I am sick,
20  I guess they saw the ring.  And they put the knife
21  through my back.
22      And they said, thank you very much.  Have a
23  nice day.  We let you know.  And I got this letter from
24  Terri saying as of immediately we are taking everything
25  out.  And you are done and finished.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

| 117 | 119 |
|---|---|

### 117

1  Q.  How long did the meeting last?

2  A.  15 minutes max.

3  Q.  Do you recall who on the board asked you

4  questions?

5  A.  A couple of ladies and a guy.

6  Q.  You don't remember the names?

7  A.  No.

8  Q.  Do you remember any specific question they

9  asked you?

10  A.  Yeah.  How many rooms have your hotel?  How

11  much do you want to sell it?  How much your bottom line

12  is?  All of the questions that the buyer would ask to

13  buy a place, not to find out how much you think it would

14  cost you to finish the remodeling.

15        I said 2-, $300,000.  And they said, no.  We

16  think it is more than $1 million.  I said, whatever it

17  takes, I have the money.  I spend it.  What do you

18  care?  I will do it right away.  Have a nice day.  And

19  they should have a transcript of that.

20  Q.  And did you present anything to the board?

21  A.  Well, I present -- I don't remember.  I took

22  some document.  And I said whatever is missing from

23  whatever you want, I get it done in less than a couple

24  of months.  And give me six months everything will be

25  perfectly done.

### 118

1  Q.  Is Exhibit 18 a letter that you wrote to the

2  board to support your presentation to the board?

3        I think it is actually Exhibit 17.

4        (Plaintiff's Exhibit 17 marked.)

5  BY MR. GARBARINO:

6  Q.  Is that the letter you presented to the

7  board?

8  A.  Yes.

9  Q.  I'm just going to paraphrase.  It says in here

10  that you were short staffed at one point in time.  Do

11  you recall that?

12  A.  Yes.

13  Q.  Can you explain why you were short staffed.

14  A.  Yes.  Alfonso's father, I think, was extremely

15  sick.  And he had to leave for two weeks to Mexico.  And

16  at the same time somebody else -- I can find out from

17  Kevin.  Kevin remembers pretty good these things.

18  Somebody else was sick.

19        So I was short staffed for getting some

20  repairs done.  And that was the only time in four years

21  that I never neglected it.  Maybe fell behind.  I didn't

22  even think I fell behind.  But I fell behind of my own

23  speed actually.

24        But I had no choice.  I can't tell somebody

25  your father is sick, not to go see him.  And I think

### 119

1  somebody's mother died.  Oh, the lady who worked in the

2  laundry room mother died, I think.

3  Q.  Do you remember what her name was?

4  A.  Lina remembers for sure.  I can ask her.  And

5  I explained that to them.  I had a full time painter on

6  the job from day one to the last minute.  I had two -- I

7  had almost four people on and off constantly on the

8  property.

9  Q.  Okay.  Let me just ask this last series of

10  questions.  And I will let you go until next time.

11        After Best Western terminated your membership,

12  did you do anything to attempt to rebrand the hotel?

13  A.  No.

14  Q.  Can you tell me why you didn't try to get a

15  new brand.

16  A.  Because I had asked a lot of people a lot of

17  questions.  And we reached the conclusion that, if you

18  have a good website which I spent $17,000, which I

19  didn't send it in our report to the whatchamacallit, the

20  accountant.  I made a new website.  I made new

21  pictures.  I made a name, new logos, new -- I spent more

22  than 50- to $100,000 in advertisement to promote our own

23  name because everybody knows Antelope Valley, and nobody

24  knows Best Western or other thing.  I mean, they know

25  from the distance.

### 120

1        But I figured AV Inn is very famous in

2  Palmdale Lancaster.  So we reached the business

3  conclusion that that would be a waste of money.

4  Q.  And how much did you spend on the website?

5  A.  I think 17- to 20,000 on a new website.

6  Q.  And you spent, also, in addition to renaming

7  the hotel or not --

8  A.  Renaming --

9  Q.  How much additional did you spend?

10  A.  I don't keep track of my expenses that much.

11  But I'm sure it was over $50,000 because we had to sign

12  up with another company.  Two weeks ago I was served

13  with a lawsuit for $140,000 from Lodgenet, who provides

14  the TV service for the room, because -- okay.

15  Q.  Do you have receipts for the amount you spent

16  in trying to --

17  A.  Quick Books.  The checks are in Quick Books.

18  And if you have to, you can get from the bank.  For

19  eternity they have copies of the checks.

20        MR. NATHANSON:  Can we call it quits,

21  Counsel.

22        MR. GARBARINO:  Sure.

23        MR. NATHANSON:  Thank you.

24        You want to say on the record we are resuming

25  Friday morning.



# ESQUIRE

an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

```
BEST WESTERN INTERNATIONAL,        )
INC., an Arizona non-profit        )
corporation,                       )
                                   )
               Plaintiff,          )
                                   )
     vs.                           ) No. CIV08-02274-PHX-DGC
                                   )
AV INN ASSOCIATES 1, LLC, a        )
California limited liability       )
company; HOOSHANG HAROONI,         )
                                   )
               Defendants.         )
_____)
```

DEPOSITION OF HOOSHANG HAROONI

(Volume II)

Phoenix, Arizona
December 11, 2009
10:30 a.m.

PREPARED FOR:
MR. DAVID W. GARBARINO
ATTORNEY AT LAW
(COPY)

Reported by:

HALEY WESTRA, RPR

Arizona CCR No. 50762

*Ottmar & Associates, Inc.*
2800 N. Central, Ste. 150
Phoenix, Arizona 85004
(602) 485-1488
1-866-485-1444

HOOSHANG HAROONI
12/11/2009

**2**

```
1              DEPOSITION OF HOOSHANG HAROONI,
2    VOLUME II, taken on December 11, 2009, commencing at
3    11:22 a.m. (sic), at the law offices of SHERMAN &
4    HOWARD, L.L.C., 2800 North Central Avenue, Phoenix,
5    Arizona, before HALEY WESTRA, a Certified Reporter in
6    the State of Arizona.
7
8    COUNSEL APPEARING:
9         SHERMAN & HOWARD, L.L.C.
          BY: Mr. David W. Garbarino
10            2800 North Central Avenue
          Phoenix, Arizona 85004-1043
11            Attorneys for Plaintiff
12       THE NATHANSON LAW FIRM
          BY: Mr. Phillip J. Nathanson
13            8765 East Bell Road, Suite 101
          Scottsdale, Arizona 85260
14            Attorneys for Defendants
15       THE NATHANSON LAW FIRM
          BY: Ms. Kira A. Schlesinger
16            8765 East Bell Road, Suite 101
          Scottsdale, Arizona 85260
17            Attorneys for Defendants
18
19   ALSO PRESENT:
20       Ms. Lisa Mikhailova
         Ms. Dorian Lefre
21
22
23
24
25
```

**4**

| | EXHIBITS DESCRIPTION | MARKED |
|---|---|---|
| 1 | No. 8  Summary Report, North American | 6 |
| 2 | Quality Assurance Assessment, | |
| 3 | Bates Nos. BW0022 to 0046 | |
| 4 | No. 9  Photographs, 05050, Antelope Valley | 6 |
| | Inn, dated 5/17/07 | |
| 5 | | |
| 6 | No. 10  Summary Report, North American | 6 |
| | Quality Assurance Assessment, Bates | |
| 7 | Nos. BW0172 to 0199 | |
| 8 | No. 11  Photographs, 05050, Antelope Valley | 6 |
| | Inn, dated 10/25/07 | |
| 9 | No. 12  Summary Report, North American | 6 |
| | Quality Assurance Assessment, | |
| 10 | Bates Nos. BW0427 to 0449 | |
| 11 | No. 13  Photographs, 05050, Best Western | 6 |
| | Antelope Valley Inn, dated 1/31/08 | |
| 12 | | |
| 13 | No. 14  Letter from Mr. Harooni to | 6 |
| | Mrs. Wininger, dated 12/4/07, | |
| 14 | Bates Nos. BW0312 to 0316 | |
| 15 | No. 15  Letter from Best Western to | 6 |
| | Mr. Harooni, dated 2/8/08, | |
| 16 | Bates Nos. BW0452 & 0453 | |
| 17 | No. 16  Letter from Best Western to | 6 |
| | Mr. Harooni, dated 2/26/08, | |
| 18 | Bates Nos. BW0459 & 0460 | |
| 19 | No. 17  Letter from Mr. Harooni to Best | 6 |
| | Western Chair and Members of the | |
| | Board, dated 3/21/08, Bates | |
| 20 | Nos. BW0562 to 0579 | |
| 21 | No. 18  Defendants' Answers to Plaintiff's | 6 |
| | Interrogatories | |
| 22 | | |
| 23 | No. 19  Defendants' Supplemental Answers to | 6 |
| | Plaintiff's Interrogatories | |
| 24 | No. 20  Declaration of Lisa Wilkerson | 6 |
| 25 | (continue) | |

**3**

INDEX

| | WITNESS | PAGE |
|---|---|---|
| 3 | | |
| 4 | HOOSHANG HAROONI | |
| 5 | EXAMINATION BY MR. GARBARINO | 6 |
| 6 | EXAMINATION BY MR. NATHANSON | 32 |
| 7 | FURTHER EXAMINATION BY MR. GARBARINO | 50 |
| 8 | FURTHER EXAMINATION BY MS. SCHLESINGER | 63 |

```
9
10                *     *     *
11         E X H I B I T S
12
```

| | EXHIBITS DESCRIPTION | MARKED |
|---|---|---|
| 13 | | |
| 14 | No. 1  Brief Two-Year History for Current | 6 |
| | Owner | |
| 15 | No. 2  Chart with Room Revenue, Catering, | 6 |
| 16 | and Service Charge | |
| 17 | No. 3  Best Western AV Inn Profit & Loss, | 6 |
| | January through December 2005 | |
| 18 | No. 4  Best Western AV Inn Profit & Loss, | 6 |
| 19 | January through December 2006 | |
| 20 | No. 5  Best Western AV Inn Profit & Loss, | 6 |
| | January through December 2007 | |
| 21 | No. 6  Best Western AV Inn Profit & Loss, | 6 |
| 22 | January through June 2008 | |
| 23 | No. 7  Best Western Membership Application | 6 |
| | and Agreement, Bates Nos. BW0001 to | |
| 24 | 0020 | |
| 25 | (continue) | |

**5**

| | EXHIBITS DESCRIPTION | MARKED |
|---|---|---|
| 1 | No. 21  Declaration of Lenaa Eseltine | 6 |
| 2 | No. 22  Declaration of Cheryl Duggan | 6 |
| 3 | No. 23  E-mail correspondence, dated 7/5/06, | 6 |
| 4 | Subject: FW: Antelope Valley Inn Best | |
| 5 | Western | |
| | No. 24  E-mail correspondence, dated 6/20/06 | 6 |
| 6 | & 6/23/06; Subject: Lockheed Martin | |
| 7 | Corporation Names New Travel Provider | |
| 8 | No. 25  Summary Report, Best Western North | 6 |
| 9 | American Quality Assurance, dated | |
| | 5/26/05 | |
| 10 | No. 26  Letter from Tony Russo to | 6 |
| 11 | Mr. Harooni, dated 10/31/07, | |
| | Bates Nos. BW0303 to 0305 | |
| 12 | No. 27  Tax Return for an S Corporation for | 6 |
| 13 | AV Inn Operations Group, Inc., 2006 | |
| 14 | No. 28  Tax Return for an S Corporation for | 6 |
| 15 | AV Inn Operations Group, Inc., 2007 | |
| 16 | No. 29  Tax Return for an S Corporation for | 6 |
| | AV Inn Operations Group, Inc., 2008 | |
| 17 | No. 30  U.S. Return of Partnership Income for | 6 |
| 18 | AV Inn Associates 1, LLC, 2005 | |
| | No. 31  U.S. Return of Partnership Income for | 6 |
| 19 | AV Inn Associates 1, LLC, 2006 | |
| 20 | No. 32  U.S. Return of Partnership Income for | 6 |
| 21 | AV Inn Associates 1, LLC, 2007 | |
| | No. 33  U.S. Return of Partnership Income for | 6 |
| 22 | AV Inn Associates 1, LLC, 2008 | |
| 23 | No. 34  Tax Return for an S Corporation for | 6 |
| 24 | AV Inn Operations Group, Inc., 2005 | |
| 25 | | |

HOOSHANG HAROONI
12/11/2009

6

1    (Exhibit Nos. 1 through 34 were marked.)

2

3            HOOSHANG HAROONI,

4    a witness herein, having been previously sworn by a

5    Certified Reporter to speak the truth and nothing but

6    the truth, was examined and testified further as

7    follows:

8

9            EXAMINATION

10   BY MR. GARBARINO:

11   Q.  Good morning, Mr. Harooni.  How are you doing?

12   A.  Fine.  How are you?

13   Q.  Good.

14          You understand that this is a

15   continuation of the deposition that we started last

16   Friday?

17   A.  Yes, sir.

18   Q.  Okay.  And could you just state your name for

19   the record.

20   A.  Hooshang Harooni, short for Harry.

21   Q.  And could you just spell your first and last

22   name for the record.

23   A.  H-O-O-S-H-A-N-G, last name is Harooni,

24   H-A-R-O-O-N-I.

25   Q.  Okay.  And you understand or you recall the

7

1    ground rules that we went over in the previous

2    deposition?

3    A.  Yes.

4    Q.  Those same ground rules apply here today.

5    A.  I understand.

6    Q.  So if you have any questions or you need to

7    take a break, just let me know --

8    A.  Yes, sir.

9    Q.  -- and we'll let that happen.  Again, my only

10   caveat is that if you take a break, that you answer the

11   question that's been asked of you before we go on

12   break.

13   A.  Yes.

14   Q.  Last Friday, you had been taking some

15   medication, and you listed a number of specific drugs

16   that you were taking.  Has any of that changed for this

17   morning's deposition?

18   A.  No.

19   Q.  Okay.  Does any of the medication you're

20   taking today affect your ability to understand my

21   questions or answer my questions?

22   A.  Same as before, no.

23   Q.  Fair enough.

24          And, again, today I'll be referring to

25   the hotel, and, again, that is the hotel located in

8

1    Lancaster, California at 44055 North Sierra Highway.

2    Is that okay?

3    A.  Correct.

4    Q.  Okay.  Something that we discussed last Friday

5    was the difference between AV Inn Associates 1, LLC and

6    another company that you testified operated the

7    businesses on the property; is that correct?

8    A.  Correct.

9    Q.  Does the name AV Inn Operations Group, Inc.,

10   ring a bell to you?

11   A.  Yes, sir.

12   Q.  Is that the company that owns and operates the

13   businesses on the property where the hotel is located?

14   A.  Correct.

15   Q.  And does that include the hotel itself, the

16   operations of the hotel --

17   A.  Yes, sir.

18   Q.  I'm sorry.  Let me finish my question.

19   A.  Oh, I'm sorry.

20   Q.  Does that include the operations of the hotel?

21   A.  I believe so.

22   Q.  Okay.  And do you file different tax returns

23   for AV Inn Associates 1, LLC and AV Inn Operations

24   Group, Inc.?

25   A.  I believe so.

9

1    Q.  I'm going to ask you to look at some exhibits,

2    and they're specifically going to be Exhibits 27

3    through 34, and we'll just start with the first one,

4    Exhibit 27.

5    A.  Okay.

6    Q.  Do you recognize this document?

7    A.  Not really.

8    Q.  You don't recognize this document?

9    A.  Can I explain?

10   Q.  Certainly.  Go ahead.

11   A.  Okay.  I don't remember the exact details, but

12   if I see my signature, it must be the same form, so it

13   must be correct.  So I really forget things, and

14   I don't exactly know, but this must be my tax return,

15   yes.

16   Q.  And this is the tax return for which company?

17   A.  AV Inn Operations Group, Inc., for the

18   restaurant and the bar and hotel and banquet.

19          (Court reporter instructs the witness to

20   speak up.)

21   BY MR. GARBARINO:

22   Q.  Okay.  So is it fair to say that, you know,

23   subject to your verification, that this is the actual

24   tax return file?

25   A.  Correct.

HOOSHANG HAROONI
12/11/2009

10

1    Q.   And that this is the tax return for AV Inn
2   Operations Group for 2006?
3    A.   Correct.
4         MR. GARBARINO:   And just for the record,
5   that was Exhibit 27.
6   BY MR. GARBARINO:
7    Q.   Mr. Harooni, these are documents -- and I
8   should have started my question with this
9   information -- these are documents that I received from
10  Mr. Lavi last week.   These are documents that you
11  testified that you gave Mr. Lavi; is that correct?
12   A.   Correct.
13   Q.   If we can go to the next exhibit, Exhibit 28,
14  is that also a tax return, Mr. Harooni?
15   A.   Correct.
16   Q.   And do you recognize this tax return?
17   A.   Correct.
18   Q.   And this tax return is for AV Inn Operations
19  Group?
20   A.   Yes.
21   Q.   And, again, that's Exhibit 28, correct?
22   A.   Correct.
23   Q.   Let's talk about Exhibit 29 for a second.
24  Is Exhibit 29 a tax return for AV Inn Operations Group,
25  Inc., for 2008?

11

1    A.   Yes.
2    Q.   And you recognize this tax return?
3    A.   Yes.
4    Q.   Let's go to Exhibit 30.   Mr. Harooni, do you
5   recognize this document?
6    A.   Yes.
7    Q.   Do you agree that this is a tax return for the
8   year 2005 for AV Inn Associates 1, LLC?
9    A.   Correct.
10   Q.   And, again, this is Exhibit 30, correct?
11   A.   Correct.
12   Q.   If you could go to Exhibit 31.   Do you agree
13  that Exhibit 31 is a tax return for AV Inn
14  Associates 1, LLC, for the tax year of 2006?
15   A.   Yes.
16   Q.   Exhibit 32, is that the exhibit you're looking
17  at right now?
18   A.   Yes, sir.
19   Q.   Do you agree that that is a tax return for the
20  year 2007 for AV Inn Associates 1, LLC?
21   A.   Yes.
22   Q.   Almost finished here on the tax returns.
23  Exhibit 33, do you agree that that is the 2008 tax
24  return for AV Inn Associates 1, LLC?
25   A.   Yes.

12

1    Q.   Last one, Exhibit 34.   Do you agree that
2   Exhibit 34 is the 2005 tax return for AV Inn Operations
3   Group, Inc.?
4    A.   Yes.
5    Q.   Have you alleged that there are oral
6   agreements between you and Best Western?
7    A.   Correct.
8    Q.   How many oral agreements are there between you
9   and Best Western?
10   A.   I can't recall how many, but we can go through
11  them, if you'd like.
12   Q.   Okay.   Let's start with the first oral
13  agreement that you have with Best Western.   Can you
14  tell me what the terms of that agreement are?
15   A.   Having two major disease and just going to a
16  new business, I went to Terry Wininger --
17        (Court reporter instructs the witness to
18  speak up, and court reporter moves closer to the
19  witness.)
20   A.   Having the two major diseases and working for
21  30 years and not even -- I didn't even have one time
22  defeat, so I wasn't going to make a mistake, so I went
23  for interview with Terry Wininger to qualify me, and
24  she assured me that "Don't worry, everything is going
25  to be okay, we have money manager, we have people that

13

1   come in to monitor your revenue for you, we have a
2   field officer, anytime you want, he'll be there to help
3   you with any questions that you have."   And the other
4   chain -- and at that time, I said, "I like Best Western
5   name myself too," so I thought it would be a good name
6   for that location, so I went for it.
7    Q.   So what are the terms of the actual oral
8   agreement that you just discussed?
9    A.   I didn't know it was supposed to be a term.
10  What do you mean by that?
11   Q.   What obligation did Best Western have to you
12  under the agreement that you just set forth?
13   A.   To help me with the account.
14   Q.   What consideration did you give Best Western
15  for that obligation?
16        MR. NATHANSON:   Objection.   You're asking
17  for a legal opinion of the witness.
18   A.   I gave my life, my time, my effort, my
19  experience, money, everything that I had and promised,
20  and I was always in contact with Terry.   She was nice
21  to me, and Mitch was very nice up to the last appraisal
22  that he did for us, last thing, then nobody ever saw
23  him again.
24  BY MR. GARBARINO:
25   Q.   Do you know if you paid any more than any

HOOSHANG HAROONI
12/11/2009

14

1  other Best Western under the membership agreement and
2  application?
3      A.  Honestly, I have no idea.  I was happy.
4  I paid 50-some.  I don't know how much was the money --
5  or 35-.  I don't even remember.
6      Q.  Did Terry Wininger state any specific support
7  that would be provided to you under this oral
8  agreement?
9      A.  I don't understand the word -- I mean,
10 I understand the word, what "specific" means, but when
11 somebody tells you, "We have money managers, revenue
12 managers, people to contact, we have design standards,
13 we have design people, this people, that people,"
14 I was -- I took her word as a good thing, that they
15 would help me if they can.
16     Q.  So are there any other specific terms to this
17 oral agreement that you --
18     A.  Not that I know of.
19     Q.  Let me finish my sentence.
20         Are there any other specific terms to
21 this oral agreement than what you've stated here today?
22     A.  I think I answered that question.
23     Q.  Can we just confirm your answer to that
24 question.
25     A.  Specifically, monitoring my growth, money

15

1  manager, giving me support in design and any standards,
2  and anything like that I need to call her to make sure
3  that things get done for me, and good luck.
4      Q.  Was this above and beyond what is provided to
5  any other Best Western member, to your knowledge?
6      A.  I guess Best Western knows that better than
7  me.
8      Q.  So you don't have any answer to that question?
9      A.  I have no answer to that question.
10     Q.  And do you know if you paid Best Western any
11 additional money for this additional support?
12     A.  Well, I think many, many times they stole
13 money from you.  By having to go to that meeting, you
14 have to pay the design standard, ready to collect money
15 whether you want it or not.  Anything.  They make
16 you -- they encourage you very hard -- they encourage
17 you to buy from their people so they can make their
18 10 percent commission.
19         I forgot what was the question.  I'm
20 sorry.
21     Q.  Did you pay Best Western any additional money
22 for the additional support that you've stated here you
23 should have received?
24     A.  At the end, yes.  At the end, anything
25 I asked, they said that you have to pay money.  You

16

1  have to pay this, you have to pay that before we can
2  come out again.  You have to pay for design lady to
3  come out; otherwise, she won't come see you.  They take
4  you for every penny that you have, for everything that
5  they wanted, yes.
6      Q.  Do you know if other Best Western members had
7  to pay the exact same amounts for somebody to come to
8  their property from Best Western?
9      A.  Unfortunately, I only own one hotel.
10     Q.  Who was present when this oral agreement was
11 allegedly struck?
12     A.  Me, Terry, and God.
13         (Court reporter asks for clarification.)
14         THE WITNESS:  And God.
15 BY MR. GARBARINO:
16     Q.  Kevin was not present?
17     A.  Maybe he was in one of the meetings.  I'm not
18 sure.
19     Q.  And was this agreement struck before you
20 entered into the Best Western agreement?
21     A.  Yes.
22     Q.  Was there any other oral agreement that you're
23 alleging here today that Best Western breached?
24     A.  Not breached, purposely not helped.
25     Q.  What other oral agreement are you referring

17

1  to?
2      A.  Well, not helping with their corporate people,
3  don't even -- they -- nobody -- after I requested so
4  many times from Terry, "Please help me out, please help
5  me out," it wasn't until I hired two people,
6  professional people, that they dug in and find out
7  there is a department that only gets -- for corporate
8  accounts and stuff, that they hide it from me, and
9  I didn't even know it exist.
10     Q.  So, Mr. Harooni, my question is, What other
11 oral agreement existed between you and Best Western?
12     A.  Oral agreement?  Specifically, I don't recall,
13 but generally everything.
14     Q.  What do you mean, "generally everything"?
15     A.  I don't know how to answer that question.
16 I've said it many times.
17         MR. NATHANSON:  Can we have two minutes,
18 please?
19         MR. GARBARINO:  Certainly.
20         MR. NATHANSON:  No question is pending?
21         MR. GARBARINO:  No question is pending.
22         MR. NATHANSON:  Thank you.
23         (Recess was taken from 11:38 a.m. to
24 11:46 a.m.)

# EXHIBIT I

LAW OFFICES
**SHERMAN & HOWARD L.L.C.**
2800 NORTH CENTRAL AVENUE, SUITE 1100
PHOENIX, ARIZONA 85004-1043
TELEPHONE (602) 240-3000
FACSIMILE (602) 240-6600
(AZ BAR FIRM NO. 00441000)
Arthur W. Pederson (AZ Bar No. 002821)
(apederson@shermanhoward.com)
David W. Garbarino (AZ Bar No. 022452)
(dgarbarino@shermanhoward.com)
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BEST WESTERN INTERNATIONAL, INC., an Arizona non-profit corporation, | No. CIV08-02274-PHX-DGC |
| Plaintiff, | **PLAINTIFF'S INTERROGATORIES TO DEFENDANTS** |
| v. | |
| AV INN ASSOCIATES 1, LLC., a California limited liability company; HOOSHANG HAROONI, | |
| Defendants. | |

Plaintiff Best Western International, Inc., an Arizona non-profit corporation ("Best Western"), requests that defendants AV Inn Associates 1, LLC, a California Limited liability company ("AV Inn"), and Hooshang Harooni ("Harooni") (AV Inn and Harooni collectively, "Defendants") answer all of the following interrogatories, in writing and under oath, as required by Rule 33 of the Federal Rules of Civil Procedure ("Rule 33"). According to Rule 33, a copy of Defendants' written response to these interrogatories must be served on undersigned counsel for Best Western at the address listed in this document within 30 days of service of these interrogatories. Pursuant to Rule 33(a)(1), "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Because AV Inn and Harooni are two different parties, Best Western is entitled to serve 25 written interrogatories upon AV Inn and Harooni. For the sake of convenience and efficiency, however, Best Western

476462.1 \ xh9x01 \ 18224-013

has combined its interrogatories to AV Inn and Harooni herein.

## *INSTRUCTIONS FOR RESPONDING*

A.     These interrogatories are to be answered by Defendants based on all the information that is or may be available to Defendants, or any person, employee, agent, expert, accountant or attorney who has acted or is now acting on Defendants' behalf.

B.     If, after a reasonable and thorough investigation, using due diligence, Defendants are unable to answer any interrogatory, or any part of an interrogatory, on the grounds of lack of information available to Defendants, specify in full and complete detail why the information is not available to Defendants and what has been done to locate such information.  In addition, specify what knowledge or belief Defendants do have concerning the unanswered portion of any interrogatory and set forth the facts on which such knowledge or belief is based.

C.     When an interrogatory does not specifically request a particular fact, but when that fact or facts are necessary to make the answer to the interrogatory either comprehensible, complete or not misleading, Defendants should include that fact or those facts as part of the answer.  The interrogatory shall be deemed specifically to request whatever fact or facts are needed to make the response comprehensible without reference to any other matter.

D.     If Defendants claim any form or privilege with regard to any oral communication, document or tangible thing, whether based on a statute or otherwise, as a ground for not answering an interrogatory or any portion of an interrogatory, or for not voluntarily producing any tangible thing or document, set forth in Defendants' answers, with respect to each oral communication, document or tangible thing for which Defendants claim such a privilege, state the following:

        1.     The date of any oral communication or the date of preparation of any document;

        2.     The name, address, title, and occupation of each of the participants in any oral conversation or each of the authors and addresses of

1    any document;

2    3.    The name, title, and address of the present custodian of any

3    document or tangible thing;

4    4.    A description of each oral conversation, document or tangible

5    thing (by subject matter or title) that is sufficient to identify the

6    particular conversation or tangible thing without revealing its

7    content, but with sufficient detail to set out the legal and factual

8    basis for the application of the privilege claimed for that

9    conversation, document, or tangible thing.

10    E.    When statements of factual information are requested, the requested

11    information includes the identification of all formal and informal documentation that

12    explains, clarifies, describes or in any way relates to the requested statement of factual

13    information.

14    F.    For the purposes of these interrogatories, whenever necessary to ensure

15    completeness or accuracy, words importing the singular number include the plural and

16    words importing the plural number include the singular, and words importing the

17    masculine include the feminine.

18    G.    With respect to any interrogatory or answer in which reference is made to

19    an oral communication, specify the following:

20    1.    The name, company or other affiliation, and title or identifying

21    feature of the individual who made the oral communication;

22    2.    The name, company or affiliation, and title or other identifying

23    feature of each individual to whom the oral communication was

24    made;

25    3.    The date on which the oral communication was made;

26    4.    The place where the oral communication was made;

27    5.    The name of each individual who heard the oral communication if

28    different or in addition to those individuals to whom the oral

communication was made. If the name of these individuals is not sufficient to permit identification of the individuals, include a description of those individuals that will be sufficient to permit their identification by Best Western;

6. The nature and content of the oral communication, repeating the actual words used to the extent possible and, when not possible, paraphrasing in detail those words;

7. State whether any individual to whom the oral communication was made, or hearing the oral communication, made any statements in response to the communication and, if so, identify the response or responses in detail, repeating the actual words used to the extent possible and, when not possible, paraphrasing those words; and

8. State whether the oral communication was ever memorialized in any document. If so, identify each document in sufficient detail to permit the preparation of a valid request to produce it under Rule 34 of the Federal Rules of Civil Procedure.

H. "Identify," "describe" or "explain," when used with respect to a fact, evidence, event, occurrence, meeting, action, conference or discussion, shall require Defendants to set forth a detailed account item to be identified, described or explained (i.e., what is the fact, evidence, event, occurrence, meeting, action, conference or discussion that supports Defendants' answer and who can testify based upon personal knowledge to the answer provided, what documents or other materials support the answer provided, when the fact, evidence, event, occurrence, meeting, action, conference or discussion came about, and how the fact, evidence, event, occurrence, meeting, action, conference or discussion supports the answer Defendants provide).

I. Where an individual interrogatory calls for an answer that involves more than one part, each part of the answer should be clearly set out so that it is understandable.

J.     A space has been provided on the interrogatories for Defendants' answers. Defendants' answers should immediately follow the interrogatory. If the answer requires more space than is provided, Defendants shall use a separate sheet that restates the interrogatory to be answered and includes Defendants' answer to interrogatory.

K.     The following definitions apply to these interrogatories and any responses thereto.

1.     "Litigation" means the litigation captioned *Best Western International, Inc. v. AV Inn Associates 1, LLC*, cause no. CV-08-2274-PHX-DGC, pending in the United States District Court for the District of Arizona.

2.     "Best Western" means Best Western International, Inc., an Arizona non-profit corporation.

3.     "AV Inn" means AV Inn Associates 1, LLC, a California Limited liability company.

4.     "Harooni" means Hooshang Harooni.

5.     "Defendants" means AV Inn and Harooni collectively.

6.     "Hotel" means the hotel formerly known as the Best Western Antelope Valley Inn, located in Lancaster, California and referenced in Best Western's records as property T-05050 (the "Hotel").

7.     "Membership Agreement" means the Membership Application and Agreement executed on or about December 1, 2004 by Harooni as Managing Member of AV Inn and in his individual capacity.

8.     "Rules & Regulations" means the Rules & Regulations dated December 2007.

9.     "Bylaws & Articles" means the Bylaws & Articles dated June 2006.

10.    "Governing Documents" means the Membership Agreement, Rules & Regulations, and Bylaws & Articles, collectively.

11.    "Board" means the Board of Directors of Best Western.

12.    "Documents" shall include, but shall not be limited to, every means of recording any tangible thing, including letters, words, pictures, sounds, symbols or combinations thereof; any oral communication later reduced to writing, notes, memoranda, correspondence, written statements or reports; other writings; recorded or taped interviews or statements; agreements; invoices; checks; bank account statements; broker-dealer and insurance company statements; receipts; financial statements; tax returns; contracts; agreements; files; records; computer files; disks; CD ROMs; tapes; electronic mail; and other data compilations from which information can be obtained or translated through detection devices into reasonably usable form when translation is practically necessary.

L.    These interrogatories are continuing in nature and responses that Defendants later learn are inaccurate or incomplete are to be reasonably supplemented as required by Rule 26(e).

......
......
......
......
......
......
......
......
......

1

## ***INTERROGATORIES***

2      1.      Identify each and every fact Defendants' rely upon to assert their denials

3  of the allegations contained in paragraph 21 of Best Western's Complaint.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11.      Identify each and every representation made by an employee, agent, or officer of Best Western to Defendants before Defendants executed the Membership Agreement on or about December 1, 2004.

15.   Identify each and every fact Defendants rely upon to allege that any inspection score was unjustly issued or given by Best Western with respect to the Hotel.

1

2          18.     Identify the term or provision of the Governing Documents that allegedly

3    obligated Best Western to provide the services Defendants identified in response to

4    Interrogatory 17 *supra*.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25.    Identify each and every fact Defendants' rely upon to allege the affirmative defenses asserted in paragraph 14 of Defendants' Answer.

1

2          27.    In Paragraphs 14 and 15 of Defendants' Counterclaim, Defendants allege

3    the incurrence of "economic harm," damages, and irreparable harm to Defendants'

4    business and property.    Identify how much Defendants seek to recover from Best

5    Western in the Litigation.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28.     With respect to the amount identified by Defendants in response to Interrogatory 27 *supra*, explain how that amount was calculated.

1

2          29.     Provide an itemized list with specific amount of each category of

3   damages Defendants seek to recover from Best Western.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2        30.    Identify all evidence within Defendants' possession, custody, or control,

3 and/or anticipated testimony of witnesses, including the names of such witnesses and

4 their respective anticipated testimony, that demonstrates the facts identified by

5 Defendants' response to Interrogatories 27-29.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **DATED** this 9th day of July, 2009.

2

3                                   SHERMAN & HOWARD L.L.C.

4                          By /s/ David W. Garbarino
                               Arthur W. Pederson
5                              David W. Garbarino
                               2800 North Central Avenue, Suite 1100
6                              Phoenix, AZ 85004-1043
                               Attorneys for Plaintiff
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on July 9, 2009, the foregoing was transmitted to the following CM/ECF registrant via email and U.S Mail:

3

4                 Philip J. Nathanson
The Nathanson Law Firm

5              8765 East Bell Road, Suite 101
Scottsdale, Arizona 85260

6               Attorney for Defendants
philipj@nathansonlawfirm.com

7

8

9

10  /s/ David W. Garbarino

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT J

1  Philip J. Nathanson (AZ Bar #013624)
   **THE NATHANSON LAW FIRM**
2  8765 E. BELL ROAD, SUITE 101
   SCOTTSDALE, AZ 85260
3  (480) 419-2578
   (480) 419-4136-Fax
4

5  *Attorney for Defendants*

6          **IN THE UNITED STATES DISTRICT COURT**
7                   **DISTRICT OF ARIZONA**

8  BEST WESTERN INTERNATIONAL,
   INC.,                                    No.  CV 08 - 2274 - PHX-DGC
9
       Plaintiff,                           **DEFENDANTS' ANSWERS TO**
10                                          **PLAINTIFF'S INTERROGATORIES.**

11 vs.                                      (Assigned to Judge David G. Campbell)

12 AV INN ASSOCIATES 1, LLC, and
   HOOSHANG HAROONI,
13
       Defendants.
14

15

16      **DEFENDANTS' ANSWERS TO PLAINTIFFS INTERROGATORIES**

17      Defendants, AV INN ASSOCIATES 1, LLC and HOOSHANG HAROONI,

18 by their attorney, PHILIP J. NATHANSON and THE NATHANSON LAW FIRM,

19 submit these answers to plaintiff's interrogatories pursuant to Federal Rule of

20 Civil Procedure 33 as follows:

21                         **General Objection**

22      Pursuant to Rule 33(a)(1), "a party may serve on any other party no more

23 than 25 written interrogatories, including all discrete subparts." Plaintiffs address

24 their Interrogatories to AV INN ASSOCIATES 1, LLC and HOOSHANG

25

HAROONI collectively.  Plaintiffs, however, address a total of 33 Interrogatories to AV INN ASSOCIATES 1, LLC and HOOSHANG HAROONI collectively. Addressing two defendants collectively does not entitle Plaintiffs to aggregate the total number of Interrogatories that may be directed to each of them under Rule 33(a)(1).  Such a practice would ignore the language and plain meaning of the Rule. For this reason AV INN ASSOCIATES 1, LLC and HOOSHANG HAROONI collectively answer the first 25 Interrogatories directed to them by the Plaintiffs.

## Answers and Specific Objection

1.   Identify each and every fact Defendants' rely upon to assert their denials of the allegations contained in paragraph 21 of Best Western's Complaint.

**ANSWER:**  Defendants objects that the phrase "certain fees and other charges imposed on Defendants" incorporated by reference to paragraph 21 of Best Western's Complaint is vague and overbroad.  Without further specificity Defendants are unable to anticipate "each and every fact" that might have a bearing on "certain fees and other charges."

1. Subject to and without waiving this objection, Defendants deny that they owe any money to Best Western.  Defendants paid Best Western all monies that Defendants rightfully owed Best Western up to and including April 8, 2008, the date Best Western terminated Defendants' affiliation with Best Western. Defendants contend that plaintiff wrongfully terminated their membership, shut down the reservation system, interfered with the business and therefore prevented defendants from making money.

Defendants deny that they owe Best Western any membership fees which accrued after Best Western wrongfully terminated Defendants' Best Western membership. Defendants further deny that they owe Best Western "certain fees and other charges" for services that were not satisfactorily provided by Best Western.

2.   Identify all evidence within Defendants' possession, custody or control, and/or anticipated testimony of witnesses, including the names of such witnesses and their respective anticipated testimony, that demonstrates the facts identified by Defendants' response to Interrogatory 1 *supra*.

**ANSWER:** Defendants anticipate the testimony of Lisa Wilkerson, Director of Sales at Best Western Antelope Valley Inn, Cheryl Dugan, General Manager of the Best Western Antelope Valley Inn from approximately April 2006-April 2008, and Lenaa Eseltine, Housekeeping Manager of the Best Western Antelope Valley Inn.   Ms. Wilkerson, Ms. Dugan and Ms. Eseltine each submitted signed Declarations which accompanied Defendants Counterclaim in this action.

3.   Identify each and every fact Defendants rely upon to assert their denials of the allegations contained in paragraph 24 of Best Western's Complaint.

**ANSWER:** Defendants object to the phrase "the amounts" as vague. That phrase is incorporated by reference to paragraph 24 of Best Western's Complaint. Without further specificity Defendants are unable to anticipate "each and every fact" which might bear upon the vague phrase "the amounts."

9.      Identify each and every fact Defendants rely upon to assert their denials of the allegations contained in paragraph 35 of Best Western's Complaint.

**ANSWER:**  Defendants deny paragraph 35 of Best Western's Complaint to the extent that it states that the amount claimed by the Plaintiffs is rightfully due to Plaintiffs from Defendants.  Once again, Defendants deny that Defendants owe Plaintiffs for "fees and other charges" charged to Defendants by Plaintiffs after the termination of Defendants' membership in Best Western.  Defendants further deny that Defendants owe Plaintiffs for services that Plaintiffs failed to provide to Defendants.  Defendants hereby incorporate their Answers to Interrogatories 6 and 7 *supra*.

10.     Identify all evidence within Defendants' possession, custody or control, and/or anticipated testimony of witnesses, including the names of such witnesses and their respective anticipated testimony, that demonstrates the facts identified by Defendants' response to Interrogatory 9 *supra*.

**ANSWER:**  Defendants hereby incorporate their answer to Interrogatory 8 *supra*.

11.     Identify each and every representation made by an employee, agent, or officer of Best Western to Defendants before Defendants executed the Membership Agreement on or about December 1, 2004.

**ANSWER:**    Defendant HAROONI spoke with Terry Winiger before Defendant HAROONI executed the Membership Agreement.   Terry Winiger induced Mr. Harooni to purchase the hotel after 2 other buyers backed out. She

promised to provide support because of his inexperience in the hotel business. He would not have purchased the hotel if not for those promises.

12. Identify all evidence within Defendants' possession, custody or control, and/or anticipated testimony of witnesses, including the names of such witnesses and their respective anticipated testimony, that demonstrates the facts identified by Defendants' response to Interrogatory 11 *supra*.

**ANSWER:** Defendants' investigation is ongoing. Defendants will provide Plaintiffs with evidence as it becomes available.

13. Identify each and every fact Defendants rely upon to claim that Best Western failed to maintain a functioning online reservation system.

**ANSWER:** Sheryl Dugan and Lisa Wilkerson collectively discovered the online reservation system was not working. After Best Western was advised of the problem they failed to fix it. Defendants have attached Declarations from Sheryl Dugan and Lisa Wilkerson hereto. Defendants have also attached an email from Lisa Wilkerson to MariAnn Gray identifying an issue with the online reservation system. Defendants' investigation is ongoing. Defendants will provide Plaintiffs with additional information as it becomes available.

14. Identify all evidence within Defendants' possession, custody or control, and/or anticipated testimony of witnesses, including the names of such witnesses and their respective anticipated testimony, that demonstrates the facts identified by Defendants' response to Interrogatory 13 *supra*.

**ANSWER:**  Defendants incorporate herein their answer to Interrogatory 13 *supra*.  Defendants further answer that Mitch Van Wormer, an inspector for Best Western who investigated the Hotel, has knowledge of the malfunctioning system. Defendants further answer that Defendant HAROONI's nephew, Kevin Rafou has knowledge of the malfunctioning system.

15.    Identify each and every fact Defendants rely upon to allege that any inspection score was unjustly issued or given by Best Western with respect to the Hotel.

**ANSWER:**  The Hotel was in a poor condition when Defendants purchased it.  The prior hotel owner's membership was not terminated even when the hotel was in bad condition under that prior ownership.  Mitch overlooked the problems according to Lenaa Haseltine.   Mitch took points off for items he previously approved.

Pursuant to Rule 33(d) Defendants have attached hereto a list of suggested improvements to the property dated 12/29/03.  The Hotel had been placed on probation under its previous owners, but had not had its membership revoked. Defendants invested over two million dollars into the property after purchasing it on March 1, 2005.  The inspections were capricious and points would be taken off on subsequent inspections for Hotel property that had previously passed.

16.    Identify all evidence within Defendants' possession, custody or control, and/or anticipated testimony of witnesses, including the names of such

witnesses and their respective anticipated testimony, that demonstrates the facts identified by Defendants' response to Interrogatory 15 *supra*.

**ANSWER:** Defendants cite the Declaration of Lenaa Haseltine, which is attached hereto pursuant to F.R.C.P. Rule 33(d). Pursuant to F.R.C.P. Rule 33(d) Defendants have also attached the Summary Reports from: (1) January 31, 2008; (2) October 25, 2007; (3) May 17, 2007, and; (4) May 26, 2005.

17.    Identify each and every service that Defendants allege Best Western was obligated to provide to Defendants at any time.

2. **ANSWER:** Plaintiffs were obligated to provide Defendants with a functioning online reservation system, a Revenue Manager to look over the account and to make suggestions for improvements and assistance from Best Western in obtaining corporate accounts. Further, Plaintiffs were obligated to inform Defendants of corporate policies that directly affected Defendants' ability to thrive as Best Western members. Plaintiffs failed to inform Defendant HAROONI of an internal Best Western corporate accounts deadline. Plaintiff was also obligated to provide a functioning online reservation system, a Revenue Manager to look over the account and make suggestions for improvements.

18.    Identify the term of provision of the Governing Documents that allegedly obligated Best Western to provide the services Defendants identified in response to Interrogatory 17 *supra*.

**ANSWER:** Some of the services that Plaintiffs promised Defendants were pursuant to oral agreement. Other promises, such as the fact that Defendants

need only participate in maintaining the computer systems is included in the Membership Agreement.

19.   Identify all evidence within Defendants' possession, custody or control, and/or anticipated testimony of witnesses, including the names of such witnesses and their respective anticipated testimony, that demonstrates the facts identified by Defendants' response to Interrogatory 17 *supra*.

**ANSWER:** Defendants incorporate herein their answer to Interrogatory 2 *supra*.   Defendants further answer that Kevin Rafou and Terry Winiger are witnesses with knowledge of the oral agreements.

20.   Identify each and every fact that Defendants rely upon to assert that Best Western breached any term or provision of the Governing Documents.

**ANSWER:**   Plaintiffs failed to provide Defendants with functioning reservations equipment.   Defendants incorporate their answers to interrogatories ##7, 11, 13, 15 and 17.

21.   Identify the term or provision of the Governing Documents that Defendants' allege Best Western breached in Defendants' response to Interrogatory 20 *supra*.

**ANSWER:** Membership Agreement ¶ 16; Rules & Regulations Chapter 4 generally and 500.34 specifically.

22.   Identify all evidence within Defendants' possession, custody or control, and/or anticipated testimony of witnesses, including the names of such

attached to these Interrogatories.  Defendants' investigation is ongoing and will supplement this answer as the Litigation progresses.

27.    In paragraph 14 and 15 of Defendants' Counterclaim, Defendants allege the incurrence of "economic harm," damages and irreparable harm to Defendants' business and property.   Identify how much Defendants seek to recover from Best Western in the Litigation.

**ANSWER:** Paragraph 14 is the final paragraph in Defendants' Counterclaim.  To the extent that Interrogatory 27 confuses "paragraph 14 and 15" with "paragraph 13 and 14," Defendants aver that Defendants purchased the Hotel for $8.9 million and sold it for $4.8 million.  Mr. Harooni spent close to $2 million in renovations, and defendants are attempting to determine how much money they lost due to the malfunctioning reservation system and after the membership was terminated.

28.  With respect to the amount identified by Defendants in response to Interrogatory 27 *supra,* explain how that amount was calculated.

**ANSWER:** By assessing expenditures.

29.    Provide an itemized list with specific amount [sic] of each category of damages Defendants seek to recover from Best Western.

**ANSWER:** Defendants claim damages due to the malfunctioning reservation system and losses sustained as a result of the Hotel's loss of affiliation with Best Western.  Defendants incorporate their answer to interrogatory #27.

30.   Identify all evidence within Defendants' possession, custody or control, and/or anticipated testimony of witnesses, including the names of such witnesses and their respective anticipated testimony, that demonstrates the facts identified by Defendants' response to Interrogatory 27-29 *supra*.

**ANSWER:** Defendants are in the process of acquiring and will produce the Escrow Statements for the purchase and sale of the Hotel.  Defendants are in the process of obtaining the additional financial records from their accountant and will update this answer at that time.

31.   Provide an itemized listing of all amounts Defendants paid Best Western in 2004, 2005, 2006, 2007, and 2008.

**ANSWER:**  Defendants paid a total of $629,360.61 to Best Western from 2004-2008.  Defendants do not have itemized listings in their possession at this time.  They are in the process of obtaining them from their accountant and will furnish them when they are recovered.

32.   Explain why Harooni is entitled to recover any amount from Best Western as he was not the owner of the Hotel during Defendants' Best Western membership.

**ANSWER:** Defendants' Counterclaim was drafted while Defendants were still *pro per* or *pro se*.  If legally necessary or required, Defendants will amend the Counterclaim to remove HAROONI as a counter-plaintiff.

33.   Identify each and every cause of action Defendants assert against Best Western in the Litigation.

1   **ANSWER:** Defendants assert Breach of Contract, Breach of Implied

2   Contract and Breach of Implied Covenant of Good Faith and Fair Dealing.

3   DATED this 29th day of September, 2009.

4

5

6   Philip J. Nathanson

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## CERTIFICATE OF SERVICE

I, Philip J. Nathanson, an attorney, certify that I caused a copy of the above and foregoing answers to be served upon the above named parties, electronically, by emailing same on September 29, 2009, to all counsel of record.

_____ /s/   Philip J. Nathanson
Philip J. Nathanson