# EXHIBIT K

1

Philip J. Nathanson (AZ Bar #013624)
**THE NATHANSON LAW FIRM**

2

8765 E. BELL ROAD, SUITE 101
SCOTTSDALE, AZ 85260

3

(480) 419-2578

4

(480) 419-4136-Fax

5

*Attorney for Defendants*

6

IN THE UNITED STATES DISTRICT COURT

7

DISTRICT OF ARIZONA

8

BEST WESTERN INTERNATIONAL, INC.,

No.  CV 08 - 2274 - PHX-DGC

9

Plaintiff,

**DEFENDANTS' SUPPLEMENTAL ANSWERS TO PLAINTIFF'S INTERROGATORIES.**

10

11

vs.

(Assigned to Judge David G. Campbell)

12

AV INN ASSOCIATES 1, LLC, and HOOSHANG HAROONI,

13

Defendants.

14

15

16

**DEFENDANTS' SUPPLEMENTAL ANSWERS**
**TO PLAINTIFFS INTERROGATORIES**

17

18

Defendants, AV INN ASSOCIATES 1, LLC and HOOSHANG HAROONI,

19

by their attorney, PHILIP J. NATHANSON and THE NATHANSON LAW FIRM,

20

submit these supplemental answers to plaintiff's interrogatories, pursuant to

21

Federal Rule of Civil Procedure 33 as follows:

22

**SUPPLEMENTAL ANSWERS**

23

1.   Interrogatories 1-10. No additional documents will be used to disprove

24

liability under paragraph 21, other than defendants' F.R.Civ. P. 26 expert report

25

and any accounting documents identified in that report as a basis for the expert's opinion, or as documents on which the expert relied to formulate his opinion.

11.    Identify each and every representation made by an employee, agent, or officer of Best Western to Defendants before Defendants executed the Membership Agreement on or about December 1, 2004.

**SUPPLEMENTAL ANSWER:**    During the initial interview for membership, Ms. Winiger told Mr. Harooni that she was the district manager for hotel area and was in charge of all the decision making and it would be up to her whether the membership license would be granted. Mr. Harooni was hesitant to purchase the hotel by himself after his partners backed out, having no prior hotel experience. Ms. Winiger stated Best Western had various support that would be available to Mr. Harooni to aid him in running the hotel, including money management, account management, design help. These representations were made orally during the initial interview and there are no documents containing these promises.

13.    Identify each and every fact Defendants rely upon to claim that Best Western failed to maintain a functioning online reservation system.

**SUPPLEMENTAL ANSWER:**    The online reservation system started malfunctioning approximately in August 2006 and continued to malfunction for at least a year after that.

14.    Identify all evidence within Defendants' possession, custody or control, and/or anticipated testimony of witnesses, including the names of such witnesses and their respective anticipated testimony, that demonstrates the facts identified by Defendants' response to Interrogatory 13 *supra*.

**SUPPLEMENTAL ANSWER:**  Kevin Rafou has direct knowledge of the malfunctioning reservation system. His position was assistant manager and he personally witnessed the online reservation system was not working and no revenue was coming in. His testimony would be consistent with his knowledge.

15.    Identify each and every fact Defendants rely upon to allege that any inspection score was unjustly issued or given by Best Western with respect to the Hotel.

**SUPPLEMENTAL ANSWER:**  The following items had points taken off in the 10/25/2007 assessment report but were previously approved:

Beds, Box Spring, and Mattress, Bed Coverings, Linens and Pillows

Doors, Frames and Hardware

Kitchen area equipment

Carts (Baggage, Housekeeping, Repair)

Walkways, Stairways, Patios Including Lighting, Accessories

Guest Laundry/Doors, Frames, Hardware

Critical Brand Standards/High Speed Internet Access

Public Areas/Additional toiletries available at desk

Guest Rooms/Guest Bathroom

18.   Identify the term of provision of the Governing Documents that allegedly obligated Best Western to provide the services Defendants identified in response to Interrogatory 17 *supra*.

**SUPPLEMENTAL ANSWER:**   The oral agreement was between Terry Winiger and Hooshang Harooni made on the day of the initial interview for the membership. Ms. Winiger promised various support to help Mr. Harooni in running the hotel if he was to purchase the hotel. Those promises included money management, account management, design help, and general help with day to day operations of the hotel.

25.   Identify each and every fact Defendants rely upon to allege the affirmative defenses asserted in paragraph 14 of Defendants' Answer.

**SUPPPLEMENTAL ANSWER:**   Defendant's belief that Best Western disfavors older properties in favor of new ones is based on what various people in the hotel industry and other hotel owners have told Mr. Harooni. However, those individuals have asked to remain anonymous in fear of retaliation from Best Western.

DATED this 28th day of October, 2009.

Philip J. Nathanson

1

**CERTIFICATE OF SERVICE**

2          I, Philip J. Nathanson, an attorney, certify that I caused a copy of the above

3   and foregoing supplemental answers to be served upon the above named parties,

4   electronically, by emailing same on October 28, 2009, to all counsel of record.

5

6                    /s/   Philip J. Nathanson
                 Philip J. Nathanson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,　）
INC., an Arizona non-profit 　）
corporation,　　　　　　　　　　）
　　　　　　　　　　　　　　　　）
　　　　　　　Plaintiff,　　　　）
　　　　　　　　　　　　　　　　）
　vs.　　　　　　　　　　　　　）No. CIV08-02274-PHX-DGC
　　　　　　　　　　　　　　　　）
AV INN ASSOCIATES 1, LLC, a 　）
California limited liability 　）
company; HOOSHANG HAROONI,　　 ）
　　　　　　　　　　　　　　　　）
　　　　　　　Defendants.　　　 ）
_____）

TELEPHONIC DEPOSITION OF ELIAS AZIZ-LAVI, CPA

Phoenix, Arizona
December 11, 2009
3:00 p.m.

PREPARED FOR:
MR. DAVID W. GARBARINO
ATTORNEY AT LAW
(COPY)

*Ottmar & Associates, Inc.*
2800 N. Central, Ste. 150
Phoenix, Arizona 85004
(602) 485-1488
1-866-485-1444

Reported by:

HALEY WESTRA, RPR

Arizona CCR No. 50762

ELIAS AZIZ-LAVI, CPA
12/11/2009

4

TELEPHONIC DEPOSITION OF ELIAS AZIZ-LAVI,
CPA, taken on December 11, 2009, commencing at
3:17 p.m., at the offices of OTTMAR HOLIDAY &
ASSOCIATES, 2800 North Central Avenue, Phoenix,
Arizona, before HALEY WESTRA, a Certified Reporter in
the State of Arizona.


COUNSEL APPEARING:

    SHERMAN & HOWARD, L.L.C.
    BY:  Mr. David W. Garbarino
    2800 North Central Avenue
    Phoenix, Arizona 85004-1043
    Attorneys for Plaintiff

    THE NATHANSON LAW FIRM
    BY:  Ms. Kira A. Schlesinger
    8765 East Bell Road, Suite 101
    Scottsdale, Arizona 85260
    Attorneys for Defendants

1      (Exhibit Nos. 1 and 2 were marked.)
2
3          ELIAS AZIZ-LAVI, CPA,
4  a witness herein, having been first duly sworn by the
5  Certified Reporter to speak the truth and nothing but
6  the truth, was examined and testified as follows:
7
8              EXAMINATION
9  BY MR. GARBARINO:
10     Q.  Thank you for taking the time to speak with us
11  today, Mr. Lavi.
12         Have you ever had your deposition taken
13  before, sir?
14     A.  Yes.
15     Q.  Okay.  And I'm sure they probably went over
16  some ground rules with you in your previous
17  depositions, and I'm just going to go over them just to
18  kind of refresh you on this.
19         As you know, there is a court reporter
20  that is taking a transcript of this deposition.  It
21  makes it a heck of a lot easier for her if we don't
22  speak over each other.  So I will do my absolute best
23  to try to let you finish your answers to my questions,
24  and I would just ask the same of you, that you let me
25  finish my question before you jump in and answer.

3

1
2
3  WITNESS                                        PAGE
4  ELIAS AZIZ-LAVI, CPA
5       EXAMINATION BY MR. GARBARINO                4
6
7
8                E X H I B I T S
9
10  EXHIBITS  DESCRIPTION                        MARKED
11    No. 1   Mr. Lavi's report, dated 11/6/09      4
12    No. 2   Mr. Lavi's invoice, dated 11/6/09     4
13
14
15
16
17
18
19
20
21
22
23
24
25

I N D E X

5

1          Is that okay, sir?
2     A.  Yes.
3     Q.  Secondly, "uh-huhs" and "huh-uhs" don't make
4  the record very well.  So please don't be offended if
5  I ask you to answer a question "yes" or "no" where you
6  have answered "uh-huh" or "huh-uh."  I just want to
7  make sure that the record is crystal clear on your
8  answers to my questions.  Is that okay, sir?
9     A.  I will do my best.
10     Q.  Okay.  And I appreciate that.
11         Sir, if at any time you need to take a
12  break, you just let us know, and you're free to take a
13  break.  The only caveat that I have is that if you do
14  ask for a break and there is a question pending,
15  meaning I have asked you a question but an answer has
16  not been given, that you provide us the answer before
17  we go on break.  Is that okay, sir?
18     A.  Yes.
19     Q.  And lastly, if there is any question that
20  I ask you that you do not understand or for some reason
21  you do not hear the question or you need it repeated or
22  worded differently, please let me know.  I want to make
23  sure that you understand my question and that you hear
24  the entire question.  So if there's a problem, feel
25  free to just let me know.  Okay, sir?

ELIAS AZIZ-LAVI, CPA
12/11/2009

10

1    Q.  Okay.  Did you consider those tax returns when
2   you prepared your report regarding AV Inn Operations
3   Group, Inc.?
4        MS. SCHLESINGER:  Form.
5    A.  No.
6   BY MR. GARBARINO:
7    Q.  I'm sorry.  I didn't hear that answer.
8    A.  No.
9    Q.  That's "no," sir?
10   A.  I did not prepare those tax returns.
11   Q.  Okay.  I think my question was, Did you
12  consider the tax returns of AV Inn Associates 1, LLC,
13  when you were preparing the report that I'm referring
14  to in this deposition as Exhibit 1?
15       MS. SCHLESINGER:  Same objection.  Form,
16  foundation.
17   A.  No, I did not.
18  BY MR. GARBARINO:
19   Q.  Thank you.
20       Mr. Lavi, can you tell me how you came to
21  know Mr. Harooni?
22   A.  He's a friend of my brother.
23   Q.  Had you met Mr. Harooni before you were
24  engaged to prepare the report in this litigation?
25   A.  Yes.

11

1    Q.  On how many occasions had you met him before?
2    A.  I cannot count them, but I met him on several
3   occasions.
4    Q.  Would you consider Mr. Harooni a friend or an
5   acquaintance?
6    A.  It all depends how you define "friend" or
7   "acquaintance."
8    Q.  Fair enough.
9        Did you spend time in the recent past
10  with Mr. Harooni on a regular basis?
11       MS. SCHLESINGER:  Form.
12   A.  Again, depending how you define "regular," but
13  I didn't meet him on a regular basis, no.
14  BY MR. GARBARINO:
15   Q.  Okay.  So within the past year, how many
16  different times have you met with or spent time with
17  Mr. Harooni?
18       MS. SCHLESINGER:  Form.
19   A.  I can't remember exactly, but our meetings
20  have been very short and very kind of "Hi, hello, how
21  are you doing?" and that's all.  Not much more than
22  that.
23  BY MR. GARBARINO:
24   Q.  Okay.  Have you performed any professional
25  services for Mr. Harooni for AV Inn Associates 1, LLC,

12

1   or for AV Inn Operations, Inc., within the past year
2   with the exception of the report that we're referring
3   to in this deposition as Exhibit 1?
4    A.  No.
5    Q.  Have you agreed to provide services to
6   Mr. Harooni, AV Inn Associates 1, LLC, or AV Inn
7   Operations, Inc., at any time in the future?
8    A.  No.
9    Q.  Do you recall when Mr. Harooni retained you to
10  prepare the report that we're discussing today in this
11  deposition?
12   A.  I'm sorry.  What was your question?
13   Q.  Certainly.  Do you recall when you were
14  retained to prepare the report that we're discussing
15  today in this deposition?
16   A.  Not the exact day, but he called me up, and
17  we met.  I think it was -- it should be -- if my memory
18  eludes me, I think it was towards -- sometime in
19  October -- sometime in October, because he called
20  me and I was busy with the taxes for October 15 and
21  probably I met him immediately after October 15.
22   Q.  And, sir, that's October 15th of this year,
23  2009?
24   A.  Yes.
25   Q.  Is this the first time -- and when I refer to

13

1   "this," I mean preparing this report for Mr. Harooni --
2   is this the first time that you have performed any
3   professional services for Mr. Harooni?
4    A.  Yes.
5    Q.  And, Mr. Lavi, last week you delivered a box
6   of documents to Esquire Depositions in LA, and I was
7   present and Mr. Nathanson was present.  Was that box of
8   documents inclusive of all the documents that
9   Mr. Harooni provided you?
10   A.  Yes.
11   Q.  And was last Friday the first time that you
12  disclosed those documents to me?
13   A.  It was the first time that I provided you with
14  those documents to be copied.
15   Q.  Had you provided those documents to anybody
16  else from Best Western or my law firm before last
17  Friday?
18   A.  No.
19   Q.  I'm sorry.  That was a "no," sir?
20   A.  Yes.  As far as I remember, no.
21   Q.  Sir, with respect to the report that I'm
22  referring to as Exhibit 1 in this deposition, did you
23  yourself perform the procedures that allowed you to
24  make the conclusions in the report, or did somebody
25  else in your office perform those procedures?

ELIAS AZIZ-LAVI, CPA
12/11/2009

14

1      A.  My associate in the office assisted me in
2  preparing this report.
3      Q.  Now, what is your associate's name, sir?
4      A.  Melanie Balagtas.
5      Q.  Can you spell that for me, please.
6      A.  M-E-L-A-N-I-E, B-A-L-A-G-T-A-S.
7      Q.  And is that person a licensed CPA, sir?
8      A.  She is a CPA, yes.
9      Q.  Is she licensed in the State of California?
10     A.  Yes.
11     Q.  Is she licensed in any other state as a CPA?
12     A.  Not to my knowledge.
13     Q.  Does she hold any other licenses other than
14  her CPA license?
15         MS. SCHLESINGER:  Foundation.
16     A.  I believe so.
17  BY MR. GARBARINO:
18     Q.  What license is that, sir?
19     A.  She could be -- you know, I don't have her CV
20  in front of me, but she could be -- she's a -- she has
21  an accounting degree, and she could be a member of the
22  CPA Institute in the Philippines.
23     Q.  Sir, was that an institute in the Philippines?
24     A.  CPA -- yeah, from the Philippines, yes.
25     Q.  Do you know how long she has been a CPA, sir?

15

1      A.  I think it's more than 15 years.
2      Q.  Sir, is she a partner in your accounting firm,
3  or is she an associate in your accounting firm?
4      A.  She's an associate.
5      Q.  And did you supervise her when she performed
6  her procedures that allowed you to make your
7  conclusions in your report?
8         MS. SCHLESINGER:  Objection, form.
9         THE WITNESS:  What's that objection by
10  the other side?
11         MS. SCHLESINGER:  I'm sorry, Mr. Lavi.
12  This is Kira Schlesinger.  I'm going to occasionally
13  make objections.  It's really just for the record.  And
14  unless you're instructed not to answer for some reason
15  that I do not anticipate, you can just go ahead and
16  answer counsel's question.
17         THE WITNESS:  Okay.  Could you please
18  repeat your question.
19         MR. GARBARINO:  Could you read back my
20  question, please.
21         (The requested portion of the record was
22  read by the reporter as follows:
23         "Question: And did you supervise her when
24  she performed her procedures that allowed you to make
25  your conclusions in your report?")

16

1      A.  It was not clear to me, because it looks like
2  the distance to the speaker was in such a way that
3  I cannot hear her clearly.
4  BY MR. GARBARINO:
5      Q.  I understand.
6      A.  You were questioning me about my supervision,
7  correct?
8      Q.  Yes, your Honor -- your Honor? -- yes, sir.
9  Can you tell me how you supervised Melanie when she
10  performed the work related to this report?
11         MS. SCHLESINGER:  Same objection.
12     A.  I go over the computation, I go over the
13  report, and then this way I discuss it with her, and
14  that's the way, you know, the supervision is done.
15  BY MR. GARBARINO:
16     Q.  Okay.  Sir, did you provide Mr. Nathanson with
17  your CV?
18     A.  No.  I have not prepared one for a very long
19  time.  And as far as I remember, I couldn't -- I don't
20  have it on file.
21     Q.  Okay.  Did you provide Mr. Nathanson with a
22  list of all your litigation experience?
23     A.  No.
24     Q.  Sir, do you have a listing of your litigation
25  experience for the last ten years?

17

1      A.  No.
2      Q.  Sir, can you tell me if you graduated from
3  college?
4      A.  Yes.
5      Q.  Can you tell me where you graduated from
6  college.
7      A.  I graduated at the University of Salford
8  in England.
9      Q.  And what area did you study there?
10     A.  What was your question?
11     Q.  What was your area of study in England?
12     A.  I have an honor degree in joint mathematics
13  and economics.
14     Q.  And is that where you obtained your
15  undergraduate degree?
16     A.  I'm sorry.  What did you say?
17     Q.  Is that where you obtained your undergraduate
18  degree?
19     A.  Yes.
20     Q.  Did you obtain any postgraduate degree?
21     A.  No.
22     Q.  Sir, when did you first become licensed as a
23  certified public accountant?
24     A.  In 1981.
25     Q.  And which state did you first become licensed

ELIAS AZIZ-LAVI, CPA
12/11/2009

22

1  statements, tax returns, and tax consultation, and work
2  like this that comes our way.
3  BY MR. GARBARINO:
4  Q. So you mentioned you do some tax work. Do you
5  also do some attestation work?
6  A. Yes.
7  Q. You also mentioned bookkeeping, correct?
8  A. Yes.
9  Q. Do you do any, let's say, non-tax consulting
10  work?
11  MS. SCHLESINGER: Form.
12  A. Like this one, like this project that we are
13  discussing? Yes.
14  BY MR. GARBARINO:
15  Q. And let me see if I can make my question a
16  little bit clearer.
17  Do you do any non-tax, non-litigation
18  consulting?
19  MS. SCHLESINGER: Again, form.
20  A. Non-tax, non-litigation? We do business
21  consultation with regard to purchases of businesses,
22  which has nothing to do with taxes or it has nothing to
23  do with litigation. We do partnership partition
24  between different partners, or we do some work for
25  couples who are getting separated. You know, we do all

23

1  kinds of things.
2  BY MR. GARBARINO:
3  Q. Okay. And you also do litigation consulting,
4  correct?
5  A. Litigation consulting? Not consulting;
6  litigation accounting.
7  Q. Litigation accounting. Okay.
8  A. I'm not an attorney. I cannot do litigation
9  consultation.
10  Q. I understand, sir. Let me ask you this.
11  What percentage of your practice is devoted to taxes?
12  And I'm referring to preparing tax returns and advising
13  clients on tax matters.
14  A. I don't have the percentages, but probably
15  less than 50 percent.
16  Q. I'm sorry. I couldn't hear that.
17  A. I don't have the correct percentage, but
18  I believe it's less than 50 percent.
19  Q. Less than 50 percent?
20  A. Yeah.
21  Q. And what percentage of your practice is
22  providing attestation services?
23  A. I would think -- again, it should be less than
24  50 percent. I don't have the exact figure because
25  I have no partner. I don't have to account for anyone.

24

1  I don't keep records of such.
2  Q. I understand, sir, and I'm just asking for
3  your best estimate.
4  What percentage of your practice is
5  related to litigation consulting, like what you're
6  doing in this case?
7  A. Usually, less than -- I would say about 5 to
8  10 percent. It depends. Each year, you know, it
9  depends on different circumstances.
10  Q. Do you remember when the last time was that
11  you were deposed as an expert?
12  A. I believe it was -- when was it? I think it
13  was two and a half years ago or three years ago. I'm
14  not sure.
15  Q. I'm sorry. That was two and a half to
16  three years ago?
17  A. Yes.
18  Q. And when was the last time that you testified
19  at trial as an expert?
20  A. I think it was sometime in -- probably it was
21  2000 or 2001, something like that. I don't remember
22  exactly.
23  Q. In the last time -- or in the trial that you
24  last testified in, which was in 2000 or 2001,
25  approximately, what were you retained as an expert to

25

1  report on?
2  A. There was a dispute between an individual who
3  was claiming to be a partner in a partnership, but it
4  was denied by the other partners that he was a partner;
5  therefore, that was the trial, about the existence of
6  the partnership with that individual.
7  Q. And what expertise did you testify to, or what
8  area of expertise did you utilize in your testimony?
9  MS. SCHLESINGER: Form.
10  A. I was the accountant to the partnership, and I
11  was hired to represent the partnership, and, you know,
12  testify about the activities of the partnership and
13  whom I met and what were the positions and what were
14  the actual loss or profit of the company, of different
15  activities, of different products. I was testifying
16  about these matters, financial matters.
17  BY MR. GARBARINO:
18  Q. So were you actually a fact witness in that
19  case, or were you an expert witness?
20  MS. SCHLESINGER: Form.
21  A. To the best of my knowledge, I was an expert
22  witness.
23  BY MR. GARBARINO:
24  Q. But had you been retained by the partnership
25  before testifying, sir?

ELIAS AZIZ-LAVI, CPA
12/11/2009

**70**

1 BY MR. GARBARINO:
2    Q.  So how is this any measure of damages related
3 to Best Western conduct?
4        MS. SCHLESINGER:  Objection, calls for
5 legal conclusion.
6        THE WITNESS:  I'm sorry.  What was your
7 objection?
8        MS. SCHLESINGER:  Objection based upon
9 calling for a legal conclusion and form.
10        THE WITNESS:  I'm sorry.  I didn't hear
11 you.
12 BY MR. GARBARINO:
13    Q.  Okay.  Let me see if I can rephrase the
14 question.
15        You're claiming a loss of $1.3 million on
16 Schedule D, correct?
17    A.  Correct.
18    Q.  And the dates of the two numbers that you're
19 providing both relate to events or transactions that
20 occurred after the Best Western membership was
21 terminated, correct?
22    A.  That's why they didn't -- it didn't go
23 through, because it was no longer a Best Western hotel,
24 and it is my understanding that the prospective buyer
25 refused to go ahead with the purchase agreement.

**71**

1    Q.  And what information gives you the ability to
2 make that statement?
3        MS. SCHLESINGER:  Form.
4    A.  Well, the fact of the matter is that we have
5 here an offer from these guys, as you can see here --
6 I'm sure that you have it in your possession -- that
7 the negotiations started at least before February 26,
8 2008, and there was a letter of intent at that time
9 that the subject property was clearly stated as Best
10 Western Antelope Valley Inn and Conference Center with
11 the address of 44055 North Sierra Highway, and their
12 purchase price at that time was $7 million, and this is
13 when the negotiations started, and that purchase
14 agreement was -- the initial letter of intent from
15 Brown Hotel Group, Inc., was dated February 26, 2008.
16 That was before Best Western terminated its agreement.
17 This is what we based our computation on.
18 BY MR. GARBARINO:
19    Q.  Okay.  Let me ask you this.  Do you know why
20 the previous buyer's offer of the property dated
21 June 15th, 2008, in the amount of $6.1 million, why
22 that offer fell through?
23    A.  Well, when they looked at the books and they
24 realized that -- you know, this is my understanding of
25 the situation from Mr. Harooni -- that when the

**72**

1 business hotel income, due to termination by Best
2 Western, decreased substantially, they did not -- they
3 didn't want to go through with the deal.
4    Q.  Okay.  And you just said you based this on
5 your understanding from Mr. Harooni?
6    A.  Yes.
7    Q.  Does that mean through --
8    A.  Yes.
9    Q.  Let me finish my question.
10        Does that mean based on conversations you
11 had with Mr. Harooni?
12    A.  Yes.
13    Q.  Okay.  Sir, do you have any background in real
14 estate appraisal?
15    A.  As an accountant, I come across real estate
16 very often.
17    Q.  Do you have any qualifications to testify
18 regarding the value of real property?
19    A.  The value of property?  I don't have a
20 specific qualification for this purpose, and I often am
21 consulted by my clients when they want to go through a
22 purchase or sale of real estate.
23    Q.  I'm sorry.  You said you did have specific
24 qualifications?
25    A.  I don't have a specific qualification.

**73**

1    Q.  Okay.  Would you agree, sir, that the
2 calculation on Schedule D at least relates in part to
3 the valuation of real estate?
4        MS. SCHLESINGER:  Form.
5    A.  I have relied on recent documentation and
6 records provided to me.  These are not subjective
7 assumptions.  They are taken out of documents.
8 BY MR. GARBARINO:
9    Q.  Okay.  So is it fair to say the calculation on
10 Schedule D is based solely on documents that were
11 provided to you by Mr. Harooni?
12    A.  That's correct.
13    Q.  And those are the same documents that you
14 provided to us last Friday?
15    A.  That's correct.
16    Q.  Sir, if we can refer to Exhibit 2 to this
17 deposition, which is the invoice.  And we should have
18 faxed you a copy.  Do you have a copy of that now?
19    A.  Excuse me.  To which document, did you say?
20    Q.  Yes.  There's two exhibits to this deposition.
21 Exhibit 1 is your report.
22    A.  Oh, yes, my invoice.  Yes, I have it here.
23    Q.  Okay, great.  And I just want to verify for
24 the record that you're looking at Invoice No.
25 110609AVINN; is that correct?

ELIAS AZIZ-LAVI, CPA
12/11/2009

---

**74**

1    A.  That's correct.
2    Q.  And this is an invoice in the amount of
3  $7,200, correct?
4    A.  That's correct, sir.
5    Q.  Can you tell me what services are included in
6  this invoice?
7    A.  This is for the preparation of the report that
8  you have as Exhibit No. 1.
9    Q.  Okay.  Do you know if this invoice has been
10  paid?
11         MS. SCHLESINGER:  Objection.
12    A.  I'm sorry.  What was your question?
13  BY MR. GARBARINO:
14    Q.  Yes.  Do you know if this invoice has been
15  paid?
16    A.  Taped?
17    Q.  Paid.
18    A.  No, it hasn't been paid yet.  No.
19    Q.  Can you tell me what your hourly fees are for
20  testimony such as in this deposition?
21    A.  It's $300 per hour.
22    Q.  And what is your hourly fee for trial
23  testimony?
24    A.  I'm sorry.  I didn't get your question.
25    Q.  Yes.  What is your hourly rate for trial

---

**75**

1  testimony?
2    A.  Five.
3    Q.  $500?
4    A.  No.  I didn't get your question.  I was
5  repeating your question.  I didn't say a figure.
6    Q.  I understand.  What is your hourly rate for
7  trial testimony?
8    A.  It's $300.
9    Q.  Same as deposition?
10    A.  Yes.
11    Q.  And these are the rates that you're charging
12  for this matter?
13    A.  That's correct.
14    Q.  Okay.  Do you anticipate that your hourly
15  rates are going to change any time in the near future?
16    A.  I don't believe so.
17    Q.  Sir, can you tell me who your client is in
18  this matter?
19    A.  My client in this matter is AV Inn Operations
20  Group, Inc.
21    Q.  Okay, sir.  If I can have a moment, I think
22  I'll just go over my question list here to make sure
23  that I've gotten everything, and I'll come back on just
24  briefly.  If you just want to hang or stay on the phone
25  for just a moment.

---

**76**

1    A.  I'm staying on the phone.
2    Q.  Okay.
3         (Recess taken from 5:32 p.m. to
4  5:34 p.m.)
5  BY MR. GARBARINO:
6    Q.  Mr. Lavi, are you still there?
7    A.  Yes, I'm here.
8    Q.  Sir, I appreciate you taking the time to speak
9  with us today.  I have no further questions for you.
10    A.  Thank you very much, sir.  You have been very
11  professional and very courteous.
12    Q.  Thank you, sir.
13         MS. SCHLESINGER:  Thank you, Mr. Lavi.
14  (5:34 p.m.)
15
16
17
18
19
                    _____
                    ELIAS AZIZ-LAVI, CPA
20
21
22
23
24
25

---

**77**

1  STATE OF ARIZONA      )
                         ) SS.
2  COUNTY OF MARICOPA    )
3      BE IT KNOWN that the foregoing transcript was
4  taken before me, HALEY WESTRA, a Certified Court
5  Reporter in the State of Arizona; that the witness
6  before testifying was duly sworn by me to testify to
7  the whole truth; that the questions propounded to the
8  witness and the answers of the witness thereto were
9  taken down by me in shorthand and thereafter reduced to
10  print under my direction; at the witness's request,
11  notification was provided that the transcript was
12  available to read and sign; that the foregoing pages
13  are a true and correct transcript of all proceedings,
14  all done to the best of my skill and ability.
15      I further certify that I am in no way related to
16  any of the parties hereto nor am I in any way
17  interested in the outcome hereof.
18      Dated at Phoenix, Arizona, this 21st day of
19  December, 2009.
20
21         _____
22         HALEY WESTRA
           AZ Certified Court Reporter No. 50762
23
24
25

---

# EXHIBIT M

# DECLARATION OF DAVID W. GARBARINO

STATE OF ARIZONA     )
                         ) ss.
County of Maricopa    )

      I, **DAVID W. GARBARINO**, make the following declarations under penalty of perjury:

      1.      I am an attorney with the law firm of Sherman & Howard L.L.C., and am one of the attorneys representing Best Western International, Inc., an Arizona non-profit corporation ("Best Western"), in the litigation captioned *Best Western International, Inc. v. AV Inn Associates 1, LLC*, CV08-02274-PHX-DGC (the "Litigation") between Best Western and defendants AV Inn Associates 1, LLC, a California limited liability company ("AV Inn Associates"), and Hooshang Harooni ("Harooni") (AV Inn Associates and Harooni collectively, "Defendants"), and am authorized to make this Declaration.

      2.      I have personal knowledge of the facts described in this Declaration.

      3.      On November 6, 2009, I received via email the report prepared by Elias Aziz Lavi ("Lavi"), a Certified Public Accountant (the "Lavi Report"). The report I received via email is the same report filed with the Court as Dkt. # 36.

      4.      On November 20, 2009, after several written requests for convenient dates and times for depositions of Defendants' witnesses, Defendants' counsel, Philip Nathanson ("Nathanson"), agreed in writing to be available on December 1-4, 2009 for

**EXHIBIT "M"**

depositions of Defendants' witnesses to take place in Los Angeles, California. (*See* Ex. 1 hereto.)

5.      That same day, I requested in writing that Defendants also provide a date for the deposition of Lavi (*see id.*), but Defendants did not respond.

6.      On November 23, 2009, I suggested to Defendants  in writing that we also perform the deposition of Lavi while in Los Angeles, California from December 1 – 4, 2009 for depositions of Defendants' other witnesses (*see* Ex 2), but Defendants did not respond.

7.      On November 24, 2009, having not heard from Defendants regarding the deposition of Lavi, I issued a Amended Notice of Deposition for Harooni and subpoenas for depositions and document production for Defendants' witnesses as follows:

- December 1, 2009, at 9:30 a.m. deposition of Hooshang Harooni;

- December  2, 2009, at 9:00 a.m. deposition and document production of Lina Eseltine;

- December 2, 2009, at 1:30 p.m. deposition and document production of Lisa Wilkerson;

- December 3, 2009, at 9:00 a.m. deposition and document production of Kamyar "Kevin" Refova;

- December 3, 2009, at 1:30 p.m. deposition and document production of Cheryl Duggan; and

- December 4, 2009 at 9:00 a.m. deposition and document production of Lavi.

(*See* Dk. # 40.)

8.    Upon receipt of the Amended Notice of Deposition and Subpoenas described *supra*, Nathanson refused to produce Harooni for his deposition on December 1, 2009, demanded that Harooni's deposition be taken on December 4, 2009, and refused to produce Lavi as subpoenaed.  (*See* Ex. 3 hereto.)

9.    After attempts to work out a resolution, and a joint request to the Court for time for settlement discussions, Nathanson refused to make himself or Harooni available for Harooni's deposition as properly noticed for December 1, 2009.  (*See* Ex. 4 hereto.)

10.    The remaining non-expert depositions took place as discussed above.[1]

11.    On Friday December 4, 2009, at 9:00 a.m., Lavi appeared for his subpoenaed deposition and produced more than 2200 pages of tax returns and documents that Harooni had provided to Lavi to assist him in preparing the Lavi Report which had not been previously disclosed to Best Western.

12.    Nathanson would not, however, permit the deposition of Lavi that Friday, and instead produced Harooni for his deposition.

13.    Defendants' permitted a telephonic deposition of Lavi the following Friday, December 11, 2009, at 3:00 p.m.

**EXECUTED** this ⟍⟍⟍ day of February 2010.

**David W. Garbarino**

---

[1]    Ms. Eseltine spoke Spanish only.  Defendants did not communicate this fact to Best Western's counsel. By shear luck, an interpreter was immediately located and available for Ms. Eseltine's deposition.

# EXHIBIT 1

**Garbarino, David W.**

| | |
|---|---|
| **From:** | Philip J. Nathanson [philipj@nathansonlawfirm.com] |
| **Sent:** | Friday, November 20, 2009 3:46 PM |
| **To:** | Garbarino, David W. |
| **Cc:** | Pederson, Arthur W.; Mota, Raymundo |
| **Subject:** | RE: Best Western, adv. AV Inn Associates; depositions |

You have a deal.

I will block off those dates, and we will arrange for the depositions.


Philip J. Nathanson
*Licensed in Illinois & Arizona*



*Chicago • Phoenix*

## THE NATHANSON LAW FIRM

120 N. LaSalle Street, Suite 1000
Chicago, IL 60602
**(312) 782-3322**
**(312) 782-4518 fax**


8765 E. Bell Road, Suite 101
Scottsdale, AZ 85260
**(480) 419-2578**
**(480) 419-4136 fax**

philipj@nathansonlawfirm.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

---

**From:** Garbarino, David W. [mailto:dgarbarino@shermanhoward.com]
**Sent:** Friday, November 20, 2009 3:37 PM
**To:** Philip J. Nathanson
**Cc:** Pederson, Arthur W.; Mota, Raymundo
**Subject:** RE: Best Western, adv. AV Inn Associates; depositions


Philip,

2/26/2010

We respectfully disagree with your analysis, but that is somewhat irrelevant given your proposal below.

Art and I believe that we can take depositions of all of the non-expert witnesses from December 1 - 4 in California.   We would expect to take all day with Mr. Harooni, and split the other three days with the other deponents (Lenaa Eseltine, Cheryl Duggan, Lisa Wilkerson, and Kevin Rafoua).

We would like to do it near a major airport if that is possible.  Do you have a suggestion on a place?

With respect to the non-party deponents, we will still want to subpoena them.  Please confirm with Mr. Harooni whether the addresses disclosed in Defendants' Initial Rule 26 disclosure statement are still good addresses, and advise these folks that they should expect and accept service by a process server of the subpoena.  Do you have any idea of what dates they are available from December 1-4?

We will cancel the deposition set for Monday, but reserve the right to compel Mr. Harooni to come to Arizona should the parties be unable to work out the details above.


Do you have a suggestion of when we can depose the Defendants' expert witness?

---

From: Philip J. Nathanson [mailto:philipj@nathansonlawfirm.com]
Sent: Friday, November 20, 2009 12:30 PM
To: Garbarino, David W.
Cc: Pederson, Arthur W.
Subject: RE: Best Western, adv. AV Inn Associates; depositions


As I told you previously, I question why Mr. Harooni, a California resident and citizen, is required to appear for a deposition in Arizona.  He is a defendant hauled into court by your plaintiff.


I would prefer not to bother the judge with this issue.  Therefore, I propose the following compromise:


1.    You will depose Mr. Harooni in California and the other California witnesses you want to depose at one time, on one trip, and on consecutive dates and times;


2.    We will ask the witnesses you want to depose to appear voluntarily, and suggest they do so, without you having to serve them with a subpoena.  We will also interact with them personally to schedule dates for their depositions that are in line with the one time, one trip plan; and


3.    I am available to do those California depositions on the following dates:  December 1-4, or December 8-9.


Let me know if this works, or if I need to file a motion for a protective order regarding Mr. Harooni's deposition.

Philip J. Nathanson
Licensed in Illinois & Arizona

120 N. LaSalle Street, Suite 1000

Chicago, IL 60602

(312) 782-3322

(312) 782-4518 fax

8765 E. Bell Road, Suite 101

Scottsdale, AZ 85260

(480) 419-2578

(480) 419-4136 fax

philipj@nathansonlawfirm.com <mailto:philipj@nathansonlawfirm.com>

NOTICE:  This communication may contain privileged or other confidential information. If you have received it in error, please advise the
sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

From: Garbarino, David W. [mailto:dgarbarino@shermanhoward.com]
Sent: Friday, November 20, 2009 11:47 AM
To: Philip J. Nathanson
Cc: Pederson, Arthur W.; Alexander, Deborah M.; Mota, Raymundo
Subject: RE: Best Western, adv. AV Inn Associates; depositions

Philip,

We are preparing for Mr. Harooni's deposition, and have made arrangements for a court reporter, etc.  You have not confirmed whether or not
Mr. Harooni will be attending his deposition despite my earlier two requests for confirmation.  Best Western will incur costs and fees in
preparation for Monday, and will seek to recover those costs and fees from Mr. Harooni should he not attend.

Please advise whether Mr. Harooni will be in attendance on Monday.

2/26/2010

In addition, I have repeatedly asked for dates and times that will work for you and defendants' other California witnesses. You have not responded with dates and times. I would appreciate a response from you with such dates and times.


Thanks.

---

From: Garbarino, David W.
Sent: Thursday, November 19, 2009 4:30 PM
To: 'Philip J. Nathanson'
Cc: Pederson, Arthur W.; Alexander, Deborah M.; Mota, Raymundo
Subject: RE: Best Western, adv. AV Inn Associates; depositions

Philip,


Can you please respond to my email below? Thanks.

---

From: Garbarino, David W.
Sent: Wednesday, November 18, 2009 1:08 PM
To: 'Philip J. Nathanson'
Cc: Pederson, Arthur W.; Alexander, Deborah M.; Mota, Raymundo
Subject: RE: Best Western, adv. AV Inn Associates; depositions

Philip,


Can you please confirm whether or not Mr. Harooni will be in Scottsdale, Arizona next week for his noticed deposition.


Also, any luck on dates for depositions of the other defense witnesses?


Thanks.

---

From: Garbarino, David W.
Sent: Friday, November 13, 2009 10:13 AM
To: 'Philip J. Nathanson'
Subject: RE: Best Western, adv. AV Inn Associates; depositions

Philip,


Even assuming that Defendants will not produce the other persons referenced without a subpoena, and a subpoena has to be issued, is there a day that will work best in late November and/or December for the deponents, you and Defendants. We are simply trying to be courteous to you, the deponents and Defendants, and work with all parties to schedule mutually agreeable dates, but we seem to be getting nowhere. As I said below, we can simply chose the dates ourselves and will ultimately have to if the refusal to cooperate continues. As always, we would prefer to work with you.

2/26/2010

From: Philip J. Nathanson [mailto:philipj@nathansonlawfirm.com]
Sent: Thursday, November 12, 2009 1:30 PM
To: Garbarino, David W.
Subject: RE: Best Western, adv. AV Inn Associates; depositions

Mr. Garbarino:


We will be researching in the next few days whether you can compel Mr. Harooni to come to Arizona.


We will also research whether you may require us to produce the other persons referenced, without a subpoena.


Didactic emails and letters do not generally produce cooperation.


        Philip


Philip J. Nathanson
Licensed in Illinois & Arizona




120 N. LaSalle Street, Suite 1000

Chicago, IL 60602

(312) 782-3322

(312) 782-4518 fax




8765 E. Bell Road, Suite 101

Scottsdale, AZ 85260

(480) 419-2578

(480) 419-4136 fax



philipj@nathansonlawfirm.com <mailto:philipj@nathansonlawfirm.com>

2/26/2010

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

From: Garbarino, David W. [mailto:dgarbarino@shermanhoward.com]
Sent: Thursday, November 12, 2009 2:21 PM
To: Philip J. Nathanson
Cc: Pederson, Arthur W.; Alexander, Deborah M.; Mota, Raymundo
Subject: RE: Best Western, adv. AV Inn Associates; depositions


Philip,


We see no reason why Mr. Harooni's deposition should not take place in Arizona. The litigation is taking place in Arizona, Mr. Harooni is a party, he is the principal and owner of AV Inn that has asserted a counterclaim against Best Western and is apparently seeking to recover in excess of $3 million dollars from Best Western, Best Western is in Phoenix, we are in Phoenix/Scottsdale, and you have a location in Scottsdale. The only person who will have to travel is Mr. Harooni.


We have still not received dates and times for depositions of Lenaa Eseltine, Cheryl Duggan, Lisa Wilkerson, and Kevin Rafoua in late November and early December. It has been two weeks since we first requested dates. Again, we would prefer to work with you on scheduling rather than against you, but if you do not communicate with us, we have no choice but to have subpoenas issued for the dates of our choosing.

---

From: Philip J. Nathanson [mailto:philipj@nathansonlawfirm.com]
Sent: Tuesday, November 10, 2009 8:11 PM
To: Garbarino, David W.
Subject: Re: Best Western, adv. AV Inn Associates; depositions

Mr. Harooni is not a healthy man.


Why does he have to travel from California to Arizona?


Sent from my iPhone


On Nov 10, 2009, at 9:40 AM, "Garbarino, David W." <dgarbarino@shermanhoward.com> wrote:

Philip,

Please see attached Notice of Deposition for Mr. Harooni. We attempted to work with you to reach a mutually agreeable date for Mr. Harooni's deposition, but I received no response to my emails below.

Can you please let us know what dates in late November and early December work best for depositions of the other witnesses listed below. Thanks.

2/26/2010

<<NOTICE OF DEPOSITION - Harooni.PDF>>

From:   Garbarino, David W.
Sent:   Tuesday, November 03, 2009 9:13 AM
To:     'Philip J. Nathanson'
Cc:     Pederson, Arthur W.; Alexander, Deborah M.
Subject:    FW: Best Western, adv. AV Inn Associates; depositions

Philip,

Did you have a chance to discuss deposition dates with Mr. Harooni?  Please let me know whether November 11 and/or 12 in Phoenix work for you and Mr. Harooni, and what dates in November work for the others.

Thanks.

From:   Garbarino, David W.
Sent:   Wednesday, October 28, 2009 2:54 PM
To:     'Philip J. Nathanson'
Cc:     Pederson, Arthur W.; Alexander, Deborah M.; Mota, Raymundo
Subject:    Best Western, adv. AV Inn Associates; depositions

Philip,

We would like to take several depositions in this case, including the deposition of Mr. Harooni.  Are you and Mr. Harooni available for his deposition in Phoenix on November 11 and/or 12, 2009.

In addition can you please provide dates for depositions of Lenaa Eseltine, Cheryl Duggan, Lisa Wilkerson, and Kevin Rafoua in November 2009.

Thanks.

David W. Garbarino
Sherman & Howard L.L.C.
2800 North Central Avenue, 11th Floor
Phoenix, Arizona 85004-1043
Direct: (602) 240-3026
Fax:   (602) 240-6600
email:  dgarbarino@shermanhoward.com

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of: (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or, (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This electronic message transmission contains information from the law firm Sherman & Howard L.L.C. that may be confidential or privileged.  The information is intended solely for the intended recipient and use by any other party is not authorized.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.  Any wrongful interception of this transmission is punishable as a Federal Crime.  If you have received this electronic transmission in error, please notify us immediately by telephone ((602) 240-3000) or by electronic mail to the sender at dgarbarino@shermanhoward.com.

Although this email and any attachments are believed to be free of any virus or other defect that might negatively affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or Sherman & Howard L.L.C. for any loss or damage arising in any way in the event that such a virus or defect exists.

Thank you.

<NOTICE OF DEPOSITION - Harooni.PDF>

2/26/2010

# EXHIBIT 2

**Mota, Raymundo**

---

| | |
|---|---|
| **From:** | Garbarino, David W. |
| **Sent:** | Monday, November 23, 2009 12:27 PM |
| **To:** | 'Philip J. Nathanson' |
| **Cc:** | Pederson, Arthur W.; Mota, Raymundo |
| **Subject:** | RE: Best Western, adv. AV Inn Associates; depositions |

Thanks.

Can you please let us know what dates and times will work from Dec. 1 - 4 for the following deponents:

Mr. Harooni (full day);

Cheryl Duggan (half day);

List Wilkerson (half day);

Lenna Eseltine (half day);

Kevin Refova (half day); and

Elias Aziz Lavi (half day).

We need to get our subpoenas out ASAP, so I would appreciate a qucik response.  If I do not get a response by 3:00 today, we will have to get our subpoenas out today without a response due to the holiday weekend coming up.

We have made arrangements for the depositions to be taken at Esquire located at 1875 Century Park East, Ste. 500 Los Angeles, CA 90067.

---

**From:** Philip J. Nathanson [mailto:philipj@nathansonlawfirm.com]
**Sent:** Friday, November 20, 2009 3:46 PM
**To:** Garbarino, David W.
**Cc:** Pederson, Arthur W.; Mota, Raymundo
**Subject:** RE: Best Western, adv. AV Inn Associates; depositions

You have a deal.

I will block off those dates, and we will arrange for the depositions.


Philip J. Nathanson
*Licensed in Illinois & Arizona*

2/26/2010

# EXHIBIT 3

**Garbarino, David W.**

**From:**    Philip J. Nathanson [philipj@nathansonlawfirm.com]
**Sent:**    Tuesday, November 24, 2009 8:59 PM
**To:**      Garbarino, David W.
**Cc:**      Pederson, Arthur W.; Alexander, Deborah M.; Mota, Raymundo
**Subject:**  RE: Best Western, adv. AV Inn

Nice try.  Non-expert discovery is just that.

In your November 20, 2009, email to me you stated:

> "Art and I believe that we can take depositions of all of the
> **non-expert witnesses** from December 1 - 4 in California.  We
> would expect to take all day with Mr. Harooni, and split the
> other three days with the other deponents (Lenaa Eseltine,
> Cheryl Duggan, Lisa Wilkerson, and Kevin Rafoua)."  (emphasis
> added)

I never agreed to produce our expert witness during the depositions of "**non-expert witnesses**."  You included a deposition subpoena for our expert.  We are not willing to do that next week and never agreed to that deposition as your November 20th email states.

We will produce Mr. Harooni on the Friday morning (December 4th ) your invalid subpoena reserved for the expert deposition that we never agreed to.


Philip J. Nathanson
*Licensed in Illinois & Arizona*



*Chicago • Phoenix*

## THE NATHANSON LAW FIRM

120 N. LaSalle Street, Suite 1000
Chicago, IL 60602
**(312) 782-3322**
**(312) 782-4518 fax**


8765 E. Bell Road, Suite 101

2/26/2010

Best Western, adv. AV Inn

Scottsdale, AZ 85260
**(480) 419-2578**
**(480) 419-4136 fax**

philipj@nathansonlawfirm.com

NOTICE:  This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

---

**From:** Garbarino, David W. [mailto:dgarbarino@shermanhoward.com]
**Sent:** Tuesday, November 24, 2009 6:42 PM
**To:** Philip J. Nathanson
**Cc:** Pederson, Arthur W.; Alexander, Deborah M.; Mota, Raymundo
**Subject:** Best Western, adv. AV Inn


Philip,

Want to make sure you received copies of the attached subpoenas.

<<Subpoena to Lavi.pdf>> <<Subpoena to Eseltine.pdf>>  <<Subpoena to Refova.pdf>> <<Subpoena to Duggan.pdf>> <<Subpoena to Wilkerson.pdf>>


**David W. Garbarino**
Sherman & Howard L.L.C.
2800 North Central Avenue, 11th Floor
Phoenix, Arizona 85004-1043
Direct: (602) 240-3026
Fax:    (602) 240-6600
email:  dgarbarino@shermanhoward.com

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of: (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or, (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This electronic message transmission contains information from the law firm Sherman & Howard L.L.C. that may be confidential or privileged.  The information is intended solely for the intended recipient and use by any other party is not authorized.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.  Any wrongful interception of this transmission is punishable as a Federal Crime.  If you have received this electronic transmission in error, please notify us immediately by telephone ((602) 240-3000) or by electronic mail to the sender at dgarbarino@shermanhoward.com.

Although this email and any attachments are believed to be free of any virus or other defect that might negatively affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or Sherman & Howard L.L.C. for any loss or damage arising in any way in the event that such a virus or defect exists.

Thank you.

2/26/2010

# EXHIBIT 4

**Garbarino, David W.**

| | |
|---|---|
| **From:** | Philip J. Nathanson [philipj@nathansonlawfirm.com] |
| **Sent:** | Monday, November 30, 2009 11:41 AM |
| **To:** | Garbarino, David W. |
| **Subject:** | RE: Best Western v. AV Inns |

I have to go to Chicago tomorrow morning.  So that is not happening as I already told you.

**Philip J. Nathanson**
*Licensed in Illinois & Arizona*



Chicago • Phoenix

**THE NATHANSON LAW FIRM**

120 N. LaSalle Street, Suite 1000
Chicago, IL 60602
**(312) 782-3322**
**(312) 782-4518 fax**

8765 E. Bell Road, Suite 101
Scottsdale, AZ 85260
**(480) 419-2578**
**(480) 419-4136 fax**

philipj@nathansonlawfirm.com

NOTICE:  This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

---

**From:** Garbarino, David W. [mailto:dgarbarino@shermanhoward.com]
**Sent:** Monday, November 30, 2009 12:09 PM
**To:** Philip J. Nathanson
**Cc:** Pederson, Arthur W.; Mota, Raymundo ; Alexander, Deborah M.
**Subject:** RE: Best Western v. AV Inns

Philip,

Any word from the expert regarding his availability on December 9, 2009?  If we don't hear something by 1:00 pm AZ time, I will need to book a flight and hotel room and will plan to depose Mr. Harooni tomorrow morning.

---

**From:** Philip J. Nathanson [mailto:philipj@nathansonlawfirm.com]
**Sent:** Friday, November 27, 2009 11:59 AM
**To:** Garbarino, David W.

2/26/2010

# EXHIBIT N

Admin Cncl

April 8, 2008

Mr. Hooshang Harooni       EXPRESS MAIL (1-Day)
Antelope Valley Inn
44055 Sierra Hwy.
Lancaster, CA 93534-4412



**Best Western International, Inc.**
THE WORLD'S LARGEST HOTEL CHAIN

6201 N. 24th Parkway
Phoenix, Arizona
85016-2023, USA

(602) 957-4200
bestwestern.com

RE:     Member No.: T-05050

Dear Mr. Harooni:

The Best Western International, Inc. ("Best Western") Board of Directors was pleased to have the opportunity to meet with you recently to discuss the membership status of your property. The information provided prior to and during the hearing was also reviewed. After full and complete consideration of the information provided, it was the decision to cancel all aspects of the property's membership effective immediately.

We have deleted the property's listing from our reservations system and cancelled your participation in Best Western's master credit card agreements. You must take appropriate steps to discontinue all use of the Best Western name and logo at your property effective immediately. You will be contacted within the next few days to confirm your arrangements to comply with this requirement.

**You must ensure that all of the instructions outlined in this letter are followed carefully and promptly. Specifically:**

**APRIL 23, 2008**

- Remove all Best Western signs, symbols, designs, trademarks and service marks ("Best Western Marks") from the property as required by your Membership Application and Agreement with Best Western and by Best Western's Rules and Regulations, including Rule 300.6. Please note that this includes not only the sign faces, but also the actual sign cabinets if curvilinear in shape that display or are part of Best Western Marks. You are responsible for the actual expenses incurred in removing all Best Western Marks. Please ensure that photographs and written confirmation of compliance with this requirement are received in the Best Western Brand Identity Department by this date.

  Note: Enclosed is a copy of the Membership Application & Agreement which you signed indicating your understanding of Best Western's ownership of the Best Western Marks.

- A representative of our Member Care Administration Department will be contacting you to verify your arrangements for removal of the Best Western registered name and marks from your hotel.

BW0728



Mixed Sources

Antelope Valley Inn
Lancaster, CA
Member No.: T-05050
April 8, 2008
Page 2 of 3

## APRIL 23, 2008 (Continued)

- You will be contacted again shortly after this date to confirm your arrangements for removal of the Best Western registered name and marks from your hotel.

- Remove all references to your property as a Best Western hotel, regardless of where these references are or what kind of media contains them. This includes, but is not limited to, advertising, collateral and promotional material, amenities, White and Yellow Pages listings/ads, directory assistance, hotel and travel guides and directories, billboards and highway signs, web sites, domain name registrations, etc. You are responsible for instructing the appropriate parties to make these changes (state and federal highway agencies, webmasters, etc.).

- Contact Best Western's E-Commerce Department at ecom@bestwestern.com prior to this date to obtain relevant technical information to advise your domain registrars to transfer your Best Western domain names to Best Western International, Inc. by this date.

- Complete and return the enclosed "Affidavit" and "Logo Removal Checklist" to the Best Western Brand Identity Department by this date confirming that all of Best Western's logo'd items used at the hotel/or elsewhere in conjunction with the hotel have been removed. You may contact the Best Western Brand Identity Department at (602) 957-5684.

Continued use of these marks, including on the internet, is an infringement and is illegal. Your membership agreement with Best Western requires you to pay hundreds of dollars a day for each day you infringe and Federal laws may require you to pay Best Western three times the value of the amount of harm you cause Best Western if you infringe.

## MAY 8, 2008

- You are responsible for returning the VSAT communications equipment and CSI credit card terminal, if applicable, to Best Western by this date. If you are not contacted first, you must contact the Best Western Property Help Desk to make arrangements for return of this equipment. You may reach the Help Desk by calling 1-800-528-1902 and selecting Option #1.

- Ensure that the Member Web terminal is not turned off until after this date so that Best Western can continue to process any cancellations received for reservations that had been made prior to your effective cancellation date.

BW0729

Antelope Valley Inn
Lancaster, CA
Member No.: T-05050
April 8, 2008
Page 3 of 3

## BEST WESTERN ACCOUNT

- Make arrangements to clear the remaining balance owed on your Best Western account as soon as possible, including the charges for fees and dues for the remainder of the fiscal year as specified in Article II, Section 5 (B) of the Bylaws. If you have any orders pending with the Best Western Supply Department, they may be shipped (with the exception of logo'd items) upon full prepayment by credit card or by cashier's check. If you have any questions concerning the account, please contact Ms. Rebecca Altieri in our Accounting Department at (602) 957-5627.

## FUTURE RESERVATIONS

- Best Western expects you to honor existing and future reservations on file with the Best Western reservations center. The guests will be expecting the same Best Western policies that applied when they booked the reservations to apply during their stays, e.g. form of payment, credit card policies, etc. You must advise the Best Western Customer Care Department at 1-800-528-1238 if you will not honor these policies so that Best Western can rebook the guests at another Best Western facility.

## GOLD CROWN CLUB

- Your past participation in the Gold Crown Club has been appreciated. However, at this time, we must ask that you destroy your Gold Crown Club materials or send them to our office. If tracking forms are awarded to your guests after your effective cancellation date, your Best Western account will be charged accordingly.

Please feel free to call me at (602) 957-5835 if you have any questions or you may reach me via email at cheryl.pollack@bestwestern.com.

Sincerely,

*Cheryl Pollack*

CHERYL POLLACK, CHA
Director, Member Care and Development Administration

CP/kf
Enclosures

cc:      Best Western Governor (6-8)

BW0730



## LOGO REMOVAL CHECKLIST

This checklist is intended to help you determine if all Best Western logo'd items used at the hotel and / or in conjunction with the hotel have been removed. This list may not be all inclusive and it is your responsibility to ensure that the use of the Best Western logo and name at and in conjunction with your hotel has been completely discontinued. Further, it will be necessary for you to contact the local Chamber of Commerce to request that Best Western representation be removed from their maps and contact any publications, such as Travel Directories, Telephone Directories, Trade Magazines, etc., to request the next printing does not include the Best Western logo or the words "Best Western" in conjunction with your hotel. **Photographs must also be submitted showing the Best Western signs have been removed and/or replaced. This includes not only the sign faces, but also the actual sign cabinets if curvilinear in shape that display or are part of Best Western Marks.**

Former Best Western Member Number:   T-05050
                  Property Name:   Antelope Valley Inn
                  City & State:   Lancaster, CA

| ITEM | REMOVED | | | |
|------|-----|-----|-----|---------------|
| | Yes | No | N/A | Date/Comments |
| Best Western Highway Billboards | ☐ | ☐ | | |
| Best Western Department of Transportation signs | ☐ | ☐ | ☐ | |
| Internet Domain Names / Websites (other than the site set up for you by BWI) | ☐ | ☐ | ☐ | |
| Airport Duratrans | ☐ | ☐ | ☐ | |
| Logo'd items found at the property | ☐ | ☐ | ☐ | |
| Brochures | ☐ | ☐ | ☐ | |

| | |
|---|---|
| Chamber of Commerce Maps, Travel Directories, Telephone Directories, Trade Magazines, etc. | Submit copy of all correspondence requesting BW be removed in conjunction with your hotel |
| Exterior Best Western Signs | Submit day and night photos indicating signs have been removed |

G:/master forms 03/05

BW0731



Former Best Western Member Number:   T-05050
Property Name:   Antelope Valley Inn
City /State or Province:   Lancaster, CA

## AFFIDAVIT (Page 1 of 2)

STATE OF _____

County of _____

The undersigned Affiant, being first duly sworn upon oath, deposes and says:

1.   I have personal knowledge of the facts stated in this Affidavit.

2.   I make this Affidavit in connection with alleged trademark infringement by the _____ ("the Hotel"), a former member of Best Western International, Inc. ("Best Western").

3.   I am aware that Best Western's trade name, trademarks, service marks, logos, and other similar identification symbols (the "Best Western Marks") are protected by numerous federal registrations.

4.   I am aware that the Hotel's Best Western membership and affiliation was terminated on or about _____, and, as a result of that termination, the Hotel no longer has any right or authorization to use the Best Western Marks, or any similar marks, or the names "Best Western," "Best Western Hotels," or any similar names.

5.   I personally checked and verified that:

(a)   The Hotel no longer uses the Best Western Marks, or any similar marks, or the names "Best Western," "Best Western Hotels," or any similar names in connection with the Hotel's business, services, or products.

BW0732

# AFFIDAVIT (Page 2 of 2)

Former Best Western Member Number: <u>T-05050</u>

(b)     The Hotel has removed all sign faces, sign cabinets if curvilinear in shape, banners, and letters, has withdrawn and destroyed all advertising, internet-based pages, promotional materials, or other materials, and has removed all other objects and items bearing the Best Western Marks, or any similar marks, or the names "Best Western," "Best Western Hotels," or any similar names;

(c)     The Hotel has contacted each travel web site known to contain an improper listing of the Hotel, arranged for removal or alteration of the hotel's listing, and subsequently confirmed removal of the listing;

(d)     The Hotel no longer states or implies in any way to any person that the Hotel is affiliated with or endorsed by Best Western in any way whatsoever.

(e)     The Hotel no longer does business with any entity that engages in the foregoing violations.

**Attached are photos evidencing my compliance with all of the above requests.**

Signature of Affiant: _____

Printed Name: _____

SUBSCRIBED AND SWORN to before me this ___ day of _____, 20___ by

_____, in the County of _____, State of _____.

_____

Notary Public

My Commission Expires: _____

BW0733

# EXHIBIT O

**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

                    Plaintiff,

        vs.                           CASE NO. CV082274PHXDGC

AV INN ASSOCIATES 1, LLC; and
KAMYAR REFOUA,

              Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**KAMYAR REFOUA**
December 3, 2009
9:07 a.m.

1875 Century Park East
Suite 500
Los Angeles, California

MARYAM T. SALAHUD-DIN, CSR No. 9669



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

**1**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

     Plaintiff,

     vs.         CASE NO. CV082274PHXDGC

AV INN ASSOCIATES 1, LLC; and
KAMYAR REFOUA,
     Defendants.
------------------------------

DEPOSITION OF
KAMYAR REFOUA

December 3, 2009
9:07 a.m.

1875 Century Park East
Suite 500
Los Angeles, California

MARYAM T. SALAHUD-DIN, CSR No. 9669

---

**3**

### INDEX OF EXAMINATION

WITNESS: KAMYAR REFOUA

| EXAMINATION | PAGE |
| --- | --- |
| By Mr. Garbarino | 5, 67 |
| By Ms. Lazarus | 53 |

---

**2**

### APPEARANCES OF COUNSEL

For the Plaintiff:
SHERMAN & HOWARD
BY:  DAVID W. GARBARINO
Attorney at Law
2800 North Central Avenue, Suite 1100
Phoenix, Arizona 85004-1043
602.240.3000

For the Defendants:

THE NATHANSON LAW FIRM
BY:  BLAIR LAZARUS
Attorney at Law
120 North LaSalle Street, Suite 1000
Chicago, Illinois 60602
312.782.3322

Also Present:
HOOSHANG HAROONI

---

**4**

### INDEX TO EXHIBITS

| Exhibit | Description | Page |
| --- | --- | --- |
| 19 | Defendants' Supplemental Answers to Plaintiff's Interrogatories | 41 |

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Kamyar Refoua                                                    December 3, 2009

---

**5**

1    DEPOSITION OF KAMYAR REFOUA
2    December 3, 2009
3
4    KAMYAR REFOUA,
5    having been first duly sworn, testifies as follows:
6
7    EXAMINATION
8    BY MR. GARBARINO:
9    Q.  Can you please state your full name for the
10   record.
11   A.  Yes.  Kamyar Refoua.
12   Q.  How did you spell Kamyar?
13   A.  K-a-m-y-a-r.
14   Q.  And your last name?
15   A.  R-e-f-o-u-a.
16   Q.  And do you go by any other name?
17   A.  Yes.  Kevin.
18   Q.  Is it okay if I call you Kevin during this
19   deposition?
20   A.  Yes.
21   Q.  Are you familiar with this litigation and the
22   facts leading up to it?
23   A.  Yes.
24   Q.  Okay.  You understand that Best Western has
25   filed claims against Mr. Harooni and AVN Associates 1,

---

**6**

1    LLC?
2    A.  Yes.
3    Q.  And you understand that Mr. Harooni has filed
4    a counterclaim against Best Western for essentially
5    wrongful termination of his Best Western membership?
6    A.  Yes.
7    Q.  You understand today, when I use the term
8    "hotel," I'm going to be referring to the hotel that is
9    located in Lancaster, California at 44055 North Sierra
10   Highway?  Is that okay?
11   A.  That is fine.
12   Q.  In which time frame did you work for the
13   hotel?
14   A.  It was from the beginning -- you want specific
15   dates?
16   Q.  If you can remember specific dates, great.  If
17   you just give me months, that is fine too.
18   A.  It was from the date of purchase which I
19   believe was in 2005 all the way until either March or
20   April of '08.
21   Q.  And I'm sorry.  I should have done this
22   earlier.  But I'm just going to go over the ground rules
23   real quick of this deposition.
24   Have you ever been deposed before?
25   A.  Never.

---

**7**

1    Q.  Okay.  The ground rules are real simple.
2    Because the court reporter is here taking everything
3    down, she can only take things down when one person is
4    speaking at a time.  So please let me try to finish my
5    question.  And I will do my best to let you finish your
6    answer before I ask my next question.
7    In that same vein, because she is taking
8    everything down verbally that has been spoken, uh-huhs,
9    huh-uhs shaking of the head, nodding the head, that
10   stuff doesn't quite make it onto the record very well.
11   So if you use uh-huhs and huh-uhs or shake
12   your head up and down, nod, whatever, I will probably
13   ask for a verbal answer, yes or no.  So don't feel
14   offended by that.  I just want to make sure we have a
15   clear record on that.
16   If at any time you need to take a break, just
17   let me know.  The only caveat I have is, if I have ask a
18   question, I would require you to answer that question
19   before we go on break.  But, otherwise, feel free to ask
20   for a break at any time if you need one.
21   Lastly, if you don't understand one of my
22   questions the way I phrased it, whatever, just let me
23   know.  I will be happy to rephrase it and do my best to
24   make you understand or state my question in a way that
25   you are able to understand it.

---

**8**

1    Are you currently taking any medication that
2    might affect your ability to understand my questions or
3    answer my questions here today?
4    A.  No.
5    Q.  While you were working at the hotel, what was
6    your position?
7    A.  It was more of an assistant position to
8    Mr. Harooni.  So helping him out with any
9    responsibilities that he would give me.
10   Q.  Did you report directly to Mr. Harooni?
11   A.  Yes.
12   Q.  Did you report to anyone else at the hotel?
13   A.  No.  You mean in terms of an immediate
14   supervisor?
15   Q.  Correct.
16   A.  No.
17   Q.  So in terms of hierarchy of the folks who
18   worked at the hotel, where would you be in relation to
19   the general manager?
20   A.  Below the general manager.
21   Q.  But you didn't report to the general manager?
22   A.  No, I didn't report to the general manager.
23   Q.  What is your relationship to Mr. Harooni?
24   A.  My aunt's husband.
25   Q.  Is it fair to say you have known Mr. Harooni

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Kamyar Refoua                                          December 3, 2009

---

**21**

1    Q.   Explain to me in a little bit more detail why
2    the GM training in 2007 Cheryl didn't go and instead you
3    went.
4        A.   The hotel was busy with operations and
5    remodeling.  And it was a few-day training.  And we
6    called.  When I called, they said it wasn't something
7    that would require the general manager to go.  And all
8    of the training tools and information that they gave, I
9    was able to bring back.
10        So I just went to collect information, get
11    trained, and then come back and tell Cheryl what
12    happened.
13        Q.   During your time at the hotel, did you know if
14    any general manager attended the general manager
15    training?
16        A.   No.
17        Q.   No, you don't know; or no general manager
18    attended the training?
19        A.   No general manager attended the training.
20        I believe it became mandatory in '07.  So
21    prior to that I don't believe it was mandatory for any
22    general manager to attend.  I also believe the
23    certification was good for two years, two or three
24    years.
25        Q.   While you were at the hotel, did anybody work

**22**

1    under you?
2        A.   No.
3        Q.   In this litigation Mr. Harooni is alleging
4    that Best Western didn't provide services and supplies
5    as promised by the membership agreement.  Do you know
6    what those services and supplies are?
7        A.   Yes.  I'm not sure to the full extent of what
8    Mr. Harooni's -- what he expects the service to be.  But
9    I have an understanding of what the services would have
10    been that should have been provided that weren't.
11        Q.   And what are those services?
12        A.   Okay.  So in the beginning, when I went to the
13    first meeting with Best Western, it was an initial
14    meeting that we met with Terri Winegger.  And she kind
15    of explained how the operation how Best Western operates
16    and what kind of services they provide the foundation
17    they have.
18        And one of the services she said that they
19    provide is RFP management where they would be able to
20    get all of the large corporations like Boeing, Northrop,
21    Lockheed for us.  And that was part of their sales
22    strategies that they would be able to provide those
23    services and on those accounts.
24        And then she also mentioned that there was an
25    accounts manager that would overlook the financial

**23**

1    health of the property to make sure that all of the
2    avenues of revenues were being exhausted.
3        So it was sales service.  It was also
4    monitoring the property in terms of the financial health
5    and, also, to make sure that all of the avenues of
6    income from Best Western were being exhausted.
7        I believe they called it revenue manager.
8        Q.   Okay.  Let's start with the RFP management.
9    Did Terri explain to you how Best Western was going to
10    go about to do this for the hotel?
11        A.   Very vaguely.  It was more, this is the
12    services we offer.  We have the infrastructure in place
13    to be able to support the demands that the hotel would
14    need.  And she outlined what the scope of services would
15    be that they would be able to provide.
16        Q.   Do you know if Mr. Harooni or anybody else at
17    the hotel asked Best Western to provide these services?
18        A.   Yes.  We all did.
19        Q.   When?
20        A.   It was in the beginning stages and throughout
21    the ownership period.
22        Q.   How were these requests made to Best Western?
23        A.   I believe verbally they were made.  There is
24    some paper trail, e-mail, some letters.
25        Q.   Do you have any of those e-mails or paper

**24**

1    trail in your possession?
2        A.   If I look, I could probably find them.
3        Q.   You understand that part of the -- let me back
4    up for a minute.
5        Were you actually served with a subpoena?
6        A.   Yes.
7        Q.   And there was a document request on that
8    subpoena.  Did you happen to notice that?
9        A.   No.
10        Q.   There was a document request on the subpoena.
11    And if you have any documents related to the litigation,
12    the hotel, et cetera, et cetera, you need to give those
13    to Mr. Harooni's attorney.  And they will get those to
14    me; okay?
15        A.   Okay.  That is fine.
16        I was served a subpoena two days ago.  I
17    didn't even know I was coming until two days ago.  I
18    didn't have enough time to prepare.
19        Q.   I understand.
20        Did you ever receive any written materials
21    from Terri Winegger regarding the RFP management as to
22    what she said Best Western was going to provide?
23        A.   No, I did not.
24        Q.   Okay, let's talk about the account manager
25    looking over the financial health of the hotel for a

---



# ESQUIRE

an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

## 25

1  minute. What was your understanding of how Best Western
2  could do this?
3      A. So they have a reservation system in place
4  where you are able to book through Best Western. And it
5  was our understanding that they monitored that system to
6  make sure that it is active and working correctly.
7          And that was one of the services that Terri
8  mentioned that -- she took us to a room and said this is
9  our department. These are the people in charge and
10  introduced us to our revenue manager and said, if you
11  have any questions in terms of the Best Western
12  reservation system or any other questions in terms of,
13  if there was any monetary questions, you would be able
14  to talk to him.
15      Q. So Terri told you that they specifically
16  monitored the reservation system for this hotel?
17      A. It wasn't specific for us. It was for every
18  hotel. That was the service they provided to all the
19  members.
20      Q. The reservation system or the monitoring of
21  the reservation system?
22      A. The reservation system and the monitoring.
23      Q. What was your understanding of the term
24  "monitoring"?
25      A. To make sure that, if it was closed, it would

## 26

1  be open. To make sure that our rate structure was
2  correct and competitive to the marketplace.
3      Q. Did Terri Winegger specifically mention that
4  they monitor to see if the hotel had rooms that were
5  closed on the system?
6      A. Yes.
7      Q. She told you that?
8      A. Yes.
9      Q. Did Terri Winegger also tell you that Best
10  Western monitored the rate structure?
11      A. Yes. She said that, when the quarterly
12  inspections were being done, that we would have someone
13  come sit down with us and review all of our rates,
14  review the Best Western booking system and kind of train
15  us on what our rate structure should be also.
16          So at the time I believe -- I'm trying to
17  recall the name. There were so many names. Mitch. His
18  name was Mitch. So Mitch would come out. And he would
19  inspect the property.
20          And then after he had his inspections, he
21  would sit down with us and go through all of the revenue
22  chains that Best Western provides to make sure that they
23  are functioning properly and to also make sure that it
24  is competitive in the marketplace.
25          So he would have an analysis report of the

## 27

1  other hotels. And he would make recommendations, like,
2  this is charging X amount for their rooms on these
3  dates. This is where you guys should be also.
4      Q. It was more recommendations.
5          So did Mitch come do that every time he came
6  out and --
7      A. Yes.
8      Q. What, in addition to Mitch coming out and
9  doing that, do you believe the hotel should have
10  received from Best Western in terms of its management of
11  its financial health?
12          MS. LAZARUS: Object to the form.
13          THE WITNESS: Can you repeat the question.
14  BY MR. GARBARINO:
15      Q. Sure.
16          You just testified that Mitch came out and
17  talked with you regarding the various matters that we
18  just discussed. In addition to that, what else did the
19  hotel expect to receive from Best Western?
20      A. So he would --
21          MS. LAZARUS: Object to the form.
22          THE WITNESS: He would overview the monitoring
23  system. And then we would -- we expected that Best
24  Western, our revenue manager, would go through it in
25  more detail.

## 28

1          So Mitch was very vague about everything. So
2  he didn't specifically go into every single category and
3  make sure that everything was opened and closed. His
4  was more overview and recommendations.
5  BY MR. GARBARINO:
6      Q. Did Terri Winegger tell you that somebody
7  would go over it in detail?
8      A. Yes. If we need the service, yes.
9      Q. Did you request the service?
10      A. Multiple times, yes.
11      Q. And those requests were made in writing?
12      A. I believe e-mail, yes.
13      Q. And if you have those, would you provide those
14  to Mr. Harooni's attorney?
15      A. Yes.
16      Q. Do you know if Best Western had any other
17  financial information about the hotel other than what
18  was through the reservation system?
19      A. To the best of my knowledge, no.
20      Q. So in terms of monitoring the financial health
21  of the hotel, the only information Best Western had was
22  the information through the reservation system?
23      A. Yes, which would be a large portion of the
24  bookings.
25      Q. I understand.



Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Kamyar Refoua                                           December 3, 2009

---

29

1        Is it fair to say that walk-ins come that in
2   and rent a room for the night wouldn't be on the Best
3   Western system?
4        A.   No.
5        Q.   And Best Western would have no means of
6   tracking that; correct?
7        A.   Yes.
8        Q.   And the same would be true if somebody called
9   the hotel directly?
10       A.   Yes.
11       Q.   So the bookings that we are talking about
12  through the reservation system are probably through a
13  1-800 number and the Internet maybe?
14       A.   Yes.  So it would be any electronic bookings.
15       Q.   And you had no role with respect to the
16  accounting for the hotel; correct?
17       A.   Yes.
18       Q.   When you were in Arizona in 2005 for the
19  initial training, were there any other promises that
20  Best Western made to you?
21       A.   Yes.  It was more in terms of support,
22  anything that we would need.  So it was more like a
23  blanket statement.  So if you need any help on anything,
24  any support, you would need, you just call us and we
25  would try to help you.

30

1        Q.   Was there any sort of specific support that
2   was represented to you that was included in that?
3        A.   So it was obviously the financial overview and
4   then the sales, the sales aspects of the hotel.
5        Q.   What do you mean by sales aspects of the
6   hotel?
7        A.   Okay.  So Lancaster Palmdale, the market is
8   mostly corporate.  So and those corporate clients would
9   have to go through an RFP.  So it would be like 90
10  percent corporate, 10 percent leisure.  And out of that
11  90 percent, a good 80 percent of them, we didn't have
12  control over getting the accounts because they were
13  corporate accounts.
14       So Best Western would have to initiate the
15  contact and build the relationship.  And we would feed
16  off that.  So like Ratheon, Boeing, Northrop, Lockheed.
17  So those clients were promised.
18       Q.   Best Western promised these clients to you?
19       A.   We said that we would be able to get them our
20  own.  And they said we are 4,000 strong.  We have a
21  relationship with these corporate contacts and that we
22  would be able to get them.
23       Q.   Who made that promise to you?
24       A.   I spoke with a sales manager, also, in Chicago
25  when I went for a convention.  So I have to recall his

31

1   name.  I can't recall his name.  He was the sales
2   manager for that region.
3        Q.   And this person promised you that Best Western
4   would get these customers for the hotel?
5        A.   Yes.
6        Q.   And when was that promise made?
7        A.   It was, I believe, in '06.  We went to the
8   convention in Chicago.  And I'm trying to recall if it
9   was either '06 or '07.
10       Q.   Did this person identify specific clients that
11  Best Western would obtain for the hotel?
12       A.   Yes.  Northrop, Northrop Grumman, Boeing,
13  Lockheed, Ratheon.
14       His name was Scott Wilson.
15       Q.   What would prevent these companies from
16  choosing a different hotel?
17       A.   Nothing.
18       So it would be at their discretion.  But at
19  least you would have the option of being on the list for
20  them to pick from.  So it wasn't that they promised that
21  they would come to the hotel.  It was more of a promise
22  the account would be established for them to pick the
23  hotel from a group of hotels.
24       Q.   And you didn't believe that Best Western was
25  on the list of hotels for any of these companies?

32

1        A.   No, not for our property.  So each property
2   would have to submit an RFP and then get qualified and
3   then be placed on the list.
4        Q.   So if there are 4,000 Best Western hotels,
5   they each had to submit something to be on the list?
6        A.   That was my understanding, yes.
7        Q.   Is it possible you had a misunderstanding?
8        A.   Yes, it is possible.
9        I don't believe that the blanket RFP was for
10  each property.  So it was more case -- it was more per
11  each property than just generally speaking.  So if we --
12  Best Western submitted an RFP to Boeing and Northrup and
13  it applied to all hotels, they wouldn't make sense.
14       Q.   That wouldn't make sense?
15       A.   No.  It wouldn't make sense.
16       Q.   But if someone from Boeing is making a
17  reservation through Best Western, wouldn't they go
18  through the Best Western system?
19       A.   Yes.  Would go through the Best Western system
20  if that property is on that system.
21       MS. LAZARUS:  Object to the form.
22  BY MR. GARBARINO:
23       Q.   Was the AVN on that form?
24       A.   No.
25       MS. LAZARUS:  Object to form.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

# EXHIBIT P

**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

        Plaintiff,

    vs.

AV INN ASSOCIATES 1, LLC; and
HOOSHANG HAROONI,

      Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CASE NO.
CV082274PHXDGC

**DEPOSITION OF**

**LINA ESELTINE**

December 2, 2009
9:26 a.m.

1875 Century Park East
Suite 500
Los Angeles, California

Maryam T. Salahud-Din, CSR No. 9669



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Lina Eseltine

December 2, 2009

## 1

                    IN THE UNITED STATES DISTRICT COURT
                            DISTRICT OF ARIZONA

        BEST WESTERN INTERNATIONAL,
        INC.,

                    Plaintiff,

                vs.                   CASE NO. CV082274PHXDGC

        AV INN ASSOCIATES 1, LLC; and
        HOOSHANG HAROONI,
                    Defendants.
        _____


                            DEPOSITION OF
                            LINA ESELTINE

                          December 2, 2009
                             9:26 a.m.

                        1875 Century Park East
                              Suite 500
                        Los Angeles, California


                MARYAM T. SALAHUD-DIN, CSR No. 9669

## 2

APPEARANCES OF COUNSEL

For the Plaintiff:

    SHERMAN & HOWARD
    BY:  DAVID W. GARBARINO
    Attorney at Law
    2800 North Central Avenue, Suite 1100
    Phoenix, Arizona 85004-1043
    602.240.3000

For the Defendants:

    THE NATHANSON LAW FIRM
    BY:  BLAIR LAZARUS
    Attorney at Law
    120 North LaSalle Street, Suite 1000
    Chicago, Illinois 60602
    312.782.3322

Interpreter:
    MAGGIE BENAVIDES
    CONTINENTAL INTERPRETING
    714.283.9050

Also Present:
    HOOSHANG HAROONI

## 3

INDEX OF EXAMINATION

WITNESS:  LINA ESELTINE

| EXAMINATION | PAGE |
|---|---|
| By Mr. Garbarino | 5, 48 |
| By Ms. Lazarus | 52 |

## 4

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 8 | Summary Report dated 5/17/2007, Bates stamped BW0022 through 46 | 29 |
| 10 | Summary Report dated 10/25/2007, Bates stamped BW0172 through 199 | 32 |
| 12 | Summary Report dated 1/31/2008, Bates stamped BW0427 through 449 | 37 |
| 21 | Document titled "Declaration of Lenaa Eseltine" | 41 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Lina Eseltine                                                                December 2, 2009

## 5

1          DEPOSITION OF LINA ESELTINE
2              December 2, 2009
3
4              LINA ESELTINE,
5    having been first duly sworn through the interpreter,
6    was examined and testified through the interpreter as
7    follows:
8
9              MAGGIE BENAVIDES,
10   was duly sworn to act as English/Spanish interpreter.
11
12             EXAMINATION
13   BY MR. GARBARINO:
14        Q.   It is Lina Eseltine?
15        A.   Eseltine.
16        Q.   May I call you Lina?
17        A.   Yes, Lina, yes.  It is easy.
18        Q.   Thank you.  As you know, we are here for your
19   deposition today.
20        A.   Yes.
21        Q.   In litigation involving Best Western
22   International and AV Inn Associates 1, LLC and
23   Mr. Hooshang Harooni.
24             Best Western has asserted a breach of contract
25   claim against AV Inn and Mr. Harooni.  And Mr. Harooni

## 6

1    has asserted various claims against Best Western.
2         A.   Yes.
3         Q.   Okay.  Have you ever had your deposition taken
4    before?
5         A.   No.
6         Q.   I'm going to go over some just brief ground
7    rules.  Since we have a court reporter here, only one
8    person can speak at a time.  Similarly, the court
9    reporter can only take down verbal responses.
10        A.   Okay.
11        Q.   So no nodding, shaking of the head.
12        A.   Okay.
13        Q.   And, similarly, uh-huhs, huh-uhs don't make it
14   on the record very well.
15        A.   Okay.  Okay.
16        Q.   If at any time during this deposition you need
17   to take a break, please let me know.  And my only caveat
18   is that, if we are in the middle of a question, you need
19   to finish the question.
20        A.   Okay.
21        Q.   If for any reason you don't understand a
22   question that I ask, please feel free to say you don't
23   understand the question and ask me to rephrase it.
24        A.   Okay.
25        Q.   Are you on any medication today that would

## 7

1    affect your ability to understand my questions or answer
2    my questions?
3         A.   No.
4         Q.   This litigation involves the hotel located in
5    Lancaster, California located at 44055 North Sierra
6    Highway.  When I use the term "hotel," that is the
7    property that I will be referring to.
8         A.   Okay.
9         Q.   Now I understand that you were employed at the
10   hotel for some time.
11        A.   Yes.
12        Q.   Can you tell me how many years you were
13   employed at the hotel?
14        A.   29.
15        Q.   During those 29 years, what positions did you
16   hold at the hotel?
17        A.   When I was hired in 1980, I did rooms for two
18   years.  Later I worked at the laundry for 10 years.
19   Later on I was the manager's, housekeeping manager's
20   assistant for about five or six, maybe four or five.
21   When she was laid off, then they gave me the keys for --
22   so I can take on her position.  And then until the last
23   day I was there, I was the supervisor for housekeeping.
24        Q.   So the previous manager who you assisted was
25   laid off?

## 8

1         A.   I think -- I don't remember if she was fired
2    or if she left because she was sick.
3         Q.   Do you recall when that was?
4         A.   I think about 10 years.  10, 11 years that I
5    was a housekeeper supervisor or housekeeping
6    supervisor.
7         Q.   How many previous owners of the hotel have you
8    worked for?
9         A.   Five.
10        Q.   Do you recall who the owners were previous to
11   Mr. Harooni and AV Inn?
12        A.   Mr. Peter.  Mr. Peter Sue.
13        Q.   Is that S-u-e?
14        A.   I think so.
15        Q.   Do you know how long he had owned the hotel
16   before Mr. Harooni?
17        A.   I think he had it about three years.  Not a
18   long time, not a long time.
19        Q.   Prior to starting at the hotel in 1980, did
20   you have any formal education?
21             MS. LAZARUS:  Object to the form.
22             THE WITNESS:  No.  I was going to a night
23   school to learn English.
24   BY MR. GARBARINO:
25        Q.   Do you know when you first met Mr. Harooni?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Lina Eseltine                                                    December 2, 2009

---

**33**

1  know.
2  BY MR. GARBARINO:
3      Q.  If we can look at Exhibit 10, which is a
4  similar inspection report for October 25th, 2007.  If we
5  turn to BW0173, the inspection report lists a number of
6  rooms that were inspected.
7      A.  Yes.
8      Q.  Do you specifically recall the inspection of
9  these rooms on October 25th of 2007?
10     A.  Yes.
11     Q.  One of the rooms inspected is 393.
12     A.  Yes.
13     Q.  Do you recall the last time this room was
14 inspected?
15     A.  I think the last time was with the woman
16 because she was the last one that came to inspect.
17     Q.  But before October 25th of 2007, do you recall
18 that this room had been previously inspected?
19     A.  I don't remember.
20     Q.  Fair enough.
21         Turn to page BW00175 under the heading Bed
22 Coverings, Linens, and Pillows.  It states that the
23 inspector found hair on bed sheets in 293 and 267.
24     A.  He found one hair on the edge of the sheet,
25 but I think it was the maid's.

---

**34**

1      Q.  So you recall seeing hair on the sheet in room
2  293 or 267?
3      A.  Yes.
4      Q.  In both rooms?
5      A.  In 393.
6      Q.  She recall seeing hair on the bed in 393, not
7  293?
8      A.  Oh, yes, yes.  In this one.
9      Q.  In 293?
10     A.  Yes.  It was on the edge of the sheet.
11     Q.  And did you also see hair on the bed in room
12 267?
13     A.  The maid did change that room, but the blanket
14 did have a little hair.
15     Q.  Did Mitch previously find hair in his
16 inspection of the hotel rooms and not deduct points?
17     A.  I think he did deduct points.  He would say
18 that hair was very -- no.  He didn't like it, and
19 neither did I.  No.
20     Q.  So Mitch would deduct points every time he
21 found hair in an inspection of the room?
22     A.  Yes.  I'm going to get marshal.  What is
23 marshal?  What does that mean?  It was either too few
24 points or too little points.
25         But he would always tell me that the rooms

---

**35**

1  were excellently cleaned.  I always passed the
2  inspections for cleaning always, always.  And he would
3  tell me that I did excellent work.
4      Q.  On that same page just above where we were
5  discussing before, there is a heading Beds, Box Springs
6  and, Mattress.  It states that the bed sets are showing
7  visible sagging in mattress and/or box spring in 393.
8      A.  Well, if I didn't turn them every three
9  months, they would get a little saggy.  I always brought
10 the young men in to turn the mattresses over.  But that
11 time he just happened to go into that room.  And those
12 rooms were not made.  They were not made up.
13     Q.  So you agree that in room 393 there was a
14 sagging mattress?
15     A.  Yes, a little bit.  Very little.  It was just
16 wavy.  The guest would not know, but Mitch did.
17     Q.  If we go to the next page BW0176.
18     A.  Okay.
19     Q.  There is a heading called Tubs, Showers,
20 Surround, Grout.
21     A.  Yes.
22     Q.  And there is a statement that there is a rust
23 stain on tub bottom in 267.  Do you recall seeing this
24 rust stain?
25     A.  Yes.  I tried to take it off with several

---

**36**

1  chemicals, but they wouldn't go away because those tubs
2  were very old.
3      Q.  And just moving down a bit there, it says
4  vanity, counter, wash basin.  Vanity top outside the
5  bathroom has a worn finish in 134.
6      A.  The window.
7      Q.  Do you recall seeing that worn finish?
8      A.  I do remember it, but we did fix it.  And then
9  afterwards he put marble on it.  He put marble in all of
10 the rooms.
11     Q.  Do you recall when he put marble in all of the
12 rooms?
13     A.  That was almost the last thing he did when he
14 remodeled.
15     Q.  If we can go to the next page, BW0177.
16     A.  Yes.
17     Q.  You agree under the heading Buildings, Roofs
18 that the inspector noted the roof is damaged in this
19 building.
20     A.  Yes.
21     Q.  And would you also agree that under the
22 heading parking lot, trash areas, delivery, et cetera,
23 that the inspector noted that the parking lot surface is
24 very cracked and damaged?
25     A.  Yes.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Lina Eseltine                                    December 2, 2009

37

1       Q.   And do you agree that the parking lot surface
2   was very cracked and damaged at that time?
3       A.   Yes.
4       Q.   And, again, this report notes that the trash
5   area door at the rear of the property is broken.
6       A.   Yes.
7       Q.   Do you recall that being true?
8       A.   Yes.  But he repaired it later.  The trucks
9   would break it when they would pick up the garbage.  So
10  he fixed it like three times.  About two or three times
11  he sent maintenance in to fix it.  Put new ones.  (In
12  English.)
13      Q.   Fair enough.  If we could take a look at
14  Exhibit 12.
15          (Plaintiff's Exhibit 12 marked.)
16          THE INTERPRETER:  Counsel, can go off the
17  record.
18          (Recess.)
19  BY MR. GARBARINO:
20      Q.   Exhibit 12 is a summary report dated January
21  31st, 2008.  Do you recall specifically attending this
22  inspection?
23      A.   Yes.  She was very hard.
24      Q.   And the inspector this time was different;
25  right?

38

1       A.   Yes.  She was very picky.
2       Q.   And on BW428 the report states that rooms 105,
3   115, 134, 163, 258, 157, 180, 286, 388, and 264 were
4   inspected.
5          Do you recall the inspections of those
6   individual rooms?
7       A.   Yes.
8       Q.   Turning to BW430, there is a heading entitled
9   Equipment.  And under that heading it says, Top of A/C
10  scratched in room 180.  Do you recall that scratch?
11      A.   Yes.
12      Q.   Turning to the next page BW0431, under the
13  heading chrome, it says the tub chrome was tarnished in
14  room 180 and 388.  Do you recall that tub chrome
15  tarnished?
16      A.   It wasn't tarnished.  It was like worn out.
17  But he put them in new later.
18      Q.   Fair enough.  A little further down, it says
19  is Toilet Seat, Bowl, Tank.  Under that it says toilet
20  bowl has hard water build up in room 258.
21      A.   Yes.
22      Q.   Do you recall seeing that?
23      A.   Yes.  There was a liquid that I would put on
24  to remove it, but then it would come back.  Once the
25  room was vacant for one or two weeks, it would build up

39

1   again.
2       Q.   So was that a common problem in all of the
3   hotel rooms?
4       A.   No, no.  It was more of a problem or more of a
5   problem in the two story because it was older.  But they
6   installed all new toilets.
7       Q.   Do you know when they installed all new
8   toilets?
9       A.   It was in 2007, I think.  When was this
10  inspection?  I think that, when she inspected, they
11  hadn't all been changed yet.  Some but not all.
12      Q.   Turn to the next page BW0432.  Under the
13  heading Buildings, Roofs, it states, "Roof edge damaged
14  on overhang near Japanese garden."
15      A.   Yes, yes, yes.  I know.
16      Q.   Do you recall seeing that damage?
17      A.   Yes.  After that actually my brother fixed it
18  because he worked --
19          We didn't put my brother on the list.  (In
20  English.)
21      Q.   I understand.  Not a problem.
22          Is this the same roof edge damage that had
23  been noted on the previous inspection reports?
24      A.   Yes.  But it was actually on both sides.  It
25  first got it on one side.  And then that was fixed.  And

40

1   then it went to the other side.
2       Q.   Go down a little further.  There is a heading
3   Elevators/Lifts Interior or Exterior.  And it says,
4   "Elevator panels have holes and scratches."  Do you
5   recall seeing the holes and scratches?
6       A.   Yes.
7       Q.   Are these the same defects with the elevator
8   that had been noted in the previous inspection reports?
9       A.   I think the scratches were, yes, but not the
10  holes.  I think that people are very mischievous, and
11  they do things.
12      Q.   Maybe some of those children from the soccer
13  and baseball teams.
14      A.   Exactly.  The soccer.  They destroy the hotel
15  when they come.  (In English.)
16      Q.   And if we go further down, there is a heading,
17  Parking Lot, Trash Areas, Delivery et cetera.  And the
18  inspection report says that the parking lot has numerous
19  cracks.
20          Is that an accurate description of the parking
21  lot on the date of this inspection?
22      A.   Well, there was some pavement that was
23  cracked.  But as far as the borders and the lines, my
24  brother painted some.  My brother was the painter for
25  the hotel.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Lina Eseltine

December 2, 2009

## 41

1    Q.   And did he paint those after January 31st,
2    2008?
3        A.   Yes.  They were painted, yes.
4        Q.   After January 31st?
5        A.   Yes.  After she was inspecting, they painted
6    them, yes.
7        Q.   Now, you were the head housekeeper when Best
8    Western terminated the membership for the hotel;
9    correct?
10       A.   Yes.  I got very sad.
11       Q.   Do you know if Mr. Harooni or the hotel tried
12   to change to another flag?
13       A.   I don't remember.
14       Q.   Do you need to take a break, ma'am?  Fair
15   enough.  Not a problem.  We can go off.
16           (Recess.)
17           MR. GARBARINO:  We are back on the record.
18       Q.   I'm just going to reask the last question I
19   asked you.  It may not be precisely the same words, but
20   it will be similar.
21           Do you know if Mr. Harooni took any effort to
22   rebrand the hotel to obtain a different hotel name such
23   as Clarion?  Econolodge?
24       A.   It seems to me that I heard something about
25   that, but he didn't do it.  He left it as the Antelope

## 42

1    Valley Inn as it was when I first started.
2        Q.   Fair enough.  I want to discuss for a moment
3    Exhibit 21.
4           (Plaintiff's Exhibit 21 marked.)
5    BY MR. GARBARINO:
6        Q.   And it is my understanding that this is a
7    declaration that you signed and executed.
8        A.   Yes.
9        Q.   And I'm going to ask the interpreter to read
10   it to you to make sure that you understand what is
11   written in this declaration.
12       A.   Okay.
13           (Interpreter reading document in Spanish.)
14           THE WITNESS:  With No. 3
15   BY MR. GARBARINO:
16       Q.   Yes.
17       A.   He did take points off.  And he would say to
18   me, you know, there is a little spot here on the
19   carpet.  But I would make it marshal or something like
20   that.  Like, I think he meant just a little but not a
21   lot, that there wasn't very many points taken off
22   because not all of the rooms had stains or spots.
23           (Interpreter reading document in Spanish.)
24           THE WITNESS:  I don't remember having written
25   in this No. 4, no, because, when Mitch started the

## 43

1    inspections, the hotel had not been remodeled.  But
2    after the remodeling, it was very good, much better,
3    much better.
4           (Interpreter reading document in Spanish.)
5           THE WITNESS:  Like No. 5, when he would say
6    that to me, because like, for example, if there was old
7    sheets on the beds, but Mr. Harooni bought new linen for
8    me later on.  Yes.  And they were put onto the beds.
9           (Interpreter reading document in Spanish.)
10           THE WITNESS:  Yes, yes, with No. 6.
11           (Interpreter reading document in Spanish.)
12           THE WITNESS:  Okay.  What I was not able to
13   understand is that.  Before the hotel was remodeled, my
14   points were -- my scores were higher.  Once this lady
15   came and after it was remodeled, then she made it really
16   low.  And I don't know why.
17           And I don't know why because it had new sinks,
18   floors, walls.  Everything had been -- the floors, the
19   walls, everything had been remodeled.  And so I was
20   never able to understand why it is that she scored it so
21   low.  More than Mitch.
22           MR. GARBARINO:  Let the record reflect that
23   the interpreter has read Exhibit 21 to the deponent.
24       Q.   And, I guess, let's start with the beginning.
25   Do you know who prepared this declaration?

## 44

1        A.   I think it was -- it might have been the
2    manager, I think.
3        Q.   The manager being?
4        A.   I think it was Laliana as a manager.  I never
5    got a copy of this.
6        Q.   Did you sign the declaration at the bottom?
7    Is that your signature?
8        A.   Yes, I signed it.  I think so.  Yes, I signed
9    it.  But I think that I was talking about before the
10   hotel was remodeled.  And I would get high scores.
11           And then after it was remodeled, they lowered
12   them.  And I never understood why.  And I think the
13   hotel is old.  And it had a lot of problems, but it was
14   very clean.  I kept it very clean.  They would always
15   tell me that the housekeeping was excellent.  That it
16   was not my problem.
17       Q.   Let's discuss the declaration for just a
18   second.  Before you signed it, did anyone read it to
19   you?
20       A.   You know what, I don't remember.
21       Q.   Was there anybody working at the hotel who
22   could translate from English to Spanish to read this to
23   you?
24       A.   No.
25       Q.   Does she recall anybody translating this from



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Lina Eseltine                                        December 2, 2009

---

45

1    English to Spanish to her?
2    A.  I don't remember.  I don't remember.
3    Q.  Fair enough.  In paragraph 3 we talked about
4    the spots on the carpet.  It is my understanding that
5    Mitch would deduct points when he found spots on the
6    carpet.
7    A.  He would take points off.  But he would take a
8    little points off like three or four.  He would say, oh,
9    I'm going to take three or four points because not all
10   of the rooms were like that.
11   Q.  I understand.  Would Mitch ever overlook spots
12   on a carpet?
13   A.  Yes.  No.  He saw them.
14   Q.  Would he always deduct points?
15   A.  I think he did take off but not many.  And he
16   would take pictures.
17   Q.  In paragraph 4 the declaration states, "He
18   would tell me everything was fine as he was inspecting
19   the hotel although we could both see the problem
20   areas."
21       What does that sentence mean?
22   A.  Maybe I wasn't able to tell them how to put it
23   down when they wrote this out.  What this means is that,
24   when he would see something, he would say to me, Lina,
25   you have to fix this for next time.  He would say to me,

---

46

1    your rooms are very clean.  But this is -- but this
2    needs to be fixed because I had a young man who would
3    take turns with the carpets because he would be in one
4    room.  And then, when he would be at the end and the
5    final one, he would come back again.
6        Do you understand that what I'm saying?  What
7    I'm trying to say is, he would start on the first
8    floor.  And he would go through all of the rooms and
9    replace all of the rugs on each room.  By the time he
10   would get to the last room, they would have to come back
11   down to the first room and start all over again and then
12   replace all of the rugs again in all of the rooms
13   because the rugs would wear out.
14       But this is when the carpeting was old, not
15   the new ones.  Not the new ones.
16   Q.  Is it fair to say that, when Mitch saw a
17   problem, he deducted a point?
18   A.  Yes.  Yes, he did deduct points.
19   Q.  Did Mitch ever see problems when he didn't
20   deduct points?
21   A.  If it was something little -- if it was
22   something little, he would say, you know, this doesn't
23   make any sense.  He would say like if he would find a
24   little stain on a chair or something like that.  But he
25   would always take a picture of it.

---

47

1    Q.  But it would have to be a very small problem?
2    A.  Very little, very small.  I would say, please
3    don't take any points off.
4    Q.  This declaration states that it was executed
5    on the 29th of April of 2009.  Who was your employer at
6    that time?
7    A.  The owner?
8    Q.  Mr. Harooni was your employer at the time?
9    A.  Yes, yes.
10   Q.  Let me just go through my list.  I think I'm
11   probably done.
12       Were the other maids paid on an hourly basis
13   or salary?
14   A.  Per hour.  Minimum.
15   Q.  Any estimate of how much per hour?
16   A.  It was minimum wage.  But I think it is 8.00.
17   But when they started, it was less.
18   Q.  Do you recall a couch in the lobby of the
19   hotel being damaged at any time?
20   A.  Yes.  The mischievous kids from the football
21   tore it.
22   Q.  Do you know how long it took the hotel to
23   replace that coach?
24   A.  I don't remember.  But they did fix it.
25   Q.  Fair enough.  I have no further questions for

---

48

1    you.
2    A.  Okay.
3        MS. LAZARUS:  I do have a couple of questions
4    for you.
5        EXAMINATION
6    BY MS. LAZARUS:
7    Q.  I just want to clarify a few more things.  And
8    i apologize for starting off this way, but it is because
9    of just -- we just finished it.
10       Do you currently work for Mr. Harooni?
11   A.  Not right now.
12   Q.  When did you stop working for him?
13   A.  June or July.  I think it was June.  Yes, yes,
14   June, June.  When he turned it over to the new owners,
15   they didn't have any work for me.
16   Q.  Okay.  You said that the sports groups, the
17   kids playing soccer, that they normally came in the
18   summer.
19   A.  Yes.  They would come around June, July,
20   August or September.  That was the time when they would
21   come the most.
22   Q.  Okay.  Did they ever come earlier?
23   A.  Sometimes.  But only like for one night.  If
24   they lost the game, they would leave.
25   Q.  And did they ever come later than September?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

# EXHIBIT Q

**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

Plaintiff,

vs.                              CASE NO. CV082274PHXDGC

AV INN ASSOCIATES 1, LLC; and
KAMYAR REFOUA,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**CHERYL DUGGAN**
December 3, 2009
12:17 p.m.

1875 Century Park East
Suite 500
Los Angeles, California

MARYAM T. SALAHUD-DIN, CSR No. 9669



Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Cheryl Duggan                                          December 3, 2009

## 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

　　　　Plaintiff,

　　vs.　　　　　　　CASE NO. CV082274PHXDGC

AV INN ASSOCIATES 1, LLC; and
HOOSHANG HAROONI,
　　　　Defendants.

-------------------------------

DEPOSITION OF
CHERYL DUGGAN

December 3, 2009
12:17 p.m.

1875 Century Park East
Suite 500
Los Angeles, California

MARYAM T. SALAHUD-DIN, CSR No. 9669

## 2

APPEARANCES OF COUNSEL

For the Plaintiff:
　SHERMAN & HOWARD
　　BY:　DAVID W. GARBARINO
　Attorney at Law
　2800 North Central Avenue, Suite 1100
　Phoenix, Arizona 85004-1043
　602.240.3000

For the Defendants:

　THE NATHANSON LAW FIRM
　　BY:　BLAIR LAZARUS
　Attorney at Law
　120 North LaSalle Street, Suite 1000
　Chicago, Illinois 60602
　312.782.3322
Also Present:
　HOOSHANG HAROONI

## 3

INDEX OF EXAMINATION

WITNESS:  CHERYL DUGGAN

| EXAMINATION | PAGE |
|---|---|
| By Mr. Garbarino | 5, 105 |
| By Ms. Lazarus | 92, 112 |

## 4

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 1 | Document titled "Brief Two-Year History for Current Owner" | 43 |
| 3 | Document titled "Best Western AV Inn Profit & Loss January through December 2005" | 44 |
| 4 | Document titled "Best Western AV Inn Profit & Loss January through December 2006" | 44 |
| 5 | Document titled "Best Western AV Inn Profit & Loss January through December 2007" | 44 |
| 6 | Document titled "Best Western AV Inn Profit & Loss January through June 2008" | 44 |
| 8 | Document titled "Summary Report North American Quality Assurance Assessment," dated 5/17/2007, Bates stamped BW0022 through 46 | 52 |
| 9 | Document titled "0505 Antelope Valley Inn Lancaster, CA Global Quality Assurance Assessment 05/17/07," Bates stamped BW0047 through 162 | 60 |
| 10 | Document titled "Summary Report North American Quality Assurance Assessment," dated 10/25/2007, Bates stamped BW0172 through 199 | 65 |
| 12 | Document titled "Summary Report North American Quality Assurance Assessment," dated 1/31/2008, Bates stamped BW0427 through 449 | 67 |
| 20 | Declaration of Lisa Wilkerson | 88 |
| 21 | Declaration of Lenaa Eseltine | 88 |
| 22 | Declaration of Cheryl Duggan | 75 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Cheryl Duggan                                              December 3, 2009



**5**

1           DEPOSITION OF CHERYL DUGGAN
2                December 3, 2009
3
4                CHERYL DUGGAN,
5      having been first duly sworn, testifies as follows:
6
7                EXAMINATION
8      BY MR. GARBARINO:
9          Q.  Can you state your full name for the record.
10         A.  Cheryl Ann Duggan.
11         Q.  And how do you spell that last name?
12         A.  D-u-g-g-a-n.
13         Q.  Have you ever had your deposition taken
14     before?
15         A.  Yes.
16         Q.  And when did you have your deposition taken
17     before?
18         A.  I had a deposition taken probably six months
19     ago and then probably about 10 years ago.
20         Q.  Okay.  I'm sure that, when you had your
21     deposition previously taken, there were some ground
22     rules the attorney went over at the get-go.  I'm going
23     to go over those again just to refresh your memory.
24             The court reporter is taking down everything
25     that we say.  So we need to say everything verbally.

**6**

1      And it is better if we each talk at one time, don't
2      overlap talking.  It makes it difficult for her to get
3      that down.
4             Same thing with head shaking and head nods,
5      uh-huhs, huh-uhs.  Those don't make it on to the record
6      very well.
7             If at any time during this deposition you need
8      to take a break, feel free.  Let me know.  My only
9      caveat is, if I have a question to you, that you answer
10     that question before we go on break; okay?
11         A.  Okay.
12         Q.  If for any reason you don't understand one of
13     my questions, please feel free to let me know.  I will
14     try to reword it, do everything I can to help you
15     understand what I'm trying to get at.  Okay.
16             Are you taking any medication that would
17     affect your ability to understand what I'm saying here
18     today --
19         A.  No.
20         Q.  Let me finish my question.  I'm sorry.
21         -- or affect your ability to answer my
22     questions here today?
23         A.  No.
24         Q.  You said you were deposed six months ago.  Can
25     you tell me what the circumstances of that deposition

**7**

1      were.  What I mean circumstances, I mean what was the
2      nature of the case?
3          A.  It was regarding a car accident.
4          Q.  Were you a party in that case, meaning were
5      you a plaintiff or a defendant?
6          A.  I insured a vehicle that somebody had bought
7      regarding an accident.  So they were researching me as
8      being the insured.
9          Q.  So this is a personal injury case?
10         A.  Uh-huh.  Yes.
11         Q.  And you said you were deposed 10 years ago.
12     What was the nature of that case?
13         A.  I was involved in a chamber of commerce
14     lawsuit.
15         Q.  How were you involved?
16         A.  I was the president of the chamber.
17         Q.  Which chamber of commerce?
18         A.  Palmdale.
19         Q.  Was the chamber of commerce at Palmdale being
20     sued?
21         A.  Yes.
22         Q.  Have you been a party to any other litigation
23     other than the two that we just spoke about here today?
24             And I'm not saying that you were a party to
25     these litigations.

**8**

1             But have you ever been a named party to any
2      other litigation?
3          A.  No.
4          Q.  What did you do to prepare for your deposition
5      today?
6          A.  Actually, nothing.
7          Q.  Fair enough.
8             Did you read any documents?  Anything like
9      that?
10         A.  No.
11         Q.  Did you speak with Mr. Harooni before your
12     deposition today about the substance of what we would be
13     talking about?
14         A.  Just when I came in.
15         Q.  Fair enough.
16             Are you aware that this litigation involves
17     Best Western AV Inn Associates and Mr. Harooni?
18         A.  Yes.
19         Q.  And do you understand that Best Western has
20     sued AV Inn Associates and Mr. Harooni to collect undue
21     assessments and whatnot?
22         A.  I'm not sure of who is suing who.
23         Q.  Fair enough.  I understand.  Let me just give
24     you a little background.  And I'm sure that counsel for
25     the defendants will correct me if I'm incorrect.



Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Cheryl Duggan                                            December 3, 2009

---

**21**

1   the hotel?
2        When I say audit, I mean a financial statement
3   audit?
4        A.  I don't recall one.
5        Q.  I take it your position with the hotel was a
6   full-time, 40-hour-a-week or more job?
7        A.  Yes.
8        Q.  Meaning, you were there at least five days a
9   week?
10       A.  Yes.
11       Q.  How often was MR. Harooni at the hotel when
12  you were there?
13       A.  Almost daily.
14       Q.  Did you ever have any contact with anybody at
15  Best Western?
16       A.  Yes.
17       Q.  Did you ever have any contact with anyone at
18  Best Western while you were employed in 2007?
19       A.  Yes.
20       Q.  Who did you have contact with?
21       A.  I had conversations with a lady named Terri.
22  I believe her name -- Winegger, something like that.
23       Q.  Fair enough.
24       A.  I had conversations with a salesperson Scott
25  Wilson.  I had conversations with another salesperson

**22**

1   Mary Ann Gray.
2        Q.  And the inspector, Mitch, I assume you had
3   conversations with him?
4        A.  Yes.
5        Q.  Anybody else?
6        A.  We had met a lot of people at the convention.
7        Q.  Do you recall who in particular you met at the
8   convention?
9        A.  Well, that was the first time I had actually
10  met face to face with Terri and Scott.  And I remember
11  seeing the board, you know.  I don't remember their
12  names, if I knew them from the material and everything.
13       Q.  Do you remember when you first came into
14  contact with Terri Winegger?
15       A.  It was pretty immediate.  When I came on
16  board, we were doing researching, revamping the whole
17  program.  And with doing that, I had conversations
18  with Terri.  We had a wholesales relationship going on.
19  And that is when we would talk to Scott.
20       Q.  You said earlier revamping the program.  What
21  do you mean by revamping the program?
22       A.  Well, with every general manager that comes
23  in, they have their own type of way of managing.  So I
24  was going through each department.  Front desk being
25  one, you know.  Reservation systems, tracking, all of

**23**

1   those types of things.
2        Q.  So revamping the program essentially means
3   revamping the operations at the hotel to fit your style
4   of management?
5        A.  Well, I just went through and seen what was
6   being done and things that could be improved on at the
7   report level.
8        Q.  Does revamping the program have anything to do
9   with the sales and marketing activities of the hotel?
10       A.  Well, yes, because there really wasn't any.
11       Q.  Before you arrived there, there was no sales
12  and marketing?
13       A.  Not at the property, I don't believe.
14       Q.  Was Lisa Wilkerson employed while you were at
15  the hotel?
16       A.  She -- yes, she was.
17       Q.  And she was in marketing; correct?
18       A.  Yes.
19       Q.  And she was there before you or at the same
20  time?
21       A.  Yes.  Just a short while.  A week or something
22  like that.  Two or three weeks.
23       Q.  Two or three weeks before you started?
24       A.  Just short time.
25       Q.  Do you recall Terri Winegger making any

**24**

1   promises to the hotel for additional support?
2        A.  Well, yeah.  They had promised, you know, to
3   help.  And one of the things was the reservations and
4   getting some corporate accounts.
5        Q.  What specifically did Best Western promise
6   with respect to the reservations?
7        A.  Help with the corporate accounts.
8        Q.  What did you understand that help to mean?
9        A.  Making contact, getting -- having us do RFP's,
10  doing everything they can to push the property.
11       Q.  Was there some sort of deadline each time for
12  each year for RFP's?
13       A.  Yes.
14       Q.  When was that deadline?
15       A.  Usually October is our RFP deadline for the
16  next year so you receive a good many of them in October.
17       Q.  Explain to me the process, the RFP process.
18       A.  Companies that put out requests for proposals
19  for rates ask what your hotel has to offer.  A lot of
20  the RFP's had fallen by the wayside because the property
21  had been so rundown that the corporate companies didn't
22  request an RFP from them.
23       So in getting that back online and making
24  those corporate contacts and getting us in so we can --
25  so we could be part of the bidding process and getting

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Cheryl Duggan                                    December 3, 2009

---

37

1  fixed and getting it opened.
2      Q.  Okay.  So once you discovered there was a
3  problem, how long did that take to get it fixed?
4      A.  A day, an hour, whatever it takes to go in and
5  open it up.
6      Q.  Was there anybody who you knew had experience
7  working with this reservation system before you
8  arrived?
9      A.  Christine.
10      Q.  Is there anybody else that had access to the
11  system at the time that you arrived?
12      A.  To the able to block out dates and things like
13  that?
14      Q.  Yes.
15      A.  I believe only to Christine.  I don't know who
16  was there prior.  I don't know who had access.  I
17  limited it so I could have control.
18      Q.  So there wasn't an entire -- based on what you
19  are telling me, there wasn't an entire year that
20  reservations weren't allowed to be made into the
21  system.  It just was blocked out that nobody could make
22  a reservation a year out.  Is that fair?
23      A.  Well, I don't know how long it had been done.
24      Q.  Right.  I understand that.  But let's say the
25  day before you discovered the problem, the only problem

---

38

1  was that somebody couldn't make a reservation, say, the
2  following month; correct?
3      A.  Right.
4      Q.  The day after you saw that, the problem, that
5  same person could make that reservation?
6      A.  Correct.
7      Q.  So it is not like there was an entire year's
8  worth of revenue lost because of the problem?
9      A.  It could have been.
10      Q.  But if somebody made a reservation after you
11  had the problem fixed --
12      A.  But I don't know how long it was closed out.
13      Q.  But once you fixed the problem, reservations
14  could be made?
15      A.  Correct.
16      Q.  And if we looked at Best Western's figures and
17  regarding the amount of revenue related to the
18  reservation system, if there is revenue related to a
19  particular month that was previously blocked out, is it
20  fair to assume that reservation was made after you fixed
21  the system?
22      A.  Yes.
23      Q.  Okay.  In your belief, it could have been made
24  beforehand?
25      A.  Say it again.

---

39

1      Q.  If there is -- let's say there is one room
2  night worth of revenue in April of 2006.  Okay.  It is
3  possible that -- you believe that that reservation was
4  made after you fixed the problem; correct?
5      MS. LAZARUS:  Object to the form.
6  BY MR. GARBARINO:
7      Q.  Let's back up.  Let's just take, for example,
8  one room night of revenue in April of 2006.  Could that
9  reservation have been made after you fixed the problem?
10      MS. LAZARUS:  Object to the form.
11      THE WITNESS:  If the system was opened up,
12  they could make reservations for any time.
13  BY MR. GARBARINO:
14      Q.  Right.  Okay.
15      A.  Once the system was opened up.  But if the
16  system is closed, it won't take it.
17      Q.  Okay.
18      A.  It will defer you to a comfortable location,
19  another Best Western.
20      Q.  So the real question is how long was the block
21  out in place going backwards?
22      A.  Correct.
23      Q.  Not how long going forward the system had it
24  blocked out.  It could have been three years to be
25  blocked out.  And as long as you solved the problem, we

---

40

1  would have had reservations in April of 2006?
2      A.  Once it was opened.
3      Q.  Right.  Got it.  Does that make sense?
4      A.  Yes, I think.
5      Q.  So it is your testimony -- and I just want to
6  make sure of this -- that before you and Lisa started
7  working at the hotel, there was nobody who was in charge
8  of marketing at the hotel?
9      A.  I don't believe so.
10      Q.  Were you present for any of the inspections
11  that occurred on the property?
12      A.  Yes.
13      Q.  How many inspections were you present for?
14      A.  One.
15      Q.  Do you remember what the date of that
16  inspection was?
17      A.  No, I don't remember.  It was with Mitch.
18      Q.  Mitch?
19      A.  Uh-huh.
20      Q.  It was obviously after you started in 2006.
21  Excuse me.  2007.  Would it have been the first
22  inspection on your watch as general manager?
23      A.  Yes.  I'm not sure it was the first
24  inspection.
25      Q.  Right.  But in terms of the time, your being

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Cheryl Duggan
December 3, 2009

---

41

1  general manager --
2      A.  Yes.
3      Q.  -- this was the first inspection that occurred
4  while -- since you had been employed as general manager
5  at the hotel?
6      A.  Yes.
7      Q.  Was Mitch the only person who inspected the
8  hotel while you were there?
9      A.  Yes.
10     Q.  And the first inspection was when you first
11 met Mitch?
12     A.  Yes.
13     Q.  Tell me about that meeting.
14     A.  We met in the lobby.  He was -- you know,
15 picked out some rooms that he wanted to go see.  When we
16 started going through the property, he was really,
17 really happy because he had said to me and Lina that he
18 was sent there to pull the flag.
19     Q.  Did he say who sent him there to pull the
20 flag?
21     A.  I'm just thinking that, you know, Best Western
22 corporate, whoever he comes from; that, you know, he was
23 so pleasantly surprised to see how much progress was
24 done and the condition of the property.  He was really
25 happy.  We received a very high score.  I mean, we were

---

42

1  only a few points off.  I was very proud because
2  everybody had worked very hard.
3      Q.  Did you have the impression that Mitch would
4  overlook any problems that he saw?
5      A.  No.
6      Q.  Was your impression, if Mitch saw a problem,
7  he marked it down on his inspection report?
8      A.  Yes.
9      Q.  And he would deduct points for that problem?
10     A.  Yes.  I know how the process goes.  I did cite
11 inspections a lot.
12     Q.  Is it possible that the first inspection the
13 first time you met Mitch was in May of 2007?
14     A.  Probably.
15     Q.  And in May of 2007, you were the general
16 manager; correct?
17     A.  Yes.  If it is a 900, very high 900's, that is
18 the one because I don't think that they had received
19 that high after that, after I had left.
20     Q.  Okay.
21     A.  Because we were so good.
22     Q.  Can we go off the record for just a second.
23         (Recess.)
24     MR. GARBARINO:  Back on the record.
25     Q.  So right before we took a break, we were

---

43

1  discussing the inspections performed by Best Western
2  inspector Mitch.  And his last name is Van Wormer; is
3  that correct?  Is that what you recall?
4      A.  Yes.
5      Q.  And you only attended one of those
6  inspections?
7      A.  Yes.
8      Q.  And we believe that was the inspection,
9  though, in May of '07; correct?
10     A.  I believe.
11     Q.  Okay.  I'm going to backtrack just for a quick
12 second to ask you some questions about exhibits.
13         Exhibit 1 was a document that was disclosed to
14 us by Mr. Harooni.  And I'm not sure who prepared it.
15 And I just want you to look at it.  And if you recognize
16 it, tell me who prepared it.  If you know, that would be
17 great.
18         (Plaintiff's Exhibit 1 marked.)
19     THE WITNESS:  I don't know.
20 BY MR. GARBARINO:
21     Q.  Does it look familiar to you?
22     A.  No.
23     Q.  That is fine.
24         Okay.  Exhibits 3 through 6 are profit and
25 loss statements that we were provided.  I believe

---

44

1  Exhibit 3 is 2005.
2      (Plaintiff's Exhibits 3 through 6 marked.)
3  BY MR. GARBARINO:
4      Q.  You weren't at the property in 2005; right?
5      A.  Right.
6      Q.  So you would have no reason to review that
7  document?
8      A.  Right.
9      Q.  2006, I think, is No. 4.
10         And you would have no reason to review that
11 document either?
12     A.  Right.
13     Q.  Okay.  But Exhibit No. 5 is 2007; correct?
14     A.  Yes.
15     Q.  Did you review this at any time, or do you
16 recall reviewing this at any time?
17         In fact, it was probably prepared after you
18 left.  I'm guessing.
19     A.  I'm thinking because I oversaw monthly
20 reports.  I don't think this was -- the whole year was
21 prepared before I left.
22     Q.  And that makes sense to me since you left
23 in --
24     A.  I left in April.
25     Q.  Oh, you left in April.  That is right.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Cheryl Duggan                                                    December 3, 2009

---

69

1       THE WITNESS: My God, I would have been all
2   over everybody. I would have been into -- because that
3   is -- it shouldn't have been possible being a running
4   hotel, being a brand new hotel, you know, pretty much
5   brand new furniture, pretty much public areas much brand
6   new. The hotel was beautiful. There was no reason.
7       So I would want some explanations and
8   especially if going through and seeing what he actually
9   took points off for because in six months a property
10  can't go downhill that bad. It is brand new. I mean,
11  even for -- if you didn't do anything.
12      And for ours -- I had 116 point maintenance
13  program. And rooms were taken off market. And these
14  rooms had 116 points of repair to check. And so when
15  those rooms went back on, they were just like a brand
16  new room.
17      Q. Okay. And Mitch inspects not only for
18  maintenance issues but also cleanliness issues; correct?
19      A. Corrects.
20      Q. Is it possible for a room to get dirty during
21  a six-month period?
22      A. Not if they are doing their job. I mean,
23  there is dirty. There is mistakes that people make.
24  They are human. Okay. They miss something that is
25  hidden behind somewhere. Or if somebody has a lazy day,

---

70

1   you know.
2       But I'm talking, you know, you can tell a room
3   that has been neglected. You can tell by just the
4   edges. You know, if they don't sweep before they
5   vacuum. Crud build up in the corners, you know, mold,
6   those types of things. That is -- you know --
7       Q. Okay. So do you use a -- and I will certainly
8   give you the opportunity to go through these inspection
9   reports.
10      But based on the fact that you weren't there,
11  do you have any ability to dispute what is in these two
12  inspection reports that we talked about?
13      And those are the inspection reports for
14  January 31st, 2008 and October 25th, 2007.
15      MS. LAZARUS: Object to form.
16      THE WITNESS: I would have to actually sit and
17  read through that whole second one.
18  BY MR. GARBARINO:
19      Q. Okay. The 31st?
20      A. Yes.
21      Q. Of 2008?
22      A. Yes.
23      Q. Do you want to go through it on the record.
24      A. I mean, I just -- it doesn't make sense for us
25  to go from acquiring 800 when I'm not sure what we had

---

71

1   before. I'm thinking it was really, really low because
2   everybody -- the whole staff was ecstatic that we had
3   received such high scores because we had all really,
4   really worked hard.
5       So, like I said, I'm thinking that, if Mitch
6   was coming to critique the renovation, the progress of
7   the renovation, it would not have been a big deal to me
8   because renovation was going along. You know what I'm
9   saying. I was never afraid for anybody to walk in and
10  look at my rooms.
11      Q. Okay.
12      A. You know.
13      Q. Let's go over the January 31st, 2008 report if
14  you want to.
15      A. The 12th.
16      Q. Yes. Starting on BW0430. Is there any item
17  there that is surprising to you?
18      MS. LAZARUS: Counsel, I'm going to object to
19  this. She has never seen this before. She wasn't
20  there -- these are specific things that she just didn't
21  have personal knowledge of.
22      MR. GARBARINO: That is fair.
23      Q. Have you ever inspected any of these rooms
24  before?
25      A. Yes.

---

72

1       Q. If somebody was to say there was a problem
2   with room 388 and you had seen it before, could you
3   testify to its existence?
4       A. At the time I could have.
5       Q. Have you inspected every room in the hotel?
6       A. Yes.
7       MR. GARBARINO: Is that enough foundation?
8       MS. LAZARUS: She wasn't there when the report
9   was made. She has never looked at the report before.
10      THE WITNESS: What I'm taking is that he
11  didn't look at rooms on this day is what I'm
12  taking. No rooms were assessed or identified for
13  additional reassessment. Was he there looking at
14  renovation or --
15      MR. GARBARINO: Can we go off the record for a
16  minute.
17      (Discussion off the record.)
18      MR. GARBARINO: We went off the record to
19  confirm some dates.
20      Up until this point in the deposition, the
21  deponent has testified that she started with the hotel
22  in early of 2007 and left in April of 2008. Upon
23  further recollection, and understandably this being some
24  time ago, it appears that the deponent actually started
25  to work at the hotel early in 2006 and left in 2007.

---



ESQUIRE
an Alexander Gallo company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Cheryl Duggan                                                          December 3, 2009

---

73

1        Therefore, the inspection reports that we
2   discussed which was dated May 17, 2007 -- and let me ask
3   the deponent this.
4        Q.  You don't believe that you were present for
5   that inspection in May of 2007?
6        A.  I don't think so.
7        Q.  Okay.  And any inspection report that was
8   authored or occurred later than May of 2007, you were
9   not at the hotel; correct?
10       A.  Correct.
11       Q.  And so you had no knowledge of the
12  inspection.  You were not present for the inspection.
13  And you did not receive the inspection report; correct?
14       A.  Correct.
15       Q.  Okay.  And I think, as we looked back at the
16  other dates we discussed here today, is it fair to say
17  that the dates are probably a year ahead of time?
18       A.  Correct.
19       Q.  Meaning that, to correct those dates, we would
20  subtract a year?
21       A.  Yes.
22       Q.  Okay.  And at this point going forward,
23  though, we are going on the assumption and your
24  understanding as well as my understanding that you
25  started work in 2006 and left in 2007; correct?

---

74

1        A.  Correct.
2            MR. GARBARINO:  Do you have anything else to
3   add?
4            MS. LAZARUS:  I do not.
5   BY MR. GARBARINO:
6        Q.  And you were not there in December of 2007 at
7   the hotel; correct?
8        A.  Correct.
9        Q.  Do you have any knowledge regarding the
10  freeway 14 bypass?
11       A.  The freeway?
12       Q.  Yes.  The Sierra Highway used to be the main
13  highway?
14       A.  Yes.
15       Q.  And was it bypassed at one point in time?
16       A.  They put in a freeway.
17       Q.  Do you know when that occurred?
18       A.  When I was in the second grade.
19       Q.  Okay.  Fair enough.
20       A.  They were putting it in when I moved up to the
21  Antelope Valley.  And I was in the second grade.  So
22  whenever that is.
23       Q.  Do you have any knowledge regarding any
24  efforts made by the hotel, AV Inn Association 1, or
25  Mr. Harooni to rebrand the hotel after the Best Western

---

75

1   membership was terminated?
2        A.  No.
3        Q.  Did you have any conversations with
4   Mr. Harooni about the hotel being rebranded?
5        A.  No.
6        Q.  And you have no information regarding the
7   board meeting that took place to discuss the hotel's
8   Best Western membership?
9        A.  No.
10       Q.  Could we talk about Exhibit 22 for just a
11  minute.
12           (Plaintiff's Exhibit 22 marked.)
13  BY MR. GARBARINO:
14       Q.  And this is your declaration; correct?
15       A.  Yes.
16       Q.  Do you recognize this document?
17       A.  Yes.
18       Q.  Did you prepare this document yourself?
19       A.  Yes.
20       Q.  Why did you prepare this document?
21       A.  I was asked to document my knowledge of --
22  during my employment time of my dealings and my staff's
23  dealings with Best Western.
24       Q.  While we were on break a minute ago, did you
25  have an opportunity to review this document in full?

---

76

1        A.  Pretty much.
2        Q.  Do you want to take a minute and read it again
3   because I'm going to ask you some pretty specific
4   questions about it.
5        A.  Okay.  Go ahead.
6        Q.  Paragraph 1, is it fair to say that those
7   dates are incorrect?
8        A.  Yes.
9        Q.  So should it really be April, 2006 through
10  April, 2007?
11       A.  Yes.
12       Q.  So after April, 2007, did you have any contact
13  whatsoever with Mr. Harooni, AV Inn Associates or the
14  hotel?
15       A.  No.
16       Q.  So as for any event that occurred after April
17  of 2007, you have no knowledge with respect to the
18  hotel?
19       A.  No.
20       Q.  Is there any way that you can explain the
21  apparent inconsistency in paragraph 2 between Mitch
22  saying that he had come to take away the hotel's
23  membership and then in the very next sentence Mitch
24  giving the hotel one of the highest scores it has ever
25  received?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

# EXHIBIT R

**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

        Plaintiff,

    vs.

AV INN ASSOCIATES 1, LLC; and
HOOSHANG HAROONI,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CASE NO.
CV082274PHXDGC

**DEPOSITION OF**

**LISA WILKERSON**

December 2, 2009
1:42 p.m.

1875 Century Park East
Suite 500
Los Angeles, California

Maryam T. Salahud-Din, CSR No. 9669



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Lisa Wilkerson                                                December 2, 2009

---

**1**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

     Plaintiff,

     vs.          CASE NO. CV082274PHXDGC

AV INN ASSOCIATES 1, LLC; and
HOOSHANG HAROONI,
     Defendants.

_____

DEPOSITION OF
LISA WILKERSON

December 2, 2009
1:42 p.m.

1875 Century Park East
Suite 500
Los Angeles, California

MARYAM T. SALAHUD-DIN, CSR No. 9669

---

**3**

INDEX OF EXAMINATION

WITNESS:  LISA WILKERSON
EXAMINATION                          PAGE
By Mr. Garbarino                     5, 52
By Ms. Lazarus                       45

---

**2**

APPEARANCES OF COUNSEL

For the Plaintiff:

  SHERMAN & HOWARD
  BY:  DAVID W. GARBARINO
  Attorney at Law
  2800 North Central Avenue, Suite 1100
  Phoenix, Arizona 85004-1043
  602.240.3000

For the Defendants:

  THE NATHANSON LAW FIRM
  BY:  BLAIR LAZARUS
  Attorney at Law
  120 North LaSalle Street, Suite 1000
  Chicago, Illinois 60602
  312.782.3322
Also Present:
  HOOSHANG HAROONI

---

**4**

INDEX TO EXHIBITS

Exhibit    Description     Page
20    Declaration of Lisa Wilkerson    39

---



Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

## 5

1      DEPOSITION OF LISA WILKERSON
2            December 2, 2009
3
4            LISA WILKERSON,
5   having been first duly sworn, testifies as follows:
6
7            EXAMINATION
8   BY MR. GARBARINO:
9      Q.  I just wanted to give you a little bit of an
10  introduction here.  My name is David Garbarino.  As we
11  just discussed, when I introduced myself to you, I
12  represent Best Western International.
13       Best Western is in this litigation as a
14  plaintiff and a counter-defendant.  Best Western has
15  sued AV Inn Associates 1, LLC and Mr. -- I'm sorry.
16  How do you say his first name?
17  MS. LAZARUS:  Hooshang.
18  BY MR. GARBARINO:
19      Q.  Hooshang Harooni, Mr. Harooni.  Basically, a
20  breach of contract type claim.  And Mr. Harooni has
21  asserted counterclaims against Best Western for certain
22  things, mainly, wrongful termination.  That is just to
23  sum it up.
24       And I'm sure if you disagree with the summary,
25  you will let me know.

## 6

1        And we are here taking your deposition in that
2   matter between Best Western, AV Inn, and Mr. Harooni.
3        Have you ever had your deposition taken
4   before?
5       A.  Never.
6       Q.  I'm just going to go over a few ground rules.
7        First of all, everything we are saying is
8   being taken down by the court reporter, meaning that it
9   is difficult for her to take things down if we are
10  speaking over one another.
11       So I will try to finish my question and not
12  interrupt you in your answer.  And I would hope that you
13  would let me finish my question before you start to
14  answer.  I know sometimes deponents get a little antsy
15  and want to jump in as quickly as they can.  But feel
16  free to wait until I'm finished with the question.
17       Nonverbal answers, head shaking up and down,
18  nodding, that sort of thing just doesn't make it into
19  the written record.  So if that happens, I might ask you
20  is that a yes or no.  I'm not trying to be difficult.  I
21  just want to make sure that we have it on the record.
22       The same with verbal answers such as uh-huh
23  and huh-uh.  They sound great when we are here talking,
24  but they don't make it on the record very well either.
25       If at any time you need to take a break, feel

## 7

1   free.  Just let me know.  You can take a break at any
2   time.  The only caveat I have is, if there is a question
3   that I have asked, that you answer that question before
4   we go on break.  But once you are done, we can go on
5   break.  Okay.
6        If there are any questions that I ask that you
7   do not understand, please feel free to ask me to reword
8   them or ask it differently or just tell me you don't
9   understand.  And I will ask you why you don't
10  understand.  And I will try to sort through the
11  confusion.  Sometimes my questions are confusing to even
12  me.  So we will just have to work on that.
13       Are you currently taking any medication that
14  would affect your ability to answer my questions?
15      A.  Stress level is over the top.  But I'm good.
16  It has nothing to do with anything here.
17      Q.  I understand.  And, like I said, let me ask
18  the question first and then answer it.
19      A.  Okay.
20      Q.  Hopefully, we can get your stress level to go
21  down a little bit because, hopefully, it is not going to
22  be too painful.
23       As I indicated, this litigation is against
24  Best Western AV Inn, a hotel that is located at 44055
25  North Sierra Highway in Lancaster, California.  When I

## 8

1   refer to the term hotel, that is the property that I
2   will be referring to; is that okay?
3       A.  Okay.
4       Q.  And may I call you Lisa?  Is that preferable?
5       A.  Please.
6       Q.  Thank you.
7        Can you tell me when you first became employed
8   by AV Inn at the hotel?
9       A.  Dates, oh, my, gosh.  I want to say February,
10  2005, I believe.
11      Q.  Was that before or after AV Inn and
12  Mr. Harooni took over control of the hotel?
13      A.  After.
14      Q.  What was your initial position at the hotel?
15      A.  Director of sales.
16      Q.  Was that your position while you were at the
17  hotel for the entire time you were at the hotel?
18      A.  I also was catering manager.  Mostly director
19  of sales.
20      Q.  Was there a time frame that you were director
21  of sales?  For example, 2000 or March of 2005 through --
22      A.  The whole time.
23      Q.  The whole time.  Okay.
24       (Mr. Harooni entered the proceedings.)
25  BY MR. GARBARINO:



an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

Lisa Wilkerson                                    December 2, 2009

## 17

1   reservation system?
2       A.  I was.
3       Q.  Had you taken any formal training on that
4   system?
5       A.  I called Best Western, and they sent someone
6   to come help me.
7       Q.  But before you started to operate the system,
8   did you take any formal training?
9       A.  No, not with their system.
10      Q.  Had you ever had any previous experience with
11  that system?
12      A.  No.
13      Q.  Now, it is my understanding that you
14  personally encountered problems with the reservation
15  system.
16      A.  Yes.
17      Q.  Can you tell me what those problems were.
18      A.  When I was trying to figure out how to work
19  their system with having a basic idea how the usual
20  system works, when I got into it and started poking
21  around, there were some things that didn't make any
22  sense.  No one at the property left could answer it.
23          And they called Best Western.  And they said
24  Mitch -- I have no idea what his last name is.  He
25  showed up.  And we sat down together.  And we went

## 18

1   through some things.  And when we got into the system,
2   there was a problem with not getting any reservations.
3   And Mitch found that problem when we stumbled across
4   the -- that the reservation system had been closed out
5   for the previous three months.
6       Q.  When did you first notice that there was a
7   problem?
8       A.  Three weeks after I started.
9       Q.  So in terms of months, in March, 2005 --
10      A.  March, well, February.
11      Q.  When you did call Mitch?
12      A.  I called him as soon as I got in and realized
13  I didn't know what I was doing and nobody could help
14  me.  And they offered to send him.  I just needed
15  somebody to show me.
16      Q.  Do you know when you placed that call to Best
17  Western?
18      A.  I have no idea.
19      Q.  Was it in February of 2005?
20      A.  Could have been, probably.
21      Q.  Could it have been in March of 2005?
22      A.  Could have been, probably.  I called him
23  constantly every day for weeks.
24      Q.  Okay.  What I'm trying to figure out is the
25  first time that you called to discuss the problem with

## 19

1   Best Western?
2       A.  It wasn't a problem.  I didn't know there was
3   a problem because I didn't know what I was looking at.
4   He came to teach me, to understand what it was I was
5   looking at.  He was my only training that I had.  So it
6   wasn't an official training.
7       Q.  So do you think you called him in February of
8   2005?
9       A.  Sure.
10      Q.  And how soon after you requested assistance
11  did Mitch come down?
12      A.  One week later.
13      Q.  Do you know who had access to the hotel
14  reservation system at that time?
15      A.  Just employees that were working there before
16  I got there.
17      Q.  Do you know by name who those people are?
18      A.  I remember Christine.  That is about the only
19  name that really comes to me.
20      Q.  Christine was the general manager before
21  Cheryl?
22      A.  Christine was there from the very first day I
23  started back in '98.  And she was still there when I
24  came back in 2005.  She has been in every department.
25      Q.  Now, when Mitch came to work with you in the

## 20

1   reservation system, what did he do to help you out?
2       A.  I needed to learn how to open and close out
3   dates.  Showed me how to monitor the TDS that they have,
4   how to block dates, how to make reservations, how to
5   tell how many rooms we had available, how to tell what
6   dates were available.  Just the general everyday use of
7   our reservation system.
8       Q.  Had you been trying to do all of these tasks
9   before Mitch came out to give you some help?
10      A.  (No audible response.)
11      Q.  Is that a yes?
12      A.  Sorry.  Yes.
13      Q.  Did you continue to have problems with the
14  system even after Mitch came out and helped you out?
15      A.  Once he helped me get it fixed and back to
16  where it was, the year I was there, it seemed to work
17  fine from then own on as long as it was monitored.
18  Passwords were given to people so only certain people
19  could get in.
20      Q.  So in 2005 who had a password to get into the
21  reservation system?
22      A.  Myself, Cheryl, Harry, Kevin, Christine.
23      Q.  Now, were Cheryl, Mr. Harooni, Kevin, and/or
24  Christine present when Mitch Van Wormer came and told
25  you how to use the reservation system?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite  500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com