INDEX OF EXHIBITS

Ex. 1.      Deposition of Hooshang Harooni

Ex. 2.      Declaration of Hooshang Harooni

Ex. 3.      Bylaws (2006), Article III, Related Articles of
            Incorporation

Ex. 4.      Members' Bill of Rights

Ex. 5.      Best Western Rules and Regulations

Ex. 6.      Deposition of Cheryl Pollack

Ex. 7.      Deposition of Terry Wininger

Ex. 8.      Applicant General Information Form

Ex. 9.      Deposition of Mitch Van Wormer

Ex. 10.     E-Mail correspondence between Terry Wininger
            and Tom Wilson, Revenue Manager, Best
            Western, Bate Stamped BW 0993

Ex. 11.     March 28, 2005 Welcome Letter, (BW 0989-
            0990

Ex. 12.     Deposition of Cheryl Duggan

Ex. 13.     Deposition of Kamyar ("Kevin") Refuoa

Ex. 14.     Deposition of Kevin Barror

Ex. 15.     KANA LOG

Ex. 16.     Declaration of Lisa Wilkerson

Ex. 17.     Best Western 2007 Annual Report

Ex. 18.     Reaffiliation Worksheet

Ex. 19.    BW 0296- BW 307 (Rapid Response with Invoice); BW 166-167 (Regional Design Consultant Letter)

Ex. 20.    October 25, 2007 Quality Assessment Report

Ex. 21.    JPG 42 (1/31/08 QA Photos

Ex. 22.    Quality Assurance Report dated 1/31/08

Ex. 23.    Deposition testimony of Lloyd Nygaard, March 15, 2010

Ex. 24.    BW 0312-0315; BW 00726

Ex. 25.    Bates No. BW 0325 (Design Status Change showing average of 796 based upon 5/17/07 and 10/25/07 assessments

Ex. 26.    Termination Letter

*Best Western v. AV Inn Associates 1, LLC, et al.*
*Exhibit No. 1*

# EXHIBIT "1"

**Deposition of Hooshang ("Harry") Harooni**



**Page 1**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,
INC.,

    Plaintiff,

    vs.         CASE NO. CV082274PHXDGC

AV INN ASSOCIATES 1, LLC; and
HOOSHANG HAROONI,
    Defendants.

DEPOSITION OF
HOOSHANG HAROONI

December 4, 2009
10:33 a.m.

1875 Century Park East
Suite 500
Los Angeles, California

MARYAM T. SALAHUD-DIN, CSR No. 9669

**Page 2**

APPEARANCES OF COUNSEL

For the Plaintiff:
  SHERMAN & HOWARD
  BY:  DAVID W. GARBARINO
  Attorney at Law
  2800 North Central Avenue, Suite 1100
  Phoenix, Arizona 85004-1043
  602.240.3000

For the Defendants:

  THE NATHANSON LAW FIRM
  BY:  PHILIP J. NATHANSON
  Attorney at Law
  120 North LaSalle Street, Suite 1000
  Chicago, Illinois 60602
  312.782.3322

**Page 3**

INDEX OF EXAMINATION

WITNESS:  HOOSHANG HAROONI

EXAMINATION.                              PAGE
By Mr. Garbarino                             5

**Page 4**

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 1 | Document titled "Brief Two-Year History for Current Owner | 19 |
| 2 | Chart | 81 |
| 3 | Document titled "Best Western Profit & Loss January through December 2005" | 71 |
| 4 | Document titled "Best Western Profit & Loss January through December 2006" | 71 |
| 5 | Document titled "Best Western Profit & Loss January through December 2007" | 71 |
| 6 | Document titled "Best Western Profit & Loss January through June 2008" | 71 |
| 7 | Best Western International, Inc. Membership Application and Agreement | 67 |
| 10 | Document titled "Summary Report North American Quality Assurance Assessment," dated 10/25/2007 | 64 |
| 12 | Document titled "Summary Report North American Quality Assurance Assessment," dated 1/31/2008 | 65 |
| 17 | Letter dated March 21, 2008 to The Board of Directors Best Western International, Inc. from Hooshang Harooni, Bates stamped BW0562 through 579 | 118 |

5

1       DEPOSITION OF HOOSHANG HAROONI
2              December 4, 2009
3
4             HOOSHANG HAROONI,
5    having been first duly sworn, testifies as follows:
6
7              EXAMINATION
8    BY MR. GARBARINO:
9         Q.   Good morning, Mr. Harooni.  How are you doing
10   this morning?
11        A.   Fine.
12        Q.   You have attended several of the depositions
13   that I have taken here to date.  And I assume you have
14   heard the ground rules that I went over in those
15   depositions.  I'm going to go over them briefly to make
16   sure that we have them on the record here today.
17             Do you have any previous depo experience, or
18   have you ever been deposed before?
19        A.   No.
20        Q.   Do you understand that the court reporter is
21   taking down everything that is being said here today,
22   and it is easier for her to take down things when only
23   one person is speaking at a time?
24        A.   Yes.
25        Q.   So I will do my best to let you finish any

6

1    answer to my question.  And I will ask the same, that
2    you wait until I finish the question before you begin to
3    answer it.  Is that okay?
4        A.   Yes.
5        Q.   And as I have said before, head shaking,
6    nodding, uh-huhs, huh-uhs don't make it on to the record
7    very well.  So please don't be offended -- it is
8    obviously human nature to answer questions in that way.
9             But if I ask you for a yes or no, don't feel
10   embarrassed.  I'm just trying to make sure that the
11   record is clear on that issue.
12        A.   That is clear.
13        Q.   If at any time you need to take a break, feel
14   free to let us know.  You are more than welcome to take
15   a break at any time.  My only caveat is that, if I have
16   a question and I have asked you a question, I will want
17   an answer to that question before we go on to break.  Once
18   I have an answer, you can obviously go on break; okay?
19        A.   I understand.
20        Q.   If there is any question that I ask you that
21   you do not understand, please feel free to ask me to
22   rephrase the question.  I will do my best to rephrase it
23   in an understandable manner.
24             I sometimes get questions poorly phrased, and
25   it is no offense to me.  I understand.  I just want to

7

1    make sure that you understand the question.
2        A.   Thank you.
3        Q.   Are you currently taking any medication that
4    may affect your ability to understand my questions
5    and/or answer my questions here today?
6        A.   Maybe.
7        Q.   Okay.  Can you tell me what that medication
8    is.
9        A.   I take medication for Parkinson's disease and
10   arthritis.
11        Q.   Do you know the names of those medications?
12        A.   Yes.
13        Q.   Can you tell me what the names of those
14   medications are.
15        A.   Selegiline.
16        Q.   Do you happen to know how to spell that?
17        A.   S-e-l-e-g-n-e-n-e (sic).
18             Klonopin, Lexapro, Artane, Sinemet,
19   Methotrexate, Humira, and something to reduce
20   inflammation, ibuprofen basically.
21        Q.   Are you currently on these medications as we
22   sit here today?
23        A.   Yes.
24        Q.   Each one of these medications?
25        A.   No.

8

1        Q.   Which ones are you on here today?
2        A.   Parkinson's.
3        Q.   Which one of those?
4        A.   Selegiline, Sinemet, Lexapro, and Artane.
5        Q.   Do you know if those medications affect your
6    ability to understand speech?
7        A.   No.  It gives me dry mouth and, basically --
8    and speech.  Parkinson's disease can affect speech.  But
9    that is about it.  And short memory loss is a part of
10   all of these medications.
11        Q.   Okay.  If at any time today you have
12   difficulty understanding one of my questions or
13   answering it, because of any affects of any medications
14   that you are on, can you please let us know so that we
15   are aware of that.
16             And if you need to take a break because of
17   that, obviously, please let us know.  Again, the only
18   caveat I have is if you would finish the question that
19   is posed.
20        A.   I understand.
21        Q.   Okay.  Have you ever been involved as a party
22   to litigation in the past?
23        A.   Never.
24        Q.   Okay.  And as with the other depositions, I'm
25   going to use the term "hotel" today.  And I'm going to

## 9

1  be referring to the hotel that is located in Lancaster,
2  California located at 44055 North Sierra Highway. Is
3  that okay?
4      A. Yes.
5      Q. AV Inn Associates 1, LLC, I think I understand
6  that is a California limited liability company.
7      A. Correct.
8      Q. Did you form AV Inn -- and I'm going to refer
9  to it now on out as AV Inn.
10         Were you one of the founding members of AV
11  Inn?
12     A. Yes.
13     Q. Were there any other members of AV Inn when
14  you founded it?
15     A. I don't recall.
16     Q. Why was AV Inn formed?
17     A. To purchase the Best Western Hotel.
18     Q. Was it formed for any other reason?
19     A. No.
20     Q. Were there any other members at any point in
21  time other than you?
22     A. Maybe.
23     Q. Do you recall who those members were?
24     A. Originally, I don't know if there were any
25  more in the thing or not. But my two friends, they were

## 10

1  supposed to be my partners and may have been on the
2  thing. And then we removed them, perhaps, or not. I
3  don't remember.
4      Q. But as of the point in time that you purchased
5  the hotel and, as you sit here today, is it your
6  understanding that you are the only member of AV Inn?
7      A. Correct.
8      Q. And is it fair to say that AV Inn purchased
9  the hotel or title to the hotel and -- can you answer
10  that question?
11     A. Yes.
12     Q. You yourself did not have any interest in the
13  property or the hotel?
14         MR. NATHANSON: Object to form.
15         One second, Harry. Object to form.
16         MR. GARBARINO: Fair enough.
17     A. You can answer.
18     A. The LLC owned the property. And a corporation
19  owned the businesses inside the hotel.
20     Q. What was the name of that corporation?
21     A. AV Inn Associates -- no. AV Inn something
22  corporation. I don't remember.
23     Q. Okay. So I guess -- let me back up.
24         When I use the term "AV Inn" in this
25  deposition, I'm going to change that and use the term AV

## 11

1  Inn, LLC. It seems here that you are telling me there
2  is another entity that may be AV Inn Corp. I am not
3  familiar with that entity. So I may be misnaming it.
4  But I'm going to call it AV Inn Corp. if that is okay
5  with you.
6      A. That is okay.
7      Q. Is it your understanding that AV Inn, LLC had
8  title to the property under the hotel?
9      A. Most of the property.
10     Q. What do you mean by most of the property?
11     A. It was two different parcels. One, I was
12  renting, and one, I bought.
13     Q. And AV Inn Corp., what was its role in the
14  hotel?
15     A. It owned all the businesses inside the hotel.
16     Q. And what were those businesses?
17     A. Bar, restaurant. Basically, that is it.
18     Q. The banquet hall?
19     A. I don't believe so.
20     Q. So the banquet hall was part of the operations
21  of AV Inn, LLC?
22     A. Actually, no. All of the businesses, I think
23  even the hotel business, was with the corporation. LLC
24  just owned the land. That was the -- that was the only
25  function.

## 12

1          MR. NATHANSON: Can we go off the record for
2  second.
3          MR. GARBARINO: Certainly.
4          (Discussion off the record.)
5          MR. GARBARINO: Back on the record.
6      Q. So there are two entities, AV Inn, LLC and
7  what we are calling AV Inn Corp. Were the accounting
8  records for these two entities maintained separately or
9  together as consolidated statements?
10     A. Together.
11     Q. Do you know the reason that you had two
12  different entities, one that owned the property and one
13  to operate the businesses on the property?
14     A. Yes.
15     Q. What was that reason?
16     A. My accountant said, as far as the -- it is
17  better for tax purposes to do and liability to do it
18  this way. And I said okay.
19     Q. Did you set up AV Inn Corp. and AV Inn LLC at
20  or around the same time?
21     A. I must have.
22     Q. Who is the accountant that you referred to
23  that advised you to set up these two different entities?
24     A. Scott Evans.
25     Q. Is he with an accounting firm?

| 13 | | 15 | |
|---|---|---|---|
| 1 | A. Yes. | 1 | Q. How many rental homes? |
| 2 | Q. What is the name of that firm? | 2 | A. I don't know exactly. |
| 3 | A. I think it is Scott Evans and something -- you | 3 | MR. NATHANSON: One second. I'm sorry. |
| 4 | have it yesterday. She gave you the -- because she has | 4 | MR. GARBARINO: You can go ahead and wait. |
| 5 | a business with the same accountant. | 5 | We can go off the record for a second. |
| 6 | Q. Was that the same accountant you used | 6 | (Recess.) |
| 7 | throughout 2005, '6, '7, '8, and '9? | 7 | BY MR. GARBARINO: |
| 8 | A. '6, '7, '8, yes. '5 might not have been. But | 8 | Q. I will just restate my last question. How |
| 9 | '6, '7, and '8. | 9 | many rental homes do you own? |
| 10 | Q. Now, the hotel was purchased around March of | 10 | A. At this time? Or what time are you |
| 11 | 2005; correct? | 11 | referring? |
| 12 | A. Correct. | 12 | Q. Well, let's start in 2005. |
| 13 | Q. Did you own or operate any other business at | 13 | A. I believe -- I am not exactly sure because I |
| 14 | that time? | 14 | keep selling them and putting the money in the hotel. |
| 15 | A. Yes. | 15 | But I think I had about 20, 22 homes. |
| 16 | Q. What other business did you own or operate at | 16 | MR. NATHANSON: I'm going to shut if off by |
| 17 | that time? | 17 | the way. It won't happen again. I'm sorry. |
| 18 | A. Ladin, L-a-d-i-n's Liquor. It was a liquor | 18 | MR. GARBARINO: Not a problem. |
| 19 | store. And I had some income property. | 19 | Q. So you started out in 2005 with approximately |
| 20 | Q. Let's talk about Ladin's Liquor for just a | 20 | 20. As you sit here today, how many rental homes do you |
| 21 | moment. Where was that located? | 21 | own? |
| 22 | A. It is in California, Canoga Park. | 22 | A. I just started from scratch again. I didn't |
| 23 | Q. I'm sorry? | 23 | have any until six months ago. |
| 24 | A. Canoga Park, California. | 24 | Q. When did you sell your last of the 20 that you |
| 25 | Q. And how long had you owned Ladin's Liquor? | 25 | held in 2005? |

| 14 | | 16 | |
|---|---|---|---|
| 1 | A. A little less than 20 years. | 1 | A. At least four, five years ago. I'm not good |
| 2 | Q. 20 years? | 2 | with dates. |
| 3 | A. Yes. | 3 | Q. But you sold them after you -- the 20 after |
| 4 | Q. Do you still own Ladin's Liquor as we sit here | 4 | you began to run and operate the hotel? |
| 5 | today? | 5 | A. Before. |
| 6 | A. Yes. | 6 | Q. You sold them before? |
| 7 | Q. What is your role in the operations of Ladin's | 7 | A. I would say yes. |
| 8 | Liquor? | 8 | Q. During the time that you owned and operated |
| 9 | A. Inactive partner. | 9 | the hotel, did you own any rental homes? |
| 10 | Q. Have you always been an inactive partner of | 10 | A. I don't remember. |
| 11 | Ladin's Liquor? | 11 | Q. Fair enough. Any other income property other |
| 12 | A. Ever since I got sick. | 12 | than the rental homes? |
| 13 | Q. When was that? | 13 | A. No. |
| 14 | A. 15 years ago. | 14 | Q. At the time you purchased the hotel, were you |
| 15 | Q. You also testified you have some income | 15 | employed by anybody else? |
| 16 | property. What did you mean by income property? | 16 | A. I never worked for anybody. |
| 17 | A. I had some homes that I was renting. | 17 | Q. Fair enough. Before purchasing the hotel, did |
| 18 | Q. Any other? | 18 | your income consist of money from your income |
| 19 | A. Not that I recall. | 19 | properties, money from the liquor store -- excuse |
| 20 | Q. What was your role in managing these rental | 20 | me -- Ladin's Liquor? Were there any other businesses |
| 21 | homes? | 21 | at that point in time that you used income to support |
| 22 | A. Pretty much. | 22 | yourself? |
| 23 | Q. Did you have a management company that you | 23 | A. Can you repeat the question, please. |
| 24 | hired to take care of them? | 24 | Q. I'm sorry. That was very long winded. |
| 25 | A. No. | 25 | At the time you purchased the hotel in 2005, |

## 17

1   was your sole source of North Carolina from the rental
2   homes, Ladin's Liquor --
3       A.  Yes, sir.  And I used to buy and sell homes.
4   I used to buy and sell about 10 homes per year.
5       MR. NATHANSON:  I didn't hear that.
6       (Record read.)
7   BY MR. GARBARINO:
8       Q.  Once you purchased the hotel, did you continue
9   to buy and sell homes?
10      A.  Not that much.
11      Q.  But you did engage in some buying and selling
12  of homes after you purchased the hotel?
13      A.  Very few.
14      Q.  Are there any businesses or other sources of
15  income since 2005 that we haven't discussed here today?
16      A.  Except Ladin's Liquor, no.
17      Q.  Fair enough.
18      MR. NATHANSON:  I'm allowed to go down the
19  hall for two minutes.
20      MR. GARBARINO:  Sure.  Take at a break.
21      (Recess.)
22  BY MR. GARBARINO:
23      Q.  Before 2005, had you had any prior experience
24  in the hotel industry?
25      A.  Never.

## 18

1       Q.  What is your educational background?  Did you
2   go to college?
3       A.  Yes.
4       Q.  Where did you go to college?
5       A.  University of Maryland.
6       Q.  What did you study when you were there?
7       A.  Civil engineering.  Bachelor's degree.
8       Q.  Did you have any postgraduate work?
9       A.  What does that mean?
10      Q.  Did you go into a master's program of any
11  kind?
12      A.  No.
13      Q.  About what year did you graduate from
14  Maryland?
15      A.  1980.
16      Q.  So you started, I assuming, in Maryland in
17  approximately 1976?
18      A.  '75.  No.  I came to U.S. 1975.  I'm sorry.  I
19  went to University of Maryland in 1976.
20      Q.  And you came to the U.S. from where?
21      A.  Iran.
22      Q.  I want to go over some of the documents that
23  are before you.  I have set out a stack of exhibits.
24  And I have put tabs on this, numbers referring to the
25  exhibit number itself.

## 19

1       A.  I'm not good at this.  If you please, can you
2   show me.
3       Q.  Sure.  Will do.
4       A.  My hands --
5       Q.  The first one I want to discuss is Exhibit 1.
6       (Plaintiff's Exhibit 1 marked.)
7   BY MR. GARBARINO:
8       Q.  This is a document that we received actually
9   from you with your disclosure statement and your
10  complaint.  And I'm just wondering, do you recognize
11  this document?
12      A.  Pretty much, yes.
13      MR. NATHANSON:  Can I see it, please.
14      MR. GARBARINO:  I think you have all of the
15  exhibits right there, a copy of them all.
16      MR. NATHANSON:  So this conforms to that
17  stack?
18      MR. GARBARINO:  Absolutely.
19      MR. NATHANSON:  All right.  Thank you.  And we
20  are talking about which exhibit number?
21      MR. GARBARINO:  No. 1.
22      MR. NATHANSON:  Okay.
23      Go ahead, Harry.
24      THE WITNESS:  I'm ready.
25  BY MR. GARBARINO:

## 20

1       Q.  Can you tell me what this document is.
2       A.  It is two-year brief history fro current
3   owner.  I put the property for sale.  And this is
4   basically my resume of two years' work.
5       Q.  Who prepared this document?
6       A.  Obviously, the mental work must have been me
7   and with the secretaries who was at the time.  I don't
8   know.
9       Q.  Fair enough.  But the substance of what is in
10  this document came from you?
11      A.  Correct.
12      Q.  Do you remember when you prepared this
13  document?  Or let me rephrase the question.  When it was
14  prepared by your secretary?
15      A.  Somewhere around 2007.
16      Q.  The document has bullet points on it.  And I'm
17  going to start with the second bullet point.
18      A.  Okay.
19      Q.  It states that the gross sale, including room
20  and banquets, was $2.85 million at the time of
21  purchase.
22      A.  Correct.
23      Q.  Do you recall where that number came from?
24      A.  Yes.
25      Q.  Can you tell me, please.

21

```
 1    A.  The previous owner had the business for sale.
 2  And that is how we checked him out. And, actually, his
 3  credit card sales only that was a proof of his sale was
 4  almost adding up to 2.85. So he must have done a little
 5  bit more.
 6    Q.  So that is the number that came from documents
 7  provided to you --
 8    A.  From previous owner.
 9    Q.  Excuse me. Let me finish my sentence. I'm
10  sorry.
11        These were documents that were provided to you
12  by the previous owner?
13    A.  Correct.
14    Q.  The next bullet point in this paragraph states
15  that the hotel was in probation for many years? How did
16  you know it was in probation?
17    A.  They told me.
18    Q.  They being?
19    A.  What do you mean?
20    Q.  When you refer to they told you, who told you?
21    A.  Terri, Terri Wininger. And I believe the
22  broker at the time. I really don't recall. But I know
23  Best Western people told me.
24    Q.  Do you remember when Terri Wininger told you
25  that?
```

22

```
 1    A.  Yes. They had a stack of these big documents
 2  asking me that, if I take over, I have to fix. And I
 3  said yes.
 4    Q.  Okay. Do you remember when she told you that
 5  the hotel had been in probation for many years?
 6    A.  When I went to -- can I explain. I don't --
 7        MR. NATHANSON: Hold on, Harry.
 8        Could you read the question back, please.
 9        (Record read.)
10        MR. NATHANSON: Go ahead. You can explain,
11  Harry.
12        THE WITNESS: The long process -- they listed
13  the properties through the broker. Somebody calls me
14  and said, are you interested to purchase the property?
15  And I say yes. We make an offer subject to everything
16  going okay.
17        Then you can take -- then the Best Western
18  would ask you to come. And you have to come and they
19  approve. Then there is a fee to get pre-approved like
20  3, 4, $5,000 whether they say yes or no. Then you pay
21  that money. And you give that money before you purchase
22  it. And if they approve you, you buy it.
23        At that time they told me that the property is
24  in probation. And I have all of those pictures that
25  show how -- what bad shape it was when I took it over.
```

23

```
 1  BY MR. GARBARINO:
 2    Q.  So is it fair to say that Terri Wininger told
 3  you the property was in probation before you purchased
 4  the hotel?
 5    A.  Correct, yes.
 6    Q.  And is it fair to say that Terri Wininger told
 7  you the property was in probation before you signed the
 8  Best Western agreement?
 9    A.  Correct.
10    Q.  The sixth bullet point down on Exhibit 1
11  states, due to not having adequate experience, three
12  major mistakes were made.
13        And the first of those three is listed as
14  closing the restaurant and bar for remodeling for five
15  months resulted in loss of most corporate business. Can
16  you explain what you meant by that.
17    A.  Yes. First, the brokers would help you for
18  the sales speech to make the property more attractive to
19  people. Having said that, the corporate people do not
20  like to go to the hotel that is not a full service.
21        And, unfortunately, Mitch and the people who
22  made me remodel the restaurant and bar and make it new
23  failed to tell me to do it at part at a time. I could
24  have left it open and do that section and that section.
25        And I closed it for a month or so before I do
```

24

```
 1  it. So I lost a lot of people because my restaurant and
 2  bar was closed.
 3    Q.  Exhibit 1 states that it was closed for five
 4  months. Is that incorrect?
 5    A.  Could have been.
 6    Q.  And if you had known that you would have lost
 7  corporate business, would you have closed the bar and
 8  restaurant?
 9    A.  Definitely not.
10    Q.  You mentioned that Best Western required you
11  to make changes to the restaurant and bar; is that
12  correct?
13    A.  Correct.
14    Q.  When did they communicate those changes to
15  you?
16    A.  I have to explain.
17        MR. NATHANSON: Go ahead.
18  BY MR. GARBARINO:
19    Q.  Fair enough.
20    A.  When I went, they said we have people to help
21  you. And we have designer specialist, this and that.
22  These are the following things you have to do.
23        Then I find out I have to pay. Every time
24  that somebody comes out from Phoenix, they charge you.
25  They charge you hourly. Nobody knows what is going on.
```

## 25

1  In my mind, I thought that they are
2  overcharging. So I hired a full-time designer who got
3  in touch with their designer and showed them samples,
4  everything. And she could be available for questioning
5  if you want.
6  So they dictated to me it has to be fixed.
7  They showed all -- you have to change all the chairs.
8  You have to change -- it has to be this model. You
9  can't have the things that is like the wheels. You have
10  to have the flat. They have so many rules and
11  regulations.
12  And they make -- I do extra things. If you
13  are asking me, the chair like this makes no difference
14  than a chair like that or something. But for their
15  designer standard, you have to -- and then I think they
16  mostly do it to make money, of course, because
17  everything they sell, they make 10 percent off of it.
18  Q. Okay. I think my question was, when did you
19  learn that Best Western required you to remodel the bar
20  and restaurant?
21  A. First, I don't recall exactly.
22  Q. Do you remember if it was before or after you
23  purchased the hotel?
24  A. Could have been before.
25  Q. Do you remember who told you that the bar and

## 26

1  restaurant would need to be remodeled?
2  A. Probably Mitch. Probably.
3  Q. Do you recall the first time you met with
4  Mitch?
5  A. No.
6  Q. And going forward, when we refer to Mitch, you
7  understand his full name is Mitch Van Wormer?
8  A. Correct.
9  Q. I will probably just use the name Mitch going
10  forward; okay?
11  A. Okay.
12  Q. Back to Exhibit 1 and the sixth bullet point
13  which is listing, as you have described in Exhibit 3,
14  major mistakes, the second one states that, for many
15  months the Best Western reservation site, mistakenly
16  showed that our hotel rooms are full and couldn't make
17  any new reservation. The owner became aware of this
18  problem after a long period of time.
19  Do you know how many months the reservation
20  system showed the hotel as being full?
21  A. No.
22  Q. In your opinion, who would have the best
23  knowledge as to how long the reservation system showed
24  the hotel as being full?
25  A. I can explain. But most probably God only

## 27

1  knows.
2  Q. You were present for a number of depositions
3  earlier this week; correct?
4  A. Correct.
5  Q. And one of the persons we deposed was Lisa
6  Wilkerson.
7  A. Correct.
8  Q. Do you remember that?
9  A. Correct.
10  Q. And Lisa Wilkerson's position at the hotel was
11  what?
12  A. Sales manager.
13  Q. Did she have access to the reservation system
14  of the hotel?
15  A. At the time she was hired, yes.
16  Q. Did anybody else have access to the
17  reservation system at any time during your ownership of
18  the hotel?
19  A. Front desk people and my general manager and
20  Kevin.
21  Q. Okay. Of Lisa Wilkerson, Kevin -- and it is
22  Refoua; correct?
23  A. Correct.
24  Q. Your general manager and the front desk people
25  and you, who would have the best knowledge about the

## 28

1  reservation system?
2  A. Lisa and Kevin.
3  Q. I'm going to go to the third bullet point down
4  on bullet point No. 6 on the exhibit. And that is
5  Exhibit 1. States, the owner missed the September
6  deadline for renewal of contracts with major corporate
7  companies and therefore lost all that business for the
8  year of 2006.
9  Can you explain to me what that means.
10  A. I have to explain. Is that okay?
11  MR. NATHANSON: Could you read the question
12  back, please.
13  (Record read.)
14  MR. NATHANSON: He is asking you to explain.
15  So please explain.
16  THE WITNESS: Okay. First of all, in my
17  opinion, because you are reading from this, when you say
18  owner means -- because nobody is involved and cares
19  about Best Western or anything. So we said owner. The
20  owner missed September deadline.
21  That means I had no knowledge of that I have
22  to renew the contracts before September 1 for every
23  major company. And we missed that deadline because
24  nobody told me. Or I had no knowledge or whichever way
25  you want to put it.

29

1     But Mitch has been there many times. I talked
2  to him many times. Nobody ever told me anything about
3  this on the contrary of what they promised.
4     Q.  Did you have anybody in the sales position
5  during the year 2005?
6     A.  Except my own ability and Kevin, no, I didn't
7  think it was necessary.
8     Q.  I'm curious about the deadline. It was a
9  deadline to do what?
10    A.  This is how I understand the system works. If
11 you want to have Boeing --
12       MR. NATHANSON:  Stop.
13       MR. GARBARINO:  Let's go off the record.
14       (Recess.)
15       (Record read.)
16       THE WITNESS:  Let's say you are -- in my hotel
17 I'm in an area that heavily depends on government or
18 like NASA or Boeing, which I'm not really familiar with
19 all of the companies.
20       So every September you have to fill out a form
21 that they ask you about your rates. They ask you many
22 questions about this and that, how is your property.
23 And maybe they come and inspect it. If they approve
24 you, then you go on the list.
25       But since I had no knowledge of that, we miss

30

1  it for the whole year.
2  BY MR. GARBARINO:
3     Q.  You missed the deadline of asking these folks
4  to come to your property?
5     A.  Correct. Or fill out the application. Or you
6  put it any way you want. It is a whole process. I
7  mean --
8     Q.  Let me ask you this. Is this process for
9  each -- and let's call it, I guess, target customers or
10 potential customers. Is the process for each customer
11 different?
12    A.  Correct. No. The same format but different
13 companies. But to individually address each big
14 companies and get them -- like she explained yesterday,
15 Cheryl, like Holiday Inn gets it automatically. They
16 didn't have to do it. The corporate office would get
17 it. I guess every people have their own different
18 view.
19       But when we try -- after I find and we tried,
20 as she explained yesterday, Best Western tried to even
21 stop us. They say you can't go individually. You have
22 to go through us to get it.
23    Q.  You say that Best Western told you you
24 couldn't go individually. Did that apply to all
25 potential customers or just certain potential

31

1  customers?
2     A.  What do you think?
3     Q.  I'm asking you.
4     A.  Well, when they say -- somebody tells you you
5  can't go individually after these big companies, that
6  means -- I interpreted it like any or all companies.
7  And, also, we -- I personally got Lisa, got three new
8  customers for the whole Best Western chain because she
9  knew.
10       She was one of the best salespeople in the
11 industry that used to work for Essex House. And she
12 knew everybody from inside. And that is why I hired her
13 to go around the country and everywhere because she knew
14 Lisa Bliss or these people that I never heard of their
15 names in the companies.
16       And she had good rapport to get those accounts
17 for us. And that made -- and I have -- Best Western
18 mad. And I have no idea why.
19    Q.  What makes you believe it made Best Western
20 mad?
21    A.  If you hear the two ladies' testimony. And
22 Mary Ann told that you are not on our list, preferred
23 list, number one.
24       And the other guy said, sorry, we dropped the
25 ball. And I don't know. As a businessman, you have to

32

1  calculate every possibility. And, to my knowledge, I
2  would say it was a deliberate action. And I have an
3  argue why. But I will leave it at that.
4     Q.  What evidence do you have that there was a
5  deliberate action taken by Best Western?
6     A.  Well, I don't know what you call telling us
7  you can't go after the corporate account. You have to
8  go through us. And they deliberately delayed things.
9  And they didn't follow up. And they say sorry. We
10 dropped the ball. What do you think?
11    Q.  What evidence do you have that you were
12 treated differently than any other member of Best
13 Western?
14    A.  I have no evidence except I talked to a few
15 owners. And nobody wants to go on the record because
16 everybody is scared that they will be in jeopardy.
17    Q.  Can you give me the names of the owners you
18 have spoken to.
19    A.  No.
20    Q.  You refuse to give me the name as you sit here
21 today?
22    A.  Exactly. I swear to them not to give it.
23       MR. NATHANSON:  I better confer with
24 Mr. Harooni.
25       MR. GARBARINO:  Fair enough. Go off the

## 33

1   record.

2       (Recess.)

3       MR. NATHANSON: Back on the record.

4       MR. GARBARINO: Would you like me to reask the

5   question?

6       MR. NATHANSON: Could you reask the question,

7   please, Counsel.

8       I want the record to show that I conferred

9   with my client. So can you show that I conferred with

10   Mr. Harooni and we left the room. And he wants to

11   supplement the answer where he said that he can't give

12   the names.

13       Do you recall any of the names? Without

14   looking at the document.

15       THE WITNESS: Well, to be honest with you,

16   because I forget things. I must have it somewhere. And

17   I might be able to give it to you in less than a minute,

18   one or two of them.

19       But I run an ad in "Los Angeles Times" in the

20   business section, business for sale section and in

21   Arizona that anybody who is upset about or knows

22   somebody about mishaps that Best Western is doing and to

23   call me. And almost nine to ten people, owners, called

24   me. And they told me the same story.

25   BY MR. GARBARINO:

## 34

1      Q. Do you have a listing of those owners

2   someplace that you can refer to?

3      A. I hope I can find them.

4       MR. NATHANSON: Do you agree today to provide

5   that to counsel upon locating it?

6       THE WITNESS: Yes. I will be happy to.

7       MR. NATHANSON: How is that, sir?

8       MR. GARBARINO: That would be great.

9       MR. NATHANSON: Okay. You can close your book

10   now.

11   BY MR. GARBARINO:

12      Q. I'm going to go down the bullet points on

13   Exhibit 1. I believe it is going to be the ninth bullet

14   point down. And it reads, The biggest major hotel, and

15   the only possible competition in Lancaster, has been

16   sold to an old age home.

17      A. That is correct.

18      Q. Which hotel were you referring to?

19      A. Essex House.

20      Q. And in the very next bullet point, Exhibit 1,

21   states, The hotel has a very good chance of having an 85

22   to 90 percent occupancy rate in 2007. Is that correct?

23      A. Yes.

24      Q. Did you have an 85 to 90 percent occupancy

25   rate in 2007?

## 35

1      A. Let me look at my --

2      Q. And, sir, let the record reflect that you are

3   taking a look at some documents. Do you know if those

4   documents have been disclosed to Best Western?

5      A. I'm not sure. But I can tell you the answer

6   is not 85 to 90 percent.

7       MR. NATHANSON: Hold on. Hold on before you

8   ask the next question.

9       MR. GARBARINO: We will go off the record.

10       MR. NATHANSON: Let the record show that I'm

11   tendering the documents today. I apologize to counsel

12   if they were not previously disclosed. And I don't know

13   whether they were or weren't as I sit here today without

14   my whole file.

15       But does counsel want the documents?

16       MR. GARBARINO: Yes. We would like to have

17   the documents.

18       MR. NATHANSON: I know you are reserving your

19   rights, and I understand. And I'm sure we will work

20   that out when we are done.

21       MR. GARBARINO: Fair enough.

22      Q. As you sit here today, can you recall what the

23   occupancy rate was for 2007 at the hotel?

24      A. I would say 50 percent. It looks like maybe

25   60 percent. Maybe you can -- better than me.

## 36

1       MR. NATHANSON: Are you reading from

2   something, Harry?

3       THE WITNESS: It is a chart. But the green

4   one is 2007.

5   BY MR. GARBARINO:

6      Q. Can you tell me what the name of the chart is

7   right now?

8      A. It is 2007 versus 2008 occupancy rate.

9      Q. And who prepared that chart?

10      A. Last night after seeing your questions and

11   answers from the other people, you are asking them if

12   they brought anything, I sat. And I said to myself,

13   maybe I should get more detail. And from 2:00 o'clock

14   in the morning I researched to see if I can see

15   something that I haven't seen before. And this sounded

16   like something that might be interest.

17      Q. Okay. Can you tell me what other documents

18   you reviewed in preparation for this deposition?

19      A. Yeah. I find three more offers that I had on

20   my hotel. And I brought them here. And I found some

21   more pictures. And that is it.

22      Q. Okay. And I assume you also disclosed the

23   other offers as well to us here today?

24       MR. NATHANSON: They were disclosed to me when

25   they were spread out on the table this morning.

---

37

```
1        MR. GARBARINO: I understand.
2        MR. NATHANSON: Never saw them before.
3        THE WITNESS: Can I explain.
4        MR. NATHANSON: Well, no need to explain.
5    BY MR. GARBARINO:
6      Q.   Let me ask a question.
7        MR. NATHANSON: Let him ask a question, Harry.
8        THE WITNESS: I'm sorry.
9        MR. NATHANSON: Not a problem.
10   BY MR. GARBARINO:
11     Q.   Go down to the very last bullet point on the
12   very same page of Exhibit 1. The bullet point says
13   there was a very high employee cost. And it states two
14   reasons for that. Number one, it was listed on
15   Exhibit 1. (A), in order to assure full customer
16   satisfaction to change the old owner's image.
17        What effect did that have on employee cost?
18     A.   Well, there were two major reasons why I did
19   that. One, because I was sick. And, one, I wanted to
20   change the image. And I didn't want to make a mistake.
21        So I had the old management there, most of
22   them. So they don't -- somebody just in case they want
23   to retaliate or for any reason you want to take it. And
24   I had new people also hired. I had extra people, extra
25   manpower people who fix, painters, this, that, extra so
```

38

```
1    just in case somebody quits or something I protect my
2    life, basically, everything that I ever worked for.
3      Q.   So does your statement apply to 2005, 2006,
4    and/or 2007?
5      A.   I think at the beginning of 2005 and mostly
6    2006. Because at 2007 I saw really good potential. And
7    in order for me to bring up the sales even more, because
8    I thought my ideas are working and my remodeling is
9    working and everything is getting better. And I said
10   now it is time to go full force.
11        I send the people over like other cities,
12   salesperson to even increase more because my record for
13   the -- all of my life shows that I was successful in
14   everything I did. And I didn't want to fail.
15     Q.   Okay. So you just said that you didn't have
16   more employees, though, in 2006; is that correct?
17     A.   Perhaps.
18     Q.   Bullet point 4 on Exhibit 1 states that over
19   $2 million has been spent in remodeling. Do you have
20   any receipts that would demonstrate the $2 million that
21   was spent?
22     A.   Yes. Not all of it.
23     Q.   Would you be willing to produce those receipts
24   in this litigation to Best Western?
25     A.   Yes.
```

39

```
1      Q.   The asphalt of the hotel was replaced at one
2    point in time; is that correct?
3      A.   Most of it.
4      Q.   Do you know when that occurred?
5      A.   2007, I think.
6      Q.   Let me ask you this. Do you have a specific
7    listing of each of the improvements? And is that
8    listing actually page 2 of Exhibit 1?
9      A.   Yes. Did you see that?
10     Q.   Is this a complete listing of all --
11     A.   Not really. It is good up to -- I made that
12   for the listing for the broker. So ever since after
13   that is everything that -- the rules changed for Best
14   Western or whatever I did is added to that.
15     Q.   So this list, is it fair to say it is
16   comprehensive as of the time you made the list?
17     A.   Yes.
18     Q.   And I'm sorry. I might have asked this. And
19   I don't recall off the top of my head. Do you recall
20   when this document -- I'm referring to Exhibit 1 --
21   was prepared?
22     A.   Pretty much very close to the listing
23   agreement that I had with the broker, of course, because
24   I prepared it for him. And I looked at the listing
25   agreement. And the date was missing. But let's say the
```

40

```
1    first offer came in February 22nd of 2008. So it must
2    have been at the end of 2007 or beginning of 2008.
3      Q.   So as for the list of capital improvements
4    being complete for the hotel as a total, the ones that
5    aren't included on here would be improvements that were
6    made in 2008 and/or 2009?
7      A.   Correct. Or maybe I would say from September
8    of 2007 to -- three months prior to that would be a more
9    accurate estimate.
10     Q.   I assume in the operations of the hotel that
11   balance sheets were prepared reflecting assets,
12   liabilities and owner equity in a business operating a
13   hotel. Is that a fair statement?
14     A.   Yes.
15     Q.   Could you disclose those balance statements to
16   us for years 2005, 2006, 2007, and 2008?
17     A.   They are all in the accountant thing that you
18   are copying right now.
19     Q.   Okay.
20     A.   And including my tax returns, including
21   general ledgers. Anything that accountant asked me for
22   him to see, you can have.
23     Q.   And should the capital improvements be
24   reflected on those balance sheets as increases in assets
25   from 2005 through the time period that you owned the
```

41

1   hotel?
2       A.  It should.  But whether it is or not, that is
3   a different story.
4       Q.  Now, there has been testimony that you
5   remodeled the rooms.  Can you tell me specifically what
6   was remodeled in the rooms.
7       A.  Yes.  That takes explanation.  As a person, I
8   think, with good common sense, when I came, I saw a lot
9   of leaks.  I mean, all the roofs were so bad it was
10  unbelievable.  So I said, if I fix the rooms and it
11  rains, I'm dead.  So what I did, I changed all of the
12  roofs.  I changed all of the air-conditioning.
13      Then I got inside the -- I did outside
14  appearance to make it more attractive to people, more
15  nicer, landscaping.  Then -- I don't exactly recall at
16  what order.  Then at the same time we were doing the
17  rooms, the hallways, changing all of the carpet to tile,
18  this, that.
19      And but the rooms -- the most important thing
20  was, because it wasn't in bad shape except the leaks,
21  the ceiling, and the walls were the most important thing
22  to paint.  So I did those.
23      Then the rest was mandatory from Best Western
24  which I did.  They have their own design standard.  They
25  want you to change the blanket, to change the sheets, to

42

1   change this.  Every time they come with a new idea.  And
2   you have to do it.
3       And I have done it.  I have changed furniture
4   to brand new furniture.  I have changed carpet to brand
5   new carpet.  I have changed the chairs.  I brought
6   actually the same kind of chairs for every room extra
7   because they require two chairs instead of one.  If
8   there is a little bit of knickknack is there, they make
9   you change.
10      I have done every single thing that they
11  requested plus then some because I have my own
12  motivation and did the best remodeling ever I have done
13  in my job and did not put any limit of budget
14  whatsoever.  Whatever needed to be done, I said yes.
15  And I did it.
16      But it took time because I was trying to -- it
17  is six-acre land, 146 rooms.  It is not humanly possible
18  to run a business and do everything in one day.  It gets
19  very cold.  And it gets so cold.
20      I talked to Mitch, for example, and surface
21  for asphalt.  It was $80,000 just to change the
22  asphalt.  I did half of it in the front.  And I left the
23  back because it is wintertime.  Everything cracks
24  there.  I mean, nothing stays alive there.  It gets so
25  cold and things.

43

1       So I didn't see any point of continuing and
2   asking for permission to do it after winter instead of
3   then.
4       Q.  Okay.  And let me ask you this question.  From
5   the time that you would start to remodel a room, how
6   long would it take before that room was available for
7   the public?
8       A.  Okay.  Let me say that -- because I was
9   sitting there.  You were asking the same question from
10  the other people -- what Kevin said was correct.
11      We check -- of course, that is rule of thumb.
12  And it is common sense.  You don't start remodeling when
13  you know you have a customer coming for soccer game this
14  weekend, for example.  When your occupancy is low, you
15  pick a section.  You close it down.           .
16      I mean, we are doing five rooms at a time.
17  They picked 20 rooms.  But we take five rooms at a
18  time.  And if we had to put them back together again, I
19  had enough people to put everything back like nothing
20  ever happened and stopped it, open it, close it.  It is
21  not like we are Hilton Hotel or -- I don't know -- one
22  of these big hotels that we have hundred percent
23  occupancy.  So it wouldn't make any difference.
24      Q.  But my question is, once remodeling started on
25  a room, how long would it take before that room would be

44

1   available to the public?
2       A.  One or two weeks.
3       Q.  I want to go back to the time when you
4   purchased the hotel.  How did you become aware that the
5   hotel was for sale?
6       A.  My best friend who buys and sales with me for
7   last 25 years, he said it is a good deal.  Let's buy
8   it.
9       Q.  What is your best friend's name?
10      A.  Robert Mestepy.
11      Q.  How do you spell the last name?
12      A.  M-e-s-t-e-p-y.
13      Q.  And he originally wanted to purchase it with
14  you?
15      A.  No.  He bought and sold properties for me for
16  the last 30 years.  I made all of my money with him.  I
17  mean, he made all of my money for me.
18      Q.  Was he an employee of yours?
19      A.  No a friend.  We started together with no
20  money.
21      Q.  And there has been some mention that you had
22  some partners at least at the get-go?
23      A.  Yes.  At the beginning there were two of my
24  friends wanted to get involved.  They were coming from
25  Maryland.  And we knew from the past.

45

1     And once I talked to Terri and I was sure that
2  I have the support that I need, and they wanted to back
3  out, and I let them go. And I continued with the sale
4  of the property because I was sure of my management and
5  past history and also counting on management teams that
6  they were, quote, money manager, this manager. We have
7  that manager to help you. Not to worry.
8     Q. Who were the two partners?
9     A. We went to college together. We graduated
10  together.
11     Q. Do you know their names?
12     A. Yes.
13     Q. Can you tell me what those names are.
14     A. One of them is Bob Kamdjou, K-a-m-d-j-o-u.
15     Q. And the other?
16     A. And the other one is Tom Azhdam, A-z-h-d-a-m,
17  which is fighting with cancer right now. I would
18  appreciate if you not call him.
19     Q. And did these two individuals back out on
20  their own accord, or did you ask -- let me finish my
21  question -- or did you ask them to back out?
22     A. They backed out on their own.
23     Q. Do you know why they backed out?
24     A. Yes. They were not familiar with Palmdale .
25  Lancaster. They were not sure -- he has been here for

46

1  seven years. He hasn't bought a business yet.
2     Q. Did either of them have experience in the
3  hotel industry?
4     A. No.
5     Q. Can you tell me what due diligence you
6  performed before deciding to purchase the hotel?
7     A. I checked the sales figures. I looked at the
8  property from outside. I relied on mostly on Best
9  Western report that they had from the property being in
10  distress sale. And he had his final notice from Best
11  Western after so many years. And I saw maybe 10, 15
12  rooms.
13     Q. Did you have a professional inspect the
14  property?
15     A. Yes.
16     Q. Do you remember that professional's name?
17     A. No.
18     Q. Did you have an accountant perform any review
19  of the financial statements that the prior owners
20  provided you?
21     A. Bob Kamdjou was my tutor all of my life as a
22  math teacher. And he is really good with accounting.
23  So he did all of the analysis up to the last minute.
24     Q. Is Bob a CPA?
25     A. No. He could be.

47

1     Q. But you relied upon Bob's analysis of the
2  financial statements?
3     A. No.
4     Q. Then, did you analyze the financial statements
5  yourself?
6     A. Some.
7     Q. Do you remember what years you analyzed? What
8  particular financial statement you analyzed?
9     A. Well, what really made sense to me was because
10  when somebody sells their business, you don't know
11  whether they are telling the truth or not. And they
12  might misrepresent everything.
13     But one thing nobody can his represent is
14  credit card sales that goes through your system. So we
15  added finally those up and matched with what the owner
16  was telling us. So we went ahead and go forward.
17     Q. Were you represented by an attorney at the
18  time that you purchased the hotel?
19     A. I don't know if you -- you don't know. My
20  friend Robert is much more experienced than any lawyer
21  that I have ever known.
22     Q. So you were not represented by an attorney at
23  that time?
24     A. No. My broker which was my best friend.
25     Q. At the time you purchased the hotel, did you

48

1  explore renaming or rebranding the hotel to a brand
2  other than Best Western?
3     A. I have to explain. I think I know what you
4  are trying to get at.
5     At some point near the end that I saw no hope
6  with Best Western, I thought of an idea, a genius idea
7  which they didn't let me to do because it was two
8  separate parcels. I thought if I split the two parcels
9  to a hundred units and a 48 unit with banquet center, I
10  can sell them separately and make 10, 11, $12 million,
11  God knows how much.
12     And I presented this to Best Western, and that
13  was the end of me.
14     Q. My question was this. Did you consider  .
15  rebranding the hotel -- let me finish the question. Did
16  you consider rebranding the hotel before you purchased
17  it?
18     A. I don't recall. I don't think so.
19     Q. There has been some reference that you
20  believed that Best Western required the sale of the
21  hotel to continue to have the hotel branded as the Best
22  Western?
23     A. Correct.
24     Q. What gave you that impression?
25     A. They gave the prior owner notice to sell or we

49

1    are going to take your license away. And that is why
2    they interviewed me. And Terri said she is the head
3    honcho, and she makes all the decisions. And she gave
4    me -- she interviewed me. And I went to Arizona. And
5    she said okay. You are approved.
6        Q. Did you actually see the notice that they gave
7    to the prior owners?
8        A. I think it was obvious. It was in the
9    listing. I can ask Robert, my friend. Maybe he can
10   find it because everybody knows that. The Best Western
11   knows that.
12       Q. My question is, did you see the notice
13   yourself?
14       A. Not that I recall. My broker told me. Is not
15   something to see the notice on or not. They gave me the
16   booklet of things to repair.
17       Q. At the time you purchased the hotel, were you
18   concerned that it was in such poor condition?
19       A. I was very glad, actually.
20       Q. Why is that?
21       A. Because I saw tremendous potential to make
22   money.
23       Q. Did you have any concern that you may not be
24   able to meet Best Western's standards?
25       A. No. I had money. I had power. I had

50

1    praying. I thought I have all the knowledge and backing
2    necessary to go on.
3        Q. At the time that you purchased the hotel, did
4    you know what Best Western's quality standards were?
5        A. I believe so to some extent. Not
6    100 percent.
7        Q. You talk about an initial interview that you
8    had with Terri Wininger that occurred before you
9    purchased the hotel.
10       A. Yes.
11       Q. Did you -- you said you traveled to Arizona
12   for that interview?
13       A. Yes.
14       Q. Can you tell me what Ms. Wininger told you to
15   the best of your recollection as you sit here today
16   during that interview?
17       A. Yes. Actually, that was one of the things
18   that I found last night.
19       MR. NATHANSON: What are you referring to,
20   Harry?
21       THE WITNESS: Well, the ticket. I found the
22   ticket and the date that I went there. It was three
23   months before I buy the hotel.
24       MR. NATHANSON: Okay.
25       THE WITNESS: Well, mostly, she was

51

1    interviewing me to see if I'm qualified to have the Best
2    Western. That is what the meeting was all about and, of
3    course, charging me money for 3,000 -- I don't know how
4    many thousand regardless of whether it goes through or
5    not. I took the chance. And I went there. And she
6    approved me.
7        And I asked some question. What kind of
8    support? She says we have money manager. We have
9    people coming there visiting you if you have any help.
10       And even though Mitch was very nice guy and I
11   think he is a very nice guy and everything, every time I
12   call him for help, he didn't say no, but he came on his
13   regular schedule. Like, he is not like they -- like you
14   said, they have 4,000 hotels. Who am I to pay
15   attention. They just want the $10,000 a month.
16       Q. Were you aware at the time that Best Western
17   had -- you said 4,000 hotels?
18       A. Well, they were using that as a sales pitch.
19   And I believed them. And, honestly, I never thought a
20   franchise company that is so --
21       MR. NATHANSON: Harry, you answered the
22   question.
23       THE WITNESS: Okay. Say that again, please.
24       (Record read.)
25       THE WITNESS: Yes.

52

1        MR. NATHANSON: Please answer the question.
2        THE WITNESS: Yes.
3    BY MR. GARBARINO:
4        Q. So, specifically, what support did Terri
5    Wininger tell you Best Western would provide?
6        A. Specifically, what I recall was three items.
7    She said three or four items. She said we have design
8    people standards. She showed me all of the room, design
9    room, and people working on design and stuff. That
10   wasn't part of her sales pitch.
11       And she said we have money manager who monitor
12   your accounts at all times. That was good just in case
13   anything goes wrong. They are there to help you. And
14   like Mitch type of a person that comes there all the
15   time. And she said we give you -- all the help we can
16   give you, we will give you.
17       Q. So did you take that to mean that Best Western
18   would run and operate the hotel for you?
19       A. If they wanted to do that, why would they
20   interview me?
21       Q. Well, I'm trying to -- on the spectrum of
22   support, there is the support that you received --
23       A. She said any --
24       Q. Let me finish my question. There is the
25   support you received. There is total running and

---

53

1  operations of the hotel for you. Where on that spectrum
2  did you believe you were told Best Western would
3  provide?
4      A.  Okay.  She said -- my impression was any
5  question that I have or any help that I need mentally at
6  least they provide.
7      Q.  Is there any specific, you know, advice you
8  were told that you would receive?
9      A.  I'm sorry.  I'm shaking too much.  Give me a
10 minute.
11     MR. NATHANSON:  Could you read the question
12 back for Mr. Harooni, please.
13     (Record read.)
14     MR. NATHANSON:  Are you okay?
15     THE WITNESS:  Well.  I have to wait until
16 medicine kicks in.  I'm okay mentally.  So if you
17 guys --
18     MR. NATHANSON:  No.  But I notice you are
19 visibly shaking.
20     THE WITNESS:  No.  Let's wait a couple of
21 minutes, and it will go away.
22     MR. NATHANSON:  Why don't you wait.
23     MR. GARBARINO:  Okay.  Let's take a break.
24 Can we go off the record.
25     (Lunch recess.)

---

54

1      (Record read.)
2  BY MR. GARBARINO:
3      Q.  When we left off, Mr. Harooni, I had asked you
4  a question as to whether there was any specific advice
5  that you believe you would receive from Best Western
6  after your meeting with Terri Wininger.
7      Was there any specific advice you thought you
8  would receive?
9      A.  Beside the money manager that we have -- that
10 they would control and watch for us and sales team and
11 whatchamacallit, the design team and support.  And that
12 is it.
13     Q.  What was your understanding of what the money
14 manager would do for you?
15     A.  It would monitor our accounts to see if it is
16 losing money, making money, recommendation or whatever.
17     Q.  Did Best Western have any information
18 regarding the expenses of the hotel?
19     A.  No.
20     Q.  How could Best Western determine whether the
21 hotel was making or losing money?
22     A.  Okay.  I called at least 10 times and begged
23 them for help because my occupancy was going down and
24 down and down.  I was getting more things done and done
25 and done.  And my sales were going down and down.

---

55

1  Like,.
2      I was amazed.  It didn't make sense to me.
3  And I had no idea of how the other side was closed.  And
4  I had no idea what I'm doing wrong, that I am doing all
5  of the right things in my mind.  And my sales are going
6  down.
7      Q.  When did you first call Best Western to tell
8  them of this problem?
9      A.  Honestly, I don't remember.
10     Q.  Was it within a month after purchasing the
11 hotel?
12     A.  I have no idea.
13     Q.  There is no way for you to recall how long you
14 had a problem -- or let's back up for just a second.
15     When did you identify that you were having a
16 problem with revenue?
17     A.  I think after relying on the dates the other
18 one gave or the charts on Best Western, if I look to see
19 when the sales started going down on 2005.
20     Q.  But the problem you were having with the
21 reservation system wouldn't result in immediate loss of
22 sales, would it?
23     A.  Of course.  Because anybody wants -- okay.
24     Q.  Just answer the question.
25     A.  Of course it would.

---

56

1      Q.  Okay.  How would it?
2      A.  Okay.  You just told me to come to, let's say,
3  Arizona.  I call Best Western in Arizona.  Best Western,
4  they try to reserve a room.  And they say it is full.
5  What do I do?  Call another hotel.
6      Q.  But if that person was booking the room six
7  months in advance, you wouldn't actually realize the
8  revenue until the person stayed in the hotel; correct?
9      A.  Say that again.
10     Q.  If the person is trying to book the room --
11 and let's just use an example.  Let's say the person
12 tries to call in January.  Excuse me.  December of
13 2005.  They want to book a room for May.  But, as you
14 allege, the reservation system was showing that all of
15 the rooms were full.  So that person couldn't book that
16 room.  The revenue you lost was actually in May of the
17 following year; is that correct?
18     A.  Well, if that would have been the case, that
19 the person wanted to rent for six months from now on a
20 particular day, I'm not sure if you will -- yes.  You
21 would loose future money.  But if it was -- it depends
22 on which day it was blacked out.  How do you know?  How
23 does anybody know?
24     Q.  You have offered evidence and answers to
25 interrogatory say that it was closed out for a year.

57

1    A. That I am saying how does anybody know how
2  much business we lost? I mean, it could be 50
3  reservations a day. It could be 100. It could be 25.
4  But the best thing is to average out like how many -- if
5  you really want to know, you have to compare 2005 and
6  2006, the actual number of reservations that Best
7  Western made through 800 number versus -- I think that
8  would be your answer.
9    Q. So you don't believe that the number of --
10  strike that. You don't believe that the revenue that
11  Best Western has records of because of the reservations
12  made through its system would be consistent with prior
13  years?
14    A. For my sake, I hope not.
15    Q. And if the revenue was consistent or even more
16  through the reservation system --
17    A. Okay.
18    Q. Let me finish my question. Would that change
19  your position?
20    A. No. But let's not forget the fact that there
21  is millions of things I did to raise the business. I
22  made the business from two star to three star hotel in
23  AAA. I put ads all over the things. It is not that I
24  didn't do anything while I didn't have a sales manager.
25  I did millions of things to raise the business.

58

1    Q. But if we looked at just the numbers from Best
2  Western which only include calls made through the Best
3  Western systems, that go through the reservation system,
4  if they were consistent or even more, when you say this
5  problem occurred, how would you explain that?
6    A. Well, I would say I am really not an expert.
7  But I would say that everything went up. All of my
8  sales went up. Restaurant sales went up. Banquet sales
9  went up. The general sales went up. The marketing went
10  up.
11      So if you take everything into consideration
12  and the economy, that was a lot better than -- better in
13  2006 and after one year of headaches. So I would have
14  expected the first three months to go up 20 percent, 30
15  percent. But it is a fact that nobody can deny the
16  system was not working.
17    Q. Let's talk about the property itself. There
18  were two parcels of property; correct?
19    A. Correct.
20    Q. The hotel or at least a portion of the hotel
21  sits on the property that was owned by AV Inn
22  Associates; correct?
23    A. Correct.
24    Q. And when you purchased that property, you also
25  purchased the rights under a lease to lease the property

59

1  which is next door where the banquet center sits;
2  correct?
3    A. Correct.
4    Q. And there are also some hotels rooms on the
5  banquet center; correct?
6    A. Correct.
7    Q. So that was all included in that one purchase
8  by AV Inn, LLC?
9    A. Correct.
10    Q. What was the original purchase price of that?
11    A. I bought it for $5.7 million.
12    Q. How much of that was financed?
13    A. I put $2.3 million down. $3.5 million
14  finance, I think.
15    Q. And the ground lease where the banquet center
16  sits was originally a 53-year lease. Does that sound
17  right to you?
18    A. I don't really care about the originally, but
19  I think I have 25, 30 years left.
20    Q. Does January 31st, 2017 sound correct?
21    A. Perhaps.
22    Q. Were there any options to extend the lease?
23    A. Not that I know of.
24    Q. Can we get a copy of that lease?
25    A. Possible. But it was so small payment, that

60

1  was insignificant basically.
2    Q. I'm sorry. What was insignificant?
3    A. My payment on the land was $20,000 a month.
4  The rent was only $3,000 a month.
5    Q. I understand my question is, can we get a copy
6  of the lease?
7    A. Most probably yes.
8    Q. What happened to the improvements on the
9  leased parcel once the lease expired?
10    A. I guess --
11    Q. And let me back up. Do you have any
12  understanding of what would happen to those
13  improvements?
14    A. Yes.
15    Q. What is your understanding of what would
16  happen?
17    A. There are two or three different scenarios you
18  can analyze. One, hoping -- because there were nine or
19  10 people owning and the grand kids and this and that.
20  And some of them were very hungry. So just wait until
21  the right moment to buy the land from them.
22    Q. But my question is -- let's assume the lease
23  expired as it was set to expire. What would happen?
24    A. I had a choice to destroy -- I'm sorry. Go
25  ahead.

61

1      Q.  What would happen to the improvements on the
2  property?  Would those pass to the actual owners of the
3  property?
4      A.  If I wanted.
5      Q.  And the only way for that situation to change
6  would be for either you to purchase the leased parcel
7  itself or release it for a term, who knows when, into
8  the future?
9      A.  Exactly.
10     Q.  When you sold the property -- I understand you
11  sold it in 2009; is that correct?
12     A.  Correct.
13     Q.  Did you sell both parcels?
14     A.  Yes.
15     Q.  Did you sell both parcels to the same buyer?
16     A.  Correct.
17     Q.  Now, there was an offer to purchase the
18  property, I believe, in 2008 which was approximately
19  $6.1 million.  Do you recall that?
20     A.  Yes.
21     Q.  And that was relied upon by Mr. Labbie in his
22  report.  Do you recall that?
23     A.  Yes.
24     Q.  What happened to that sale?
25     A.  Okay.  I tell you what happened to that sale.

62

1  I picked that because that was the lowest sales amount
2  that I was offered.  And the guy was an Indian guy.  I
3  have his name and number maybe somewhere.  And he was
4  lowballing me.  And he was ready to take Best Western,
5  buy my place with the Best Western headache.  And stood
6  by me for eight, nine months.  And he gave up and left.
7      Q.  So all that needed to be done to consummate
8  that deal was for you to accept the offer?
9      A.  Yes.  I wouldn't.  It was so cheap.
10     Q.  But did you have other offers?
11     A.  Yes.  I had -- I listed it for 8.9 million.
12     Q.  And what was the highest offer you received?
13     A.  Seven million.
14     Q.  Do you recall when you received the $7 million
15  offer?
16     A.  Shortly after listing it.
17     Q.  When did you list it?
18     A.  January or February of 2008.
19     Q.  So somewhere between January and February of
20  2008, from the time you actually sold the property, you
21  had an offer for $7 million?
22     A.  Yes.
23     Q.  And what needed to be done to consummate that
24  offer or consummate -- make that offer into a contract?
25     A.  Get rid of Best Western headache.

63

1      Q.  When you say "get rid of Best Western
2  headache," what do you mean?
3      A.  Get a blessing and get two good numbers.  As
4  you know, that when you get two numbers below 900, then
5  it will not be an automatic sale.  And they can demand
6  anything they want.
7      Q.  So when you put the property up for sale, you
8  had already received the second inspection score below
9  800?
10     A.  Above 800.  No.  I had good grades.  Let me
11  explain to you how it is.  When I had no idea -- I had
12  no idea what does automatic transfer mean.
13         The company who listed my property is three
14  generations, most famous brokers in -- hotel brokers in
15  America.  And they are so famous.  He put in his listing
16  automatic transfer.
17         And then should I explain?  Go on?
18         MR. NATHANSON:  No.  You should answer his
19  question.
20         THE WITNESS:  Okay.  I'm sorry.
21         MR. NATHANSON:  Do you need the question read
22  back.
23         THE WITNESS:  Yes, please.
24         (Record read.)
25         THE WITNESS:  No.

64

1  BY MR. GARBARINO:
2      Q.  But you received that second inspection score
3  below 800 on January 31st of 2008?
4      A.  Say that again.
5      Q.  You received the second inspection score below
6  800 on -- and let me just verify it by looking at the
7  inspection report -- January 31st, 2008.
8      A.  Okay.  What were the scores below that, the
9  last two scores before that?
10     Q.  The score previous to that -- let me look at
11  the inspection report.  But the inspection report will
12  be dated, I believe, October 25th of 2007.  And it was
13  less than 800 as well.
14         If you can -- I will pull it out for you
15  here.  Exhibit 10.
16         (Plaintiff's Exhibit 10 marked.)
17  BY MR. GARBARINO:
18     Q.  Is this the inspection report dated 10-25 --
19  let me finish my question -- 2007.
20     A.  What does it say?  Okay.  October 25th, 2007.
21     Q.  Correct.
22     A.  Yes.
23     Q.  And the score -- and I'm, again, going to use
24  the term GRUPA.  And that is short for guest room public
25  areas assessment -- was 750 correct?

Hooshang Harooni

## 65

1    A.  Yes.

2    Q.  So this is one score before 2008 below 800;

3  correct?

4    A.  What is this 979 here?

5    Q.  This is on your supplemental facilities?

6    A.  What is the difference?

7    Q.  Well, unfortunately, you don't get to ask

8  questions.  But I will explain it to you if you want to

9  go off the record and do it.

10         MR. NATHANSON:  Go off the record.

11         MR. GARBARINO:  Let's go off the record for

12  just a second.

13         (Discussion off the record.)

14         MR. GARBARINO:  Back on the record.

15    Q.  Would you agree, though, that on the

16  inspection report dated 10-25 of '07 the hotel received

17  a GRUPA score below 800?

18    A.  If that means GRUPA, yes, whatever that

19  means.

20    Q.  And if -- I will turn to the correct exhibit

21  which is going to be Exhibit 12.

22         (Plaintiff's Exhibit 12 marked.)

23  BY MR. GARBARINO:

24    Q.  Do you agree that that is the inspection

25  report dated January 31st of 2008?

## 66

1    A.  Is that the one done with the lady?

2    Q.  Yes.

3    A.  Yes.

4    Q.  And would you agree that the GRUPA score on

5  this inspection report is 681?

6    A.  According to her.

7    Q.  And so before you listed the property, do you

8  agree that you had two inspection scores below 800?

9    A.  If that GRUPA means what you say, maybe.

10         MR. NATHANSON:  Well, I'm going to object to

11  the form of the question for this reason.  You are

12  asking him if he agrees.  I'm not sure if that means if

13  he agrees with what the piece of paper says or if he

14  agrees with the report.

15         MR. GARBARINO:  That is fair.  Let me reask

16  the question.

17    Q.  Did you receive two inspection reports where

18  the GRUPA score was less than 800 points before you

19  listed the property?

20    A.  I honestly have to check that.

21    Q.  When you executed the Best Western membership

22  agreement, did you read that agreement before you

23  executed it?

24    A.  Hopefully.

25    Q.  I want to talk about that agreement for just a

## 67

1  minute.  And it is actually going to be an exhibit.

2  Exhibit No. 7.  I will put that out for you.

3         (Plaintiff's Exhibit 7 marked.)

4         MR. NATHANSON:  I think if you can just read

5  it, I would know.

6  BY MR. GARBARINO:

7    Q.  Is that the membership application and

8  agreement --

9    A.  Yes.

10    Q.  -- that you executed?

11    A.  Correct.

12    Q.  And you do not recall or you do recall

13  reviewing this agreement before you executed it?

14    A.  I'm sure I reviewed it at the time.  But I

15  don't remember now.

16    Q.  That is fair.  Do you review all agreements

17  that you execute?

18    A.  Not all the time.

19    Q.  What would be the distinction between an

20  agreement you would review and one you wouldn't review

21  before you executed it?

22    A.  If it is escrow office, if it is my friend

23  buying and selling home, then I sign it.  If it is a

24  contract like this, I should read it.

25    Q.  So if this had been put in front of you under

## 68

1  your typical method or means of deciding which contracts

2  to review, you would have reviewed it?

3    A.  Most probably, yes.

4    Q.  Okay.  Were you also provided a copy of the

5  Best Western bylaws?

6    A.  Yes.

7    Q.  Were you also provided a copy of the Best

8  Western rules and regulations?

9    A.  That, I don't recall.  But I'm sure as a

10  systematic thing, they have given it to me.

11    Q.  In the agreement in paragraph 11, it states

12  that applicant acknowledges that applicant has received,

13  read and understood the current bylaws and rules and

14  regulations.

15    A.  Okay.

16    Q.  If you executed this agreement, do you believe

17  that you would have reviewed the bylaws, rules, and

18  regulations?

19    A.  Yes.

20    Q.  And you understood that as a Best Western

21  member, all Best Western members were subject to the

22  same bylaws and rules and regulations?

23         MR. NATHANSON:  Object as to foundation.

24         THE WITNESS:  Nobody talked about any other

25  hotel.  It wasn't -- now thinking about it now, maybe

## 69

1   that is -- I can understand that might be the case. But
2   then I didn't think about it, anybody else but myself.
3   BY MR. GARBARINO:
4      Q.  What was your understanding of the Best
5   Western organization when you executed this agreement?
6      A.  I *liked the free breakfast. I was going to*
7   Best Western myself sometimes. I thought it was a good
8   name for the neighborhood. And it made sense for that
9   time. 5.7 I paid for it. It was a good price for the
10  even land value. I made a mistake, and I bought it.
11      Q.  Did you understand that there was a
12  distinction between Best Western and other franchises?
13      A.  Meaning?
14      Q.  In terms of its organizational structure.
15      A.  One is a membership, and the other ones are
16  not.
17      Q.  And you understood that being a membership,
18  that the members voted on a great many things that Best
19  Western implemented?
20      A.  At that time I didn't even know the true
21  meaning of it to be honest with you. But now I know.
22      Q.  And did you attend annual conventions where
23  you voted on various subjects?
24      A.  Yes.
25      Q.  And you understand that the members of Best

## 70

1   Western elect the board of directors of *Best Western?*
2      A.  Yes.
3      Q.  But you didn't understand that at the time you
4  executed the membership agreement?
5      A.  I really -- I didn't take -- the meeting
6  didn't sound so seriously and up and up because we had a
7  lot of angry people throwing shoes and apples and stuff
8  like that. *They were fighting with the old members.*
9  And some they were saying fixed. Who knows. I really
10  didn't believe in that system. But I went to the
11  meeting. I don't know if it was fixed or not. Who
12  knows.
13      Q.  And let me just back up because I'm not quite
14  sure what you are talking about here.
15      My question, I think, was, when you purchased
16  the hotel, did you understand that the Best Western
17  members essentially ran Best Western organization?
18      A.  No.
19      Q.  One fact I missed. On the offers that were
20  made to you, did all of the offers include purchase of
21  the hotel parcel?
22      A.  Yes.
23      Q.  And the *lease parcel as well?*
24      A.  Correct. Can I --
25      MR. NATHANSON:  No question pending.

## 71

1   BY MR. GARBARINO:
2      Q.  Can we talk about your profit and loss
3  statements just briefly. These are going to be Exhibits
4  3, 4, 5, and 6.
5      (Plaintiff's Exhibits 3 through 6 marked.)
6   BY MR. GARBARINO:
7      Q.  Can you take just take a minute and take a
8  look and verify that those are the profit and
9  loss statements for the hotel for their respective
10  years.
11      A.  I don't know the exact numbers. But I would
12  say yes if you got it from us and you have the documents
13  also from the lawyer, I mean, the accountant.
14      Q.  Fair enough. Who prepared those documents or
15  those profit and loss statements that are listed as
16  Exhibits 3 through 6?
17      A.  At some point it was -- I had an accountant at
18  the beginning that I wanted to let go from previous
19  owner. She was doing the bookkeeping. Then I hired a
20  lady Danette. She was working for ABC or some famous
21  thing. And I paid a lot of money to her to build a
22  system. And she worked for like six months on the side
23  of her job. And she developed a system. Then that
24  didn't work.
25      Then we got Quick Books. Then there was a

## 72

1   lady named Hannah. And then sometimes Kevin did data
2  entry. And the bottom line was we had at all times
3  someone doing data entry. And we get the numbers to
4  Scott Evans. And he made them.
5      Q.  Okay. So the actual profit and loss
6  statements were ultimately generated by Scott Evans?
7      A.  Yes.
8      Q.  Do you know was there any audit conducted of
9  the hotel's financial statements?
10      A.  Actually, there was an audit done by AIG for
11  employees' insurance and thing. And they checked all of
12  our documents.
13      Q.  Let me ask you this question. Was there a
14  financial statement audit performed?
15      A.  Can I ask you what does that mean?
16      Q.  Did an independent CPA come in and audit your
17  financial records and the financial statements and issue
18  an auditor's opinion?
19      A.  Yes.
20      Q.  For what years?
21      A.  I think 2007.
22      Q.  2007?
23      A.  Yes.
24      Q.  Have you provided us with those audited
25  financial statements?

73

1     A.  No.
2     Q.  Will you provide us with those audited
3  financial statements?
4     A.  I don't have.
5     Q.  Who paid for the audit?
6     A.  I must have paid.
7     Q.  Why don't you a copy of the audit financial
8  statements?
9     A.  I might have the checks, some checks.  But I
10  went in and out of doctors.  I honestly don't know a lot
11  of things that has been going on 2007.
12        What happened was, when Essex House sold his
13  business to the old age home, I hired the owner of that
14  hotel as a consultant.  He is extremely educated man and
15  been in the hotel business for many years.  He brought
16  some auditors with him to check on every single details
17  of the hotel to see where the leaks are and financial.
18  And everything was okay.  That is all I know.  I paid
19  him like $20,000.
20     Q.  What was this consultant's name?
21     A.  His name -- Essex House owner's name.
22     Q.  If you don't recall sitting here today --
23     A.  It is the owner of Essex House.  He sold his
24  hotel for $15 million.  He was extremely successful.
25  And he is on board of Brown Hotel.

74

1     Q.  This individual, we don't know his name as we
2  sit here today.  But I presume you have provided your
3  attorney with that name who has knowledge of the
4  operations of the hotel.
5     A.  Yes.
6     Q.  And he has knowledge of those operations in
7  2007?
8     A.  Yes.  Checked -- actually, he checked every
9  corner to see how I can cut the cost and how I can be
10  more successful.  He gave me a lot of his customers
11  after he closed down.
12     Q.  And while we are on the subject of people who
13  were at the hotel, there has been mention of a manager
14  named Christina.  What is Christina's last name?
15     A.  I don't remember.
16     Q.  And Christina was a manager when you initially
17  bought the hotel?
18     A.  Correct.
19     Q.  And she also came back and was at least a
20  part-time employee at some time; correct?
21     A.  Yes.  I needed help for some reason.  And I
22  never depart from anybody on bad terms.  Or I try.  So I
23  leave things open for future.  I needed help.  And she
24  probably came back.  So I won't be without help at any
25  moment.

75

1     Q.  And she was the general manager at the time of
2  the inspection in January of 2008?
3     A.  I honestly don't remember the date.
4     Q.  Is there any way you can find out that, her
5  last name, and give that information to your attorney?
6     A.  Yes.  I think one of the girls mentioned her
7  name.  I can easily find out her name.
8     Q.  And the contact information.  Other than
9  Christine and Cheryl Duggan, were there any other
10  general managers of the hotel?
11     A.  Yes.
12     Q.  Who was the other general manager?
13     A.  I hired one gentleman who I don't even
14  remember his name or nothing.  He was just sitting down
15  and doing nothing.  And he didn't understand there is a
16  chain of command.  So I fired him fast.
17     Q.  When did you hire this gentleman?
18     A.  It was like for a couple of months.  In and
19  out.
20     Q.  And when did you hire this gentleman?
21     A.  Somewhere around between '6 and '7, 2006 and
22  2007.
23     Q.  How long was this gentleman with the hotel?
24     A.  Two or three months.
25     Q.  Let's back up to where we were before I got

76

1  off track on these financial statements.  If you would
2  look at those and, in particular, I want to focus on the
3  salary expense.
4     A.  Okay.
5     Q.  Okay.  In 2005 the salary expense was
6  approximately $271,000.  Does that sound right, or would
7  you like to refer to the financial statement in front of
8  you?
9     A.  No.  I remember.  You asked the other lady in
10  2005 how much was what.
11     Q.  In 2005 there was approximately $271,000.
12     A.  Right.
13     Q.  In 2006 it was approximately $370,000.
14     A.  I'm sorry.  What was $270,000?
15     Q.  In 2006 the salary expense was approximately
16  $370,000.
17     A.  What do you mean by salary expense?
18     Q.  If you look at the financial statements here.
19     A.  But you said 26 times $50,000 a month was like
20  500,000 a year.
21     Q.  Let's do this one step at a time.
22     A.  Okay.
23     Q.  When I'm referring to salary expense, I'm
24  referring to what is -- looks like an account number of
25  6000 on your profit and loss statements.

Hooshang Harooni                                          December 4, 2009

---

77

1      MR. NATHANSON: What exhibit are you reading
2   from?
3      MR. GARBARINO: I just picked one. 3, 4, 5,
4   and 6.
5      THE WITNESS: Can you show me, please, which
6   page.
7   BY MR. GARBARINO:
8      Q.  Sure. Let me see if I can point it out here.
9   Salary expenses, approximately third line down.
10     A.  Salaries.
11     Q.  Do you see that? It looks like it has an
12  account number of some sort of designation of 6000. Do
13  you agree with that?
14     A.  Excuse me. This is 626,000.
15     Q.  Yes.
16     A.  Then, why you say --
17     Q.  I'm sorry. I was referring to the wrong
18  numbers. You are absolutely correct. In 2005 do you
19  agree it is 628,000?
20     A.  I must have been.
21     Q.  Do you agree that what is listed on this
22  profit and loss statement, the salary expense was
23  approximately $628,000?
24     MR. NATHANSON: May I see it, Harry.
25     THE WITNESS: The answer to your question is,

---

78

1   it should be. But since I have never done this before,
2   I am not so sure.
3   BY MR. GARBARINO:
4      Q.  Okay. And I am just asking you a fact about
5   what the piece of paper or the profit and loss --
6      A.  It must be correct.
7      Q.  You agree that is what it says?
8      A.  Yes.
9      Q.  That is all I'm trying to get to.
10     A.  I'm sorry.
11     Q.  That is okay. Not a problem.
12     And if you go to Exhibit 4, same profit and
13  loss statement, different year. The salary expense is
14  $982,000. Do you agree with that or at least as it is
15  reported on that profit and loss statement?
16     MR. NATHANSON: Object to the form. That was
17  compound. And is the question that that is what the
18  piece of paper says or that he agrees with it?
19     MR. GARBARINO: That he agrees that this is
20  what the profit and loss statement says.
21     THE WITNESS: I would say yes. The first one
22  was 2005; right?
23  BY MR. GARBARINO:
24     Q.  That is correct.
25     A.  Then --

---

79

1      MR. NATHANSON: The question is, is that what
2   that says.
3      THE WITNESS: Yes.
4   BY MR. GARBARINO:
5      Q.  Can you explain the difference between the
6   salary expense as reported on these profit and loss
7   statements from 2005 to 2006?
8      A.  Okay. As you recall, I hired both managers in
9   2006 and 2007. Lisa and -- what is her name? Cheryl
10  Duggan. And we had -- I saw good potential that -- and
11  I saw the sales are going up. If you look, you confirm
12  that the sales were going up.
13     So in order to guarantee myself and put myself
14  over the head, I saw that is a very good move to hire
15  managers, sales manager. We put in restaurant. We put
16  in seafood buffet, this breakfast. I doubled the number
17  of employees of the restaurant, managers, front desk. I
18  add a lot more expense for employees in 2006 and 2005.
19  Correct. How much more, I can't swear. But a lot
20  more.
21     Q.  Okay. And do you recall how much Lisa and
22  Cheryl were paid?
23     A.  I think maybe combined 75-, 80,000 a year.
24     Q.  Okay.
25     A.  And, also, something that you didn't see.

---

80

1   Maybe you might forget. I have to check. But we might
2   have not calculated one year the employee tax, and one
3   year we would have added it maybe. Maybe, maybe not.
4      And then we have banquet commissions and
5   things that we paid because the sales are going up. So
6   that could be some part of salary because every party
7   takes 15, 20 people to work every function.
8      Q.  But you agree you hired more employees in 2006
9   than you had in 2005?
10     A.  Yes, sir.
11     MR. NATHANSON: Can I go to the men's room?
12     MR. GARBARINO: You bet you.
13     MR. NATHANSON: Thanks.
14     (Recess.)
15  BY MR. GARBARINO:
16     Q.  On the financial statements for 2005, do you
17  understand that those are for the entire year in 2005,
18  meaning 12 months? Or do the financial statements only
19  reflect the amount of time that you owned and controlled
20  the property in 2005?
21     A.  To be honest with you, I had that same
22  question myself. You might not believe, but I had no
23  way of checking because a lot of people are gone. And
24  not too many people return my call.
25     And they are employed again or not -- people

81

1    are friendly to ask this or that. It just was a strange
2    thing to miss three months. Or maybe I used the other
3    owner's figures. It might have been.
4        Q.  But as you sit here today, you don't recall?
5        A.  I said I don't recall. That is exactly
6    right. But I know my own pattern of thinking. So maybe
7    I might have done that.
8        Q.  I'm going to ask you another quick question
9    here. On Exhibit No. 2 or that I have marked Exhibit
10   No. 2, this is a document that we received from you.
11            (Plaintiff's Exhibit 2 marked.)
12   BY MR. GARBARINO:
13       Q.  Do you know what this document is?
14       A.  Can I explain.
15       Q.  Can you just tell me what it is.
16       A.  No. From -- 2004? Is that 2004? I gave you
17   this?
18       Q.  That is correct.
19       A.  Oh, 2004 to 2005, 2006. Yes.
20       Q.  It looks like it only gives us data through
21   2006. Do you know if you have this report updated
22   through the time that you sold the property or the
23   hotel? Excuse me.
24       A.  No. I tell you why. Because the people who
25   bought was a college. Nobody wanted to buy it as a

82

1    hotel.
2        Q.  But my question is, do you have this schedule
3    updated?
4        A.  No.
5        Q.  Through any time beyond?
6        A.  No.
7        Q.  The last date on here which is, I want to say,
8    the last --
9        A.  That is it. 2008. 2006, actually.
10       Q.  The actual date of the figures is 2005.
11       A.  But what about this 2006.
12       Q.  Oh, excuse me.
13       A.  2006 and 2007.
14       Q.  It looks like the last date is January 31st,
15   2007.
16       A.  '7.
17       Q.  Do you have this updated beyond January 31st
18   of 2007?
19       A.  I have no idea. Honest.
20       Q.  Did you use this report?
21       A.  I mainly use it for selling the place.
22       Q.  Okay. And so the monthly -- where it says RM
23   revenue, is it fair to assume that is room revenue?
24       A.  Room revenue. That is it.
25       Q.  But you don't know if you had this updated?

83

1        A.  No.
2        Q.  If you do have it, can you disclose it to your
3    attorneys?
4        A.  I have to go through files again and find the
5    rest. You are interested in 2007 sales figures?
6        Q.  To be honest, I would just like to see that
7    report updated through the time that you sold the
8    hotel.
9        A.  I don't know the same software and stuff. But
10   you need room revenues, catering, and salaries charges
11   pretty much?
12       Q.  If you have that information available to you
13   and it has not already been disclosed to us through the
14   accountants.
15       A.  I think it is in the accountant's possession.
16   I'm 99 percent sure. Actually, it is. I gave him.
17       Q.  Do the general managers report to you?
18       A.  When they want to, yes.
19       Q.  How often would they report to you?
20       A.  I was there daily basis. So I had many
21   different contacts.
22       Q.  At the time you owned the hotel, did you
23   live -- where did you live?
24       A.  I lived in Brentwood.
25       Q.  In Brentwood?

84

1        A.  Brentwood is near Beverly Hills.
2        Q.  How far away from the hotel did you live?
3        A.  One hour and five minute drive going, one hour
4    and five minute coming.
5        Q.  And how many days a week would you go out to
6    the hotel?
7        A.  At least five.
8        Q.  And how much time would you spend out there at
9    the hotel when you were there?
10       A.  Seven, eight hours, ten hours, two hours.
11       Q.  Did you ever take any training from Best
12   Western or participate in any training that Best Western
13   offered?
14       A.  Yes.
15       Q.  What training was that?
16       A.  Their mandatory meeting they have. Before you
17   purchase the business, they put you through owner
18   training. And Kevin then through management training.
19           And I might -- can I add something.
20       Q.  I will ask you a question.
21           MR. NATHANSON: Just answer the question.
22   BY MR. GARBARINO:
23       Q.  We talked a little bit about this lease, the
24   ground lease on the banquet center. How was the yearly
25   lease payment calculated?

85

```
 1        A.  It was monthly.  About $3,000 a month.  Pretty
 2   much fixed.
 3        Q.  The entire banquet center lease was $3,000 a
 4   month?
 5        A.  Yes.  That was a great lease.
 6        Q.  And was it dependent anything on revenue?
 7        A.  No.
 8        Q.  It was a flat $3,000 a month payment?
 9        A.  3,100.  They had every year or two just a
10   touch of increase.
11        Q.  Do you have a statement of occupancy prepared
12   for the hotel, or did you have a statement of occupancy
13   prepared for the hotel?
14        A.  What do you mean by that?
15        Q.  A statement showing a percentage of occupancy
16   during any specific period of time -- daily, monthly,
17   yearly.
18        A.  Yes.
19        Q.  Could you disclose that to us if you do have
20   it.
21        MR. NATHANSON:  Where is it, Harry.
22        THE WITNESS:  This is -- that shows pretty
23   much occupancy too.  But you can get that from me
24   actually.  But let me see.  I have to --
25   BY MR. GARBARINO:
```

86

```
 1        Q.  If you find it, can you disclose that to us as
 2   well.
 3        MR. NATHANSON:  Yes.
 4   BY MR. GARBARINO:
 5        Q.  Okay.
 6        A.  Daily or monthly occupancy.
 7        Q.  Whatever you have.
 8        A.  Go ahead, please.
 9        Q.  Do you have any statement that reflects the
10   rates that were being charged during your ownership of
11   the hotel?
12        A.  I can tell you.
13        Q.  Okay.
14        A.  2005 we were charging average about $70 a
15   person per night.
16        Q.  Uh-huh.
17        A.  2006 we were charging average of $75.  And
18   2007 an average of 85 to $90.
19        Q.  Okay.
20        A.  And that is pretty much it.
21        Q.  Now, Mitch performed a number of inspections
22   at the hotel; correct?
23        A.  Correct.
24        Q.  Were you present for any of those
25   inspections?
```

87

```
 1        A.  At least maybe five or six.
 2        Q.  Five or six inspections.  Do you remember
 3   which ones you were present for?
 4        A.  No.  I was there for -- the last one I was
 5   there, the last one that he ever showed up.  And they
 6   switched him to another territory.
 7        Q.  So let's back up for just a second.  You were
 8   present for --
 9        A.  That I know for sure.
10        Q.  -- the last two inspections?
11        A.  The last inspection that he did on my
12   property.
13        Q.  You were there for the October 25th, 2007
14   inspection?
15        A.  If that is the time that was the last one
16   before the lady comes.
17        Q.  Did you disagree with any of the items that he
18   noted in that inspection report?
19        A.  Pretty much.
20        Q.  Let's go through them and tell me what you
21   disagreed with.
22        A.  Okay.
23        Q.  And let's go through.
24        MR. NATHANSON:  He is going to ask you the
25   questions.
```

88

```
 1        THE WITNESS:  Okay.
 2   BY MR. GARBARINO:
 3        Q.  It is going to be Exhibit 10.
 4        MR. NATHANSON:  Can we go outside.
 5        THE WITNESS:  10 seconds.
 6   BY MR. GARBARINO:
 7        Q.  Do you want to take a minute to review that?
 8        A.  No.  I need to consult with him 10 seconds and
 9   then come back.
10        MR. GARBARINO:  Let's go off the record.
11        (Recess.)
12        MR. GARBARINO:  Back on the record.
13        MR. NATHANSON:  Can you repeat the question,
14   please.
15   BY MR. GARBARINO:
16        Q.  I have Exhibit 10 sitting before you.  Do you
17   agree that that is the inspection report dated October
18   25th of 2007?
19        A.  Correct.
20        Q.  And you believe you were present for this
21   inspection?
22        A.  Definitely.
23        Q.  And the inspector was Mitch?
24        A.  Correct.
25        Q.  Turn to the next page.  And I'm going to refer
```

89

1  to the Bates numbers at the bottom. We will start with
2  BW when I am referring to a page number. And we are
3  looking at BW0173.
4      A. Correct.
5      Q. It has a heading there stating "names of
6  participants and position titles." And it names
7  Christina, the manager. And Lina, the head
8  housekeeper. Do you agree with that?
9      A. I know I talked to him at the end before he
10  leaves.
11      Q. So you weren't present for the entire
12  inspection.
13      A. That could be correct.
14      Q. Do you remember actually going to any rooms
15  with him?
16      A. No. I have foot problem. So I probably
17  didn't walk all the time, especially when Mitch comes
18  in.
19      Q. Okay. So the extent of your contact with
20  Mitch during this inspection was possibly talking to him
21  briefly after the inspection?
22      A. Correct. I make the correction.
23      Q. So with respect to any particular point
24  deduction Mitch deducted off, how do you have a basis to
25  challenge that point deduction?

90

1      A. Okay. The only thing I have to say, from day
2  one, whenever Mitch came in, he came out as a friend and
3  was the nicest guy in the world. And he was friendly
4  enough. And he was there all the time. I thought, not
5  only as an inspector more as a friend and a person who
6  patted me on the shoulder and check up on progress
7  report to see what more have I done.
8          And he in the whole two-and-a-half years,
9  three years not even once he said you are doing a bad
10  job. And then the last time that he was there, and he
11  never showed up. He turned his face around. And I
12  said, Mitch, what are you doing? I'm selling the
13  place. He said that is what it is. And he walked
14  away. And that wasn't him at that time, I'm thinking.
15          And then I called the headquarters and said to
16  talk to Terri. I said, Terri, please don't do this to
17  me. What are you doing? She said. Sorry. The 48
18  hours has passed. I called him two, three days later
19  and said you had only 48 hours to get a reinspection.
20  And I said Terri, you can -- it is out of my hand. What
21  do you mean out of your hands? That is how it works.
22      Q. My question to you was, what basis do you have
23  to object to any particular deduction?
24      A. That is what I'm objecting because he never
25  treat us like that to just take off every little point

91

1  and walk away.
2      Q. But you also heard the testimonies of Lina.
3      A. Correct.
4      Q. Correct?
5      A. No, no. I wasn't here for Lina.
6      Q. And Cheryl; correct?
7      A. Yes.
8      Q. Who testified that every time Mitch was there,
9  if he saw a problem, he deducted a point. Do you
10  disagree with that now?
11      A. Yes.
12      Q. But you weren't with Mitch when he conducted
13  this inspection?
14      A. No. Well, this is how Mitch was doing it. He
15  would forgive and forget some of the things when we were
16  remodeling. He said, I should take a deduction out of
17  this. But he won't take it and, he would go. And he
18  comes back. But then the last time he did not do that.
19      Q. Would you agree that your testimony is
20  inconsistent with that of Cheryl Duggan?
21      A. No, that is not.
22          MR. NATHANSON: Hold on, Harry. Let me
23  object.
24          Object to the form.
25          THE WITNESS: Can I answer now?

92

1  BY MR. GARBARINO:
2      Q. Yes.
3      A. If you would have heard Cheryl Duggan, your
4  answer if you -- if this is correct, she wasn't walking
5  with the guy. Say if that is the number you say is
6  correct, it is correct. But she didn't -- you didn't
7  ask do you have any objection or do you know if it is
8  true or not. That is not what you asked.
9      Q. Okay. We will just rely on the transcript of
10  what I asked and what her answer was.
11      A. Okay. That is fine.
12      Q. So other than what you have stated here today,
13  you have no other basis to objecting to the inspection
14  scores?
15      A. No, because he was a good friend to the last
16  minute.
17      Q. Were you present for the inspection conducted
18  by Cindy Bree?
19      A. I was there that day, yes.
20      Q. Did you go out with her to the rooms?
21      A. I have to explain.
22      Q. Can you just answer my question. Did you go
23  out to the rooms with Cindy Bree that day?
24      A. No. But I was outside with her and outside of
25  the inspection for half of it I was and half of it I

## 93

1  wasn't.
2      Q.  So what basis do you have to object to the
3  points that Cindy Bree deducted on her inspection
4  report?
5      A.  I tell you what objection I have.  First of
6  all, she came out in the middle of winter.  In Palmdale
7  Lancaster -- it might not be as cold as Chicago, but it
8  is just as bad.
9          So when she comes out -- and everybody -- you
10  can ask my personality.  All of my employees respect me
11  for my values.  She comes, she takes off points for not
12  seeing any employees painting or something outside in
13  the cold weather.  Who is going to put their employee in
14  such cold weather to work on something outside?  You put
15  them for inside.
16          So she took off points.  Mitch never did that
17  before.  Then we are in an area that is all industrial.
18      Q.  That is all what?
19      A.  Industrial.  There is a lot of truck drivers.
20  There is a lot of construction people.  And then Cindy
21  Bree comes in after five years that Mitch has never
22  mentioned anything on back of -- back of my hotel there
23  is this three containers that have been there for many
24  years.  Cindy Bree says bad curb appeal.  I'm sorry.
25      Q.  I understand.

## 94

1      A.  It is my English and Parkinson's at the same
2  time.  That was --
3          Then we had some aluminum doors, windows
4  outside of the yard that was -- Mitch never ever
5  mentioned.  She goes and says, these windows have a
6  scratch on them or something is outdated.  It has to be
7  changed.  She takes off points from there.
8          Then she goes in the middle of a storm --
9  first of all, I have an objection -- I forgot this.
10  Mitch would take half an hour to complete his
11  inspection.  They made it look like it is a training
12  camp.  And she brought another guy with her and took six
13  hours inspection of my property.
14          And then one of the things that she picks like
15  this -- I want you to look at me if you please for one
16  second.  On a three, two-story building open doors in
17  the middle of a storm, she goes all the way in the
18  corner of a thing and goes like this.  Dust build up.
19          Who would -- then if you go to Hilton Hotel or
20  the best hotel in the world, you can pick up things.
21  Mitch never did that before.
22          And then I have a garden.  I have all the
23  receipt.  I hired one of the best landscapers in the
24  area with the design which they approved.  And,
25  actually, if you read the design report from the design

## 95

1  lady from their own company, she was so happy with my
2  landscaping.
3          She comes in the middle of winter.  And I have
4  in the whole six acres -- I'm sorry.  In the whole six
5  acre landscaping there is an area of 2-by-10 that has
6  three roses in it.  And she said, oh, these roses are
7  dead.  And you should have bark in here.  This is not my
8  design.  Flowers in here.  You should have bark in
9  here.  Take off points.
10      Q.  Let me -- do you disagree with any --
11      A.  All of these things --
12      Q.  Let me finish my question.  Do you disagree
13  with any description that is contained within the
14  January 31st, 2008 inspection report?
15      A.  Most of them.  Yes.
16      Q.  So you are saying these conditions simply did
17  not exist?
18      A.  I don't say they exist.  Listen, I was not
19  familiar -- okay.  How do you say this?  When you go to
20  Cheesecake Factory -- you take the Cheesecake Factory.
21  You expect it to be the same cheesecake you get all the
22  time.  You don't expect it to be Sarah Lee cheesecake.
23          For 12 years he has been coming there, Mitch,
24  patting me on the shoulder for the last four years.  You
25  are doing fine.  And then they switch somebody.

## 96

1          And listen to this.  They -- first time she
2  told me 48 hours is passed.  I cannot do anything for
3  you.  Then I got the picture.  And I said, they have
4  something in the thing for me.  And I checked around
5  other owners.  And some, I find out that they are doing
6  that on purpose.
7      Q.  Doing what on purpose?
8      A.  Give you failing grade.  Then you are in
9  escrow.
10      Q.  Who told you that?
11      A.  If I can provide you the name.  One of them is
12  this broker.  Brown Hotel broker.  He is willing to come
13  and testify.
14      Q.  Have you listed him as a witness in this case?
15      A.  Well, he said with the expert list -- and I
16  was a little bit too late.  But he will be more than
17  happy to come to Arizona as an expert witness.
18  Actually, no broker in the whole America is better than
19  him.
20      Q.  But you are telling me that he told you the
21  that Best Western did this?
22      A.  Yes.
23      Q.  But you haven't listed him as a potential
24  witness that we may want to depose?
25      A.  You might not believe me, but I honor people's

97

1   integrity and privacy at any cost. I didn't want to
2   jeopardize his business because he has to sell hotels
3   and he. Might have problems with Best Western later to
4   come and testify on my behalf. I have no right to ask
5   him that.
6        But when I asked him that, he said he will be
7   happy to do it. Now, if you want to call him, call him.
8        Q.  Okay. Let's go back to my original question.
9   I'm not sure we got an answer to it yet.
10       A.  Okay.
11       Q.  Do you disagree with the description or the
12   existence of any of the items that Ms. Bree noticed in
13   the January 31st, 2008 inspection report?
14       A.  According to the past, yes.
15       Q.  Okay.
16       A.  Whether they existed or not, to her opinion,
17   no.
18       Q.  Do you have any basis to dispute the existence
19   of the physical conditions noted --
20       A.  Yes.
21       Q.  -- in Cindy Bree's report?
22       A.  Yes.
23       Q.  What basis do you dispute the physical
24   existence of these conditions?
25       A.  Okay. For example, what do you call a 2-by-10

98

1   area of three roses in the middle of winter that is
2   there when it is blooming? Is that a crime?
3        Q.  I'm not trying to get to --
4        A.  No, no. I understand. I'm just nervous.
5        Q.  Let me finish my question.
6             I'm not trying to get to your opinion whether
7   it was right or wrong. I'm simply asking you whether,
8   as she has described in the inspection report, whether
9   those conditions actually existed.
10       A.  Yes.
11       Q.  Are there any conditions in the inspection
12   report that you dispute as actually in existence,
13   putting aside your personal feelings as to whether it
14   was right or wrong, whether the actual condition did not
15   exist?
16       A.  Well, the curb appeal that nobody can -- and
17   the landscaping. Those two are. But everything else
18   could exist without me having heard anything about it
19   before.
20            Everything in the report -- Mitch has been
21   there every single time. And he never picked on it. So
22   how do I know?
23       Q.  Are you telling me that Mitch never picked on
24   anything that is contained in this report?
25       A.  Nothing. No, sir.

99

1        Q.  And if we go back and look at his other
2   inspection reports --
3        A.  Go ahead.
4        Q.  -- you are telling me we won't find?
5        A.  Curb appeal for those --
6        Q.  Excuse me. You just said that everything in
7   this inspection report was new. Is that a fair
8   statement?
9        A.  Not everything. The things that I explained
10   to you.
11       Q.  So you are talking about the roses and the
12   curb appeal issue and the dust build up and the people
13   are not work --
14       A.  I have four people at each time on my property
15   either painting or fixing or everything. How could you
16   just say I didn't see anybody working. It is six-acre
17   land. I guess, how did I get all of this accomplished?
18       Q.  Let's go -- one of the ones you complained
19   about is dust in the corner.
20       A.  Yes.
21       Q.  Can you show me in this report where Cindy
22   Bree noted that there was dust in the corner?
23       A.  From my understanding from Lina, you should
24   have asked that from Lina, but it is never too late.
25            MR. NATHANSON:  Do you know, Harry?

100

1            THE WITNESS:  Yes. They told me that she went
2   all the way in the corner. That even the broom or
3   anything cannot get there. And put her hand in the
4   corner and said dust build up.
5   BY MR. GARBARINO:
6        Q.  But my question to you is where in this
7   inspection report --
8        A.  Hallway, one of the hallway, two-story hallway
9   or -- two-story hallway.
10       Q.  Okay. So what you are referring to -- and if
11   you will look at the report, I can't find a number on
12   it.
13       A.  It doesn't matter. Just read it.
14       Q.  It says under the heading corridors, building
15   three carpet has dust build up in the corners of hall.
16   Is that what you are referring to?
17       A.  That is what I was referring to.
18       Q.  And that was a five point deduction; correct?
19       A.  Correct.
20       Q.  So we have five points for one of the items
21   you just viewed; correct? Is that fair to say?
22       A.  On that item, yes.
23       Q.  And the other item was the bare landscaping;
24   is that correct?
25       A.  Correct.

101

1    Q.  And that is on that same page.  Areas of bare
2    dirt, planted areas have dead plants, lawn has bare
3    areas missing grass, some planters are empty, satellite
4    dish on lawn is rusted.  Is that correct?
5         MR. NATHANSON:  Is what correct?  Object to
6    form.
7         THE WITNESS:  That is all of it -- all of it,
8    whether it is true or not, has been overlooked by
9    Mitch.  And he said it was okay
10   BY MR. GARBARINO:
11       Q.  But would you agree that statement is in the
12   report?
13           And I appreciate it if you would just take a
14   look at the report.
15       A.  I am a very slow reader.  Okay.  What page is
16   that, sir?
17       Q.  It says page -- let's see here.  Keep going?
18       A.  It is all page 1.
19       Q.  Which exhibit are you looking at?  Let me see
20   if I can find the page for you.
21       A.  I appreciate that.
22       MR. NATHANSON:  How are you feeling?
23       THE WITNESS:  I'm all right.
24   BY MR. GARBARINO:
25       Q.  Oh, part of the problem is we had the wrong

102

1    exhibit.  Okay.  First, let's just authenticate the
2    exhibit real quick.  You agree that is the inspection
3    report for January 31st, 2008?
4        A.  Okay.
5        Q.  And if we flip back a couple of pages, almost
6    two or three fourths of the way down, there is a heading
7    called landscaping, fencing.  Do you see that?
8        A.  Yes, sir.
9        Q.  Okay.  Do you agree that that states, "areas
10   of bare dirt, planted areas have dead plants, lawn has
11   bare areas missing grass, some planters are empty,
12   satellite dish on lawn is rusted"?
13           Did I read that correctly?
14       A.  Completely wrong.  Yes, not true.
15       Q.  But did I read that correctly?
16       A.  Yes, sir.
17       Q.  And the point deduction is 20 points; correct?
18       A.  Yes.
19       Q.  And what was the third thing that you disagree
20   with?  We have the dust in the corner.  We have the
21   landscaping issue.
22       A.  Elevator lifts interior or exterior
23   maintenance.
24       Q.  But hadn't Mitch noted that on numerous
25   occasions before?

103

1        A.  Yes.  But let me tell you.  He never -- has he
2    taken points off of that?  Can you look.
3        Q.  I'm not going to testify to that.  But you are
4    free to go through the reports and find it yourself.
5        A.  Okay.  I'm sorry.
6        Q.  That is okay.  So what other matter did you
7    disagree with on this report?
8        A.  What is this?  All doors, trims and thresholds
9    in public areas have scratching, peeling.  That is
10   nonsense.
11       Q.  So but you don't disagree that the physical
12   conditions described here existed; correct?
13       A.  Of course I disagree.  You can -- you see, I
14   have to explain this to you.
15       Q.  But the question is real simple.
16       A.  No.  It is not real simple.  I understand you
17   are maybe frustrated.  But I'm -- you see, when you --
18       Q.  Let's put it this way.  Do you agree that
19   there are two distinctions?  There is, one, whether the
20   physical condition existed; and, two, whether you agree
21   you should be deducted or points should be deducted for
22   that physical condition?  Do you agree with those two
23   areas?
24       A.  Yes.
25       Q.  And do you agree that I'm asking you simply

104

1    whether the physical condition itself existed?
2        A.  Yes.
3        Q.  Do you disagree that this physical condition
4    existed?
5        A.  No.
6        Q.  Do you disagree that the lobby sofa had torn
7    fabric?
8        A.  Somebody put a knife through it.  And it was a
9    $2,000 chair that I just ordered.  So I can't be
10   responsible for somebody sitting down in the lobby and
11   tearing up my thing.  It was a fresh cut.
12       Q.  You talked earlier about there being some
13   paint that you don't believe --
14       A.  Can we do something, please.  If you want to
15   do it that way, we have to go through from A to Z
16   because I don't know exactly what points that I have to
17   object to to be honest with you.  But go ahead.  Some
18   windows were taken off because they were too old in the
19   yard.  Can you find that?
20       Q.  Some windows were taken off because they were
21   too old in the yard?
22       A.  Yes.
23       Q.  What do you mean?
24       A.  We had aluminum doors.  She said it doesn't
25   look good.

## 105

1   Q.   That would be under doors, frames, and
2   hardware where it says, all doors, trim and threshold in
3   public areas have scratching, peeling paint?
4       A.   Maybe.
5       Q.   And you agree she deducted 20 points for that
6   one as well?
7       A.   Definitely not.
8       Q.   But you agree that she deducted 20 points for
9   it?  You may not agree to the deduction; right?
10          MR. NATHANSON:  Object to the form.  We got to
11  be clear.  I know what you are driving at, Dave.  But
12  no --
13          THE WITNESS:  Okay.  If the aluminum door is
14  30 years old, would you agree that it would have some
15  scratches on it outside of the cold, that cold -- I
16  mean, do you catch cold if you sleep nude for one month
17  in Chicago weather in the winter?  Yes.  If you say no,
18  then the answer is --
19          MR. NATHANSON:  I'm not sure where we are at,
20  Dave.
21          MR. GARBARINO:  I'm not sure either.  Can we
22  just go off the record for a minute.
23          (Recess.)
24  BY MR. GARBARINO:
25      Q.   Okay.  Let's start on BW0431.

## 106

1       A.   Okay.
2       Q.   Actually --
3       A.   The next page.
4       Q.   -- the previous page, 430.  The first
5   deduction was for visible patch on ceiling.  Do you
6   disagree that this condition existed?
7       A.   What is the English word for it?  It is like
8   optional.  I mean, one worker would say I fixed it.  One
9   worker would say it shows.
10      Q.   But my question is fairly straightforward.  Do
11  you disagree that this condition existed?
12      A.   Yes.
13      Q.   You have reason to dispute the existence of
14  this condition?
15      A.   How can I be fair?  Yes.
16          MR. NATHANSON:  Just answer the question.
17          THE WITNESS:  Yes, it did.
18  BY MR. GARBARINO:
19      Q.   Yes, it did exist?
20      A.   Yes.
21      Q.   Let's go to the next point deduction.
22  Scratches and damage to surface of furniture in 388.  Do
23  you disagree with the description?
24      A.   No.
25      Q.   The next one A/C grill vent dusty.  Do you

## 107

1   disagree with the existence of that condition?
2       A.   Maybe.
3       Q.   What is your basis for disagreeing with that?
4       A.   Okay.  Because we have like -- Cheryl put a
5   system that every three months or two months somebody
6   goes and clean all of those.  I don't know whether the
7   lady came at like a month and a half afterward or two
8   days after.
9       Q.   Okay.  But do you have reason to disagree --
10      A.   No.  I have no reason to disagree.
11      Q.   And to be clear, you have no reason to
12  disagree with the existence of A/C grill vent dusty on
13  the date that the inspection was performed?
14      A.   No.  They took a picture.
15      Q.   And the same with top of A/C scratched in 180,
16  do you have any disagreement with the existence of that
17  condition on the date the inspection was performed?
18      A.   No.
19      Q.   Next page hairdryer vent has lint build up on
20  it, 388.  Do you have any reason to disagree with the
21  existence of that condition?
22      A.   No.
23      Q.   Tub chrome tarnished, 180, 388.  Do you have
24  any reason to disagree with the existence of that
25  condition?

## 108

1       A.   No.
2       Q.   Exhaust fan dusty, 105, 134.  Do you have any
3   reason to disagree with the existence of that
4   condition?
5       A.   No.
6       Q.   Mirror desilvered, 105.  Do you have any
7   reason to disagree with the existence of that
8   condition?
9       A.   Maybe.
10      Q.   What is your basis for disagreement?
11      A.   I mean, it doesn't make sense.  Mirror
12  desilvered, what does that mean?  Can you show me the
13  picture.
14      Q.   I will try to find it.  Let's keep moving
15  here.
16          The next one is toilet bowl has hard water
17  build up, 258.  Do you have any disagreement with that
18  condition?
19      A.   No.
20      Q.   Next one, "part of plastic holder glued to
21  tilew in tub, 258."
22          Do want to see a picture of that one?
23      A.   No, I don't want to see it, but I want to
24  explain something.  When the first time -- the last time
25  that Mitch was there, I called.  And I said that

109

1    inspection was not fair to send somebody else to
2    reinspect.
3         Terri Wininger herself told me that 48 hours
4    has passed. And she cannot send somebody else. And I
5    turned around and told her then -- I was up to what she
6    is trying to do. And I told her then I will do it the
7    next time. I remember for next time.
8         The next time the minute she left, I called.
9    And you know what they told me. They say we are not
10   coming back unless you pay a few thousand dollars and
11   request. And then the only -- we only come to look at
12   our pictures to prove that we were right.
13        Then why didn't she tell me that before the
14   last time talking. So now I object to every single
15   thing that she took off because Mitch never did that to
16   us. Now the pictures might say something. But I
17   disagree the way they did the business.
18        Now, if you want to get angry, go ahead.
19   Q.  No. I'm not going to get angry with you.
20   Your testimony is what it is.
21   A.  It is the truth. Why didn't she tell me that
22   we are not coming for an inspection. Why did they
23   charge me money.
24   Q.  Let's back up a second. Are you indicating
25   that you didn't have notice of inspection?

110

1    A.  I had the notice of inspection. She came out,
2    but I called her and said to come back again. She said,
3    we are not coming back. You have to pay money. You
4    have to do this. And if we come out -- they are going
5    to try to discourage me. If we come out, we are only
6    going to come out and check the pictures that we took to
7    prove we are right.
8         I said, thank you for charging me money.
9    Q.  There was a point in 2007 when you were
10   interested in closing down part of the hotel; is that
11   correct?
12   A.  Yes.
13   Q.  Okay. Can you tell me a little bit about
14   that?
15   A.  Yes. Again, I have to explain. Like, how I
16   told you before, I thought I had a genius plan. And it
17   would have worked if they would have let me. I had an
18   idea because I was getting certain reservation from Best
19   Western. And I had my own customer.
20        One side of the hotel was 100 rooms. And the
21   other side was 48 rooms, plus convention center. I said
22   to myself, if I sell the 100 unit, the occupancy would
23   go higher. And it will sell faster at the lower price.
24   And I can keep the convention center with 48 rooms for
25   $3,000 a month.

111

1         And I can sell them separately for 5, $6
2    million each and make tons of money. And they destroyed
3    my plan to. They played game with me.
4    Q.  They wouldn't let you separate the hotel?
5    A.  They say, oh, it is a good idea, and left.
6    Q.  Did they tell you you couldn't do it?
7    A.  No. They told me I can't do.
8    Q.  Do you have any written documentation
9    saying --
10   A.  Ask Terri.
11   Q.  Okay. I'm asking you, do you have any written
12   documentation where they specifically denied --
13   A.  I shake too much. I don't type. I get -- for
14   every single documentation, I have to get somebody to
15   type for me.
16   Q.  I understand that. But you are telling me the
17   that Best Western told you, you couldn't do it?
18   A.  Correct.
19   Q.  Do you have that in writing from Best
20   Western?
21   A.  I might have in some files if I get lucky.
22   Q.  Is there any way we can get a copy of the
23   actual purchase agreement between you and the party that
24   eventually did purchase the hotel?
25   A.  I think I brought it.

112

1    Q.  So we will get that disclosed to us?
2         MR. NATHANSON:  Yes, sir. Is it here in the
3    room, Harry?
4         THE WITNESS:  I hope so.
5         MR. NATHANSON:  Why don't you look for it
6    while I walk out for a minute.
7         (Recess.)
8         MR. GARBARINO:  Back on the record.
9    Q.  Are you able to testify as to how much you are
10   seeking to recover from Best Western?
11   A.  Well, I can prepare myself. Yes.
12   Q.  But as you sit here today, do you know how
13   much you are seeking to recover from Best Western?
14   A.  Should I answer that?
15        MR. NATHANSON:  If you can answer it yourself
16   as a nonexpert --
17        THE WITNESS:  No.
18        MR. NATHANSON:  -- then answer it.
19        THE WITNESS:  Honestly, no.
20        MR. NATHANSON:  Okay.
21        THE WITNESS:  As much as I can
22   BY MR. GARBARINO:
23   Q.  Can you explain to me what the measure of the
24   amount is you are seeking to recover from Best Western?
25   A.  I will tell you -- can I answer you in a

---

113

1  phrase, please.
2    Q.  Absolutely.
3    A.  My taxes for the last 10 years showed I made
4  20 percent return every year on my money.  I could have
5  made that $2 million to $20 million by now.  But I lost
6  everything.  So who can put a price-tag on that.
7    MR. NATHANSON:  Your expert.
8  BY MR. GARBARINO:
9    Q.  Okay.  As you sit here today, you can't tell
10  me today what the measure of your damages are that you
11  seek to recover from Best Western?
12    A.  No.
13    Q.  And it is my understanding that the damages
14  you are going to seek to recover from Best Western, the
15  only evidence that you are going to offer is your
16  expert's testimony; correct?
17    MR. NATHANSON:  Object to the form because the
18  expert relies on documents.
19    THE WITNESS:  I would answer it like this.  If
20  you allow for me to bring the broker that has 40 years'
21  experience, if you allow other witnesses or other names
22  of hotel owners, I can try to get them.  If not, your
23  answer is correct.
24  BY MR. GARBARINO:
25    Q.  Do you know who prepared Lina Eseltine's

---

114

1  declaration?
2    A.  Yes.
3    Q.  Who prepared that?
4    A.  Well, if you recall, at that time I did not
5  have any counsel.
6    Q.  Okay.  Can you just tell me the name of the
7  person who prepared the declaration.
8    A.  I don't remember.
9    Q.  Was there anybody to your recollection at the
10  hotel that could read English and translate it into
11  Spanish?
12    A.  That is what I was trying to tell you.  Yes.
13    Q.  Was there somebody at the hotel that could do
14  that?
15    A.  Yes.
16    Q.  Who was that?
17    A.  We have numerous -- I think I asked the lady
18  named Rosa, our banquet manager, banquet head server.
19  I'm not sure.
20    Q.  Were you present when Rosa translated Lina's
21  declaration from the written English to Spanish for
22  her?
23    A.  Can I explain?
24    Q.  Were you present?
25    MR. NATHANSON:  Can you answer?

---

115

1    THE WITNESS:  Yes.
2  BY MR. GARBARINO:
3    Q.  You were present?
4    A.  I wasn't there, no.
5    Q.  You were not there?
6    A.  No.
7    Q.  In your disclosure statement, you noted
8  somebody by the last name of Blank.  Who is that person,
9  and what are they?
10    A.  That is a big blank on my head.  I don't
11  know.
12    Q.  Okay.  We will talk to you about it in a
13  minute --
14    A.  Okay.
15    Q.  -- off the record.
16    When you attended the board meeting in Phoenix
17  where your membership was discussed, did anybody attend
18  that with you?
19    A.  I don't think if they let anybody -- I took
20  somebody with me.  I think my wife.  They did not let
21  anybody in with me.
22    Q.  Who did you take with you?
23    A.  I think maybe my -- if I tell you, I don't
24  remember.  I think I took my wife because she doesn't
25  let me drive.

---

116

1    Q.  Can you tell me what happened during the
2  meeting.
3    A.  Yes.  I have to act.  Okay.  There is a big
4  guy standing at the door.  There is a security guard,
5  but he doesn't tell you because, apparently, they have
6  too many people trying to kill them or something.  He
7  opens the door.  He touches you.  He does, come on in.
8  Have a sit.  He sits you.  And he stands right behind
9  you.
10    And the people ask you questions.  90 percent
11  of the questions they ask was how much your hotel is
12  worth?  You want to sell it?  Or you don't want to sell
13  it?  They were trying to get information out of me to
14  see if they have a buyer if they can put me down so
15  somebody buys it cheap if you are asking me.
16    I told them in that meeting I have money.  I
17  do anything that is necessary to fix the place.  I kiss
18  your foot.  I do anything.  Please don't take my
19  livelihood away.  I am sick the minute I said I am sick,
20  I guess they saw the ring.  And they put the knife
21  through my back.
22    And they said, thank you very much.  Have a
23  nice day.  We let you know.  And I got this letter from
24  Terri saying as of immediately we are taking everything
25  out.  And you are done and finished.

---

117

1    Q.  How long did the meeting last?

2    A.  15 minutes max.

3    Q.  Do you recall who on the board asked you

4    questions?

5    A.  A couple of ladies and a guy.

6    Q.  You don't remember the names?

7    A.  No.

8    Q.  Do you remember any specific question they

9    asked you?

10    A.  Yeah.  How many rooms have your hotel?  How

11    much do you want to sell it?  How much your bottom line

12    is?  All of the questions that the buyer would ask to

13    buy a place, not to find out how much you think it would

14    cost you to finish the remodeling.

15        I said 2-, $300,000.  And they said, no.  We

16    think it is more than $1 million.  I said, whatever it

17    takes, I have the money.  I spend it.  What do you

18    care?  I will do it right away.  Have a nice day.  And

19    they should have a transcript of that.

20    Q.  And did you present anything to the board?

21    A.  Well, I present -- I don't remember.  I took

22    some document.  And I said whatever is missing from

23    whatever you want, I get it done in less than a couple

24    of months.  And give me six months everything will be

25    perfectly done.

---

118

1    Q.  Is Exhibit 18 a letter that you wrote to the

2    board to support your presentation to the board?

3        I think it is actually Exhibit 17.

4        (Plaintiff's Exhibit 17 marked.)

5    BY MR. GARBARINO:

6    Q.  Is that the letter you presented to the

7    board?

8    A.  Yes.

9    Q.  I'm just going to paraphrase.  It says in here

10    that you were short staffed at one point in time.  Do

11    you recall that?

12    A.  Yes.

13    Q.  Can you explain why you were short staffed.

14    A.  Yes.  Alfonso's father, I think, was extremely

15    sick.  And he had to leave for two weeks to Mexico.  And

16    at the same time somebody else -- I can find out from

17    Kevin.  Kevin remembers pretty good these things.

18    Somebody else was sick.

19        So I was short staffed for getting some

20    repairs done.  And that was the only time in four years

21    that I never neglected it.  Maybe fell behind.  I didn't

22    even think I fell behind.  But I fell behind of my own

23    speed actually.

24        But I had no choice.  I can't tell somebody

25    your father is sick, not to go see him.  And I think

---

119

1    somebody's mother died.  Oh, the lady who worked in the

2    laundry room mother died, I think.

3    Q.  Do you remember what her name was?

4    A.  Lina remembers for sure.  I can ask her.  And

5    I explained that to them.  I had a full time painter on

6    the job from day one to the last minute.  I had two -- I

7    had almost four people on and off constantly on the

8    property.

9    Q.  Okay.  Let me just ask this last series of

10    questions.  And I will let you go until next time.

11        After Best Western terminated your membership,

12    did you do anything to attempt to rebrand the hotel?

13    A.  No.

14    Q.  Can you tell me why you didn't try to get a

15    new brand.

16    A.  Because I had asked a lot of people a lot of

17    questions.  And we reached the conclusion that, if you

18    have a good website which I spent $17,000, which I

19    didn't send it in our report to the whatchamacallit, the

20    accountant.  I made a new website.  I made new

21    pictures.  I made a name, new logos, new -- I spent more

22    than 50- to $100,000 in advertisement to promote our own

23    name because everybody knows Antelope Valley, and nobody

24    knows Best Western or other thing.  I mean, they know

25    from the distance.

---

120

1        But I figured AV Inn is very famous in

2    Palmdale Lancaster.  So we reached the business

3    conclusion that that would be a waste of money.

4    Q.  And how much did you spend on the website?

5    A.  I think 17- to 20,000 on a new website.

6    Q.  And you spent, also, in addition to renaming

7    the hotel or not --

8    A.  Renaming --

9    Q.  How much additional did you spend?

10    A.  I don't keep track of my expenses that much.

11    But I'm sure it was over $50,000 because we had to sign

12    up with another company.  Two weeks ago I was served

13    with a lawsuit for $140,000 from Lodgenet, who provides

14    the TV service for the room, because -- okay.

15    Q.  Do you have receipts for the amount you spent

16    in trying to --

17    A.  Quick Books.  The checks are in Quick Books.

18    And if you have to, you can get from the bank.  For

19    eternity they have copies of the checks.

20        MR. NATHANSON:  Can we call it quits,

21    Counsel.

22        MR. GARBARINO:  Sure.

23        MR. NATHANSON:  Thank you.

24        You want to say on the record we are resuming

25    Friday morning.

## 121

1    We are resuming pursuant to agreement of
2  counsel.
3    And you have agreed to come go Phoenix;
4  right?
5    THE WITNESS:  Correct.
6    MR. GARBARINO:  Okay.  Fair enough.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 122

1    Penalty of Perjury
2
3    I, HOOSHANG HAROONI, do hereby declare under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition; that I have made such
6  corrections as noted herein, in ink, initialed by me, or
7  attached hereto, that my testimony as contained herein,
8  as corrected, is true and correct.
9    EXECUTED this _____ day of _____,
10
11  _____, at _____, _____.
12       (City)       (State)
13
14  _____
15    HOOSHANG HAROONI
16
17
18
19
20
21
22
23
24
25

## 123

1    I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby certify:
3    That the foregoing proceedings were taken
4  before me at the time and place herein set forth; that
5  any witnesses in the foregoing proceedings, prior to
6  testifying, were placed under oath; that a verbatim
7  record of the proceedings was made by me using machine
8  shorthand which was thereafter transcribed under my
9  direction; further, that the foregoing is an accurate
10  transcription thereof.
11    I further certify that I am neither
12  financially interested in the action nor a relative or
13  employee of any attorney of any of the parties.
14    IN WITNESS WHEREOF, I have this date
15  subscribed my name.
16
17  Dated: December 24, 2009
18
19
20
21
22    MARYAM T. SALAHUD-DIN
23    CSR No. 9669
24
25

## 124

1    DEPOSITION ERRATA SHEET
2  RE: Esquire Deposition Solutions
3  File No. 40605  Assignment No 283281
4  Case Caption: BEST WESTERN INTERNATIONAL, INC.
5  vs. AV INN ASSOCIATES 1, LLC, ET AL.
6  Deponent:  HOOSHANG HAROONI
7  Deposition Date: December 4, 2009
8  To the Reporter:
9  I have read the entire transcript of my Deposition taken
10  in the captioned matter or the same has been read to me.
11  I request that the following changes be entered upon the
12  record for the reasons indicated.  I have signed my name to
13  the Errata Sheet and the appropriate Certificate and authorize
14  you to attach both to the original transcript.
15
16  Page No._____Line No._____Change to:_____
17  _____
18  Reason for change:_____
19  Page No._____Line No._____Change to:_____
20  _____
21  Reason for change:_____
22  Page No _____Line No._____Change to:_____
23  _____
24  Reason for change:_____
25

125

1    Deposition of HOOSHANG HAROONI

2    Page No. _____ Line No. _____ Change to: _____

3    _____

4    Reason for change: _____

5    Page No. _____ Line No. _____ Change to: _____

6    _____

7    Reason for change: _____

8    Page No. _____ Line No. _____ Change to: _____

9    _____

10   Reason for change: _____

11   Page No. _____ Line No. _____ Change to: _____

12   _____

13   Reason for change: _____

14   Page No. _____ Line No. _____ Change to: _____

15   _____

16   Reason for change: _____

17   Page No. _____ Line No. _____ Change to: _____

18   _____

19   Reason for change: _____

20   Page No. _____ Line No. _____ Change to: _____

21   _____

22   Reason for change: _____

23

24   SIGNATURE: _____ DATE: _____

25        HOOSHANG HAROONI