## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL, )
INC., an Arizona non-profit )
corporation, )
        )
        Plaintiff, )
        )
vs. ) No. CIV08-02274-PHX-DGC
        )
AV INN ASSOCIATES 1, LLC, a )
California limited liability )
company; HOOSHANG HAROONI, )
        )
        Defendants. )

DEPOSITION OF HOOSHANG HAROONI
(Volume II)

Phoenix, Arizona
December 11, 2009
10:30 a.m.

PREPARED FOR:
MS. KIRA A. SCHLESINGER
ATTORNEY AT LAW
(COPY)

Reported by:
HALEY WESTRA, RPR
Arizona CCR No. 50762

## Page 2

1   DEPOSITION OF HOOSHANG HAROONI,
2 VOLUME II, taken on December 11, 2009, commencing at
3 11:22 a.m. (sic), at the law offices of SHERMAN &
4 HOWARD, L.L.C., 2800 North Central Avenue, Phoenix,
5 Arizona, before HALEY WESTRA, a Certified Reporter in
6 the State of Arizona.
7
8 COUNSEL APPEARING:
9     SHERMAN & HOWARD, L.L.C.
      BY: Mr. David W. Garbarino
10    2800 North Central Avenue
      Phoenix, Arizona 85004-1043
11    Attorneys for Plaintiff
12    THE NATHANSON LAW FIRM
      BY: Mr. Phillip J. Nathanson
13    8765 East Bell Road, Suite 101
      Scottsdale, Arizona 85260
14    Attorneys for Defendants
15    THE NATHANSON LAW FIRM
      BY: Ms. Kira A. Schlesinger
16    8765 East Bell Road, Suite 101
      Scottsdale, Arizona 85260
17    Attorneys for Defendants
18
   ALSO PRESENT:
19
      Ms. Lisa Mikhailova
20    Ms. Dorian Lefre
21
22
23
24
25

## Page 3

INDEX

| WITNESS | PAGE |
|---|---|
| HOOSHANG HAROONI | |
| EXAMINATION BY MR. GARBARINO | 6 |
| EXAMINATION BY MR. NATHANSON | 32 |
| FURTHER EXAMINATION BY MR. GARBARINO | 50 |
| FURTHER EXAMINATION BY MS. SCHLESINGER | 63 |

* * *

EXHIBITS

| EXHIBITS DESCRIPTION | MARKED |
|---|---|
| No. 1  Brief Two-Year History for Current Owner | 6 |
| No. 2  Chart with Room Revenue, Catering, and Service Charge | 6 |
| No. 3  Best Western AV Inn Profit & Loss, January through December 2005 | 6 |
| No. 4  Best Western AV Inn Profit & Loss, January through December 2006 | 6 |
| No. 5  Best Western AV Inn Profit & Loss, January through December 2007 | 6 |
| No. 6  Best Western AV Inn Profit & Loss, January through June 2008 | 6 |
| No. 7  Best Western Membership Application and Agreement, Bates Nos. BW0001 to 0020 | 6 |
| (continue) | |

## Page 4

| EXHIBITS DESCRIPTION | MARKED |
|---|---|
| No. 8  Summary Report, North American Quality Assurance Assessment, Bates Nos. BW0022 to 0046 | 6 |
| No. 9  Photographs, 05050, Antelope Valley Inn, dated 5/17/07 | 6 |
| No. 10  Summary Report, North American Quality Assurance Assessment, Bates Nos. BW0172 to 0199 | 6 |
| No. 11  Photographs, 05050, Antelope Valley Inn, dated 10/25/07 | 6 |
| No. 12  Summary Report, North American Quality Assurance Assessment, Bates Nos. BW0427 to 0449 | 6 |
| No. 13  Photographs, 05050, Best Western Antelope Valley Inn, dated 1/31/08 | 6 |
| No. 14  Letter from Mr. Harooni to Mrs. Wininger, dated 12/4/07, Bates Nos. BW0312 to 0316 | 6 |
| No. 15  Letter from Best Western to Mr. Harooni, dated 2/8/08, Bates Nos. BW0452 & 0453 | 6 |
| No. 16  Letter from Best Western to Mr. Harooni, dated 2/26/08, Bates Nos. BW0459 & 0460 | 6 |
| No. 17  Letter from Mr. Harooni to Best Western Chair and Members of the Board, dated 3/21/08, Bates Nos. BW0562 to 0579 | 6 |
| No. 18  Defendants' Answers to Plaintiff's Interrogatories | 6 |
| No. 19  Defendants' Supplemental Answers to Plaintiff's Interrogatories | 6 |
| No. 20  Declaration of Lisa Wilkerson | 6 |
| (continue) | |

Page 5

| | EXHIBITS DESCRIPTION | MARKED |
|---|---|---|
| No. 21 | Declaration of Lenaa Eseltine | 6 |
| No. 22 | Declaration of Cheryl Duggan | 6 |
| No. 23 | E-mail correspondence, dated 7/5/06, Subject: FW: Antelope Valley Inn Best Western | 6 |
| No. 24 | E-mail correspondence, dated 6/20/06 & 6/23/06; Subject: Lockheed Martin Corporation Names New Travel Provider | 6 |
| No. 25 | Summary Report, Best Western North American Quality Assurance, dated 5/26/05 | 6 |
| No. 26 | Letter from Tony Russo to Mr. Harooni, dated 10/31/07, Bates Nos. BW0303 to 0305 | 6 |
| No. 27 | Tax Return for an S Corporation for AV Inn Operations Group, Inc., 2006 | 6 |
| No. 28 | Tax Return for an S Corporation for AV Inn Operations Group, Inc., 2007 | 6 |
| No. 29 | Tax Return for an S Corporation for AV Inn Operations Group, Inc., 2008 | 6 |
| No. 30 | U.S. Return of Partnership Income for AV Inn Associates 1, LLC, 2005 | 6 |
| No. 31 | U.S. Return of Partnership Income for AV Inn Associates 1, LLC, 2006 | 6 |
| No. 32 | U.S. Return of Partnership Income for AV Inn Associates 1, LLC, 2007 | 6 |
| No. 33 | U.S. Return of Partnership Income for AV Inn Associates 1, LLC, 2008 | 6 |
| No. 34 | Tax Return for an S Corporation for AV Inn Operations Group, Inc., 2005 | 6 |

Page 6

1  (Exhibit Nos. 1 through 34 were marked.)
2
3       HOOSHANG HAROONI,
4  a witness herein, having been previously sworn by a
5  Certified Reporter to speak the truth and nothing but
6  the truth, was examined and testified further as
7  follows:
8
9       EXAMINATION
10 BY MR. GARBARINO:
11   Q.  Good morning, Mr. Harooni. How are you doing?
12   A.  Fine. How are you?
13   Q.  Good.
14       You understand that this is a
15 continuation of the deposition that we started last
16 Friday?
17   A.  Yes, sir.
18   Q.  Okay. And could you just state your name for
19 the record.
20   A.  Hooshang Harooni, short for Harry.
21   Q.  And could you just spell your first and last
22 name for the record.
23   A.  H-O-O-S-H-A-N-G, last name is Harooni,
24 H-A-R-O-O-N-I.
25   Q.  Okay. And you understand or you recall the

Page 7

1  ground rules that we went over in the previous
2  deposition?
3    A.  Yes.
4    Q.  Those same ground rules apply here today.
5    A.  I understand.
6    Q.  So if you have any questions or you need to
7  take a break, just let me know --
8    A.  Yes, sir.
9    Q.  -- and we'll let that happen. Again, my only
10 caveat is that if you take a break, that you answer the
11 question that's been asked of you before we go on
12 break.
13   A.  Yes.
14   Q.  Last Friday, you had been taking some
15 medication, and you listed a number of specific drugs
16 that you were taking. Has any of that changed for this
17 morning's deposition?
18   A.  No.
19   Q.  Okay. Does any of the medication you're
20 taking today affect your ability to understand my
21 questions or answer my questions?
22   A.  Same as before, no.
23   Q.  Fair enough.
24       And, again, today I'll be referring to
25 the hotel, and, again, that is the hotel located in

Page 8

1  Lancaster, California at 44055 North Sierra Highway.
2  Is that okay?
3    A.  Correct.
4    Q.  Okay. Something that we discussed last Friday
5  was the difference between AV Inn Associates 1, LLC and
6  another company that you testified operated the
7  businesses on the property; is that correct?
8    A.  Correct.
9    Q.  Does the name AV Inn Operations Group, Inc.,
10 ring a bell to you?
11   A.  Yes, sir.
12   Q.  Is that the company that owns and operates the
13 businesses on the property where the hotel is located?
14   A.  Correct.
15   Q.  And does that include the hotel itself, the
16 operations of the hotel --
17   A.  Yes, sir.
18   Q.  I'm sorry. Let me finish my question.
19   A.  Oh, I'm sorry.
20   Q.  Does that include the operations of the hotel?
21   A.  I believe so.
22   Q.  Okay. And do you file different tax returns
23 for AV Inn Associates 1, LLC and AV Inn Operations
24 Group, Inc.?
25   A.  I believe so.

---

Page 9

1  Q.  I'm going to ask you to look at some exhibits,
2  and they're specifically going to be Exhibits 27
3  through 34, and we'll just start with the first one,
4  Exhibit 27.
5  A.  Okay.
6  Q.  Do you recognize this document?
7  A.  Not really.
8  Q.  You don't recognize this document?
9  A.  Can I explain?
10 Q.  Certainly.  Go ahead.
11 A.  Okay.  I don't remember the exact details, but
12 if I see my signature, it must be the same form, so it
13 must be correct.  So I really forget things, and
14 I don't exactly know, but this must be my tax return,
15 yes.
16 Q.  And this is the tax return for which company?
17 A.  AV Inn Operations Group, Inc., for the
18 restaurant and the bar and hotel and banquet.
19         (Court reporter instructs the witness to
20 speak up.)
21 BY MR. GARBARINO:
22 Q.  Okay.  So is it fair to say that, you know,
23 subject to your verification, that this is the actual
24 tax return file?
25 A.  Correct.

Page 10

1  Q.  And that this is the tax return for AV Inn
2  Operations Group for 2006?
3  A.  Correct.
4         MR. GARBARINO:  And just for the record,
5  that was Exhibit 27.
6  BY MR. GARBARINO:
7  Q.  Mr. Harooni, these are documents -- and I
8  should have started my question with this
9  information -- these are documents that I received from
10 Mr. Lavi last week.  These are documents that you
11 testified that you gave Mr. Lavi; is that correct?
12 A.  Correct.
13 Q.  If we can go to the next exhibit, Exhibit 28,
14 is that also a tax return, Mr. Harooni?
15 A.  Correct.
16 Q.  And do you recognize this tax return?
17 A.  Correct.
18 Q.  And this tax return is for AV Inn Operations
19 Group?
20 A.  Yes.
21 Q.  And, again, that's Exhibit 28, correct?
22 A.  Correct.
23 Q.  Let's talk about Exhibit 29 for a second.
24 Is Exhibit 29 a tax return for AV Inn Operations Group,
25 Inc., for 2008?

Page 11

1  A.  Yes.
2  Q.  And you recognize this tax return?
3  A.  Yes.
4  Q.  Let's go to Exhibit 30.  Mr. Harooni, do you
5  recognize this document?
6  A.  Yes.
7  Q.  Do you agree that this is a tax return for the
8  year 2005 for AV Inn Associates 1, LLC?
9  A.  Correct.
10 Q.  And, again, this is Exhibit 30, correct?
11 A.  Correct.
12 Q.  If you could go to Exhibit 31.  Do you agree
13 that Exhibit 31 is a tax return for AV Inn
14 Associates 1, LLC, for the tax year of 2006?
15 A.  Yes.
16 Q.  Exhibit 32, is that the exhibit you're looking
17 at right now?
18 A.  Yes, sir.
19 Q.  Do you agree that that is a tax return for the
20 year 2007 for AV Inn Associates 1, LLC?
21 A.  Yes.
22 Q.  Almost finished here on the tax returns.
23 Exhibit 33, do you agree that that is the 2008 tax
24 return for AV Inn Associates 1, LLC?
25 A.  Yes.

Page 12

1  Q.  Last one, Exhibit 34.  Do you agree that
2  Exhibit 34 is the 2005 tax return for AV Inn Operations
3  Group, Inc.?
4  A.  Yes.
5  Q.  Have you alleged that there are oral
6  agreements between you and Best Western?
7  A.  Correct.
8  Q.  How many oral agreements are there between you
9  and Best Western?
10 A.  I can't recall how many, but we can go through
11 them, if you'd like.
12 Q.  Okay.  Let's start with the first oral
13 agreement that you have with Best Western.  Can you
14 tell me what the terms of that agreement are?
15 A.  Having two major disease and just going to a
16 new business, I went to Terry Wininger --
17         (Court reporter instructs the witness to
18 speak up, and court reporter moves closer to the
19 witness.)
20 A.  Having the two major diseases and working for
21 30 years and not even -- I didn't even have one time
22 defeat, so I wasn't going to make a mistake, so I went
23 for interview with Terry Wininger to qualify me, and
24 she assured me that "Don't worry, everything is going
25 to be okay, we have money manager, we have people that

### Page 13

1    come in to monitor your revenue for you, we have a
2    field officer, anytime you want, he'll be there to help
3    you with any questions that you have." And the other
4    chain -- and at that time, I said, "I like Best Western
5    name myself too," so I thought it would be a good name
6    for that location, so I went for it.
7        Q.  So what are the terms of the actual oral
8    agreement that you just discussed?
9        A.  I didn't know it was supposed to be a term.
10   What do you mean by that?
11       Q.  What obligation did Best Western have to you
12   under the agreement that you just set forth?
13       A.  To help me with the account.
14       Q.  What consideration did you give Best Western
15   for that obligation?
16           MR. NATHANSON:  Objection. You're asking
17   for a legal opinion of the witness.
18       A.  I gave my life, my time, my effort, my
19   experience, money, everything that I had and promised,
20   and I was always in contact with Terry.  She was nice
21   to me, and Mitch was very nice up to the last appraisal
22   that he did for us, last thing, then nobody ever saw
23   him again.
24   BY MR. GARBARINO:
25       Q.  Do you know if you paid any more than any

### Page 14

1    other Best Western under the membership agreement and
2    application?
3        A.  Honestly, I have no idea.  I was happy.
4    I paid 50-some.  I don't know how much was the money --
5    or 35-.  I don't even remember.
6        Q.  Did Terry Wininger state any specific support
7    that would be provided to you under this oral
8    agreement?
9        A.  I don't understand what the word -- I mean,
10   I understand the word, what "specific" means, but when
11   somebody tells you, "We have money managers, revenue
12   managers, people to contact, we have design standards,
13   we have design people, this people, that people,"
14   I was -- I took her word as a good thing, that they
15   would help me if they can.
16       Q.  So are there any other specific terms to this
17   oral agreement that you --
18       A.  Not that I know of.
19       Q.  Let me finish my sentence.
20           Are there any other specific terms to
21   this oral agreement than what you've stated here today?
22       A.  I think I answered that question.
23       Q.  Can we just confirm your answer to that
24   question.
25       A.  Specifically, monitoring my growth, money

### Page 15

1    manager, giving me support in design and any standards,
2    and anything like that I need to call her to make sure
3    that things get done for me, and good luck.
4        Q.  Was this above and beyond what is provided to
5    any other Best Western member, to your knowledge?
6        A.  I guess Best Western knows that better than
7    me.
8        Q.  So you don't have any answer to that question?
9        A.  I have no answer to that question.
10       Q.  And do you know if you paid Best Western any
11   additional money for this additional support?
12       A.  Well, I think many, many times they stole
13   money from you.  By having to go to that meeting, you
14   have to pay the design standard, ready to collect money
15   whether you want it or not.  Anything.  They make
16   you -- they encourage you very hard -- they encourage
17   you to buy from their people so they can make their
18   10 percent commission.
19           I forgot what was the question.  I'm
20   sorry.
21       Q.  Did you pay Best Western any additional money
22   for the additional support that you've stated here you
23   should have received?
24       A.  At the end, yes.  At the end, anything
25   I asked, they said that you have to pay money.  You

### Page 16

1    have to pay this, you have to pay that before we can
2    come out again.  You have to pay for design lady to
3    come out; otherwise, she won't come see you.  They take
4    you for every penny that you have, for everything that
5    they wanted, yes.
6        Q.  Do you know if other Best Western members had
7    to pay the exact same amounts for somebody to come to
8    their property from Best Western?
9        A.  Unfortunately, I only own one hotel.
10       Q.  Who was present when this oral agreement was
11   allegedly struck?
12       A.  Me, Terry, and God.
13           (Court reporter asks for clarification.)
14           THE WITNESS:  And God.
15   BY MR. GARBARINO:
16       Q.  Kevin was not present?
17       A.  Maybe he was in one of the meetings.  I'm not
18   sure.
19       Q.  And was this agreement struck before you
20   entered into the Best Western agreement?
21       A.  Yes.
22       Q.  Was there any other oral agreement that you're
23   alleging here today that Best Western breached?
24       A.  Not breached, purposely not helped.
25       Q.  What other oral agreement are you referring

### Page 17

1  to?
2     A.  Well, not helping with their corporate people,
3  don't even -- they -- nobody -- after I requested so
4  many times from Terry, "Please help me out, please help
5  me out," it wasn't until I hired two people,
6  professional people, that they dug in and find out
7  there is a department that only gets -- for corporate
8  accounts and stuff, that they hide it from me, and
9  I didn't even know it exist.
10    Q.  So, Mr. Harooni, my question is, What other
11 oral agreement existed between you and Best Western?
12    A.  Oral agreement?  Specifically, I don't recall,
13 but generally everything.
14    Q.  What do you mean, "generally everything"?
15    A.  I don't know how to answer that question.
16 I've said it many times.
17          MR. NATHANSON:  Can we have two minutes,
18 please?
19          MR. GARBARINO:  Certainly.
20          MR. NATHANSON:  No question is pending?
21          MR. GARBARINO:  No question is pending.
22          MR. NATHANSON:  Thank you.
23          (Recess was taken from 11:38 a.m. to
24 11:46 a.m.)
25

### Page 18

1  BY MR. GARBARINO:
2     Q.  Mr. Harooni, other than the terms you've
3  discussed this morning, are there any other oral
4  agreements that we need to be aware about?
5     A.  No.
6     Q.  While you were operating the hotel, did any of
7  your employees attend Best Western training sessions?
8     A.  Yes.
9     Q.  Can you tell me who?
10    A.  I believe it was mandatory for me and Kevin to
11 go first as the owner and the manager, and then the one
12 time, Christine -- me and Christine went, I believe.
13 And by the way, I got her last name for you.  Last time
14 you asked me if I had her last name.  Whatever was
15 required, we did.
16    Q.  Okay.  Let's start with the first one, where
17 you and Kevin went.  Where did you go for your
18 training?
19    A.  I believe it was in Arizona.
20    Q.  Do you remember when that was?
21    A.  Somewhere around January of 2005.
22    Q.  Did you and Kevin go to both -- excuse me.
23         Did you and Kevin go to the same training
24 sessions, or did you do different training sessions?
25    A.  No.  They -- what they had was a -- it was at

### Page 19

1  the same time and date, but they would split you up as
2  was necessary.  At some session, they say, "Okay,
3  that's for owners only, and this is for managers only."
4  So we had -- maybe it was the first day that we had
5  together, and second day, we were split up most of the
6  day, I believe.
7     Q.  Did Kevin attend the general managing training
8  at that time?
9     A.  Yes.
10    Q.  Was he your general manager at the time?
11    A.  On and off, yes.  His job was to back me up
12 from driving to management, because my wife would not
13 let me take another business, and that was a part of my
14 agreement with my wife.
15    Q.  My question is, Was Kevin general manager at
16 the time that he attended the training here in Phoenix?
17    A.  I think so.
18    Q.  And then when was the next training that you
19 attended?
20    A.  I don't recall.
21    Q.  You don't recall.  Do you recall when any of
22 the trainings occurred that you attended?
23    A.  Training or -- I went to Canada once, I
24 went -- we went to Arizona twice, and my managers went
25 to Chicago once, and that's all I remember, actually.

### Page 20

1     Q.  Do you remember any of the specific trainings
2  that your employees attended?
3     A.  No.
4     Q.  Do you know if any of your general managers
5  other than Kevin attended a general managing training
6  put on by Best Western?
7     A.  I think maybe Christine, but I'm not sure.
8     Q.  Do you know when Christine attended that
9  general managing training?
10    A.  I don't recall the exact time and date.
11    Q.  Do you recall whether the hotel ever received
12 the GM tool kit?
13    A.  No.
14    Q.  Do you recall whether the hotel ever received
15 the executive housekeeper's tool kit?
16    A.  I think so.
17    Q.  Can you describe any other training-like
18 materials that you received from Best Western during
19 the time that you owned and operated the hotel?
20    A.  Plus we had meetings between -- when Mitch
21 would come and train us in the hotel, and it was
22 necessary.
23    Q.  Now, you had a banquet center at the hotel,
24 correct?
25    A.  Yes.

## Page 21

1  Q. What type of customers did the banquet center
2  cater to?
3  A. Weddings. What kind of customers?
4  Q. Were they local customers or customers from
5  out of town?
6  A. Both.
7  Q. Both?
8  A. (Nodding head.)
9  Q. Can you estimate percentage-wise the split
10 between customers for the banquet center from local,
11 within Lancaster/Palmdale, as compared to out-of-town
12 customers?
13 A. Weddings and Quinceañeras were mostly local,
14 and pretty much everything else was meetings and
15 corporate parties, Christmas parties. I would say
16 50/50.
17 Q. I asked you this last week, and you don't
18 recall -- or you didn't recall the answer, but your
19 disclosure statement lists a name of Beverly Blank as a
20 witness who either resides or works at 844 South Holt
21 Avenue, Number 1, Los Angeles, California. Do you know
22 who this person is?
23 A. Okay. I usually write everything in the
24 yellow pads, and I went through all of them. The only
25 thing I found, the Best -- one of the Best Westerns so

## Page 22

1  far, I find out that they called me. I think it was
2  the Best Western on 1100 North Central Avenue, right
3  here, and the owner, I believe, was Beverly, near the
4  same area code, and we had a meeting together.
5  Q. Okay. So she was an owner of another Best
6  Western?
7  A. Correct.
8  Q. And the Best Western that she owned was here
9  in Phoenix?
10 A. No. Oh, yeah, the Best Western, yes.
11 Q. And what did you speak with her about?
12 A. Like I said, I put an ad in the paper, in the
13 local Arizona paper, and also in The Los Angeles Times.
14 Under "Hotel for Sale," I put a sentence, something
15 like this, "Is anybody having problem with Best Western
16 that wants to come forward, the same problem," and nine
17 people called me with the exact same scenario.
18 Q. Let me ask a question.
19 A. I'm sorry.
20 Q. Is Beverly Blank one of those people?
21 A. Yes.
22 Q. And last week, you also told me that there
23 were other people and that you had a list of those
24 names.
25 A. Yes.

## Page 23

1  Q. Do you have those names for me today?
2  A. One of them was the broker that also -- the
3  broker who listed my hotel, he also owned and operated
4  at one point a Best Western. Exact same thing happened
5  to him. And like I told you, I didn't want to disclose
6  his name because I respect his -- he makes his money
7  from buying and selling hotels only.
8  Q. And, excuse me, this is the broker that listed
9  your property in 2008?
10 A. 2007, I believe.
11 Q. Do you know his name?
12 A. Yes. His name was Chuck Nester.
13 Q. I'm sorry?
14 A. Chuck Nester, N-E-S-T-E-R. His phone number,
15 805, area code, 496-9797. He said that if somebody
16 asked him to come here, he would be more than happy to
17 come and testify, but I wasn't going to use him first.
18 Q. You indicated that you spoke with other --
19 either current Best Western members or former Best
20 Western members.
21 A. Correct.
22 Q. Do you have those list of names with you
23 today?
24 A. Honestly, I've been looking. The only one
25 I find is on this, because I put them on a yellow piece

## Page 24

1  of paper. But at this time, no.
2  Q. In your disclosure statement, you listed a
3  number of witnesses, but you did not list Alfonso, your
4  maintenance person, as a witness. Can you tell me why
5  you did not list him as a witness?
6  A. I try to keep the cost down as much as I can,
7  plus using the people who will speak better English and
8  have a better understanding. I have no objection to
9  Alfonso. Alfonso would be a very good witness too.
10 Q. And does Alfonso have relevant knowledge
11 regarding the operations of the hotel?
12 A. Yes, yes, in fixing things.
13 Q. You also did not list Christina Cheney as a
14 witness in your disclosure statement.
15 A. Correct.
16 Q. Can you tell me why you didn't list her as
17 a --
18 A. I can't find her.
19 Q. Just let me finish my sentence.
20 A. I'm sorry.
21 Q. Can you tell me why you did not list Christina
22 Cheney as a witness?
23 A. Yes. I let her go at least two, two and a
24 half years ago, and I honestly don't know where she
25 lives or her number. People disappear, especially with

## Page 25

1. this economy from Palmdale/Lancaster. It's a ghost
2. town.
3. Q. Was she the general manager at the time that
4. Cindy Bree inspected the property?
5. A. No, I don't think so.
6. Q. Was she the general manager at the time that
7. Mitch inspected the property in October of 2007?
8. A. Could have been, but she left -- if that's the
9. date that -- when Cheryl Duggan came in, she was no
10. longer a manager.
11. Q. But after Cheryl Duggan left, she was the
12. general manager?
13. A. Maybe I asked her to help me just in case if I
14. needed some help, but no.
15. Q. Okay. So who were the general managers after
16. Cheryl Duggan left the hotel?
17. A. Well, I was -- while I was placing ad in
18. papers and looking for general managers, I don't recall
19. exactly. Maybe me, Kevin, Christine. There was a
20. bunch of us that we would decide.
21. Q. Did you eventually retain a general manager
22. after Cheryl Duggan left?
23. A. No.
24. Q. So once Cheryl Duggan left, there was no
25. person in the general management position of the hotel?

## Page 26

1. A. That's correct.
2. Q. Last week I asked you about some of the
3. improvements that you made to the hotel and asked you
4. whether you had receipts for those improvements.
5. A. Correct.
6. Q. Have you been able to locate any receipts for
7. those improvements?
8. A. You asked me exactly, "If we asked you to
9. provide those, would you be able to provide them,"
10. and I said "Yes."
11. Q. Okay. Do you have those receipts?
12. A. Not with me.
13. Q. Do you have those receipts somewhere?
14. A. Somewhere.
15. Q. Okay. Do you agree to provide us those
16. receipts?
17. A. Would you like me to?
18. Q. Yes.
19. The same with balance sheets for the two
20. entities, AV Inn Associates 1, LLC, and AV Inn
21. Operations Group, Inc., for 2005, '6, '7 and '8.
22. I asked you if you'd provide those.
23. A. The accountant, whatever he -- wasn't it on
24. those papers?
25. Q. I've been through what the accountant

## Page 27

1. provided, and I'm not seeing any balance sheets.
2. Do you know if you have balance sheets for those
3. entities during those time frames?
4. A. I have to look, because I wasn't counting,
5. to be honest.
6. MR. NATHANSON: Were these documents
7. requested previously by you, Counsel, prior to the
8. deposition last week in L.A.?
9. MR. GARBARINO: I'll have to go back and
10. look at the discovery to make sure.
11. MR. NATHANSON: Okay.
12. BY MR. GARBARINO:
13. Q. Another question was we asked for a copy of
14. the lease for the banquet center.
15. A. I think I have it here.
16. Q. Okay. Can we get a copy of that today,
17. please.
18. A. Yes.
19. MR. NATHANSON: Same question. Was that
20. requested previously?
21. MR. GARBARINO: We were not aware there
22. was a lease for the banquet center before last week.
23. MR. NATHANSON: Well, I know you're
24. objecting to us seeking document production at this
25. point in time, and here we are in a deposition and

## Page 28

1. you're seeking document production at this point in
2. time.
3. MR. GARBARINO: Do you want to go off the
4. record?
5. MR. NATHANSON: I don't want to go off
6. the record.
7. MR. GARBARINO: Okay. I will certainly
8. tell you that in our initial discovery to you, we asked
9. for all documents related to calculation of damages and
10. losses. The lease for the banquet center is obviously
11. an item of expense, a significant item of expense for
12. the hotel and would be relevant to the calculation for
13. damages.
14. So I believe that, yes, we have requested
15. that document. If you disagree, we can discuss it at
16. another time, but I think it's appropriate that we have
17. the lease.
18. MR. NATHANSON: Well, then my objection
19. is foundation. I don't think you've laid a foundation
20. that he's premising his damage claim on that lease, but
21. you're free to ask him if that's the case.
22. MR. GARBARINO: Okay.
23. BY MR. GARBARINO:
24. Q. Your damage claim against Best Western, does
25. it include lost income?

### Page 29

1  A. Yes.
2  Q. Is that lease expense for the banquet center
3  included in that calculation of lost income?
4  A. I don't think so.
5  Q. Why would it not be?
6  A. It was so insignificant. $3,000 a month was
7  the whole rent of 2-acre land, so it was not like my
8  monthly payments to the bank of $26,000.
9  Q. Would you also agree that the lease is
10 relevant to the value of the property under the hotel
11 and the banquet center?
12 A. Yes.
13        MR. NATHANSON: I'm going to object to
14 the question. You're asking a witness what's relevant
15 to the case, and that's asking for a legal opinion.
16        Subject to the objection, you can answer.
17 A. Yes.
18 BY MR. GARBARINO:
19 Q. Did the fact that you would not be purchasing
20 the hotel, including the banquet center in fee, and
21 that there was a lease for the banquet center, did that
22 affect the price that you paid for the property?
23 A. Yes.
24 Q. Okay. And would that affect the price that
25 somebody else would be willing to pay for the property?

### Page 30

1  A. It depends.
2  Q. On?
3  A. It depends on your gross sale. It depends on
4  your monthly payment. It depends on -- you make a
5  calculation. That's how I do it. Whether you want to
6  buy a piece of land to have $10,000-a-month-payment or
7  you want to rent it for the rest -- the entirety for
8  $3,000 a month. I would rent it for $3,000 a month,
9  and I would be happy to pay top dollar for the
10 business.
11 Q. So might the lease actually be relevant to
12 somebody making a purchase decision regarding the
13 hotel?
14 A. I think sometimes it could be a good point,
15 sometimes it might be a bad point.
16 Q. And I believe that we have asked for all
17 evidence related to damage calculations, and I think
18 that that lease is probably an important part of those
19 calculations. We've asked for that previously in our
20 discovery, we haven't got it as of today, and I'm
21 simply asking for it again today. Is that fair?
22        MR. NATHANSON: I don't know if it's
23 fair, but your request is noted for the record.
24        MR. GARBARINO: Fair enough.
25

### Page 31

1  BY MR. GARBARINO:
2  Q. As part of the damage calculation of Mr. Lavi,
3  there is a line item for hiring of a sales manager and
4  general manager. Do you recall that?
5  A. Yes.
6  Q. Did you not already have a sales manager and
7  general manager at the time?
8  A. Well, I had a general manager, but I thought
9  it's time to hire two really good ones to help me,
10 because I was really getting tired of Best Western's
11 answers and not helping me.
12 Q. At any point, did you have two general
13 managers?
14 A. Maybe.
15 Q. And why would you have had two general
16 managers at one time?
17 A. Because I didn't want to make a mistake and
18 throw everything out that I had worked for. I wanted
19 to make sure I would be successful.
20 Q. Can you give me the time frame that you had
21 two general managers?
22 A. I don't recall.
23 Q. Did you ever have two sales managers?
24 A. I don't recall.
25 Q. Do you recall if you had two sales managers at

### Page 32

1  the same time?
2  A. I may have.
3  Q. Do you recall who those people were?
4  A. Lisa Wilkerson was one and maybe Lisa --
5  I forgot her last name -- Lisa -- I can get her last
6  name for you.
7         MR. GARBARINO: Can we go off the record
8  for a second? I'm just going to confer with my client
9  for a second.
10        MR. NATHANSON: Okay.
11        (Recess was taken from 12:06 p.m. to
12 12:11 p.m.)
13        MR. GARBARINO: Back on the record.
14        Mr. Harooni, thank you very much for
15 coming here this morning. I have no further questions
16 for you at this time.
17        THE WITNESS: Okay. Thank you.
18
19            EXAMINATION
20 BY MR. NATHANSON:
21 Q. Harry, before I appeared in the case, you
22 filed, on your own, a counterclaim; is that correct?
23 A. Yes, sir.
24 Q. And in paragraph 2 of the counterclaim, you
25 alleged as follows, and then I'm going to ask you what

```
                                    33
 1   the facts are in connection with that. Okay?
 2      A. Okay.
 3      Q. You alleged that you were extremely hesitant
 4   to purchase the hotel -- now, I'm paraphrasing -- by
 5   myself and expressed that concern to Terry Wininger,
 6   District 6 manager of Best Western International, Inc.
 7   Do you remember alleging that?
 8      A. Yes.
 9      Q. Let me put that -- sorry. Let me put the
10   counterclaim in front of you. Paragraph 2. I'm
11   reading the first sentence. Do you see that?
12      A. Yes, sir.
13      Q. When did you tell Mr. Wininger?
14      A. Mrs. Wininger.
15      Q. I'm sorry. I apologize.
16          When did you tell -- let me rephrase.
17   Strike the question.
18          When did you tell, as alleged in
19   paragraph 2, Terry Wininger about your hesitancy to
20   purchase and manage the hotel and your concerns?
21      A. At the meeting that she was interviewing me,
22   she was asking questions, and I was answering, and my
23   background, things like that. I told her about my
24   sickness, but I told her that I have money and I'm
25   willing to fix things, and she said she has support and
```

```
                                    34
 1   not to worry, to go ahead with it.
 2      Q. Your paragraph 2 goes on, Harry --
 3          MR. GARBARINO: Can I stop you just for a
 4   second? Can I just take a break to get a copy of that
 5   so I can see what you're reading? Do you have a
 6   problem with that?
 7          MR. NATHANSON: No.
 8          MR. GARBARINO: Okay.
 9          (Recess was taken from 12:13 p.m. to
10   12:16 p.m.)
11   BY MR. NATHANSON:
12      Q. Harry, the second sentence in paragraph 2 of
13   your counterclaim says, "Ms. Wininger reassured me that
14   Best Western would provide me various support in
15   managing the hotel and in generating sales," period.
16   Do you see that?
17      A. Yes.
18      Q. Did that occur in the same conversation you
19   just testified to --
20      A. Yes.
21      Q. -- or was that at another time, Harry?
22      A. Same time that she was showing me around and
23   presentation meetings.
24      Q. This is before you purchased the hotel; am I
25   correct?
```

```
                                    35
 1      A. Correct.
 2      Q. And did you rely on what she was telling you?
 3   I mean, did you take that to heart that she was
 4   reassuring you, Harry?
 5      A. Yes, because at that time, I was going to
 6   retire, basically, because of my sickness, and I had
 7   $4 million. Why would I have to take any chances to go
 8   on other projects two hours away from home -- one hour
 9   away from home, going back and forth. So I relied
10   heavily upon what she said.
11      Q. Is it fair to say that you wouldn't have
12   invested your money had you not received these
13   reassurances?
14      A. Of course.
15      Q. And the last sentence in paragraph 2, where
16   you allege, Harry, "I was told that Best Western had a
17   great support team for its members that I could utilize
18   in the event any problems should arise," was that
19   told -- communicated to you by Ms. Wininger in the same
20   conversation?
21      A. Yes.
22      Q. And did you rely on that as well?
23      A. Yes.
24      Q. Paragraph 3, Harry, you alleged that you were
25   induced to purchase the franchise through falsehood and
```

```
                                    36
 1   failed to perform all their promises, the plaintiff.
 2   Do you see what I'm referring to? I actually read it
 3   poorly, so I'm going to strike the question and start
 4   over again.
 5          Paragraph 3 starts, Harry, "Plaintiff
 6   induced me to purchase the franchise through falsehood
 7   and failed to perform all the promised services,"
 8   period. Do you see that?
 9      A. Yes, sir.
10      Q. Could you explain for the record what factual
11   basis there is for that allegation?
12      A. Well, when I was introduced to that property,
13   was in a distress sale, and that's what I was good at.
14   And when I went to Best Western, they gave me a big
15   document of the things that needed to be fixed, and
16   that I did on those terms, and they -- she promised to
17   let me -- I lost track of my mind.
18      Q. First sentence, paragraph 3.
19      A. Well, I thought to myself, because the
20   business was so run down, I put my money, I fix things,
21   and I have good relation with people, I have good
22   business sense, and with the management and help,
23   I should be successful and make millions of dollar
24   more, but, unfortunately, it didn't happen.
25      Q. You used the word "falsehood" in paragraph 3,
```

### Page 37

1  Harry. What are you referring to that were the
2  falsehoods?
3     A. Not giving me support, denying their support,
4  and hiding their support.
5     Q. Please explain.
6     A. Well, denying their support came from Chicago.
7  I find out when my manager went. Cindy Bree told one
8  of my managers, "Your hotel is not on our list of
9  important hotels to go after business for."
10         And Mr. -- what's his name? One of the
11 biggest boss told my other managers, you know, in a
12 heated conversation, "Sorry, I guess we dropped the
13 ball. We forgot about you."
14         And then after they said that, it took
15 many months for them to take any action. I don't know
16 what would you call hiding -- why nobody told me when I
17 was begging for help that we have a department that can
18 get the corporate account for you.
19    Q. The second sentence in paragraph 3, Harry,
20 says, "Plaintiff failed to provide any support in the
21 management of the hotel, generating sales or marketing
22 of my property." Do you see that?
23    A. Yes.
24    Q. And could you explain what you meant by that
25 allegation?

### Page 38

1     A. That's exactly what I just answered the last
2  question, was they didn't give me any management help
3  to generate and market. I was hoping that they would
4  market my hotel and make more money. I was doing my
5  part, and nobody was helping me.
6     Q. You were asked a minute ago by Mr. Garbarino
7  about changing managers. Do you remember that
8  question, that you let some managers go?
9     A. Yes.
10    Q. Had Best Western done what they assured you
11 and promised you, as you've so testified today, that
12 they were going to do, would you have been required to
13 switch managers like that?
14    A. I honestly think if I -- if they would have
15 done what they said they would, I would never need a
16 sales manager because I have good business sense and
17 they would get corporate account. Why would I need a
18 sales manager? I mean, if you want to go a lot higher
19 and higher and higher, maybe, but not to save yourself,
20 not to find out that there's no help when you ask for
21 help.
22        And just for the record, even when I was
23 asking for Mitch to come, he would -- very nicely would
24 come for me under the scheduled time. He would not
25 come off times, like -- because he's supposedly living

### Page 39

1  locally in the same area. But when I tell him, "I need
2  your help." "Okay, I'll be there two weeks from now.
3  I'll be there next week. We'll discuss it." And for
4  the most part, that's how it worked.
5     Q. In paragraph 4 of your counterclaim, Harry,
6  you state that Best Western, plaintiff, "failed to
7  maintain a functioning online reservation system.
8  Shortly after the purchase of the hotel, it was
9  discovered that the online reservation system was
10 malfunctioning and the occupancy of the hotel was shown
11 as full when in fact it had a low occupancy." Is that
12 what happened?
13    A. Well, I have a 90 percent clear idea of this.
14 I know for the fact it did happen. Mitch came out,
15 then I find out. When I hired these two managers, the
16 first thing they did, they went through the whole
17 system, and then she find out and say, "Hey, Harry, how
18 come you're not getting any reservation from the Best
19 Western site? And then they dig into it, Lisa and
20 Cheryl, because they have, like, many years of
21 experience, and then we called the Best Western. We
22 find out after the few reservations that we do, the
23 whole -- on our end shows empty rooms if somebody would
24 call us directly; and if they called the 800 number, we
25 show all the rooms are full.

### Page 40

1     Q. So did you report that to Best Western?
2     A. Yes.
3     Q. Who did you report it to, Harry?
4     A. I believe Terry and Mitch, and Mitch came out
5  a week later, a week or one day or ten days, I don't
6  know. He was nice. He came out. He fixed the
7  problem. He didn't know what would -- what had caused
8  that, but he said to monitor it. And a few other
9  times, it happened again, but it went away. But we
10 were watching it like a hawk every single day. And
11 I don't know as of today it's because we were scared --
12 I think it's because we were scared that something else
13 would happen again with the system. Normally, I don't
14 think you have to watch it every single day to see if
15 they're making a mistake or not.
16    Q. You allege in paragraph 4, Harry, that Best
17 Western, plaintiff, "was notified of the problem
18 immediately, however, made little effort to resolve
19 this issue and the reservation system continued to
20 malfunction for a considerable period of time." Do you
21 remember that?
22    A. Yes.
23    Q. Is that true?
24    A. I remember that it happened a few more times,
25 but Cheryl and Lisa said that after we complained, it

## Page 41

1  was mostly fixed when Mitch came out.
2      Q. How long was the reservation system down?
3      A. I have no idea. I have no idea because my
4  sales were going down and down, and I was doing
5  remodeling, and it was going down, and I didn't know
6  what's going on. I called Best Western three, four,
7  five times with Terry. "What's going on?" Because
8  I had in my mind that she told me that they have money
9  manager that watches your account. I told her, "Can
10 you find out what's going on with my system? Why my
11 sales are down or something?" And, honestly, nobody
12 helped me. I never figured it out until the day Cheryl
13 and Lisa find out. So it could have been a minimum of
14 six months, one year, two days. It could have been --
15 not two days. At least three, four months, I'm sure.
16 But how much longer before that or how it affected the
17 future -- because somebody might call today to reserve
18 for three months from now and everything shows sold
19 out. So how exactly you can calculate the damages on
20 that, I can't answer.
21     Q. When this occurred, when all this was
22 happening, was it your position that they never
23 completely fixed the reservation system?
24     A. I can swear that it two or three times
25 happened again and again and again, but why Cheryl or

## Page 42

1  Lisa didn't say it, I don't know. But I, as an owner,
2  was watching, I was worried every day with anxiety, and
3  I know it happened again. But then we fixed it
4  correctly, because now they knew what was the problem.
5  And Mitch was giving us instruction to keep watching it
6  because we didn't know where the problem is coming
7  from.
8      Q. But after it was fixed initially, didn't it
9  malfunction again?
10     A. No.
11     Q. And how long --
12     A. Well, initially, you mean?
13     Q. Yes.
14     A. A few times, it showed thereafter. But after
15 it was fixed, the problem was gone. I never had that
16 for the next two or three years.
17     Q. Who was dealing with Best Western on the
18 reservation system, you or someone else in your
19 company?
20     A. I believe that was Lisa Wilkerson.
21     Q. Okay.
22     A. And Lisa Pitko. Oh, I find out the last name
23 of the Lisa.
24     Q. Were they most familiar with the ins and outs
25 and the specifics on how long this occurred?

## Page 43

1      A. Yes. I would allocate the job to the best
2  person who has the knowledge. Even I could be great at
3  one thing, and you could be great at something else
4  that I'm not. Or a maid, I cannot do the maid's job,
5  so you get a good maid to do the job.
6          Did I answer that or no?
7      Q. Harry, do you know if written reports were
8  filed by your people in connection with the reservation
9  system issue?
10     A. Well, it should be on Mitch's computer because
11 he came out and he worked on it.
12     Q. Okay.
13     A. But literally, I'm not good at typing. I can
14 type 120 words per month (sic).
15     Q. And you said that sales were going down and
16 down, and that's when the inkling --
17     A. I.
18     Q. Hold on. Let me finish my question, Harry.
19     A. I'm sorry.
20     Q. You said the sales were going down and down,
21 and then you started investigating or your people did,
22 and that's when it was initially discovered there was a
23 problem with the reservation system; is that right?
24     A. Yes.
25     Q. Did Best Western come to you before you found

## Page 44

1  out and say, "Your reservation system is
2  malfunctioning"?
3      A. Never.
4      Q. Harry, in paragraph 7 of your counterclaim,
5  you allege that the hotel, when you bought it, was in
6  complete disrepair.
7      A. Correct.
8      Q. Did Best Western know that?
9      A. Yes.
10     Q. How do you know they knew it?
11     A. Because they put it on probate -- not
12 probation. He was on probation for many years, and
13 that was something that scared me, that how could
14 somebody can go for years being on probation and they
15 terminate me for too-bad grade, but that's beside the
16 point. But they gave me a list of things that I have
17 to do, and I said I would be more than happy to do
18 them, but -- there is no buts.
19     Q. Well, do you think they, to use street talk,
20 Harry, cut the previous owner more slack on the
21 condition of the hotel than you?
22         MR. GARBARINO: Objection, form.
23 BY MR. NATHANSON:
24     Q. Let me rephrase the question.
25         Do you think Best Western was more

### Page 45

1  lenient regarding the condition of the hotel and
2  inspections of the hotel under the previous owner than
3  they were with you?
4       MR. GARBARINO: Objection, form.
5    A.  100 percent.
6  BY MR. NATHANSON:
7    Q.  Can you explain why, for the record?
8    A.  For one thing, I have pictures, their report.
9  And even after $2 million I put in there in cash, they
10 still were bugging me to fix more. I mean, how badly
11 can hotel be? It was very bad, and that's -- they told
12 him -- they gave him a warning, "You have six months to
13 sell or you're out," but why didn't they give me? They
14 pat me on the shoulder every month. "You're doing
15 great, great -- good job, good job," and all of a
16 sudden, "get out."
17   Q.  In your opinion, Harry, was the condition of
18 your hotel when Best Western said "get out" better than
19 the condition of the hotel when you bought it?
20   A.  Million times. I have letters from every
21 major company, that they accepted all our fees, that
22 they congratulated us as a beauty, and even their own
23 design-standard person came out before they kicked me
24 out and gave me a good review, said everything looks
25 good.

### Page 46

1       But they wanted to change a building in
2  the middle of the desert. I had two separate parcels,
3  and they wanted -- one of them was a Spanish look, one
4  of them an American look. They wanted to make this
5  building look like that when there is a train station
6  across the street and every motel in the row looks
7  different, in a different color, and nobody cares to do
8  that. It just was mind-boggling.
9    Q.  Okay. In paragraph 10 of your counterclaim,
10 Harry, you allege that the plaintiff, Best Western,
11 "unjustly issued failing scores for Best Western
12 Antelope Valley Inn and its motives were financial
13 gain." What do you mean by that allegation, Harry?
14   A.  Okay. From my research and from asking
15 around, I found out they do that when the hotels that
16 they want to get rid of, they -- for some reason they
17 don't like them, what happened was -- number 9?
18   Q.  Paragraph 10, Harry.
19   A.  Okay. So Mitch was our inspector for many
20 years and was inspector for many other years. So my
21 maid that worked there, was for 26 years there, was
22 used to the same kind of thing that Mitch was to do.
23 Like Mitch would come -- by the way, Mitch would take
24 half an hour and go over the things, detail and stuff,
25 and Mitch knew -- helped the cleaning lady -- I'm

### Page 47

1  sorry. I'm excited.
2    Q.  Do you need a break, Harry?
3    A.  No. I was in the middle of question.
4    Q.  Go ahead.
5    A.  So Mitch came. Then all of a sudden, I get a
6  call from Terry Wininger, and like we were friendly and
7  she was talking to me nicely and this, and in the
8  middle of conversation, she said, "How come you listed
9  your hotel as an automatic transfer?" I didn't think
10 about it that much, and I didn't know the broker had
11 done that. I mean, maybe that was his sales pitch, the
12 broker, without telling me because he had experience
13 with this business.
14      Anyways, then next thing I know, I get a
15 letter that Mitch is coming for an inspection, and
16 Mitch comes, and for the first time -- all the time he
17 come -- he comes there, he pat me on the shoulder and
18 said he'd work with me. He said, "Very good, very
19 good. You spend good money." Never any problem. Then
20 all of a sudden, as soon as I list the property, that's
21 his last inspection. They send him away to another
22 area. I mean, he comes and gives a bad point, failing
23 grade.
24      And then I called him, and I said,
25 "Mitch, what did you do that for? He said, "Sorry,

### Page 48

1  that's what it is."
2       Then I called Terry, and I said, "Terry,
3  why did you do that to me? I've been good to you.
4  I've done everything that you say." And Terry said --
5  and I asked for reinspection, and Terry said, "Sorry,
6  48 hours has passed, and there is nothing I can do for
7  you." And I said -- I begged her a little bit.
8  I said, "I'm sick, I'm this, I'm that, I need your
9  help." She said, "Sorry, it's out of my hands."
10 Up 'til now, she was a big manager and biggest guy in
11 the territory, and now she cannot send somebody to
12 reinspect it.
13      Then I knew more, I brainstormed more,
14 and I thought, Okay, this is the first time. The
15 second time, I would call her back in time.
16      So the second time, they sent me a letter
17 that Cindy Bree is coming and Mitch has changed, and
18 she's going to train somebody. They made a campground
19 out of my 6-acre land, and this lady, instead of taking
20 half an hour, took like something like around five or
21 six hours, and every single corner, everything -- a lot
22 of things that I had no idea, that Mitch never told us
23 before, and I wasn't familiar with the way of having
24 inspection -- she picked out and took the points off.
25      And then I called immediately. I knew

### 49

1  what's up, so I called immediately. And I begged, and
2  I said, "It's before 48 hours now. I'm calling you."
3  She said, "Sorry, we're not coming out." "What?"
4  "Well, if we come out, we're only going to come out to
5  look at the pictures that we took and verify your
6  mistakes. So we're not coming for a reinspection."
7  And if you want, you have to send so much money, you
8  have to send this, you have to send that, you have
9  to -- I spent all the money they say. The
10 designer-standard person came in and said everything
11 was good.
12      Then Cindy Bree took so many points off,
13 and the next thing I know, Terry calls me, "Sorry, we
14 decided to terminate you" -- "They decided to terminate
15 you. As of today, we're taking everything out. You
16 will not use" -- they take their satellite. They treat
17 you like the biggest enemy. They don't even give you
18 time to fix your reservation. Why do you have to --
19 if you want to kick somebody, why do you want to --
20 I guess they want to destroy you so bad that you won't
21 be able to breathe.
22      THE WITNESS: Excuse me. Can I now take
23 a break?
24      MR. NATHANSON: Yes, you can take a
25 break. We're going to go out and talk.

### 50

1      (Recess was taken from 12:43 p.m. to
2  12:54 p.m.)
3       MR. GARBARINO: Let's go back on the
4  record.
5       Did you want to put that on the record,
6  that you're reserving to come back?
7       MS. SCHLESINGER: Yeah, that's fine.
8  Very gentleman of you.
9
10      FURTHER EXAMINATION
11 BY MR. GARBARINO:
12   Q. Mr. Harooni, you told Mr. Nathanson that
13 Terry Wininger promised you services when you met with
14 her before you executed the Best Western membership
15 application and agreement, correct?
16   A. Support and services, yes.
17   Q. Okay. I need to know exactly what those
18 services were. Do you have -- can you tell me in
19 detail what services she provided or promised you?
20      MS. SCHLESINGER: Objection, form.
21   A. Exactly? Well, I think the support part was
22 the most important thing for me, that they had money
23 manager exactly that looks at your accounts. They have
24 a person comes out every month -- not every month, I'm
25 sorry -- person comes out like Mitch that is your local

### 51

1  rep. You can ask him any question you want. We help
2  you with anything we can. Basically, that's it.
3  Anything you need, we'll help you.
4  BY MR. GARBARINO:
5    Q. So anything in the world that you would need
6  for the operations of the hotel --
7       MS. SCHLESINGER: Objection, form.
8  BY MR. GARBARINO:
9    Q. -- you understood Best Western would provide
10 that for you?
11      MS. SCHLESINGER: Form, foundation.
12   A. No, not everything. Mostly support, to give
13 me ideas, to get accounts, to watch my growth, and
14 pitch in when they need to be pitch in to guide me in
15 the right direction.
16 BY MR. GARBARINO:
17   Q. And it's your testimony here today that those
18 are services that Terry Wininger promised to you before
19 you executed the Best Western agreement?
20   A. Correct.
21   Q. You also testified that Terry Wininger said
22 that she would give you management help. What did you
23 mean by that?
24   A. Did I say that?
25   Q. I believe so, yes.

### 52

1       MS. SCHLESINGER: I'm going to object on
2  foundation. I don't recall that.
3    A. Can you rephrase the question or ask me again,
4  because I don't --
5  BY MR. GARBARINO:
6    Q. Did you have an understanding that Best
7  Western would provide you help with management of the
8  hotel?
9    A. Not really.
10   Q. So if I heard the term "management," I must be
11 mistaken?
12      MS. SCHLESINGER: Objection, form.
13   A. Or I misheard.
14 BY MR. GARBARINO:
15   Q. You testified that Best Western denied support
16 to you. What support did Best Western deny?
17   A. Well, I think the two major one is just not
18 putting our hotel in the priority list to help and not
19 getting enough support, and get accounts for us.
20 That's the major two or two major.
21   Q. And what specific accounts are you referring
22 to?
23      MS. SCHLESINGER: Form.
24   A. I have to look up my list to see what is
25 mostly corporate account, like Boeing, all those big

### Page 53

1 names, NASA, whatever, Air Force base, whoever is in
2 that area or come to that area.
3 BY MR. GARBARINO:
4   Q. And you complained that Best Western didn't
5 get these accounts for you?
6   A. Not only did they didn't get it, they said
7 they're not getting it.
8   Q. And who said that?
9   A. Scott Wilson. He said, "Sorry, we dropped the
10 ball." I don't know what that means.
11   Q. You don't know what "dropped the ball" means?
12   A. Well, do you? I mean, he said, "Sorry, we
13 made a mistake. We should have -- we're going to get
14 it for you."
15   Q. Did Scott say this to you?
16   A. He said it to Kevin and Lisa Wilkerson in
17 Chicago.
18   Q. But you weren't present when Scott said this?
19   A. No.
20   Q. You also mentioned hidden support. What
21 support did Best Western hide?
22   A. To me, I think if when you ask somebody for
23 help and the person is knowledgeable enough to be in a
24 management position and not tell you that we have a
25 group of people that will do this for you, that's

### Page 54

1 hiding it from me.
2   Q. Okay. So, again, what support did Best
3 Western hide?
4       MS. SCHLESINGER: Objection, asked and
5 answered.
6   A. The fact that they have people that they can
7 get accounts for you.
8 BY MR. GARBARINO:
9   Q. And when did you learn that this support
10 existed?
11   A. Again, when I hired two managers that was
12 extremely experienced. Lisa Wilkerson used to work for
13 best hotel in Lancaster for many, many years, and it
14 was not a franchise, so she had to go personally one by
15 one and get those accounts. And then we find out that
16 they're not helping us. Actually, we got few accounts
17 for Best Western.
18   Q. You spoke with Mr. Nathanson about the rooms
19 being shown as blocked out. Were you doing
20 construction and remodeling to the hotel in 2005?
21   A. From day one to the last day.
22   Q. Would you block out rooms through the
23 reservation system for rooms that were being taken out
24 of service?
25       MS. SCHLESINGER: Form.

### Page 55

1   A. I don't recall. I would say no, and the
2 reason is because the rooms were operable. It wasn't
3 like it was something like -- we just wanted to
4 renovate. So if it was necessary to put the room back
5 in, we just ordered the maids and all the people to put
6 everything back in, and we accommodate the guest. And
7 we never were 100 percent occupancy -- had occupancy to
8 worry about. Honestly, if it was a major something
9 that we had to keep the whole hotel open, then we
10 wouldn't do the remodeling on that day.
11 BY MR. GARBARINO:
12   Q. Okay. Who had access to the reservation
13 system in 2005?
14   A. Christine was one of the managers, I believe.
15 Christine for sure, actually. Maybe front desk person.
16   Q. Would there be more than one front desk
17 person?
18   A. Most of them, yes.
19   Q. Do you know who those people are?
20   A. Honestly, no. That was the day I started.
21 None of those people are with us at this time -- or was
22 with us.
23   Q. Let's say at any point in 2005, can you tell
24 me how many front desk people the hotel would have on
25 staff?

### Page 56

1       MS. SCHLESINGER: Form.
2   A. I would say four -- one -- two -- two people
3 in the morning. One people after 5:00, and one people
4 in the morning.
5 BY MR. GARBARINO:
6   Q. Would each of those people have access to the
7 reservation system?
8   A. Correct.
9   Q. Do you know if those folks had any training on
10 the reservation system?
11   A. Yes.
12   Q. When did they have training on that system?
13   A. All the time. Me, Kevin, and Christine, we
14 made sure that whoever -- whoever we hired -- actually,
15 we paid a lot of -- I think some money to Best Western
16 or someone -- whoever had to hire, had to listen to the
17 tape and take a test.
18   Q. On the reservation system?
19   A. Yes. And also the manager we would go and
20 train them to get training on Best Western's site.
21   Q. When did this training occurred?
22   A. All the time. Whoever we fired, the next
23 person had to do -- for the hire, had to go through the
24 Best Western -- what do you call it? -- training
25 session of how to operate the system, and then they

---

Page 57

```
 1   would have tested them, and then -- I think Best
 2   Western tested them.
 3       Q.  So would these people attend training here in
 4   Phoenix or someplace else?
 5       A.  No, no, no.  They go -- they sit --
 6           MS. SCHLESINGER:  Form, foundation.
 7       A.  They sit in a room, they listen to a video,
 8   they go on a computer online -- they listen to the
 9   video, they learn about the system, then they act on
10   it, and then we ask them questions -- the computer asks
11   them questions and gives them a score and they pass.
12   I think that's how it worked.
13   BY MR. GARBARINO:
14       Q.  Do you have any records of these folks taking
15   these trainings?
16       A.  Best Western should have them all, all the
17   time.
18       Q.  My question is --
19       A.  No, no, I don't.
20       Q.  -- do you have any records?
21       A.  Records, I don't know -- I mean, how could
22   anybody have any record of online training session?
23       Q.  You told Mr. Nathanson that you called Terry
24   and told her that you had problems with the revenue.
25   Do you remember when you first placed that call to
```

Page 58

```
 1   Terry?
 2       A.  No.
 3       Q.  How many months within purchasing the hotel do
 4   you believe you made that call?
 5       A.  Yes, maybe three, four months after that,
 6   because, like I said, I checked the previous owner's
 7   record before I buy the place, and he was doing a lot
 8   more business, and I wasn't -- it didn't make sense for
 9   me that I'm doing remodeling, I clean up everything.
10   It should be going up, and it was going down.  I mean,
11   it didn't make any sense.
12       Q.  So if at that point in time people were
13   trained on the reservation system who worked at the
14   hotel, did anybody investigate the reservation system
15   as being a potential problem?
16       A.  No, not from our end.
17       Q.  But did people know how to work the
18   reservation system at that time?
19       A.  Yes.
20       Q.  You told Mr. Nathanson that after Mitch came
21   out and worked with the hotel on the system, that there
22   were still problems after that with the system.
23       A.  Yes.
24       Q.  Do you know the dates of those that you --
25       A.  No, no, sir.
```

Page 59

```
 1       Q.  Excuse me.  Let me finish my question.
 2           Do you remember the dates of when you
 3   discovered those problems?
 4       A.  It was shortly after I hired Lisa and Cheryl.
 5       Q.  But was Lisa there when Mitch came out to --
 6       A.  Yes.
 7           MS. SCHLESINGER:  Let him finish the
 8   question.
 9           THE WITNESS:  I'm sorry.
10   BY MR. GARBARINO:
11       Q.  Do you remember the problems that were
12   discovered after Mitch fixed the system or gave you
13   training on the system?
14           MS. SCHLESINGER:  Form.
15       A.  I know that he explained it to Lisa, his
16   computer, and one person sits next to him.  So he
17   explained it to Lisa.
18   BY MR. GARBARINO:
19       Q.  But do you know what the other problems were
20   that you encountered with the reservation system after
21   Mitch came out?
22       A.  Same.  Same problem, but not for long, like
23   on and off.  He would fix it fast or Mitch would
24   call -- he was pretty much on standby.  He was helping
25   after we find out.
```

Page 60

```
 1       Q.  So once you discovered a problem, it was fixed
 2   within how many days?
 3       A.  I wouldn't be able to say.
 4       Q.  Do you remember when you first had the
 5   conversation with Terry Wininger about the automatic
 6   transfer?
 7       A.  Yes.
 8       Q.  Do you have a date?
 9       A.  No.  I mean, the way I would calculate it was
10   like maybe two months after I listed the property.
11       Q.  Do you remember when you first listed the
12   property?
13       A.  I'd have to look.
14       Q.  Did you list the property in 2008 or 2007?
15       A.  It wasn't definitely in 2008.  It must have
16   been 2007.
17       Q.  I'm sorry.  Could you repeat that answer.
18       A.  It must have been 2007.
19       Q.  And was the name of the broker that you listed
20   it with, was that Chuck Nester?
21       A.  Originally, yes.
22       Q.  And is that the person you listed it with in
23   2007?
24       A.  Yes.
25           THE WITNESS:  I'm sorry.  Can you forgive
```

### Page 61

1  me for 30 seconds?
2       MR. GARBARINO: Certainly. If you need
3  to take a break, take a break.
4       THE WITNESS: I have to go to the
5  restroom.
6       MR. GARBARINO: Absolutely.
7       (Recess was taken from 1:10 p.m. to
8  1:16 p.m.)
9  BY MR. GARBARINO:
10    Q.  Mr. Harlan, you testified that Terry Wininger
11 told you the property was on probation before you
12 signed the Best Western agreement; is that fair?
13    A.  Yeah.
14    Q.  Is that a "yes"?
15    A.  Yes.
16    Q.  Did she show you any documents that
17 demonstrated the property was on probation at the time?
18    A.  Yes.
19    Q.  What were those documents?
20    A.  List of necessary repairs.
21    Q.  And the list said that this property was on
22 probation?
23    A.  The list didn't say that; she said that.
24 That's why the guy had to sell his business. Best
25 Western gave him final warning.

### Page 62

1    Q.  Did Best Western give you any documents that
2  showed that --
3    A.  Yes.
4    Q.  Let me finish my question.
5    A.  I'm sorry.
6    Q.  -- that showed the property was on probation?
7    A.  I think the broker told me.
8    Q.  The broker being who?
9    A.  Whoever was selling it, selling the hotel.
10   Q.  So the broker was the seller's broker?
11   A.  Yes, sir.
12   Q.  Did Best Western give you any documents that
13 showed that the hotel was in probation?
14      MS. SCHLESINGER: Objection, asked and
15 answered.
16   A.  No.
17 BY MR. GARBARINO:
18   Q.  But it's still your testimony that Terry
19 verbally told you the property was in probation?
20   A.  Well, nobody ever denied it, and they told me.
21 They told me, "You have to fix these things. The
22 property is in probation. You have to fix these
23 things, and you have so much time to do it," and that
24 was it.
25   Q.  And I'm just trying to clarify, who told you

### Page 63

1  that the property was in probation? Did Terry Wininger
2  tell you the property was in probation?
3    A.  Yes.
4       MR. GARBARINO: I have no further
5  questions.
6       MS. SCHLESINGER: And just because of a
7  little confusion, I've got like two quick questions
8  just to clarify.
9
10      FURTHER EXAMINATION
11 BY MS. SCHLESINGER:
12   Q.  Mr. Harooni, when you testified that you were
13 told the property was in probation, you're talking
14 about prior to your purchasing the property; is that
15 right?
16   A.  Yes.
17   Q.  And you mentioned something about a final
18 warning, that they had told you the property prior to
19 your purchase had had a final warning; is that correct?
20      MR. GARBARINO: Objection, form.
21   A.  Yes. I guess Best Western finally gave up on
22 the guy and gave him a notice, if you don't sell your
23 business to a new buyer, we're going to take our name
24 away.
25      (Court reporter instructs the witness to

### Page 64

1  not turn away when speaking.)
2    A.  Best Western told the previous owner that if
3  you do not sell it, we're going to take the name away,
4  so you have to sell it.
5    Q.  Okay. Did they ever give you a similar
6  warning?
7    A.  No.
8    Q.  Okay. And then real quickly, you mentioned
9  that Mitch had come out and helped you with various
10 things. Was there additional support that you believed
11 Best Western had promised you above and beyond what
12 Mitch came out and was doing with his inspections,
13 et cetera?
14   A.  Yes.
15   Q.  Okay.
16   A.  Mitch was basically a middleman and a
17 manager -- area manager that would look over the
18 account, but there was supposed to be a money manager
19 looking at my account from their end.
20   Q.  Here, let me get you something.
21   A.  No, I'm okay.
22   Q.  Okay. And then part of what you just -- I'm
23 sorry.
24      Did you also understand that Best Western
25 was going to assist with obtaining corporate accounts?

## Page 65

1    A.  Well, at that time -- at that time, I thought
2    that was a done deal.  I wasn't sure that we have to
3    renew every year and somebody has to go renew it.
4    Nobody ever told me.
5    Q.  And you later -- if I understood your
6    testimony correctly, you said that you later found out
7    there was an entire department at Best Western to help
8    with corporate accounts; is that right?
9    A.  Yes.
10   Q.  Did they ever suggest -- when you called about
11   your revenue falling, did anyone at Best Western ever
12   suggest that you contact this department for
13   assistance?
14   A.  Let me correct you.
15   Q.  Okay.
16   A.  I never said the department.  There is a few
17   people that they -- maybe you can call it the
18   department, maybe a group of people that were only in
19   sales and they can get accounts for me, and those
20   people not only -- the name never came up to me, never
21   tried to do anything for me until it was too late.
22           MS. SCHLESINGER:  I believe that's all
23   we've got.
24           MR. GARBARINO:  That's all I have.
25           MS. SCHLESINGER:  Are you going to read

## Page 66

1    and sign?
2            MR. GARBARINO:  It's your witness.
3            MS. SCHLESINGER:  I mean, that's been the
4    practice.  We'll read and sign.
5            (1:22 p.m.)

                    _____
                    HOOSHANG HAROONI

## Page 67

1    STATE OF ARIZONA    )
                         ) SS.
2    COUNTY OF MARICOPA  )
3          BE IT KNOWN that the foregoing transcript was
4    taken before me, HALEY WESTRA, a Certified Court
5    Reporter in the State of Arizona; that the witness
6    before testifying was duly sworn by me to testify to
7    the whole truth; that the questions propounded to the
8    witness and the answers of the witness thereto were
9    taken down by me in shorthand and thereafter reduced to
10   print under my direction; at the witness's request,
11   notification was provided that the transcript was
12   available to read and sign; that the foregoing pages
13   are a true and correct transcript of all proceedings,
14   all done to the best of my skill and ability.
15         I further certify that I am in no way related to
16   any of the parties hereto nor am I in any way
17   interested in the outcome hereof.
18         Dated at Phoenix, Arizona, this 21st day of
19   December, 2009.

                    _____
                    HALEY WESTRA
                    AZ Certified Court Reporter No. 50762