*Best Western v. AV Inn Associates 1, LLC, et al.*
*Exhibit No. 6*

# EXHIBIT "6"

**Deposition of Cheryl Pollack**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BEST WESTERN INTERNATIONAL, INC., an Arizona non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> AV INN ASSOCIATES 1, LLC, a California limited liability company; HOOSHANG HAROONI, <br><br> Defendants. <br><br> And Related Claims | No. CIV08-02274-PHX-DGC |

DEPOSITION OF CHERYL D. POLLACK, CHA

Phoenix, Arizona
January 13, 2010
9:30 a.m.

PREPARED FOR:

ATTORNEY AT LAW
(COPY)

Reported by:
HALEY WESTRA, RPR
Arizona CCR No. 50762

CHERYL D. POLLACK, CHA
1/13/2010

**Page 2**

```
            DEPOSITION OF CHERYL D. POLLACK, CHA,
taken on January 13, 2010, commencing at 9:32 a.m., at
OTTMAR HOLIDAY & ASSOCIATES, 2800 North Central Avenue,
Phoenix, Arizona, before HALEY WESTRA, a Certified
Reporter in the State of Arizona.

COUNSEL APPEARING:
        THE NATHANSON LAW FIRM
        BY:  Ms. Kira A. Schlesinger
        8765 East Bell Road, Suite 101
        Scottsdale, Arizona  85260
        Attorneys for Defendants/Counterclaimant
        SHERMAN & HOWARD, L.L.C.
        BY:  Mr. Arthur W. Pederson
        2800 North Central Avenue, Suite 1100
        Phoenix, Arizona  85004-1043
        Attorneys for Plaintiff/Counterdefendant

 ALSO PRESENT:
        Ms. Katie Lipp, Legal Assistant for Best Western
```

**Page 3**

```
                        I N D E X
WITNESS                                          PAGE
CHERYL D. POLLACK, CHA
        EXAMINATION BY MS. SCHLESINGER             4
        EXAMINATION BY MR. PEDERSON               127
        FURTHER EXAMINATION BY MS. SCHLESINGER    130

                     E X H I B I T S

EXHIBITS   DESCRIPTION                          MARKED
No. 1      Rules & Regulations,                    79
           Bates Nos. BW0934 to BW0974
No. 2      Letter from Best Western to             79
           Mr. Harooni, dated 2/8/08
No. 3      Letter from Best Western to             99
           Mr. Harooni, dated 1/17/08
No. 4      Letter from Best Western to            116
           Mr. Harooni, dated 3/24/08
No. 5      Less Than 840 Score Property           122
           Report, dated 1/31/08
No. 6      Membership Application and             130
           Agreement, dated 12/1/04
```

**Page 4**

1  CHERYL D. POLLACK, CHA,
2  a witness herein, having been first duly sworn by the
3  Certified Reporter to speak the truth and nothing but
4  the truth, was examined and testified as follows:
5
6  EXAMINATION
7  BY MS. SCHLESINGER:
8      Q.  Good morning. Is it Ms. Pollack?
9      A.  Yes.
10     Q.  Am I saying it correctly?
11     A.  Yes.
12     Q.  My name is Kira Schlesinger. I represent
13 Harry Harooni in this litigation, and I understand that
14 you've been produced today as a 30(b)(6) witness
15 covering the issue of termination of membership
16 agreements; is that correct?
17     A.  Yes.
18     Q.  Have you ever been deposed before?
19     A.  Yes.
20     Q.  How many times?
21     A.  Several.
22     Q.  And was that always in the capacity as a
23 representative for Best Western?
24     A.  Yes.
25     Q.  And can you tell me when the last time you

**Page 5**

1  were deposed was.
2      A.  It's been a few months past.
3      Q.  A few months?
4      A.  (Nodding head.)
5      Q.  Estimate around September or ...
6      A.  Probably last fall.
7      Q.  And when you say "last fall," you mean of
8  2009?
9      A.  Yes.
10     Q.  And what case was that in?
11     A.  I don't recall.
12     Q.  Where was the venue?
13     A.  It would have been here in Phoenix.
14     Q.  Is the case still ongoing?
15     A.  I don't know.
16     Q.  And in what capacity were you deposed in that
17 matter?
18     A.  I don't recall if it was a 30(b)(6) or just
19 representing for Best Western.
20     Q.  And this was just a few months ago?
21     A.  It was last fall.
22     Q.  Of 2009?
23     A.  Yes.
24     Q.  So four months ago or so?
25     A.  Perhaps.

Page 6

1  Q. And do you recall who counsel was in that
2  matter?
3  A. I believe it was Art Pederson and his law
4  firm.
5  Q. I'm sorry, I wasn't clear.
6  A. I believe it was Mr. Pederson's law firm.
7  Q. I wasn't clear. I meant deposing counsel.
8  A. Oh. I don't recall.
9  Q. Was it a man or a woman?
10 A. It was a man.
11 Q. All right. You probably know the rules of the
12 road, but so far they've already been broken, so I want
13 to reiterate them.
14     I'm going to ask that you let me finish
15 my questions. I'm going to attempt to let you finish
16 your answers. I apologize in advance if I don't do a
17 stellar job with that. I certainly will try.
18     I would appreciate it if instead of you
19 nodding or saying "uh-huh," "huh-uh," you make sure you
20 use "yes" and "no" responses or, as appropriate,
21 elaborate. Where the question does call for a "yes" or
22 "no" answer, I would appreciate it if you would give me
23 a "yes" or "no," and if you need to explain, so be it.
24 Do you understand this?
25 A. Yes.

Page 7

1  Q. Thank you.
2     And if you need to take a break, please
3  feel free to let us know that. If you need to confer
4  with Mr. Pederson, please feel free to do that after
5  you answer my question. Do you understand that?
6  A. Yes.
7  Q. If for any reason you do not understand my
8  question as it is posed, I would appreciate if you ask
9  me to rephrase it or let me know that you don't
10 understand. Can you do that for me?
11 A. Yes.
12 Q. Thank you.
13     And if you do not ask me to rephrase it,
14 I'm going to assume that you did understand the
15 question and we're going to take your answer for the
16 question that I asked. Does that make sense?
17 A. Yes.
18 Q. Thank you.
19     You said that you had been deposed
20 several times. You say you don't have any recollection
21 of the one that was just a few months ago in the fall
22 of 2009. When were you deposed prior to that occasion?
23 A. I don't recall.
24 Q. Can you give me an estimate of when it was?
25 A. No.

Page 8

1  Q. Okay. And do you know the difference
2  between -- for future reference, it's not particular to
3  this question but to clarify that you do know the
4  difference between an estimate and a guess?
5  A. Yes.
6  Q. Can you explain that for me?
7  A. Estimate is estimated time. A guess is I'm
8  guessing that it was a certain period of time.
9  Q. Okay. Well, it's not just applicable to time.
10 It's applicable to anything. A classic example is if
11 I asked you to estimate the length of this desk, you
12 could probably come up with a number even without
13 measuring it. If I asked you to estimate the size of
14 my desk in my office, that would be a guess because you
15 have no basis upon which to come up with that answer.
16 Do you follow me?
17 A. Yes.
18 Q. Okay. So in this deposition I'm going to be
19 entitled to your best estimate, but I do not want you
20 to guess. Is that clear?
21 A. Yes.
22 Q. Okay. You said you had been deposed several
23 times, you don't recall the case from the fall of 2009,
24 and you don't recall when the time prior to that was.
25 Do you have an estimate of when that would have been?

Page 9

1  A. No.
2  Q. And how about the one before that?
3  A. No.
4  Q. Are you taking any drugs or on any kind of
5  medication that would impair -- it's a standard
6  question, ma'am. You don't need to roll your eyes
7  here.
8     Are you on any kind of medication or any
9  drugs or other substances that would impair your memory
10 today?
11 A. No.
12 Q. Nothing that would impair the clarity of your
13 thought?
14 A. No.
15 Q. Okay. What is your title at Best Western?
16 A. I'm director of member care and development
17 administration.
18 Q. And is that the position for which you were
19 hired by Best Western?
20 A. No.
21 Q. For what position were you hired initially?
22 A. Secretary in the quality control department.
23 Q. So you were a secretary before becoming
24 director of member care and development administration?
25 A. No.

CHERYL D. POLLACK, CHA
1/13/2010

**Page 10**

1  Q. You had an interim position?
2  A. Yes.
3  Q. What was that?
4  A. I was manager of member care administration.
5  Q. And any other interim positions?
6  A. I was a supervisor of member care
7  administration.
8  Q. When were you hired by Best Western?
9  A. February 2, 1976.
10 Q. How long were you a secretary?
11 A. About -- it was a year and a half.
12 Q. Did you have any -- I will assume you
13 graduated from high school?
14 A. Yes, correct.
15 Q. Where was that?
16 A. Camelback High School here in Phoenix.
17 Q. Oh, here local?
18 A. Beg your pardon?
19 Q. That's local?
20 A. Yes.
21 Q. So are you a Phoenix native?
22 A. No.
23 Q. Where are you from originally?
24 A. Kansas.
25 Q. My husband is from the Midwest.

**Page 11**

1  Do you ever think about going back there?
2  A. No.
3  Q. Not as cold as it's been, huh? He's laughing
4  at me.
5      Okay. So you were hired initially after
6  graduating high school or had you gone to college?
7  A. I had been to college.
8  Q. What college did you attend?
9  A. Phoenix Community College.
10 Q. And that's a two-year program?
11 A. It was.
12 Q. Did you complete that program?
13 A. Yes.
14 Q. What was the concentration of study?
15 A. Just general studies, business.
16 Q. Okay. What type of business classes?
17 A. There was some business management classes.
18 I can't remember specifically what I took.
19 Q. Did you go to -- attend any school after
20 community college?
21 A. I went to Scottsdale Community College for a
22 while.
23 Q. Was that part of the two-year program or was
24 that in addition to it?
25 A. In addition.

**Page 12**

1  Q. And did you have any focus of study there?
2  A. Art.
3  Q. Okay. And do you have any degree -- and I'm
4  not talking about a CHS or something -- or if that's
5  the right acronym -- I'm not talking about that. I'm
6  talking about specifically a degree from a four-year or
7  other institution.
8  A. No.
9  Q. Are you a certified hotel -- what is it, CHS;
10 is that correct?
11 A. CHA.
12 Q. CHA. Okay. And when did you obtain that
13 certification?
14 A. December 1990.
15 Q. Was that -- strike that.
16     You had told me that you were a manager
17 prior to becoming a supervisor; is that correct?
18 A. No.
19 Q. Give me that order again. You were a
20 secretary and then --
21 A. Then I became a supervisor in quality control,
22 then a supervisor in member care, then a manager in
23 member care, and a director in member care.
24 Q. When did you become a director of member care?
25 A. It was January of 2000.

**Page 13**

1  Q. And when had you become a manager of member
2  care?
3  A. It was in 1980. I don't remember the month
4  particularly.
5  Q. That's fine. And supervisor of member care?
6  A. '79.
7  Q. A supervisor of quality control?
8  A. It was '77 or '78.
9  Q. And you told me you had been hired as a
10 secretary in '76; is that right?
11 A. Yes.
12 Q. Did you undergo any additional training to
13 become a supervisor of quality care through Best
14 Western?
15 A. Not that I remember.
16 Q. What about for the position as a supervisor of
17 member care? Any separate training?
18 A. Just what would have been provided at Best
19 Western.
20 Q. And that's what I'm trying to find out about.
21 Any training by Best Western, the answer would be
22 "yes," then?
23 A. There has been some training at Best Western.
24 Q. Can you describe that training for me.
25 A. They have provided supervisory classes,

CHERYL D. POLLACK, CHA
1/13/2010

Page 14

1  training on employment development of employees,
2  performance reviews.
3   Q. Is that performance reviews of staff?
4   A. It would have been of my employees.
5   Q. Of employees?
6   A. Yes.
7   Q. Okay. As opposed to some outside third
8  entity, third-party entity?
9   A. Yes.
10  Q. Anything else?
11  A. There has been some training classes from
12 ExecuTrain and SkillPath, companies like that that do
13 in-house training.
14  Q. And that kind of in-house training has to do
15 more with management than the hotel industry? In other
16 words, it's management not specific to hotel
17 operations; is that correct?
18  A. Yes.
19  Q. Any separate or additional training to become
20 a manager or supervisor of member care?
21  A. Not that I recall.
22  Q. What about for director of member care?
23  A. Not that I recall.
24  Q. Did you have any training other than the CHA
25 in hotel operations or anything specific to hotels?

Page 15

1   A. I spent a day at a hotel on-site observing
2  what they do and participating in housekeeping and
3  maintenance, front desk activities.
4   Q. That must have been fun. When you say
5  "participating," what did you do?
6   A. I made beds, cleaned sinks, helped clean
7  pools, swimming pools.
8   Q. So for one day, they kind of walked you around
9  the operation?
10  A. Yes.
11  Q. Anything more than that one day?
12  A. No.
13  Q. Where was that hotel?
14  A. It was in Tempe.
15  Q. In Tempe. And I will assume that it was a
16 Best Western?
17  A. Yes.
18  Q. What year was that? Do you recall?
19  A. Last year.
20  Q. What was the purpose of that additional
21 training last year?
22  A. Just provided staff an experience, a day at
23 the hotel.
24  Q. Kind of a field trip?
25  A. It was just myself.

Page 16

1   Q. I'm not clear. Why you? Were other people
2  also going through this one-day experience at other
3  hotels?
4   A. Yes.
5   Q. And was this experience offered or required?
6   A. Required.
7   Q. Okay. And what was the purpose of that
8  requirement? Do you know?
9   A. I had not worked at a hotel before, so they
10 wanted us to experience a day at a hotel.
11  Q. Thank you.
12    Where had you worked -- had you worked
13 anywhere prior to Best Western?
14  A. Yes.
15  Q. Where was that?
16  A. I worked for Volt Technical Corporation.
17  Q. As a secretary?
18  A. General office activities.
19  Q. What year did you graduate high school?
20  A. '73.
21  Q. So you worked at Volt while you were doing
22 community college, then?
23  A. Yes.
24  Q. And then you obtained the job at Best Western?
25  A. Yes.

Page 17

1   Q. So it was only that one other employer?
2   A. During high school.
3   Q. Okay. And we're reaching far back. We won't
4  reach that far back.
5    You didn't work in any hotel industry or
6  anything like that prior to Best Western?
7   A. No.
8   Q. Can you define your current position in terms
9  of job duties and responsibilities?
10  A. I oversee member care administration, brand
11 identity administration, data control word processing,
12 two switchboard employees, and an individual that works
13 with our PeopleSoft automation project.
14  Q. What is that?
15  A. It's our database that houses information on
16 Best Western properties.
17  Q. When you say "information on Best Western
18 properties," can you be more specific, please?
19  A. Names and addresses of the voting member,
20 contact information, ownership, status of the property,
21 whether it's active or a member, voting selections,
22 general information about the voting member and its
23 property.
24  Q. So you said ownership was one of the criteria
25 that's tracked in this PeopleSoft?

CHERYL D. POLLACK, CHA
1/13/2010

Page 18

1   A. Yes.
2   Q. Do you have any experience with computers
3   other than day-to-day using of them? I'm referring to
4   things such as writing programs or updating software.
5   Anything like that?
6   A. No.
7   Q. When you said "status of the property," you're
8   referencing there whether or not it's in good standing,
9   probation, conditional, that sort of thing?
10  A. Yes.
11  Q. How frequently is that updated in the
12  PeopleSoft program?
13  A. Every day there's changes made.
14  Q. The software is updated every day?
15  A. If there's a change to a particular property,
16  information piece, it's updated every day.
17  Q. So if somebody gets the information that a
18  change has occurred, then they go into the system live
19  and change it?
20  A. Yes.
21  Q. Correct?
22  A. Yes.
23  Q. Thank you.
24     What kinds of checks and balances -- is
25  there a system to check whether that has appropriately

Page 19

1   happened for all changes that occur on a daily basis?
2   A. The individual that enters the change, that is
3   checked by another individual in that department. The
4   information that they entered is checked to make sure
5   it was accurately entered.
6   Q. Okay. And the person who is doing the
7   checking, the other individual you referenced, what's
8   that person's name, do you know, or title?
9   A. They're data control word processing
10  operators.
11  Q. Okay. And do they get like a stack of changes
12  that they're supposed to then double-check have been
13  entered? Do you know how that works by any chance?
14  A. I'm not sure how they do that, but once it's
15  entered, then it's checked by that other team member.
16  Q. You said that you oversee member care
17  administration. What does that entail?
18  A. Once an application has been approved for
19  membership, there is a team of member care coordinators
20  that will follow the requirements that were placed upon
21  that member to ensure compliance, all the way through
22  final approval of their membership. There is a team
23  that processes files for review by our board of
24  directors for failure to comply with our rules and
25  regulations. They also handle the waivers/extension

Page 20

1   requests.
2   Q. I'm sorry, the what?
3   A. Waivers and extension requests of design
4   items, unit count changes.
5   Q. I'm sorry?
6   A. Unit count changes.
7   Q. You speak quickly with words I'm not familiar
8   with in this context. So unit account changes?
9   A. Unit, U-N-I-T, count, C-O-U-N-T.
10  Q. I appreciate that.
11     And what does that mean in this context?
12  What are they counting? What are the units?
13  A. Motel rooms.
14  Q. I lost my live feed here. In any event -- all
15  right.
16     So you coordinate these items, any
17  failure to comply with the requirements to become a
18  member. Then once somebody is a member, you coordinate
19  or oversee any waivers or extensions with design items
20  only?
21  A. Not just design items, but perhaps if they
22  have not been activated, they're asking for an
23  extension of time to be activated on the system.
24  Q. And in order to ask for an extension of time
25  to be activated, I'm going to assume that means that

Page 21

1   they have not yet become full and active members; is
2   that correct?
3   A. Yes.
4   Q. But once they become full and active members,
5   what other areas do you oversee other than waivers and
6   extensions with regard to design items?
7   A. That's it.
8   Q. Are there any other duties that you do in this
9   area of member care administration?
10  A. We oversee the annual renewal process, the
11  membership ballot process, comfort agreements.
12  Q. What is a comfort agreement?
13  A. It's a letter that is provided to our member
14  so they can provide it to their lender, which
15  reiterates what the bylaws state, that we will notify
16  the lender if there is a comfort agreement on file, if
17  there is perhaps a potential pending cancellation of
18  the membership.
19  Q. What is a comfort agreement other than a
20  letter that you send to the lender? You said -- the
21  explanation was a little circular, I'm sorry.
22     You said a comfort agreement is a letter
23  we send to the lender to tell them if a comfort
24  agreement is on file. So I'm trying to clarify that.
25  A. Let me restate that. A comfort agreement is

CHERYL D. POLLACK, CHA
1/13/2010

---

22

1   basically a letter of comfort to the lender. That's
2   why we call it a comfort agreement, that we will
3   provide the lender notice prior to potential
4   cancellation of the membership so that they can try to
5   cure any defaults.
6       Q.  And that letter says that there's a comfort
7   agreement on file?
8       A.  The letter is a comfort agreement. It just
9   reiterates what the bylaws state.
10      Q.  What's the agreement that's being referred to
11  in the term "comfort agreement"?
12      A.  It's a letter that I sign and send to the
13  member, who provides to the lender.
14      Q.  So there's no agreement between parties? It's
15  just saying we're going to give you notice before we
16  cancel anybody's membership?
17      A.  That particular property's membership.
18      Q.  Right. Is that correct?
19      A.  Yes.
20      Q.  Okay. Do you have any other duties in your
21  current position?
22      A.  Other than what I've described.
23      Q.  Okay. So let me just recap here. So you
24  oversee data entry --
25      A.  Yes.

---

23

1       Q.  -- is that correct?
2           And you oversee extensions or waivers for
3   the design department?
4       A.  Not for the design department, for members
5   that are asking for extensions prior to activation, and
6   then those that are members that we're monitoring.
7       Q.  And when you say "members that we're
8   monitoring," can you be more precise with that, please?
9       A.  Once they have been activated, they may have a
10  design issue they want an extension on, or a waiver.
11  We will process those.
12          If they're a property that was offered a
13  conditional extension, they have design requirements
14  they need to meet, so we will monitor those. We
15  monitor them jointly with the design department.
16      Q.  I'm sorry, did you say "we won't monitor
17  them"?
18      A.  We monitor them jointly with the design
19  department.
20      Q.  And I apologize. I've been ill, so it may be
21  that my ears are a little stopped up. I appreciate
22  your patience with that.
23          And then you said that you also oversee
24  the annual renewal process; is that correct?
25      A.  Yes.

---

24

1       Q.  What's involved in that process?
2       A.  We work with the accounting department to send
3   statements to the members that include the renewal of
4   their membership for the following year, and we follow
5   up with those properties that have not renewed to see
6   if they plan on renewing their membership.
7       Q.  What's the percentage of properties that opt
8   not to renew their membership?
9       A.  Less than 1 percent.
10      Q.  So there's not a lot of follow-up there?
11      A.  There's a lot of follow-up between
12  September 15th and November 30th. Not everyone is
13  responsive.
14      Q.  Does anything else occur between
15  September 13th, if you have not received somebody's
16  membership dues, and November 30th? Are any other
17  steps taken other than your follow-up?
18      A.  The accounting department will bill them a
19  penalty fee for each month that it's late.
20      Q.  Anything else?
21      A.  We will send out faxes or contact the members,
22  ask them to give us a call, let us know if they plan to
23  renew.
24      Q.  Anything else?
25      A.  No.

---

25

1       Q.  You also told me that you oversee the
2   membership ballot process for voting issues; is that
3   right?
4       A.  Yes.
5       Q.  Okay. Have we discussed now all of your
6   duties for Best Western?
7       A.  I've indicated other areas that I oversee.
8       Q.  I appreciate that.
9           Have you indicated all other areas, all
10  other duties that you have for Best Western, at least
11  in broad terms?
12      A.  I also present matters to the board of
13  directors on a monthly basis on properties that need
14  the board's attention.
15      Q.  And what's the criteria for deciding that a
16  property needs the board's attention?
17      A.  If the member requests an extension or waiver
18  that has not been approved at the staff level, it's
19  presented to the board of directors.
20          If a property is subject to cancellation,
21  per the bylaws, rules, and regulations, it's submitted
22  to the board of directors for their decision.
23          (Recess was taken from 10:03 a.m. to
24  10:07 a.m.)
25

---

CHERYL D. POLLACK, CHA
1/13/2010

Page 26

BY MS. SCHLESINGER:
Q. Ms. Pollack, I'm going to go back to something here. You had told me you couldn't recall the litigation in which you were deposed in the fall of 2009, correct?
A. Correct.
Q. Do you recall if Best Western was the plaintiff or the defendant?
A. I don't recall. I don't recall specifically.
Q. Somebody just called you up and said, "We need you to testify," you came, and that was the end of it, as far as you were concerned?
A. Yes.
Q. Did you do any preparation for that testimony?
A. Other than look at perhaps a few documents, like I normally do.
Q. What documents do you look at, like you said, like you normally do? Are there a standard set of documents that you look at?
A. I look at the complaint, and if there's anything that's provided by my legal department for me to look at, I'll look at that.
Q. In this case, was anything provided by your legal department for you to look at?
A. I don't remember specifically.

Page 27

Q. How are you compensated, Ms. Pollack, for your work at Best Western?
A. I'm salaried.
Q. Is that a base salary?
A. Yes.
Q. And are you entitled to bonuses?
A. Yes.
Q. What's the criteria for bonuses?
A. The company needs to meet its goals and the department needs to meet its goals, and there's a percentage calculated, and I'm awarded a bonus.
Q. That was a very broad and succinct answer. I appreciate that.
What are the department's goals, please?
A. They relate to the company's -- they relate to the company's overall objectives, and if my department meets that individual objective, then I receive a percentage of -- a point evaluation, I should say, on my scorecard, and then it's calculated, and then there's a percentage that's added to my scorecard.
Q. While I appreciate that bonuses are frequently calculated on the ability of companies to meet their goals and the individual's ability to meet their goals, I would like to get more specific than to say, "I may get a bonus if I meet my goals." I really want to find

Page 28

out what the criteria -- what are the goals, what are the criteria upon which the company bases the bonus for you?
A. If our company meets a member satisfaction level of -- it depends on what the board establishes that satisfaction level to be. If, say, it's at least 75 percent that the members are satisfied on the member satisfaction survey, then that is a goal that has been reached.
If my team meets satisfactory Signature shopper call evaluations, meaning they met all the requirements of a positive, well-responsive phone call, then they get so many points and that gives them a percentage of up to 100 percent.
If they meet those goals, then there's a percentage that's awarded.
Q. What is a Signature shopper call?
A. Signature Training will call various staff members and pretend that they are a member and ask questions about "I'd like to request a waiver. How do I do that?" and there's certain things they need to establish in that call in order to get all their points.
Q. What is "Signature" in this context? You said Signature Training, and you referred to Signature

Page 29

a moment ago. What does the term "Signature" designate?
A. That's the name of the company that does the training.
Q. So it's a third party?
A. Yes.
Q. And that was some of the training you said you had undergone previously when we were talking about your training?
A. Yes. I didn't mention Signature, but that is a company that had offered some training.
Q. When you say it was offered, did you partake in that training?
A. Yes.
Q. What other goals go into the award, or nonaward, I suppose, of your bonuses?
A. The employee engagement (sic) survey is evaluated, and if I met my particular objectives of the employee evaluation survey, then I would be awarded anywhere from a 1 to a 5 on my scorecard.
Q. What's an employee evaluation survey?
A. Maritz is a company that sends out a confidential survey to our employees. They take the survey, and it's calculated with their ratings on whether they are happy with Best Western, whether they

30

1  feel like they are collaborative efforts (sic), that
2  our processes and procedures are good, and they
3  evaluate that.
4      Q. Do you -- strike that.
5          Are any member retention rates calculated
6  as part of your -- considered as part of your bonus?
7      A. No.
8      Q. Any collection of fees in a timely manner
9  considered as part of your bonus?
10     A. No.
11     Q. Any ability to keep properties from
12 terminating considered as part of your bonus?
13     A. No.
14     Q. Do you have any other compensation other than
15 a base salary and potential bonus?
16     A. No.
17     Q. Do you get any commissions of any sort?
18     A. No.
19     Q. Do you get any stock percentages?
20     A. No.
21     Q. Do you get any health benefits?
22     A. Yes.
23     Q. 401(k)?
24     A. Yes.
25     Q. Is that a 401(k) or is it a profit sharing?

31

1      A. It's a 401(k).
2      Q. What would you consider to be the -- strike
3  that.
4          Members pay a fee to be part of the Best
5  Western group, correct?
6      A. Yes.
7      Q. Okay. What is it they're paying a fee for?
8      A. The services that the members want to have.
9      Q. So Best Western is marketing services?
10     A. Yes.
11     Q. Do they also market various goods such as case
12 goods or linens or things of that nature?
13     A. We have a supply division that is a source for
14 our members to purchase goods.
15     Q. And that's a part of Best Western?
16     A. Yes.
17     Q. So it's just a division; it's not a separate
18 company?
19     A. Correct.
20     Q. You also mentioned that you present matters to
21 the board, and you mentioned -- that's correct, right?
22     A. Yes.
23     Q. And you mentioned that sometimes those
24 presentations to the board were triggered by member
25 requests. Do you recall that?

32

1      A. Yes.
2      Q. Why would a member request a presentation to
3  the board?
4      A. They request waivers and extensions of certain
5  items. They may be asking for a unit count change if
6  they want to add units.
7      Q. And by "units" in this context, you mean
8  rooms?
9      A. Yes. And that may need to be presented to the
10 board of directors. Anything that cannot be approved
11 by the staff level is presented to the board.
12     Q. "Anything" is pretty board. Let's narrow that
13 down. You mean extensions and waivers or change in
14 unit count; is that right?
15     A. Yes.
16     Q. Anything else?
17     A. I'm sorry. I don't understand "anything
18 else."
19     Q. Sure. Are there other reasons a member would
20 request to have something presented to the board, that
21 you are aware of?
22     A. Their hearing, their right to a hearing. Or
23 if they don't qualify for a hearing, they would present
24 their response, and that information would then be
25 presented to the board of directors.

33

1      Q. Why would somebody not qualify for a hearing?
2      A. If they have not been granted final approval
3  of their membership and they have failed QA scores and
4  not met the conditions of the terms of approval letter.
5      Q. So they wouldn't be qualified for a hearing
6  because they're not an official member yet?
7      A. Correct.
8      Q. Is that the only reason?
9      A. No. Or if they had had a hearing and had been
10 granted a conditional extension and they did not meet
11 those requirements, they do not qualify for a hearing.
12     Q. Why not?
13     A. Because that's what the terms of the
14 conditional extension letter states, that the member
15 understands that if they receive a conditional
16 extension following a hearing, they would then not have
17 a right to a hearing until all those conditions have
18 been met.
19     Q. And what's the criteria for a conditional
20 extension being granted?
21     A. That's a decision the board makes.
22     Q. It's just their unilateral decision?
23     A. Yes.
24     Q. Is there criteria written in the bylaws or
25 rules and regulations anywhere, to your knowledge?

Page 34

1   A.  No.
2   Q.  Let's talk a little bit about the process of
3   terminations. You were brought here today to discuss
4   the terminations by Best Western; is that correct?
5   A.  Terminations in general?
6   Q.  Yeah. You were presented as the person most
7   knowledgeable at Best Western regarding terminations of
8   memberships.
9   A.  Okay.
10  Q.  Did you know that?
11  A.  Yes.
12  Q.  Okay. And going over your experience and
13  duties, I'm afraid that I've missed your expertise in
14  terminations. Can you explain that to me a little bit
15  better.
16  A.  My department prepares the files that are
17  presented to the board of directors. I present the
18  facts to the board of directors and then relay the
19  decision of the board to the member.
20  Q.  All right. When you say that you prepare the
21  files, what do you do? What does that entail?
22  A.  We provide the board with a summary of events
23  that lead up to the grounds for cancellation of
24  membership. It includes copies of quality assurance
25  reports, any communication to and from the member,

Page 35

1   including their corrective action plan, photographs
2   from the last assessment, photographs a member might
3   submit, and a updated design report, which will include
4   new requirements.
5   Q.  Does it always include new requirements?
6   A.  If a design report was required prior to the
7   hearing, we would do a design report. It doesn't
8   necessarily mean it would be brand-new requirements.
9   Maybe there would not be any for that particular
10  property.
11  Q.  Who makes the determination if these design
12  requirements are necessary?
13  A.  The board.
14  Q.  So the board decides if new requirements are
15  necessary and then the board meets to say whether or
16  not they're going to say that the hotel can continue as
17  a member based upon those prior requirements?
18  A.  It's not just related to the design reports.
19  Q.  But as to the design reports, was that
20  accurate?
21  A.  No.
22  Q.  Okay. Why don't you explain it to me.
23  A.  There's a policy that determines whether or
24  not a design report is created prior to a membership
25  review or hearing.

Page 36

1   Q.  Where is that policy?
2   A.  It's in the -- it's in the records of the
3   board.
4   Q.  It's in the records of the board?
5   A.  Yes.
6   Q.  Not in the bylaws?
7   A.  No.
8   Q.  Not in the rules and regulations?
9   A.  No.
10  Q.  So the policy is created by the board and kept
11  in their records someplace?
12  A.  Yes.
13  Q.  To determine whether or not additional design
14  requirements are necessary?
15  A.  To determine whether or not a design report is
16  necessary prior to the hearing.
17  Q.  Is there a criteria for whether that -- I'm
18  trying to figure out what the criteria for deciding if
19  a design report is necessary is. Do you understand my
20  question?
21  A.  Yes.
22  Q.  Can you answer that, please.
23  A.  The criteria is if the property had been on
24  probation before, then a design report -- and they are
25  currently on probation for the current report, we would

Page 37

1   then send a designer out to the property prior to the
2   hearing.
3   Q.  Why?
4   A.  So the member will know what would be expected
5   of them if they do get a conditional extension or to
6   determine if they would not be able to meet those
7   design requirements.
8   Q.  Let me ask you this. Does it matter why
9   they're on probation whether or not you send a designer
10  out to create the design report? In other words --
11  just so I'm clear on the question -- I didn't mean to
12  jump in -- but if they're on probation, there's lots of
13  reasons they could be on probation, correct?
14  A.  It'd be for quality control. They had to have
15  a failing quality control score.
16  Q.  Quality control, is that the same as design
17  issues?
18  A.  No.
19  Q.  Okay. If they're on probation for a quality
20  control issue, would a design requirement be imposed
21  with a designer going out in that whole experience?
22  A.  No.
23  Q.  So when I asked you what the criteria was for
24  sending out a designer, and you said, "Well, if they
25  were on probation," that wasn't entirely accurate;

Page 38

1 is that correct?
2   A. I believe I said, and if I didn't, they had to
3 be on probation, and then the next assessment, if they
4 fail again, that's when we would send a designer out to
5 the property.
6   Q. Yes, that's what you said, that's what
7 I understood you to stay; however, probation -- that's
8 why I was clarifying that -- you can be on probation
9 for lots of different reasons that didn't have to do
10 with design; true?
11   A. Yes.
12   Q. So simply being on probation would not
13 normally trigger sending out a designer if the
14 probation had nothing to do with design; is that also
15 true?
16   A. Yes.
17   Q. Okay. In fact, there's lots of different
18 reasons, isn't there? There could be low QA scores,
19 correct?
20   A. Yes.
21   Q. And there could be low customer survey
22 results, also true?
23   A. We wouldn't place a property on probation for
24 low customer care results.
25   Q. What about failure to maintain insurance?

Page 39

1   A. That's immediate grounds for cancellation of a
2 membership.
3   Q. Always?
4   A. It is grounds for immediate cancellation.
5 We're usually able to get the insurance in.
6   Q. How long do you have in order to do that?
7   A. We work with members up to 45 days.
8   Q. Is 45 days written someplace in the bylaws?
9   A. No.
10   Q. In fact, it states it's 15 days; is that
11 right?
12   A. Yes.
13   Q. So in other words, in practical terms, what
14 Best Western does is not necessarily strict adherence
15 to the bylaws; is that true?
16   A. With regards to insurance. Usually it's the
17 carrier that just hasn't submitted the certificate.
18 They have the insurance. We're just working with the
19 carrier.
20   Q. Do you recall, ma'am, when I asked you in the
21 beginning of this that if there is a "yes" or "no"
22 question pending, that you try your best to give me
23 that "yes" or "no" answer? I would appreciate -- if
24 you need to explain, you're welcome to ask me, may
25 I explain it, but I would appreciate it if you don't

Page 40

1 just kind of explain your answer gratuitously because
2 it's going to take us way off track, and in the
3 interest of time, I'd like to not do that. Okay?
4   A. I'll do my best.
5   Q. Thank you.
6       So even though the bylaws state that it's
7 a 15-day correction period for correcting problems with
8 insurance, in practical application, Best Western does
9 not adhere to that 15-day standard in all cases; is
10 that correct?
11   A. Yes.
12   Q. Thank you.
13       Another reason why a property can be --
14 can have its membership status changed is if there is a
15 transfer of ownership; is that correct?
16   A. Yes.
17   Q. Now, as I understand it, the member, the
18 voting member is always an individual; is that also
19 true?
20   A. Yes.
21   Q. And so when we talk about the ownership of the
22 hotel, that membership is restricted to a natural
23 person who either owns the property or has a
24 partnership in the ownership of the property, something
25 to that effect, correct? In other words, it's the

Page 41

1 member, it's the individual human person that's the
2 member, right?
3   A. Yes.
4   Q. Not the corporation, not an LLC; an
5 individual?
6   A. Yes.
7   Q. And it's the individual with whom Best Western
8 works and does business, really, not whoever is
9 operating the property, correct? The voting member?
10 Is that right?
11   A. Yes.
12   Q. And I don't mean to say you can only give me
13 "yes" or "no." I just meant, please, you know, just
14 let me know if you need to explain something or you
15 want to add something to it. Okay?
16   A. Okay.
17   Q. Thank you.
18       So was that the case in this instance
19 with Mr. Harooni? It was Mr. Harooni that was the
20 person with whom Best Western worked, right?
21   A. Yes.
22   Q. I mean, occasionally you might work with
23 somebody or talk to somebody else at his hotel, but
24 it's Mr. Harooni who you regarded as the member of the
25 hotel, right?

CHERYL D. POLLACK, CHA
1/13/2010

42

1   A. That's correct.
2   Q. Were you involved with having Mr. Harooni's
3   membership approved initially after it was transferred
4   from the prior member?
5   A. I would have signed a letter acknowledging
6   auto transfer of the membership.
7   Q. And auto transfer, as I understand it, is not
8   available where a hotel is on probation; is that right?
9   A. That's correct.
10  Q. And if insurance lapses, it would be on
11  probation; is that also correct?
12  A. Yes. Well, no, excuse me. No, it would not
13  be on probation.
14  Q. Would that be a conditional extension of some
15  sort?
16  A. No.
17  Q. It would just be terminated?
18  A. I need to explain.
19  Q. Okay.
20  A. If you're referring to an auto transfer, we
21  would require the insurance to be current for the
22  applicant in order for an auto transfer to take place.
23  Q. The applicant being, in this case,
24  Mr. Harooni?
25  A. Yes.

43

1   Q. So if the insurance had been lapsed on the
2   property at the time Mr. Harooni entered escrow, you
3   wouldn't worry about the old insurance; you're only
4   looking towards the new insurance?
5   A. Generally, yes.
6   Q. In the period in between, whose insurance
7   carries it?
8   A. There is no insurance if it had lapsed.
9   Q. Okay.
10  A. For the prior owner.
11  Q. So the fact that the prior owner's insurance
12  had lapsed, would that be cause to terminate the
13  property and disallow an auto transfer?
14  A. No.
15  Q. It would be cause to terminate the membership,
16  though, correct?
17  A. Yes.
18  Q. Now, another reason that a hotel may be placed
19  in probation, or membership could be placed in
20  probation is a failure to attend meetings; is that
21  correct?
22  A. They're not placed on probation for that.
23  Q. What does happen?
24  A. They're sent notice of noncompliance.
25  Q. When a hotel is not in compliance, is that

44

1   tantamount to being on a probationary status?
2   A. It depends on the issue.
3   Q. And where would I look to determine the
4   criteria for which issue would cause a probationary
5   status when a hotel is not in compliance?
6   A. You would need to refer to the by -- rules and
7   regulations.
8   Q. I'm sorry. It wasn't clear.
9   A. The rules and regulations.
10  Q. Coincidentally, we just happen to have some
11  here. This is actually both. As you'll see, it's
12  stapled together. It's the rules and regulations as
13  well as the bylaws. It was previously made an exhibit.
14  I'm scratching that out only so that we can remark it
15  and attach it as Exhibit 1 to your deposition, on the
16  condition that you recognize that document.
17      Will you look it over for me, please, and
18  see if you do, in fact, recognize that.
19  A. I do.
20  Q. Can you find the location for me in there
21  where a hotel that was not compliant, where it explains
22  for me where some noncompliant issues will not cause
23  probation and others will, because I think that's what
24  you just told me.
25  A. There is specific rules, 1100.2, which talks

45

1   about probation involving inspections.
2   Q. Okay. But that's not really what I'm looking
3   for. Without having had a chance to look at that, if a
4   hotel is not in compliance with the requirements of
5   Best Western, would it be placed in a probationary
6   status?
7   A. Not except under quality control.
8   Q. So anything else, you're not in compliance,
9   you're okay except for quality control; is that what
10  I'm understanding?
11  A. That's correct.
12  Q. Let's discuss a little bit what you're
13  categorizing, then, as quality control. Is that based
14  solely on the QA assessments? And by that, I mean,
15  when you have a regional services manager go out, do an
16  assessment or an inspection -- I believe Best Western
17  calls them assessments -- but it's basically to go out
18  and inspect the hotel and say, this is acceptable, this
19  is not acceptable, and score points off based on what
20  they find to be unacceptable; is that what we're
21  talking about for quality control?
22  A. Yes.
23      MS. SCHLESINGER: I'm going to take a
24  five-minute break just to make sure I'm going in the
25  right direction here.

CHERYL D. POLLACK, CHA
1/13/2010

46

1   It is now, what, 10:35. So we've been
2   going for just a little under an hour. Take five to
3   ten minutes, and you can stretch your legs, and I'll be
4   back.
5       MR. PEDERSON: Okay.
6       (Recess was taken from 10:35 a.m. to
7   10:43 a.m.)
8   BY MS. SCHLESINGER:
9       Q. You had mentioned that in preparing this file
10  for a board hearing in the event that somebody had
11  requested a hearing, you would provide a summary of
12  events; is that correct?
13      A. Yes.
14      Q. And who prepares the summary of events?
15      A. One of my team members.
16      Q. So it's the summary of events as Best Western
17  understands it?
18      A. Yes.
19      Q. And you provide the quality assurance reports;
20  is that correct?
21      A. Leading up to the termination, yes.
22      Q. How many quality assurance reports are
23  provided?
24      A. It depends.
25      Q. Is it only the ones that are deemed

47

1   unacceptable or failing?
2       A. No.
3       Q. Is it the last two?
4       A. It depends on the grounds for cancellation.
5       Q. And what grounds -- how do the grounds for
6   cancellation impact the quality assurance reports that
7   are provided to the board?
8       A. I'm sorry, I don't understand that question.
9       Q. Sure. You said -- I asked you, How are the
10  quality assurance reports -- is it two? Is it the last
11  two? Is it all of them? I'm trying to find out which
12  quality assurance reports are provided to the board.
13  And you said, "Well, it depends on the grounds for
14  cancellation."
15      I'm asking, How does Best Western's
16  decision on which quality assurance reports to provide
17  to the board at a hearing change contingent upon the
18  grounds for cancellation?
19      A. They do change.
20      Q. Right. How? In what way?
21      A. If the grounds for cancellation were based on
22  two failing assessments on the same day, then we
23  provide that assessment, that complete assessment as
24  well as the one prior to it.
25      If they were two consecutive assessments,

48

1   the last six months and most current report had failed,
2   we provide those two assessments as well as the one
3   prior to the first failure.
4       If there are two within 18 months, it's
5   always the one prior to the first failure. If it's
6   three within 24 months, it's always the one -- the very
7   first one that failed and the one prior to that and
8   those in between.
9       Q. Okay. So, typically, if I'm understanding you
10  correctly, if the cause of the potential termination or
11  the cancellation of the membership is failing QA
12  reports, you would typically provide those that showed
13  the failing scores plus the one previous; is that
14  correct?
15      A. Yes, and if there was any in between.
16      Q. Okay. Do you know which ones were provided in
17  the case that brings us here today, Mr. Harooni's
18  hotel?
19      A. No, I don't.
20      Q. Is there somebody who would know?
21      A. I would need to look at the documents to make
22  that determination.
23      Q. You'd need to look at the documents to make
24  the determination if somebody else would know?
25      A. No, I would know if I looked at the documents.

49

1       Q. Okay. The answer in that context was
2   ambiguous.
3       Okay. So, and then communications from
4   the hotel owner and to the hotel owner would be
5   provided?
6       A. Yes.
7       Q. Is that all communications?
8       A. Any that I was aware of.
9       Q. Dating back to the beginning of their
10  membership?
11      A. No.
12      Q. Then what criteria would you use to determine
13  which communications are included?
14      A. Communications following the hearing letter,
15  the notice of hearing letter, any communication after
16  that.
17      Q. Is this notice of hearing letter basically a
18  form letter?
19      A. Yes.
20      Q. And a corrective action plan is also something
21  that you would provide?
22      A. No, we would ask for that.
23      Q. You would ask whom?
24      A. The member.
25      Q. Okay. Is an action plan not something that is

Page 50

1    done by Best Western?
2        A.  Not in the case of a hearing.
3        Q.  Okay.  But it's done -- Cindy Bree testified
4    that she transferred the rapid response -- I believe
5    this is what she said -- a rapid response into an
6    action plan and gave it to Mr. Harooni.  Does that make
7    sense to you?
8        A.  Yes.
9        Q.  Is that what happens?
10       A.  It happens.
11       Q.  So when you say you want an action plan from
12   the member, you're looking for something different or
13   in addition to the action plan created by Best Western?
14       A.  Yes.
15       Q.  What's the point of that?
16       A.  We want to know what the member's plan is.
17       Q.  Well, if they just say, "I'm going to
18   implement your action plan," is that not good enough?
19       A.  No.
20       Q.  Why not?
21       A.  It's very vague.
22       Q.  Okay.  Your action plan is vague, the action
23   plan created by Best Western?
24       A.  No.
25       Q.  If they say -- if the member says, "I'm going

Page 51

1    to do every single item on the action plan," you would
2    still regard that as vague?
3        A.  It's incomplete.
4        Q.  So even though this is the plan -- the action
5    plan, as I understand it, is what Best Western is
6    saying the member needs to do to avoid termination;
7    is that correct?
8        A.  No.
9        Q.  What's the point of the action plan that's
10   created by Best Western, then?
11       A.  That's an action plan that is done prior to
12   the grounds for cancellation of membership.  That's an
13   action plan when a property is not necessarily failing
14   their guest room/public areas assessment score.  That's
15   to keep them out of going into termination.
16       Q.  I don't mean to be argumentative, but, no,
17   it's not.  In this case, it was the one that was done
18   by Cindy Bree following the last inspection that caused
19   them to fail.  Does that not sound familiar to you?
20       A.  No, it doesn't.
21       Q.  Okay.  So if Cindy Bree testified that this
22   was done following her January 31st, 2008, inspection,
23   she created an action plan and gave it to Mr. Harooni,
24   you would say that has nothing to do with termination?
25       A.  No.

Page 52

1        Q.  It doesn't?
2        A.  No.
3        Q.  Okay.  So what are you looking for when you
4    talk about termination?  What are you looking for in a
5    corrective action plan?  What the member will do above
6    and beyond what Best Western has asked them to do?
7        A.  Yes.
8        Q.  And who selects the photos that you include in
9    your package to the board?
10       A.  Those are all of the QA photos from the last
11   assessment.
12       Q.  Any photos from the other quality assurance
13   reports that you might attach to a board package?
14       A.  No.
15       Q.  So just what's negative?
16       A.  They're just all the photographs that were
17   taken at the last assessment.
18       Q.  The one where you said it would be a failing
19   assessment?
20       A.  Yes.
21       Q.  So this is evidence that you're putting
22   together to show the board why you believe the hotel
23   should fail; is that correct?
24       A.  No.
25       Q.  What do you include in this package that would

Page 53

1    be considered mitigation and evidence to suggest the
2    hotel should not be terminated?
3        A.  Any response the member provides.
4        Q.  And then you also mentioned that there's
5    updated design requirements that are included?
6        A.  Yes.
7        Q.  And those are included under all
8    circumstances?
9        A.  No.
10       Q.  Let's clarify that.  When are these included?
11       A.  If the property had been placed on probation
12   prior to the most recent assessment, then a design
13   report would be required prior to the hearing.
14       Q.  Okay.  I thought I made two copies of this
15   document.  All right.  Well, I'm going to need to go
16   run some copies real quickly.  I apologize.  I thought
17   I had them.
18           (Discussion off the record.)
19   BY MS. SCHLESINGER:
20       Q.  While we're waiting for that, let me see if
21   I've got a couple other things I can cover with you.
22           Does Best Western ever fail to timely
23   remove a property from probationary status even if the
24   hotel has complied or corrected the cause of the
25   probationary status?  Is there ever a delay?

Page 54

1   A.   I -- I don't know how to answer that question.
2   Q.   Okay. You had mentioned previously that you
3   had a database that you update with changes in member
4   status. If you got in documentation, for example, that
5   indicated the problems with the hotel had been
6   corrected, what's the time lapse, if any, between the
7   time that information comes in to Best Western to the
8   time that database is updated?
9   A.   I don't know specifically.
10  Q.   If an active member is -- if an active member
11  has failed to attend training sessions, is that cause
12  to be placed on a probationary status?
13  A.   No.
14  Q.   In the membership bylaws or Best Western
15  bylaws and rules and regulations, would you agree that
16  there are certain things that Best Western obligates
17  itself to do?
18       MR. PEDERSON: Object, calls for a legal
19  conclusion.
20  BY MS. SCHLESINGER:
21  Q.   Does Best Western -- in your experience,
22  ma'am, does Best Western have any obligations to its
23  members?
24  A.   Yes, to adhere to the rules and regulations
25  that are adopted by the members, and the bylaws.

Page 55

1   Q.   And does Best Western represent to its members
2   that it's going to do certain things such as marketing
3   and advertising?
4   A.   Yes.
5   Q.   And do they also represent to the members that
6   they will provide customized press releases?
7   A.   If a member requests that, yes.
8   Q.   How is a member advised that they should
9   request that? Is a member advised that if they request
10  that, it would be done?
11  A.   By going online to mybestwestern.com, there's
12  resources there that would provide that information.
13  Q.   And do you have any personal knowledge that
14  Mr. Harooni was provided login information for this
15  mybestwestern.com?
16  A.   No.
17  Q.   And what about the services of a revenue
18  manager? Is that something that Best Western
19  represents to its members that it will provide to them?
20  A.   Yes.
21  Q.   And what about access to key partnerships and
22  programs? Does Best Western represent that its members
23  will have access to key partnerships and programs?
24  A.   I don't know.
25  Q.   What about providing worldwide reservations?

Page 56

1   Does Best Western represent that it will do that?
2   A.   Yes.
3   Q.   If Best Western does not provide these things
4   to the member, is the member nevertheless obligated to
5   do everything that Best Western has set forth in its
6   rules and regulations, in your view?
7        MR. PEDERSON: Objection, calls for a
8   legal conclusion.
9        MS. SCHLESINGER: I'm asking her for her
10  opinion.
11  A.   You need to repeat your question, please.
12  BY MS. SCHLESINGER:
13  Q.   Sure. These things that we just discussed,
14  such as marketing and advertising and press releases
15  and revenue managers, if these are not provided to the
16  member, will a member nevertheless be terminated for
17  not adhering to the rules and bylaws as Best Western
18  has set forth?
19       MR. PEDERSON: Objection, calls for a
20  legal conclusion.
21  BY MS. SCHLESINGER:
22  Q.   And, again, this is in your view. As the
23  person sitting here and represented to me today as the
24  most knowledgeable about termination, if there are
25  issues going on where Best Western has not done what it

Page 57

1   promised to do for the member, would you, nevertheless,
2   institute a termination process against the member if
3   the member is in breach of any of its duties?
4        MR. PEDERSON: Same objection.
5   BY MS. SCHLESINGER:
6   Q.   Do you consider whether or not there are
7   mitigating factors prior to initiating the termination
8   process?
9   A.   I don't know what you mean by "mitigating."
10  Q.   Well, in this instance, I mean, if Best
11  Western has not done everything it's supposed to do,
12  do you consider that before initiating a termination
13  process?
14  A.   No.
15  Q.   All right. I've just handed you a couple of
16  documents. I'd like you to look at, initially, only
17  this first top letter that is dated February 8, 2008.
18  It is on Best Western stationery directed to
19  Mr. Hooshang Harooni, and I believe it is done under
20  your signature, although you didn't technically sign
21  it; is that correct, Ms. Pollack?
22  A.   Yes.
23  Q.   Do you recognize this document?
24  A.   I recognize it as a standard letter.
25  Q.   So this is the form letter that you were

### Page 58

1  referencing earlier?
2  A. Yes.
3  Q. Okay. Let's kind of walk through this. I'm
4  going to attach this as Exhibit 1 to Ms. Pollack's
5  deposition.
6      MR. PEDERSON: I think you already
7  referenced another one as Exhibit 1.
8      MS. SCHLESINGER: I'm sorry, you're
9  right. Exhibit 2. The bylaws and the regulations were
10 attached collectively as Exhibit 1. So this is
11 Exhibit 2.
12 BY MS. SCHLESINGER:
13 Q. How many of these letters would you say that
14 you send out in a year, Ms. Pollack, or cause to be
15 sent out?
16 A. Between 75 and 100.
17 Q. To how many different properties? To how many
18 different properties?
19 A. 75 to 100.
20 Q. Okay. I wasn't sure if perhaps the same
21 letter might go to an individual property more than
22 once. Not this letter?
23 A. No, it's unlikely in the same year.
24 Q. And how many of those 75 to 100 properties
25 request hearings?

### Page 59

1  A. Most generally all of them do.
2  Q. And Best Western charges for those hearings,
3  do they not?
4  A. No.
5  Q. There's no fee?
6  A. No.
7  Q. Oh, except for that this letter says that
8  there is a mandatory reassessment; is that correct?
9  A. I don't see that.
10 Q. It says here in the fourth paragraph following
11 that small paragraph that says, "Note" -- I think
12 that's the fourth full paragraph -- it says, "The board
13 will take official action." Do you see that? Do you
14 have a letter in front of you that's dated February 8,
15 2008?
16 A. I do.
17 Q. The first paragraph begins, "The board of
18 directors has grounds."
19 A. Yes.
20 Q. The second paragraph begins, "Additionally,"
21 comma.
22 A. Yes.
23 Q. The next paragraph says, "Note," colon.
24 A. Yes.
25 Q. The fourth paragraph says, "The board will

### Page 60

1  take official action at an upcoming meeting." Do you
2  see that?
3  A. Yes.
4  Q. "The board will take official action at an
5  upcoming meeting to either cancel your membership or
6  grant a conditional extension of your membership."
7  period. "Best Western will conduct a mandatory design
8  inspection of the property before the board meets and
9  will charge a nonrefundable $1,500 on your next monthly
10 billing." Did I read that correctly?
11 A. Yes.
12 Q. So in association or in connection with any
13 hearing -- or even more accurately, perhaps, to say,
14 In connection with this letter, a member is charged a
15 nonrefundable, mandatory $1,500; is that right?
16 A. I need to clarify.
17 Q. Okay.
18 A. It's specifically related to the services of
19 the designer doing the design visit.
20 Q. Which is mandatory by Best Western?
21 A. In this particular property's case.
22 Q. I thought you said it was a form letter?
23 A. This is a form letter.
24 Q. So this is a paragraph that's included in
25 every hotel that receives one of these letters, this

### Page 61

1  75 or 100 hotels that are on probationary status due to
2  QA problems; is that correct?
3  A. No.
4  Q. So it's only those that have had a failing QA
5  due to design issues?
6  A. No.
7  Q. How many of the 75 or 100 hotels, properties
8  to which this letter goes out, what percentage would
9  you estimate include that paragraph requiring a design
10 inspection?
11 A. Between 70 and 80.
12 Q. 70 and 80 percent?
13 A. Yes.
14 Q. So three-quarters of the properties are
15 assessed a $1,500 fee for this mandatory design
16 inspection?
17 A. Yes.
18 Q. That could be as high as 80 percent, you said?
19 A. 75 to 80.
20 Q. Of the 20 percent that you allege received
21 this letter without this paragraph in it, what are the
22 reasons for the hearing -- strike that.
23     There's 20 percent of the folks that get
24 this letter without that paragraph in it, and those
25 properties are also facing a board hearing to determine

62

1  if their membership will be cancelled, correct?
2     A. Yes.
3     Q. What are the grounds for that cancellation
4  where design is not an issue?
5     A. On the current assessment, if the property
6  failed their supplemental facilities assessment or
7  brand standards assessment or brand identity
8  assessment, and then on the prior assessment they
9  failed a guest room/public areas assessment score, we
10 would not trigger a mandatory design visit.
11    Q. When you say the "guest room assessment," what
12 are the criteria in your view that go into that guest
13 room assessment?
14    A. It's everything that's outlined on the QA
15 report.
16    Q. Okay. With that said, are they design issues?
17    A. No.
18    Q. Design issues, then, pertain only to the
19 public areas?
20    A. No.
21    Q. Okay. I'm trying to figure out why the design
22 inspection would be appropriate -- strike that.
23       How many of these hearings are done in a
24 given day?
25    A. Anywhere from two to four.

63

1     Q. Because I notice in the fifth paragraph here,
2  that says, "You are entitled to request a personal
3  hearing before the board during which you may use up to
4  30 minutes to make a presentation showing why your
5  membership should not be cancelled."
6        I will be honest with you, I know most
7  judges will give me more time to make any random
8  argument. Why 30 minutes?
9     A. If the member does his due diligence and
10 submits his thorough corrective action plan,
11 photographs, purchase orders, financial information in
12 advance, the board can review that summary as well as
13 the packet, and the member can spend that 30 minutes
14 for questions and answers.
15    Q. Okay. You just added another thing. You
16 said, "financial information." What financial
17 information is required by Best Western in order to
18 determine not to cancel a membership?
19    A. That's just part of the member's corrective
20 action plan.
21    Q. That doesn't answer my question. I'm sorry,
22 ma'am.
23       I asked you, What financial information
24 is required from a Best Western member in order to
25 avoid cancellation of a membership?

64

1     A. It isn't necessarily going to avoid
2  cancellation of a membership.
3     Q. So even though they provide it, it doesn't
4  necessarily mean anything?
5     A. That's right.
6     Q. And the corrective action plan, who decides if
7  that's an adequate corrective action plan?
8     A. The board.
9     Q. Is there any criteria by which the board acts?
10 In other words, is there any written criteria to
11 ascertain if something meets a standard for a
12 corrective action plan?
13    A. No.
14    Q. So they can just kind of say, "Nope, we don't
15 like that one," and say, "Never mind, it's not good
16 enough"? Is that right?
17    A. The decision is up to the board.
18    Q. So it can be arbitrary?
19    A. I would say it's arbitrary.
20    Q. If they're in a good mood?
21       Is there written criteria for it?
22    A. No.
23    Q. So there's no way that a member could say,
24 "This is an adequate and sufficient action plan. I can
25 ensure that my membership won't be cancelled"?

65

1     A. No.
2     Q. There's no way they can do that?
3     A. No.
4     Q. Okay. How many members of the board sit
5  before one of these hearings?
6        MR. PEDERSON: Excuse me. Can you repeat
7  that? I didn't hear.
8        MS. SCHLESINGER: Sure.
9  BY MS. SCHLESINGER:
10    Q. How many members sit before one of these
11 hearings?
12    A. There are seven board members.
13    Q. That are present for one of these hearings?
14    A. Unless one individual gets ill and has to
15 leave.
16    Q. What's a quorum? Do you know?
17    A. We need at least a majority of the board.
18    Q. So it could be five?
19    A. Yes.
20    Q. Actually, what you're saying is there's seven,
21 so it could be four?
22    A. There's seven. They need -- I don't know what
23 the stipulation is for number of board members that
24 have to be present during a hearing.
25    Q. Do the board members go out to the hotel in