CHERYL D. POLLACK, CHA
1/13/2010

---

Page 66

1  question prior to these hearings or at any time prior
2  to cancellation?
3      A.  I have heard some have.
4      Q.  And so there's no requirement that they go out
5  and actually physically look at the hotel?
6      A.  No.
7      Q.  Are there any declarations submitted with the
8  photographs or QA reports that are submitted to the
9  board?  Does anybody attest the validity of those
10 reports?
11     A.  No.
12     Q.  And does somebody attest the validity of the
13 photographs?
14     A.  No.
15     Q.  Is there any live testimony from the people
16 who took the photographs?
17     A.  No.
18     Q.  So there's no opportunity for the member to
19 question or have a conversation with the person who
20 prepared the quality assurance report or the
21 photographs; is that true?
22     A.  Not at the hearing.
23     Q.  Any other time?
24     A.  Prior to the hearing.
25     Q.  When would that be?

---

Page 67

1      A.  They could call the regional service manager
2  anytime and talk about the QA score and the
3  photographs.
4      Q.  Do you think that would do any good?
5      A.  I don't know.
6      Q.  Have you ever seen that happen?
7      A.  No.
8      Q.  So, to the best of your knowledge, there's
9  never been a phone call or discussion between a member
10 and a regional service manager that has done anything
11 to prevent this hearing and subsequent termination,
12 if that's what the board decides?
13     A.  I'm not aware of any.
14     Q.  You've never seen an instance where somebody
15 called up the RSM and made a persuasive case to the
16 RSM, and the RSM modified or changed the quality
17 assurance report; is that true?
18     A.  No.
19     Q.  Okay.  So, in other words, a phone call would
20 do no good whatsoever?
21     A.  I'm saying I'm not aware of any conversations
22 like that.
23     Q.  Does the RSM have the authority to change the
24 report after it has been submitted?
25     A.  I don't know.

---

Page 68

1      Q.  What is a conditional extension of membership?
2      A.  At the time the board is determining their
3  decision following a hearing, they will either grant --
4  they will either terminate the membership or grant a
5  conditional extension.
6      Q.  Do they ever say, "Oh, gosh, we were wrong.
7  You're right.  The hotel is just fine.  Move along"?
8  Do they ever say, "We were in error, and the hotel
9  meets our standards"?
10     A.  No.
11     Q.  There's only one of two things: either you're
12 on a very short leash conditional membership, or you're
13 cancelled; correct?
14     A.  Right.
15     Q.  There's no room for agreeing with the member,
16 no room to allow the member to go back to a full and
17 active status?
18     A.  Correct.
19     Q.  In other words, once this letter goes out,
20 according to Best Western, the member is going to have
21 to jump through hoops or do something to conform to
22 whatever ruling is made at these hearings, and it's
23 going to be either conditional membership or
24 termination?
25     A.  Right.

---

Page 69

1      Q.  So it's kind of a forgone conclusion; is that
2  fair to say?
3      A.  No.
4      Q.  It's not going to be returned to full and
5  active membership ever, right?
6      A.  Yes, eventually.
7      Q.  No, I mean as a result of -- once this letter
8  goes out, they will no longer be given a grant --
9  granted -- strike this.
10         At the time of the hearing, the outcome
11 is one of two things: conditional membership or
12 cancellation of the membership; right?
13     A.  That's right.
14     Q.  Okay.  It's never reinstatement in full of the
15 membership, also true?
16     A.  Yes.
17     Q.  And to the best of your knowledge, there is no
18 criteria upon which the member can determine if they
19 have provided a sufficient action plan or financial
20 information or any combination thereof to appease the
21 board; is that also true?
22     A.  Yes.
23     Q.  Why is the member given only 15 days to
24 respond to this letter?
25     A.  I believe that's as outlined in the bylaws.

CHERYL D. POLLACK, CHA
1/13/2010

### Page 70

1  Q. Why so short?
2  A. I don't know.
3  Q. That's just that's what it says, that's what
4  we do, that's all you know?
5  A. Yes.
6  Q. Would you agree with me that the outcome of
7  this hearing has an extraordinarily significant impact
8  on the member and his future, because if the board
9  cancels his membership, you can agree that that's
10 going to be a fairly significant impact to the member,
11 in most cases, true?
12 A. I don't know.
13 Q. You don't think it would make a difference if
14 they're flying the Best Western flag or not?
15 A. No.
16 Q. No, you don't think it makes any difference?
17 A. No.
18 Q. You don't think that the member who has made
19 an investment in the hotel property is financially, as
20 well as probably in other ways, but particularly
21 financially damaged by losing its Best Western
22 membership?
23 A. I don't know anything about that individual's
24 financial background or how it would damage them.
25 Q. So you don't think it's important whether or

### Page 71

1  not their membership is cancelled? Do you think that's
2  important?
3  A. It's probably important to them.
4  Q. It's clearly not important to Best Western,
5  then? I'm sorry. Strike that.
6      So you said there were three or four,
7  typically, on any given day, hearings; is that right?
8  A. Yes.
9  Q. Does that go on five days a week?
10 A. It depends on the number of properties that
11 have requested a hearing.
12 Q. They don't request a hearing, they basically
13 need to ask for a hearing in order to save their
14 membership; is that right?
15 A. No.
16 Q. It's not like, "Gee, I have nothing better to
17 do. I think I'll go down and have a hearing today."
18 This is a hearing that is their only chance to save
19 their membership. Is that right?
20 A. Yes.
21 Q. The way you say "request a hearing," like,
22 "Gee, that would be nice, I think I'll go chat with the
23 board members," that's not what it is, is it? It's a
24 show of evidence, and the decision by the board member
25 greatly impacts the voting member's future; is that

### Page 72

1  right?
2      MR. PEDERSON: Objection, argumentative.
3  BY MS. SCHLESINGER:
4  Q. Is that correct?
5  A. I would clarify that the letter itself states
6  that a hearing request should be sent, so it is a
7  hearing request.
8  Q. Would "petition" be a word that you would also
9  be able to substitute in for that?
10 A. I would have to defer to legal on that.
11 Q. Do you have any authority as to what's
12 included or not included in these packets, Ms. Pollack,
13 the packets that you present to the board?
14 A. We have a standard packet that is always sent
15 out to the members and to the board, so I don't quite
16 understand what you're asking.
17 Q. Do you have any discretion in what's provided
18 or included in that packet?
19 A. No.
20 Q. Do you have a guideline or requirement that is
21 set forth in writing anywhere?
22 A. No.
23 Q. To whom do you report?
24 A. Ron Pohl, P-O-H-L.
25 Q. And what's Mr. Pohl's title?

### Page 73

1  A. He's vice president of brand management and
2  member services.
3  Q. Does Mr. Pohl determine what goes into this
4  package?
5  A. No.
6  Q. Who does?
7  A. The board.
8  Q. But it's not set down, written anyplace?
9  A. No.
10 Q. To your knowledge?
11 A. Not to my knowledge.
12 Q. So they could change it whenever they wanted;
13 is that true?
14 A. The only criteria is what's outlined in the
15 Best Western rules and regulations and bylaws as to
16 what needs to be provided.
17 Q. Where is that, ma'am?
18 A. Chapter 12, 1200.1 and 1200.2.
19 Q. Okay. Will you agree with me, as I look at
20 this, that nowhere is there anything that says what
21 attachments will be included with this packet that's
22 sent to the board or what the member must respond with;
23 is that correct?
24 A. It goes on to 1200.5(D).
25 Q. All right. This doesn't address what you're

Page 74

1  putting in the package to the board, though, does it?
2     A.  This is the information that is provided to
3  the board. There may be additional information that is
4  provided.
5     Q.  This says -- this says that the president --
6  I'm reading at 1200.5(D). It says, "At or before the
7  hearing, the president and chief executive officer or
8  his designee will present to each member of the board a
9  written statement containing the following," and it
10 goes through 1 through 8.
11        That's what the board is going to give to
12 the member. I'm asking what you give to the board.
13    A.  It says, "to each member of the board."
14    Q.  D, "At or before the hearing, the president
15 and chief executive officer or his designee will
16 present to each member of the board." Okay. So this
17 says the president and chief executive officer of Best
18 Western; is that what you're saying?
19    A.  Yes.
20    Q.  Because I understood that to be the president
21 of the board.
22    A.  No. It's the president of the company.
23    Q.  Okay. So you're the designee here?
24    A.  Yes.
25    Q.  Did you present to Mr. Harooni a statement of

Page 75

1  all sums due and owing?
2     A.  I don't know if there was anything that was
3  owing on his account.
4     Q.  So the 75-plus thousand dollars that's being
5  sought in this litigation, as far as you can say
6  sitting here today, all accrued after that hearing?
7     A.  I don't know.
8     Q.  Where would I look for that information?
9     A.  Probably have to look at a statement.
10    Q.  And would that have been provided to
11 Mr. Harooni?
12    A.  I don't know. He was sent statements from our
13 accounting department. That's what the normal practice
14 is.
15    Q.  I'm sorry, let me rephrase.
16        Was that information provided to him in
17 the package -- as I'm understanding it now from your
18 clarification, the same package that you prepare for
19 the board is also sent to Mr. Harooni?
20    A.  Yes.
21    Q.  So would any amounts due have been included in
22 that package?
23    A.  It's possible.
24    Q.  No, not "it's possible." Would it or wouldn't
25 it have been? If there were amounts due, would it have

Page 76

1  been included in the package that was sent to
2  Mr. Harooni preliminary to the hearing?
3     A.  If we used a profile sheet at that time, it
4  would have been included on it.
5     Q.  What is a profile sheet?
6     A.  It's part of the hearing packet.
7     Q.  Can we be more specific?
8     A.  It's a document that shows who the owner is,
9  what their AAA rating is, how many units they have,
10 when the property was built, when it joined Best
11 Western, whether it was an auto transfer of the
12 membership or change in ownership. It shows whether
13 they vote, whether they have been delinquent at any
14 time, what they're current design level is, whether
15 they've attended training classes, whether their GM has
16 been "I Care" certified. There's a number of
17 categories on this document, and that's provided to the
18 member. It's an overview of the property.
19    Q.  Why is whether the property was an auto
20 transfer relevant to whether or not it's terminated at
21 a hearing?
22    A.  That's just information the board requests.
23    Q.  And even though you're here as the person most
24 knowledgeable regarding terminations, you do not know
25 why that's on there?

Page 77

1     A.  It just shows the ownership trend, whether
2  there's been a change in ownership.
3     Q.  So even though the ownership had not
4  transferred for four years, give or take; the board
5  considers it relevant that at one point it was an auto
6  transfer?
7     A.  Yes.
8     Q.  And you don't know why they consider that
9  relevant?
10    A.  It shows when that current owner took over
11 that property.
12    Q.  No, no. I beg to differ with you, ma'am.
13        Why does an auto transfer versus any
14 other sort of accumulation of membership, why is it
15 auto transfer noted as opposed to simply when did they
16 take over the property? Do you see that those are two
17 different things?
18        MR. PEDERSON: If you know.
19    A.  No, I don't see the difference.
20 BY MS. SCHLESINGER:
21    Q.  There's other ways to obtain membership other
22 than auto transfer, correct?
23    A.  Yes.
24    Q.  So what you're telling me is that what's
25 relevant is when the owner, the voting member, became a

Page 78

1  member of Best Western, correct?
2  A. Yes.
3  Q. Why auto transfer, then? You don't know?
4  A. That's when that member took over that
5  property.
6  Q. Why doesn't it just state the year that the
7  member took over the -- or the date the member took
8  over the property? Why does it designate auto
9  transfer? If you have an answer, I'd appreciate it;
10 if you don't, I'll be happy to move on.
11 A. You know, I don't.
12 Q. All right. A hotel owner such as Mr. Harooni
13 does not have any power to control the board's decision
14 beyond submitting his rebuttal to this package; is that
15 right? And it's half an hour? He can try to be as
16 persuasive as he wants, but other than that, does he
17 have any control?
18 A. No.
19 Q. So, basically, and in theory, if the board
20 decided it was going to terminate it, it would not
21 really matter what was presented by the hotel owner;
22 the board can terminate the member, correct?
23 A. It's not a predrawn conclusion.
24 Q. Again, I'm going to move to strike because
25 it's a "yes" or "no" --

Page 79

1  A. No.
2  Q. -- answer.
3  A. No.
4  Q. In other words, if the board had decided they
5  were going to terminate a membership, is there anything
6  that the member can present that would change -- that
7  would guarantee change their mind? Strike that.
8      MS. SCHLESINGER: I'm going to go off the
9  record for five minutes.
10     (Exhibit No. 1 and 2 were marked.)
11     (Recess was taken from 11:29 a.m. to
12 11:39 a.m.)
13 BY MS. SCHLESINGER:
14 Q. On page 2 of Exhibit 2, the February 8, 2008,
15 letter that we've been discussing, do you see that full
16 paragraph that begins with, "Generally, presentations
17 to the board"?
18 A. Yes.
19 Q. Do you know if Mr. Harooni provided an
20 explanation of why he believes the grounds for
21 cancellation were invalid or incorrect?
22 A. I don't know.
23 Q. What types of -- what kind of explanation is
24 the board looking for to avoid termination of their
25 membership?

Page 80

1  A. It would be up to the member to explain to the
2  board that either the photographs weren't their
3  photographs or those conditions did not exist at the
4  property to convince the board they didn't have the
5  grounds for cancellation.
6  Q. That was interesting. You said that the
7  photographs weren't the photographs of their property.
8  A. I'm throwing that out as an example.
9  Q. So that happens occasionally?
10 A. No, it has not happened.
11 Q. To your knowledge?
12 A. To my knowledge.
13 Q. Interesting. Okay.
14     So other than saying that the photographs
15 weren't actually of their property, what other things
16 would you consider a member might be able to say to
17 convince the board not to terminate them?
18 A. I don't know.
19 Q. What about short term and long terms action --
20 that's, I think, a typo there. Sub 2 of that paragraph
21 on page 2, Exhibit 2, that begins with, "Generally,"
22 if you go down, do you see small number 2 there?
23 A. Yes.
24 Q. "Short term and long terms action plans for
25 correcting deficiencies," comma. Did I read that

Page 81

1  correctly?
2  A. Yes.
3  Q. What short term and long terms action plans
4  are you referring to there?
5  A. Generally, it's what the member's done prior
6  to the hearing following the last assessment; of what
7  they plan to do immediately, within the next 30 days;
8  and what their plans are for the next six months to a
9  year.
10 Q. Would there be somebody at Best Western who
11 would already be familiar with those plans? In other
12 words, you have, for example, Terry Wininger, who is
13 supposed to be this liaison between the members and
14 Best Western. It seems to me that if there were
15 renovations underway and plans for renovations, that
16 Best Western would be aware of those prior to sending
17 out a letter such as this. Does that sound right?
18 A. Yes.
19 Q. So you're really asking here for information
20 that Best Western probably already has?
21 A. Not necessarily.
22 Q. But you agree they should be aware of plans
23 such as any plans for correcting deficiencies? I mean,
24 a plan such as that would have to be run by Best
25 Western's design team and all of that, correct?

Page 82

1    A. Not necessarily.
2    Q. If the hotel was planning to renovate its
3    rooms, would that not be something that would have to
4    be approved by Best Western's design department?
5    A. Only if the member notified them.
6    Q. So if you didn't say anything, then Best
7    Western has no say in it? In other words, I asked you,
8    If there was a plan to renovate the hotel rooms at a
9    property, doesn't that plan need to be approved of by
10   Best Western?
11   A. Yes.
12   Q. Okay. Because your answer said, "Oh, only if
13   the member notifies them." I'm just trying to follow
14   what you're really saying to me.
15   A. Let me clarify. We would only be able to
16   approve what we knew what was in the works.
17   Q. So if the member had a secret plan that they
18   hadn't told you about, then that might be what you're
19   referring to in this letter?
20   A. Yes.
21   Q. Okay. Does that happen often?
22   A. We have properties that do renovations without
23   our knowledge.
24   Q. Did that happen in this case?
25   A. I don't know.

Page 83

1    Q. Do you know anything specific about
2    Mr. Harooni?
3    A. No.
4    Q. Why is this letter at small number 3 seeking
5    "details about ownership involvement and management of
6    the property," comma, "and key staffing"? What details
7    are you looking for there?
8    A. The board wants to know how involved the owner
9    is with the day-to-day activities of the property, or
10   if they are just an owner and have someone else oversee
11   the property.
12   Q. So would it be in Mr. Harooni's favor that he
13   was involved in the property and the daily management?
14   A. It would be important for the board to know if
15   he was aware of the property's condition and involved
16   with the operation or how involved he was.
17   Q. Would that be something that the board would
18   consider in favor of the hotel or voting member's
19   continued membership in Best Western, if the owner was
20   very involved in the management of the property?
21   A. I don't know.
22   Q. What types of other information would a member
23   be invited to present to the board pursuant to number 4
24   in Exhibit 2, page 2?
25   A. Sometimes they submit photographs, purchase

Page 84

1    orders, work orders. Maybe there's something unique
2    that happened at the property, and they want to explain
3    that to the board.
4    Q. What do you mean "unique that happened to the
5    property"?
6    A. Maybe a hurricane hit it, bad storm.
7    Q. So a hurricane would be a mitigating factor?
8    A. It may.
9    Q. You don't know?
10   A. No.
11   Q. You don't know what the criteria for
12   termination really is?
13   A. Yes, I do.
14   Q. At this hearing, at this board hearing, do you
15   have any knowledge of the criteria they use to
16   determine whether to terminate a membership?
17   A. No.
18   Q. So, in fact, where it says in the last
19   sentence of that paragraph, it says, "The board will
20   consider these things" -- referencing back to small 1,
21   2, 3, and 4 that we've just discussed, it says,
22   "The board will consider these things when determining
23   if it should cancel your membership or grant a
24   conditional extension." I read that last sentence
25   correctly?

Page 85

1    A. Yes.
2    Q. Do you have any knowledge of whether they,
3    in fact, consider any of those things in making that
4    determination?
5    A. I don't know what the board thinks.
6    Q. It says then -- two paragraphs down, where it
7    says, "If you are granted a conditional extension of
8    your membership, the terms of the extension will
9    require action beyond simply correcting the current
10   deficiencies," something that is not acceptable to Best
11   Western would be considered a deficiency, correct?
12   A. Depends on what you mean by "deficiencies."
13   Q. For example, if the bedspreads were outdated
14   and in bad repair, that might be one or two
15   deficiencies according to Best Western's standards,
16   correct?
17   A. Yes.
18   Q. If the member brings those up by replacing the
19   bedspreads with brand-new bedspreads ordered from Best
20   Western, they've now corrected the deficiency; is that
21   also correct?
22   A. Possibly.
23   Q. Possibly?
24   A. Yes.
25   Q. Under what circumstances would be replacing

CHERYL D. POLLACK, CHA
1/13/2010

---

Page 86

1   worn or outmoded bedspreads with bedspreads purchased
2   from Best Western Supply, under what circumstances
3   would that not have corrected that particular
4   deficiency?
5       A.  They'd have to remain clean and in good
6   repair.
7       Q.  Okay.  On day two after the bedspreads are
8   shipped and put on the beds, is the deficiency
9   corrected?
10      A.  It would be, yes.
11      Q.  But according to this letter, Best Western is
12  saying they have to do something beyond that.  What
13  would be the "beyond that"?
14      A.  I believe it goes on to say that they would
15  need to not just correct deficiencies, but they need to
16  maintain an 875 guest room/public areas assessment
17  score over the next three assessments.  They'd have to
18  meet the accelerated design requirements.  It's all
19  outlined in that paragraph.
20      Q.  Right, but I'm looking at the sentence that
21  says -- because if you had read the sentence you're
22  quoting correctly, ma'am, you would say, "You will also
23  be required."  So that is separate and apart due to the
24  way that we usually do the English language, as far as
25  I know.

---

Page 87

1   So I'm looking at the first sentence.
2   "If you are granted a conditional extension of your
3   membership," comma, "the terms of the extension will
4   require action beyond simply correcting the current
5   deficiencies."
6       So you're saying the only thing they have
7   to do in addition, then, is all that's outlined in that
8   paragraph?  You're saying that's the "beyond," are
9   those two separate things?  Is there anything more
10  rather than correcting the deficiencies, or for the
11  example I gave, replacing the bedspreads?  Is there
12  something more that they would need to do than to
13  correct the deficiencies?
14      A.  Yes, the other things that are outlined in
15  that paragraph.
16      Q.  Let me ask you this.  If something -- if each
17  and every condition at a property is like the bedspread
18  example I was just giving you, corrected and passing,
19  then they would automatically get a score of 875 or
20  more, correct?
21      A.  If there were no other deficiencies.
22      Q.  Again, your answers are hinging, in my
23  opinion, as being extraordinarily evasive and
24  qualified, and I'm going to ask you to try to just
25  follow the question, answer the question.

---

Page 88

1           If all items meet the Best Western
2   criteria, then the hotel would automatically have a
3   score above 875; does that sound right to you?
4       A.  Yes.
5       Q.  Okay.  So if you've corrected the current
6   deficiencies, wouldn't it be redundant to say that you
7   need to maintain a score of over 875?
8           MR. PEDERSON:  Objection, argumentative.
9       A.  No, because --
10  BY MS. SCHLESINGER:
11      Q.  Go ahead.  I'm trying to understand how, if
12  all the deficiencies are corrected, you wouldn't have a
13  better than 875 score?
14      A.  I'm not saying you wouldn't.
15      Q.  Well, you just said that you have to do
16  something more, means have a score of above 875.  And
17  I'm asking you, If you've corrected the deficiencies,
18  wouldn't you then have a score over 875?
19      A.  Yes.
20      Q.  So when it says you have to do something
21  beyond that, then having a score of 875 isn't really
22  it?  Once you've corrected the deficiencies, they're
23  corrected, right?  Does that sound right?
24      A.  No.  Let me clarify.
25      Q.  Sure.

---

Page 89

1       A.  They're corrected at that time, but there has
2   to be an ongoing effort to maintain an 875 over the
3   next three assessments.
4       Q.  Is that in the rules and regulations
5   someplace?
6       A.  No.
7       Q.  Is that in the bylaws?
8       A.  No.
9       Q.  So this is sort of an added extra requirement
10  that comes out, and the member is just notified of it
11  in this letter?
12      A.  It's a board policy.
13      Q.  It's not in the rules or the bylaws?
14      A.  Right.
15      Q.  So I won't find it in Exhibit 1 to your
16  deposition?
17      A.  No.
18      Q.  It's just added on here?
19      A.  Yes.
20      Q.  And let me ask you this.  These current and
21  enhanced standards with accelerated deadlines for
22  design compliance, do you see that in the middle of
23  that paragraph on Exhibit 2, page 2?
24      A.  Yes.
25      Q.  Okay.  "Accelerated deadlines for design

90

1    compliance, current and enhanced standards," where are
2    those standards set forth?
3        A.  In the Design Excellence guidelines, booklets.
4        Q.  And are those changed regularly?
5        A.  They are updated, but I don't know how
6    regularly they are.
7        Q.  So, in other words, it could have been changed
8    a week before the hearing, and the member is now
9    required to adhere to the new standard?
10       A.  It's unlikely it would have been the week
11   before.  But it's current and enhanced standards, so
12   whenever there is changes, then that would be a part of
13   that design report.
14       Q.  And the enhanced standards, are those
15   applicable to all members across the board, all hotel
16   members, or only to members who have undergone one of
17   these hearings?
18       A.  To members undergone this hearing or new
19   members joining Best Western for the first time.
20       Q.  So a member that has undergone a hearing is
21   held to different standards than a member who has
22   maintained, say, an 875 consistently in old criteria?
23       A.  Yes.
24       Q.  And the accelerated deadlines, what is that
25   about?

91

1        A.  The member needs to complete their design
2    requirements within six months.
3        Q.  And that six months runs from the date of the
4    hearing?
5        A.  From the date of my letter, generally, after
6    purchase orders have been submitted.  So it could be
7    six to seven months.
8        Q.  Let me ask you this, then.  When you send out
9    this form letter, do you look to see what renovations
10   have been done by the hotel in the recent past?
11       A.  No.
12       Q.  You just send this out?
13       A.  Yes.
14       Q.  So it doesn't matter if they just finished
15   renovating their hotel a month ago, they're now going
16   to be held to accelerated deadlines for design
17   compliance, current and enhanced standards; is that
18   correct?
19       A.  Yes.
20       Q.  And, in fact, that's the same with these
21   accelerated deadlines for "installing a Best Western
22   compliant two-way interface and SpeedLinks high-speed
23   Internet access"?  When that letter went out with that
24   language in it, you didn't know what the Internet
25   access availability at Mr. Harooni's property was at

92

1    all, did you?
2        A.  No.
3        Q.  You didn't know when it was last updated?
4        A.  At the time I sent this letter, no.
5        Q.  Do you know now?
6        A.  I would have to look at his files.
7        Q.  So, in other words, the answer is, no, you
8    don't as you sit here today?
9        A.  I don't as I sit here today.
10       Q.  At some point in between there, did you learn
11   about Mr. Harooni's property?  Did you undertake any
12   investigation to determine when it was last renovated
13   or what the Internet access was?
14       A.  Yes.  If there was information relating to
15   renovation, it would have been information that would
16   be in our files, and we would have notified the board
17   that they had done some renovation.
18       Q.  You don't know if you did that in this case?
19       A.  No, I don't.
20       Q.  And you don't know whether or not Mr. Harooni
21   or his staff members attended a Best Western annual
22   convention/district meeting and general manager and
23   voter member training, do you?
24       A.  I would have known at the time of the hearing.
25       Q.  So this letter kind of just says, "I'm going

93

1    to" -- strike that.
2             This letter sets forth criteria to which
3    the member won't actually be held?
4        A.  It sets forth criteria to which the member may
5    be held.
6        Q.  In the determination of the board?
7        A.  Yes.
8        Q.  Which we've established isn't written down
9    anywhere, right?
10       A.  Right.
11       Q.  The other document that I handed to you is a
12   letter dated January 17th, 2008.  Do you see that?
13       A.  I do.
14       Q.  It purports to have been sent by certified
15   mail to Mr. Harooni.  Do you also see that?
16       A.  I do.
17       Q.  And it's signed by Steven Williams, director
18   of design?
19       A.  Yes.
20       Q.  Two-page letter with attachments, correct?
21       A.  Yes.
22       Q.  It says, "Enclosure"?
23       A.  It says, "Enclosure."
24       Q.  Do you have any knowledge of what the
25   enclosures would have been?

94

1    A.  Other than what's referenced in the letter.
2    Q.  Okay. Let's walk through that, shall we.
3  What documents are referenced in the letter?
4    A.  Under the first paragraph, it says, "Your
5  regional design consultant has reviewed the progress
6  and updated your design report accordingly. Copy
7  enclosed."
8    Q.  Okay. So updated design report should be
9  enclosed; is that right?
10   A.  It says, "Copy enclosed."
11   Q.  If you turn through there, you're going to see
12 two pages -- one, two, three, four -- four pages I'd
13 like you to set aside for the moment, because I want to
14 turn to what is listed here or has a heading of
15 "Assessment Summary, Design Detail Assessment Report."
16 Do you see that?
17   A.  Yes.
18   Q.  And it says pages 1 of 3. Do you also see
19 that?
20   A.  Yes.
21   Q.  Is this the report that would be the updated
22 design report?
23   A.  I don't know.
24   Q.  The next sentence says, "The design detailed
25 assessment indicates that the requirements due at this

95

1  time have not been completed."
2          MR. PEDERSON: What document are you
3  referring to?
4          MS. SCHLESINGER: You should have a copy
5  there.
6          MR. PEDERSON: I've got it, but there's
7  no -- nothing on the record as to what you're referring
8  to.
9          MS. SCHLESINGER: I'm trying to establish
10 if we're all even looking at the same documents, and
11 then I'll --
12         MR. PEDERSON: Is this what you're
13 looking at?
14         MS. SCHLESINGER: Yes.
15         MR. PEDERSON: All right.
16         MS. SCHLESINGER: The one that says,
17 "Design Detail Assessment Report, Assessment Summary."
18 It's a three-page document.
19 BY MS. SCHLESINGER:
20   Q.  Do you see that there, ma'am?
21   A.  I do.
22   Q.  Let's make sure we are all on the same page,
23 and I believe that only the letter previously had been
24 admitted as Exhibit 2, so at this time, I'm going to
25 say this January 17th, 2008, letter will be Exhibit 3,

96

1  and I'm trying to establish what the appropriate
2  attachments to it were.
3          So did you tell me that you do recognize
4  this design detail assessment report as being the type
5  of report referenced by Mr. Wilson -- Mr. Williams'
6  letter?
7    A.  I don't know if this was the one that was sent
8  or the other one that's in this packet.
9    Q.  Okay. And that, you're referring to a
10 four-page letter that states, "The design review" -- in
11 the upper right-hand corner, it says, "The design
12 review was done on 10/30/2007." Do you see that?
13   A.  I see that.
14   Q.  Is that the other document you're looking at?
15   A.  Yes.
16   Q.  So design review had been done prior to
17 Mr. Williams' letter by just a few months? Is that
18 what that documentation would indicate to you?
19   A.  Yes.
20   Q.  Okay. And then in your letter, you're saying,
21 "No, no, you need an updated design evaluation, or
22 design assessment"; is that right?
23   A.  Yes.
24   Q.  And for that, you're going to charge $1,500?
25   A.  Yes.

97

1    Q.  So even though it was done just a few months
2  ago, now, as of February, another one needs to be done?
3    A.  Yes.
4    Q.  Why is that?
5    A.  Because these were original requirements that
6  were found at the property in '05, '06. There were new
7  requirements that were established in '07.
8    Q.  No, I'm sorry, ma'am. This says, "Design
9  review date 10/30/2007."
10   A.  Right. This was not the initial date this was
11 prepared. This is an update.
12   Q.  So it was updated in October 2007?
13   A.  Yes, it was.
14   Q.  So now Best Western wants another one?
15   A.  Let me clarify. It was updated to confirm
16 what items had and had not been done. It wasn't a
17 report to indicate what new items needed to be added to
18 the design report.
19   Q.  Sure. They, at the time of your letter,
20 decided to add new items; is that correct?
21   A.  Under the new requirements.
22   Q.  That only people that are falling into
23 hearings are needing to comply with?
24   A.  That's right, and new members joining Best
25 Western.

## Page 98

1  Q. Okay. Mr. Williams' January 17, 2008, letter
2  says that it is as a result of the design detail
3  assessment and the alleged failure to meet these
4  requirements that the property has been placed in a
5  probationary status. Do you see that?
6  A. I do.
7  Q. And then it says, further down, "On April 16th
8  or shortly thereafter." Do you see that?
9  A. I do.
10  Q. "Your regional service manager will revisit
11  your property and report to Best Western design
12  department on your property's progress in its attempt
13  to meet Best Western brand design standards." Did
14  I read that correctly?
15  A. Yes.
16  Q. But, in fact, the regional service manager
17  showed up on January 31, 2008; is that also correct?
18  A. Yes.
19  Q. So even though Mr. Williams gave Mr. Harooni
20  until April 16th, 2008, in fact, that didn't happen?
21  Your letter came out on February 8th, a good two months
22  prior to the date given by the design department; is
23  that right?
24  A. Yes.
25       MS. SCHLESINGER: I'm going to go ahead

## Page 99

1  and mark just the letter since there was some confusion
2  about this other assessment. I'm going to mark the
3  January 17, 2008, letter as Exhibit 3, and this is a
4  two-page document signed by Steven Williams, director
5  of design.
6       (Exhibit No. 3 marked.)
7  BY MS. SCHLESINGER:
8  Q. Was there any notice given to Mr. Harooni
9  prior to your February 8th, 2008, letter that the dates
10  have been changed?
11       MR. PEDERSON: Objection. I don't know
12  what dates you're referring to.
13       MS. SCHLESINGER: The April 16th, 2008,
14  date referenced by Mr. Williams in this January 17th
15  letter that's been marked as Exhibit 3.
16  BY MS. SCHLESINGER:
17  Q. Was there anything that went out, to your
18  knowledge, to apprise Mr. Harooni that that date of
19  April 16th, 2008, was no longer the deadline?
20  A. No.
21  Q. Would Best Western get involved in the
22  financing of a hotel?
23  A. No.
24  Q. They just wanted the member to produce all of
25  the documentation related to their financing at the

## Page 100

1  hearing?
2  A. If the member choses to provide that
3  information, they can.
4  Q. If the member had changes in his financial --
5  his financing, in other words, let's say he's gone out
6  and gotten a new loan or inherited money, would that
7  influence the decision to terminate a hotel?
8  A. It would be considered. I don't know if it
9  would influence them one way or another.
10  Q. That's right. You told me you didn't know
11  that.
12       Now, one of the things that would change
13  or would cause -- be cause for termination is if
14  50 percent of the membership was sold to a third party;
15  is that right?
16  A. No.
17  Q. Okay. Do you want to explain that?
18  A. It's not 50 percent of the membership. It's
19  50 percent of the owning entity that was sold.
20  Q. And the owning entity is always the
21  individual, right?
22  A. No.
23  Q. That's the member, right?
24  A. That's the voting member.
25  Q. Okay. How is the member apprised of new

## Page 101

1  construction guidelines or new guidelines for
2  renovations and refurbishing?
3  A. That information is generally posted on our
4  websites and through CEO newsletters.
5  Q. And how often do these newsletters come out?
6  A. The CO newsletters go out after each board
7  meeting, and then the website is posted if there's a
8  new policy that's been adopted by the board.
9  Q. So if the member doesn't read this newsletter,
10  then they would not necessarily know that there was any
11  new membership -- or new requirement; is that right?
12  A. That would be one source to find that out.
13  Q. So you told me that if they look for it on the
14  website or read the newsletter. Is there any other
15  method of notice to the members that guidelines have
16  been changed?
17  A. Through attending conventions and district
18  meetings.
19  Q. How often are those held?
20  A. District meetings are held in the spring.
21  Convention is held in the fall. There's also state and
22  regional meetings that are held periodically throughout
23  the year.
24  Q. So in the spring, what time -- when is the
25  spring, you would say? Is that March? April?

CHERYL D. POLLACK, CHA
1/13/2010

### Page 102

1   A.  March through May.
2   Q.  So at the time of your February 8th, 2008,
3   letter, the meeting had been ten months ago? The last
4   meeting had been like ten months previous?
5   A.  Spring meeting.
6   Q.  What other meeting was --
7   A.  The convention was held in fall.
8   Q.  So you didn't remember a deposition you did in
9   the fall of 2009; is that right?
10  A.  That's right.
11  Q.  So that's a significant period of time, I
12  guess?
13  A.  Yes.
14  Q.  So, basically, if they don't go to a -- are
15  the attendance of these conventions mandatory?
16  A.  No.
17  Q.  So if they didn't read the newsletter, they
18  might not know that the website had been updated and so
19  they might not know that new guidelines were in place;
20  is that correct?
21  A.  Or if they don't make a practice of just
22  looking at bestwestern.com on a daily basis.
23  Q.  That's assuming that they have access to it,
24  right?
25  A.  Right.

### Page 103

1   Q.  Which you don't know have any personal
2   knowledge if Mr. Harooni had access to it?
3   A.  No, I don't.
4   Q.  So is there any other method of notifying a
5   member that guidelines are changing?
6   A.  Not that I'm aware of.
7   Q.  And, in fact, are the members notified at all
8   that the guidelines are under consideration for change?
9   A.  Again, I don't know.  I don't know.
10  Q.  But whether or not they meet the guidelines is
11  cause for termination, right?
12  A.  If they don't meet the guidelines, it's cause
13  for termination.
14  Q.  Right. That's what I said.
15  A.  Yes.
16  Q.  So the guidelines could be changing, a member
17  is not apprised of it except through this newsletter --
18  well, strike that.
19       When the board is contemplating changing
20  guidelines, do they communicate that information to the
21  members at all?
22  A.  I don't know.
23  Q.  So as far as you're aware, there's not
24  necessarily any advance warning that the guidelines
25  will be changing?

### Page 104

1   A.  Generally, when the board establishes a policy
2   to change guidelines, they notify the members. You
3   have a certain period of time to get acclimated and
4   understand there will be changes. So there's a period
5   of time in which to comply.
6   Q.  Again, just for the heck of it, I want to make
7   sure I understand the way that they are notified of
8   this is either through attendance of a nonmandatory
9   convention or meeting or by reading the newsletter,
10  right?
11  A.  Newsletters, websites. There's also Best
12  Western Today, which goes out at least once a week.
13  Q.  What is that?
14  A.  That's a fax communication that goes to all
15  properties and voting members.
16  Q.  Would that fax communication necessarily
17  state, "Here is the proposed change in a guideline"?
18  A.  It could.
19  Q.  It could. Does it, as a matter of course, or
20  is there a requirement that it state, "Here's the
21  proposed change that's being considered"?
22  A.  I don't know.
23  Q.  I believe that there is something called an
24  extension administration fee; is that correct?
25  A.  It's a conditional extension administration

### Page 105

1   fee.
2   Q.  How much is that?
3   A.  It depends on the grounds for cancellation.
4   Q.  Can you give me some examples?
5   A.  If the grounds for cancellation related to
6   quality control, failing GRPA scores, it would have
7   been a $5,000 conditional extension fee. If it was for
8   nonattendance at a meeting, then they would be charged
9   a $1,700 conditional extension fee. If the grounds for
10  cancellation were only related to brand standards
11  failures, it would be a $4,000 conditional extension
12  fee.
13  Q.  Brand standards failures, is that something
14  that Mr. Harooni was in trouble for?
15  A.  I don't recall.
16  Q.  You dealt with Mr. Harooni's property, though,
17  right? You did this letter and you did a couple of
18  other letters, as I see. You directed correspondence
19  to Mr. Harooni, right?
20  A.  Yes.
21  Q.  Is this the package that you put together to
22  present to the board prior to the hearing regarding
23  Mr. Harooni's termination?
24      MS. SCHLESINGER:  As soon as she confirms
25  that, we can stop and have another copy made so you've

CHERYL D. POLLACK, CHA
1/13/2010

106

1  got it. Unfortunately, my copier at home is one of
2  those old junky four-in-one, sit there and wait for it
3  forever.
4     A. This is incomplete.
5  BY MS. SCHLESINGER:
6     Q. Really? How do you know that?
7     A. Well, because it's our normal practice to
8  provide copies of the quality assurance reports, and I
9  don't see those in here.
10   Q. Is there anything here that indicates that
11 they were included?
12   A. No, just reference to them in the summary.
13 In addition, a copy of my letter is not in here.
14   Q. Do you have any documentation -- and this is
15 what we have that was together, and I guess I'm going
16 to say since you're telling me that's incomplete, I'm
17 going to walk out to the files in my car, and we'll go
18 through those documents laboriously one at a time until
19 we can find them.
20      MS. SCHLESINGER: We'll be off the record
21 for 15 minutes.
22      MR. PEDERSON: Remember, you've got
23 four hours.
24      MS. SCHLESINGER: Yeah, I'm well aware of
25 that. We're off the record.

107

1      (Recess was taken from 12:18 p.m. to
2  12:32 p.m.)
3  BY MS. SCHLESINGER:
4     Q. Ms. Pollack, you stated that you don't believe
5  this is a complete report, this March 24th, 2008, with
6  attachments. You said that you believe that your
7  quality assurance reports would have been included;
8  is that correct?
9     A. They would have been included.
10   Q. And you said that just because that's your
11 normal practice; is that right?
12   A. It references pages 8 through 28 on the
13 summary, page 3.
14   Q. I'm sorry, where are you looking at now?
15   A. Page 3 of the summary. Those are pages of the
16 packet labeled 8 through 28. 29 through 53 aren't
17 there, 54 through 58.
18   Q. Where does it say there are page numbers?
19   A. It doesn't, but that's -- we label them on the
20 documents.
21   Q. Is that what the numbers -- where these little
22 numbers come from that are handwritten on the documents
23 that are attached?
24   A. Your question? I'm sorry.
25   Q. If you look at the other attachments past this

108

1  summary, you'll see, for example, on this
2  December 21st, 2005, letter that's marked "Urgent &
3  Confidential" just past the summary --
4     A. Yes.
5     Q. -- and you see a number up there. It's the
6  number 6.
7     A. Yes.
8     Q. Is that what those numbers are?
9     A. Yes.
10   Q. Is that communicated to the member in some
11 manner?
12   A. No.
13   Q. Okay. Because I didn't know where those
14 numbers came from when I looked at it, so I'm just
15 wondering how the --
16      MS. SCHLESINGER: Oh, what a gentleman.
17 Thank you.
18      MR. PEDERSON: Trying to stay safe over
19 here.
20      MS. SCHLESINGER: I should have realized.
21 I apologize for sneezing.
22 BY MS. SCHLESINGER:
23   Q. Okay. So you're saying that -- which numbers?
24 You said 8 through 28 is not included?
25   A. Yes.

109

1     Q. And that would be a summary report?
2     A. It would be a quality assurance guest
3  room/public areas assessment report.
4     Q. Is there any way, as you sit here today, we
5  can sort out, since these were not Bates stamped or
6  produced to us, Bates stamped as far as I'm aware,
7  which reports would have been included? It says 5/17
8  inspection, so would this be a copy of what you're
9  saying would be included, then?
10   A. It would be. It just doesn't have a number on
11 it that correlates with the hearing packet.
12   Q. And then the other one you're saying that's
13 not included is this 10/25?
14   A. Yes.
15   Q. Is that a copy there of what you're saying
16 wasn't included that should have been?
17   A. All I can say is that the report's dateable
18 October 25, '07, which correlates with the information
19 that's in the summary, but, again, there's no page
20 numbers 29 through 53 on this.
21   Q. Do you know how this document was produced in
22 this litigation, ma'am?
23   A. No.
24   Q. Do you know if it was produced?
25   A. I don't know.

CHERYL D. POLLACK, CHA
1/13/2010

Page 110

1  Q.  What else, if anything, are you saying would
2  have been included that is not?
3  A.  Pages 54 through 58, and that is the hearing
4  probationary status letter for brand standards.
5  Q.  Who would have sent that letter?
6  A.  It would have been from quality assurance.
7  I don't know who in particular.
8  Q.  All right.  As we look down here -- so it
9  would be your testimony that this summary would list
10 everything that would have been included in the
11 package; is that right?
12 A.  Yes.
13 Q.  Do you see any photographs listed?
14 A.  No.
15 Q.  But you testified earlier that those would
16 have normally been included; is that right?
17 A.  Yes.  We include those with the hearing
18 letter.
19 Q.  By "hearing letter," are you referring to the
20 February 8th, 2008, letter, form letter you sent?
21 A.  Yes, I am.
22 Q.  That letter doesn't state that there was any
23 enclosure with it either.
24 A.  Excuse me.  It does.
25 Q.  Really?

Page 111

1  A.  Page 2, it says, "I have enclosed a copy of
2  your most recent assessment and CD containing the
3  assessment photographs."
4  Q.  But you didn't mark that as "Enclosed" under
5  your signature block?
6  A.  No, I did not.
7  Q.  So is it possible that they were omitted?
8  A.  I doubt that.
9  Q.  But it's possible?
10 A.  I would say very unlikely.
11 Q.  What are you basing that on?
12 A.  Our past experience.
13 Q.  You never leave an enclosure out of a --
14 A.  It's possible we have.
15 Q.  And you don't have any way to confirm whether
16 or not it was actually included, as you sit here today,
17 do you?
18 A.  No.
19 Q.  Looking at this package that you say is
20 incomplete -- oh, that's funny.  Sorry.  I was just
21 distracted by this, because you told me there were
22 seven board members, right?
23 A.  There are seven board members, yes.
24 Q.  Okay.  Why would you require a member to bring
25 20 copies for seven board members?

Page 112

1  A.  Because there's staff members that are also
2  there, and if they submit it to us in advance, which
3  it's advised that they do, we can provide the seven
4  board members with their copy.  In a case they'd leave
5  it in their hotel room or someplace, then we'll have an
6  extra copy for them, so we then have 13 copies for the
7  hearing.
8  Q.  Okay.  Well, I think that's an interesting
9  explanation.  I'm not clear why you need at least
10 20 copies.
11 A.  Because there are seven board members and
12 staff members that are present during the hearing.
13 Q.  So in case one of your board members gets
14 careless and leaves it behind, you want to have an
15 extra copy for them?
16 A.  That's right.
17 Q.  So you want the member to provide 20 copies so
18 that in case a board member forgets his copy, you've
19 got one?
20 A.  Yeah.  Yes, that's correct.
21 Q.  Okay.  And as you turn through this, there
22 is an "Urgent & Confidential," December 21st, 2005,
23 letter signed by the chairman of the board, vice chair,
24 et cetera.  Do you see those documents?  It's a
25 two-page document with the number 6 and 7 up in the

Page 113

1  upper right-hand corner.
2  A.  I do.
3  Q.  Do you see that it says, third paragraph down,
4  it says, "Unfortunately, industry research indicates
5  that Best Western has slipped in important industry
6  satisfaction rankings."  Do you see that?
7  A.  I do.
8  Q.  I've read it correctly?
9  A.  Yes, that's what it says.
10 Q.  Okay.  So is it fair to say, then, that
11 because of Best Western's slipping in important
12 industry satisfaction rankings, pressure was then put
13 on the members to come to a higher standard after this
14 December 21st, 2005, letter?
15 A.  Higher than what they were at.
16 Q.  Okay.  And Mr. Harooni purchased this hotel in
17 2004; is that right?
18 A.  I think it was March 1st of '05.
19 Q.  But it was certainly before this letter?
20 A.  Yes.
21 Q.  So the standards changed subsequent to Best
22 Western's slipping in the ratings?
23 A.  I don't know if they changed.
24 Q.  They were asked to come to a "higher standard
25 after the December 21st, 2005, letter?"

Ottmar & Associates
602-485-1488

114

1  Answer: "Higher than what they were at."
2  So "higher" would be changed?
3  A. I believe we were just asking for members to
4  raise the bar. If they were in the bottom 15 or
5  20 percent, we were looking for them to address
6  complaints.
7  Q. Can you see where that -- point that out to me
8  in this letter where it says that?
9  A. You were asking me a question that didn't
10 necessarily relate to this letter, I thought. It says,
11 "While your property may not have exceeded the customer
12 service ratio in the last two six-month rating periods,
13 it is one of 155 that account for over 50 percent of
14 the accommodation and service-related problem types in
15 customer care tracking system."
16 Q. I'm sorry, that --
17 A. That's all this letter is saying.
18 Q. Okay. And this letter was included in the
19 package regarding Mr. Harooni's hearing why?
20 A. Because the board asked us to include copies
21 of any customer care-related letters in hearing
22 packets.
23 Q. What is customer care at Best Western? Is
24 that directed towards assisting the members to avoid
25 termination?

115

1  A. No.
2  Q. What is it?
3  A. Those are guests that call in to our
4  reservation center, customer care department, and
5  complain.
6  Q. Because you said, "The board asked us to
7  include copies of any customer care-related letters in
8  hearing packets." So any customer complaints would
9  have been included in this packet?
10 A. Any letters like this, the board asked us to
11 include in the hearing packet.
12 Q. Would Mr. Harooni have been apprised of the
13 specific customer complaints, if any, regarding his
14 hotel? Would he get copies of those?
15 A. I don't recall if we were sending out copies
16 at that time or summary pages of the complaints.
17 Q. So, in other words, he might not have gotten
18 copies of those?
19 A. No. I don't know.
20 MS. SCHLESINGER: With the caveat that
21 Ms. Pollack states that documents were missing for
22 reference, and to make the record complete of what we
23 were looking at, I will attach this as Exhibit 4 to the
24 deposition.
25 MS. SCHLESINGER: I'm going to review,

116

1  but I think I'm done. Let me take a look and make
2  sure.
3  (Exhibit No. 4 marked.)
4  BY MS. SCHLESINGER:
5  Q. Did Mr. -- strike that.
6  Do you have any knowledge of Best Western
7  slipping in important industry standards as a direct
8  result of anything Mr. Harooni did or did not do on his
9  property?
10 A. No.
11 Q. And isn't it true that hotels are frequently
12 given bad reviews by customers even when they meet Best
13 Western standards? That can happen, right, that a
14 customer will give a bad review on like a Travelocity
15 or something of that nature even for a hotel that's
16 getting passing grades from Best Western?
17 A. I suppose that can happen.
18 Q. Let me tell you, I realize -- there's no sense
19 of humor in that. Sorry.
20 Did you do anything or get involved in
21 any way to try to prevent the termination of
22 Mr. Harooni's membership?
23 A. No.
24 Q. Are you aware of anyone that did?
25 A. No.

117

1  Q. So, to your knowledge, no one at Best Western
2  did anything in order to assist Mr. Harooni to avoid
3  termination; is that correct?
4  A. Not except through the assistance through the
5  regional service managers when they were out to the
6  property in advance of the two failures.
7  Q. So whatever Ms. Bree said with regard to what
8  she did to avoid termination would be all you'd be
9  aware of, right?
10 A. That's just an action plan if the member
11 chooses to use it.
12 Q. Are you aware of anything else that Best
13 Western did in order to help Mr. Harooni avoid
14 termination?
15 A. No.
16 Q. Did you ever contact Mr. Williams, the design
17 director, whose letter we were looking at, the
18 January 17th letter, to confirm the time frame that he
19 stated for correcting the design issues?
20 A. No.
21 Q. Never had any contact with him in that regard?
22 A. That's not my typical.
23 Q. Did you attend the board hearing?
24 A. Most likely I did. I've rarely missed -- I've
25 rarely missed any.

CHERYL D. POLLACK, CHA
1/13/2010

                                                                    118

1    Q.  Did you communicate with Mr. Harooni
2    personally after your February 8th, 2008, letter went
3    out?
4    A.  I don't recall if I did.
5    Q.  Do you know why -- strike that.
6        Do you know if the property that's the
7    subject of this litigation was under probation or in
8    danger of termination prior to Mr. Harooni's
9    acquisition of the property?
10   A.  Not without looking through their complete
11   file.
12   Q.  So if I understand this correctly, the only
13   thing that you do with regard to terminations is you
14   put together this package and attend the board
15   hearings; is that right?
16   A.  I present a overview to the board, make sure
17   they have their packet, see if they have any questions.
18   Then I invite the member into the hearing, introduce
19   them to the board members, and then the member presents
20   and questions are asked.
21   Q.  So basically you put together the package and
22   you introduce the voting member to the board; is that
23   correct?
24   A.  Prior to introducing the member to the board,
25   I review the packet with the board.

                                                                    119

1    Q.  So did you review the packet that you prepared
2    with regard to Mr. Harooni's hotel with the board?
3    A.  That's my standard procedure to do so.
4    Q.  What did you say?
5    A.  That's my standard procedure.
6    Q.  No, I'm sorry.  What did you say to the board?
7    A.  I don't recall what I said to the board.
8    Q.  Do you have a -- do you individualize your
9    discussion with the board regarding each hotel, or do
10   you have a general spiel?
11   A.  I have a general spiel.
12   Q.  Can we hear that now?
13   A.  Sure.  I say, "The hearing is being held today
14   on behalf of Hooshang Harooni with the Best Western
15   Antelope Valley Inn in Lancaster, California.
16       The grounds for cancellation are the
17   property failed two substandard assessments within the
18   last two assessments: 750 on October 25th, 2007;
19   January 31, 2008.  You can see the major point losses
20   were maintenance issues."  I highlight that.
21       I also would highlight that this property
22   had had a failing GRPA score back in May of '05, a 722.
23       I also note that the property had an
24   automatic transfer, if that information was in there as
25   well.

                                                                    120

1        I highlight the pages on the property
2    profile, which indicate that the average GRPA for this
3    property over the last eight assessments was a 794.
4        The property's in the bottom 20 percent
5    overall composite rating.  QA score, GSS are bottom
6    20 percent.  Customer care, however, is above average.
7        I indicate GM attendance, how many units
8    the property is.  This is a three-diamond rated
9    property.
10       And then I don't read this.  They can
11   read for themselves.
12   Q.  By "this" -- I'm sorry to interrupt you, but
13   by "this," you're referencing your summary?
14   A.  Yes.
15       And then I would have copies of the
16   QA reports.  Specifically, I would highlight any
17   planned improvements that were noted by the regional
18   service manager or any improvements that have made
19   prior to that particular assessment.  I do highlight
20   those.
21       And then I defer further communication to
22   the designer who is present in the board room, saying,
23   "Can you report to the board what your recommendation
24   is on the amount of money that might need to be spent
25   to do the design work based on the new design report

                                                                    121

1    that was completed within the last 30 days."
2        She tells the board what her
3    recommendation is.  And then I ask the board if there
4    are any other questions.  Generally there's not.  And
5    we invite the member in.
6    Q.  So the voting member doesn't even hear your
7    spiel?
8    A.  No.  It's just a highlight of what's already
9    there.
10   Q.  Do you know what happens with regard to the
11   RSM's recommendation for continued membership on the --
12   I believe it's the 840 or below report?  Are you
13   familiar with that?
14   A.  I would need to look at the report.
15   Q.  This document was authenticated by Cindy Bree
16   at a prior deposition.  It's the less than 840 score
17   property report.  You'll find on page 2 the
18   recommendation to which I am referring.
19   A.  Yes, I see that.
20   Q.  And that's a scale of 1 to 10; is that
21   correct?
22   A.  This says 1 to 7.
23   Q.  Okay.  So 1 to 7.  Did anybody question
24   Ms. Bree as to why she put down a 1?
25   A.  Not to my knowledge.

CHERYL D. POLLACK, CHA
1/13/2010

<table>
<tr><td>

122

1   Q. To your knowledge, would circumstances have
2  come out differently had she put a number 7 on there,
3  the highest recommendation?
4   A. Not necessarily.
5      MS. SCHLESINGER: I'm going to attach
6  that as Exhibit 5, just so that the record is complete
7  and we'll know what we were looking at.
8      MR. PEDERSON: I'm sorry, what did you
9  say?
10     MS. SCHLESINGER: I said, I'm going to
11 attach that as Exhibit 5 so that the record is complete
12 and we all know what we were looking at.
13     (Exhibit No. 5 marked.)
14 BY MS. SCHLESINGER:
15  Q. Do you know in this instance, Ms. Pollack, why
16 a conditional extension was not granted?
17  A. No, I don't.
18  Q. Do you know generally why conditional
19 extensions are not granted?
20  A. It's the decision the board makes.
21  Q. Do you have any communication with the voting
22 member during the hearing?
23  A. I'm at the board table. I might acknowledge
24 if they want water or -- that's it.
25  Q. Substantive.

</td><td>

124

1  to policies?
2   A. I don't know what's discussed during those
3  because I'm not part of it.
4   Q. Did you ever meet Mr. Harooni prior to the
5  board hearing?
6   A. I don't recall.
7   Q. Were you aware or are you aware that
8  Mr. Harooni's property met the Best Western Design
9  Excellence Program standards?
10  A. No.
11  Q. Are you familiar with how many other hotels
12 are terminated on an annual basis by Best Western?
13  A. It's around 100 properties that are
14 terminated.
15  Q. A year?
16  A. Yes. And that includes not just quality
17 assurance. It could be for delinquent accounts or
18 failure to comply with terms of approval.
19  Q. How many properties are terminated for quality
20 assurance problems?
21  A. I don't know off the top of my head.
22  Q. You're the person most knowledgeable regarding
23 terminations. You don't know that?
24  A. I don't have that number in front of me.
25 I would have to --

</td></tr>
<tr><td>

123

1   A. No.
2   Q. Are you familiar with a policy that prohibits
3  challenging an inspection report after 48 hours?
4   A. Yes.
5   Q. And how did you come to be familiar with that
6  policy?
7   A. By attending board meetings, that may have
8  been presented or by reviewing the quality assurance
9  manual that's online. Just my general experience with
10 the quality assurance department.
11  Q. So that issue has come up at prior board
12 hearings?
13  A. Yeah, it may have.
14  Q. I think that's what you just said. You're
15 familiar with that by attending board meetings, so ...
16  A. Not necessarily at hearings.
17  Q. Oh, I see. So it would be board meetings.
18 Board meetings are not attended by the typical voting
19 member, are they?
20  A. They're welcome to attend board meetings
21 except for executive session, such as a hearing.
22  Q. What other executive sessions are conducted?
23  A. Legal discussions, personnel discussions.
24  Q. And when you say "legal discussions," might
25 that entail the legal ramifications of various changes

</td><td>

125

1   Q. Can you estimate?
2   A. Maybe 50.
3   Q. So half the properties that are terminated are
4  for quality assurance problems?
5   A. No, that wouldn't be right. It would probably
6  be at least -- probably be at least 80.
7   Q. So the majority?
8   A. The majority of them are for quality
9  assurance.
10  Q. Problems?
11     Do you have inspectors that go out
12 specifically for -- to do reinspections or rapid
13 response visits or other issues that raise the specter
14 of termination? Do you have a specific team that goes
15 out and deals with those issues from a service
16 management perspective?
17  A. I'm not aware of that.
18  Q. You don't have go-to people when properties
19 are in trouble?
20  A. No, other than their district manager and
21 continued support from their regional service manager.
22  Q. Meaning, somebody who will go out and do an
23 assessment and transfer that information to an action
24 plan?
25  A. If the member requests that.

</td></tr>
</table>

CHERYL D. POLLACK, CHA
1/13/2010

126

1   Q. I just was wondering what you mean by
2   "continued support from their regional service
3   manager."
4   A. A member may contact their regional service
5   manager at any time and say, "I need assistance with a
6   cleaning issue. What product do you suggest we use?"
7   for example.
8   Q. You're not privy to those conversations, are
9   you?
10  A. No, but I'm aware they happen.
11  Q. Somebody in Best Western told you that
12  happens?
13  A. I've heard from time to time members saying
14  they contact their regional service manager for
15  assistance.
16  Q. Do you do anything to follow up with the
17  member to ensure that termination is unlikely?
18  A. No.
19  Q. When termination is pending, does Best Western
20  take action including but not limited to turning off
21  the reservation system?
22  A. Not prior to termination, unless the property
23  scored below 600 points on its guest room/public areas
24  assessment score.
25  Q. Dues are due on the 15th of the month. Does

127

1   Best Western -- I'm sorry, the 15th of September;
2   is that correct?
3   A. That's the annual dues, correct.
4   Q. Okay. Does Best Western take any steps to
5   enforce payment of dues that involves turning off the
6   reservation system?
7   A. Once a delinquent -- once an account becomes
8   severely delinquent, past 90 days, they're restricted
9   on the reservation system.
10  Q. By "restricted," you mean it's turned off,
11  right?
12  A. They can't receive reservations, correct.
13  Q. Who makes that determination?
14  A. Our finance department.
15      MS. SCHLESINGER: I'm going to reserve
16  for redirect.
17      MR. PEDERSON: I'm sorry? I didn't hear
18  what you said.
19      MS. SCHLESINGER: I'm reserving for
20  redistrict. I have no further questions at this time.
21      MR. PEDERSON: Okay.
22
23          EXAMINATION
24  BY MR. PEDERSON:
25  Q. Ms. Pollack, take a look at Exhibit 2, would

128

1   you -- I'm sorry -- Exhibit 3. Does Best Western also
2   notify members of changes by mailings to members?
3   A. Page 2 of that letter does indicate that.
4   Q. Now, does Best Western have a membership
5   agreement in writing?
6   A. Yes.
7   Q. Does that describe who the members are of Best
8   Western?
9   A. Yes.
10  Q. And does it describe a separate category of a
11  member and then the voting member?
12  A. It describes the owning entity.
13      MS. SCHLESINGER: I'm going to object to
14  the form. Go ahead.
15  BY MR. PEDERSON:
16  Q. Go ahead.
17  A. It describes the owning entity, individuals,
18  and who the voting member is.
19  Q. So does the membership agreement control,
20  then, who is the voting member and who is the member?
21      MS. SCHLESINGER: Objection, form,
22  foundation.
23  A. Yes.
24  BY MR. PEDERSON:
25  Q. Is there a difference between a termination --

129

1   let's back up a step.
2       Do you recall whether the membership at
3   issue in this litigation was terminated because of
4   quality assurance issues or because of design review
5   issues?
6   A. The grounds for cancellation related to
7   quality assurance.
8   Q. And that design review had nothing to do with
9   it?
10      MS. SCHLESINGER: Objection, form,
11  foundation.
12  A. It was information the board considered, but
13  it wasn't the grounds for cancellation.
14  BY MR. PEDERSON:
15  Q. All right. If a member gets a conditional
16  extension and meets the requirements of the conditional
17  extension, are they restored to an active member
18  status?
19  A. Yes.
20  Q. Is more than 30 minutes given to a member at a
21  termination hearing if the member so requests?
22      MS. SCHLESINGER: Objection, form.
23  BY MR. PEDERSON:
24  Q. Go ahead.
25  A. Yes.

CHERYL D. POLLACK, CHA
1/13/2010

130

1  Q. Have you ever attended hearings where a member
2  has taken more than 30 minutes to present his or her or
3  its case?
4  A. Yes, I have.
5       (Exhibit No. 6 marked.)
6  BY MR. PEDERSON:
7  Q. All right. Ma'am, I'm showing you what's been
8  marked as Exhibit 6. Can you identify that?
9  A. This is a copy of the membership application
10 agreement that was submitted on behalf of Antelope
11 Valley Inn in Lancaster, California.
12 Q. All right. And does that identify who the
13 member is and the voting member?
14 A. It identifies the voting member as Hooshang
15 Harooni, and the entity name is AV Inn Associates 1,
16 I believe, LLC.
17      MR. PEDERSON: No further questions.
18
19      FURTHER EXAMINATION
20 BY MS. SCHLESINGER:
21 Q. Ms. Pollack, your correspondence of
22 February 8, 2008, was directed to Mr. Hooshang Harooni,
23 Best Western Antelope Valley Inn. Do you see that on
24 Exhibit 2?
25 A. I do.

131

1  Q. It did not -- was not directed to AV Inn
2  Associates 1, LLC, was it?
3  A. No.
4  Q. So it was irrelevant whether AV Inn
5  Associates, LLC -- that doesn't appear to be relevant
6  in your correspondence, does it?
7       MR. PEDERSON: Object to the form of the
8  question, calls for a legal conclusion.
9  BY MS. SCHLESINGER:
10 Q. Did you regard it as relevant what the
11 technical name of the member on the application was
12 when you drafted your important correspondence of
13 February 8, 2008?
14 A. No.
15 Q. Okay. Did you in fact even know what the name
16 of the member was at the time you drafted this
17 correspondence?
18 A. Probably not.
19 Q. You stated that you had been present when a
20 hearing took more than a half an hour and that that
21 would be acceptable if the member asked. Is there any
22 place that it was communicated to the member that they
23 could be given a waiver or an exception to the
24 half-an-hour rule stated in the correspondence you sent
25 to Mr. Harooni?

132

1  A. No.
2  Q. Did you inform Mr. Harooni that more than a
3  half an hour would be permissible?
4  A. I don't recall what I told him.
5  Q. So you have no personal knowledge of ever
6  having said that to him?
7  A. No.
8  Q. Is there any communication or correspondence
9  in which you explained to him that you could actually
10 take longer than a half an hour?
11 A. No.
12 Q. To the best of your knowledge, he had no way
13 of knowing that he might be able to take longer if
14 necessary?
15 A. Only if he asked.
16 Q. Which he had no idea he could do, right?
17 A. I don't know what he knew.
18 Q. You didn't communicate that to him?
19 A. No, I did not, to the best of my knowledge.
20 Q. Would you consider the design review
21 assessment just an exercise?
22 A. No.
23 Q. Okay. So it was relevant to Mr. Harooni's
24 continued membership with Best Western?
25 A. It's something the board considers when

133

1  they're looking at whether granting a conditional
2  extension or not.
3  Q. Ma'am, first of all, you previously testified
4  you don't know what the board considered. I'm sure we
5  can have the court reporter read that back. You do not
6  know what they considered in making these
7  determinations; is that true?
8  A. That's true.
9  Q. Okay. So let me ask you this. You then
10 testified under cross to Mr. Pederson that, oh, this
11 was really only about quality assurance. That was the
12 cause of the termination. Is that right? Do you
13 recall that?
14 A. I thought I said it was the grounds for
15 cancellation, and if I didn't, that was my intent.
16 Q. And, in fact, you don't know that because you
17 previously and just now confirmed you don't know what
18 the board considered; is that right?
19 A. Let me clarify.
20 Q. Actually, let's just get an answer to the
21 question first and then we can have you clarify.
22      You know what, I'm going to strike that,
23 because you've already testified, and, you know,
24 I wouldn't want to run over our four hours. Have a
25 good day. Thank you for your time.

CHERYL D. POLLACK, CHA
1/13/2010

```
                                          134
 1     MR. PEDERSON:  Thank you.
 2     THE WITNESS:  Thank you.
 3     (1:12 p.m.)
 4
 5
 6
 7
 8     _____
       CHERYL D. POLLACK, CHA
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                          135
 1   STATE OF ARIZONA    )
                         ) SS.
 2   COUNTY OF MARICOPA  )
 3       BE IT KNOWN that the foregoing transcript was
 4   taken before me, HALEY WESTRA, a Certified Court
 5   Reporter in the State of Arizona; that the witness
 6   before testifying was duly sworn by me to testify to
 7   the whole truth; that the questions propounded to the
 8   witness and the answers of the witness thereto were
 9   taken down by me in shorthand and thereafter reduced to
10   print under my direction; at the witness's request,
11   notification was provided that the transcript was
12   available to read and sign; that the foregoing pages
13   are a true and correct transcript of all proceedings,
14   all done to the best of my skill and ability.
15       I further certify that I am in no way related to
16   any of the parties hereto nor am I in any way
17   interested in the outcome hereof.
18       Dated at Phoenix, Arizona, this 19th day of
19   January, 2010.
20
21       _____
         HALEY WESTRA
22       AZ Certified Court Reporter No. 50762
23
24
25
```