*Best Western v. AV Inn Associates 1, LLC, et al.*
*Exhibit No. 7*

# EXHIBIT "7"

**Deposition of Terry Wininger**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL, )
INC., an Arizona non-profit )
corporation, )
 )
        Plaintiff, )
 )
  vs. ) No. CIV08-02274-PHX-DGC
 )
AV INN ASSOCIATES 1, LLC, a )
California limited liability )
company; HOOSHANG HAROONI, )
 )
        Defendants. )
_____)


DEPOSITION OF TERRY SUZANN WININGER


Phoenix, Arizona
January 5, 2010
9:30 a.m.


PREPARED FOR:

ATTORNEY AT LAW
(COPY)


Reported by:

HALEY WESTRA, RPR

Arizona CCR No. 50762

## Page 2

```
         DEPOSITION OF TERRY SUZANN WININGER,
taken on January 5, 2010, commencing at 9:33 a.m., at
OTTMAR HOLIDAY & ASSOCIATES, 2800 North Central Avenue,
Phoenix, Arizona, before HALEY WESTRA, a Certified
Reporter in the State of Arizona.

COUNSEL APPEARING:

      THE NATHANSON LAW FIRM
      BY:  Ms. Kira A. Schlesinger
      8765 East Bell Road, Suite 101
      Scottsdale, Arizona  85260
      Attorneys for Defendants

      SHERMAN & HOWARD, L.L.C.
      BY:  Mr. David W. Garbarino
      2800 North Central Avenue
      Phoenix, Arizona  85004-1043
      Attorneys for Plaintiff


ALSO PRESENT:

      Ms. Dorian Lefre
```

## Page 3

```
                    I N D E X

WITNESS                                        PAGE
TERRY SUZANN WININGER
      EXAMINATION BY MS. SCHLESINGER             4
      EXAMINATION BY MR. GARBARINO             118
      FURTHER EXAMINATION BY MS. SCHLESINGER   122


                   E X H I B I T S

EXHIBITS   DESCRIPTION                         MARKED
No. 1      Best Western memorandum, Subject:    113
           $1,500 Fee, dated 2/4/08,
           Bates No. BW0450
No. 2      KANA Log entries, fax sent 1/5/10    113
No. 3      Reaffiliation Worksheet, Property    113
           05050, Date initiated: 10/4/04
```

## Page 4

TERRY SUZANN WININGER, a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION
BY MS. SCHLESINGER:

Q. Thank you. Good morning. Will you state your full name for the record, please.

A. Terry Suzann Wininger.

Q. Thank you. And do you reside here in Phoenix?

A. Yes. Sun City West is my home.

Q. Okay. And you're currently an employee of Best Western?

A. Correct.

Q. And what's your job title, ma'am?

A. District manager, member relations.

Q. How long have you been in that position?

A. Six years.

Q. So you were in that position at the time Mr. Hooshang -- and I'll probably call him "Harry." Is that how you knew him also?

A. Yes.

Q. -- Harry Harooni first applied for membership with Best Western?

## Page 5

A. Yes.

Q. Can you briefly tell me what your background was before joining Best Western.

A. Immediately prior to joining Best Western, I was the general manager of an independent motel/lodge/cabins out-camp, restaurant, conference center in Jackman, Moose River, Maine.

Q. What was the name of that?

A. Sky Lodge.

Q. And how long had you been there?

A. 20 months.

Q. And why did you leave?

A. My husband couldn't take the winters of 20 below.

Q. Understandable. Okay. And so Phoenix, the Phoenix area seemed like a good choice for you?

A. We had lived in Phoenix prior to going up there for that position.

Q. And what did you do prior to being at Sky Lodge?

A. I was a legal assistant for Emily Burns, who is an attorney.

Q. Here in this area?

A. In Phoenix, yes.

Q. Okay. And do you have -- did you have any

**Page 6**

1  employment prior to that?
2   A. Yes. Development -- secretary to the vice
3  president at St. Joseph's Hospital, and before that,
4  secretary to the vice president of the accounting
5  office there at St. Joe's.
6   Q. And did you have any employment prior to being
7  a secretary to the vice president of accounting?
8   A. Yes. I was a workout specialist for Great
9  American Bank.
10   Q. And prior to that?
11   A. I worked for Duty Free International in their
12  corporate office as an executive assistant in charge of
13  marketing programs.
14   Q. Did you have any formal education, past high
15  school?
16   A. I started college, and then my husband was in
17  the military and he got shipped overseas, so I didn't
18  continue on.
19   Q. Did you graduate high school?
20   A. Yes.
21   Q. And what year was that?
22   A. 1968.
23   Q. And how much college did you have?
24   A. Just one quarter.
25   Q. Okay. Anything specifically pertaining to

**Page 7**

1  hotel management or any hotel-related field?
2   A. Not in college.
3   Q. Okay. And other than that one semester of
4  college, did you have any specialized training?
5   A. Throughout my career, different fields. I had
6  courses in banking. I also obtained my certified hotel
7  administrator certification while working at Best
8  Western.
9   Q. And that's something that they do with all of
10  their employees on your level?
11   A. It was a requirement for the position.
12   Q. And that's true for RSMs and then also your
13  position?
14   A. Yes.
15   Q. Sky Lodge that you mentioned, was that a
16  franchise or membership or anything of that nature?
17   A. No. It was an independently owned property.
18   Q. Did you own it with any partners?
19   A. I was not an owner.
20   Q. Oh, you were not?
21   A. General manager.
22   Q. Okay. Who was the owner of it?
23   A. John Couri, C-O-U-R-I.
24   Q. Have you ever been deposed before,
25  Ms. Wininger?

**Page 8**

1   A. No.
2   Q. You're doing a good job so far, so I kind of
3  assumed you had been. Basic rules of the road is, as
4  you know, the court reporter is taking down everything
5  that we say. I'm seeing here a transcript of it. So
6  I may from time to time go back and check what was said
7  in case I didn't get something.
8       As we're talking, I appreciate that you
9  are using "yes" and "no," verbal responses to my
10  questions. She cannot take down nods of heads. And
11  although we do it in conversation, we say "uh-huh,"
12  "huh-uh," it's hard for her to take that down and keep
13  the record clear. So I'm going to ask you to try to
14  use verbal responses. Do you understand that?
15   A. Yes.
16   Q. And if you don't understand a question that
17  I've asked you, please ask me to repeat it, rephrase
18  it, make sure that you're clear with what I'm asking
19  you. Can you do that for me?
20   A. Yes.
21   Q. Because if you do not ask me to repeat it or
22  clarify it, I'm going to assume that you understood my
23  question, and we're going to take the answer that you
24  gave me. So that's very important.
25       If you need to take a break, feel free to

**Page 9**

1  ask me to do so. I'll probably take a break along the
2  way. I don't want you to be uncomfortable. If you
3  want to get up, stretch, that's fine.
4       Is Mr. Garbarino representing you today?
5       MR. GARBARINO: Yes, I'm representing
6  Best Western and Ms. Wininger. Can we go off the
7  record for just a second?
8       MS. SCHLESINGER: With regard to?
9       MR. GARBARINO: Just a matter that needs
10  to be discussed off the record, just briefly.
11       MS. SCHLESINGER: Sure.
12       (Discussion off the record.)
13  BY MS. SCHLESINGER:
14   Q. As I was saying, do feel free to take breaks
15  or shift, however you need to do that.
16       If there is a question pending and you do
17  need to take a break or you have any concerns or you
18  want to talk to your counsel, I would appreciate it if
19  you answer the question that I've asked before stopping
20  and consulting with counsel. Will you agree to that?
21   A. Yes.
22   Q. With that said, you were just telling me that
23  you had obtained a CHA, that's a certified hotel
24  administrator's certificate, administration
25  certificate; is that right?

Page 10

```
 1    A.  Yes.
 2    Q.  And when did you obtain that?
 3    A.  In 2003, while working for Best Western.
 4    Q.  How long had you been at Best Western, then,
 5  when you got that?
 6    A.  Approximately three years.
 7    Q.  Okay.  So was that something new that they had
 8  implemented, to require their people to have this CHA?
 9    A.  No.  I was employed in another position with
10  Best Western at the time.
11    Q.  Okay.  What position was that?
12    A.  Executive assistant to the vice president of
13  operations.
14    Q.  And what were your duties in that position?
15    A.  I would schedule meetings, arrange
16  transportation, coordinate with his direct reports on
17  any issues that would come up.
18    Q.  Okay.  How did you obtain the position of --
19  I'm sorry -- and your position with Best Western now is
20  a regional service manager?
21    A.  District manager.
22    Q.  What are the job duties for a district
23  manager?
24    A.  We liaison between the directors and the staff
25  of Best Western corporate and the membership.  We
```

Page 11

```
 1  advocate for the members.  If there are issues that
 2  arise where they're not getting responses timely, what
 3  have you, from staff within corporate, we try to ensure
 4  that gets facilitated.
 5       District manager is the person that
 6  coordinates auto transfers of property.  We help
 7  coordinate district meetings and meetings of the
 8  district held at annual conventions.  We're
 9  generalists.
10       I tell members when I meet them that,
11  "I'm the person you go to if you don't know who to go
12  to at Best Western.  I don't have all the answers, but
13  I will help find the answers for you or direct you to
14  the person who can assist you."
15    Q.  And let me just understand a couple of things
16  here.  What do the directors at Best Western do?
17    A.  The directors are elected members of the
18  organization, there are seven districts, and they serve
19  on our board to help guide the direction of the
20  company.  They sit in -- in review of new members
21  pending to determine whether or not to accept them into
22  the organization.  They conduct hearings for current
23  members who are not in good standing to determine
24  whether membership should be continued on a conditional
25  basis or if they should be terminated.
```

Page 12

```
 1    Q.  What is the criteria, if you know, upon which
 2  a member would be continued on a conditional basis?
 3    A.  It's at the discretion of the seven board
 4  members when they hear what the member has to say on
 5  their behalf.  I can never tell what -- you know, what
 6  the seven members of the board are thinking or how they
 7  might rule on something.
 8    Q.  So it's not written down someplace?  There's
 9  no guideline that they follow, that you're aware of?
10    A.  As far as I know, they take every case on an
11  individual basis.
12    Q.  And then you also mentioned that there were
13  seven districts.  How are those districts divided up?
14    A.  They're grouped by states and Canadian
15  provinces.  At one point, they tried to do it so that
16  there were a relatively even number of properties per
17  district.  I'm aware that they have redistricted it at
18  least one time, but I wasn't here when those districts
19  were set.
20    Q.  Do you know -- you said you were the manager
21  for District 6, did you say?
22    A.  Correct.
23    Q.  Have the properties included within District 6
24  changed over time, to your knowledge?
25    A.  The properties?
```

Page 13

```
 1    Q.  Yes.
 2    A.  Yes.
 3    Q.  And when did that occur?  I'm sorry.  Let me
 4  clarify.  Did it occur more than once?
 5    A.  Properties change as members come into the
 6  system and leave the system, but it's -- since I've
 7  been here, it's always been the properties of
 8  California, Nevada, and Hawaii that encompassed
 9  District 6.
10    Q.  Do you know who P.G. West is?
11    A.  Yes.
12    Q.  Is there a correlative person to his title for
13  District 6?  Do you understand my question, ma'am?
14    A.  Yes.  P.G. West is the director for
15  District 1.
16    Q.  Who would that be for District 6, then?
17    A.  It is currently Julie Montmaneix.
18    Q.  Can you spell that, please.
19    A.  M-O-N-T-M-A-N-E-I-X.
20    Q.  Montmaneix, did you say?
21    A.  Yes.
22    Q.  And how long was Ms. -- I'm going to goof that
23  up -- Ms. Montmaneix the director for District 6?
24    A.  She was elected November of last year.
25    Q.  So '09?
```

Page 14

1    A.  Yes.
2    Q.  So a very short time, then?
3    A.  Yes.
4    Q.  Who preceded her in that position?
5    A.  Raymond Johnston, J-O-H-N-S-T-O-N.
6    Q.  And do you know how long Mr. Johnston was in
7    his position as director for District 6?
8    A.  Six years.
9    Q.  So, to your knowledge, he was present in that
10   position at the time Mr. Harooni became a member of
11   Best Western?
12   A.  Yes.
13   Q.  And I think that you said that the directors
14   review the new members pending; is that correct?
15   A.  Yes, applications.
16   Q.  I'm sorry?
17   A.  The applications.
18   Q.  So that would have been Mr. Johnston that
19   would have done that with regard to Mr. Harooni?
20   A.  No.
21   Q.  Who would that have been?
22   A.  Mr. Harooni came in under an automatic
23   transfer.
24   Q.  Can you explain that, please.
25   A.  When a member is in good standing and wants to

Page 15

1    sell their property, as long as certain criteria is
2    met, the property transfers automatically to the new
3    buyer without prior approval of our board of directors.
4    Q.  Let me back up a little bit.  You said that
5    you had switched positions with Best Western when you
6    moved from being an assistant to the VP to VP of
7    operations, I think you said --
8    A.  Yes.
9    Q.  -- to your current position; is that correct?
10   A.  Yes.
11   Q.  And did your compensation package change at
12   that time?
13   A.  Yes, it did.
14   Q.  Can you explain your compensation package at
15   the time you became a district manager.
16   A.  I became an exempt employee and was bonus
17   eligible.
18   Q.  And what does "bonus eligible" mean?
19   A.  There has been set aside approximately
20   5 percent of our salary and criteria set forth that if
21   it is met in whole or in part, at the end of our year,
22   it's calculated whether or not we are eligible for any
23   portion of that bonus funding that was set aside.
24   Q.  So you get a base salary of how much?
25   A.  It's approximately $65,000 now.

Page 16

1    Q.  And what was it in 2004?
2    A.  I don't recall exactly.  Around $54,000,
3    maybe.
4    Q.  And you mentioned that there were criteria
5    upon which the bonus is based.  What are those
6    criteria?
7    A.  It has changed from year to year.  I believe
8    there's five, about five elements, usually four or
9    five.  One being that we are in contact with every
10   member of our district at least two times a year.  Part
11   of it is based on member feedback from surveys that
12   Best Western conducts.  Part of it was based on surveys
13   from an outside source contacting members that we have
14   had dealings with to see whether or not we perform to
15   their satisfaction when they call in, and another part
16   was based on our district meetings, how well we worked
17   within the budgets of operating the district meetings.
18   Q.  Was any portion based upon revenue generated
19   by your member properties?
20   A.  No.
21   Q.  Any portion generated by revenue that Best
22   Western derived from the member properties?
23   A.  No.
24   Q.  Any portion based upon the number of auto
25   transfers versus new applications?

Page 17

1    A.  No.
2    Q.  You said that the members would be surveyed
3    with regard to how well you as a district manager
4    performed.  What were the elements of that performance?
5    A.  It was just one question within the survey,
6    overall Best Western performance, that is sent out to
7    all of the members on an annual basis, and it's on a
8    scale.  You rate how satisfied are you with your
9    district manager, type of thing.
10   Q.  So you report then -- or during the relevant
11   time -- I'm going to refer to that -- "relevant time"
12   is going to mean, for the purposes of this deposition,
13   the time period from when Mr. Harooni made his
14   application to Best Western until the date his hotel
15   was terminated from membership.  Can you agree with
16   that?
17   A.  Yes.
18   Q.  Unless I explain otherwise, that's what I mean
19   by "relevant time," and I'll try to remind you of the
20   time frame I'm referring to.
21       During the relevant time, you reported,
22   then, to Ray Johnston?
23   A.  Not officially.
24   Q.  To whom did you report?
25   A.  Debi Wesson.

```
                                                     18
 1      Q.  W-E-S-S-E-N?
 2      A.  O-N, and it's D-E-B-I.
 3      Q.  And what was Ms. Wesson's title?
 4      A.  Director of member care, I believe, was the
 5  title.
 6      Q.  What is your understanding of what a director
 7  of member care does?
 8      A.  She oversaw the membership relations
 9  department that the district managers were in, also
10  member care where the member's status is monitored for
11  compliance issues.
12      Q.  And how is the member status monitored?  Do
13  you know?
14      A.  If a member comes into Best Western and
15  they're given certain criteria to complete to move from
16  a conditional member to a full member, then there's
17  staff that watches for deadlines for completion of
18  these elements to ensure that the members do all of the
19  required items in the time frames that are set forth,
20  such as attending orientations, attending district
21  meetings, updating design reports -- not exactly design
22  reports, but updating their design elements to comply
23  with the reports.
24      Q.  Okay.  Can you define "conditional member" for
25  me?
```

```
                                                     19
 1      A.  It's a member that has been approved with
 2  conditions so that they are allowed to fly the Best
 3  Western flag, if you will, get reservations, but there
 4  are certain criteria that have to be met within certain
 5  time frames to continue their membership.
 6      Q.  Can you give me an example of such criteria?
 7      A.  As I said, a voting member and a general
 8  manager have to attend training within 90 days.  If
 9  there was a design report, the board could say, "Within
10  six months, you have to complete all of these items to
11  upgrade your property."
12      Q.  Would you be involved in the reduction of the
13  number of rooms that a hotel may seek?
14      A.  In that, I would be the one to send out to the
15  property the forms and the instructions on what is
16  required to request it.
17      Q.  And part of what's required to request it is
18  an additional fee?
19      A.  There's a $100 fee.
20      Q.  And you mentioned earlier -- you mentioned,
21  for example, a training event that you said had to be
22  attended within 90 days.  So there's a fee to that as
23  well?
24      A.  The voting member attends without an
25  additional fee to his -- I mean, we charge a membership
```

```
                                                     20
 1  fee for them to come into Best Western.  The voting
 2  member's training is included in that, the general
 3  manager fee is an additional fee.
 4      Q.  But Best Western requires a general manager to
 5  also attend?
 6      A.  Yes.
 7      Q.  And the fee for an auto transfer is different
 8  than for a new member application; is that true?
 9      A.  Yes.
10      Q.  What's the difference?  Do you know?
11      A.  An auto transfer fee is $5,500.  A new member
12  fee, I believe at the time Mr. Harooni came in, was
13  $37,000-plus depending on the number of rooms.  It
14  started at a base fee of 50 rooms, up to 50 rooms, and
15  then more than that was an additional $200 per room.
16      Q.  Is it fair to say, then, that Best Western had
17  a vested interest in ensuring their hotels were larger
18  rather than smaller?
19          MR. GARBARINO:  Objection, form.
20  BY MS. SCHLESINGER:
21      Q.  That's going to happen from time to time.
22  Unless he specifically instructs you not to answer a
23  question -- and I don't mean to be rude -- you can
24  basically ignore him.  He's just doing that for the
25  record, and unless I chose to rephrase my question,
```

```
                                                     21
 1  that's something we'll sort out later.  You can
 2  basically ignore him and go ahead and answer the
 3  question.
 4          So I'm going to read that question back
 5  for you -- or read it again -- say it again for you.
 6          Is it fair to say that Best Western has a
 7  vested interest in ensuring that their hotels are
 8  larger or over 50 rooms?
 9          MR. GARBARINO:  Same objection.
10      A.  Not to my knowledge.  Best Western looks at
11  location and other things.  For example, a roadside
12  property in the middle of the country, there's no need
13  for additional rooms.  A 40-room property may be
14  totally appropriate and sufficient.
15  BY MS. SCHLESINGER:
16      Q.  Okay.  But they make more money on their fees
17  if they have more rooms coming in rather than less;
18  is that right?
19      A.  Yes.
20      Q.  Is there a reduction in -- now, the fees
21  are -- there's also an annual fee; is that also
22  correct?
23      A.  Yes.
24      Q.  How much is the annual fee for a property with
25  144 rooms?  Do you know?
```

TERRY SUZANN WININGER
1/5/2010

---

Page 22

1  A. No, I do not know.
2  Q. Can you estimate that for me?
3  A. It's based on two parts. Part of it is based
4  on unit count and the other part is based on the number
5  of reservations that Best Western provides to the
6  property for the past year.
7      So we look at fiscal year '08 as a guide
8  for fiscal year '09 fees. So I would have no way of
9  really estimating what his annual dues were.
10 Q. Okay. But if I'm understanding you correctly,
11 the annual dues are then going to change if the number
12 of rooms are reduced at the hotel; is that correct?
13 A. Yes.
14 Q. Okay. And they will go down, correct?
15 A. Yes.
16 Q. In other words, there's less fees for less
17 rooms in that circumstance?
18 A. Yes.
19      MS. SCHLESINGER: Excuse me, off the
20 record for a second.
21      (Discussion off the record.)
22 BY MS. SCHLESINGER:
23 Q. And does Best Western also charge a fee for
24 its assessments and reviews of the hotel?
25 A. Best Western typically conducts two quality

Page 23

1  assurance assessments per year at no additional fee to
2  the members. If a member requests additional
3  assessments, there's an additional fee, and there can
4  be an additional fee if the member has fallen into a
5  failing score and that we're required to come out more
6  frequently to inspect the property.
7  Q. When you say "we're required to come out more
8  frequently," you really mean that Best Western chooses
9  to go out more frequently; is that correct?
10     MR. GARBARINO: Objection, form.
11 A. It's either directed by the board or, at some
12 point, even voted on by the membership by ballot as to
13 how these additional assessments occur.
14 BY MS. SCHLESINGER:
15 Q. So it is the members and/or the board that
16 decide they want to go out more often, it is not a
17 government agency or something of that nature that
18 actually mandates that it must be done, correct?
19 A. Correct.
20 Q. So it's within Best Western's control to
21 decide they're going to go out more frequently to
22 assess a hotel; is that correct?
23 A. Yes.
24 Q. And when they do go out for these additional
25 assessments, they charge a fee; is that true?

Page 24

1  A. They can, depending on the circumstances.
2  Q. Under what circumstances would they go out for
3  a, quote, additional assessment and not charge a fee?
4  A. I'm not aware of specific circumstances.
5  Q. As far as you know, if they go out for an
6  assessment beyond the two times a year that they say
7  were their typical assessments, if they go out any
8  additional times, they charge a fee; is that correct?
9  A. I believe so.
10 Q. And they also charge fees for board hearings;
11 is that correct?
12 A. No, not that I'm aware of.
13 Q. What is BMV 1 Care? Do you know?
14 A. I'm sorry. I don't understand.
15 Q. I'm going to show you a document here. Let me
16 back that up. Do you know what BMV stands for?
17 A. I don't believe so.
18 Q. Okay. You know what QA stands for?
19 A. Quality assurance.
20 Q. Hold on for a second.
21     And do you know what a rapid response is?
22 A. Yes.
23 Q. What is that?
24 A. It is after a member scores below or fails,
25 which is under 800 points on a QA assessment, we send

Page 25

1  out a regional service manager, RSM, to conduct a rapid
2  response visit to assist the property with how to bring
3  the property back into compliance.
4  Q. And this rapid response visit also entails a
5  fee to the member; is that true?
6  A. Yes.
7  Q. Do you know how much that fee is?
8  A. I think it's $1,500.
9  Q. And how many members are in District 6, on an
10 average?
11 A. It fluctuates, but probably around 310 now.
12 Q. And how many during the relevant time between
13 2004 and 2008?
14 A. Maybe 325 to 330.
15 Q. A little higher, in other words?
16 A. Yes.
17 Q. So what percentage of those properties would
18 have a rapid response visit during the course of a
19 year?
20 A. I've never tracked it. I would say maybe
21 5 percent.
22 Q. At $1,500 per rapid response, approximately?
23 A. Yes.
24 Q. And how many would have -- how many of those
25 properties would enter probationary status at some time

**Page 26**

1  in the course of a given year?
2  A. Every property that fails and is required a
3  rapid response is automatically placed in probation.
4  Q. Okay. So are there probationary properties
5  for which a rapid response is not done in that same
6  year?
7  A. There could be if the probation was because of
8  design failures. The rapid response is based on
9  quality assurance assessments.
10 Q. I'm going to show you what's been marked as
11 BW0450. It's a document dated February 4th, 2008.
12 Have you ever seen a form such as that one before?
13 A. I believe it's just a standard form that our
14 regional services department uses to request our
15 accounting department to bill for services.
16 Q. And so each of those items that have an open
17 check mark -- or a check mark there would be something
18 that is billed for accounting services, to bill the
19 member?
20 A. It could be, the ones that are checked.
21 Q. Okay. But the ones that are available there
22 have the potential to incur fees to the members; is
23 that correct?
24 A. Yes.
25 Q. Just that the record is clear, I will attach

**Page 27**

1  that as Exhibit 1 so we can see what we were referring
2  to.
3       MS. SCHLESINGER: So Exhibit 1 will be
4  BW0450, a document dated February 4th, 2008.
5  BY MS. SCHLESINGER:
6  Q. To your knowledge, Ms. Wininger, are those the
7  only fees for which members are -- strike that.
8       Are there other categories other than
9  what's listed on Exhibit 1 for which a member is
10 charged?
11 A. Members can be charged fees for design work
12 that they request.
13 Q. What does that mean, "work that they request"?
14 A. They can request a designer come to their
15 property and assist them. They can, you know, help,
16 say, redecorate their rooms or their lobby. A designer
17 will review their proposals, typically, without any
18 fee. But if they ask for us to provide services of the
19 design nature, then we would charge them for that.
20 Q. So they can be charged fees for design work.
21 What else can they be charged fees for?
22 A. We can provide specific property revenue
23 management help, that if they ask for it on an
24 individual-property basis, they could be charged for.
25 Q. Is that separate? In other words, when you

**Page 28**

1  said there's certain things the design group would do
2  that they wouldn't charge for, such as review design,
3  are there certain things that the property revenue
4  management people would do that they don't charge for?
5  A. Correct.
6  Q. What else would an owner be -- could an owner
7  be charged fees for?
8  A. There are monthly fees and dues that all
9  members are charged for: co-op membership fees, they're
10 charged commission fees for reservations, and a number
11 of others. I don't know them all off the top of my
12 head. Just regular monthly fees.
13 Q. Assessments? Would that word be applicable?
14 In other words, is it based upon number of rooms?
15 I mean, we talked about earlier, if you'll recall, that
16 the application amounts can be based upon the number of
17 rooms and some other criteria. Are the monthly fees
18 also based upon the number of rooms and other criteria?
19 A. Yes, but it's set for a year at a time. The
20 base monthly fees are set for a full fiscal year, just
21 like the annual fees.
22 Q. So the monthly fees are in addition to annual
23 fees?
24 A. Yes.
25      MS. SCHLESINGER: I'm going to go off the

**Page 29**

1  record and take a very brief break for a moment. I'll
2  come back and go through some documents.
3       (Recess was taken from 10:22 a.m. to
4  10:30 a.m.)
5  BY MS. SCHLESINGER:
6  Q. Do you know who Cheryl Pollack is?
7  A. Yes.
8  Q. Who is she?
9  A. She was second under Debi Wesson as the
10 director of member care.
11 Q. Can you define what "member care" is for me?
12 A. Member care is the department that helps
13 ensure members are compliant as they come into the
14 system, into Best Western, that they meet the criteria
15 required for membership. They also monitor
16 requirements of conditional properties that have come
17 before the board for hearings and been granted
18 additional extensions to ensure that they meet those
19 terms and conditions in a timely manner.
20 Q. So it's not really caring for the members,
21 it's caring for Best Western; is that fair to say?
22      MR. GARBARINO: Objection, form.
23 BY MS. SCHLESINGER:
24 Q. Do you understand my question? It's not
25 providing services to the members individually, but

Page 30

1 rather it's ensuring that Best Western's standards are
2 met; is that correct?
3         MR. GARBARINO: Same objection.
4     A. It's both. They help remind members of
5 upcoming deadlines and requirements, help place
6 requests for extensions on a member's behalf.
7 BY MS. SCHLESINGER:
8     Q. What does that mean?
9     A. If there's a deadline that a member can't meet
10 for some reason, then they help request an extension so
11 that the property stays compliant.
12     Q. Is another way to say "stays compliant," would
13 it be a synonym for saying "avoids termination"?
14     A. It could, but that's not the only reason. It
15 just keeps them from perhaps going back into a --
16 further review of their membership.
17     Q. A conditional or probationary status?
18     A. Yes.
19     Q. So member care is really -- I'm rephrasing to
20 make sure I understand it here. Member care is to make
21 sure Best Western's deadlines are met and that all
22 members stay in -- keep the standards that Best Western
23 mandates; is that correct?
24     A. Basically.
25     Q. Cheryl Pollack, you said, reported to

Page 31

1 Ms. Wesson?
2     A. Yes.
3     Q. What was Ms. Pollack's title? Do you recall?
4     A. No, I don't.
5     Q. And from your phrasing earlier, I take it that
6 Ms. Pollack is no longer with the company?
7     A. No, she is.
8     Q. She is. Is she in the same position?
9     A. Basically. Yes, she is.
10    Q. Who is Loyd Nygaard?
11    A. He is the person in charge of member
12 operations support.
13    Q. What does that mean?
14    A. That's the area that encompasses the regional
15 service managers and the revenue managers.
16    Q. Okay. But what does the term -- you said
17 "member operations support." What types of support are
18 in his department?
19    A. The revenue managers that help properties
20 position themselves on the reservation systems, the
21 RSMs, the people that do the quality inspections but
22 they also help train -- do training at the properties
23 for any new programs that Best Western is putting out
24 or if new staffing comes into the property and they
25 need guidance.

Page 32

1     Q. So giving guidance is one of the things that
2 Best Western does for its members?
3     A. Yes.
4     Q. And assisting with revenue is one of the
5 things that Best Western does for its members?
6     A. Yes.
7     Q. Who is Joe Wilson?
8     A. He is a regional services manager, but at a
9 senior level.
10    Q. Do you know what Mr. Wilson's job encompasses,
11 what are his general duties?
12    A. Not specifically, no.
13    Q. Do you have any idea?
14    A. He oversaw certain regional service managers
15 within the company, in a supervisory capacity.
16    Q. I'll come back to that.
17        Who is Daryl Preece or was Daryl Preece?
18 Do you understand he is no longer with the company?
19    A. Correct. He was a regional service manager.
20    Q. I'm sorry. Is that the same thing you just
21 told me Mr. Wilson did?
22    A. Mr. Wilson was a supervisory level over
23 regional service managers.
24    Q. Okay. So Mr. Preece would, then, report to
25 Mr. Wilson?

Page 33

1     A. No.
2     Q. It seems to me that Best Western has a lot
3 of -- I'm trying to picture this as a corporate
4 structure. Are you familiar with those charts?
5     A. Yes.
6     Q. And I'm trying to see who reports to whom,
7 and, apparently, there's a lot of lateral positions at
8 Best Western. Is that correct?
9     A. Yes.
10    Q. Who is Jim Sasiak?
11    A. Sasiak. I believe his title is director of
12 new member development.
13    Q. And that would be trying to bring additional
14 hotels into the membership?
15    A. Yes.
16    Q. Terry Russo?
17    A. I know of a Tony Russo.
18    Q. I'm sorry. Tony Russo.
19    A. He was an RSM as well.
20    Q. For which division? Do you know?
21    A. For District 6.
22    Q. District 6. At some point, were hotels
23 shifted out of District 6?
24    A. No.
25    Q. Is there any reason that they would be?

34

1  A. Not unless the corporation did a shift to
2  realign the divisions.
3  Q. The districts, you mean?
4  A. Or the districts, yeah.
5  Q. I used that word. I'm sorry.
6  A. Sorry.
7  Q. Do you know if that's occurred recently?
8  A. Not to my knowledge, since I've been with the
9  company.
10 Q. I'm going to show you a document that is Bates
11 stamped BW0288. It is page 2, but the salient portion
12 is included here. Will you take a look at that. Have
13 you ever seen something like that before?
14 A. Yeah. Yes.
15 Q. And that would be the kind of realignment
16 you're referring to?
17 A. No.
18 Q. What would that indicate? Do you know?
19 A. Governors are members appointed by the
20 director within the district, and there are regions set
21 up within the district that each governor helps on a
22 volunteer basis with.
23 Q. So maybe that's part of what the confusion has
24 been. So you're saying that there's District 6, and
25 then there are regions within District 6, correct?

35

1  A. Correct.
2  Q. What are the various regions within
3  District 6? Do they have names?
4  A. They're numbered.
5  Q. What are the numbers?
6  A. There's 1 through 25, excluding one number.
7  I don't remember which one it is. It's -- they merged
8  a couple of regions, and so they did away with one
9  number.
10 Q. How are the regions set up?
11 A. The director appoints governors, and they try
12 to do it so that one governor doesn't have too many
13 properties in their area and that the governor
14 typically lives within the area, within the region or
15 has properties within that region.
16 Q. Okay. So the governors are typically property
17 owners as well?
18 A. Yes.
19 Q. And the regions, then, are set up roughly
20 geographically?
21 A. Yes.
22 Q. So would southern California be in one region
23 and northern California be in another region,
24 typically?
25 A. Southern California has many regions.

36

1  Northern California has fewer based on number of
2  properties.
3  Q. Where would Fresno or Sacramento, that kind of
4  area, fall? Would it be in the same region, typically,
5  as someplace like San Diego?
6  A. No.
7  Q. And what about Fresno versus Lancaster? Would
8  those typically be in the same region?
9  A. That, I don't recall, because once you get out
10 of the metropolitan areas, sometimes the regions
11 expand. I would have to look at my maps.
12 Q. Are those maps available -- the regions
13 available anyplace online?
14 A. On mybestwestern.com, the governors are all
15 listed with their regions.
16 Q. Is there any public posting of those
17 governors?
18 A. I am unaware of any posting other than on
19 mybestwestern.com.
20 Q. Fair enough. Who is Jovy Cheng?
21 A. Jovy is a governor.
22 Q. For?
23 A. For one of the regions, and she was appointed
24 to -- the Lancaster property was one of her properties.
25 Q. What are the duties of a governor?

37

1  A. They're outlined in our governing documents,
2  but, basically, they volunteer to be the eyes and ears
3  of director. They typically are asked to visit
4  properties at least once a year; to be there if a
5  property has issues, concerns because they're typically
6  experienced Best Western members; and they're also
7  asked, when a new member property comes in or applies
8  to be a Best Western, to go out and look at the
9  proposed site if it's a new build or look at the
10 property and get recommendations.
11 Q. And that would not occur, then, if it was an
12 auto transfer?
13 A. That's correct.
14 Q. And an auto transfer will not occur if the
15 property being transferred is on probation, correct?
16 A. Correct.
17 Q. Or a conditional or some other
18 not-in-good-standing status, correct?
19 A. They can be in good standing if they're
20 conditional as long as they are not past due with any
21 requirements.
22 Q. Or fees?
23 A. Well, that's part of the requirements, is that
24 they maintain current fees.
25 Q. You have money managers at Best Western?

TERRY SUZANN WININGER
1/5/2010

Page 38

1  Would you like me to rephrase that?
2    A.  Yes, please.
3    Q.  Do you have people that oversee the finances
4  of your member properties?
5    A.  No, not that I'm aware of.
6    Q.  How do you know what revenue the property is
7  generating, then?
8    A.  We don't ask the properties to tell us what
9  they generate. All we know is what they get through
10 Best Western channels.
11   Q.  And what channels are those?
12   A.  Like through our CROs.
13   Q.  What's a CRO?
14   A.  Central reservation office.
15   Q.  And what else? What other channels are there?
16   A.  I don't know if there's others other than the
17 central reservation office, that we are aware of,
18 because those would be the only ones we'd access to
19 track.
20   Q.  What about -- does Best Western have any items
21 in the room that are sold that are supplied by Best
22 Western, you know, snack-bar types of things, I'm
23 thinking of.
24   A.  There's no requirement for properties to do
25 that. They have to have snacks and beverages available

Page 39

1  on a property, but it's nothing that Best Western
2  necessarily furnishes.
3    Q.  What about revenue managers? Those are people
4  at Best Western?
5    A.  Yes.
6    Q.  What do they do?
7    A.  They help properties set up their rooms in our
8  reservation system, room types. They help suggest
9  rates.
10   Q.  Does every property have a revenue manager?
11   A.  Every district has revenue managers assigned
12 and the members can use them.
13   Q.  So if a member property was concerned about
14 its revenue, you would be the person that would direct
15 them to get in touch with the revenue manager to try to
16 work out any concerns; is that true?
17   A.  That's what I would do if a member property
18 came to me with those concerns, yes.
19   Q.  And you would sometimes offer that these
20 services were available?
21   A.  Oh, absolutely.
22   Q.  Who is the revenue manager that would be
23 assigned -- would have been assigned to Mr. Harooni's
24 property?
25   A.  I'm not certain.

Page 40

1    Q.  What about Worldwide Marketing Service, what
2  is that? Worldwide Services, have you heard that term?
3    A.  Worldwide Sales.
4    Q.  Okay. What is that?
5    A.  That's our division that goes out and solicits
6  corporate business, advertising, marketing,
7  solicitations to help drive business to the properties.
8    Q.  And that's done for all Best Western
9  properties?
10   A.  It's done on a corporate level.
11   Q.  So with the goal being to assist all
12 properties within the Best Western system?
13       MR. GARBARINO: Objection, form.
14   A.  Certain things that they do help some
15 properties, not all properties are always helped.
16 BY MS. SCHLESINGER:
17   Q.  Okay. But the general idea of becoming a Best
18 Western member is that you're going to have the
19 benefits of something like the Worldwide Sales
20 department at Best Western; is that true?
21   A.  Yeah, the benefit of our marketing and
22 advertising.
23   Q.  Are you familiar with the term "Business Plus
24 Rooms"?
25   A.  Yes.

Page 41

1    Q.  What is that?
2    A.  There's a set of additional amenities within
3  the guest room conducive to business travelers that
4  would make it more appealing and help us draw corporate
5  business.
6    Q.  Okay. And is that a program that was
7  instituted relatively recently? When was that
8  instituted, ma'am?
9    A.  I don't remember.
10   Q.  In the last two years?
11   A.  Maybe two or three years ago.
12   Q.  So it might have been just getting going when
13 Mr. Harooni was still a member in 2007?
14   A.  Yes.
15   Q.  And, in fact, was there any pressure on the
16 hotels to participate in that program and provide more
17 upscale rooms?
18   A.  I wouldn't say there was pressure.
19   Q.  But it was encouraged?
20   A.  Encouraged if they wanted to draw corporate
21 business.
22   Q.  Are you familiar with Best Western Premier
23 program?
24   A.  Somewhat.
25   Q.  That's something that's going on in Europe,

42

1  correct?
2      A.  Correct, and Asia.
3      Q.  And are they bringing that to the United
4  States? Has there been some discussion about that?
5      A.  There's been discussions.
6      Q.  What about the Global Quality Assurance
7  program? What is that?
8      A.  I'm not sure.
9      Q.  Is there some system to -- strike that.
10         Do you know who Raymond Johnston is?
11     A.  Yes.
12     Q.  Is that the same Mr. Johnston we were talking
13 about earlier?
14     A.  Yes.
15     Q.  Do you know who the Boston Consulting Group
16 is?
17     A.  That's a company that was hired by Best
18 Western.
19     Q.  To improve their image?
20     A.  I don't know that that was the purpose.
21     Q.  Do you know that they were hired in
22 approximately 2006?
23     A.  It's possible.
24     Q.  Are you aware that Best Western embarked on a
25 five-year mission to lead the hotel industry in

43

1  customer care at approximately that time?
2      A.  Yes.
3      Q.  You've heard that expression?
4      A.  Yes.
5      Q.  I see the look on your face.
6          So at that time, thereabouts, perhaps
7  shortly thereafter, like approximately 2007, Best
8  Western engaged in a program to try to get all of these
9  hotels up to a certain standard; is that fair to say?
10     A.  Clarify what you mean by "a certain standard."
11     Q.  Sure. In 2004, when Mr. Harooni joined Best
12 Western as a member, Best Western clearly had certain
13 standards, right?
14         MR. GARBARINO: Objection, form.
15 BY MS. SCHLESINGER:
16     Q.  They had a certain level to which they wanted
17 their hotels to measure up to, correct?
18         MR. GARBARINO: Same objection.
19     A.  I mean, we've always had criteria for quality,
20 yes.
21 BY MS. SCHLESINGER:
22     Q.  And that criteria changed in approximately
23 late 2006, 2007, true?
24     A.  Quality didn't change, no.
25     Q.  The criteria upon which you based your hotels,

44

1  did that change in 2006 or 2007?
2      A.  I don't understand what you mean by the
3  criteria we based the hotels on.
4      Q.  The general standards to which Best Western
5  strived in terms of the customer's image of their hotel
6  rooms changed at some point between 2004 and 2008, did
7  it not?
8          MR. GARBARINO: Objection, form.
9  BY MS. SCHLESINGER:
10     Q.  Do you understand my question?
11     A.  I think so.
12     Q.  If you'd like to rephrase it in your own words
13 so that we're clear what you're responding to, that
14 would be fine.
15     A.  Well, I think that Best Western or any hotel
16 brand strives to provide a level of quality service
17 that the customers expect, and to that end, customer
18 expectations have risen, so I would say, yes, we strive
19 to meet those expectations.
20     Q.  And it was part of this five-year mission to
21 lead the hotel industry in customer care; is that true?
22     A.  That was a differentiator that Best Western
23 decided to strive for.
24     Q.  Just so I'm clear what you're telling me, yes,
25 as a part of this -- and you acknowledged you heard

45

1  about this five-year mission -- as a part of this
2  five-year mission, the standards Best Western was
3  striving for went up, correct?
4          MR. GARBARINO: Objection, form.
5  BY MS. SCHLESINGER:
6      Q.  Is that correct?
7      A.  Are you saying standards of care, quality?
8      Q.  Well, it says here "customer care."
9      A.  Okay. Yes.
10     Q.  And part of that would also be the quality of
11 the hotel to meet those higher customer satisfaction
12 goals that you just mentioned?
13     A.  In some cases, it would go hand in hand.
14     Q.  At any time, did you communicate to
15 Mr. Harooni that this five-year mission had been
16 established by Best Western?
17     A.  I didn't personally, no.
18     Q.  Were you aware that he put a considerable
19 amount of money into renovations and repairs at his
20 hotel?
21     A.  Yes.
22     Q.  And that was approximately $2 million?
23     A.  That's what he indicated to me, yes.
24     Q.  To your knowledge, was that money invested
25 before or after this embarking on the five-year

TERRY SUZANN WININGER
1/5/2010

### Page 46

1  mission? It would have been before, correct?
2  A. A portion of it probably before.
3  Q. And any design plans that had been submitted
4  would have been before this five-year mission began;
5  is that true?
6      MR. GARBARINO: Objection, form.
7  A. I wouldn't know that for sure.
8  BY MS. SCHLESINGER:
9  Q. Okay. Are you aware that Mr. Harooni
10 submitted various design plans to your design
11 department?
12 A. Yes.
13 Q. Do you know when those were done?
14 A. No.
15 Q. Is Linux a part of your revenue centers for
16 Best Western? Linux is your reservation system,
17 correct?
18 A. Not that I'm aware of.
19 Q. I'm sorry. LYNX. I'm sorry. I'm saying it
20 wrong.
21 A. LYNX, yes.
22 Q. My mistake. I'm used to LYNX with computers.
23     LYNX is your reservation system?
24 A. Yes.
25 Q. And that's what you would consider one of your

### Page 47

1  revenue generators for Best Western?
2      MR. GARBARINO: Objection, form.
3  BY MS. SCHLESINGER:
4  Q. Is that something that is considered to
5  generate revenue for Best Western, the reservation
6  system that's in place?
7      MR. GARBARINO: Same objection.
8  A. Yes.
9  BY MS. SCHLESINGER:
10 Q. Okay. Just so that we're clear, in light of
11 counsel's objection. LYNX is a proprietary system,
12 correct? Do you know what that means?
13 A. I know what it means, but I have no idea if it
14 is or not.
15 Q. Members are charged for the use of this
16 system?
17 A. I don't know what that structure is.
18 Q. Do you know if there is a fee for maintenance
19 of the system?
20 A. I'm not sure.
21 Q. Okay. Do you recall when you first met
22 Mr. Harooni?
23 A. I do recall meeting him.
24 Q. When was that?
25 A. Just prior to his purchase of the property.

### Page 48

1  Q. So that would be in 2004?
2  A. I believe so. At the end of 2004.
3  Q. Did you ever see the application that he
4  filled out --
5  A. Yes.
6  Q. -- for the property?
7      That was something that would have come
8  to you?
9  A. Yes.
10 Q. Did you meet with him before or after that
11 application was completed? Do you recall?
12 A. I don't recall a specific timeline.
13 Q. This application is dated 12/1/2004. So does
14 that refresh your memory at all?
15 A. Not specifically, no.
16 Q. Is there anything else that would refresh your
17 recollection as to when you first met Mr. Harooni?
18 A. I would have made a log of my meeting with him
19 when I was -- in conjunction with the process for the
20 sale.
21 Q. And what does the log consist of?
22 A. There's a form that we complete when a member
23 tells us they're going to sell the property, and we
24 follow that through until the property closes, until
25 the sale closes.

### Page 49

1  Q. And at some point if Mr. Harooni informed you
2  that he was thinking about selling his property, you
3  would have created a similar form?
4  A. Not if he just told us he was thinking about
5  it.
6  Q. If he told you he had listed the property,
7  would such a form be created?
8  A. I would ask him at that time if he wanted
9  to -- for me to give him a -- to check to see first if
10 the property qualified for an auto transfer and to then
11 see if he wanted an application sent to him.
12 Q. What do you do to check to see if a property
13 qualifies for an auto transfer?
14 A. We go back, look at the last two quality
15 assurance inspection scores, ensure that they are
16 passing on all elements. We check to make sure that
17 they are current with design, they're not past due on
18 any payments to Best Western, and that there are no
19 other delinquencies or deficiencies that would, say,
20 put them in a probationary status.
21 Q. When you met with Mr. Harooni initially, did
22 you indicate to him that the property was eligible for
23 an auto transfer?
24 A. Before he -- are you asking before he
25 purchased the property?