TERRY SUZANN WININGER
1/5/2010

Page 50

1  Q. Yes, ma'am.
2  A. Yes, I would have done that.
3  Q. In other words, you don't have any specific
4  recollection, but that would have been part of your
5  normal procedure?
6  A. We would have already done that on behalf of
7  the seller. We qualify the property for the seller.
8  Q. Do you have any recollection of the property's
9  condition prior to Mr. Harooni purchasing it?
10     And just for clarification, you
11 understand that when I say "the property," I'm talking
12 about the property that was -- at that time, I believe
13 it was called The Antelope Valley Inn Best Western in
14 Lancaster, California.
15 A. I've never personally visited the property.
16 I only have knowledge of their last QA assessment
17 scores.
18 Q. And what were those? Do you recall?
19 A. Not exactly.
20 Q. Did you review anything for this deposition?
21 A. I looked at some of my logs from when I had
22 spoken with Mr. Harooni.
23 Q. And that would include that initial
24 conversation that you had with him?
25 A. Uh-huh, yes.

Page 51

1     MS. SCHLESINGER: I'm going to take a
2  brief break here.
3     MR. GARBARINO: Sure.
4     (Recess was taken from 11:09 a.m. to
5  11:17 a.m.)
6  BY MS. SCHLESINGER:
7  Q. Ms. Wininger, we were talking about what you
8  reviewed for this deposition. What else did you review
9  in addition to your logs?
10 A. I looked at the reaffiliation worksheet.
11 Q. What is that?
12 A. That was the document that I previously
13 mentioned that we create when a buyer notifies us that
14 he is selling the property.
15 Q. And what you looked at, did you look at the
16 ones for the prior property as well as those for when
17 Mr. Harooni was selling his property?
18 A. There was not one made. Mr. Harooni never
19 sold his property while he was a Best Western member.
20 Q. What else did you look at?
21 A. The bylaws for automatic transfers.
22 Q. Anything else?
23 A. I saw e-mails where I had asked the revenue
24 managers to try and assist Mr. Harooni.
25 Q. Were those internal e-mails?

Page 52

1  A. Yes. And e-mails regarding asking for
2  assistance on his behalf through our accounting
3  department.
4  Q. Anything else?
5  A. Nothing that I recall, no.
6  Q. So there were other documents, you just don't
7  recall right at this moment?
8  A. No, I don't -- I did see the membership
9  application agreement that he completed.
10 Q. Anything else?
11 A. No, not that I recall. No.
12 Q. All right. You mentioned there were e-mails
13 that you were asking -- regarding asking assistance on
14 Mr. Harooni's behalf through the accounting department.
15 What assistance were you referring to?
16    I'm sorry. Do you have those documents
17 with you today?
18 A. I didn't bring any documents.
19 Q. Because I would like to see those documents.
20 I believe I'm entitled to see those documents.
21    MS. SCHLESINGER: Do you have those with
22 you?
23    MR. GARBARINO: Not with me today, no.
24    MS. SCHLESINGER: Can we get them?
25    MR. GARBARINO: Can we go off the record?

Page 53

1     MS. SCHLESINGER: No.
2     MR. GARBARINO: I believe the court was
3  clear in its orders yesterday that there would be no
4  further written discovery.
5     MS. SCHLESINGER: That is not written
6  discovery, that is what this witness has reviewed for
7  this deposition.
8     MR. GARBARINO: Cite me the legal
9  authority that you are entitled to those documents, and
10 we'll be happy to provide them to you.
11    MS. SCHLESINGER: I'd like them for this
12 deposition.
13    MR. GARBARINO: We're not going to
14 continue this deposition because you don't have the
15 documents.
16    MS. SCHLESINGER: We're going to take a
17 break. I'm going to get you your legal authority.
18    MR. GARBARINO: Okay.
19    MS. SCHLESINGER: If you'll excuse me,
20 Ms. Wininger.
21    That entails my getting to someplace with
22 Westlaw, getting it for you, and continuing this.
23 That's going to inconvenience your witness. Maybe we
24 should just call the court.
25    MR. GARBARINO: Well, let me talk to my

Ottmar & Associates
602-485-1488

<!-- Page 54 -->

54

1  client for a second.
2          (Recess was taken from 11:24 a.m. to
3  12:18 p.m.)
4  BY MS. SCHLESINGER:
5     Q.  As we were discussing before we broke, there
6  was an issue with documents. I've now been handed some
7  documents, including one that I won't go over now that
8  is not Bates stamped, has not been previously produced,
9  as I understand it, in this litigation.
10         MR. GARBARINO: Can I just make a quick
11 comment?
12         MS. SCHLESINGER: Of course.
13         MR. GARBARINO: We produced these
14 documents to you, some of which, actually, were
15 produced to you previously.
16         Just for the sake of expediting this
17 deposition and resolving this dispute, we don't waive
18 our right to object in the future at future depositions
19 for any request for documents, and as I requested, we
20 would appreciate any legal authority you can cite us to
21 that entitles you to such documents during a
22 deposition.
23         MS. SCHLESINGER: You mean, the documents
24 that were reviewed by the witness in preparation for
25 this deposition?

55

1          MR. GARBARINO: That's correct.
2          MS. SCHLESINGER: That's what I'm talking
3  about. You say "request for documents." It's not.
4  It's for what this witness has reviewed.
5          But in any event, we'll move on.
6          MR. GARBARINO: We would just request
7  that you cite us the legal authority which entitles you
8  to those documents at future depositions.
9          MS. SCHLESINGER: So noted.
10 BY MS. SCHLESINGER:
11    Q.  Ms. Wininger, one of the documents that I was
12 handed was something that was apparently faxed by
13 "BW Membership." It states at page 2 of 5; although,
14 I don't have a page 1 of 5. Did your counsel give you
15 a copy of that document?
16         MR. GARBARINO: I'm sorry. 2 of 5?
17         MS. SCHLESINGER: That's correct.
18         THE WITNESS: Was the first page perhaps
19 the header?
20         MS. SCHLESINGER: I have no idea. It
21 simply says page 2 of 5. I'm just identifying the
22 document.
23         MR. GARBARINO: I would just note for the
24 record that the first page was a facsimile page to me
25 with attorney-client privilege information on it.

56

1          MS. SCHLESINGER: Since I have no idea,
2  I have no idea whether that was something that was
3  reviewed or not. I appreciate your comments, but I am
4  simply identifying this document, which says at the top
5  of it, 1/5/2010, 12 noon, 602957, BW Membership, page
6  2 of 5.
7  BY MS. SCHLESINGER:
8     Q.  Do you see that there, Ms. Wininger?
9     A.  That's the fax header. The document itself is
10 page 1 of 4 -- or there's four pages to the actual
11 document that I reviewed, and that's the entire
12 document.
13    Q.  And, obviously, since I was just handed this,
14 I have not had an opportunity to review it.
15         Did your counsel provide you with a copy,
16 ma'am?
17    A.  Not today, no.
18    Q.  Okay.
19         MS. SCHLESINGER: Haley, can we get
20 another copy made of this?
21         MR. GARBARINO: I have three copies.
22 I just haven't given her one yet.
23         MS. SCHLESINGER: All right. Good to
24 know.
25

57

1  BY MS. SCHLESINGER:
2     Q.  This document states that it's T, dash, 05050.
3  Do you see that there at the top?
4     A.  Yes.
5     Q.  And is that the member number for the property
6  that's at issue here?
7     A.  Yes. It's a designated terminated property,
8  05050, but T stands for terminated.
9     Q.  And that pertains -- terminated -- do you know
10 when that T was affixed to this, ma'am?
11    A.  We would affix a T to any property after
12 they're cancelled in our system. That was my heading
13 for my personal log.
14    Q.  And that's what this document is, your
15 personal log; is that correct?
16    A.  Yes.
17    Q.  And did you affix that heading in 2005 or in
18 2008 or some other time?
19    A.  After I was notified that the property was --
20 by our corporate legal counsel -- that the property was
21 going to have a hearing or sue us or whatever it is,
22 this is, then I always pull together information that
23 I have.
24    Q.  So this document was created after you were
25 aware of the litigation?

Page 58

1   A.  This is just a cut and paste of --
2   Q.  I'm sorry, ma'am, but it actually was a "yes"
3   or "no" question.  Was this document created after --
4   this particular document that we have here, pages 1
5   through 4 --
6   A.  Yes.
7   Q.  It was created after litigation?
8   A.  Yes.
9   Q.  This issue came up because I was asking you
10  about when you first met Mr. Harooni.  Do you recall
11  that?
12  A.  Yes.
13  Q.  And you said you couldn't recall, but your log
14  would remind you.  Do you recall that?
15  A.  Yes.
16  Q.  And yet this log begins only in January 2005.
17  Do you see that?
18  A.  Yes.
19  Q.  Is there a log someplace that begins in 2004?
20  A.  That would be the reaffiliation worksheet.
21  Q.  You said this was a cut and paste, this
22  document that we've been handed?
23  A.  Yes.
24  Q.  Okay.  I'm going to mark this as Exhibit 2.
25  I'm going to have this marked as Exhibit 2.  You said

Page 59

1   this Exhibit 2 was a cut and paste.  What was it cut
2   and paste from?
3   A.  Best Western has a program called KANA --
4   that's where the heading "KANA LOG" comes from -- where
5   the district managers log pertinent conversations
6   and/or information regarding a property, just for our
7   records, to help us remind -- you know, remember what's
8   corresponded with the property.
9   Q.  So what I'm looking at here is excerpts from
10  the KANA log?
11  A.  It's every KANA entry that I had pertaining to
12  this property between these dates.
13  Q.  So there may be KANA log entries predating
14  January 5, 2005, pertaining to this property?
15  A.  It's possible.
16  Q.  In some of these instances, for example,
17  Michelle Orion is mentioned after the March 4th, 2005,
18  entry, where she had a conversation.  I take it
19  Michelle is a woman?
20  A.  Yes.
21  Q.  Is she still with Best Western?
22  A.  Yes.
23  Q.  What is her position?
24  A.  She's the district manager for District 3.
25  Q.  What was her position in March of 2005?

Page 60

1   A.  District manager of District 3.
2   Q.  Do you have any idea why she was taking a call
3   from Mr. Harooni, as reflected in this KANA log,
4   Exhibit 2?
5   A.  All the district managers back each other up
6   if one of us is not available.
7   Q.  Do you recall meeting or speaking with
8   Mr. Harooni in December of 2004 or before that?
9   A.  I'm not positive.
10  Q.  But conversations could have taken place
11  between you and Mr. Harooni prior to January 5th, 2005?
12  A.  That's possible.
13  Q.  Have you met Mr. Harooni in person?
14  A.  Yes.
15  Q.  Where was that?
16  A.  He came to my office and introduced himself.
17  I saw him when he came for training.
18  Q.  When did he come to your office and introduce
19. himself?
20  A.  Well, for sure, one time I saw him with his
21  nephew in Phoenix, when he was here for the voting
22  membership orientation.  That's the 1/31/05 entry.
23  Q.  But that does not indicate that was the first
24  meeting, correct?
25  A.  It does not indicate, no.

Page 61

1   Q.  It was your understanding that Mr. Harooni was
2   the buyer of the hotel at issue here, ma'am?
3   A.  Correct.
4   Q.  And you also understood based on the entry for
5   January 5th, 2005, that Mr. Harooni anticipated putting
6   in quite a bit of money into this hotel, true?
7   A.  Correct.
8   Q.  Did you ever have a conversation with
9   Mr. Harooni or anyone else at the hotel where you
10  confirmed the identities of the other people that were
11  anticipated to be involved in the hotel, and by that,
12  I mean other owners or buyers?
13  A.  I don't recall any specific conversations.
14  Q.  Let me ask you a similar question.  With
15  regard to the people that were employees at the hotel,
16  did you ever confirm who they were or what their roles
17  were?
18  A.  Clarification.  Are you saying before he
19  purchased or after he purchased?
20  Q.  At any time.
21  A.  We typically try to know who the general
22  manager is of the property.
23  Q.  And who did you believe that to be?
24  A.  I couldn't say who it was at that time.
25  Q.  Did you ever find that out?

**Page 62**

1   A.  Yes.
2   Q.  But you just don't know now?
3   A.  I don't know now who it was.
4   Q.  Do you have anything that would indicate --
5   as I said, I haven't had an opportunity to read this.
6   Do you have anything to indicate who the managers would
7   be at any given time at the property?
8   A.  I believe I recall -- on page 2805, Christine
9   Cheney was the GM at that time.
10  Q.  And that's the only person that you're aware
11  of that was ever a GM?  Strike that.  Let me rephrase.
12  Let me see if I can get at this a better way.
13       When you would contact or speak to
14  somebody at the property, did you ask their full name?
15  A.  Not always.
16  Q.  Did you ask their title?
17  A.  Sometimes.
18  Q.  But not always?
19  A.  Not always.
20  Q.  Had you met everybody that worked at the
21  hotel, per se?
22  A.  No.
23  Q.  So you basically would call up, you talked to
24  whoever you talked to, you wouldn't necessarily confirm
25  who they were or what their role was; is that true?

**Page 63**

1   A.  It depended on the nature of the call.
2   Q.  So it's true, you didn't always do that?
3   A.  Correct.
4   Q.  Did Mr. Harooni ever inform you of his health
5   problems?
6   A.  Yes, at our first meeting.
7   Q.  And you know that you had conversations with
8   him before your first meeting, true, based on even just
9   this log?
10  A.  Yes.
11  Q.  You had conversations with him prior to your
12  first meeting; is that correct?
13  A.  Yes.
14  Q.  This first entry here states that Mr. Harooni
15  asked for something in writing confirming that the
16  property he was -- and I'm paraphrasing here --
17  considering purchasing still qualifies for auto
18  transfer.  Do you see that?
19  A.  Yes.
20  Q.  Did you look into that, the status of the
21  property?
22  A.  Yes.
23  Q.  What did you do to confirm -- or did you
24  confirm that the property qualified for auto transfer?
25  A.  I confirmed that the property still qualified

**Page 64**

1   for automatic transfer and sent him documentation to
2   that effect.
3   Q.  What did you do to confirm that?  You said you
4   just looked at the last two Q&A packets -- two quality
5   assessments, the last two; is that right?
6   A.  I had my assistant check the status of
7   QA assessments, design, accounting, account status.
8   Q.  So they only checked -- what you told me
9   earlier was they only checked the last two quality
10  assurance assessments.
11  A.  Correct.
12  Q.  Is it true, ma'am, that, in fact, there can be
13  more than two quality assurance assessments that are
14  considered in determining if a property is to be placed
15  on probationary status?
16  A.  It's possible.
17  Q.  So by looking at only two quality assurance --
18  the last two, as you told me earlier -- it's possible
19  that notwithstanding those last two, the hotel could be
20  on probationary status; is that true?
21  A.  No.
22  Q.  In fact, ma'am, wasn't the hotel on
23  probationary status prior to Mr. Harooni's purchasing
24  it?
25  A.  It could not be on probationary status at the

**Page 65**

1   time of purchase to qualify for an automatic transfer.
2   Q.  Do you have any personal knowledge of the
3   status of the hotel prior to Mr. Harooni's purchase of
4   it?
5   A.  I don't recall.
6   Q.  Well, you said you had your assistant check.
7   You didn't do it personally?
8   A.  No.
9   Q.  So you had no personal knowledge of the status
10  of the hotel prior to responding to Mr. Harooni's
11  query; is that correct?
12  A.  I had knowledge that it qualified for
13  automatic transfer when the seller informed us that he
14  was selling the property.  My assistant checked, again,
15  to ensure that the property still continued to be
16  qualified for automatic transfer, and she furnished
17  that information to me.
18  Q.  On what date did you personally check to
19  confirm the status of the property prior to
20  Mr. Harooni's purchase of it?
21  A.  The last time I would have checked would have
22  been on the 5th, when I sent out the letter stating
23  that it still qualified for automatic transfer.
24  Q.  Which is when you said you had your assistant
25  check that?

Page 66

1  A. Yes. She pulls the documentation, I review
2  it, and then I sign off on it.
3  Q. Are you aware that the hotel which Mr. Harooni
4  purchased had been on probationary status at various
5  times prior to his purchase of it?
6  A. I don't recall specifics, no.
7  Q. Do you have anything to indicate that that
8  statement is not correct? In other words, do you have
9  anything to indicate that, in fact, it was never on
10 probationary status prior to the purchase by
11 Mr. Harooni?
12 A. No.
13 Q. What do you do by way of investigation, if
14 any, into your prospective purchasers of hotels when an
15 automatic transfer is involved?
16 A. Nothing.
17 Q. Does somebody else at Best Western perform any
18 kind of investigation or other inquiry?
19 A. No.
20 Q. Did Mr. Harooni ever express to you that he
21 did not have a lot of experience or any experience with
22 hotels?
23 A. Yes.
24 Q. And he did that prior to purchasing the hotel?
25 A. Yes.

Page 67

1  Q. Did you tell him that Best Western would
2  assist him with the operation of his hotel?
3  A. Not that specifically, not assist with
4  operation, no.
5  Q. Did you reassure him that Best Western would
6  help him with his hotel?
7  A. Not day-to-day operations, no.
8  Q. That's not the question I just asked you,
9  though.
10    Did you ever express to Mr. Harooni that
11 Best Western would provide services to assist him with
12 his hotel?
13 A. Yes.
14 Q. Did you define for him what those services
15 were?
16 A. In general terms.
17 Q. What did you tell him?
18 A. That we provide training for the voting
19 member, for the general manager; that we have revenue
20 management that can help them establish rates, ensure
21 that they're in categories that are loaded properly in
22 the computers; and that we have the regional service
23 managers that will go out and do on-site training once
24 the property is purchased, once the purchase is
25 completed; and that the RSM is a good source of

Page 68

1  training for staff.
2  Q. Were there any other services that you
3  expressed to Mr. Harooni would be available through
4  Best Western? For example, marketing to corporations?
5  A. I don't recall discussing that.
6  Q. But you may have?
7  A. I don't typically.
8  Q. But you have what we were discussing
9  previously, you have Worldwide Sales that is part of
10 what Best Western does, correct?
11 A. Correct.
12 Q. That's an attribute of Best Western, correct?
13 A. Yes.
14 Q. And when Mr. Harooni was considering
15 purchasing the hotel, would you have told him about the
16 attributes of Best Western?
17 A. I don't recall.
18 Q. But it's very possible that you do?
19    MR. GARBARINO: Objection, form.
20 BY MS. SCHLESINGER:
21 Q. Is it possible that you do?
22 A. I don't think so.
23 Q. You don't talk about the attributes of Best
24 Western when you're talking to prospective purchasers?
25 A. To some extent, but I don't go into detail

Page 69

1  about a lot of the departments other than the revenue
2  management and the member relations and our training
3  department.
4  Q. And the detail that you're referencing is what
5  you just stated today?
6  A. Yes.
7  Q. Did Mr. Harooni have any questions for you?
8  A. Yes.
9  Q. Would you have responded to those questions
10 with information regarding the things that Best Western
11 can do for a hotel owner?
12 A. To the best of my ability, I would have
13 answered his questions, yes.
14 Q. So even if it wasn't in your normal spiel, you
15 would have done that?
16 A. Yes.
17 Q. Based upon Exhibit 2, would you characterize
18 Mr. Harooni's attitude when he first purchased this
19 hotel as enthusiastic?
20 A. Yes.
21 Q. And very anxious to make money for both Best
22 Western and his property, correct?
23 A. Yes.
24 Q. It says here at entry 2/2/05 that he offered
25 to be a trial property for new processes, slash,

TERRY SUZANN WININGER
1/5/2010

---

Page 70

1  products. Do you see that there?
2  A. Yes.
3  Q. Do you know what that was in reference to?
4  A. Just in general, he was anxious, in my
5  opinion, to become more involved and to learn more
6  about Best Western.
7  Q. Do you have hotel owners that are not as
8  anxious or cooperative as Mr. Harooni seemed to be
9  initially?
10 A. Yes.
11 Q. So when you find somebody that is very
12 enthusiastic like Mr. Harooni, do you do anything to
13 make sure you are able to assist them to your fullest?
14 A. I try to do that with all of my members.
15 Q. Can you point me in this document to instances
16 where you provided assistance to Mr. Harooni to prevent
17 his property from going into any kind of probationary
18 status?
19 A. On 8/30/05, I contacted the property. They
20 had not completed required general manager training.
21      On 5/4/06, I left him a message regarding
22 his past due account.
23      On 11/07, I called to remind him that we
24 didn't have annual dues yet. He could be terminated in
25 our system.

---

Page 71

1  Q. I'm sorry. What was the date on that?
2  A. 11/5/07.
3  Q. Are those the instances that you think are
4  responsive to my question?
5  A. Yes.
6  Q. So basically you called him on, let's see,
7  8/30/05, after Mr. Harooni had the hotel for four
8  months, and you called him to try to get the dues paid
9  by Mr. Harooni to Best Western, correct? I'm sorry.
10 You said -- I guess that was on 11/07 you say that you
11 did that.
12 A. Yes.
13 Q. 11/07/05?
14 A. 11/05/07.
15 Q. Okay. And on a prior occasion -- so on 8/30,
16 just a few months after -- it says here that he closed
17 escrow in, oh, it looks like --
18 A. I believe it was February.
19 Q. It looks to me like it was February 25th,
20 according to this, because there's an entry for 2/24/05
21 that says that they expected to close escrow tomorrow.
22 Do you see that?
23 A. Yes.
24 Q. So assuming that that was accurate and nothing
25 happened to delay closing, they would have closed on

---

Page 72

1  February 25th, and, in August, you called to say,
2  "Hey, Mr. Harooni, your training is not done yet. You
3  need to have that done"; is that correct?
4  A. Correct.
5  Q. So that was to assist Mr. Harooni?
6  A. Yes.
7  Q. And on the other two occasions that you
8  mentioned on May 4th, I believe you said it was --
9  A. Of '06.
10 Q. -- you called and said, "We need your money.
11 It's past due"?
12     MR. GARBARINO: Objection, form.
13 BY MS. SCHLESINGER:
14 Q. Is that what you did, you called --
15 A. I called.
16 Q. I'm sorry. I just wanted to clarify since
17 counsel objected.
18     Did you call in an effort to collect past
19 due amounts from Mr. Harooni? That is a "yes" or "no"
20 question.
21 A. No.
22 Q. Do you see the entry for 5/4/06?
23 A. Yes.
24 Q. And it says, "I left msg" -- we'll assume
25 that's "message," correct?

---

Page 73

1  A. Yes.
2  Q. -- "regarding Harry Harooni regarding 60-day
3  past due."
4  A. Yes.
5  Q. So you called to tell him that his account was
6  60 days -- showing 60 days past due; is that correct?
7  A. I called him to say I noticed his account was
8  60 days -- showing 60 days' past due. That's standard
9  for me on any account that comes up. And to ask if he
10 had paid it, if perhaps we had not received the check,
11 if it was, you know, possibly posted in error.
12 Q. Okay. I hate to say it. I've gotten calls
13 like that from my creditors too. I don't think they're
14 trying to help me, Mrs. Wininger.
15     MR. GARBARINO: Objection, form.
16 BY MS. SCHLESINGER:
17 Q. On the other occasion that you say that you
18 were attempting to assist Mr. Harooni, you say that
19 was -- on the next occasion you said that you called to
20 assist him, you were calling to inquire about the
21 annual dues that had not yet been paid; is that
22 correct?
23 A. Yes.
24 Q. Was there anything else that you did to assist
25 Mr. Harooni, to your recollection, in order to prevent

TERRY SUZANN WININGER
1/5/2010

---

74

1  him from falling into a probationary status or being
2  terminated?
3      A.  In general, almost everything I did was to
4  help him avoid having problems.
5      Q.  So, in other words, everything you do is under
6  the presumed threat that somebody may fall into
7  probation or termination?
8          MR. GARBARINO:  Objection, form.
9      A.  No.
10 BY MS. SCHLESINGER:
11     Q.  So everything you did was to prevent him from
12 falling into probation, based on what you just told me?
13 I'm sure you'd like to clarify that.
14         MR. GARBARINO:  Objection, form.
15 BY MS. SCHLESINGER:
16     Q.  Okay.  Fine.  We'll leave it at that.
17         Is there anything else specifically that
18 you would like to tell me about that you did to prevent
19 Mr. Harooni's property from going into a probationary
20 status?  Anything specific come to mind, ma'am?
21     A.  Specific detail, no.
22     Q.  Were you familiar with the condition of the --
23 I know I've asked you this, but I'm going to try to use
24 that as a segway into another opening.
25         Did you have any personal knowledge of

---

75

1  the condition of the property prior to Mr. Harooni's
2  purchase?
3      A.  No.
4      Q.  Would you agree that the -- did you have any
5  personal knowledge of the condition of Mr. Harooni's
6  property after he engaged in renovations and repairs to
7  the hotel?
8      A.  I never visited the property.  I did see some
9  photographs.
10     Q.  Would you agree that the hotel was in better
11 condition after Mr. Harooni took it over than it was
12 with the previous owner?
13         MR. GARBARINO:  Objection, form.
14     A.  It was obvious that he had spent money to
15 upgrade the property.
16 BY MS. SCHLESINGER:
17     Q.  The property was upgraded?
18     A.  Well, updated.  Updated.
19     Q.  Was it updated and upgraded?  Are the two
20 terms synonymous, in your mind?
21     A.  Not necessarily.
22     Q.  So there were upgrades that were done?
23     A.  It was updated.
24     Q.  If something is updated, is it not an upgrade?
25 In other words, it's newer.  Does that newer, in terms

---

76

1  of hotel parlance, necessarily indicate -- I mean, old
2  is considered bad in hotel parlance, right?  We had an
3  example the other day.  Someone at the Best Western
4  said there was a swag lamp, and swag lamps are no
5  longer in style, so if you update it, then that's going
6  to be an upgrade, in terms of, it's going to be better,
7  correct?
8      A.  In your example, yes.
9      Q.  So the property was better following the
10 updating done by Mr. Harooni, correct?
11     A.  It was newer furnishings.
12     Q.  I'm sorry?
13     A.  It was newer furnishings.
14     Q.  And he did other repairs, including repairing
15 the roof.  Do you know that?
16     A.  I don't recall specifics of all the things he
17 did, no.
18     Q.  Okay.  And he worked with your design
19 department; is that true?
20     A.  Yes.
21     Q.  And the design department approved certain
22 plans for Mr. Harooni's upgrades, true?
23         MR. GARBARINO:  Objection, form.
24     A.  I would assume so, because I've always advised
25 members to get approval from design before moving

---

77

1  forward.
2  BY MS. SCHLESINGER:
3      Q.  And, in fact, Mr. Harooni did get approval
4  from design before moving forward with some of his
5  renovations; is that correct?
6          MR. GARBARINO:  Same objection.
7  BY MS. SCHLESINGER:
8      Q.  Do you have any knowledge of that, ma'am?
9      A.  No specific recollection, no.
10     Q.  Do you know how Mr. Harooni's property
11 compared to other hotels in the area?
12     A.  No.
13     Q.  Did you ever go out to any of these hotels in
14 this area, the area around in your district even?
15     A.  I have visited some properties in my district.
16 It's not in my job description to visit my properties.
17 I take the opportunity to visit properties if we have a
18 meeting in that area, but, no, I have not visited
19 properties in his immediate area.
20     Q.  I was asking you before about various
21 fee-generating programs, and you were not able to come
22 up with a lot of the ones that I was aware of.  Would
23 you agree that Best Western generates fees through
24 monthly fees?
25     A.  Yes.

Page 78

1   Q.   Annual dues?
2   A.   Yes.
3   Q.   Affiliation fees?
4   A.   Yes.
5   Q.   Special advertising assessments?
6   A.   Yes.
7   Q.   Special quality assurance assessments?
8   A.   Yes.
9   Q.   Member meetings, they charge them for that
10  too?
11  A.   Yes.
12  Q.   Overhead recovery fees?
13  A.   I'm not familiar with that.
14  Q.   There's other program fees, including property
15  direct relation fees?
16  A.   It's possible.
17  Q.   Okay. Is there a frequency stay program for
18  which members are charged a fee?
19  A.   Yes, as the -- it's our rewards program.
20  Q.   And there's a travel card program that's
21  separate from the frequency stay programs?
22  A.   Yes.
23  Q.   And members are also charged a fee for that
24  program?
25  A.   Not for the program, that I'm aware of.

Page 79

1   I mean, if a property accepts a travel card in payment,
2   there's a commission fee.
3   Q.   So there's commissions and fees that Best
4   Western assesses?
5   A.   (Nodding head.)
6   Q.   Do you know what a GDS program and Internet
7   domestic reservations program are?
8   A.   GDS is global distribution services.
9   Q.   And that's also a program for which Best
10  Western charges a fee?
11  A.   I don't know that for certain.
12  Q.   Okay. And Best Western Supply sales, markups,
13  and commissions are also assessments to the members?
14       MR. GARBARINO: Objection, form.
15  BY MS. SCHLESINGER:
16  Q.   Are you aware of those fees that are generated
17  and charged to the members?
18  A.   Best Western Supply fees are charged when a
19  member purchases items through our supply department
20  for their hotel. It's not an additional fee.
21  Q.   The supplies are also marked up; is that
22  correct?
23       MR. GARBARINO: Objection, form.
24  A.   I don't know how the contract fees are
25  established.

Page 80

1   BY MS. SCHLESINGER:
2   Q.   Fair enough.
3        When a hotel is given a point deduction,
4   for want of a better expression -- do you understand
5   what I mean by that during a quality assessment?
6   A.   Yes.
7   Q.   When they're given a point deduction for
8   something that is worn, Best Western makes it known to
9   the members that they can correct that problem by
10  purchasing new case goods, if you will, from Best
11  Western; is that correct?
12       MR. GARBARINO: Objection, form.
13  BY MS. SCHLESINGER:
14  Q.   Is that correct, ma'am?
15  A.   They can correct the deficiency by purchasing
16  new case goods. Best Western does not require any
17  member to purchase through our supply department.
18  Q.   Have you ever told a member that a certain
19  item is available through Best Western and that will
20  make the problem -- will help resolve the problem?
21  A.   Best Western Supply has a number of items
22  available, not to say that's exclusively, necessarily
23  the only place they could get it.
24  Q.   But have you explained to members that this is
25  something that is certainly going to be acceptable to

Page 81

1   Best Western, if they purchase it through Best Western
2   Supply?
3   A.   Yes, if it's purchased through Best Western
4   Supply, it's something that has been deemed as meeting
5   our minimum acceptable standards.
6   Q.   Whereas, if they purchased it from some other
7   supplier, there's going to be additional reviews or
8   it's going to be something that may be subject to
9   critique by Best Western?
10  A.   That's possible.
11  Q.   Are you familiar with the problems with the
12  reservation system that occurred at Mr. Harooni's
13  property?
14  A.   Problems with the reservation system itself?
15  No.
16  Q.   Are you trained on the reservation system?
17  A.   No.
18  Q.   This LYNX?
19  A.   No.
20  Q.   Was it -- to your knowledge, was it the same
21  system in place for the entire time that Mr. Harooni
22  owned the hotel? Sorry. Do you understand my
23  question?
24  A.   His system or Best Western's system?
25  Q.   Best Western. Did Best Western use LYNX as

82

1  its reservation system throughout 2004 through 2008?
2      A.  To my knowledge, yes.
3      Q.  Were there any changes to the system, that
4  you're aware of, during that period?
5      A.  No.
6      Q.  Do you know who Laura Armstrong is?
7      A.  No.
8      Q.  Did you ever explain to Mr. Harooni about the
9  time limitations that are involved if a reinspection is
10 requested?  Let me rephrase that.
11         Prior to Mr. Harooni ever having a
12 failing score at his hotel, had you explained to him
13 that should that occur, he would need to request a
14 reinspection within 48 hours?
15     A.  No.
16     Q.  Was that a "no"?
17     A.  "No."
18     Q.  When Mr. Harooni's property first failed an
19 inspection, did he contact you?
20     A.  I believe so.
21     Q.  And what did you tell him?
22     A.  I don't recall specifics.  In general, I say
23 that a failed score puts you on probation, you'll be
24 reinspected within 90 days, and hopefully you can
25 review the assessment and make necessary changes as

83

1  reflected from the point deductions on that assessment
2  to prevent a second failing score.
3      Q.  On 10/31/2007, on Exhibit 2, that's on page 3
4  of 4, you'll see the date entry there for 10/31/2007.
5      A.  Yes.
6      Q.  Do you see there that it says, partway
7  through, it says "11/1/07, Harry Harooni, VM, called
8  asking for help to change his QA score above 800.  He's
9  trying to auto transfer the property."  Do you see
10 that?
11     A.  Yes.
12     Q.  So far, have I read it correctly?
13     A.  Yes.
14     Q.  And when you go down and continue, it says,
15 "His health isn't getting any better and he's put all
16 of his money into this property, not realizing what he
17 was getting himself into when he bought it two years
18 ago."  Did you write that, Ms. Wininger?
19     A.  I wrote that based on his comments to me in
20 our conversation.
21     Q.  Do you have any recordings of your --
22     A.  No.
23     Q.  -- conversations?
24     A.  No.
25     Q.  You know, so many of those recordings say,

84

1  "This call will be monitored and recorded," blah, blah,
2  blah.  Do your telephone systems do that?
3      A.  Not our department, no.
4      Q.  And the next sentence there is, "I explained
5  that since it's more than 48 hours since his
6  inspection, we can't ask for it to be audited," and you
7  just told me you never -- I read that correctly, right?
8      A.  Yes.
9      Q.  And you just told me you never told him about
10 the 48 hours in advance of Mr. Harooni's property
11 getting a failing score?
12     A.  Correct, because this was after he failed.
13     Q.  Right.  So you only told him about it
14 afterwards?
15     A.  Yes.
16     Q.  How much do they charge for reinspections?
17     A.  Now it's 1,500.
18     Q.  And if Best Western goes out and does a
19 reinspection, that reinspection is done with the
20 intention of -- strike that.
21         If Best Western goes out to do a
22 reinspection, is it fair to say that Best Western is
23 aware that that reinspection report and any associated
24 photographs will be used in a hearing at some point in
25 the future?

85

1         MR. GARBARINO:  Objection, form.
2      A.  Not to my knowledge, no.
3  BY MS. SCHLESINGER:
4      Q.  Are you aware that those reinspections are
5  introduced at hearings, ma'am?
6      A.  Sometimes, yes.
7      Q.  Do you think Best Western is aware of that?
8  Do they know that there could be a hearing following a
9  reinspection?
10     A.  A reinspection wouldn't constitute a hearing.
11     Q.  I didn't say that.  I said, Do you think, in
12 your experience, that the RSMs or whoever does the
13 reinspection is aware that the documentation associated
14 or generated in connection with the reinspection will
15 be introduced at a hearing, if such a hearing occurs?
16     A.  I don't know.
17     Q.  But you knew it, right?
18     A.  Typically, it's the initial inspection that
19 constitutes a probation.
20     Q.  That's, again -- I'm sorry.
21     A.  I don't know.
22     Q.  Have you ever participated in putting together
23 documents associated with hearings regarding
24 probationary status or termination for a hotel?
25     A.  No.  That's not my job.

**86**

1  Q. Has anybody ever asked you for documents from
2  your files or from your scope of work in connection
3  with a hearing?
4  A. No.
5  Q. Nobody's ever asked you to produce a copy of a
6  document?
7  A. No, not to my recollection.
8  Q. Oh, that's because you put them online, right?
9  You put them in a database?
10 A. Yes.
11 Q. So they wouldn't need to come to you to ask,
12 they're up there automatically, right?
13 A. Correct.
14 Q. So the documents are put online so that
15 everybody in your company will have access to them,
16 everybody that needs to, right?
17 A. Yes, we have an in-house database.
18 Q. Have you ever instructed any of the people
19 that report to you to go out and do a reinspection?
20 A. That's not my department, no.
21 Q. Do you have anything to do with reinspections?
22 A. No.
23 Q. Who does?
24 A. The regional services department member, the
25 regional service managers.

**87**

1  Q. I'm sorry. Remind me, who was the person in
2  charge of this region, the region of which
3  Mr. Harooni's hotel was a part during that relevant
4  time from 2004 to 2008?
5  A. I don't recall who the regional service
6  manager was. They move around throughout from time to
7  time. There's not always one specific district
8  manager -- or regional service manager for the
9  properties.
10 Q. Did you ever become aware that Mr. Harooni was
11 listing his hotel for sale?
12 A. Yes.
13 Q. When was that?
14    I'm sorry, ma'am. I see that you're
15 looking at Exhibit 2 --
16 A. Yes.
17 Q. -- and I'm trying to ask if you have any
18 independent recollection of it first.
19 A. I don't recall when it was. I just know I was
20 notified that it was for sale and that it showed --
21 mentioned auto transfer.
22 Q. Okay. And if you need to, at this time, if
23 you want to refer to Exhibit 2. Do you know if you
24 became aware that the hotel was for sale prior to it
25 being placed on probation?

**88**

1  A. That would be a yes.
2  Q. You were aware of that?
3  A. As of the 4/23/07.
4  Q. Okay. And if the hotel is sold while it is on
5  a probationary status, Best Western is then able to
6  charge thousands of dollars more for a new application
7  than it would be entitled to charge if there was an
8  auto transfer involved; is that correct?
9  A. Best Western doesn't guarantee a transfer if
10 the property is in probation status.
11 Q. But the answer to my question would be "yes"?
12 A. Yes.
13 Q. Once a hotel is in danger of being terminated,
14 what help is available -- and this is separate than the
15 question I asked you earlier about what help was given
16 to Mr. Harooni -- but, generally, what help is
17 available?
18 A. Can you repeat the question again.
19 Q. Sure. One of the goals that the other
20 witnesses have told me was a goal for Best Western is
21 to keep properties from terminating. Would you agree
22 with that?
23 A. Yes.
24 Q. So what help is available to a hotel owner to
25 prevent a hotel from being terminated from its Best

**89**

1  Western membership?
2  A. Well, once a property falls below 800, fails a
3  QA assessment, we require the rapid response visits.
4  Q. For which you charge the hotel member, right?
5  A. Yes.
6  Q. And what else?
7  A. In our district, we send the governor
8  information, ask them to contact the member, see if
9  there's anything that they can do to be of assistance.
10 Q. And to the best of your knowledge, that did
11 not occur in this instance, did it?
12    MR. GARBARINO: Objection, form.
13 BY MS. SCHLESINGER:
14 Q. Did that occur in this instance, ma'am, to
15 your personal knowledge?
16 A. I know that the governor was requested to
17 contact them.
18 Q. Can you show me in this document, your log,
19 Exhibit 2 where that is reflected?
20 A. No, it's not kept there.
21 Q. Where would it be kept?
22 A. It's standard for me to contact a governor
23 every time a property fails or falls below an 840 on
24 their QA assessment.
25 Q. Do you have any evidence that that was done in

**Page 90**

1 this case?
2   A.  From that far back, no.
3   Q.  What other types of assistance would normally
4 be offered to a hotel or would be available to a hotel
5 that was in danger of being terminated?
6   A.  Design assistance, if their failure was due to
7 capital requirements versus cleanliness and maintenance
8 issues.
9   Q.  Anything else?
10  A.  Well, the rapid response visit does help
11 retrain, refresh the staff at the hotel on proper
12 cleanliness procedures, techniques, tips, how to, you
13 know, do maintenance and things like that.
14  Q.  Who did the rapid response in this case?
15  A.  I don't know.
16  Q.  Do you know when it was done?
17  A.  No.  Typically, within two weeks.
18  Q.  Did you know at the time?  Is it referenced
19 here in your log?
20  A.  No.  It's the other department that handles
21 that.
22  Q.  And nobody would communicate with you and say
23 this was done?
24  A.  I might have been copied on an e-mail
25 requesting it or saying that it was done, but it's not

**Page 91**

1 something I keep a record of.
2   Q.  So you're saying that one of the main methods
3 of helping a hotel avoid termination is this rapid
4 response; is that right?
5   A.  Yes.
6   Q.  Okay.  And you don't keep a record of it, and
7 you don't follow up on it; is that also true?
8   A.  Yes.
9   Q.  Before Mr. Harooni purchased the hotel, did
10 you say that you would be available to assist him in
11 any way and that he should contact you?  Strike that.
12      Did you tell Mr. Harooni any specifics of
13 what you would be able to do following his first,
14 quote, failing score?  Did you contact him and give him
15 any personal advice or offer any personal assistance?
16  A.  No.
17  Q.  As of November 2nd, 2007, did the region's --
18 let me rephrase that.
19      As of November 2nd, 2007, was Lancaster,
20 California part of a region that included Bakersfield,
21 Lebec, L-E-B-E-C, Palmdale, Mohave, and Tehachapi?
22  A.  It might have.  I don't recall all of the
23 names and who's in what region.
24  Q.  Okay.  Is there any reason -- because I'm
25 having a real hard time understanding this -- why an

**Page 92**

1 RSM from Fresno would be handling a region that
2 included these areas?
3       MR. GARBARINO:  Objection, form.
4       MS. SCHLESINGER:  I'm sorry.  Counsel,
5 what's the problem there?
6       MR. GARBARINO:  Foundation.  I'm not sure
7 that she has testified that she has any knowledge of
8 how an RSM is assigned anywhere.
9 BY MS. SCHLESINGER:
10  Q.  Ma'am, you oversee the RSMs, do you not?
11  A.  No, ma'am.  It's a total different department,
12 division.
13  Q.  Okay.  Why don't you give me another -- why
14 don't you try, again, to explain to me what it is that
15 your job duties are.
16  A.  My job duties are to be a liaison to the
17 members with the board and the staff whenever they're
18 having problems with other departments or divisions, to
19 take care of the processes of automatic transfers of
20 membership, to see that all of the proper documentation
21 is provided to the members, and that they return all of
22 the required completed documentation.
23  Q.  Oh, and you also call to let them know that
24 the member fees or annual dues are late?
25      MR. GARBARINO:  Objection, form.

**Page 93**

1   A.  That was something that the director asked
2 that I do.
3 BY MS. SCHLESINGER:
4   Q.  The director personally asked that you do it
5 for this hotel?
6   A.  No, in general.
7   Q.  So it's part of your job duties?
8   A.  It's not part of my job duties from Best
9 Western.  It's part of my duties as a liaison with the
10 board director who is not a paid position with Best
11 Western.
12  Q.  So you were trying to ensure that the members
13 paid all of their fees and dues on time as a special
14 favor to this director?
15      MR. GARBARINO:  Objection, form.
16 BY MS. SCHLESINGER:
17  Q.  I mean, as a favor to him?  You didn't need to
18 do this as part of your job?  It's just a very fine
19 line to say you're doing it for a director, but it's
20 not part of your duties as a Best Western employee, and
21 I'm trying to clarify that.
22  A.  I don't know that all district managers do
23 that.
24  Q.  Let me ask you this.  What is it that you
25 manage?  Do you have any hiring and firing

TERRY SUZANN WININGER
1/5/2010

```
                                                    94
 1   capabilities --
 2      A.  No.
 3      Q.  -- of personnel at Best Western?
 4      A.  No.
 5      Q.  Do you have any input into the direction of
 6   the corporate structure, what direction Best Western is
 7   taking?
 8      A.  No.
 9      Q.  Does anybody report to you?
10      A.  I have -- I share one coordinator, i.e.,
11   secretary, with another director -- I mean with another
12   district manager, but she actually reports to a
13   different person.  So I have no direct reports.
14      Q.  Okay.
15          MS. SCHLESINGER:  I'm going to take a
16   real quick break, and I think we're very close to the
17   end.
18          (Recess was taken from 1:25 p.m. to
19   1:31 p.m.)
20   BY MS. SCHLESINGER:
21      Q.  Ms. Wininger, as I understand it, you were,
22   then, the primary contact person for the members;
23   is that correct?
24      A.  When they didn't know who to go to for
25   anything else.
```

```
                                                    95
 1      Q.  What were the circumstances under which you
 2   first spoke with Mr. Harooni?
 3      A.  When he talked to me about his planned
 4   purchase of the property.
 5      Q.  And at that time, it would have been your role
 6   to represent the attributes that Best Western could
 7   offer to a prospective purchaser; is that correct?
 8      A.  If asked to do so, yes.
 9      Q.  You would have represented Best Western in the
10   best possible light, I'm sure; is that also right?
11      A.  Yes.
12      Q.  And you would have conveyed to Mr. Harooni
13   that Best Western worked with its members for the
14   success of both the members and Best Western; is that
15   true?
16      A.  Yes.
17      Q.  Did you in those initial conversations with
18   Mr. Harooni explain that if they, the member, did not
19   get passing scores, they would be terminated?
20      A.  I believe so, yes.
21      Q.  You believe so?  On what are you forming that
22   belief?
23      A.  It's something that I typically do, is to
24   explain that a property needs to maintain passing
25   scores.  If they fail twice within 18 months, then they
```

```
                                                    96
 1   are -- their membership is in jeopardy.
 2      Q.  I'm having a problem picturing this
 3   conversation, to be honest with you.  "Nice to meet
 4   you, Mr. Harooni.  I'm so glad to hear you're
 5   interested -- really glad to hear you're interested in
 6   purchasing the hotel.  By the way, if you don't pass
 7   every single inspection, if you fail two inspections in
 8   24 months, we're going to terminate your membership."
 9   Is that how the conversation could have gone?
10          MR. GARBARINO:  Objection, form.
11      A.  No.
12   BY MS. SCHLESINGER:
13      Q.  No?  So do you want to explain to me how that
14   would come up?
15      A.  If he would have asked me when we discussed
16   the property's qualifications for automatic transfer,
17   that they had to obtain two passing scores, then, at
18   some point, the member typically asks, "What is it that
19   I have to look out for, what do I have to watch out
20   for?"  I say, "You have to ensure that you pass."
21      Q.  Let me stop you right there, because you said
22   "typically."  That tells me that you have no real
23   personal knowledge as you sit here today that that
24   conversation ever occurred with Mr. Harooni; is that
25   true?  As you sit here today, do you know that
```

```
                                                    97
 1   conversation occurred?
 2          MR. GARBARINO:  Objection, form.
 3      A.  I could not recollect that far back, no.
 4   BY MS. SCHLESINGER:
 5      Q.  So you're just kind of speculating here,
 6   correct?
 7          MR. GARBARINO:  Objection; form.
 8   BY MS. SCHLESINGER:
 9      Q.  You don't know if Mr. Harooni asked you that
10   question?
11      A.  No, I do not.
12      Q.  So you have no idea if you gave him that
13   spiel, correct?
14      A.  Correct.
15      Q.  And when we were discussing and your counsel
16   objected -- or counsel for Best Western objected to my
17   questioning you with regard to those hotels that are in
18   particular regions, you're only the primary liaison for
19   certain hotels that are within certain regions that are
20   within your district; is that correct?
21      A.  I'm not staff liaison for all hotels within
22   our region.
23      Q.  Within your region?
24      A.  Excuse me.  Clarification.  Within our
25   district.
```

TERRY SUZANN WININGER
1/5/2010

Page 98

1  Q. And that district is made up of certain
2  regions?
3  A. Yes.
4  Q. How would you know if a hotel owner called up
5  and said, "Ms. Wininger, I need to talk to you about
6  X." How would you know if that hotel owner was
7  properly talking to you or should be speaking to
8  somebody else?
9  A. When they explain to me what they want to talk
10 about, if it's not something that is in my realm of
11 responsibility, then I would tell them that this is the
12 person or this is the department that you need to talk
13 to and refer them on, or say, "If you'd like, I can
14 have someone from that department contact you."
15 Q. Okay. And so if it was something that was in
16 the realm of your responsibility but the hotel owner
17 was calling you from Florida, would you recognize that
18 you weren't the right person for him to be speaking to
19 and direct him to someone else?
20 A. If the hotel owner owned the hotel in Florida,
21 I would not be the district manager in charge of that
22 district. I would refer them to the other district
23 manager, if that district manager was available.
24 Q. Right. And same thing if they called from
25 Utah, correct?

Page 99

1  A. Correct.
2  Q. And same thing if they called from an area
3  that was not within your district, right?
4  A. Correct.
5  Q. And the only reason you would know that is
6  because you would know which regions went with which
7  district and what district you were responsible for,
8  correct?
9  A. I don't know anything about the regions within
10 the other districts. All I know about is the
11 districts, specific.
12 Q. So you don't know anything about the regions?
13 A. In other districts, no.
14 Q. So you do know about them in your district?
15 A. I have a list of all of the governors and what
16 their properties assigned in their regions are, yes.
17 I just don't recollect specifics of what they are.
18 Q. Would that list refresh your recollection?
19 A. Yes.
20 Q. Okay. And do you have such a list for the
21 relevant time between 2004 and 2008?
22 A. I don't know if I have it all the way back to
23 2004.
24 Q. But you would have it for 2007?
25 A. Yes.

Page 100

1  Q. Could you reconstruct it for 2004? That's
2  okay. Don't worry about it.
3  A. I don't know.
4  Q. And depending on what region is being
5  discussed, are you aware that certain RSMs -- the title
6  "RSM" means regional service manager, correct?
7  A. That's the title, yes.
8  Q. So they only service certain regions, by
9  definition, to your knowledge; is that right?
10 A. They're typically assigned a region.
11 Periodically, those regions are reassigned.
12 Q. In the documents that I was handed today, and
13 I believe your counsel said he had another additional
14 copy that you can take a look at, and I'm referring now
15 to the set of documents that start from "the desk of
16 Lenise Burns," and, apparently, contain documents
17 relating to escrow.
18 A. Uh-huh.
19 Q. Do you see those?
20 A. Yes.
21 Q. The documents I'm looking at are 13 page sets
22 starting with BW0975 through BW0987, and these were
23 documents that you said you reviewed prior to this
24 deposition; is that correct?
25 A. I was shown the documents.

Page 101

1  Q. By counsel?
2  A. By counsel.
3  Q. Do these documents pertain to the transfer of
4  the property from the previous owner to Mr. Harooni's
5  membership?
6      MR. GARBARINO: I'm sorry. Could you
7  repeat that question.
8  BY MS. SCHLESINGER:
9  Q. I said, Do these documents reflect the
10 transfer from the previous owners to Mr. Harooni?
11     MR. GARBARINO: Of?
12 BY MS. SCHLESINGER:
13 Q. Are these some of the documents that reflect
14 that transfer? That's the escrow that's at issue.
15 Is that correct?
16 A. It appears to be, yes.
17 Q. Is there anywhere in these documents that
18 would show me the membership status of the hotel prior
19 to this escrow?
20 A. No.
21 Q. Do you know why you were shown these
22 documents?
23 A. One of the criteria for transfer is for the
24 buyer to provide us with a copy of the close of sale
25 documents so that we know when the transfer actually

**Page 102**

1  occurred, which on the page 2 shows closing date
2  March 1, 2005, and that's what we would have been
3  interested in, so that we would know when to transfer
4  the membership ownership from the prior owner to
5  Mr. Harooni.
6      Q. Another one of the documents that I was just
7  handed today at the deposition was BW1178. Do you have
8  a copy of that document, ma'am?
9      A. Yes.
10     Q. And at the top of that, there is -- the first
11 half of it appears to be an e-mail dated February 28th,
12 2006. Do you see that?
13     A. Yes.
14     Q. And the e-mail is to Thomas Wilson.
15     A. Yes.
16     Q. Do you see that?
17        You've written here -- at least it's
18 signed. It's got your signature block on it?
19     A. Correct.
20     Q. Do you recall writing this?
21     A. I'm sure that I did. I mean, I recall
22 conversations that would have ...
23     Q. All right.
24     A. It's an e-mail trail that starts February 27.
25     Q. Do you see the notation that I drew your

**Page 103**

1  attention to a moment ago for February 28, 2006, where
2  it says in the second sentence of that e-mail, "No one
3  at the property has MW initials, comma, but that is who
4  most recently closed it out." Do you see that sentence
5  there?
6      A. Yes.
7      Q. When it says "closed it out," based on this
8  e-mail trail, they're talking about the reservation
9  system; is that correct?
10     A. Correct.
11     Q. Did you ever find out who MW was?
12     A. No.
13     Q. But according to your information, at least as
14 of the time that you wrote this e-mail, that's who
15 closed out the system, right?
16     A. That's what I was told.
17     Q. By whom?
18     A. I never saw -- I don't go into the system to
19 look at it.
20     Q. By whom were you told that?
21     A. It appears that it was Tom Wilson, the revenue
22 manager.
23     Q. You were telling Tom Wilson?
24     A. No, Tom told me. Or, no, I apologize.
25     Q. So it's not clear?

**Page 104**

1      A. No.
2      Q. You don't know where you got that information?
3      A. No, I don't recall.
4      Q. Okay. But, apparently, the information you
5  had at the time was that the records appeared that an
6  MW closed out the system, correct?
7      A. Correct. It appears that it might have been
8  Mitch because he suggested they call the help desk to
9  see who MW is. It was Mitch.
10     Q. Do you mean to say it might have been Mitch
11 that told you it was an MW that closed out the system?
12     A. Correct.
13     Q. But you have no knowledge of who that was?
14     A. Correct.
15     Q. Did you do anything to find out?
16     A. No.
17     Q. Did you personally do anything to find out?
18     A. No.
19     Q. Who is Leslie Lanigan?
20     A. She is the executive assistant, I believe is
21 her title, to legal now.
22     Q. To whom?
23     A. To our legal department. So she's the one
24 that would have printed this off. The only explanation
25 I can see for her name being on this.

**Page 105**

1          MR. GARBARINO: Can you just please
2  clarify which page you're looking at.
3          MS. SCHLESINGER: I'm looking at BW1186
4  and 1177 and 1178, this whole e-mail trail. It starts
5  off with "Leslie Lanigan," on both documents I was
6  provided.
7  BY MS. SCHLESINGER:
8      Q. Ms. "Wine-ing-er," am I saying that correctly?
9      A. "Wine-a-ger."
10     Q. I apologize. The name is giving me trouble.
11        Do you see the entry on 1188, the second
12 entry down?
13         MR. GARBARINO: Can you give us a page
14 number?
15         MS. SCHLESINGER: I did. 1188.
16         THE WITNESS: That is the page number.
17         MR. GARBARINO: I thought it was the
18 date.
19 BY MS. SCHLESINGER:
20     Q. Do you see there that this particular e-mail
21 I'm referencing is from Wilson, comma, Thomas, and it
22 was to you?
23     A. Yes.
24     Q. And, apparently, Mr. Thomas -- Mr. Wilson is
25 saying he will call Mr. Harooni on the morning of

106

1    February 28th. Do you see that? "I'll call him this
2    morning." blah, blah, blah.
3       A.  Yes.
4       Q.  Was that something that you would have noted
5    in your log over here, this Exhibit 2, that there were
6    some opportunities to help Mr. Harooni and so-and-so
7    was supposed to call him? Would you have made any
8    notation to follow that up?
9       A.  I need a copy of that again. Where is it?
10           MR. GARBARINO: That's my copy. Do you
11   have a marked copy?
12           THE WITNESS: No, I don't have anything
13   marked.
14           MS. SCHLESINGER: Here, I'll be glad to
15   show you the copy I've got.
16           THE WITNESS: I had it before.
17           MR. GARBARINO: Maybe I took it. Maybe I
18   took yours. I shouldn't have done that.
19           THE WITNESS: Okay. This was -- the date
20   again on that, February 28th of '06.
21      A.  Yes, on the page 2, towards the middle, it
22   starts with 2/27/06. Further down, it says, 2/28/06,
23   "Tom and Mitch both contacted Harry Harooni" -- or
24   "Harry." "Tom will help get them properly loaded in
25   rez. Mitch will go back out on Friday for additional

107

1    training."
2            So once Mr. Harooni informed me of his
3    issues, then I generated the e-mails and contacted the
4    revenue manager and the regional services manager.
5    BY MS. SCHLESINGER:
6       Q.  I see what you're referring to on the un-Bates
7    page 2 of 4 of Exhibit 2. It says, "Tom and Mitch both
8    contacted Harry." I'm missing where it says that you
9    did anything to confirm that.
10      A.  Just the sentence before, "I contacted Tom
11   Wilson, revenue manager, and Mitch Van Wormer."
12      Q.  Right. And then I see on 2/28 --
13      A.  He needs help.
14      Q.  I see that on 2/28/06, it says, "Tom and Mitch
15   both contacted Harry." Where did you get that
16   information from? How do you know that?
17      A.  Through these e-mail trails that we've been
18   looking at, where they copied me or responded to me.
19   For example, the one you just did on 1188 from Tom to
20   myself, copied Mitch. "I'll call him this morning at a
21   quick glance," et cetera.
22      Q.  So you then assumed that because he said he'd
23   do it, he did it? Do you have anything that separately
24   or independently indicates that it was actually done?
25           MR. GARBARINO: Objection, form. Can you

108

1    just repeat that.
2    BY MS. SCHLESINGER:
3       Q.  Sure. Based upon Mr. Wilson having said he
4    would do something, did you do anything to follow up
5    and ensure that he had done it, or did you just simply
6    write in your log and say, "Yep, he contacted
7    Mr. Harooni"?
8       A.  On BW0991.
9       Q.  I'm sorry, 0991?
10      A.  Yes. An e-mail from Tom Wilson to myself
11   continued on 0992, "Just a quick update on this
12   property," and then he updated me on the status of his
13   calls with the property.
14      Q.  But you don't note that in your log? You
15   don't note what was said over here, you just say, "Yep,
16   he did it"?
17      A.  Correct, because the revenue manager at that
18   point is tracking his conversations. It wasn't my
19   conversation with the property.
20      Q.  Did you ever see any photographs of the hotel
21   that's at issue here? I'm sorry. I believe you
22   answered that. Strike that.
23           Did you ever raise the issue with
24   Mr. Harooni of his property being listed in 2007 or
25   thereabouts as an automatic transfer?

109

1       A.  Yes.
2       Q.  What did you --
3       A.  On 4/23/07, I left a voice message for the
4    member.
5       Q.  Ma'am, I'm really sorry. I would appreciate,
6    actually, if you could set that away, initially,
7    because I'm asking you for your recollection. I can
8    read your log. So unless we want to get back into it,
9    I appreciate that you're looking at that and trying
10   your best, but to just look down and say "On this date,
11   this is what my log says" doesn't tell me your
12   independent recollection. Do you understand why I'm
13   concerned about what you actually remember today?
14      A.  Okay.
15      Q.  So I'm asking if you remember, not what your
16   log says.
17      A.  I didn't necessarily remember it until looking
18   at my log.
19      Q.  Okay. So other than what's written in that
20   log, do you have any independent recollection of the
21   issues that are relevant to this case?
22           MR. GARBARINO: Objection, form.
23   BY MS. SCHLESINGER:
24      Q.  Do you understand that one of the issues
25   was -- strike that.

110

1    Do you have any recollection --
2    You've already testified, ma'am, that you
3    don't have an independent recollection of your first
4    conversation with Mr. Harooni. Do you recall that?
5    Do you recall your testimony here today to that effect?
6    A. Yes. I wasn't sure what was my very first
7    conversation with him.
8    Q. Or specifically what was said during that
9    conversation, correct?
10   A. I know what was said during one of my first
11   conversations with him.
12   Q. And that's the one that --
13   A. Whether it was the very first -- I know it was
14   at one point when he was in my office.
15   Q. And based upon your log that you referred to
16   earlier, that was after January 5th, 2005, and you
17   agree that you very likely may have had conversations
18   prior to January 1st, 2005. Do you recall that?
19   A. Yes.
20   Q. And then at some point, Mr. Harooni's property
21   was put on a probationary status. Separate from
22   looking at your log, do you have any independent
23   recollection of that at this time as you sit here
24   today?
25        MR. GARBARINO: Objection, form.

111

1    A. I know his property was put on probation
2    before the QA, the quality. It had previously been put
3    on probation for failure to have account current.
4    I believe it was on probation for failure to comply
5    with -- well, no, that wasn't on probation, it was he
6    was past due on compliance with having general manager
7    trained.
8    BY MS. SCHLESINGER:
9    Q. And those are the issues that you referenced
10   earlier where you said that you tried to help him by
11   calling him and telling him his account was past due
12   and that he needed to correct that?
13   A. By asking if he was aware that his account was
14   past due.
15   Q. And by saying -- informing him that he needed
16   to come into compliance with regard to training?
17   A. Yes.
18   Q. And you just said that one of the reasons for
19   his probation was a failure to have his account
20   current. Other than calling him -- strike that.
21       One of the reasons, then, for becoming --
22   for getting a probationary status was to do with
23   accounts in revenue; is that correct?
24   A. That can be one of the reasons, and he, at one
25   point, was on probation for that.

112

1    Q. Did Best Western have any system in place to
2    assist the member with generating additional revenue?
3    A. We have the revenue managers look at their
4    properties with them, go over what their current
5    procedures are, look at the competition, the
6    competitive set in their area, and offer suggestions.
7    Q. Were you involved in any of those steps
8    that -- strike that.
9         To your knowledge, were those steps taken
10   for Mr. Harooni's property?
11   A. Yes.
12   Q. And how did you come to be aware of that?
13   A. Whenever Mr. Harooni would call me and say,
14   "Terry, I'm concerned, I'm in trouble, I've put all
15   this money into the property, I don't know what to do,"
16   you know, I would immediately contact the revenue
17   manager and ask them to take a look at the property,
18   contact them, see if there was anything they could do
19   to assist.
20   Q. And did you do anything other than just call
21   somebody else and say, "Go see what you can do"?
22   A. No, because that's not in my job purview.
23   Q. Well, did you follow up to see that something
24   was done?
25   A. Yes. Well, the revenue manager followed back

113

1    up with me.
2    Q. Did you call Mr. Harooni and ask him how
3    things were going?
4    A. In our conversations, he thanked me for --
5    Q. Ma'am, I'm sorry. I'm going to move to strike
6    this. I'm asking you, Did you call him and follow up?
7    It's a real simple "yes" or "no" question.
8    A. I don't recall if I called him or he called
9    me. We had a conversation.
10   Q. Do you have any specific recollection of
11   picking up the phone and calling Mr. Harooni and
12   saying, "Hey, how are things going?"
13   A. No.
14   Q. I was just handed, prior to your deposition, a
15   document called a "Reaffiliation Worksheet." It's a
16   very simple question. Can you just tell me what this
17   document pertains to?
18       MR. GARBARINO: Do you have a copy of
19   that?
20       THE WITNESS: I don't think so, but
21   I know what that document pertains to.
22       MR. GARBARINO: Would you like her to
23   have a copy of it?
24       MS. SCHLESINGER: That's fine.
25       (Exhibit Nos. 1, 2, and 3 were marked.)

TERRY SUZANN WININGER
1/5/2010

**Page 114**

1  BY MS. SCHLESINGER:
2  Q. Did you have a copy of that reaffiliation
3  worksheet?
4  A. Yes.
5  Q. And in the upper -- now, this document does
6  not have a Bates stamp; is that correct? Do you know
7  what a Bates stamp is?
8  A. No.
9  Q. It's the little BW stamp there in the
10 right-hand corner. Do you see one on this?
11 A. No.
12 Q. And this says that the initiator -- in the top
13 right-hand corner, it says "V. Ramaeker." I don't know
14 how to say that person's name. Do you see that up
15 there?
16 A. Yes. It's Valerie Ramacker.
17 Q. Ramacker. Okay. Thank you.
18    "For you," correct?
19 A. She's my coordinator or assistant.
20 Q. Like a secretary?
21 A. Yes.
22 Q. Okay. But it was done on your behalf?
23 A. Yes.
24 Q. What's the nature of this document?
25 A. When the former owner of the property notified

**Page 115**

1  us that he was selling the property, gave us
2  information on the buyer and asked us to send out -- to
3  see if the property qualified for an automatic
4  transfer, and if so, to send out the package of
5  information, and he also gave me permission to discuss
6  the status of his property with any potential buyers.
7  Q. And, in fact, there it says "QAR Scores." Are
8  those the same as your QA scores?
9  A. Yes.
10 Q. And they all reflect scores down in the 800s;
11 is that correct?
12 A. Correct.
13 Q. In fact, the first score noted there, and it's
14 indeed the most recent, apparently, of the three dates
15 there, is a score below 840. Do you see that there?
16 A. Yes.
17 Q. And a score below 840 causes a hotel to be put
18 on probationary status?
19 A. No, under 800.
20 Q. Really?
21 A. Yes.
22 Q. Are you familiar with a document called the
23 840 and below report?
24 A. Yes.
25 Q. So is the first score listed on this

**Page 116**

1  reaffiliation worksheet something that would be subject
2  to an 840 and below report?
3  A. Yes.
4  Q. Got it. And the next one is 856 and 858. Are
5  those considered failing scores?
6  A. No.
7  Q. Are they considered problematic, to your
8  knowledge?
9  A. They're below average.
10 Q. "Design Eval Status," on the right-hand side
11 of that same box.
12 A. Yes.
13 Q. "DEP," what does that mean?
14 A. I'm not positive of the terminology, but it
15 had to be compliant for it to be in there.
16 Q. So DEP is different than "complies"?
17 A. I believe that it referred to the design
18 report that was -- the current design report.
19 Q. And, in fact, this reaffiliation worksheet has
20 only the one reference here to scores; is that correct?
21 It just says that in that second outlined box, it
22 doesn't reference them anywhere else, does it?
23 A. Correct.
24 Q. And there are no -- is this document complete?
25 A. It was completed by me, because the last

**Page 117**

1  notation says, "I'm turning the file over to member
2  services to prepare" --
3  Q. I'm sorry. Obviously, a miscommunication
4  here. Are there any pages that are missing from this
5  document?
6  A. No.
7  Q. There were no other attachments to it?
8  A. No.
9  Q. And, in fact, it reflects that you met
10 Mr. Harooni at least as early as 12/10/2004; is that
11 correct?
12 A. Yes.
13 Q. And your log had no reference to that meeting;
14 is that also correct?
15 A. Yes.
16 Q. So you had a complete physical face-to-face
17 meeting with him that you have no reference in regards
18 to what was said there, correct?
19    MR. GARBARINO: Objection, form.
20 BY MS. SCHLESINGER:
21 Q. Beyond this one entry here?
22 A. Correct.
23    MS. SCHLESINGER: I have no further
24 questions at this time. I'll reserve to redirect.
25    MR. GARBARINO: Ma'am, I just have a

118

1  couple quick questions.
2      And if I could go off the record just to
3  confer with my client for just a second, I'd appreciate
4  it.
5      (Recess was taken from 2:08 p.m. to
6  2:12 p.m.)
7
8          EXAMINATION
9  BY MR. GARBARINO:
10  Q.  Ma'am, I just want to ask you a couple of
11 brief questions. There's been an exhibit entered today
12 that was your KANA notes, I believe Exhibit 2.
13     MR. GARBARINO: Do we have Exhibit 2 to
14 look at?
15     MS. SCHLESINGER: Actually, that was my
16 copy of it that I gave her, so I'm going to ask her to
17 hand that to me so I can go through it.
18     THE WITNESS: Is there another copy of
19 it?
20     MR. GARBARINO: Is this a copy? I always
21 thought we had the witness look at the marked copy.
22     MS. SCHLESINGER: I think it's the same,
23 isn't it, David?
24     MR. GARBARINO: It should be. That's why
25 we always mark copies, to keep things straight, to make

119

1  sure we have the right copy.
2      MS. SCHLESINGER: I'm going to trust that
3  you produced identical copies, and if you didn't, we'll
4  have to take that up later.
5  BY MR. GARBARINO:
6  Q.  These are your KANA notes, correct?
7  A.  Correct.
8      MS. SCHLESINGER: I'm going to object to
9  form.
10     MR. GARBARINO: What's the objection?
11     MS. SCHLESINGER: The objection is she
12 already testified that this is not necessarily
13 complete, that it's a paste and copy, so that was a
14 misleading characterization.
15     MR. GARBARINO: Okay. That's fine.
16 BY MR. GARBARINO:
17 Q.  Are these some of your KANA notes?
18 A.  These are all of my KANA notes regarding this
19 property from the start date to the end date of the
20 notes.
21 Q.  Okay. And on the very first -- I guess, right
22 before the first sentence of each note, there's a date.
23 Do you agree with that?
24     MS. SCHLESINGER: Objection,
25 mischaracterizes the evidence.

120

1  A.  Correct.
2  BY MR. GARBARINO:
3  Q.  Can you tell me what the first, I guess, five
4  or six or seven characters are on each of the
5  paragraphs of Exhibit 2?
6  A.  Those are the dates that I had contact with
7  the member.
8  Q.  Can you recall when you prepared those notes?
9      MS. SCHLESINGER: Objection, form.
10 A.  Typically, same day, sometimes up to two to
11 three days later.
12 BY MR. GARBARINO:
13 Q.  Fair enough.
14     Can you tell me what happens to a member
15 if he does not -- he or she does not pay their dues on
16 time?
17 A.  Question. Annual dues, monthly fees?
18 Q.  Let's start with annual dues.
19 A.  If the annual dues are not paid by the end of
20 November, a property is turned off in our reservation
21 system and considered terminated until such time if
22 they would pay them within a short time thereafter and
23 reactivate it.
24 Q.  And what about monthly fees? What happens if
25 a member does not timely pay monthly fees?

121

1  A.  They're given a notice after -- a 60-day
2  delinquency reminder. After 90 days, they can be shut
3  off in our reservation system and taken before our
4  board for potential termination.
5  Q.  Exhibit 3 that's been marked in this
6  deposition, can you tell me what that exhibit is?
7  A.  It is the worksheet that was generated after
8  the former owner notified us he was selling the
9  property with a trail of contacts up until the time
10 I turned it over to our member services department,
11 currently called "member care," for them to finalize
12 the process.
13 Q.  You just referred to some -- I guess, it was
14 contacts. Where on the reaffiliation sheet are those
15 contacts?
16 A.  Under "Comments," with the dates noted.
17 Example, the first one on the first of October, we
18 received the request to send an auto transfer package
19 and gave permission. 10/28, I received a call from one
20 of the gentlemen identifying himself as one of the
21 buyers.
22 Q.  And just to clarify, under the section
23 entitled "Comments" on Exhibit 3 to this deposition,
24 what do those dates refer to?
25 A.  The dates the contacts were made.

122

1  Q. And did you prepare those comments?
2  A. I did not prepare the first one. That was by
3  my assistant. The ones with my initials after them,
4  the slash TW, I prepared, and it appears that I
5  neglected to put my initials on the ones where it
6  says -- the two before the end, 1/31 and 2/02.
7  Q. So the comment that's dated 10/12/04 on
8  Exhibit 3, it also lacks the initials TW. Do you know
9  who prepared that comment?
10  A. I'm sorry. What date?
11  Q. Excuse me. 12/10/04 on Exhibit 3.
12  A. I would have done that one as well.
13  Q. And how do you know that?
14  A. Because he came to the office to meet with me,
15  and he would not have come specifically to meet with
16  anyone else in our office.
17      MR. GARBARINO: I have no further
18  questions.
19
20      FURTHER EXAMINATION
21  BY MS. SCHLESINGER:
22  Q. Ms. Wininger, the exhibit that Mr. Garbarino
23  was just discussing with you, on page 2 of what is now
24  Exhibit 3, there is an entry marked 12/13/04. Do you
25  see your initials after that one? It's the second one

123

1  from the top.
2  A. Yes.
3  Q. And it says, "I learned from Nancy Sawyer that
4  property is noncompliant insurance-wise, so I called
5  Young Sou and explained that the property is no longer
6  eligible for automatic transfer, comma, until he gets
7  appropriate liability insurance again, period." Did
8  I read that correctly?
9  A. Yes.
10  Q. Is there anywhere on this document -- well,
11  strike that.
12      So based upon that note, the property was
13  in a probationary status; is that correct?
14  A. No.
15  Q. It was noncompliant?
16  A. It was noncompliant with insurance but had not
17  been placed in a probationary status. We had not
18  received a renewal notice from the insurance agent.
19  Q. Is there anything on here that indicates you
20  ever did receive that prior to the hotel's close of
21  escrow?
22  A. There is nothing on this particular document;
23  however, the sale could not have gone forward if we had
24  not received it.
25  Q. Unless it slipped through the cracks, right?

124

1      MR. GARBARINO: Objection, form.
2  BY MS. SCHLESINGER:
3  Q. Does anything ever slip through the cracks at
4  Best Western?
5      MR. GARBARINO: Objection, form.
6  A. I'm sure. As in any company, yes, but not in
7  this.
8  BY MS. SCHLESINGER:
9  Q. You have no evidence, whatsoever, as we sit
10  here today that that hotel was taken out of its
11  noncompliance status based on insurance, do you?
12  A. I have no evidence in front of me, no.
13  Q. Is there something where we would look to find
14  that out? Where would you have such evidence?
15  A. I would assume somewhere in our database,
16  there would be a copy of the insurance, proof of
17  insurance document that was submitted.
18  Q. Would you normally have noted that in your
19  reaffiliation worksheet notes, that the hotel is now
20  compliant and eligible for an automatic transfer?
21  That's something that would be relevant to this
22  reaffiliation process, would it not?
23      MR. GARBARINO: Objection, form.
24  A. It's something that's relevant to the process.
25  Not every minute piece of information or detail goes

125

1  into this.
2  BY MS. SCHLESINGER:
3  Q. All right. But clearly it was relevant enough
4  for you to write it down on 12/13 that it was
5  noncompliant; would it not seem reasonable to you that,
6  then, when it became compliant, that it was also
7  relevant enough to write down?
8      MR. GARBARINO: Objection, form.
9  BY MS. SCHLESINGER:
10  Q. Why was it relevant to write it down that it
11  was noncompliant and, apparently, not relevant to write
12  it down when it became compliant?
13      MR. GARBARINO: Same objection.
14      MS. SCHLESINGER: What's your objection,
15  Counsel?
16      MR. GARBARINO: You're asking her to
17  determine what's relevant. Relevant to what?
18      MS. SCHLESINGER: To her reaffiliation
19  process notes. This was relevant enough or important
20  enough to write down on 12/13, but there's nothing
21  more, and I'm asking why not.
22  A. It was relevant at that time to say -- to
23  advise the buyer that he couldn't proceed with closing
24  the sale until such time as that document was received.
25  I don't recall. We might have gotten it from the

126

1   seller the same day, the next day, and then verbally
2   notified him, "It's fine. It's okay. We can go on."
3   BY MS. SCHLESINGER:
4       Q.  Mr. Garbarino also brought up the topic
5   that -- and you commented, rather, in response to one
6   of his questions that the failure to pay dues or fees
7   on time would result in Best Western turning off the
8   reservation system. Do you recall that?
9       A.  Yes.
10      Q.  Who would be responsible for turning off the
11  reservation system if the dues or fees were not in on
12  time?
13      A.  Our accounting department would send down a
14  request to member services, now member care, and then a
15  notice would be sent out to the reservation department
16  to close them out in the reservation system until such
17  time as they bring the account current, then accounting
18  notifies us the account is current, and we turn them
19  back on.
20      Q.  So you turn the reservations off?
21      A.  I don't, no. Our reservation system.
22      Q.  "We" being Best Western?
23      A.  Best Western, yeah.
24      Q.  Is there an MW in the reservation system,
25  accounting department, member care?

127

1       A.  There was no MW that we could find that would
2   have been involved with turning on or off property
3   specific information.
4       Q.  Did you check with accounting?
5       A.  Accounting doesn't turn it off. No, I didn't
6   check with accounting.
7           MS. SCHLESINGER: No further questions.
8           MR. GARBARINO: Read and sign. Thank you
9   very much.
10          (2:25 p.m.)
11
12
13
14
15          _____
            TERRY SUZANN WININGER
16
17
18
19
20
21
22
23
24
25

128

1   STATE OF ARIZONA    )
                        ) SS.
2   COUNTY OF MARICOPA  )
3       BE IT KNOWN that the foregoing transcript was
4   taken before me, HALEY WESTRA, a Certified Court
5   Reporter in the State of Arizona; that the witness
6   before testifying was duly sworn by me to testify to
7   the whole truth; that the questions propounded to the
8   witness and the answers of the witness thereto were
9   taken down by me in shorthand and thereafter reduced to
10  print under my direction; at the witness's request,
11  notification was provided that the transcript was
12  available to read and sign; that the foregoing pages
13  are a true and correct transcript of all proceedings,
14  all done to the best of my skill and ability.
15      I further certify that I am in no way related to
16  any of the parties hereto nor am I in any way
17  interested in the outcome hereof.
18      Dated at Phoenix, Arizona, this 8th day of
19  January, 2010.
20
21      _____
        HALEY WESTRA
22      AZ Certified Court Reporter No. 50762
23
24
25