*Best Western v. AV Inn Associates 1, LLC, et al.*
*Exhibit No. 9*

# EXHIBIT "9"

**Deposition of Mitch Van Wormer**

MITCH VAN WORMER,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. SCHLESINGER:

    Q.    Mr. Van Wormer my name is Kira Schlesinger. I represent Mr. Harooni and AV Inn Associates interests related to this case. Have you ever had your deposition taken before?

    A.    I have.

    Q.    Okay. When was that?

    A.    Oh, boy, probably three -- approximately three years ago, and then maybe 15 years ago.

    Q.    Oh, okay. Do you remember anything from the one 15 years ago?

    A.    Not much.

    Q.    Were you working for Best Western at the time?

    A.    I was not. I was working for another hotel company.

    Q.    And the one that was about three years ago?

    A.    Best Western.

    Q.    You were working for Best Western then?

    A.    Yes.

**Page 2**

1  Q. And it was in your capacity as an agent of
2  Best Western?
3  A. Yes.
4  Q. You probably, then, have a good idea of what
5  the rules of the road are, but I'm going to touch on
6  them quickly. To start with, you know she's taking
7  everything is taking everything down -- and your
8  counsel has probably told you this. By the way, David
9  is representing you for the purposes of this
10 deposition; is that correct?
11 A. Correct.
12     MR. GARABARINO: I'm representing Best
13 Western.
14     MS. SCHLESINGER: So not this witness
15 individually?
16     MR. GARABARINO: Not this witness
17 individually, but in his capacity as an employee of
18 Best Western.
19     MS. SCHLESINGER: Okay. I just wanted to
20 make sure I know where we're at.
21 BY MS. SCHLESINGER:
22 Q. Okay. So you were an employee of Best Western
23 when last you had your deposition taken?
24 A. Yes.
25 Q. She is taking everything down, and so far

**Page 3**

1  we've been doing a great job of this, but in
2  conversation, it's natural to step over or cut people
3  off if two people talk at once.
4      Because she can't type both of us at
5  once, I'm going to ask that you do your best to let me
6  finish, and I will do my best to let you finish. The
7  other reason for that is if I have a question, if you
8  stop me in the middle, you may not be answering the
9  question that I really am asking. I have a tendency to
10 talk and think on my feet, which for better or worse
11 means I might change my question in the middle of it,
12 and so I appreciate your letting me finish that and
13 make sure I've got the question out correctly. Do you
14 understand?
15 A. I do.
16 Q. And that's the other thing you're doing
17 completely correctly, is to give me "yes," "no," or
18 "I do," or verbal responses rather than shaking your
19 head or saying "uh-huh" or "huh-uh." She always
20 manages to type that when we do it in admonitions, but
21 in the course of a deposition, "uh-huh" and "huh-uh"
22 get pretty confused.
23     Obviously, if you need to take a break,
24 please let us know. I'm going to ask that you answer
25 whatever question I just asked, if there's one out

**Page 4**

1  there. Other than that, you're welcome to talk to your
2  counsel, take a break, get water, anything like that,
3  just let us know. Okay?
4  A. Okay. Yes.
5  Q. If you do answer my question, I'm going to
6  presume you understood it. So if you have any
7  confusion about it, if I'm not clear, ask me to
8  rephrase so that you're not answering some question you
9  didn't mean to. Okay?
10 A. Okay.
11 Q. Sounds great. I'm going to grab some water
12 real quick.
13     (Discussion off the record.)
14 BY MS. SCHLESINGER:
15 Q. Mr. Van Wormer, you told me that three years
16 ago you were an employee of Best Western, correct?
17 A. Correct.
18 Q. And can you tell me what position you were in
19 at that point in time?
20 A. Regional service manager.
21 Q. Is that the position you hold today?
22 A. Yes.
23 Q. Were you hired as being a regional service
24 manager?
25 A. Yes.

**Page 5**

1  Q. Okay. Let me back up just a little bit. You
2  also mentioned you're with another hotel chain. Can
3  you tell me what your educational background is.
4  A. I have a bachelor's of art degree in economics
5  from Washington State University.
6  Q. Good for you. Any further degrees or training
7  after that?
8  A. No.
9  Q. So when you got out of college, you went to
10 work where?
11 A. Went to work in a hotel.
12 Q. In what capacity?
13 A. As an night auditor.
14 Q. And what was the name of the hotel. Do you
15 recall?
16 A. Cavanagh's Motor Inn.
17 Q. How long was that?
18 A. Boy, almost 30 years ago, 28 years ago.
19 Q. Good for you for remembering. It was your
20 first job, right?
21 A. Right.
22 Q. And how long were you a night auditor?
23 A. Oh, for just, gosh, a few months.
24 Q. What happened to that job?
25 A. I moved to another job at a hotel.

MITCH VAN WORMER (ROUGH)
12/22/2009

Page 6

1    Q.  Within the same hotel?
2    A.  Different hotel.
3    Q.  Did you remember the name of that one?
4    A.  Same company, Cavanagh's Motor Inns in
5    Spokane, Washington, as a front office manager.
6    Q.  And from there?
7    A.  To assistant manager a few months later.
8    Q.  At Cavanagh?
9    A.  Yes.
10   Q.  Same hotel?
11   A.  Same hotel.
12   Q.  Then after that?
13   A.  Then moved, changed companies to Red Lion
14   Motor Inns in a different city as assistant manager.
15   Q.  Okay.
16   A.  And then, boy, a couple more assistant manager
17   jobs.
18   Q.  You can do the nutshell version.
19   A.  Right. And then general manager in Pendleton,
20   Oregon for Red Lion hotels.
21   Q.  That's Red Lion?
22   A.  Yes, Red Lion.
23   Q.  Okay.
24   A.  And that was 1985.
25   Q.  Okay.

Page 7

1    A.  And then a number of other GM positions, a
2    number with Red Lion, and through, you know, different
3    cities, and opened a new hotel, Holiday Inn Select,
4    a boutique hotel in New Jersey, Hilton hotel in Los
5    Angeles, and I'm sure I'm missing a few.
6    Q.  That's fine. I'd like to talk to you a little
7    bit. You mentioned that -- off the record for just one
8    second for a technical question here.
9         (Discussion off the record.)
10   BY MS. SCHLESINGER:
11   Q.  You mentioned that you participated in opening
12   a new hotel, and then you said Holiday Inn Select. Was
13   that the hotel that you opened?
14   A.  That was the new hotel, yes.
15   Q.  And what were your duties involved with that?
16   A.  I was the second employee at the hotel, and so
17   we prepared -- I was on the -- worked with the
18   construction company during construction, hired staff,
19   I wrote standard operating procedures, ordered
20   equipment and supplies, and presold the hotel or
21   managed the presale of the hotel and opened the hotel.
22   Q.  When you say managed the presale of the hotel,
23   you're discussing rooms there?
24   A.  Yes.
25   Q.  Booking rooms before the date of opening?

Page 8

1    A.  Correct.
2    Q.  When you said standard operating procedures,
3    can you explain that to me a little bit.
4    A.  Just writing -- writing procedures for staff
5    to work with so that they know what their job is.
6    Q.  Okay. And when you say "staff," do you mean
7    maids?
8    A.  Yes, housekeeping.
9    Q.  Do you mean front desk staff?
10   A.  Correct.
11   Q.  Do you mean procedures for the repair and
12   maintenance of the hotel?
13   A.  Yes.
14   Q.  And what was your experience -- let me
15   rephrase.
16        What in your background gave you the
17   expertise to be able to write that?
18   A.  A number of prior general manager positions
19   and kind of learning on the job.
20   Q.  Mainly on-the-job training?
21   A.  Yes.
22   Q.  Did you have any specific outside training?
23   Like, as an attorney, I need to take continuing legal
24   education. I might take it in a bunch of different
25   fields kind of related to what I'm doing. Did you do

Page 9

1    something like that?
2    A.  No, I did not.
3    Q.  Is there any requirement that you do?
4    A.  No.
5    Q.  Did you have any specific training,
6    whatsoever, whether it was continuing education or
7    other seminars, anything like that, with regard to
8    writing standards and procedures?
9    A.  No. I do have a certified hotel
10   administration certification, but that was after my
11   opening of this new hotel.
12   Q.  When did you get that certification?
13   A.  About 9 years ago.
14   Q.  9 years ago, so approximately 2000?
15   A.  Yes.
16   Q.  Okay. And where was that from?
17   A.  That's from the American Hotel Lodging
18   Association.
19   Q.  And was that something -- how long did it take
20   you to do that?
21   A.  Oh, there was -- there was a number of books
22   to study, but based on my past background, I just took
23   the test without reading the books and passed the test.
24   So I guess it does take some months, but ...
25   Q.  Do you recall what the topics of the books

10

1  were?
2     A.  The topics were aspects of hotel business,
3  food and beverage operation, cost of sales associated
4  with that, labor productivity in the hotel setting,
5  front office operation, maintenance and repair,
6  housekeeping, personnel issues.
7     Q.  All right. And the question, I take it, on
8  the test was multiple choice? Do you recall?
9     A.  Yes.
10    Q.  And you mentioned that you were hired in --
11 let me make sure I've got your current position with
12 Best Western. What is that, sir?
13    A.  Regional service manager.
14    Q.  Is that the position you were hired for -- and
15 forgive me, I think I might have asked you before.
16    A.  Yes.
17    Q.  You were hired for that?
18    A.  Yes.
19    Q.  In what year?
20    A.  I think in 2001.
21    Q.  So after you had gotten the certification?
22    A.  No. So it would have been -- having that
23 certification was part of the requirement of having a
24 job, so it's shortly after I joined Best Western, I got
25 the certification.

11

1     Q.  Okay. And when you say regional service
2  manager, how do you define region?
3     A.  Well, region, in my case, is Idaho and a
4  portion of Washington, Idaho, British Columbia,
5  Montana, and Oregon.
6     Q.  And has your region changed over time?
7     A.  Yes.
8     Q.  What was it at the time, let's say, at 2002?
9     A.  It was central California, primarily, and a
10 little bit of Nevada.
11    Q.  And that was in 2002?
12    A.  Yes.
13    Q.  Were you hired to handle central California
14 and Nevada?
15    A.  No, I was hired to operate out of Durango,
16 Colorado.
17    Q.  Darn, and you left there?
18    A.  To move Bakersfield.
19    Q.  What were you thinking?
20    A.  My children lived in Bakersfield.
21    Q.  Had you been punished?
22    A.  I hear that all the time. It's like why the
23 heck would you move from Durango. Durango is a
24 beautiful place.
25           MS. SCHLESINGER: Off the record.

12

1          (Discussion off the record.)
2  BY MS. SCHLESINGER:
3     Q.  Okay. So you were in Durango?
4     A.  Correct.
5     Q.  And when did you transfer from the Durango to
6  the central California, Nevada region?
7     A.  About a year after I began in Durango.
8     Q.  So approximately 2002, somewhere, you took
9  over in central California, Nevada?
10    A.  Yes. 2002, 2003. I'm not sure. A year
11 after.
12    Q.  So approximately one year --
13    A.  Right.
14    Q.  -- after your hire?
15        What was the reason for the change?
16    A.  Moving near my children.
17    Q.  Okay. So it was something you had requested?
18    A.  Yes.
19    Q.  And how long were you in charge of the central
20 California and Nevada region?
21    A.  Maybe six years. Approximately six years.
22    Q.  When did you --
23    A.  Five or six years.
24    Q.  When did you change to having the Idaho,
25 Washington, BC, like that region?

13

1     A.  In January of 2008.
2     Q.  And what was the reason for that change?
3     A.  Family again. My family had grown, my
4  children, and had the opportunity to move near my folks
5  and my brothers, so I took the opportunity to do that.
6     Q.  Okay. So during the time that you were in the
7  regional -- and you had the same title "region service
8  manager" when you were in California, Nevada?
9     A.  Yes.
10    Q.  Is that correct?
11    A.  That's correct?
12    Q.  So you did not change position during those
13 six years?
14    A.  No, I did not.
15    Q.  All right. Who was your supervisor during the
16 time that you were the regional service manager for the
17 central California, Nevada area.
18    A.  I had two supervisors, Brian Lamiers and Daryl
19 Preece.
20    Q.  Any chance you can spell Brian Lamiers name
21 for me?
22    A.  L-A-M-I-E-R-S, I think.
23    Q.  And it's B-R-I-A-N?
24    A.  Yes.
25    Q.  And you said the other one was?

14

```
1    A.  Daryl Preece.
2    Q.  D-A-R-R-E-L-L?
3    A.  No, D-A-R-Y-L, I think.
4    Q.  And last name?
5    A.  Preece. P-R-E-E-C-E.
6    Q.  Anyone else that you reported to?
7    A.  No. That was the chain of command.
8    Q.  And do you know who Mr. Lamiers reported to,
9  if anyone?
10   A.  To Mark Schilling, I believe.
11   Q.  Mark Schilling?
12   A.  Yes.
13   Q.  Spell that.
14   A.  S-C-H-I-L-L-I-N-G.
15   Q.  And what was Mr. Schilling's title?
16   A.  I believe it was western regional -- I can't
17 recall what it was. They've changed the titles
18 nowadays, so ...
19   Q.  Okay. And do you know if Daryl Preece also
20 reported to Mr. Schilling?
21   A.  He did, yes.
22   Q.  And you think it was western regional
23 supervisor or something like that?
24   A.  Or director of western region for regional
25 services, something like that. I mean, the words will
```

15

```
1  be a little bit different.
2    Q.  Okay. I appreciate that.
3        Have you ever seen a corporate diagram or
4  hierarchy, a schematic showing who reports to who and
5  things like that?
6    A.  I have, yes.
7    Q.  Do you know if that document has been produced
8  in this litigation?
9    A.  I have not.
10   Q.  So as far as you know, no?
11   A.  No.
12   Q.  Who other than yourself reported to
13 Mr. Lamiers? Do you know?
14   A.  It would have been the regional service
15 managers in the state of California.
16   Q.  Do you know any of those people?
17   A.  Cindy Bree, and I'm trying to think who was
18 there at the time, and in Oregon and Washington and
19 British Columbia and Alberta. So we have Bob
20 Sindlinger in British Columbia that I cannot spell his
21 last name.
22   Q.  Fair enough.
23   A.  And Diane Nichols in Oregon, approximately.
24 Oh, Tom Keogh in Washington, Alaska. And I think that
25 those were the folks at the time when Brian was there.
```

16

```
1  I think there was a change.
2    Q.  Sure, sure. And do you know who would have
3  reported to Daryl Preece?
4    A.  All of those folks in addition -- no, Daryl
5  Preece would have been a little different. It would
6  have been Cindy Bree and myself and Merit Graham.
7    Q.  Merit?
8    A.  Merit, M-E-R-I-T, and Tony Russo. I think
9  those were the folks that were there during Daryl's
10 time.
11   Q.  So you then, if I'm understanding you
12 correctly you reported to both Daryl Preece and Brian
13 Lamiers?
14   A.  Yes, again, at different times.
15   Q.  Okay. Is that what it was?
16   A.  Yes.
17   Q.  Okay. So that overlapped your time in the
18 California, Nevada area region?
19   A.  Correct.
20   Q.  Okay. And what kind of reporting did you do
21 with these folks -- and we'll just use them
22 collectively as your supervisors, if that's all right
23 to refer to them. What type of reporting did you do
24 for your supervisors?
25   A.  It would be expense reports and scheduling,
```

17

```
1  primarily.
2    Q.  Okay. Now, when you say "expense reports,"
3  that would be your expenses out on the road?
4    A.  Yes.
5    Q.  Anything else?
6    A.  No.
7    Q.  So basically you submitted those to get
8  reimbursed?
9    A.  Correct.
10   Q.  And "scheduling," that would be where you're
11 going to be, when you're going to be there?
12   A.  Yes.
13   Q.  Were you doing scheduling for any of the
14 hotels?
15   A.  Yes. I do my own scheduling for hotel visits.
16   Q.  Let me rephrase. Did you have anything to do
17 with the scheduling of the personnel at the hotel?
18   A.  No.
19   Q.  What other types of reporting did you provide
20 to your supervisors?
21   A.  Well, I think that's really pretty much it.
22   Q.  Okay. You didn't provide reports on the
23 hotels themselves?
24   A.  We have a form that we fill out during the
25 course of an assessment, and that goes into a central
```

Page 18

1    database, and so those who would like to have access to
2    those reports can, but it didn't go specifically to
3    those individuals.
4         Q.  Okay.  So do you have any personal knowledge
5    whether your supervisors regularly reviewed these form
6    assessments on the central database?
7         A.  They would periodically review reports.
8         Q.  Do you have any personal knowledge of that?
9         A.  No.  Well, I do have personal knowledge that
10   they do periodically look at reports, because you
11   are -- often photos are matched with reporting to see
12   if they can -- see if they can validate your report.
13   That's part of our training.
14        Q.  And that's part of your training?
15        A.  That's part of our ongoing training.  They
16   follow up if there's a question.
17        Q.  Okay.  So the focus of what they're doing is
18   part of your ongoing training; is that correct?
19        A.  Yes.
20        Q.  So to the best of your knowledge, the purpose
21   here is to ensure that you're doing your job properly;
22   is that fair?
23        A.  That is fair.
24        Q.  Okay.  Can you give me -- and, again, this may
25   be a nutshell version to start with -- but can you give

Page 19

1    me a nutshell of what your duties were as the regional
2    manager for this area.
3         A.  My duties are twofold, or regional services
4    are twofold.  One is to do periodic assessments of
5    properties from a quality assurance standpoint, brand
6    standards and the like, and to discuss any other issues
7    that the hotel would like to discuss.
8         Q.  Can you be more specific?
9         A.  Always a course of discussion would be revenue
10   at the hotel, guest services issues.  For sure, those
11   two things, and any other requests that the property
12   might have.
13        Q.  Requests by the property?
14        A.  Yes.
15        Q.  By that, do you mean the management of the
16   hotel?
17        A.  The management of the hotel may have certain
18   questions that I'm happy to answer when I can.
19        Q.  Can you give me some examples of the types of
20   questions that you would be able to answer?
21        A.  They may ask, help with a preventive
22   maintenance system, and then I would show them the
23   resources that are available on -- through our
24   online.bestwestern.com, and we would talk about the
25   issue at hand.  So that's one example.

Page 20

1         Q.  And so you would tell them about this
2    online.bestwestern.com in response to a specific
3    question?
4         A.  Or we may pull that up together to take a look
5    at where those resources are available.
6         Q.  Was this something that, to your knowledge,
7    all of your hotel owners, slash, franchise members were
8    able to get on to?
9         A.  Yes.
10        Q.  Do you know when they were originally informed
11   of this portal?  Can I call it a portal?
12        A.  Yes.  I don't know.  I mean, individual
13   owners, it would be based on their interest, I would
14   imagine.
15        Q.  So you really don't have any specific --
16        A.  I have no specific knowledge of individuals
17   being apprised of it.
18        Q.  Fair enough.  You also mentioned guest
19   services and revenue were items that you also would be
20   responsible or talk to the hotel about; is that
21   correct?
22        A.  Yes.
23        Q.  What kind of discussions would you have
24   regarding revenue?
25        A.  Well, depending upon what the hotel needs are.

Page 21

1    They might be as simple as going over revenue reports,
2    asking them how their business compares to the prior
3    year, potentially talk about opportunities available in
4    the reservation system.  But it really depends on the
5    individual hotel and what questions may come out of our
6    discussion.
7         Q.  So part of your conversations with the hotels
8    had to do with increasing their revenues and sales?
9         A.  Absolutely.
10        Q.  And that was something that you did on a
11   regular basis for all of your hotels?
12        A.  Yes.
13        Q.  And can you tell me some specific things that
14   you did on behalf of -- and I'm just going to refer to
15   it as "the hotel."  Do you understand we're talking
16   about the hotel AV Inn Best Western in Lancaster that
17   is the property that is the subject matter of this
18   litigation, correct?
19        A.  Yes.
20        Q.  Can I just refer to that as "the hotel"?
21        A.  Yes.
22        Q.  Can you tell me some specific things that you
23   did with regard to revenue, and you described that as
24   increasing revenues and sales, you agreed that that's
25   something you did.  Can you tell me specific things

**Page 22**

1  that you did towards that goal for the hotel?
2      A.  I can tell you specific things that
3  I remember. I'm sure I've done some things I don't
4  recall. We discussed -- or I would question dates that
5  were closed.
6      Q.  Can you -- I'm sorry to interrupt you, but
7  dates that were closed?
8      A.  Dates that were not available for guests to
9  make reservations, to find out if they, indeed, wanted
10 those dates closed. We would also discuss the use of
11 their meeting space and how they might focus on a sale
12 of that space to increase their occupancy. We would
13 also discuss rates and how their hotel rates would
14 compare to others in the marketplace.
15          And so, specifically, that's what
16 I remember we talked about. I'm sure we talked about
17 other items.
18      Q.  Let's go back and look at a couple of these.
19 You mentioned specifically that -- you mentioned you
20 would question dates that they were closed and the
21 dates that were not available for guests to make
22 reservations and find out if, indeed, they wanted those
23 dates closed. Can you discuss that a little bit more
24 for me and tell me what you mean by, did they want
25 those dates closed? What happened to close the

**Page 23**

1  reservations, to your knowledge, on this incident that
2  you say you recall?
3      A.  Well, it seemed like there was a number of
4  dates closed at the hotel, and my question --
5  I remember a couple different times wondering if the
6  hotel was really that busy or if they had made some
7  error, and there was, you know, at least -- at least a
8  couple of times that I worked with the staff to open
9  the hotel back up for reservations, because they were
10 closed by their staff to reservations when they were
11 not full or didn't appear to have the opportunity to
12 fill without taking more reservations.
13     Q.  Okay. You said you remember a couple of
14 different times having this discussion. With whom did
15 you have the discussions?
16     A.  Christine. I don't know her last name.
17     Q.  Do you know what her position was?
18     A.  For a time, it was general manager, and she
19 worked there the entire time that I visited, but she
20 had different functions during different times during
21 my visits.
22     Q.  Can you give me a specific instance when you
23 discussed with Christine acting in the capacity as
24 general manager? Do you have a specific date or at
25 least a date approximation when that occurred?

**Page 24**

1      A.  I can think of one specific time when it was
2  girls soccer coming to the area in which there was no
3  availability at the hotel because it was closed, yet
4  they had very few room in the street hotel.
5      Q.  Just to clear this up because it's a little
6  ambiguous the way you're saying it, but you say they
7  have no availability at the hotel because it was closed
8  and yet they had very little space is that -- do you
9  see what I'm saying?
10     A.  Yeah. To clarify, they have 144 guest rooms,
11 there were very few that were reserved. They expected
12 the girls soccer would fill their hotel with teams, but
13 it hadn't, yet they still did not offer reservations
14 for any other people.
15     Q.  When you say they did not offer reservations
16 for any other people --
17     A.  The hotel.
18     Q.  I appreciate that?
19     A.  I'm sorry.
20     Q.  It's really hard. You've been doing a good
21 job. It's hard when it starts getting complicated.
22         You said that, let me just get this
23 correct, exactly correct here, when you say there was
24 no availability at the hotel because it was closed, are
25 you referring there to the reservation system?

**Page 25**

1      A.  Yes.
2      Q.  Okay. So what you really mean to be saying is
3  although they had few actual booked rooms, the
4  reservation system was saying there that was no more
5  availability at the hotel; is that correct?
6      A.  Yes.
7      Q.  Okay. So when you say, they closed the hotel,
8  you're not refer to the hotel management, you're
9  referring to the reservation system made it appear as
10 though reservations were closed?
11         MR. GARABARINO: Objection, form.
12 BY MS SCHLESINGER:
13     Q.  He's going to do that from time to time.
14 Unless he instructs you not to answer, please do go
15 ahead and answer my question. I will rephrase it in
16 this instance so we're crystal clear, because it's a
17 little bit of a complicated topic.
18         When you said they closed the hotel, what
19 you're really talking about is the reservation system
20 reflected that there were no reservations; is that
21 correct?
22         MR. GARABARINO: Same objection.
23 BY MS. SCHLESINGER:
24     Q.  Did the reservation system ever at any time
25 reflect that there were no rooms when, in fact, there

Page 26

1   was availability?
2     A. Yes.
3     Q. Okay. And whose responsibility was the
4   reservation system as vis-a-vis the hotel or Best
5   Western?
6     A. It's the hotel operator's responsibility.
7     Q. Really? Okay. I'm a little bit surprised by
8   that. Let's see if we can tear into that a little bit
9   more. Are you familiar with the franchise agreement,
10  sir?
11    A. No, I'm not.
12    Q. While I'm looking for that -- and I'll take a
13  quick break to find that, so we can keep going as fast
14  as we can here.
15        On what basis do you say it was the
16  hotel's responsibility to maintain the reservation
17  system?
18    A. What I was referring to, it is the hotel
19  operator's responsibility to manage guest rooms at
20  their hotel to allow maximum potential booking at their
21  individual location. So one would hope that they would
22  be available to sell when there's rooms available.
23    Q. Forgive me, sir, but this is kind of a very --
24  this is a very ambiguous statement. If you tell me
25  that it is the hotel operator's responsibility to

Page 27

1   manage guest rooms at their hotel to allow maximum
2   potential booking, let's be more specific than that.
3     A. Okay.
4     Q. Let's break that apart. The hotel operator's
5   responsibility, so you're telling me there, if I
6   understand you correctly, and do feel free to correct
7   me, but you're telling me that the hotel operator,
8   meaning, the person that's putting the reservations in,
9   has a responsibility to manage guest rooms -- what does
10  that mean?
11        MR. GARABARINO: Objection, form.
12  BY MS. SCHLESINGER:
13    Q. Go ahead.
14    A. To clarify, it's not the individual, not the
15  individual that's putting the reservation in, it is the
16  management of the hotel's responsibility to have rooms
17  available to sell when they're empty and to close the
18  hotel when they're full.
19    Q. When you say "hotel," you mean the
20  availability of reservations?
21    A. Correct.
22    Q. You don't mean actually the sign out front
23  that says, hi, we're closed?
24    A. Yes.
25    Q. Hypothetically, if the reservation system

Page 28

1   reflects -- and I'm not talking about here about who's
2   responsible or anything else -- but would you agree
3   with me that when the reservation system says we're at
4   100 percent occupancy, the hotel owner will therefore
5   have managed his hotel in a manner to maximize revenue
6   because it appears that he's 100 percent filled?
7         MR. GARABARINO: Objection, form.
8   BY MS. SCHLESINGER:
9     Q. Would you agree that if the hotel is 100
10  percent full, he has managed his hotel to maximize?
11    A. No.
12    Q. You wouldn't?
13    A. No.
14    Q. If 100 percent booking ratio exists, what else
15  should he do to maximize?
16    A. One should maximize rate in addition to hotel
17  occupancy.
18    Q. Okay. Let me ask you this. Under the
19  franchise with Best Western, the franchisee has a flat
20  fee; is that correct?
21        MR. GARABARINO: Objection, form.
22    A. Again, I don't know the exact franchise
23  agreement.
24        MS. SCHLESINGER: Okay. So all right.
25  Let's go off the record for a moment. I'm going to

Page 29

1   locate these documents.
2         (Recess was taken from 10:41 a.m. to
3   10:53 p.m.)
4   BY MS. SCHLESINGER:
5     Q. I'm going to summarize, rather than making
6   our madam court reporter read back, and, hopefully,
7   that will be acceptable.
8         What was I was asking about before we
9   went off the record -- oh, I noted that you and counsel
10  both left the room. Did you folks have an opportunity
11  to talk about anything related to this deposition or
12  this case when you left the room?
13        MR. GARABARINO: Objection. I instruct
14  the witness not to answer that as attorney-client
15  privilege.
16  BY MS. SCHLESINGER:
17    Q. Are you going to follow your counsel's advice
18  on this?
19    A. Yes.
20    Q. Did you talk to anyone while you were out of
21  the room, sir?
22    A. Yes.
23    Q. Did you have any conversation related to this
24  case?
25        MR. GARABARINO: Objection,

**Page 30**

1  attorney-client privilege. I'm going to ask the
2  witness not to answer the question.
3  BY MS. SCHLESINGER:
4  Q. Have you been coached or instructed on how to
5  answer any questions in this case?
6  A. No.
7      MR. GARABARINO: Objection. Same
8  objection.
9  BY MS. SCHLESINGER:
10 Q. We were looking at the membership application
11 and agreement and specifically discussing the
12 reservation system, sir. Do you recall that?
13 A. Yes, I do.
14 Q. Okay. And I asked you if the reservation --
15 you had said that the hotel had the responsibility to
16 maximize it's revenue. Do you recall that?
17 A. Yes, I do.
18 Q. And that's an accurate reflection of what you
19 said?
20 A. Yes.
21 Q. And I asked you, well, if the reservation
22 system reflected 100 percent occupancy, would it be
23 your opinion, sir, that the hotel had then done
24 everything it could to maximize its revenue, and if I
25 recall, your response was, well, no, they also have a

**Page 31**

1  duty to maximize room rate; is that correct?
2  A. Correct.
3  Q. So in addition to maximizing their
4  reservations, the only other duty would be to maximize
5  room rate; is that correct?
6  A. That's correct.
7  Q. So if the hotel reservation system reflected
8  100 percent rooms sold, they're reserved, then as to
9  room reservations, the hotel has done everything that
10 it can to maximize; is that correct?
11     MR. GARABARINO: Objection, form.
12 BY MS. SCHLESINGER:
13 Q. Would you like me to rephrase that?
14 A. The way I understand your question is that
15 you're saying if the hotel is 100 percent full, then
16 they're maximizing their business. Based on sales mix
17 and price of each of those rooms, I mean, there's a lot
18 more to the component.
19 Q. Let's limit this for the moment only to the
20 reservations. Maximizing your reservations or rooms
21 that are scheduled to be taken for that night, if on
22 any given day you have 100 percent reservations as to
23 that component only, is there anything else that the
24 hotel should be doing?
25 A. The day that they're 100 percent, there's

**Page 32**

1  nothing they can do. That day is set.
2  Q. They've done it? They've done their --
3  A. They may not have maximized revenue, but one
4  has nothing else to sell. Then they've got to live
5  with it.
6  Q. So you would agree that if the reservation
7  system reflects 100 percent sales, there's nothing else
8  they can do, they've got to live with it; is that
9  right?
10 A. For that particular day, yes, you have nothing
11 to sell.
12 Q. Okay. Now, if the reservation system
13 erroneously, wrongly reflects that there's 100 percent
14 filled, what would you suggest the burden on the hotel
15 manager or the hotel is? They don't know it,
16 unbeknownst to them, it says it's 100 percent filled
17 when, in fact, it is not.
18 A. Then they would need to open the availability
19 of their hotel.
20 Q. And how would they know that?
21 A. They would need to reconcile the amount of
22 reservations that they have with what their reservation
23 system tells them.
24 Q. How would they do that? The reservation
25 system reflects 100 percent filled.

**Page 33**

1  A. They can count the names, they can count the
2  required rooms for groups, but it is their
3  responsibility to match real reservations with what the
4  reservation system says.
5  Q. So you're saying -- your testimony is that if
6  there's a glitch with the reservation system, it's the
7  responsibility of the hotel owner?
8      MR. GARABARINO: Objection, form.
9  BY MS. SCHLESINGER:
10 Q. You can answer.
11 A. Well, I think it's incumbent on the individual
12 operator of the hotel to always make sure that they are
13 maximizing revenue by matching individual reservations
14 with what the hotel reservation system says.
15 Q. Would you agree, sir, that managing a hotel is
16 a very stressful and busy occupation? Is that true?
17 A. It can be.
18 Q. And you need to count on each of the
19 components working properly within your hotel; is that
20 true?
21 A. You hope that all components can work well all
22 the time.
23 Q. And when somebody has undertaken -- when an
24 entity other than your own hotel has undertaken the
25 duty to maintain a component of your hotel,

MITCH VAN WORMER (ROUGH)
12/22/2009

---

34

1   particularly a critical component, you need to be able
2   to rely upon that component working correctly; is that
3   true?
4           MR. GARABARINO: Objection, form.
5   A.  Again, it's one of the components that you
6   work with to ensure that your hotel is full, but it is
7   incumbent upon the individual operator because things
8   do happen, and to check to see if indeed the rooms are
9   there --
10  BY MS. SCHLESINGER:
11  Q.  I'm sorry. Were you finished?
12  A.  Yes.
13  Q.  So what you're saying to me is that even
14  though somebody else has undertaken, by contract, the
15  responsibility to ensure the operation of one of the
16  components of your hotel, nevertheless, the burden and
17  duty still falls on the hotel operator? Is that what
18  you're saying?
19          MR. GARABARINO: Objection, form.
20  A.  I'm saying it's your duty, and it should be in
21  any business, to make sure that all the components are
22  working to maximize your business opportunities.
23  BY MS. SCHLESINGER:
24  Q.  Are you talking in a general oversight sense,
25  then, sir?

---

35

1   A.  Yes.
2   Q.  So general oversight versus the day-to-day
3   responsibility, you'll agree with me, I'm sure, that if
4   you contracted with somebody to carry -- if I enter
5   into a contract and say part of your agreement is
6   you're going to take care of component X, then I have a
7   right to rely on you taking care of component X, true?
8           MR. GARABARINO: Objection, form.
9   A.  I would agree that if one has a contract, that
10  one would expect that the contract would be fulfilled.
11  BY MS. SCHLESINGER:
12  Q.  Okay. If you want to take a look at the
13  document in front of you we're going to mark as
14  Exhibit 1 to your deposition, and you'll see on the
15  front of that, it says membership application and
16  agreement, Best Western International, Inc. Do you see
17  that document, sir?
18  A.  I do.
19  Q.  Would you confirm for me, please, that that's
20  a ten-page document.
21  A.  It has ten pages.
22  Q.  And those numbers are sequential, sir?
23  A.  They are.
24  Q.  Will you look at page 3, paragraph number 16.
25  Do you see just above there, sir? It says,

---

36

1   reservations and communication equipment. Is that
2   correct?
3   A.  That's correct.
4   Q.  And 16 A says reservation communication
5   equipment?
6   A.  That's correct.
7   Q.  And under that general heading, if you turn to
8   page 4 and go down, do you see subheading 4 on page 4
9   that starts off "to utilize Best Western"?
10  A.  Yes.
11  Q.  Do you see that?
12          When you read that, and you can read that
13  to yourself for the moment to make sure you have it in
14  context, you'll see in addition to the above
15  paragraphs, I'd like you to scan that, it says that one
16  of the applicant's duties is to utilize Best Western
17  for maintenance and repair for three years of the
18  hardware purchased through Best Western and for the
19  maintenance and repair as long as applicant is a member
20  of Best Western of the communications equipment
21  provided by Western -- Best Western both at applicants
22  expense." Do you see that?
23  A.  I do.
24  Q.  Did I read that correctly?
25  A.  Yes.

---

37

1   Q.  A little awkwardly.
2           In the event of hardware or communication
3   equipment failure of interruption of service, comma, it
4   will be the responsibility of the applicant to
5   participate in the troubleshooting process." Do you
6   see that?
7   A.  I do see that.
8   Q.  Can you define that term for me, participate
9   in troubleshooting process.
10          MR. GARABARINO: Objection, form.
11  BY MS. SCHLESINGER:
12  Q.  Can you define that phrase for me, sir.
13          MR. GARABARINO: Same objection.
14  A.  I would say that if there was a delivery
15  problem of Best Western reservations, that it would be
16  the responsibility to help find the cause.
17  BY MS. SCHLESINGER:
18  Q.  Okay. And Best Western has under taken by
19  this agreement the maintenance and repair for 3 years
20  of those systems?
21  A.  That's what it says.
22          MR. GARABARINO: Objection, form.
23  A.  It appears to say that, yes.
24  BY MS. SCHLESINGER:
25  Q.  Okay. Do you know -- were you familiar with

---

38

1   this prior to today's deposition?
2       A.  No.
3       Q.  Was part of your responsibility to -- strike
4   that.
5              As the regional director -- I hope I get
6   your title right -- regional service manager, was it
7   your responsibility to ensure that the reservation
8   systems worked correctly?
9       A.  No.
10      Q.  Did Best Western utilize a third party to
11  maintain the reservation systems?
12      A.  I don't know.
13      Q.  What type of reservation system was it?
14      A.  I don't understand the question.
15      Q.  Sure. Was this a system that was developed,
16  owned, and licensed by Best Western?
17      A.  I don't know.
18      Q.  You don't know?
19      A.  I do not.
20      Q.  Do you know if it was a Sabre System?
21      A.  I do not.
22      Q.  Do you have any technical experience with
23  regard to the reservation system?
24      A.  None.
25      Q.  So -- strike that. Whose responsibility was

---

39

1   it to ensure that the reservation system worked
2   correctly?
3       A.  Again, I don't -- I'm not really clear what
4   your question is.
5       Q.  Okay. Fair enough. If the reservation system
6   reflected that 100 percent of the rooms are sold on any
7   given night when in fact they are not, would you agree
8   that that is an error in the reservation system?
9       A.  No.
10             MR. GARABARINO: Objection, form.
11      A.  I I would not.
12  BY MS. SCHLESINGER:
13      Q.  What would be the cause, do you think, in your
14  experience?
15      A.  My experience has been, in fact I think the
16  cause has been 100 percent operator error on the
17  hotel's side.
18      Q.  Have you seen that happen very often?
19      A.  Yes.
20      Q.  It happens all the time?
21      A.  It happens often.
22      Q.  Can you define often?
23      A.  I can't from a percentage standpoint.
24  Certainly -- it's not unusual for me to encounter
25  that -- to have encountered that.

---

40

1       Q.  So it's not unusual for you to find where the
2   reservation system reflects 100 percent sales when in
3   fact there are no sales to that day or less than
4   100 percent sales for that day?
5       A.  Correct. Prior to the implementation on of a
6   two way reservation system.
7       Q.  When was that 2000 way reservation system
8   implemented?
9       A.  It is now required at all Best Western's at
10  the end of this year.
11      Q.  And that's because you did see a lot of
12  problems like that occurring?
13      A.  It is easier for the operator because they are
14  not able to open and close as readily. It matches
15  actual reservations with capacity of the hotel.
16      Q.  Okay. I'm going to actually move to strike
17  that that because it doesn't answer the question
18  I asked. Did you see the problem occurring with some
19  regularity that the reservation system reflected more
20  sales than were actually booked on a given night?
21      A.  Yes.
22      Q.  And that happened enough times that Best
23  Western has now mandated that this two way reservation
24  system be implemented is that true?
25      A.  I don't know the conversations that led to

---

41

1   this.
2       Q.  To your knowledge, is one of the reasons for
3   this implementation of the two way reservation system
4   to avoid this very problem?
5       A.  It will eliminate some problems.
6       Q.  Is that something that you were aware was
7   contemplated in the decision to implement it?
8       A.  My understanding is -- probably one of the
9   major reason social security that it will allow -- it
10  will more easily allow operators to maximize occupancy
11  at their hotels.
12      Q.  So there was a problem with that?
13      A.  There has been a problem, yes.
14      Q.  Okay. When this kind of problem leisure when
15  you in the past have observed this kind of problem
16  occur, and by that I mean the reservation system
17  reflecting more sales than actual sales, what steps, if
18  any, did you take to report that problem to your
19  supervisors?
20      A.  I would rarely report that problem to my
21  supervisor because it was not a Best Western corporate
22  issue, it was a local hotel operational issue.
23      Q.  What support do you have for your conclusion
24  that it was a local hotel operation issue?
25      A.  Well, one can look at hotel history and find

Page 42

1  out who opened and closed a particular date or a
2  particular rate segment.
3     Q. When you say who opened or closed, you mean
4  the actual person sitting on the front desk?
5     A. The actual person in the hotel.
6     Q. And have you done that, have you looked at the
7  history to make that determination?
8     A. Yes.
9     Q. Do you have any reports regarding that?
10    A. No.
11    Q. Do you have any evidence to support or confirm
12 that you have done that?
13    A. There's only evidence that I've read that
14 I did that one time and opened the hotel to
15 reservations while I was visiting the hotel.
16    Q. And when you say the hotel in this instance
17 you're referring to AV Inn?
18    A. Yes.
19    Q. And so you're saying that there is a report
20 that you did this?
21    A. There was no report assembled stating that
22 I did that.
23    Q. So you have no document tear evidence showing
24 your investigation into reservation system?
25    A. We do have some documentary evidence saying

Page 43

1  that I opened the hotel for sales during my visit on
2  January 27th, I believe the date was, and I don't have
3  the year.
4     Q. Do you know if the that documentation has been
5  provided to Mr. Harooni in the course of this
6  litigation?
7     A. I do not know.
8     Q. Did you provide that documentation to anyone
9  from the date it was created to the present?
10    A. I didn't provide that information to anybody.
11    Q. Do you have a copy of that information, that
12 document?
13    A. I do have a copy.
14    Q. Do you have that with you, sir?
15    A. I do not have it with me.
16       MS. SCHLESINGER: Let me turn this off.
17 Off the record.
18       (Discussion off the record.)
19 BY MS. SCHLESINGER:
20    Q. You know Harry Harooni, right?
21    A. I do.
22    Q. Did you meet him in the course of your
23 dealings with the hotel?
24    A. Yes, I did.
25    Q. And what did you think of him?

Page 44

1     A. I like Harry.
2     Q. He's a pretty go guy?
3     A. I think so.
4     Q. Do you think he was doing his best to maximize
5  revenue and produce a good product?
6     A. I believe he tried very hard.
7     Q. And did you have conversations with him
8  regarding what he should do in addition to what he was
9  already doing?
10    A. Yes, I did.
11    Q. And what was that?
12    A. Well, I can't recall all of our conversations,
13 but we discussed some revenue ideas.
14    Q. And what were those?
15    A. I can't think of them specifically, aside from
16 I thought he should focus on using his meeting space to
17 maximize room sales at his hotel.
18    Q. Okay. And that is because you get a lot of
19 people in the meeting space then you're more likely to
20 get room sales; is that right?
21    A. That's one of the managers did but he did not.
22    Q. Just to be clear, if you maximize your meeting
23 space, you're going to therefore maximize or have a
24 better probability of maximizing your room sales; is
25 that true?

Page 45

1     A. That can be true, yes.
2     Q. That's a yes?
3     A. Not a definitive yes, but it can lead to one's
4  max my station of room sales, but that's not always
5  true.
6     Q. Okay. And anything else that you recall
7  discussing with him?
8     A. Well, I know we discussed rates, and how his
9  hotel's rates fit into his competitive set.
10    Q. And how was that?
11    A. I can't recall what exactly -- what we
12 determined but we looked at rate in the street
13 marketplace, but how his hotel match.
14    Q. And his were in the general ballpark of the
15 right area?
16    A. I can't recall. I think I can remember at one
17 point that they were too high.
18    Q. For how long did that go on. Do you know?
19    A. I can't recall.
20    Q. When you say too high, by how much; do you
21 recall?
22    A. I don't.
23    Q. Just your general sense they were a little
24 high?
25    A. They seemed high compared to newer facilities

**Page 46**

1  in the marketplace.
2     Q. And do you know who brought that topic up?
3     A. Oh, I would think that, you know, at times
4  Harry would bring -- Harry would talk about revenue,
5  but I would talk about revenue out of the shoot because
6  that's important. One of the most important points of
7  any hotel operation is revenue.
8     Q. Talk to me for a moment, if you will,
9  regarding how the franchise member, if you know,
10 compensated Best Western for the use of its name?
11        MR. GARABARINO: Objection, form.
12 BY MS. SCHLESINGER:
13    Q. Do you know how the franchise member
14 compensated Best Western under the agreement?
15        MR. GARABARINO: Same objection.
16    A. No.
17        MS. SCHLESINGER: What was the basis of
18 that.
19        MR. GARABARINO: Well, I think it's a
20 mischaracterization Best Western is not a franchise
21 Best Western are members of a nonprofit organization.
22        MS. SCHLESINGER: Yes, I thought that was
23 very curious but notwithstanding.
24 BY MS. SCHLESINGER:
25    Q. Mr. Van Wormer would you agree some money is

**Page 47**

1  paid by the franchise member to Best Western?
2        MR. GARABARINO: Same objection. Same
3  objection herein on out that I object to the term
4  franchise.
5     A. Yes.
6  BY MS. SCHLESINGER:
7     Q. The document that's in front of you,
8  Mr. Van Wormer, states at -- do you see on page 2 of
9  what we're going to mark Exhibit 1 to this
10 deposition -- do you see there -- do you see there at
11 paragraph 6 A, after the first comma in that
12 sentence -- if the hotel is currently operated as a
13 Best Western, applicant shall pay -- strike that.
14 That's not what I'm looking for.
15        Actually, I think I'm going to refer you
16 to page 3, paragraph 12. Do you see that it says,
17 applicant agrees to timely pay all fees, dues, charges
18 and assessments imposed generally on the membership by
19 the board and the cost of all business and services
20 provided by or ordered through Best Western." Did
21 I read that correctly?
22    A. Yes.
23    Q. So the applicant, as opposed to perhaps the
24 franchisee -- and if I slip and use the term franchise
25 without agreeing in any way that's not what this

**Page 48**

1  is, but for purposes of speed in this deposition, I'll
2  try to use the word "applicant" and "member." The
3  applicant compensates Best Western; is that true?
4     A. That's what it says, yes.
5     Q. Okay. Charges and assessments, are you
6  familiar with how those are calculated?
7     A. No.
8     Q. So you personally have no idea if it's based
9  upon room sales or not?
10    A. It's not based upon room sales. I do know
11 that.
12    Q. Is it based on the amount of room dollar per
13 night?
14    A. No.
15    Q. So in other words, if Mr. Harooni had chosen
16 to rent his room for 50 cents per night, it's neutral
17 to Best Western; is that correct?
18    A. That is correct.
19    Q. And, likewise, then, if he wanted to charge
20 $400 a night, it would be neutral to Best Western also,
21 true?
22    A. To the extent it impacted reservation volume,
23 it may not be true.
24    Q. And what do you mean by that?
25    A. I believe that there's a component of

**Page 49**

1  reservation delivery that is a part of a member's fee.
2     Q. So when you said you don't know how the
3  charges or assessments are impose, that's not accurate
4  you believe it's got something to do with a component
5  of reservation volume?
6     A. I can't answer definitively of how all the
7  fees are charged, but it is my belief that part of the
8  fees are based on reservation volume.
9     Q. So you had conversations with Mr. Harooni
10 regarding ways for him to maximize revenue; is that
11 your testimony?
12    A. Yes.
13    Q. And other than just a discussion -- first of
14 all, where did these discussions take place?
15    A. Well, at least on a couple of occasions in
16 their restaurant.
17    Q. And were you having lunch?
18    A. Well, we may have had lunch. I think we were
19 having coffee in the morning.
20    Q. So you'd go over there, have coffee, and kind
21 of chat is that a fair description?
22    A. Yes.
23    Q. And that constitutes your advice to him
24 regarding maximizing revenue was in that kind of
25 setting?

Page 50

1  A. It is in that kind of setting as chosen by the
2  member.
3  Q. How frequently did you have these
4  conversations?
5  A. I can't recall how often I spoke to Harry, but
6  we would have -- at least twice a year, I would have a
7  discussion with a representative of the hotel.
8  Q. And did you report these conversations or
9  discussions to Mr. Preece?
10 A. Preece? No.
11 Q. Let's talk about your other duties here. One
12 of your duties as I understand it was to conduct
13 investigations of the hotel inspections?
14 A. Yes.
15 Q. How frequently did you do inspections?
16 A. Our goal is to do at least two per year, as a
17 goal.
18 Q. And were these inspections done on a regular
19 basis? In other words, during the summer, how is the
20 schedule determined?
21 A. We have a window date that we try to operate
22 within. Currently, anywhere from 60 days to 7 months
23 is our goal to visit properties.
24 Q. I'm sorry you just said 60 days?
25 A. 60 days to 7 months.

Page 51

1  Q. So that's very flexible, isn't it? Strike
2  that don't worry about it.
3     What did you do in terms of scheduling
4  these inspections with the hotel owners, and I'm not
5  talking about just this particular hotel now, I'm
6  talking generally what was your practice and procedure
7  for scheduling the inspections?
8  A. Generally, I'd work within the window period
9  and try to schedule properties in a similar geographic
10 area, and then notify hotel operators of my visit.
11 Q. And when did you give them notice vis-a-vis
12 when you were planning to actually do the inspection?
13 A. It depends upon whether they were -- there's
14 two -- there was two notices at the time, a 7-day
15 notice or a 24-hour notice, depending upon what
16 rotation the particular hotel was in.
17 Q. And how was that determined?
18 A. It was every other assessment is a 7-day
19 notice except during certain circumstances which
20 include the hotel being on probation.
21 Q. Okay and when it was on probation, it would
22 then be a 24-hour notice?
23 A. Correct.
24 Q. So there were never pop in inspections?
25 A. No.

Page 52

1  Q. And did you have any specific training with
2  regard to how to conduct inspections?
3  A. Yes.
4  Q. One we were talking about your training
5  earlier, I don't know that that came up. Can you tell
6  me about that.
7  A. I believe I spent 5 weeks in Phoenix, and with
8  regional service manager supervisors in learning how to
9  conduct an assessment.
10 Q. An assessment, you called it?
11 A. Yes.
12 Q. Rather than an inspection?
13 A. Yes.
14 Q. What went into an inspection? And by that,
15 I mean, was there a checklist, was there a standard
16 form that you filled out?
17 A. There's a checklist regarding brand standards,
18 so one has these brand standards or they don't.
19 There's also a checklist as far as brand ID. Then also
20 associated with the assessment process is a walk around
21 with hotel management of public space, supplemental
22 facilities, and at least ten guest rooms.
23 Q. And how long does it take typically to conduct
24 an assessment?
25 A. Depending on the size of the hotel, the number

Page 53

1  of staff that's with you and the condition of the
2  hotel, it could take anywhere from 2 hours to 5 hours.
3  Q. Did it ever take you less than 2 hours?
4  A. I can't tell you. I cannot tell you if that's
5  been the case.
6  Q. Okay. Did you normally assess the same
7  hotels; in other words, were you the only one in this
8  region doing assessments for a set number of hotels?
9  A. Yes, I did have hotels that were assigned to
10 me.
11 Q. And nobody else would really do those; is that
12 true?
13 A. Not frequently.
14 Q. When you say not frequently, what do you mean
15 by that?
16 A. Depending upon one's ability to schedule these
17 on a timely manner, one may have to ask for assistance.
18 Q. Did you ever ask for assistance from one of
19 the other regional folks?
20 A. In the California region, one time.
21 Q. When was that?
22 A. Early on in my arrival to California.
23 Q. Was that related to the hotel that's at issue
24 ear here?
25 A. No.

MITCH VAN WORMER (ROUGH)
12/22/2009

Page 54

1  Q. So other than that, you've never asked might
2  be to do your hotel?
3  A. Not this one, if that's what your question
4  was.
5  Q. Obviously particularly I'm concerned with this
6  one?
7  A. Yes.
8  Q. Did you ever ask anybody to come do it?
9  A. No.
10 Q. Is there any reason anybody else would have
11 come to do it?
12 A. No.
13 Q. Okay. One thing I didn't talk to you that
14 I meant to. Tell me what your pay structure is. How
15 are you compensated?
16 A. We have a pay -- we have a minimum and maximum
17 of pay structure, and we are paid somewhere within
18 that. Some of us have the opportunity to have a small
19 bonus.
20 Q. What are the bonuses based upon?
21 A. It's based upon individual -- it's based upon
22 group goals.
23 Q. Group goals?
24 A. Yes. As a regional manager group, and they
25 change annually.

Page 55

1  Q. During the period that Harry Harooni owned the
2  hotel at AV Inn Lancaster what were the group goals
3  that would provide a potential bonus for you?
4  A. I cannot remember.
5  Q. Why don't you describe what some of the group
6  goals would be in your experience?
7  A. Well, a current group goal is having hotels
8  filled out of a green checklist. Another goal that
9  each of us has, each in our group have relates to what
10 the member says about individual regional service
11 managers scoring. Those are the two current goals.
12 I can't recall others.
13 Q. Tell me what is a green checklist?
14 A. How green is the hotel. There's 11 questions
15 that the American hotel and lodging association asks to
16 determine how green -- how green a hotel is.
17 Q. How energy efficient you mean?
18 A. Yes.
19 Q. And that did the exist, I presume, in 2003?
20 A. It did not.
21 Q. In 2004?
22 A. No.
23 Q. 2005?
24 A. No.
25 Q. 2006?

Page 56

1  A. No.
2  Q. 2007?
3  A. No.
4  Q. 2008?
5  A. I don't think so.
6  Q. It may have existed in 2008?
7  A. It may have, yes.
8  Q. And the objective, as I understand what you're
9  saying is to encourage hotels to become more energy
10 initiate?
11 A. The survey is to determine how energy
12 efficient they are.
13 Q. So you would get a bonus simply by having a
14 hotel fill out that checklist?
15 A. It might be a portion of a bonus.
16 Q. Okay. I'm going to ask you to think back and
17 really try to remember what the bonuses may have been
18 based on in the period from 2004 through 2008.
19 A. At least for a couple of years, a portion of
20 the bonus was related to getting a -- getting to all of
21 your properties twice -- at least twice in 1 year.
22 Q. How many properties did you supervise?
23 A. It varied depending upon region, but anywhere
24 from 71 on the high point, to currently, I believe, 47.
25 Q. Okay. So that would turn out to be -- say if

Page 57

1  you wanted to get to them -- how many did you tend to
2  do in a day then?
3  A. We would do one per day.
4  Q. One per day. Okay. Did you get any
5  communications to getting members in to the Best
6  Western family?
7  A. No.
8  Q. So was your district 6; is that right?
9  A. That's right.
10 Q. Because I wasn't confident of that. Did you
11 have anything to do with bringing hotels into the
12 membership?
13 A. No.
14 Q. Did you have anything to do in providing
15 additional support to newer hotels?
16 A. Yes.
17 Q. What did you do in that regard?
18 A. I would introduce myself, and we would discuss
19 resources available on online.bestwestern.com. We
20 would discuss other initiatives available or available
21 through Best Western programs that are required to be
22 offered by Best Western members. We would walk-through
23 the assessment process.
24 Q. Anything else?
25 A. Basically evaluate any particular needs that

Page 58

1  the hotel might have and help meet those needs if
2  possible.
3     Q. All right. Unhack that a little bit. You
4  tell me that you would discuss resources -- let's take
5  a short break here?
6        (Recess taken from 11:37 a.m. to 11:44
7  p.m.)
8        (Discussion off the record.)
9        (Mr. Harooni enters the room.)
10 BY MS. SCHLESINGER:
11    Q. We were just chatting before Mr. Harooni
12 arrived, we were chatting about some of the things that
13 you did as your responsibilities for the benefit of the
14 hotels, the services that Best Western provided?
15    A. Uh-huh.
16    Q. Let me back up. Am I correct in saying that
17 there is a Best Western services program?
18    A. Yes.
19    Q. Okay. And can you tell me all of the
20 components of that program.
21    A. Well, the regional services program in which
22 I'm a part entails quality assurance assessment, and
23 it's our goal to visit the property at least twice to
24 conduct a quality assure chance assessment.
25    Q. And that's two time as year you said earlier?

Page 59

1     A. Yes.
2     Q. That's what you were referring to when we
3  discussed inspections that your quality inspection?
4     A. Yes.
5     Q. And during the course of our qualify assure
6  chance assessment, we'll discuss potential revenue
7  issues that a hotel might have as well as other issues
8  which might include preventive maintenance,
9  housekeeping issues, primarily, and other issues that
10 may come up that I might have a capability of helping a
11 member with?
12    Q. So as I understand you, it was to generally
13 offer help to the hotels?
14    A. Yes, generally.
15    Q. With whatever issues that they needed help
16 with?
17    A. Often, any issue that came up with the hotel,
18 I could help.
19    Q. And that was part of your Best Western
20 services program?
21    A. We were encouraged to help when we could.
22 There may be issues that come out that might not be
23 supported by our group.
24    Q. I'm trying to find out what services are
25 provided by your group?

Page 60

1     A. Front office could be, and was on at least one
2  occasion at this hotel.
3     Q. Whether you say front office training, can you
4  define that for me?
5     A. We talked about customer service training.
6     Q. What else?
7     A. Housekeeping training could be part of it,
8  could be parking lot of a visit, training on preventive
9  maintenance might be part of a visit.
10    Q. Okay. You've already named those?
11    A. Great.
12    Q. I'm just trying to figure out --
13    A. We could discuss labor productivity we could
14 discuss in the course of an hour visit.
15    Q. What about something like allocation of
16 resources by the hotel?
17    A. Can you be more specific?
18    Q. Sure. If they've got a $100,000 a year
19 whether they should be spending it on advertising, or a
20 bookkeeper, would that be something if the customer
21 brought up, you might be able to address with them?
22    A. Probably would not get involved in the
23 individual allocation of resources.
24    Q. What about things like renovations?
25    A. To the extent of the design and requirements

Page 61

1  of re renovations, I would not get involved.
2     Q. You wouldn't, but would Best Western?
3     A. Best Western could get involved from a design
4  standpoint. So the design portion of a renovation,
5  Best Western would be involved.
6     Q. What else? Other than the quality assurance
7  assessments, parentive maintenance, housekeeping, front
8  office training, and labor productivity would be
9  included in Best Western services, to your knowledge?
10       MR. GARABARINO: And you meant
11 housekeeping training and maintenance training as well.
12       MS. SCHLESINGER: That's what he just
13 said.
14       MR. GARABARINO: You just said in the
15 question housekeeping and maintenance.
16       MS. SCHLESINGER: I was trying to
17 summarize.
18    A. We can also discuss revenue generation and how
19 one would manage their inventory to hopefully maximize
20 their revenue.
21 BY MS. SCHLESINGER:
22    Q. What do you consider to be a, quote, newer
23 hotel?
24    A. I guess I would consider a newer hotel would
25 be one that's more recently built than the hotel I'm

**Page 62**

1    comparing it to.
2    Q.  In a technical sense, I'm sure that's right.
3    Did Best Western have any special programs for hotels
4    that were, say, within 5 years of joining a membership?
5    A.  Can you restate the question?
6    Q.  Of course.  Did Best Western have any programs
7    to help hotels that had recently joined the membership
8    goat on their feet, get up to running up to Best
9    Western's standards or to maximize revenue?
10   A.  Not that I'm aware of.
11   Q.  Did they have any preference for newer hotels
12   in any of the services they provided?
13   A.  Not that --
14       MR. GARABARINO:  Objection, form.
15   A.  Not that I'm aware of.
16   BY MS. SCHLESINGER:
17   Q.  Were there any hotels that opened in your
18   region after the AV Inn had opened under Mr. Harooni?
19   A.  Yes.  LaMoore California.
20   Q.  And how far away from the Lancaster property
21   that's the subject of this litigation is LaMoore's
22   property?
23   A.  200 miles.
24   Q.  Were there any other hotels that were closer
25   than this LaMoore hotel that had opened at

**Page 63**

1    approximately the same time as Mr. Harooni joined the
2    membership?
3    A.  I cannot recall any in my area during the time
4    that I was there.
5    Q.  What was the hotel that was closest
6    geographically to Mr. Harooni's property, Best Western?
7    A.  Best Western Palmdale.
8    Q.  And when was that opened?
9    A.  Prior to my position in the central California
10   area with Best Western.
11   Q.  Were you the regional director for the
12   California and Nevada territory that we've been
13   discussing prior to Mr. Harooni's taking over the AV
14   Inn?
15   A.  I was, yes.
16       MR. GARABARINO:  And just to clarify, you
17   meant regional service -- I'm sorry -- regional service
18   manager not director.
19       THE WITNESS:  Yes.
20       MS. SCHLESINGER:  I don't know.
21       THE WITNESS:  I was promoted.
22   BY MS. SCHLESINGER:
23   Q.  Okay regional services manager?
24   A.  Correct.
25   Q.  And you were the regional services in this

**Page 64**

1    territory, this division six, prior to Mr. Harooni
2    joining the membership?
3    A.  That's correct.
4    Q.  What was the name of the hotel prior to
5    Mr. Harooni taking it over?
6    A.  I believe it was the same name.
7    Q.  Okay.  And what was the condition of that
8    property during the time that you were the regional
9    manager?
10   A.  Distressed.
11   Q.  Distressed is that from day one that you saw
12   the property?
13   A.  Yes.
14   Q.  And did you visit that hotel two times
15   annually to do your quality assurance assessments?
16   A.  I believe I did.
17   Q.  Okay.  And do you recall what the lowest score
18   that you gave it on the quality assurance score
19   rating -- hold on to that question.  I just want to
20   make sure we understand and are clear on the score
21   rating.  That's what was related to the assessments,
22   was a score?
23   A.  Public areas score is often the score that
24   people refer to on the say assessment score.
25   Q.  Were there other components that were not

**Page 65**

1    reflected in that score?
2    A.  Yes.
3    Q.  And what were those, please?
4    A.  We assess a number of items when we visit a
5    property, one is brand standards and one is given 1000
6    thousand.  Guest rooms and public areas which you
7    recently referred, supplemental facilities scoring, and
8    those are scored individually, up to 1000 points, brand
9    identity is scored up to athousand points, locking
10   assessment is assessed during the process, and
11   currently staff performance is assessed also.
12   I believe those are the component.
13   Q.  When you say currently staff performs was it
14   not assessed at the time Mr. Harooni owned the hotel?
15   A.  It was, but in a different sense than it is
16   now, and it would be based on maybe conversations that
17   you would hear with a guest and the ability to deliver
18   a wake up call, and those kind of things.  Very miner
19   staff performs issues were assessed.
20   Q.  So when you say conversations you might hear
21   with a guest you mean ease dropping on your
22   conversations and I don't mean ease dropping in a bad
23   sense, just what you would over hear?
24   A.  What I would over hear in our meet management
25   lobe by, yes.

66

1  Q. So it wasn't you had the conversation with the
2  guest, you just rather got a general sense of what you
3  thought their attitude towards their experience was; is
4  that correct?
5  A. Yes.
6  Q. And then locking devices that's a yes or no,
7  do we have the locking devices that meet the criteria
8  or not?
9  A. That's correct.
10 Q. And how many points were assessed for that?
11 A. One would fail if the locking deviced did not
12 work.
13 Q. It's a pass fail?
14 A. Yes.
15 Q. And then you said brand identity you said a
16 thousand points?
17 A. Correct.
18 Q. I'll come back to that. You said there was
19 supplemental things and I'm sorry I didn't quite get
20 that.
21 Q. You said supplemental facilities scoring what
22 is supplemental scoring?
23 A. Supplemental facilities scoring includes
24 restaurant how long, individual meeting space, pool,
25 spa area. It could include exercise facility. Those

67

1  kind of items.
2  Q. You would green then that those are integral
3  to the renting of rooms, correct?
4      MR. GARABARINO: Objection, form.
5  BY MS. SCHLESINGER:
6  Q. Pardon me?
7  A. They certainly can impact one's ability to
8  rent rooms.
9  Q. And guest rooms you said that was also a that
10 you points?
11 A. Guest rooms and public areas.
12 Q. Public areas would that be something different
13 than the pools the exercise facilities, et cetera?
14 A. Yes.
15 Q. Where would that be, then?
16 A. That would include the exterior of the hotel,
17 corridors, walk ways, building.
18 Q. Your talking now about curb appeal?
19 A. No. Condition, not -- I evaluate the
20 condition of the hotel, so certainly, the condition of
21 a hotel does impact one's curb appeal, but I'm not
22 evaluating one's curb appeal, per se.
23 Q. Fair enough. But if the hotel is in poor
24 condition, curb appeal would go down?
25 A. Sure.

68

1  Q. Okay. So you've got brand standards, which is
2  minimum requirements set by Best Western is that
3  correct?
4  A. That is correct.
5  Q. And then you've got the condition of the guest
6  rooms and public areas, such as walk ways, roofs, like
7  that?
8  A. Yes.
9  Q. And then you've got supplemental facilities
10 which are the pool, the exercise rooms, meeting space,
11 that sort of thing?
12 A. Yes.
13 Q. And then you've got brand item that has to do
14 with your sign, your placement of your low go, those
15 starts of things?
16 A. Yes.
17 Q. Locking devices it's a pass fail it either
18 locks properly or doesn't?
19 A. Correct.
20 Q. And staff performs which you said was not
21 assessed at the time Mr. Harooni had a hotel?
22 A. It was assessed a little bit differently, but
23 it was assessed.
24 Q. Now, going back to the hotel under the
25 previous ownerships prior to Mr. Harooni's taking it

69

1  over, you said it was in very poor condition; is that
2  correct?
3  A. It was certainly distressed.
4  Q. Distressed. I think that's a polite way of
5  saying it. Distressed, does that mean that it had poor
6  maintenance?
7  A. Yes.
8  Q. Does that mean that it had poor curb appeal?
9  A. Yes.
10 Q. Does that mean that the brand identity was not
11 properly utilized?
12 A. I don't recall brand identity issues during my
13 visits.
14 Q. Okay. Brand standards were not met?
15 A. In the sense of items -- if the items were
16 there they're supposed to be, most of the time they
17 were.
18 Q. Are you just saying most of the time they were
19 in poor condition?
20 A. There's a difference between brand standards
21 and conditions. The way best Best Western looks at it,
22 brand standards is an individual item that is required
23 to be offered. For example, coffee in the room is a
24 brand standard.
25 Q. For example, the number of items on the

MITCH VAN WORMER(ROUGH)
12/22/2009

```
                                                     70
 1   breakfast menu would be a brand standard?
 2       A.  Yes.
 3       Q.  Whether it's a buffet or a menu?
 4       A.  Yes, there are retire requirements of what
 5   needs to be offer.
 6       Q.  And how many items are on the menu for example
 7   you have to have two different eggs or something of
 8   that nature?
 9       A.  There are two requirements that one has to
10   offer on breakfast.
11       Q.  So your sonses with regard to the low tell and
12   the previous ownership that it was distressed you're
13   saying they had all the technical requirements is that
14   correct?
15       A.  Yes.
16       Q.  For brand standards?
17       A.  Yes.
18       Q.  They just weren't done properly?
19           MR. GARABARINO:  Objection, form.
20       A.  They had all the required items.  The
21   condition of the hotel was distressed.
22   BY MS. SCHLESINGER:
23       Q.  Okay.  And was that hotel ever terminated from
24   the membership, to your knowledge?
25       A.  Not that I'm aware of.
```

```
                                                     71
 1       Q.  It was not?
 2       A.  Not that I'm aware of.
 3       Q.  So that was a question.  I'm just confirming
 4   that you're not aware.
 5           Even though it didn't meet the guest and
 6   public area points, the supplemental areas, it failed
 7   in those areas?
 8           MR. GARABARINO:  Objection, form.
 9   BY MS. SCHLESINGER:
10       Q.  Let me back up.  What's a passing score,
11   eighty 0?
12       A.  Yes.
13       Q.  And is that based on the average of all of
14   these different components?
15       A.  It's each component has to have a score of at
16   least eighty 0.
17       Q.  Okay.  So it's it's the cumulative of the
18   conglomerate effect of all of these?
19       A.  One can fail an assessment by any one of the
20   components being below 800.
21       Q.  And so when you say that -- well strike that.
22           The hotel under the prior management,
23   when you said you don't recall that person's name of
24   the company?
25       A.  No, I don't.
```

```
                                                     72
 1       Q.  We'll say prior management, we'll know what
 2   we're talking about.  So prior management had failed in
 3   at least one of these areas to get a score of 800 or
 4   better; is that correct?
 5       A.  Once again, the question.
 6       Q.  Sure.  To your knowledge, did prior management
 7   fail to obtain a score of 800 or better in one or more
 8   of the area areas we've just discussed, brand
 9   standards, brand identity, like that, one or more of
10   those areas?
11       A.  Yes.
12       Q.  They failed to get a 800 score or better?
13       A.  Yes.
14       Q.  How many times within an 18 month period, to
15   your recollection, did they fail to obtain an 800 or
16   better score?
17       A.  One time.
18       Q.  Within 18 months?
19       A.  Within 18 months, based on my recollection and
20   my experience with hotel.
21       Q.  And how many times within 24 months?
22       A.  Months.
23       Q.  And they were put on probation?
24       A.  Yes.
25       Q.  And did a final notice letter ever go out to
```

```
                                                     73
 1   that hotel that Best Western was contemplating
 2   terminating membership?
 3           MR. GARABARINO:  Objection, form.
 4       A.  I'm aware of a letter that was sent to members
 5   that are on probation, but I can't recall what was in
 6   that letter.
 7   BY MS. SCHLESINGER:
 8       Q.  You've been doing this since approximately
 9   2003 -- 2002, you said?
10       A.  Yes.
11       Q.  Have you ever seen any hotel other than the
12   one at issue here owned by Mr. Harooni, have you ever
13   seen a hotel's membership terminated?
14       A.  Yes.
15       Q.  Tell me about that those instances, passenger
16   side.  Was it more than one?
17       A.  Yes.
18       Q.  How many would you say you've seen terminated?
19       A.  Oh, I'd have to think about it, but I'd have
20   to think it's four or five in my areas.
21       Q.  And that's excluding Mr. Harooni?
22       A.  Maybe four or five total.  I don't know.
23       Q.  Total including him?
24       A.  It may be, yes.
25       Q.  So since 2002 and through the present time,
```