you've only seen four or five terminated?

A. In my entire time with Best Western in my areas, probably a handful, whether it's four, five, six or three, I can't recall. I'd have to sit and think about it.

Q. And tell me what the process was, to the best of your recollection, for the termination of these hotels.

MR. GARABARINO: Objection, form.

BY MS. SCHLESINGER:

Q. Do you understand my question, sir?

A. Yes.

Q. Okay?

A. My understanding of the process is one goes on probation once a hotel does not achieve the 800 threshold and one of those items or one of the areas of assessment.

Q. And that is based on just even one failing score?

A. Yes. And one may continue on probation until one's assessment score achieves 800 or greater.

Q. I'm sorry, sir?

A. 800 or great.

Q. So you get completed by getting an 800 score?

A. That can be too.

Q. Just so I apologize I just couldn't hear you well. If you are on probation and then you then get back up to we'll call 800 the passing score eight oh one the passing score fair enough?

A. Yes.

Q. So if you are a on a score of 800, you get a score of eighty 1, you're off probation?

A. Correct.

Q. And then the process would start all over again?

A. There's time frames that one has to maintain scores, certain scores.

Q. What are those time frames, sir?

A. I believe if one has two failures within 18 months, that you enter hearing status, and then there's I believe too in 24 months is also a threshold, but again, I don't know the current requirements.

Q. So two in 18 months would give you a hearing status?

A. Yes.

Q. What's that mean?

A. That means that board of directors will discuss the continuation of one's membership with the member.

Q. That's just a discussion?

A. One is at risk to lose their membership.

(Discussion off the record.)

BY MS. SCHLESINGER:

Q. Okay. So if you have one time in 18 months, you can then enter a hearing status is that what you then told me, and then you're in danger of losing your membership?

A. Question again.

MR. GARABARINO: Objection, form.

BY MS. SCHLESINGER:

Q. So if you get what I'm calling a failing score, within 18 months, you go into a hearing status?

A. No. If one fails, then one goes on probation.

Q. Okay?

A. If one fails a second time during an 18 month period, then one can go into hearing status.

Q. Can, as in you may?

A. You will, based on my experience.

Q. And how is the hearing status category initiated; in other words, do they get a letter, do they get a notice is it on the telephone?

A. I don't know exactly how it's delivered, but one does get a letter.

Q. But you have no personal knowledge of how that's done?

A. I believe it's a certified letter.

Q. And does Best Western offer any assistance or help to correct the problems in the hearing phase?

A. Well, I wouldn't know exactly -- exactly what services are offered. They may include design, but I'm not fully aware of what happens during the process.

Q. Is it fair to say that Best Western's goal at this stage is to get the hotel back on track, get it back into a passing goal, passing grade status?

A. Yes.

Q. So it seems reasonable to you that they would offer some help in services?

A. Certainly, it would make sense to offer some help, sure.

Q. And when we discuss the fact that a hotel can have a failing grade of under 800, that's based on your assessments on either the guest rooms the public areas the supplemental facilities, et cetera is that correct?

A. That's correct.

Q. And would you say that those are cut and dry, well defined criteria for whether or not you pass or fail those assessments?

A. Yes.

MR. GARABARINO: Objection, form.

BY MS. SCHLESINGER:
Q. Do you understand my question, sir?
A. Can you rephrase it?
Q. Sure. Are the criteria for obtaining a passing score defined with specificity by Best Western?
A. Yes.
Q. And you would agree, would be the you, sir, that it would not be fair to the hotel if it was just the assessor was in a bad mood and doesn't like something that day?
A. Oh, certainly.
Q. That would be unfair?
A. Yes.
Q. Sir, I'm going to hand you what is going to be made Exhibit 2, and it's called the rules and regulations. Do you recognize that as a Best Western publication?
MR. GARABARINO: Do you have a copy of that.
MS. SCHLESINGER: I have the two copies. We can stop for a moment although we're running a little late, and have the court reporter.
MR. GARABARINO: I'll just look at it.
A. I don't think eve seen this document before.

BY MS. SCHLESINGER:
Q. So you were doing the assessments, but you have never seen this document?
A. I have not seen this information in this format.
Q. Okay. Have you seen something similar that sets forth the criteria upon which assessments are made?
A. Yes.
Q. Have you produced that document in this litigation, sir?
A. I'm not aware of anything that's been produced.
Q. But the criteria upon which you made your assessments is in some written document; is that true?
A. It is true.
Q. And do you keep a copy of that with you when you do your assessments?
A. We have a copy available online, yes.
Q. Is that the online portal that we were discussing earlier on --
A. It can be --
Q. Thank you.
-- online.bestwestern.com?
A. Yes it's available through that website.

Q. And do you have personal knowledge that all hotel owners have access to that website?
A. All hotel owners do have access to that website, yes.
Q. Did you personally provide that information to Mr. Harooni?
A. I don't recall, and I don't know if we specifically talked about that brand.
Q. When was that website developed, do you know?
A. I don't know, in early 2000, 2001, something like that, 2002.
Q. And you did not yourself provide log in information or notify Mr. Harooni of its existence; is that true?
MR. GARABARINO: Objection, form.
A. I don't recall that, no.
BY MS. SCHLESINGER:
Q. You don't recall doing it?
A. I do not recall doing it.
Q. I'm going to ask you despite that you have not seen this, as this is a document that's marked Best Western -- it says Best Western on the cover it also says VW 0934 through VW 0974 and it contains the rules and regulations and the bylaws and articles for Best Western and I'm going to go on a limb and say that this

is a Best Western document. Under that assumption I'm going to ask you to take a look at at and see if it makes sense to you.
A. Okay.
Q. And I will mark it as Exhibit 2 if there is no objection.
MR. GARABARINO: No objection.
BY MS. SCHLESINGER:
Q. Okay. Let me start at page 7, which is baits stamped BW 0941. Do you see that page, sir? The BWs that I'm referring to are down in the right-hand corner, but it is also marked as page 7.
A. Yes.
Q. And contains subparts from 500.7 through 500.14, not necessarily all contained on that page, but I'm just identifying that for the court reporter.
A. I do see this page.
Q. Look at 500.11 for me, if you will, and 500.12. Do you see where in 500.11 on page 7 here, it says, a member or designated operating manager or active management employee of each Best Western property shall attend either the annual international convention or a district meeting?
A. I do see that.
Q. Are you aware of whether the management for

Mr. Harooni's hotel attended such a meeting?
A. I'm not aware.
Q. And what about an orientation seminar in the next paragraph, 500.12, are you aware of whether or not the management for Mr. Harooni's hotel attended an orientation seminar before opening the facility at the Best Western?
A. I don't know one way or the other.
Q. If he -- strike that.
Turn the page, if you will, and we'll talk about item number 500.15 on BW 0942, which is marked on the left-hand corner as page 8. Do you see that subsection, 500.15?
A. I do.
Q. And this is where it sets forth that Best Westerns are going to be an inspection of all accommodations facilities and procedures by Best Western regional service manager, an accredited Best Western service manager. Is that you?
A. That's me.
Q. That would be you? Okay. And when we talked about your accreditation, you're talking about certificate you got and were required to obtain when you began working with Best Western; is that correct?
A. I'm talking about accreditation that probably

correspondence with my training and our continually updated training of knowledge of the assessment process.
Q. All right. Earlier I asked you if you had any on going training, and you told me, no, you did not take any kind of on going education. Are you saying you would like to change that response?
A. I'd like to clarify it.
Q. Fair enough. Tell me about your on going training?
A. I believe it is every 2 years we are recertified at Best Western, and so that -- what's encompassed in that is knowledge training from a sufficiency standpoint, brand identity would be part of that, the assessment process would be part of that, and then often a testing is associated with that training.
Q. Is s there a particular title that goes with that certification or is it just saying that you're certified?
A. I believe there's just a saying we're certified.
Q. They didn't give you a plaque or an award?
A. I believe we got a plaque, but it's not a plaque I necessarily would hang in my home.
Q. Fair enough. Going on down this list, sir,

you say that -- do you see at the bottom of paragraph 500.15, where it says when -- they're talking about the notification of a scheduled inspection, and it says, when possible but not less than 24 hours advance notice will be given -- I'm sorry -- when possible not less than 24 hours notice will be given. Do you see that?
A. I do.
Q. And then it says, there will be no notice given when an unannounced inspection is intended. Under what circumstances would such an unannounced inspection occur?
A. I've never been on an unannounced inspection, so I don't know at what point that would happen.
Q. Fair enough. And then down at 500.17, do you see where it says -- about midway down that paragraph, it says, the board may establish a fee for any inspection which is scheduled of a more frequent inspection under this rule, period, a property once placed into probationary status, comma, will remain in the status until such time as the inspection report or guest rooms, slash, public areas condition report score is equal or is great than 800 points or until cancellation of the membership pursuant to paragraph 1100.6 of these rules and regulations?
A. I do.

Q. And I read it correctly?
A. As best I can tell.
Q. Fair enough. Do you know if there was ever a fee for a more frequent inspection imposed on Mr. Harooni's property while you were working with him?
A. I don't know definitively whether there was or not.
Q. Did you refer have to do more frequent inspections for any reason at the Harooni hotel?
A. Yes.
Q. And tell me about that. When did you do a more frequent inspection?
A. Can I clarify?
Q. Sure.
A. At Mr. Harooni -- oh Mr. Harooni's hotel, it would have happened the second assessment I did, I believe.
Q. And woo when would that have been?
A. I don't know for sure, 2004, 2005.
THE WITNESS: 2004.
A. I don't know the date.
BY MS. SCHLESINGER:
Q. Is that something that would have been produced to Mr. Harooni in this litigation?
A. I do not know.

Q. At that point in time, was the AV Inn still in a transition period from its prior owner, would you say?
A. What do you mean by transition.
Q. Well, we agree that there were some distress issues in the prior hotel, correct?
A. Correct.
Q. Okay. And Mr. Harooni took steps including renovationings to improve the condition of his hotel upon taking that property over; is that true?
A. That is true.
Q. And so you're saying a period of time in approximately late 2003, 2004 is your estimate, correct?
A. That's my estimate, correct.
Q. So and since he had recently taken the hotel over at that point, I was wondering if there was still some upgrading going on that Mr. Harooni was under taking to?
A. Yes, there was.
Q. And that could be the second or unannounced -- or more frequent assessment was done, because it was still in transition?
A. Renovation per se wouldn't cause a more frequent assessment.

Q. Do you know what the cause of a more frequent assessment was in that case?
A. The condition of the hotel during the assessment was such that the score was less than 800, which required an accelerated assessment.
Q. You say that was in 2003?
A. Probably 2004 I believe.
MR. GARABARINO: Are we talking about the time Mr. Harooni owned the property 92 that's the time I'm speaking about.
MR. GARABARINO: So he purchased the property in -- I'll let you.
MS. SCHLESINGER: I'm sorry.
MR. GARABARINO: What year did he purchase the property.
MS. SCHLESINGER: I believe it was in 2004.
Man man five.
MR. GARABARINO: 2005.
BY MS. SCHLESINGER:
Q. So we did misunderstand.
So you're talking about there was a more accelerated more frequent inspection for the prior owner?
A. There was during the prior owner, but there

was also for Mr. Harooni also.
Q. Okay, but then it could have been as counsel points out in 2004?
A. Correct. So my date is incorrect.
Q. That's what threw me, and I thought we were talking about the same thing?
A. I think we may be.
Q. I was confused on dates. So it wasn't that early, was it much later, do you think -- strike that. I'm going to try to find the document that I'm thinking of?
A. Okay.
Q. Actually, you know what, stay on the record I'm going to table that for a moment I'll come back to that.
Let's go back to Exhibit 2 of this deposition, I'm watching the clock here. Turn the page, please, if you would, to page 9 of Exhibit 2, which is Bates stamped BW 0943. Look for me at the subsection numbered 500.21, and it says a planned program shall be in effect. Do you see that?
A. Yes.
Q. It says, a planned program shall be in effect to accomplish continual maintenance of facilities associated with the member property to reflect a fresh

and high quality appearance, period.
Is that similar wording to what you said that you relied on the written source for doing these assessments?
A. I don't understand the question.
Q. Do you check and assess the properties in your district 6 for a, quote, fresh and high quality appearance, end quote?
A. I don't think that fully represents what I do.
Q. But you are looking for a fresh and high quality appearance?
A. No.
Q. No? Okay. Do you want to -- I'm at a very big disadvantage because I do not believe the document you say you rely upon has not been disclosed in discovery. I'm going to ask counsel if you know that has been disclosed?
MR. GARABARINO: I don't know.
MS. SCHLESINGER: Should I be going through this box because I've been through this.
MR. GARABARINO: I don't know that it has been disclosed.
MS. SCHLESINGER: Let's go off the record for a moment.

(Recess was taken from 12:28 p.m. to 12:36 p.m.)
BY MS. SCHLESINGER:
Q. We're back on the record. So let me ask you this, we were discussing your criteria the ones you use and you said are available to you at all times when you're doing these assessments, correct? You said there was a criteria that was a document that has the criteria you based your assessment?
A. Correct.
Q. And that was available to you when you were doing your assessment?
A. Yes.
Q. Do you have any knowledge of that document being made available to hotel owners?
A. That document is made available currently through the website.
Q. Currently. . Was it available at the time Mr. Harooni owned the hotel?
A. I would have to believe it was, but I don't know for sure.
Q. So you have no personal knowledge that it was?
A. I have no definitive knowledge that it was.
Q. Okay. So I'm going to go back to what we've marked as Exhibit 2, and just run a couple more by you.

I essentially don't want to beat this horse if you've never seen the document and the language does not match.
Is it correct to say in 500.22 on BW 0943, which is marked as page 9 in the right-hand corner of Exhibit 2, in about the middle of that paragraph, it says, any redecorating, refurbishment and renovation not first securing approval of design -- of the design department of Best Western may not at the sole discretion of the board be considered to be undertaken or completed in compliance with orders, directives, or conditions of the board and may be subject -- and may subject the member to cancellation pursuant to 1100.6 of these rules and regulations. Do you see that?
A. I do see that.
Q. Are you aware if Mr. Harooni undertook any redecorating, refurbishment and renovation of his hotel?
A. Yes.
Q. And are you aware that he did obtain approval from the design department at Best Western?
A. I don't know whether that was the case or not.
Q. Do you think he did a good job with his refurbishment, redecorating and redecorations?

A. From a design standpoint, I can't make the comment, you're requesting for my personal opinion.
Q. Sure.
A. I think that there are some aspects that certainly significantly improved the hotel from an aesthetically.
Q. So the hotel was improved aesthetically based on the improvements he made?
MR. GARABARINO: Objection, form.
A. Yes, portions of the hotel were significantly changed.
BY MS. SCHLESINGER:
Q. Okay. And you're hedging there. Can you tell me if there were portions that were not improved?
A. Yes, there were.
Q. What portions were those?
A. Parking lot was not completely renovated, 3 story building not painted completely, roofing on the two-storey building was not replaced, and that building was not painted, the rooms weren't completely renovate.
Q. What does that mean?
A. Portions of the room were renovated, but potentially -- and I'm depending upon my memory but I don't think that all zings and vanities were replaced or all guest room carpets, but I may be mistaken.

Q. So your memory is hazy on these points?
A. Yes.
Q. Let me ask you this, were these issues, assuming that your memory is correct, and I know that's a big assumption for the sake of discussion, were these points for which the prior owner had been written up or received a failing score? In other words, did the Sinks that may not have been replaced warrant a point reduction on the previous owner's assessments?
A. To the extent Sinks were cracked or worn or in poor condition, they would have been deficient during my assessment.
Q. But you have no knowledge of that as we silt here today?
A. I don't have knowledge as to specific deficiencies. But the same with deficiency requirements or deficiency scrutiny would have taken place with no matter what owner was associated with the property.
Q. Did you ever provide any written waivers regarding property maintenance to the prior owner?
A. I don't have the capability of providing waivers for anything.
Q. Did you ever recommend that a waiver be granted?

A. No.
Q. At Exhibit 2, BW 0943, subsection 500.34, the document describes something called Best Western member information and resource guide. Are you familiar with that document?
A. No.
Q. So you boo have no knowledge whether that document was ever provided to Mr. Harooni?
A. I would have no knowledge of that.
Q. Who would have knowledge of that in the Best Western enterprise is there a department or person who would be in charge of such a thing?
A. I'm sure there is. Possibly, it's membership development.
Q. Did you have a contact person at membership development?
A. No, I don't.
Q. In your assessment then, would membership development be someone who worked closely with the hotels, the individual hotel owners?
A. I guess I'm not sure what closely means.
Q. Okay. Fair enough. This Best Western member information and resource guide -- well if you don't know anything about it, let's move on.
So I'm going to close that up. Do you

know if that document has been produced by Best Western in this litigation?
A. I don't know.
Q. The next paragraph I wanted to look at is 500.35, and this paragraph in Exhibit 2 describes complaints by customers regarding the hotels. Are you aware of whether Mr. Harooni's property ever was the subject of any guest complaints during the time he owned the property?
A. I'm not specifically aware of any.
Q. So to the best of your knowledge, were there any?
A. Again, I can't say specifically, but I would have to guess any hotel in business, had a guest complaint.
Q. Will have some?
A. Yes.
Q. Fair enough. And that doesn't matter what condition the hotel is in; is that true?
A. Correct.
Q. It can be in a number one five star condition and somebody will find something to complain about?
A. Sometimes it does.
Q. Being on a bad day in a hotel -- my whole honeymoon.

On the next page BC 0944, subsection 500.39?
MR. GARABARINO: Just a second. 44.
MS. SCHLESINGER: Yeah, it's page 10 to Exhibit 2.
BY MS. SCHLESINGER: I'm looking at 500.39. On the second column on the right-hand side, you'll see capital B, which starts, in addition, each Best Western member property must provide seating at a minimum rate of 20 percent of rooms, paren, e.g., 10 seats per 50 room, end paren, with a minimum of two tables and six chairs. Is that a standard of which you were aware during the time you were making assessments on Mr. Harooni's property?
A. That is a standard that I am aware of, yes.
Q. And you were aware of it at that time?
A. Yes.
Q. Okay. Would you agree with me, sir, that the ratio of food, beverage facilities that there is a ratio between the supplemental services such as food and beverage and room sales? There's a correlation, is there not?
A. Once again the question.
Q. Would you agree there's a correlation between available food and beverage services at a hotel and

room rentals?
A. Yes.
Q. Let's turn to -- let's go to 500.4, which is located on BW 0945, page 11, at the top of the first column there. It says, all Best Western members and personnel shall display a courteous and professional attitude towards officers, comma, director, comma, employees, and staff, of Best Western International, period. Did I read that correctly?
A. Once again, the number?
Q. 500.41.
A. Okay.
Q. The second subsection on page 11 of Exhibit 2.
A. You did read that correctly.
Q. To your knowledge, sir, did anybody at Mr. Harooni's hotel ever fail to display a courteous and professional attitude toward you?
A. No.
Q. They were always very courteous to you?
A. I don't recall negative experience.
Q. On the following page BW 0946 of Exhibit 2, under chapter 6, the subheading at 600.0. Are you with me, sir?
A. Yes.
Q. It says, lobby and front office, and if you go

down there to 600.2, it says, the front office and registration checkout area shall be maintained in an orderly and clean manner. Can you define for me what orderly and clean manner means?
MR. GARABARINO: Objection, form.
BY MS. SCHLESINGER:
Q. Sir, do you know what those words mean?
A. Orderly and clean, one would expect that orderly means lack of clutter, which could include paper and brochures and equipment.
Q. When you say could include papers, brochure, and equipment, is it true that Best Western wanted certain brochures out on their counters at check in?
A. Brochures, no. But a reservation plaque someplace in the lobby, and an ownership plaque somewhere in the lobby, yes, but not necessarily at the desk.
Q. And is that criteria spelled out in the document that you say you had access to, which I'll call your criteria. I'm trying to give it a name so I don't have to -- when I say your criteria, you mean the criteria you said was available to you at the time you did assessments; is that fair? Can we use that shorthand?
A. Yes. That can be included in that document.

Q. Okay. Was there ever a requirement that a notice be placed on the front desk area that said toiletries would be available -- that even if they weren't in the room, that they would be available upon request?
A. Once again the question?
Q. Was there a requirement by Best Western that there be certain signs out to advice customers that toiletries and other accommodations would be available upon request?
A. Notification in the directory or somewhere in the guest room is a requirement, nowhere else.
Q. Go down back on Exhibit 2 to -- let's look under chapter 7. Do you see that there, buildings, grounds and public areas?
A. Yes.
Q. 700.1, where it says in the middle of the paragraph, it says, painted surfaces should be free of peeling paint, soil, and obvious cracks, masonry, and should, quote, present an attractive appearance in accordance with Best Western's standards, end quote. What is meant by attractive appearance?
MR. GARABARINO: Objection, form.
BY MS. SCHLESINGER:
Q. Can you answer the question, sir?

A. I would say attractive appearance on to me means something related to design in which I would not necessarily be assessing for.
Q. It doesn't say here it's related to design, does it?
A. It does not.
Q. When we talked about your assessment criteria, does it use language such as attractive or good taste or anything subjective like that?
A. Not that I can specifically recall.
Q. Would you agree that attractive is a subjective term?
A. I would agree.
Q. And that term is again used down at 700.7 where it talks about attractive landscaping. Do you see that, sir?
A. I do.
Q. And in fact it's used again with regard to the swimming pool area at 700.19 on BW 0947 of Exhibit 2, is it not?
A. What are you asking specifically.
Q. Do you see the word attractive with regard to the condition of the swimming pool area?
A. I do see that.
Q. Again, subjective, true?

A. That is true.
Q. Okay. And in fact the term good condition, would you agree that that is a subjective term?
A. There are some subjectivity there.
Q. And, in fact, on page BW 0948, under heading, for example, 700.34, discussing public restrooms, it says that at the last sentence in that subparagraph, says, restrooms shall be well lighted and free of offensive orders. Would you agree that offensive is also a subjective term, sir?
A. No.
Q. No?
A. Some offensive odors, I believe, everybody could agree with, or some odors I believe everybody could agree are offensive.
Q. So if you walked into a restroom in the course of one of your assessments and you found, quote, an offensive odor, that would be grounds to have the hotel be marked down; is that true?
A. Yes.
Q. So even if it was just an -- excuse the vulgarity, guys -- but even if it was just the case that somebody had just used the men's room and left a, quote, offensive odor, and you have to walk in three minutes after that, you could, theoretically,

write the hotel down for that, correct?
A. No, that wouldn't make sense. That would be silly
Q. But it would it be offensive, would you not agree?
A. Absolutely.
Q. It stinks to high heaven?
A. But one has to operate a hotel.
Q. So you would say that, no, no, offensive is not subjective, awe, but it's open to your interpretation; is that fair?
A. No.
Q. It's not?
A. In that case, it's not fair. Sorry for the interruption.
Q. So in other words, an offensive odder -- can we agree, then, that an offensive odor as used in this context is not a cut and dry proposition?
A. Yes, that one may have to apply common sense in.
Q. So you have subjective terms throughout your criteria to which you then apply common sense?
MR. GARABARINO: Objection, form.
BY MS. SCHLESINGER:
Q. Is that true?

A. I think any time you have an evaluation process, some subjectivity may be a part of it.
Q. And 900.1 on page BW 0949, under chapter 9, guest rooms and bathrooms subheading, 900.1 says that the guest rooms should be, quote, in good taste, end quote. Do you see that there?
A. 900.1., did you say?
Q. Yes.
A. I do see that.
Q. In good taste, again, is that subjective?
A. That is subjective, but not part of my assessment process.
Q. Okay. So your criteria, the ones you said you had available to you, do you know if it uses terms such as good taste?
A. It does not.
Q. Okay. Are there things in those criteria, your criteria for which a hotel could be written down, that you would regard as subjective?
A. Yes.
Q. I'm going to hand you what's going to be made Exhibit 3 to this deposition -- actually, strike that.
Let me ask you if you recognize this before we bother attaching it.
MS SCHLESINGER: And, I'm sorry, I was

doing these on my own copier last night. I just only have a couple of copies.
BY MS SCHLESINGER:
Q. I'm handing you BW 0209. Do you recognize that, sir?
A. Yes.
Q. Did you take that photo?
A. I may have.
Q. Okay. Just for the record, can you tell me what that depicts?
A. A picture of the property identity sign, the main sign.
Q. And do you see anything wrong with that sign for which the hotel would be written down?
A. I can't see anything specifically from a quality assurance standpoint.
Q. What about a brand identity standpoint?
A. I don't.
Q. Okay.
A. But I mean.
Q. It looks okay to you?
A. It looks fine.
Q. Fair enough. I'm going to attach BW 0209 as Exhibit 3 to the deposition?
MR. GARABARINO: Can we go off the record

for a second.
MS. SCHLESINGER: Sure.
(Discussion off the record.)
MS. SCHLESINGER: Let's clarify that. Counsel just pointed out -- although I think I discussed it on the record, but let's make sure. Exhibit 1 to this deposition includes the rules and regulations -- my apologizes -- Exhibit 2 to this deposition includes the rules and regulations of the Best Western as well as the attached bylaws. Again, these are purported to be Best Western documents based upon the Bates stamp, although, the deponent --
BY MS SCHLESINGER:
Q. I believe you said you did not specifically recognize these; is that right?
A. That's right.
MR. GARABARINO: Is that true with just respect to the rules and regulations and the bylaws.
THE WITNESS: I haven't seen them in this format. I'm sure I've seen them in a different format.
BY MS. SCHLESINGER:
Q. Do you want to take a moment and look through and see if there's any -- I mean, I hate to use the time that way, but I'd like to make sure that this format is -- when you say you've seen them in another

format, I'd like to make sure that what we're looking at is essentially the same thing. Is there any way that you can ascertain that?
A. The question once again.
Q. Sure. Is there any way for you to ascertain that the form you had seen is essentially the same or --
A. I am sure I have seen portions of this at different times in my career.
Q. Do you any you have seen these before doing assessments on Mr. Harooni's hotel?
A. Not necessarily in this particular format.
Q. Not this particular document, not necessarily this format but had you seen the rules and regulations prior to doing assessments on Mr. Harooni's hotel?
A. I have seen rules and regulations prior to doing an assessment.
Q. What about the bylaws?
A. I don't think I've ever read the bylaws.
Q. Were in any documents that you were required to read, review prior to doing assessments on individual hotels?
A. Yes.
Q. What were those documents, sir?
A. Quality assurance manual.

Q. Strike that do you have personal knowledge as whether that manual was provided to individual hotel owners such as Mr. Harooni?
A. I don't know if it was specifically provided. It is available on online.bestwestern.com.
Q. Which you previously told me you're not sure and have no personal knowledge of that website being made available to Mr. Harooni, correct?
A. It was made available to management at his hotel, whether it was provided to Mr. Harooni, I'm not aware of, and probably would not have been by me.
Q. Okay. How do you know, sir, that it was provided to Mr. Harooni's personnel?
A. It would not have been specifically provided. It would have, in the course of our conversations about resources available, through the Best Western website, that this as many pieces of information are available through that website.
Q. Do you have any specific recollection of having a discussion with anyone when the management of Mr. Harooni's hotel regarding the website, the online.bestwestern.com website?
A. Yes, with Christine.
Q. And you don't know whether Christine was a general manager at that time or not?

A. She was the general manager at that point, is my belief.
Q. At the time you had the specific conversation with her?
A. That is my belief.
Q. And how did that conversation come up, sir?
A. We would have -- I would have asked her if she understood or knew the resources available on the website, and as part of that discussion, we would have scrolled through pages and the directory on the website so that they felt comfortable or she felt comfortable in getting information from the site.
Q. Sir, remembering that you're under oath with penalty of perjury, do you have a specific recollection of scrolling through the website with Christina on Mr. Harooni's hotel property at any time?
A. I don't have a specific -- I cannot say specifically what date, but it would have come up in the course of a conversation.
Q. So when you say would have, that's a contingent type English language construction. So based upon that, I'm saying -- are you telling me sir that under normal circumstances you would have discussed it, or do you have a specific recollection?
A. I have a specific recollection of going

through the website with Christine.
Q. And do you know specifically what her position was at the time you allegedly went through this?
A. I do not know her -- I assumed that she was the manager, as she presented herself.
Q. You told me earlier that you didn't know at what point in time she was the manager and wasn't the manager. Do you recall that discussion we had?
A. I do.
Q. So you really don't know at the time that you believe you went through this with her what her position was; is that true?
A. That is absolutely correct.
Q. And in fact sir, do you have any documentation to show that you advised any management at Harooni's property what resources were available to them, including but not limited to this website?
A. I do not know.
Q. Did you ever send a letter saying here are the resources available to you and listing them out?
A. No, I did not.
Q. To your knowledge, did anybody at Best Western send that letter?
A. I'm not aware that that happened.
Q. Did anybody provide any other advisement,

notice, flier, any documentation to the management at Mr. Harooni's hotel stating what services were apart of the Best Western services or other resources?
A. I'm not aware of what other folks may have provided to the staff.
Q. So you really have no way, as you sit here today, saying what documents or resources were explained to the management at Mr. Harooni's hotel; is that correct?
A. It's correct that many of our conversations in and the points of our conversations cannot specifically be out lined in a document.
Q. So these were casual conversations; is that correct?
A. I don't know what casual means.
Q. Oh, it's subjective.
Did you have any kind of member booklet or anything to that effect? Like when I've taken jobs -- you understand what I'm saying -- when I've taken jobs they say here's your manual sign here. Did you do any of that that Mr. Harooni was advised of?
A. Nobody signed they were provide window that information.
Q. Was there any check by Best Western, to your knowledge, to confirm that these resources were

provided to individual hotel members?
A. There may have been.
Q. That means they may not have been too?
A. Yes.
Q. You can't say one way or the other?
A. I can't say definitive one way or the other.
Q. So you have no idea?
A. Correct.
Q. Another way to rephrase that?
A. Yes.
Q. And that would include this online.bestwestern.com; is that true?
A. No, that's not true. I know that I discussed that with a staff member there.
Q. Did you ever provide log in information?
A. Yes.
Q. Did you specifically provide after password and log in identity to any of the management at Mr. Harooni's hotel or online.bestwestern.com?
A. I don't know.
Q. You mentioned earlier that there was an issue with the roof onn't two-storey building I'm going to hand you a document. Do you have that photo?
A. I do.
Q. Is that the two-storey building you were

referring to earlier?
A. It is.
Q. And can you point out for me -- did you take that picture, by the way?
A. I don't know if I took that picture.
Q. To the best of your knowledge, does that accurately reflect the two-storey building we were discussing earlier?
MR. GARABARINO: Objection, form.
A. That reflects one portion of the building.
BY MS. SCHLESINGER:
Q. On the portion that you see here, do you see any problem with the roof or otherwise on that two-storey building that would have merited a deduction in points?
A. There may be some -- it appears there's some damage in this portion of the roof.
Q. Can you circle that for me, sir?
Q. So you've put a black circle on a portion approximately where the dip in the roof line is there?
A. Yes.
Q. On exhibit -- which will be Exhibit 4?
A. Again I say there may be. I don't know how many photos are associated with that.
Q. Let me ask you this. Did you ever go up on

the roof?
A. No.
Q. Did you personally go up on the roof at any time?
A. No.
Q. The two-storey or any other building?
A. Never.
Q. Are you a qualified inspector for structures such as a home inspector would be?
A. No.
Q. Have you had any train nothing inspection of roofs?
A. No.
Q. So you didn't go up on it and you had no training as to the quality of roofs is that correct?
A. Correct.
Q. So you kind of look at it and say that doesn't look right to me and mark it down; is that fair?
A. I would be looking for damage, appearance of damage on a roof.
Q. And you never would get up on the roof and modify things around to see if it was maybe leaks you saw inappropriately or some other cause rather than actual structural damage; is that fair?
A. No. I would know the difference between a

leaf build up and potential damage to a roof.
Q. Okay. But you never -- if you saw something that looked like a crack, you didn't go up to inspect if it was really a crack or something else?
A. No.
Q. We talked about the front desk appearance earlier, and you said that there shouldn't be any brochures and that it should be free of clutter; is that right?
A. No.
Q. I've got that wrong. Okay strike that then. I thought I heard you say it should be free from clutter. That's okay?
A. One.
Q. We'll strike it. We obviously miscommunicated. You said something about sink vanities. Sir, do you recall that I do?
Q. If you saw a sink vanity that appeared like this, and I believe this one may be in a public restroom. It's not clear from the picture. But let me ask you, first of all, then, if you recognize what's being depicted as BW 0239 as being associated with Mr. Harooni's hotel?
A. I can't recall specifically, but I know that some public restrooms were and potentially all public

restrooms were renovated.
Q. So you would have no problem with the picture?
A. Based on this photo, this is maybe an informational photo, but I can't see any deficiencies in that photo.
Q. That would be Exhibit 5. I'm going to go through a couple of your reports, sir, and try to see if we can make since of these, I'm going to BW 0289. Is that a form and I'm not talking about a specific one at this point. Is that a form you recognize, sir?
A. No.
Q. You've never used a form like that?
A. No.
Q. All right?
MR. GARABARINO: What was the number on that one. I'm sorry.
MS SCHLESINGER: BW 0289.
BY MS SCHLESINGER:
Q. Let me ask you this. Do you see on this form, it's called a status change -- and I understand that you don't recognize that form, per se -- but if you look at the second or third column, do you see the member status here. It says, new status there, that third column over?
A. Yes.

Q. Does the term new status mean anything to you?
A. Yes.
Q. What does that mean?
A. It would mean that the status has changed.
Q. And what does the PBR listed below that mean? Do you know?
A. Probation.
Q. Okay. And what's the status prior to that?
A. Member.
Q. Okay. And is it your testimony, sir, that a hotel would be on probation based upon one deficient rating in an 18 month period?
MR. GARABARINO: Objection, form.
A. That could -- yes.
BY MS. SCHLESINGER:
Q. It could be placed on probation for that deficiency?
A. For one below 800 guest and public room scoring.
Q. Are there any circumstances under which some hotel might get under 800 but not be placed on probation for the guest room and public spaces rating?
A. I wouldn't have any -- I don't have any knowledge of that.
Q. Okay. So just so that -- the question may not

have been clear and the response may not have been as clear as I would like. If a hotel has one under 800 rating on the guest rooms and public spaces and it falls under 800 on the assessment, such as the ones you do, it will automatically be placed on probation?
A. Based on my experience, that is a correct statement.
Q. I'm not going to attach that.
Do you know if the bylaws changed over time, Mr. Van Wormer?
A. Yes, they have.
Q. Do you know when the last time they were changed?
A. No, I conot.
Q. Do you know if they were changed during the period of time that Mr. Harooni owned his hotel?
A. Specifically, I don't know.
Q. And what about the other document there, the rules and regulations, do you know if those were changed during the time that Mr. Harooni owned his hotel?
A. I don't know.
Q. Does Best Western have anything that equates to a premium of preferred hotel?
A. Not in North America.

Q. So the answer is they do, generally under their membership there are premium and preferred hotels?
A. There are Best Western premium or preferred hotels in the world.
Q. Has that been a concern to your knowledge, sir of Best Western that the hotels collectively under the Best Western name are inconsistent in their quality? Would you like me to rephrase that?
A. Yes.
Q. Okay. Would you say that all Best Western hotels are of the same caliber in amenities, appearance, services?
A. No.
Q. Has, to your knowledge, sir, has the management at Best Western concerned about the discrepancy between caliber of hotels?
MR. GARABARINO: Objection, form.
BY MS. SCHLESINGER:
Q. Do you understand that question?
A. I do understand the question. I'm not sure.
Q. Are you aware if Best Western is taking any steps to make its hotels more uniform in quality and appearance?
A. From an appearance standpoint, no, I'm not

aware. It's always our -- we always strive to be as consistent as possible from -- and now I forgot my question so.
Q. Conveniently, we can read that back.
(Requested portion of record read.)
A. So from an appearance standpoint, I'm not aware of any. We always strive as a chain to have equal quality from a repair and maintenance and cleanliness standpoint.
BY MS. SCHLESINGER:
Q. And that doesn't always happen, though, is that true, sir?
A. Hotels are not uniform from a cleanliness and maintenance standpoint, you are are correct.
Q. And is it fair to say that some hotels operate under the Best Western name have on going problems that are not put on probation and taken out of the membership?
MR. GARABARINO: Objection, form.
BY MS. SCHLESINGER:
Q. Do you understand the question?
A. I don't think I understand the question fully.
Q. Are there hotels that continue to carry the Best Western name, identity, or brand, that fall below the standards Best Western would want to see which are

nevertheless not removed from membership?
MR. GARABARINO: Same objection.
A. I'm not specifically -- since I have no knowledge of what happens in the board room, the board of directors are who handles specifically or responsible specifically for who is part of the Best Western membership and who is not.
BY MS. SCHLESINGER:
Q. Okay. You mentioned to me that there were four, approximately four, you said it could have been three, five hotels where the membership was terminated. Do you remember that discussion we had earlier?
A. Absolutely.
Q. Can you tell me what the circumstances were of those terminations?
A. I can remember one specifically in LaMoore California, and a property that was terminated at -- and I believe there was a couple different reasons, one was a design -- was design issues, and another part of it may have been from a quality assurance standpoint, because they had failed prior to to the assessment.
Q. And that was a hotel that was assigned to you?
A. Yes.
Q. And was this hotel placed on probation?
A. This hotel was placed on probation.

Q. The LaMoore hotel?
A. Yes.
Q. How long did the probation last, do you recall?
A. I cannot recall.
Q. Do you know if there was a hearing conducted on that probation?
A. I believe there was, but I don't know for sure.
Q. Do you know if they were sent a final notice?
A. I don't know for sure.
Q. Do you know if they were given any warning they that they were going to be terminated as member other than probation standards?
A. I don't know specifically.
Q. Do you know if in this case with Mr. Harooni, do you know what steps were taken in terminating his membership?
A. I do not.
Q. Did you discuss the termination of his membership with him?
A. No, I did not.
Q. And in fact, at that point, when he was terminated, he was no longer assigned to you; is that correct?

A. That's correct.
Q. What happened? Why not?
A. I moved to Washington state.
Q. Did you take any steps with your placement with Ms. Bree?
A. Yes. Temporarily, yes.
Q. Did you take any steps to familiarize Ms. Bree with any of the aspect at Mr. Harooni's hotels, issues that you were talking about with Mr. March, repaired renovated anything of that nature, kind of brick her up to speed?
A. I don't know specifically, but I'm sure we would have talked about the renovation taking place.
Q. Were there any on going issues relating to Mr. Harooni's hotel at the time you left the California/Nevada district?
A. What do you mean by issues.
Q. Do you know if the hotel was under probation at the time?
A. When I left the area, yes, it was.
Q. And did you work with Ms. Bree and Mr. Harooni in order to try to ensure that the hotel was brought back up to meet the Best Western standards?
A. I did not specifically.
Q. So you said here you go, Sierra?

MR. GARABARINO: Objection. form.
BY MS. SCHLESINGER:
Q. I'm sorry. I lapsed in human speak.
MS. SCHLESINGER: We might need a five-minute break. I'm getting a little dingy and hungry.
(Recess was taken from 1:26 p.m. to 1:31 p.m.)
BY MS. SCHLESINGER:
Q. Mr. Van Wormer, you said that you were aware of Mr. Harooni's reservations, true?
A. That's correct.
Q. And at various times, there were some amounts of the renovations, in other words stone culting or dumpsters present; is that correct?
A. Sure.
Q. And you understood that because it was part of the reservation, it wasn't something that you wrote him down for, correct? In other words it was unavoidable?
A. Yes, there were certain items not assessed because it was in the process of renovation, you're correct.
Q. Did you explain what was going on to Ms. Bree and add violation her that she should allow him to get these renovations done without writing him down for

them?
A. No, I didn't have any specific conversation about renovation in progress.
Q. Okay. We were talking previously about the hotels that were terminated and you were talking specifically about the LaMoore property that was terminate from membership under your watch, so to speak. To you recall that?
A. I do.
Q. In the process of terminating that membership, were there any training sessions that went on for LaMoore to try to prevent it from going into termination?
MR. GARABARINO: Objection, form.
A. After one property failure, there was a visit that I made and met with management at that hotel and discussed planning that may need to take place to prevent additional failure.
BY MS. SCHLESINGER:
Q. What do you recall -- do you recall what the file yours were that caused that hotel to be terminated?
A. No, but it may have been more of a focus on design issue than quality of assurance -- quality assurance issue, but I can't recall the definitive

answer of reason that the board terminate that had particular property.
Q. So if Mr. Harooni was working with the design department for Best Western on his hotel, that should not have come up as an issue; is that correct?
A. Since I don't know exactly what triggers design issues with Best Western, it would be very difficult for me to answer.
Q. What was the age of the LaMoore property, do you know?
A. No, not for sure.
Q. Did it look comparable to Mr. Harooni's property, in terms of the age?
A. I'm sure it was at least 20 years old.
Q. Are you aware of Best Western implementing any kind of premier or signature brand identification for superior hotels?
MR. GARABARINO: Objection. form.
BY MS. SCHLESINGER:
Q. Did you understand my question?
A. I did. In Europe and Asian there is a premier designation.
Q. Are they going to present that here in the United States, to your knowledge?
A. I have no definitive information on that.

Q. Do you know if at the time Best Western terminated the agreement with Mr. Handwritten and the AV hotel, do you know if there were any arrearages assessed to Mr. Harooni due to customer complaints?
MR. GARABARINO: Objection, form.
A. I don't know.
BY MS. SCHLESINGER:
Q. Do you know if there are any arrearages assessed to Mr. Harooni at the time the assessment occurred?
A. No.
Q. No, I don't know?
A. No, I don't know, or yes, I don't know.
Q. My poor question, but you have no knowledge of arare?
A. At the time, correct.
Q. Do you know if there were arrearages assessed to Mr. Harooni's hotel prior to termination?
A. When you say arrearages assessed, what does that mean exactly.
Q. Well, I was look agent the complaint last night, and according to Best Western's complaint, it says that there were assessments charged by Best Western to its members, and that was on the complaint at page 3, paragraph 10. Let me see if I can have that

document for us to take a look at.
(Discussion off the record.)
BY MS. SCHLESINGER:
Q. Mr. Van Wormer, do you have any knowledge as to the asserted balance in the Best Western complaint of $75,219.59?
A. No.
Q. Do you have any information regarding any charges by Best Western against Mr. Harooni's hotel?
A. Not specifically.
Q. Do you have any idea what subsequent charges might acrew after termination of a hotel?
A. None at all.
Q. Do you have any information regarding -- strike that.
Do you know if Best Western received any complaints from customers after Mr. Harooni's hotel was placed on probation regarding the quality of the hotel?
A. I'm not aware specifically of any.
Q. So to your knowledge there was no complaints before it was placed on probation or after it was placed on probation; is that fair?
A. I'm certain there was complaints. I don't know specifically about any complaints.
Q. In other words, you're just assuming there

would be complaints based on our earlier discussion?
A. Absolutely.
Q. You have no personal knowledge of complaints?
A. Correct.
Q. Do you have any photographs of the Best Western property that existed prior to Mr. Harooni taking that property over? Let me rephrase that that was poorly done.
Do you have any photos of the hotel while it was under the management of the prior owners?
A. No.
Q. Did you take any?
A. I did.
Q. And do you know if those have been given to -- once you took them, did you give them to Best Western?
A. I did.
Q. So you do know if they've been produced in this litigation?
A. I do not know.
Q. What about any reports regarding the prior owner's property, did you give reports to Best Western regarding the condition of the property prior to Mr. Harooni taking it over?
A. Yes, I did.
Q. Do you know if those have been produced in

this litigation?
A. I do not know.
Q. What about reports on the LaMoore property?
A. Those would have been provided to Best Western, yes.
Q. Those were your report that is you gave to one of your supervisors?
A. Would have been trance nitted to our website and at the corporate office.
Q. So all of the information dealing with quality assessments would have been placed on this portal?
A. Yes.
Q. And it's those assessments that would lead to a hotel being put on proceed base or not?
A. Yes.
Q. Do you know if those have been produced in this litigation?
A.' I do not know.
Q. But you would agree that the reports you placed on that website would be relevant to assessments probation and eventaul termination of any hotel, true?
MR. GARABARINO: Objection, form.
A. Can you specify when you mean assessments. What specifically are you talking about.

BY MS. SCHLESINGER:
Q. The quality assurance assessments that you do as part of your job are a factor on whether or not a hotel is put on probation, true?
A. True.
Q. And therefore a factor they are a factor in whether a hotel is terminated, true?
A. That is also true.
Q. So to the degree that termination of a hotel membership is at issue those documents would be relevant, wouldn't you agree?
MR. GARABARINO: Objection, form.
A. I would say any document that potentially leads to probation or termination could be relevant.
BY MS. SCHLESINGER:
Q. Who was your contact person when the prior owner of the AV Inn was in place?
A. Christine.
Q. Christine was the person for the prior owner?
A. Yes.
Q. So when you say you went through the website and you said you're not positive, but you believe you would have under normal circumstances gone through the online Best Western dot come website and you said it was with Christine, do you have any defin tiff

knowledge of whether Christine was working with Mr. Harooni or the prior owner?
A. It would have been working for Mr. Harooni.
Q. It would have been?
A. Yes.
Q. So under normal circumstances that's what would have happened, but as you told me earlier, you're not your status is -- strike that we've established that.
Did you know the prior owner personally?
A. No.
Q. Did you ever socialize with him at all?
A. No.
Q. Did you have lunch with him?
A. I don't think so.
Q. Ever go for drinks?
A. No.
Q. Have coffee?
A. I don't think so.
Q. Okay.
A. I liked Harry better.
Q. Harry is a very nice guy. I'll give you that. That is an uncontested fact in this litigation, as far as I'm concerned.
Do you know if there's a way to challenge

an inspection report that leads to probation?
A. Yes.
Q. And did you ever provide details of that method for challenging to Mr. Harooni?
A. Yes, I did.
Q. When was that?
A. That was the week after the assessment, and you phoned me and I think I was in your Rica or.
Q. You need to pretend he's not here. I didn't phone you I promise you?
A. Okay. Mr. Harooni phoned me, and we discussed the need to change the assessment score because it wasn't acceptable, and Mr. Harooni, I believe, had hoped that I could change it, but that's not possible for me, so I suggested that he ask for a evaluation of my assessment which could be done by my supervisor.
Q. Now you said he called you a week after?
A. This was in the next week, whether it was a week or a few days after that assessment, I can't recall.
Q. But he called you?
A. Yes.
Q. So you had not previously explained that to me, the availability of the review of your assessment?
A. No.

Q. And is there a time limit on when that review ask be done?
A. I believe so.
Q. Is it 48 hours?
A. That's my belief.
Q. So when he called you a few days or even as much as a week afterwards and you had not previously told him -- when he told you did you tell him it was too late to have that assessment done?
A. No, I did not.
Q. But there was a time limit of 48 hours?
A. That's my believe. That's what I understand currently. I don't know if I understood that then.
Q. Fair enough. Was the hotel -- strike that.
Are hotel owners given a copy of the assessments prior to your finalizing them or transmitting them to the website?
A. They can be, but not always.
Q. What are the circumstances under which they are?
A. Of it would just depend on whether they were finalized and transmitted prior to the meeting with the management or ownership.
Q. What meeting? I'm sorry what meeting with management or ownership?

A. After the assessment process, one goes over the assessment, is required to go over the assessment with a hotel representative.
Q. So sometimes you are able to do that prior to finalizing and submitting the assessment and sometimes not?
A. It's always finalized prior to the visit, but often not transmitted until later.
Q. Okay. When you say finalized, is that something that somebody else signed off on, then?
A. No, it just means it's final undone, unchangeable on my side.
Q. But nobody else has seen it, correct?
A. That is correct sometimes.
Q. Sometimes. If the -- too much real estate litigation. If the hotel owner has a good explanation for one of the problems -- the areas you prereceive to be a problem, would you ever make a change?
A. I don't have the capability of making a change, so I could not specifically make a change.
Q. Even if it hadn't been transmitted to anybody, you can't write a new report?
A. I suppose I could cancel the report and write a new one, yes.
Q. Who is Neil Crandall?

A. He was associated with our design department.
Q. And what was his function, do you know?
A. I don't know a specific title. He was in a supervisory capacity.
Q. Would a supervisory capacity person be the final ash or in things like good taste, or is that something left up to the discretion of the person in your position?
MR. GARABARINO: Objection, form.
A. Good taste has nothing to do with my job function. In fact, that can't take -- that cannot be part of our quality assurance assessment. Good taste is part of our design process, and so that would fall under the purview of Neil Crandall or specific designer.
BY MS. SCHLESINGER:
Q. So if they had approved of it, then we can assume -- if they had approved of a design component, then we can assume that the Best Western approves of it; is that fair?
MR. GARABARINO: Objection, form.
A. I only have design reports to view, and my function is to provide any additional information that's requested.

BY MS. SCHLESINGER:
Q. Okay. Are you aware that Mr. Harooni had worked with the design department in doing some of the reVenn violations and remodels at the hotel?
A. I don't know specifically, but he probably did.
Q. Does that seem right?
A. Sure could be. I don't know for sure.
Q. And did the design components of the hotel as renovated by Mr. Harooni seem in accord with the features in other hotels in your district?
MR. GARABARINO: Objection, form.
A. I've learned long ago not to evaluate hotel from the design standpoint since I don't look through the designer's eyes.
BY MS. SCHLESINGER:
Q. Who is John Hogan?
A. He was education training director, I believe.
Q. Would it have been Mr. Hogan's responsibility to ensure that training sessions were done to prevent a hotel from being terminated, to your knowledge?
MR. GARABARINO: Objection, form.
A. No, it would not have been.
BY MS. SCHLESINGER:
Q. Would anybody at Best Western have that

responsibility?
A. Can you rephrase the question?
Q. Sure. Is it Best Western's policy to meet with hotel owners for properties on probationary status to try to bring them up before termination?
A. Yes.
Q. Whose responsibility would it be before that's done?
A. Normally it would be the regional manager.
Q. Is that you?
A. That would be me, normally.
Q. And did you do that in this instance?
A. I did not. It was another regional service manager that did that.
Q. Even though the low tell was on probation before you left, you did not take any steps to do that?
A. Another person stepped in to do that.
Q. How long from the time the hotel was placed on probation to the time you left this region?
A. I can't say for sure.
Q. Can you give me an estimate?
A. It was a very short time after.
Q. Are we talking days?
A. It was probably weeks.
Q. *Did you advice Mr. Harooni during those weeks*

that somebody would be in touch with him to work on these issues to avoid termination?
A. Yes.
Q. Did you do that in writing, sir?
A. I did not do that in -- I did not do that in writing, but it's my understanding that rapid response visits and that's what it would be, are mentioned in some correspondence with ownership and certainly upon my leaving, I whomever I did the final discussion with about the assessment, I did explain that there would be somebody coming shortly to discuss a plan of action to help the property not fail during their next assessment.
Q. Okay. Are these plans of actions done in writing?
A. They sure -- I would expect they would have been.
Q. So here's the goal, here's the problem area, here's the requirement to bring it up, here's the plan of action, that's something that should be set forth and made pretty clear to the owner?
A. One would think, yes.
Q. So who is Russo, do you know?
A. Tony Russo.
Q. Who is that?

A. He's a regional service manager that works primarily in the San Diego area.
Q. Okay. Was he involved with Mr. Harooni's property at all?
A. I believe he was.
Q. In what capacity?
A. He would have been in the individual that visited the property to discuss challenges of the property.
Q. So areas that needed improvement in order to avoid termination?
A. Yes.
Q. And do you know if Mr. Russo's custom and habit was to put them in challenges and in writing?
A. I don't know specifically, but, again, one would assume that would have happened.
Q. Is it the case that on occasion Best Western would wait for three scores under 800 before terminating the property within a 24 month period?
MR. GARABARINO: Objection, form.
A. I have never experienced that, and I don't know of any specific case.
BY MS. SCHLESINGER:
Q. Let me go back to the reservation system questions for a moment. Were you involved in the

repair or troubleshooting of any reservation system?
A. No, not that I can recall. I mean, guess repair I'd need to have a definition of your meaning of repair.
Q. Okay. Fair enough. If the reservation system independent of any operator error reflected 100 percent capacity, while in fact there was still capacity or rooms still available, is that something you would be involved in trying to figure out how that happened?
A. Yes, I could be involved.
Q. Do you have any training on computer systems, sir?
A. From a hardware, standpoint, no, and I would not attempt to fix a hardware or software issue. I can operate software.
Q.. So how would you approach solving that problem? If that was the case that the reservation system was erroneously what would your role be in trying to resolve that problem?
A. I would first set out to find out whether it was an issue that was caused by the property.
Q. And how would you do that?
A. We would take a look at specific dates, and I would talk to the staff and find out why these might have been closed, and then work with the staff to open

those dates if they were erroneously closed.
Now, if there is a portion of the system that we couldn't figure out or there's a reason that we couldn't figure out why something might be closed, I would then defer to the computer experts at Best Western.
Q. Is that a separate department?
A. That is. And they are called the help desk for the properties.
Q. To your knowledge, sir, was there ever a problem that you discussed with Mr. Harooni oar the management at his hotel regarding the reservation system?
A. I can't think of anything specifically that I talked to Mr. Harooni about, but problems with the reservation system were discussed with management at the hotel.
Q. And did you play a role in trying to resolve the problems the reservation system, sir?
A. Yes.
Q. What did you do specifically?
A. On at least one occasion I opened a closed date that was closed due to error of the staff.
Q. And do you know it was quote, closed to an error of the staff? What did you do to definitively

make that assessment?
A. By speaking with the staff Christine, in particular, in discussing why a particular date was closed? Is it indeed full and why would it have been closed, and based on the response, if it was unnecessarily closed, normally I would suggest that they open it up, but if we're looking on my computer, I would open it myself based on consent of the individual I'm sitting with.
Q. Okay. Do you know what Christine's position was when you had this alleged conversation with her regarding the computer system?
A. No, because I've been told now that she has different positions during the course of my visits.
Q. So at the time you had this alleged conversation with Christine, did you ask her what her job position was with the hotel?
A. It was not normal for me to check with individuals each time that I visited to find out whether their positions changed.
Q. That's a long way of saying, no, you didn't ask her, right?
MR. GARABARINO: Objection, form.
A. I did not ask her each time that I visited what her position was specifically, no.

BY MS. SCHLESINGER:
Q. And the reason I'm asking obviously is because I'm trying to find out, did you have any conversation with Mr. Harooni as to the problem and the resolution regarding the reservation system?
A. I know we had some discussions about reservation systems -- the reservation system being closed by an employee or employees at his hotel, but that was -- yes, so yes.
Q. And did you talk about the resolution of that problem? Did you talk to him about how to solve that problem?
A. I don't remember specifically what was discussed in the course of that conversation.
Q. But it was multiple conversations?
A. There was multiple conversations discussed or had regarding revenue and reservations, yes.
Q. And is it your testimony today, sir, that the sole -- the sole basis for your conclusion that it was operator error was simply this discussion with Cindy?
MR. GARABARINO: Objection, form.
BY MS. SCHLESINGER:
Q. Did you understand my question?
A. Cindy? Did you mean Christine.
MR. GARABARINO: Same objection.

MS. SCHLESINGER: My apologizes.
MR. GARABARINO: Excuse me. Same objection.
BY MS. SCHLESINGER:
Q. Would you like me to rephrase it, sir?
A. No. I'm just thinking about how to answer. I can't recall specifically, but I'm sure there's at least a couple of reasons why the reservation system was closed at the property. One was over optimism about particular demand on a particular day. Another one was Harry maybe not knowing how to use the particular system and the security associated with the system.
Q. You told me earlier that you don't know whose system this was in terms of was it Sabre or manufactured by some third party? You don't know whose system this was, right?
A. I don't know what the front desk system was, right.
Q. I'm just recalling your conversation, your discussion. Is it the case that Sabre has updated their computer reservation systems relatively recently?
MR. GARABARINO: Objection, form.
A. I don't know specifically about that company.

BY MS. SCHLESINGER:
Q. Did you have a manual or a tutorial available to your hotel operators on how to run reservation system?
A. Yes.
Q. It was available to you?
A. It's available to me and to them.
Q. And do you have any personal knowledge of it being available to Mr. Harooni and/or his staff?
A. Yes.
Q. How do you know that?
A. That would have absolutely been covered with Christine during my visit of the hotel.
Q. Have you ever had the experience, as I have, of having something go wrong with your computer at home?
A. Sure.
Q. Did you get any help online?
A. I have.
Q. Did they ever tell you oh, no, no, it's somebody's problem?
A. Absolutely.
MR. GARABARINO: Objection, form.
BY MS. SCHLESINGER:
Q. So when you tell them and you have to push

them to say what's going on here, when you tell me, it was all operator e error or over optimism are you saying that's the only reason for the computer system going down?
A. Those are the only reasons that I know for sure about.
Q. So it could be something else?
A. Certainly.
Q. And did you take any steps to bring in a third party agent to ascertain the true cause of the reservation system failures?
A. During the course of my visit, Harry, I think specifically and probably others discussed that the system was being closed by some outside entity. I could not find any evidence of that myself, but I don't necessarily I would as I'm not a computer expert, so we turned that over to the help desk at Best Western to investigate.
Q. Do you have any personal knowledge of the investigation being done by the help desk regarding the reservation failures?
A. I have no knowledge about the specifics of the investigation.
Q. Anything they may or may not have done, you just don't know?

A. No, I have no idea.
Q. Okay. So you could not give me any definitive date when problems would have been corrected by this help desk intervention, true?
MR. GARABARINO: Objection, form.
A. It was never determined that a force outside the hotel was ever closing the hotel.
BY MS. SCHLESINGER:
Q. You just told me you have no real knowledge about it, so it was never determined it wasn't, true?
A. That's true.
Q. Are you aware that the individual hotels pay a fee for the maintenance of this reservation system?
A. I'm certain that they do. I don't know what form that takes, but absolutely I can believe it.
Q. Did you know Ms. Bree before she came on the scene with Harry's hotel?
A. Yes.
Q. How long had you known her?
A. I think I've known her for 8 years.
Q. Did the reservation system change -- I'm doing some clean up here.
Did the reservation system change over time, to your knowledge?
A. It has changed over time, yes.

Q. When was the last change made?
A. I am aware of the last change, timing.
Q. Are you aware of any specific changes that were made during the time that Mr. Harooni had his hotel?
A. No.
Q. Did Ms. Bree have anything -- any contact with the LaMoore property, to your knowledge?
A. I believe she assessed that property since it was -- I believe she has. I don't know for sure.
Q. And do you know if she had any contact with the other four or five properties that you told me you were aware of had been terminated?
A. No.
Q. No, you just don't know?
A. No, I don't think so. The only time -- LaMoore I believe used to be her property prior to me taking it.
Q. Why did you take it?
A. We rejig territories based on members of hotels in the system, and I I just happened to be on the edge of my territory.
Q. So you don't have anybody -- strike that.
Are you aware of any Best Western employee who is assigned specifically to hotels that

are on probation or in danger of termination from an assessment perspective?
A. There's no individual. Again, one is to visit the hotel when a property becomes on probation, and that's typically the regional service manager that is in charge of that hotel.
Q. And in this case that would have been Mr. Lammier?
A. No, it would have been the regional service manager. Under normal services I would have been the one that would have visited Harry after his proceed base after my last assessment at the property.
Q. Other than the help desk, was there any third party maintenance company that handled the reservation system and/or software or hardware?
A. I'm not aware. There certainly could have been the individual property software of the company.
Q. Were you aware of any problems with other hotels reservation systems malfunctioning?
A. Aside from operator error, no.
Q. But did you ever investigate those to definitively term that it was not operator error?
A. I guess I can't say definitively, just that we suspected.
Q. So you just said, oh, it's operator error?

A. And fixed it.
Q. Fixed it?
A. Changed what needed to be changed, opened it if it was opened or closed if it needed to be closed.
Q. So it was on a spot basis, so to speak. It wasn't something that you went and said, okay, let's make sure this doesn't happen again. You just went in, if it had been inadvertently closed, you would open it. Is that what you're telling me?
A. Right, unless there was some reason to believe that it was another issue, I would have turned it over to the help desk.
Q. Did you take any affirmative action in order to ascertain that it was indeed operator error versus some systemic problem with the hardware or software?
A. I personally did not take definitive action.
Q. Are you familiar with get there corporate booking system?
A. No.
Q. Did you work in either way with your hotel owners, or do you in your new territory, to ensure that corporate bookings were obtained and serviced properly?
A. Not usually.
Q. Sometimes?
A. We'll talk about corporate business and

obviously corporate business is important to hotels, but to specifically solicit corporate business, no.
Q. Did anyone else at Best Western to your knowledge assist hotel owners with obtaining corporate accounts?
A. Yes.
Q. Was that part of Best Western's services?
A. That can be part of Best Western's services.
Q. What was the name of the company that ran the hotel before Mr. Harooni had it? Do you know?
A. Boy, I don't know the entity's name.
Q. Did you know the entity that ran the hotel for Mr. Harooni? It was just Mr. Harooni's hotel?
A. It was just Mr. Harooni's hotel. I didn't notice the legal entity.
Q. It didn't matter to your job?
A. It really doesn't.
Q. You wouldn't have done anything different if you knew it was a corporation or LLC or company?
A. No.
Q. It's all the same?
A. Yes.
Q. Did Mr. Harooni seem concerned about the quality of his hotel? Did he care?
A. He cared.

Q. And is it your estimation sir that he would have done everything in reason to try to make sure it was not terminated?
MR. GARABARINO: Objection, form.
BY MS. SCHLESINGER:
Q. Is that the impression he gave you, sir?
A. My impression is that Harry cared deeply about the operation of that hotel.
Q. Did you ever discuss with him that he was personally losing money as a result of the reservation problem?
MR. GARABARINO: Objection, form.
A. We discussed that the volume of revenue was negatively impacting his hotel.
BY MS. SCHLESINGER:
Q. His hotel?
A. Yes.
Q. Okay. Sir, I have no further questions for you at this time, but I am going to reserve redirect?
MR. GARABARINO: Real quick.
BY MR. GARABARINO:
Q. Are these all the picture exhibits right here?
(Discussion off the record.)
BY MR. GARABARINO:
Q. Just a couple of quick questions for you as

follow up questions. Counsel for defendants offered three exhibits, which are photographs, and those exhibit are Exhibit 4, 5, and 3. I'm sorry, I read them out of order. Are those the three exhibits sitting that are sitting before you right now?
A. Yes, they are.
Q. And you agree that those are photographs of the hotel?
A. I do.
Q. Do you know who took those photographs?
A. I don't.
Q. Okay. Do you know the date that those photographs were taken?
A. I do not.
Q. Do you know the purpose for which those photographs were taken?
A. No.
Q. Okay. Is it possible as you sit here today that there is no deficiency in these photographs that would resulted in a mark down of Mr. Harooni's hotel?
MS. SCHLESINGER: Objection, form, foundation.
A. That is possible.
BY MR. GARABARINO:
Q. Did you take pictures during your inspection

of items that didn't result in point deductions?
A. Yes, I did.
Q. Going to the reservation system for just a moment, and this is the only area I have left to cover, do you have any reason to believe that the blocking out of the reservation system that Mr. Harooni's hotel was due to anything other than operator error?
A. No.
MS. SCHLESINGER: Objection, form.
A. No, I do not.
BY MR. GARABARINO:
Q. I have no further questions?
MS. SCHLESINGER: I think you're off the hook and you can go find some snow if you can.