## Page 73

1  Therefore, the inspection reports that we
2  discussed which was dated May 17, 2007 -- and let me ask
3  the deponent this.
4  Q. You don't believe that you were present for
5  that inspection in May of 2007?
6  A. I don't think so.
7  Q. Okay. And any inspection report that was
8  authored or occurred later than May of 2007, you were
9  not at the hotel; correct?
10 A. Correct.
11 Q. And so you had no knowledge of the
12 inspection. You were not present for the inspection.
13 And you did not receive the inspection report; correct?
14 A. Correct.
15 Q. Okay. And I think, as we looked back at the
16 other dates we discussed here today, is it fair to say
17 that the dates are probably a year ahead of time?
18 A. Correct.
19 Q. Meaning that, to correct those dates, we would
20 subtract a year?
21 A. Yes.
22 Q. Okay. And at this point going forward,
23 though, we are going on the assumption and your
24 understanding as well as my understanding that you
25 started work in 2006 and left in 2007; correct?

## Page 74

1  A. Correct.
2  MR. GARBARINO: Do you have anything else to
3  add?
4  MS. LAZARUS: I do not.
5  BY MR. GARBARINO:
6  Q. And you were not there in December of 2007 at
7  the hotel; correct?
8  A. Correct.
9  Q. Do you have any knowledge regarding the
10 freeway 14 bypass?
11 A. The freeway?
12 Q. Yes. The Sierra Highway used to be the main
13 highway?
14 A. Yes.
15 Q. And was it bypassed at one point in time?
16 A. They put in a freeway.
17 Q. Do you know when that occurred?
18 A. When I was in the second grade.
19 Q. Okay. Fair enough.
20 A. They were putting it in when I moved up to the
21 Antelope Valley. And I was in the second grade. So
22 whenever that is.
23 Q. Do you have any knowledge regarding any
24 efforts made by the hotel, AV Inn Association 1, or
25 Mr. Harooni to rebrand the hotel after the Best Western

## Page 75

1  membership was terminated?
2  A. No.
3  Q. Did you have any conversations with
4  Mr. Harooni about the hotel being rebranded?
5  A. No.
6  Q. And you have no information regarding the
7  board meeting that took place to discuss the hotel's
8  Best Western membership?
9  A. No.
10 Q. Could we talk about Exhibit 22 for just a
11 minute.
12 (Plaintiff's Exhibit 22 marked.)
13 BY MR. GARBARINO:
14 Q. And this is your declaration; correct?
15 A. Yes.
16 Q. Do you recognize this document?
17 A. Yes.
18 Q. Did you prepare this document yourself?
19 A. Yes.
20 Q. Why did you prepare this document?
21 A. I was asked to document my knowledge of --
22 during my employment time of my dealings and my staff's
23 dealings with Best Western.
24 Q. While we were on break a minute ago, did you
25 have an opportunity to review this document in full?

## Page 76

1  A. Pretty much.
2  Q. Do you want to take a minute and read it again
3  because I'm going to ask you some pretty specific
4  questions about it.
5  A. Okay. Go ahead.
6  Q. Paragraph 1, is it fair to say that those
7  dates are incorrect?
8  A. Yes.
9  Q. So should it really be April, 2006 through
10 April, 2007?
11 A. Yes.
12 Q. So after April, 2007, did you have any contact
13 whatsoever with Mr. Harooni, AV Inn Associates or the
14 hotel?
15 A. No.
16 Q. So as for any event that occurred after April
17 of 2007, you have no knowledge with respect to the
18 hotel?
19 A. No.
20 Q. Is there any way that you can explain the
21 apparent inconsistency in paragraph 2 between Mitch
22 saying that he had come to take away the hotel's
23 membership and then in the very next sentence Mitch
24 giving the hotel one of the highest scores it has ever
25 received?

## Page 77

1  Can you explain the inconsistency there?
2  A. That is the conversation that we had, that he
3  was so pleasantly surprised at the progress because he
4  was actually sent to take away the Best Western flag.
5  Q. And that is what he told you; correct?
6  A. Yes.
7  Q. Do you know if it was actually true whether
8  somebody sent him to take away the flag?
9  A. I only know what he said to me.
10 Q. Fair enough.
11   And the inspection that we are talking about
12 here, obviously, had to have occurred from April of 2006
13 to April of 2007; correct?
14 A. Correct.
15 Q. Paragraph 4 talks about attendance of the Best
16 Western convention in San Francisco.
17 A. Yes.
18 Q. Do you recall attending that convention?
19 A. Yes.
20 Q. We sure on the date it was 2006?
21 A. Yeah. I'm pretty sure.
22 Q. Do you remember what time of year it was?
23 A. I don't remember.
24 Q. Fair enough. I understand?
25 A. I don't remember when it was.

## Page 78

1  Q. It says that you encountered many top-level
2  executives. Do you remember who any of those top-level
3  executives are by name?
4  A. I met Terri Winegger. I met Scott Wilson. I
5  don't recall meeting Mary Ann Gray. I don't think I
6  ever met Mary Ann Gray. I think I only had
7  conversations with her.
8    But there was -- you know, there was like
9  everybody. Like, the board was there. You know, not
10 that I was, like, had a personal conversation. But I
11 did introduce myself.
12 Q. So as you sit here today, the only names that
13 you can remember of top-level executives are Terri
14 Winegger and Scott Wilson?
15 A. Because I had conversations about them, yes.
16 So it was placing a face with the name.
17 Q. The next sentence says, "The conversation with
18 all of them was one of promising support and individual
19 attention"; correct?
20 A. Uh-huh.
21 Q. Does that apply to all of the executives you
22 met with or just Terry Winegger and Scott Wilson?
23 A. All of the people. All of the Best Western
24 were very cordial and supportive and seemed to be aware
25 of our hotel.

## Page 79

1  Q. When you say supportive, are they promising
2  you anything in particular or are they just saying you
3  have our support?
4  A. No. To me it was addressing problems that had
5  already been taking place. They knew Harry by name.
6  They didn't know me by name. You know, but it was --
7  they definitely knew him and what was going on with the
8  hotel, that there was problems at the hotel.
9    So they were promising to, you know, we will
10 get it fixed. We will get you online. You know, we
11 will get some business to you, you know.
12 Q. Were there any specific promises, I guess, is
13 what I'm trying to get at? I mean, did Scott Wilson
14 promise to have Boeing be a customer of Best Western?
15 A. Scott Wilson promised to do all that he could
16 as far as the marketing and getting us RFP's and getting
17 us online with whatever RFP's we could get online with
18 and contact names and those type of things just like any
19 other marketing or salesperson.
20   You know, they were going to make sure that we
21 didn't leave anything undone. So we could get all of
22 the business that we could.
23 Q. Do you feel that those promises were
24 fulfilled?
25 A. Like I said, they were like kind of late on

## Page 80

1  the draw because in not waiting for a phone call, we had
2  done it on our own. And so we actually had the contact
3  name and made contact by the time Scott would call and
4  say this is the person you need to talk to.
5  Q. Okay. But Scott did do what he said he was
6  going to do?
7  A. Yeah.
8  Q. The next paragraph says that you got the
9  impression that Best Western's policy was to weed out
10 older properties?
11 A. Yes.
12 Q. What gave you that impression?
13 A. Sitting through -- I guess it was the general
14 meeting. It was the first big meeting. And they were
15 talking about plans that they had. I was kind of really
16 taken back. I wasn't familiar with Best Western, that
17 world.
18   And sitting there, so I was like listening to
19 everything because I wanted -- it is a membership. So
20 it isn't like a franchise. So it was different. They
21 were voting and stuff like that. They were -- it was
22 just a different process.
23   So in listening and everything, they were
24 showing that -- what the other franchises brands were
25 doing.

## 81

1  And, honestly, I felt like we were followers.
2  That is what I felt like. And I sat there. And I
3  thought to myself, my God, you know, they are reviewing
4  things that I had reviewed a year prior with Holiday
5  Inn. And they are showing the very thing that -- sales
6  strategies and everything. And now they are coming on
7  saying, okay, so we can do this, and we can do that.
8  And I'm thinking, being with Holiday Inn, we
9  were always very aggressive in being -- to set the
10  trend, not to follow a trend. And I found that I --
11  that was very alarming to me to say, okay, well, we can
12  do this or we can do that. This is what is going on
13  here.
14  And then they were addressing the fact that
15  there was older properties. There was a lot of
16  inconsistent with you can go from here to here.
17  And they were talking about how they were just
18  getting ready to open a big hotel overseas, I believe,
19  because they were talking about this prototype. Does
20  that make sense?
21  Q. Okay.
22  A. I mean, it was something that they were very
23  proud of.
24  And that is when in the whole presentation
25  that different members would get up and, you know, voice

## 82

1  their opinions and concerns. And they were talking
2  about how some of the older properties that needed to be
3  pretty much weeded out so Best Western's name could be
4  more corporate-related, higher standard, that type of
5  thing.
6  And through the whole thing, I just sat
7  there. And I thought this is -- I didn't tell him. But
8  to me it was alarming.
9  Q. You didn't tell who?
10  A. Harry.
11  Q. It was alarming because you thought that the
12  Best Western brand and the whole package that Best
13  Western offered was behind what other franchises were?
14  A. Yes.
15  Q. Okay. But you understood that Best Western is
16  a membership organization?
17  A. Yes.
18  Q. And you understood that the members vote on
19  many of the major policies that are put into effect by
20  Best Western?
21  A. Yes.
22  Q. Did you understand that this could be an
23  extremely slow process given the number of members?
24  A. Yes.
25  Q. And that was your concern?

## 83

1  A. My concern was that they weren't -- they just
2  weren't on the cutting edge as the other franchises.
3  And that was alarming.
4  It was surprising to me because coming from
5  Holiday Inn and Ramada and, you know, they are very
6  proactive and, you know, aggressive. And in watching
7  what I had just -- the year previous, you know, had seen
8  with Holiday Inn.
9  And that is what they were setting up
10  giving -- okay, well, we can do this. Or we can do
11  this. And I'm just thinking, my God, these people need
12  to have -- they need to be leaders.
13  Q. Let me ask you this. Did you ever review the
14  membership agreement that Mr. Harooni entered into with
15  Best Western?
16  MS. LAZARUS: Objection to form.
17  MR. GARBARINO: What is the objection?
18  MS. LAZARUS: Withdrawn.
19  THE WITNESS: I could have. I don't know. I
20  read through a lot.
21  BY MR. GARBARINO:
22  Q. You are not sure as you sit here today?
23  A. I don't recall.
24  Q. Did you ever read the rules and regulations
25  that Best Western has?

## 84

1  A. I'm sure I did.
2  Q. Okay. Did you ever review the Best Western
3  bylaws?
4  A. Yes.
5  Q. As you sit here today, to the best of your
6  recollection, do you recall any provision of either the
7  bylaws, the rules and regulations, and/or the membership
8  agreement that you believe Best Western didn't fulfill
9  its obligations with respect to AV Inn and Mr. Harooni?
10  MS. LAZARUS: Objection to the form.
11  THE WITNESS: I really couldn't answer that
12  because it would be my own personal opinion of what I
13  felt could have been more. Does that answer you, or
14  does it --
15  BY MR. GARBARINO:
16  Q. And is your personal opinion on what you
17  thought could be more based on your previous experience
18  with other franchises?
19  A. Yes:
20  Q. Fair enough.
21  Do you remember on your 10-day sales trip
22  which companies you met with?
23  A. We went to Eglin Air Force Base in Florida.
24  We went to a lot of travel agents. I think we went to
25  Rite Aid. I can't remember offhand. There was a whole

## Page 85

1  list of them at the whole East Coast, started up and
2  came all the way down.
3      Q.  So you went from New Hampshire to Florida?
4      A.  Uh-huh, yes.
5      Q.  Did you venture beyond the East Coast?
6      A.  No.
7      Q.  You didn't go to Missouri?
8      A.  No.
9      Q.  Did you meet with anybody from Boeing during
10 this 10-day sales trip?
11     A.  No.
12     Q.  Did you meet with any aerospace-related
13 businesses during this 10-day sales trip?
14     A.  We could have, but it would be a
15 subcontractor.  It wouldn't be any Lockheed or Northrop
16 or Boeing or anything like that.
17     Q.  So no Lockheed?  No Boeing?
18     A.  Yeah.
19     Q.  No Northrop?
20         Do you remember a BAE?
21     A.  Yes.
22     Q.  You did meet with those folks?
23     A.  Yes.  BAE Systems.
24     Q.  Do you recall meeting with -- strike that.
25         Is there a company that has a distribution --

## Page 86

1      A.  Rite Aid.
2      Q.  -- plant in Lancaster?
3      A.  Rite Aid.
4      Q.  Is there anybody else, in particular, that has
5  a distribution plant in Lancaster that you visited while
6  you were on your 10-day sales trip?
7      A.  Rite Aid.
8      Q.  There was some discussion about -- or there
9  has been some discussion in this litigation about there
10 being a problem loading corporate information into the
11 Best Western system.
12         Do you recall encountering any problems like
13 that?
14     A.  There could have.  Lisa would have been
15 dealing with that.
16     Q.  Would Lisa be the best person to talk to about
17 that?
18     A.  Yes.
19     Q.  In paragraph 6 there is a phrase.  It says,
20 "Mr. Harooni implored Best Western's management to help
21 determine the reason behind drastically low occupancy
22 rates."
23         How did Mr. Harooni implore Best Western
24 management?
25     A.  One being Terri because I sat in on conference

## Page 87

1  calls.  And he was like begging her to please help him.
2      Q.  Okay.  Any written requests for help?
3      A.  I don't know.
4      Q.  In paragraph 8 you state that Mr. Harooni did
5  not receive adequate support from Best Western.
6      A.  In my opinion.
7      Q.  And that is your opinion only?
8      A.  Yeah.
9      Q.  It is not based on your review of the
10 membership agreement?
11     A.  No.
12     Q.  It is not based on your review of the rules
13 and regulations?
14     A.  No.
15     Q.  And it is not based upon your review of the
16 bylaws?
17     A.  No.
18     Q.  Is it fair to say it is based on your
19 experience with other franchises?
20     A.  Yes.
21     Q.  Paragraph 9, is it fair to say we need to
22 change that date to April, 2007?
23     A.  Yes.
24     Q.  Did you prepare any other declarations for
25 anybody else?

## Page 88

1      A.  Huh-uh.
2      Q.  Forgive me.  But you prepared this on your
3  computer?
4      A.  On my computer at work.
5      Q.  At work?
6      A.  (No audible response.)
7      Q.  Did somebody send you a form to use for this
8  declaration?
9      A.  No.  I was just asked to put this first line.
10     Q.  You were asked to do what?
11     A.  This first line.
12     Q.  And you understand what that first line means?
13     A.  Yeah.  And I goofed it up.
14     Q.  Let me ask you this.  If you look at Exhibit
15 21 and Exhibit 20.
16         (Plaintiff's Exhibits 20 and 21 marked.)
17 BY MR. GARBARINO:
18     Q.  And if you can sat all three declarations --
19 Exhibit 20, 21, and 23 in front of you.
20     A.  Yes.
21     Q.  Do you have that?
22     A.  Uh-huh.
23     Q.  And you testified you prepared yours on your
24 computer; correct?
25     A.  Uh-huh.

## Page 89

1  Q. Would you agree that the formats of each one
2  of these declarations is exactly the same?
3      MS. LAZARUS: Objection. Counsel, you said
4  23. Do you mean 22?
5      MR. GARBARINO: Excuse me. I'm sorry.
6  Exhibit 20, 21 and 22.
7      THE WITNESS: Yes. But it is a standard time
8  line, you know, generalization of events.
9  BY MR. GARBARINO:
10  Q. I'm not necessarily even talking about the
11  events and the substance. I'm just talking about the
12  format. It looks like the exact same font.
13  A. It couldn't be. I guess it could be. But it
14  is mine, was done on a computer at work.
15  Q. Okay. Can I take a break and just see if I
16  have got anything else. I think I'm almost done.
17      (Recess.)
18  BY MR. GARBARINO:
19  Q. There was a convention in Chicago that I
20  believe Kevin Refoua and Lisa went to.
21  A. Correct.
22  Q. Were you the GM at the time?
23  A. Yes.
24  Q. Why did they go to that conference?
25  A. To try and secure Boeing.

## Page 90

1  Q. To try and secure Boeing?
2  A. Uh-huh.
3  Q. Did Best Western invite the hotel to have
4  somebody attend this conference?
5  A. I couldn't say exactly how it was. Best
6  Western had a booth. And I believe that they had told
7  Lisa that they could be at the booth. Not to promote
8  the hotel but to -- they could be with the booth to
9  attend.
10  Q. So it is your understanding that Best Western
11  told the hotel that Lisa could be there but not promote
12  her hotel or the hotel?
13  A. It was -- yes. It was -- it wasn't for
14  individual properties. It was for the companies. So it
15  was a chance that we were taking because we wanted to
16  have an opportunity to talk to her face to face. And
17  she was going to be there.
18  Q. When you mean her, you mean?
19  A. Lisa Bliss with Boeing.
20  Q. But you understood going in that there
21  wouldn't be other Best Westerns specifically marketing
22  their properties at this convention?
23  A. No.
24  Q. No, you didn't?
25      Let me rephrase that question. That was very

## Page 91

1  poorly phrased.
2      You knew that other Best Western properties or
3  owners would not be at the convention; correct?
4  A. I couldn't swear that they wouldn't be there
5  because we were there.
6  Q. Okay. Fair enough. But you knew that the
7  only Best Western marketing would be the Best Western
8  corporate worldwide marketing, not a specific hotel
9  marketing for its specific location?
10  A. They might have. They might have. I'm
11  thinking -- I hate to -- I don't know if that is when we
12  found out that we would not be part of what was going to
13  be promoted. So that is why they said you could come
14  and talk to people on your own.
15  Q. Okay.
16  A. Because it was not a conference that was
17  really for property-level properties.
18  Q. And I just want to go back and clarify another
19  date. This is kind of critical.
20      When were the room renovations completed? In
21  2007 or 2006?
22      And maybe a better way to ask this question
23  is, how long were room renovations going on once you
24  started your employment at the hotel?
25  A. Well, I can't remember because I know that we

## Page 92

1  moved into the convention center to get that done. And
2  there was nothing that sparks my memory of hurry up and
3  get it done by a certain date. I know the rooms were
4  done before the convention center because we moved on
5  into that.
6  Q. Okay. Can we make an estimate? Six months
7  after you started?
8  A. Yeah. I think that would be a fair give or
9  take.
10  Q. Okay. But certainly not less than three
11  months?
12  A. No.
13  Q. And not more than nine months. Is that fair?
14  A. I think so. I couldn't swear to it.
15  Q. I don't think I have any further questions.
16      MS. LAZARUS: Okay. I do.
17      EXAMINATION
18  BY MS. LAZARUS:
19  Q. First, you have Exhibit 22 still in front of
20  you. So with respect to Exhibit 22, do you recognize
21  this font?
22  A. The font?
23  Q. Is there anything notable about that font?
24  A. It is just whatever comes up on Microsoft word
25  or whatever on the computer.

## 93

1  Q. So it looks like a pretty standard font to
2  you?
3  A. Yeah.
4  Q. And then I just want to clarify a few things.
5  So going back now, you said that you would be renovating
6  the rooms floor by floor?
7  A. Yes.
8  Q. And that there were about 20 rooms per floor?
9  A. I'm thinking there is 20.
10 Q. With respect to the turnaround time for a
11 room, is it possible that it could have been less than
12 two to three weeks?
13 A. Well, it could have been as far as, you know,
14 from start to finish. When they would go in, they would
15 go ahead and gut them out and everything. And what
16 would happen is they would move all of the furniture
17 over into the rooms across the hall. And we would use
18 that as a storage.
19     And then they would get gut one side and do
20 whatever they had to do. And then they would move the
21 furniture back into that and do the other one.
22     So, yeah. But I don't think that it would
23 have been okay for anybody to be on that floor because
24 it would be unsafe. So we had the whole floor down
25 until we were ready to put the whole floor back on

## 94

1  market.
2  Q. Okay. Now, you said you never met Mary Ann
3  Gray face to face?
4  A. No.
5  Q. When did you first converse with Mary Ann Gray
6  over the phone or over e-mail?
7  A. I believe that she contacted us after the
8  convention.
9  Q. Okay. Do you remember what her title was?
10 A. I think she was the one that was over the
11 corporate accounts. I'm thinking. I can't remember how
12 Scott and her were. But it was Scott and her, the two
13 that we -- and she was -- I'm pretty sure she was the
14 corporate account, over corporate accounts other than
15 versus someone that was in over SMRF accounts or, you
16 know, promoting sports, military --
17 Q. Okay. And that is what you mean by a SMRF
18 account?
19 A. Yes.
20 Q. Sports, military. Recreation might be the R?
21 A. Yes.
22 Q. Something like that?
23 A. Yes. All of the rest.
24 Q. You testified that at some point, quote, it
25 was made clear that our property wasn't going to be one

## 95

1  of the number one properties promoted; is that right?
2  A. Yes.
3  Q. Who made that clear to you?
4  A. Mary Ann.
5  Q. How did she do that?
6  A. She said it.
7  Q. In an e-mail?
8  A. She either said it to myself, or she said it
9  to Lisa, but I responded in an e-mail.
10 Q. So she actually said we aren't going to
11 promote the property?
12 A. She was not going to promote the property. It
13 was not in the selection of hotels that they were going
14 to be promoting and pushing, per se, at that Chicago
15 conference or anything like that, that they had their
16 selection. And that was really devastating for us.
17 Q. Did she explain to you why the Best Western
18 Antelope Valley Inn wasn't going to be part of that
19 selection?
20 A. Because it wasn't a favored hotel
21 consistently. It had come back out of being run down.
22 And that hotel hadn't been promoted.
23 Q. Did you know how long -- let me back up.
24     When did this conversation occur?
25 A. I would think -- I would -- I'm thinking that

## 96

1  maybe before the Chicago trip. That was what prompted
2  the Chicago trip so we could at least talk about our
3  property.
4  Q. Okay. I think there was a whole series of
5  things that were taking place. But it was in 2006?
6  A. Yes.
7  Q. Do you know for how long prior to 2006 the
8  property hadn't been promoted?
9  A. No.
10 Q. And it had been out of this -- I think you
11 also said that it also had been out of the RFP process
12 for a lot of these companies for a long time too; right?
13 A. Yes. Right.
14 Q. And that is because it was run down?
15 A. Yes.
16 Q. And that is while it was a Best Western?
17 A. Yes.
18 Q. So and who told you that it had been out of
19 the -- that it had been out of this RFP radar because it
20 was so run down?
21    Or did anyone say it?
22    Let me rephrase.
23    Did anyone tell you that it had been off the
24 radar because it was so run down?
25 A. Yeah. Mary Ann.

---

Page 97

1  Q. Okay. Did Mary Ann actually say that the
2  property was run down or just that it --
3  A. The property was not being promoted because of
4  the condition. They were getting complaints that --
5  from the corporate accounts because if they would send
6  somebody there or it was horrible. So they didn't
7  refer -- they didn't promote that property.
8  Q. And they went to the Chicago conference to
9  just help change the image?
10 A. To be able to at least talk about -- talk with
11 some people about our property.
12 Q. Do you know if Mary Ann had ever been to the
13 hotel?
14 A. No. I don't know if she has been there or
15 not.
16 Q. Did Mary ever visit the hotel while you were
17 there?
18 A. No.
19 Q. You also testified that, after attending the
20 San Francisco convention, you felt that Best Western was
21 trying to weed out some of the older properties?
22 A. Yes.
23 Q. What gave you that idea?
24 A. Basically, they were talking about how they
25 wanted to raise the flag, the brand. They wanted to

Page 98

1  raise it up to a higher standard.
2       And some of the members would get up. And
3  they would say, you know, I have a very nice older
4  property. And then there are some that are really run
5  down. So how can you -- how are you going to decipher?
6  You know, is it your years' membership? Is it going to
7  be cite inspections? Is it going to be -- just what is
8  it going to be because other people were worried about
9  it too that had older properties. The whole meeting was
10 talking about it.
11 Q. People in the hallways were talking about
12 this?
13 A. No. In the room, in the meeting room. It was
14 like a big meeting room with a board up there.
15 Q. Okay. You mentioned a prototype. Was the
16 prototype architecturally different than an older
17 property?
18 A. Oh, yeah. It was a new type hotel. And I'm
19 thinking it was overseas. It was overseas. I know it
20 was overseas because I'm thinking, well, why wouldn't
21 you start that here. If you are going start something
22 new, why don't you start it here.
23 Q. With respect to the reservation system, I
24 think you said Lisa would have been the person most
25 familiar with it; is that right?

Page 99

1  A. Yes.
2  Q. But to the best of your recollection, when --
3  you said -- once the problem was solved with respect to
4  the reservation system, did it have to be monitored?
5  A. Yes.
6  Q. What happened if it wasn't monitored?
7  A. Well, you wouldn't know if something went
8  wrong or if it was closed out. It was part of -- you
9  know, you needed to -- since it was closed down, that
10 was a red flag. So we needed to monitor and make sure
11 that whatever happened wouldn't happen again. So that
12 was Lisa's responsibility.
13 Q. Do you know if there were any problems -- or
14 let me withdraw that.
15      You testified that you had previously served
16 as a sales manager at a different hotel; is that right?
17 A. Director of sales.
18 Q. When you were director of sales at that other
19 hotel, did you ever work with big groups booking rooms?
20 A. Yes.
21 Q. Do you know how far in advance they generally
22 booked their rooms?
23 A. Well, on conventions they usually plan
24 anywhere from, I would say, the least is six months.
25 Usually, it is anywhere from 9 to 12 months.

Page 100

1  Q. And let's say that you don't have the dates
2  that they wanted 9 to 12 months in advance. What would
3  they do?
4  A. They would book elsewhere.
5  Q. And, you know, once they booked elsewhere, was
6  it possible that they would double-check with you to
7  make sure that your dates hadn't opened up in the
8  meantime?
9  A. Not usually.
10 Q. So for this period that the reservation system
11 was malfunctioning and a year in advance was not
12 available, you don't really know -- you don't really
13 know about lost reservations, do you?
14 A. Well, there could be -- there is group sales.
15 If any group called in or was inquiring even on the Best
16 Western line, availability would not be there. So it
17 automatically, like, takes you to the closest.
18 Q. Okay.
19 A. So, I mean, if they are looking for a
20 specific, you know, 500 rooms, you know, and a
21 convention that can fit 1,000 people, it would weed out
22 certainly all the small properties or even if they said,
23 you know, we just want it in Southern California, you
24 know.
25 Q. So then, even if your reservation system had

**Page 101**

1  shown that a group of rooms was blocked out but then
2  they were available the next day, the person --
3     A.  No.
4     Q.  The person would have already been directed
5  elsewhere through the Best Western system?
6     A.  Yeah, or just denied.
7     Q.  Okay.  And when was the convention in San
8  Francisco?  Do you remember --
9     A.  I can't remember.  I don't remember.  It
10 was -- we walked everywhere.  It was nice weather.
11    Q.  Do you think it was before the Chicago trip or
12 after?
13    A.  I don't remember.
14    Q.  Okay.
15    A.  I don't remember.
16    Q.  Which is understandable.
17        So in terms of your interactions with Mitch
18 during this inspection that you worked, do you know if
19 anyone on the property was nervous about Mitch's
20 inspection?
21    A.  No.
22    Q.  Did you ever talk to anybody at the property
23 about their previous experiences with Mitch?
24    A.  No.
25    Q.  Did he explain to you why he was sent to pull

**Page 102**

1  the flag?
2     A.  Because the property was run down and things
3  weren't, I guess, renovated or being renovated fast
4  enough.  I don't know.
5     Q.  Okay.
6     A.  He was surprised.
7     Q.  Do you know if he was familiar with the
8  remodeling process that was going on?
9     A.  I don't know.
10    Q.  Did he ever talk to you about monitoring it or
11 anything like that?
12    A.  The only thing that I knew on some of the
13 things that he had discussed that he would put them
14 under -- it would go underneath remodeling.  So it
15 wasn't like you weren't getting docked the points then.
16 But it was noted.  It was noted.  And it was underneath,
17 like, renovation.
18        I forget.  He called it something.  But it
19 meant that they are -- on that date that is what was
20 taking place, but it was supposed to be taken care of in
21 a renovation.
22    Q.  Okay.
23    A.  You know.
24    Q.  Do you know what the hotel score had been on
25 the inspection report prior to the one where Mitch said

**Page 103**

1  that he was sent to pull the flag?
2     A.  No.
3     Q.  That was before you began working?
4     A.  Yes.
5     Q.  You had been working in the hospitality
6  industry in Antelope Valley for some time before you
7  started at the Best Western Antelope Valley Inn;
8  correct?
9     A.  Yes.
10    Q.  Did you already have personal contacts with
11 people in central corporate accounts in the area?
12    A.  Yes.
13    Q.  Do you know if Lisa did?
14    A.  Yes.
15    Q.  You said that you had your own program that
16 you had implemented for going through and checking the
17 rooms.
18    A.  Yes.
19    Q.  What did that entail generally?
20    A.  It was a form, and it had 116 different
21 listings and boxes to be checked off as that item was
22 tested or replaced or checked, repaired, whatever, that
23 it is pretty much everything in a room down to plugs,
24 light switches, lamps, everything.
25    Q.  Okay.  And people -- I mean, you did this

**Page 104**

1  often while you were the general manager?
2     A.  The rooms we went through a quarterly -- every
3  three months there had to be -- by the time a quarter
4  came around, the whole property should have been
5  completed.
6     Q.  Okay.  And this was similar to what you had
7  done at other properties?
8     A.  Yes.
9     Q.  And I apologize.  I would like to direct you
10 back to Exhibit 22 and paragraph 8.
11        Now, where you say that you feel like
12 Mr. Harooni did not receive adequate support from Best
13 Western, did you feel like Best Western, when -- let
14 me start over.
15        When you and Harry were at the -- when you and
16 Mr. Harooni were at the convention in San Francisco,
17 were the executives -- were they friendly to
18 Mr. Harooni?
19    A.  Yes.
20    Q.  Do you feel like they cared about
21 Mr. Harooni's success?
22    A.  They seemed to.  They were aware -- they knew
23 him.  They were aware of the property.
24    Q.  You say that he didn't receive adequate
25 support.  I think counsel asked you a couple of

## Page 105

1  questions about the legal documents, the bylaws, and the
2  membership agreement.
3      Were you thinking about those when you wrote
4  this paragraph?
5    A. What I was referring to was that -- what was
6  discussed in my presence that Harry had talked with them
7  about. And then I felt that we had did everything. And
8  we had accomplished a lot on our own only to come to the
9  conclusion of the property would not be one of those
10 that would be promoted for the area.
11     So I don't feel that he was adequately
12 supported. I mean, it was like it was a very big
13 letdown.
14   Q. This was that begging for help that you talked
15 about?
16   A. Yeah. Like I said, I wrote a very nasty
17 e-mail.
18   Q. Okay. I don't think I have anything further
19 for you.
20     Do you have any follow-up questions?
21     MR. GARBARINO: You bet you.
22     FURTHER EXAMINATION
23 BY MR. GARBARINO:
24   Q. How many people were present at the Best
25 Western convention?

## Page 106

1    A. Thousands.
2    Q. Thousands?
3    A. (No audible response.)
4    Q. All in one big meeting room?
5    A. There was different -- well, that one I think
6  was a general meeting.
7    Q. Of all of the members?
8    A. I think so. It was a big one because they had
9  smaller break-out rooms or whatever for later on. But I
10 think all of us went into that first big one. That is
11 where the board was.
12   Q. So it consisted of members owning a variety of
13 different properties?
14   A. Yes.
15   Q. Some of them older properties?
16   A. Yes.
17   Q. Some of them owned new properties?
18   A. Yes.
19   Q. The very nature of Best Western's membership
20 is it contains lots of different properties. Is that
21 fair?
22   A. Yes.
23   Q. And it is quite a wide range in the age and
24 type of properties owned by the members of Best Western?
25   A. Yes.

## Page 107

1    Q. Do you know if the former owners -- and I'm
2  referring to the owners of the hotel prior to
3  Mr. Harooni -- did anything to keep the RFP process
4  going?
5    A. I don't know. I don't know.
6    Q. Is it possible that the former owners dropped
7  the ball in terms of keeping the process going?
8    A. It is possible.
9    Q. You said a lot today about promotion of a
10 particular hotel.
11   A. Yes.
12   Q. Is it possible for Best Western or -- and this
13 is in your opinion, obviously -- to market each one of
14 its 4,000 hotels?
15   A. No. But our community is a fishbowl community
16 in the Antelope Valley. And we have Edwards Air Force
17 Base, which is a major, major business source.
18     So when you only have two Best Westerns there,
19 one of them being limited service, it didn't make sense
20 to me for a full-service, fully renovated hotel that is
21 just -- with a conference center would not be one of a
22 chosen selection to promote for that area.
23   Q. So do you know that Best Western promoted any
24 hotels for that area?
25   A. I don't know. I don't know.

## Page 108

1    Q. Have you seen Best Western promote a hotel for
2  any particular area in general?
3    A. Only according to Mary Ann. Yeah.
4    Q. But you have never seen it?
5    A. Yeah, I have. I have seen some of their
6  commercials where they showcase some of their members
7  and their hotels.
8    Q. Do you remember what areas those were?
9    A. Actually, right after we got back from the
10 conference there, there was one that I think I
11 recognized. And it was a man that was more vocal about
12 his property, nice property.
13   Q. Do you remember where it was located?
14   A. I'm thinking it was on the coast. Maybe Santa
15 Barbara somewhere, you know.
16   Q. Okay. When you talk about promoting this
17 specific hotel, referring to the hotel in this
18 litigation, how did you think that Best Western should
19 have promoted it? What specific steps should Best
20 Western have done?
21   A. Well, in whatever she was pushing. I don't
22 know what.
23   Q. When you refer to she --
24   A. Mary Ann. I don't know how she based her
25 selection of the hotels that she was going to pitch to

### Page 109

1  corporations for RFP's. I imagine there are different
2  ways of doing it. I don't exactly -- I know -- just
3  know that she said that our property was not going to be
4  one of them that she is going to be actively promoting.
5    Q.  Okay. What does it mean to be actively
6  promoting?
7    A.  Because Antelope Valley and Edwards Air Force
8  Base has such an influx of business coming to it, I
9  can't imagine any franchise that is there that would not
10 push a hotel that is there in that valley.
11   Q.  Okay. I understand that.
12      But what steps specifically does Best
13 Western -- or did you expect Best Western to take to
14 actively promote the hotel in the area?
15   A.  Whatever she was doing with the others.
16   Q.  But you don't know what she was doing with the
17 others?
18   A.  No.
19   Q.  When you were at the meeting, referring to the
20 annual convention of Best Western, and you were talking
21 about how there was discussion of phasing out older
22 properties, did anybody come to any decision at that
23 meeting as to what would be done with older properties?
24   A.  No. I think it was conversation.
25   Q.  So nobody said or nobody voted on any proposal

### Page 110

1  to eliminate older properties?
2    A.  I don't recall. I know that there was
3  conversation because, like I said, I was -- the whole
4  voting thing was odd to me.
5    Q.  I understand.
6       Generally, when was the busy season for the
7  hotel in terms of, you know, fall, summer, spring or
8  winter?
9    A.  The hotel could be full all through the year.
10 The only time that it is really slow is pretty much
11 everybody suffers through the last two weeks in
12 December. Other than that, there is business. If it is
13 not corporate, then there is certainly enough SMRF
14 business.
15   Q.  And as you testified here, you worked at a lot
16 of different hotels in your career in the hotel
17 industry. Did most of those hotels have a sales
18 manager?
19   A.  No.
20   Q.  No?
21   A.  No.
22      When I went to Oxford Inn before becoming
23 general manager, I was their first salesperson, their
24 first director of sales.
25   Q.  But you were a salesperson there?

### Page 111

1    A.  Yes.
2    Q.  Did you work at any other hotels that didn't
3  have a sales manager?
4    A.  No.
5    Q.  Okay. Based on your experience at the
6  properties, is it necessary to have a sales manager if
7  you are a Best Western member?
8    A.  No.
9    Q.  Why not?
10   A.  Because if you are in a location that is a
11 designation location, if you are on the beach, you
12 pretty much don't have to market the same way as
13 somebody sitting in a desert. You know what I mean.
14   Q.  If you are a Best Western sitting in
15 Lancaster, is a sales manager an important position to
16 have?
17   A.  Yes.
18   Q.  You talked about monitoring the reservation
19 system. Why did it need to be monitored?
20   A.  Because I wanted to make sure that it was
21 opened, dates were opened. No glitches, no nothing.
22   Q.  Okay. Who did that monitoring?
23   A.  Lisa.
24   Q.  Do you know if anybody monitored that system
25 before Lisa did?

### Page 112

1    A.  I don't know. I wasn't there.
2    Q.  I have no further questions. Thank you for
3  coming down here today. I appreciate it.
4    A.  You are welcome.
5       So sorry for goofing you up.
6       MR. GARBARINO:  We are done.
7       MS. LAZARUS:  Can I ask two more questions?
8       MR. GARBARINO:  Sure.
9            FURTHER EXAMINATION
10 BY MS. LAZARUS:
11   Q.  Did you ever understand that Best Western
12 required you to go through corporate?
13   A.  For what?
14   Q.  For the marketing of the hotel, for the RFP
15 process.
16   A.  Say that again.
17   Q.  Did corporate require you to use the sales
18 team at Best Western in order to submit these RFP's?
19   A.  Well, there is national accounts that your
20 VP's handle.
21   Q.  Okay.
22   A.  So there is national accounts that you can go
23 clear across the board with. They got a lot of RFP's
24 from businesses. It is like a -- how can I explain it
25 to you?

### 113

1  For every location, region, there is reasons
2  for people going there. So there are certain
3  companies. And with that there would be known companies
4  to all hotels.
5      Let's just say like, okay, for -- Lockheed is
6  a big one. But there is others too. Lockheed isn't
7  going to go to Santa Barbara. Okay.
8      Q. Right.
9      A. So there are corporate accounts that are
10 targeted for special regions. And they handle that.
11     So in talking to Scott and Mary Ann, they had
12 a handle on a lot of RFP companies. But like I said,
13 nothing was coming to this property because it had been
14 run down.
15     Q. So these corporate accounts that weren't
16 coming to the hotel before when it was run down, were
17 they -- did they start coming while you were there?
18     Did the hotel get new corporate accounts while
19 you were there?
20     A. Yes. We got lucky. Yes. We got Boeing.
21     Q. Were they happy with the condition of the
22 property after the renovation?
23     A. Yes.
24     MR. GARBARINO: Objection. Form.
25     You can go ahead and answer if you can.

### 114

1      THE WITNESS: I had several individuals come
2  to me because I was a very hands-on GM. So I was on the
3  property basically night and day. So I was there during
4  the day for operations. But I was also there in the
5  evening when the guests came in.
6      And I had on several different occasions
7  people come up to me and ask me if I was the general
8  manager and compliment the property.
9      And one particular was a man with Lockheed.
10 And he assured me that he was going back -- he was from
11 back east. And he was going to make sure everybody knew
12 because he had been there before prior to, and he had
13 stopped coming.
14     So that, I mean, for a GM that is the biggest
15 pat on the back you can get and for your staff. I mean,
16 he raved about the service. And he was very happy.
17     Q. I have no further questions for you.
18     A. Okay.
19     Q. Thank you.
20     A. Thank you.
21 /
22 /
23
24
25

### 115

1      Penalty of Perjury
2
3      I, CHERYL DUGGAN, do hereby declare under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition; that I have made such
6  corrections as noted herein, in ink, initialed by me, or
7  attached hereto; that my testimony as contained herein,
8  as corrected, is true and correct.
9      EXECUTED this _____ day of _____,
10
11 _____, at _____, _____
12          (City)         (State)
13
14 _____
15     CHERYL DUGGAN

### 116

1      I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby certify:
3      That the foregoing proceedings were taken
4  before me at the time and place herein set forth; that
5  any witnesses in the foregoing proceedings, prior to
6  testifying, were placed under oath; that a verbatim
7  record of the proceedings was made by me using machine
8  shorthand which was thereafter transcribed under my
9  direction; further, that the foregoing is an accurate
10 transcription thereof.
11     I further certify that I am neither
12 financially interested in the action nor a relative or
13 employee of any attorney of any of the parties.
14     IN WITNESS WHEREOF, I have this date
15 subscribed my name.
16
17 Dated: _____
18
19
20 _____
21 MARYAM T. SALAHUD-DIN
22 CSR No. 9669

Cheryl Duggan, 2009

117

1    DEPOSITION ERRATA SHEET
2    RE: Esquire Deposition Solutions
3    File No. 40605  Assignment No. 283278
4    Case Caption: BEST WESTERN INTERNATIONAL, INC.
5    vs. AV INN ASSOCIATES 1, LLC
6    Deponent: CHERYL DUGGAN
7    Deposition Date: December 03, 2009
8    To the Reporter:
9    I have read the entire transcript of my Deposition taken
10   in the captioned matter or the same has been read to me.
11   I request that the following changes be entered upon the
12   record for the reasons indicated. I have signed my name to
13   the Errata Sheet and the appropriate Certificate and authorize
14   you to attach both to the original transcript.
15
16   Page No._____Line No._____Change to:_____
17   _____
18   Reason for change:_____
19   Page No._____Line No._____Change to:_____
20   _____
21   Reason for change:_____
22   Page No._____Line No._____Change to:_____
23   _____
24   Reason for change:_____
25

118

1    Deposition of CHERYL DUGGAN
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____ DATE:_____
25       CHERYL DUGGAN