# EXHIBIT "14"

**Deposition of Kevin Barror**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,      )
INC.,                            )
                                 )
            Plaintiff,           )
                                 )
  vs.                            )No. CV 08-2274-PHX-DGC
                                 )
AV INN ASSOCIATES 1, LLC, and    )
HOOSHANG HAROONI,                )
                                 )
            Defendants.          )
                                 )
And Related Claims               )
                                 )

DEPOSITION OF KEVIN BARROR

Phoenix, Arizona
February 18, 2010
11:00 a.m.

PREPARED FOR:

ATTORNEY AT LAW

(COPY)

Reported by:

HALEY WESTRA, RPR

Arizona CCR No. 50762

**2**

1    DEPOSITION OF KEVIN BARROR, taken on
2  February 18, 2010, commencing at 10:56 a.m., at the law
3  offices of THE NATHANSON LAW FIRM, 8765 East Bell,
4  Suite 101, Phoenix, Arizona, before HALEY WESTRA, a
5  Certified Reporter in the State of Arizona.
6
7  COUNSEL APPEARING:
8
9    THE NATHANSON LAW FIRM
10   BY:  Mr. Philip J. Nathanson
11   8765 East Bell Road, Suite 101
12   Scottsdale, Arizona  85260
13   Attorneys for Defendants/Counterclaimants
14
15   SHERMAN & HOWARD, L.L.C.
16   BY:  Mr. David W. Garbarino
17   2800 North Central Avenue, Suite 1100
18   Phoenix, Arizona  85004-1043
19   Attorneys for Plaintiff/Counterdefendant
20
21
22
23  ALSO PRESENT:
24
25   Mr. David Youseffi, Esq.

**3**

1
2                    I N D E X
3  WITNESS                              PAGE
4  KEVIN BARROR
5     EXAMINATION BY MR. NATHANSON        4
6              *    *    *
7
8                  E X H I B I T S
9
10 EXHIBITS  DESCRIPTION               MARKED
11 No. 1   Second Amended Notice of      26
           Deposition of Rule 30(b)(6)
12         Witness Re Reservation Systems
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1              KEVIN BARROR,

2    A witness herein, having been first duly sworn by the

3    Certified Reporter to speak the truth and nothing but

4    the truth, was examined and testified as follows:

5

6              EXAMINATION

7    BY MR. NATHANSON:

8        Q.  Would you state your name for the record,

9    please, sir.

10       A.  My name is Kevin, last name Barror, B as in

11   boy, A-R-R-O-R.

12       Q.  Have you ever been deposed, sir?

13       A.  No.

14       Q.  I think from watching the last deposition, you

15   have the drill.  I ask questions; you give answers.  If

16   you can't answer the question, just tell me, and I'll

17   rephrase it.  Okay?

18       A.  Yes, sir.

19       Q.  Nodding of the head or "uh-huh" or "um" is not

20   good for court reporters.

21       A.  Understood.

22       Q.  Okay.  Are you employed, sir?

23       A.  Yes, sir, I am.

24       Q.  By whom are you employed?

25       A.  Best Western International.

**5**

1        Q.  For how long have you been so employed?

2        A.  Since April 21st, 1997.

3        Q.  And do you have the same job today you had in

4    1997?

5        A.  No, sir.

6        Q.  Can you start with your position that you had

7    in 1997 and move forward to today.

8        A.  Certainly.  I started with Best Western as a

9    property management system trainer and installer.

10   I don't know the exact time frame.  I believe it was

11   from 1997 to 1998.

12          Then I actually worked from '98 to '99 on

13   the property management system help desk, which was

14   kind of a partner to Julie's position today.

15          Then I worked in our telecommunications

16   department from '99 to 2000.

17          And then from 2000 until currently, I am

18   the manager of what's called our desktop and property

19   services department.

20       Q.  What does that mean, your current position?

21       A.  My current position?  Well, I've had different

22   positions over the course of my history with Best

23   Western.

24       Q.  You just said it's your current position.

25   What do you do?

6

1      A.  IT manager of the desktop and property
2   services department.
3      Q.  What does that mean on a day-to-day basis?
4   Tell me what you do on a day-to-day basis.
5      A.  Sure.  Our department is responsible for the
6   support and maintenance of all of our corporate
7   equipment, from a PC and laptop perspective only.  We
8   don't do anything with the servers or anything on the
9   back end.  Just the PCs and laptops, and also the
10  procurement and configuration and what have you of the
11  terminal, the property terminal units, the actual PC
12  itself that goes out to the member hotels.
13     Q.  So let me see if I understand what you're
14  telling me.  You deal with the PCs, laptop/desktop
15  machines that go to the properties, to the hotels?
16     A.  And the corporation, yes.
17     Q.  And at the central corporation?
18     A.  That is correct.
19     Q.  But the servers, the network setup, which you
20  referred to as "the back end," somebody else deals
21  with?
22     A.  That is correct.
23     Q.  So when this MemberWeb software is
24  communicating from a hotel, someone like my client's
25  property, to the central Best Western computer setup,

7

1   are they talking to a particular PC at your office in
2   Phoenix, or are they talking to this server and
3   back-end setup that you described?
4      A.  They would be talking to the back-end setup.
5      Q.  Something you would not deal with?
6      A.  That is correct, yes.
7      Q.  Okay.  Now, you understand you're testifying
8   as a representative of Best Western today, correct?
9      A.  Yes, I do.
10     Q.  You understand I'm not taking your personal
11  deposition; that you're speaking for the corporation
12  today?
13     A.  Yes, I do.
14     Q.  Can you tell me how the corporation and its
15  lawyers prepared you today to speak for the
16  corporation?
17     A.  The document -- I believe, it's the one that
18  you're looking at now -- I was provided with that to
19  review any part of that document that I would actually
20  have some knowledge of, that I could speak to.
21     Q.  So the issue was what knowledge you personally
22  had of the items on Exhibit 1 today, the list of
23  subjects?
24     A.  That is correct.
25     Q.  Did anyone sit you down at the corporation,

8

1   Mr. Garbarino, in-house counsel, anyone, and say --
2   you're first name is Kevin, right?
3      A.  That is correct, yes.
4      Q.  Did anyone sit you down and say, "Kevin, you
5   may not know A, B, and C, but the corporation does, so
6   we have to impart to you, for purposes of testifying in
7   this deposition, what the corporation knows, not just
8   what you know"?
9      A.  No.
10            MR. GARBARINO:  Objection,
11  attorney-client privilege to the extent it referred to
12  communication between me and Mr. Barror.
13  BY MR. NATHANSON:
14     Q.  Well, I wasn't -- I'm not driving at what
15  Mr. Garbarino told you.  Okay?  I'm talking about what
16  you were given.  Were you given materials to read by
17  anyone at Best Western, or did people at Best Western
18  sit you down and educate you about subjects about which
19  you had no knowledge personally?
20     A.  No.
21     Q.  So what we're talking about in terms of your
22  knowledge base is what you personally know about the
23  topics on Attachment A, correct?
24     A.  That is correct.
25     Q.  Could you tell us --

9

1            MR. NATHANSON:  Let the record show
2   I have furnished Exhibit 1 to the witness.
3   BY MR. NATHANSON:
4      Q.  Could you go through there, and while I go get
5   another water -- for some reason I'm thirsty -- could
6   you go through and look through Attachment A, and then
7   I'm going to ask you, like I did with the other nice
8   lady, to identify which subjects you are prepared to
9   speak about from your knowledge.  Okay?
10     A.  Okay.
11            (Recess was taken from 11:03 a.m. to
12  11:04 a.m.)
13  BY MR. NATHANSON:
14     Q.  Take them one at a time.
15     A.  1 E.
16     Q.  1 E.
17     A.  2 E, probably item number 10, number 11,
18  number 14 as it relates to the actual PC itself, and
19  that would be it.
20     Q.  Okay.  Directing your attention to 1 E -- you
21  can keep that in front of you.
22     A.  Okay.
23     Q.  What were the required and recommended system
24  hardware and specifications for operation of the
25  software in question, in item 1?

KEVIN BARROR
2/18/2010

10

1      A.  Could you clarify.  From the beginning of
2    when -- it's evolved over time.  So the hardware
3    specifications in general are a PC, personal computer,
4    a monitor, keyboard, mouse, network hub, and the
5    associated cabling to connect those devices to one
6    another.
7      Q.  To run the MemberWeb software?
8      A.  That is correct, yes.
9      Q.  So my client had all of those items from their
10   beginning with Best Western through their end?
11     A.  Yes, sir.
12     Q.  Do you know that for yourself for a fact, or
13   do you know that that's the general specification?
14     A.  That is the general specification, but I also
15   looked up our records for this property and looked at
16   the actual hardware that the property was shipped, and
17   all of those components are part of the hardware that
18   was shipped to the property.
19     Q.  When you say you looked up this property,
20   where did you look it up, in Quintus?
21     A.  Yes, in Quintus.  There's actually a hardware
22   manifest in Quintus for all of our member hotels.
23     Q.  So you can ascertain what's in each member
24   hotel by looking at the hardware manifest?
25     A.  Yes.

11

1      Q.  And you did so for this one?
2      A.  Yes, I did.
3      Q.  Is there a way -- is there a software manifest
4    for each hotel?
5      A.  No.
6      Q.  So you can see what hardware they have, but
7    you don't know what they're operating on in terms of
8    software on that hardware?
9      A.  I know only because it's my responsibility
10   also to review the actual -- what we call "the load,"
11   what's actually installed on the machine.  When it
12   leaves, we actually create a base image, and then every
13   member hotel gets exactly the same base image.
14     Q.  What are they running?
15     A.  Windows XP.
16     Q.  And MemberWeb?
17     A.  Well, yes, MemberWeb, Windows XP, Symantec
18   antivirus.  They do -- again, as I said, over the
19   years, the hardware has been upgraded.  There's more
20   functionality, such as having a DVD player in it, so
21   they have software that would allow that to function
22   and do its thing.  It has a sound card in it now, which
23   allows it to be able to hook up speakers and play
24   sound.
25          So the drivers have changed, maybe some

12

1    of the hardware has changed from a functionality
2    perspective.  So the software would be a little
3    different as each machine evolves, but the base
4    hardware -- or the base software is the same.
5      Q.  You said there was a network hub?
6      A.  That is correct.
7      Q.  And that's plugged into the PC, right?
8      A.  That is correct.
9      Q.  And the hub runs to the back-end servers back
10   at Best Western?
11     A.  The hub runs to the satellite equipment, which
12   then communicates back to Best Western.
13     Q.  It ends up at the back-end servers, right?
14     A.  Yes, sir.
15     Q.  And who is administering or who did administer
16   the back-end servers to ascertain the communications
17   that were occurring between the member property and the
18   back-end server?
19     A.  We have a department.  It's called systems --
20   not systems.  Hang on just a second.  Well, it's
21   Windows -- the name has changed, so I'm struggling.
22   We have a department that that's their -- specifically
23   their function, is to monitor and keep -- or watch the
24   communication of the databases on the back end of Best
25   Western servers.  I don't recall the exact name of it.

13

1          We have IT Architecture, which builds
2    them; and then we have IT Windows, which actually is
3    watching what's going on; and IT UNIX, which watches
4    the UNIX servers.
5      Q.  UNIX servers are communication servers that
6    communicate with the satellite, aren't they?
7      A.  UNIX servers is a very powerful back-end
8    server.  It's a different kind of operating system
9    that's used to run large databases.
10     Q.  You've already said you had no involvement
11   with the UNIX servers or the back end, correct?
12     A.  That is correct, no.
13     Q.  So if there was a functionality problem -- I'm
14   not saying there was -- I'm saying if there was a
15   problem in communication or functionality or whatever
16   between the back-end server and my client's front-end
17   PC, that wasn't your deal to deal with, was it?
18     A.  That is correct.
19     Q.  And you told us whose deal it was, the
20   person's name?
21     A.  Julie Session's team is -- they would be the
22   first ones to know about it, but outside of that,
23   I don't know the particular individual who actually
24   would -- it could be any number of individuals.
25     Q.  Well, wouldn't the first person to deal with

KEVIN BARROR
2/18/2010

14

1    it be the back-end database administrator in the server
2    room before Julie knew about it?
3        A.   Not necessarily.   If the database is up and
4    running and functioning as it's supposed to, that
5    doesn't necessarily have anything to do with whether or
6    not it's communicating with the property itself.
7        Q.   No, but I'm saying if a problem develops,
8    you're saying that goes -- and the back-end server is
9    not, for whatever reason, communicating with the
10   front-end PC at the hotel, you're saying that goes to
11   the help desk first before the server people are aware
12   of it?
13       A.   No, that's not what I said.
14       Q.   Okay.
15       A.   If the database is down or it's not -- the
16   databases themselves are not functioning, the server
17   folks would be one of the first ones to know.   They
18   would get an alert.
19            If the databases are running but there's
20   a communication problem, then Julie's team would be the
21   first ones to know.
22       Q.   Okay.   Now, did you have any involvement,
23   whatsoever, about how many times, if ever, the
24   databases were down or weren't running?
25       A.   No.

15

1        Q.   So you couldn't tell us about that today?
2        A.   That is correct.
3        Q.   And in terms of -- Julie's job would be to
4    talk about -- if the databases were running, then she
5    would get the communication alerts, right?
6        A.   That is correct.   She would know that there
7    was a communication problem.
8        Q.   We've already talked to her about that, so I'm
9    not going there.
10            So both of those topics are outside of
11   your knowledge base; am I correct?
12       A.   That is correct.
13       Q.   And no one at the company has said, "Here, let
14   me tell you about those so you can talk about them at
15   the deposition today"?   You've already established
16   that?
17       A.   That is correct.   No one has told me.
18       Q.   So as we sit here today, you couldn't tell me
19   one way or the other whether the databases were ever
20   down and impacted on the reservation systems and the
21   communications regarding those reservation systems?
22       A.   That is correct.
23       Q.   I suppose you're not going to tell me that
24   it's impossible for a database to go down, are you?
25       A.   No, I would never say that.

16

1        Q.   Okay.
2        A.   Microsoft is a prime example.
3        Q.   Or a prime culprit, depending on one's point
4    of view, right?
5        A.   Possibly.   I don't know that it would be
6    applicable in this case, but yes.
7        Q.   Are the databases we're talking about
8    Windows-based databases?
9        A.   To the best of my knowledge, no.
10       Q.   What is the underlying database software
11   that -- is it Oracle?
12       A.   Yes, it's Oracle.
13       Q.   Okay.   So you got the Oracle database engine
14   that's running all of this?
15       A.   That's correct.
16       Q.   And is that UNIX-based, or what is -- what
17   operating system is the Oracle database running on?
18       A.   It does run on HP-UNIX.
19       Q.   But the front end is Windows, correct, the
20   front end that you install on the member's computer?
21       A.   Yes, that is correct.
22       Q.   You said it's Windows XP?
23       A.   Yes.
24       Q.   So the MemberWeb software on the front end is
25   Windows-based?

17

1        A.   That is correct.
2        Q.   But you're saying on the back end, it's
3    HP-UNIX and Oracle-based?
4        A.   That is correct.   The database is HP-UNIX.
5        Q.   Okay.   And then there's some -- somebody
6    programs some link for the HP-UNIX back in database to
7    communicate to the front end, I'm sure?
8        A.   That is correct.
9        Q.   Now, who monitors that link?
10       A.   Julie Session's team monitors that link.
11   That's what she referred to as the DDM.   When the
12   messages do not deliver, she gets -- her team gets an
13   alert, which tells them that messages are not
14   delivering to any particular property.
15       Q.   Do you have any familiarity with if there's
16   ever been problems or breakdowns in the link between
17   the HP-UNIX back-end databases and the front-ends at
18   the hotels?
19       A.   No, I do not.
20       Q.   That's just not something you deal with,
21   right?
22       A.   That is correct.
23       Q.   There's got to be a back-end database
24   administrator for the HP-UNIX/Oracle setup, isn't
25   there?

KEVIN BARROR
2/18/2010

18

1     A.  That is correct.  Yes, we do have a department
2  that manages the back-end databases.
3     Q.  And whose the responsible person in that
4  outfit?
5     A.  I don't know the actual name of the manager or
6  director who actually is over that department.  It's a
7  group of people, so I don't know actually who the
8  manager of that area is at the moment.
9     Q.  Does that area have a name?
10    A.  Database administration.
11    Q.  For the back end?
12    A.  Yes.
13    Q.  At the front end, database administrators are
14 the hotels themselves, right?
15    A.  I don't know that I would call them "database
16 administrators."
17    Q.  That's fair enough.
18       What would you call the people who are
19 operating the reservation system on the front end, at
20 the hotel?
21    A.  Just users.
22    Q.  Users?
23    A.  Uh-huh.
24    Q.  Okay.  So what knowledge -- you said you're
25 prepared to testify to what you know about the I E,

19

1  about the required and recommended system hardware and
2  specifications.  Have you already told me what that is?
3     A.  Well, not model or, you know, what the
4  specifications of the hardware is, but I can actually
5  give that to you, yes.
6     Q.  I'm not sure that's relevant at the moment.
7     A.  Okay.
8     Q.  You mean like whether it's a Dell --
9     A.  I can tell you the model, the processer, the
10 memory.
11    Q.  These are Dell machines?
12    A.  Yes.  All of our properties have Dell
13 machines.
14    Q.  On the front end?
15    A.  Yes.
16    Q.  Does the front-end memory -- in terms of RAM,
17 how much RAM is available -- affect the communication
18 between the back end and the front end?
19    A.  No.
20    Q.  Okay.  You also said you could talk -- I mean,
21 I assume the answers are pretty close to the same on
22 2 E in terms of the recommended system hardware and
23 specifications?
24    A.  Yes.
25    Q.  Okay.  Let's go to 10.  "All maintenance

20

1  programs provided by Best Western pursuant to the
2  membership agreement."
3        What maintenance programs are, as far as
4  you understand, provided pursuant to the membership
5  agreement, including paragraph 16(4) of the membership
6  agreement?
7     A.  The maintenance program is simply, if the
8  property is experiencing a problem, they contact the
9  property help desk.  They walk them through
10 troubleshooting steps, you know, because we don't have
11 someone on the ground there at the site.  They walk
12 them through troubleshooting steps.
13       The property help desk is all
14 Dell-certified, so they go through a certification
15 process to troubleshoot the issues if it's a hardware
16 problem or a software problem, and then they take the
17 appropriate action, be it dispatching a Dell technician
18 to repair the PC if it's broken, dispatch Hughes
19 network system to repair the satellite system if the
20 issue is determined to be with the satellite system, or
21 they can also request that a -- say, for instance, the
22 software on the hard drive got -- you know, the
23 property installed something and it's caused an issue
24 with the software on the hard drive.  They can
25 actually -- they would contact my department to say,

21

1  "Would you please ship them a replacement," which then
2  would be swapped out on site.
3     Q.  So the maintenance we're talking about is
4  front-end maintenance?
5     A.  "Front-end" Could you clarify.
6     Q.  Maintenance on site at the hotel --
7     A.  That is correct, yes.
8     Q.  -- of the front-end computer system, the PC
9  and whatever, the mouse, whatever else is --
10    A.  That is correct.
11    Q.  -- attached to the PC.
12    A.  Sure.
13    Q.  Whatever peripherals it has, right?
14    A.  That is correct.
15    Q.  You're not involved in the maintenance of the
16 software on the -- back at Best Western in terms of --
17    A.  No, no.
18    Q.  All right.  And did you review the maintenance
19 records for this property that we're talking about with
20 my client to see what the maintenance issues were?
21    A.  No, I did not.  I actually came to speak about
22 what the maintenance program is, but I did not review
23 what, if any, maintenance issues they had.  That would
24 be -- Julie's team would actually be the ones who would
25 actually review that.

KEVIN BARROR
2/18/2010

22

1  Q.  But that would be ascertainable on a Quintus
2  database for the time period in question, correct?
3     A.  It should be, yes.
4     Q.  So you didn't look at any troubleshooting
5  records regarding any particular maintenance issues for
6  this property?
7     A.  No, I did not.
8     Q.  How about item 10 D?  Do you have any
9  information regarding final problem determinations made
10 regarding the reservation system at the subject
11 property, my client's property?
12    A.  No.
13    Q.  I'm sorry?
14    A.  No.  It's not my department's responsibility
15 to troubleshoot system problems at the property level.
16    Q.  So you couldn't tell us what final problem
17 determinations there were regarding the reservation
18 system?
19    A.  No.
20    Q.  How about F, 10 F, "Dates of problem
21 resolution and all subsequent steps taken and or
22 required"?
23    A.  No.
24    Q.  You don't know about that?
25    A.  No.

23

1     Q.  You said you know about 11?
2     A.  Yes.
3     Q.  "All computer hardware that is required to be
4  purchased."  Have we covered that already?
5     A.  Not exactly.  I mean, when a property becomes
6  a new member, they actually purchase -- it's in the
7  membership agreement that they purchase their
8  reservations equipment from Best Western.
9          Any refreshes or, you know, updates to
10 the equipment that are done subsequent to that are not
11 purchased by the property.  It's at no cost to them.
12    Q.  Did my people satisfy that requirement, to
13 purchase the hardware and the reservation system from
14 Best Western?
15    A.  I would assume so.  They had the Best
16 Western-approved software -- or Best Western-approved
17 hardware, so I can only make an assumption that they
18 did.
19    Q.  But you don't know for sure?
20    A.  No.  Our records go back to 1997, and I
21 believe they were a member hotel prior to that, and
22 that is before my tenure at Best Western, so I wouldn't
23 have any idea.
24    Q.  How about number 14, sir?  "All upgrades" --
25 you said you know about 14?

24

1     A.  Uh-huh.
2     Q.  "All upgrades to the hardware, software,
3  and/or communications equipment as referenced and
4  contemplated by Best Western's membership application
5  of paragraph 16."
6     A.  And as I stated, as related to the PC, I can
7  speak to the upgrades to the hardware equipment, and
8  the hardware for this property was upgraded in --
9  I don't know the exact date, but it was in 2004, in
10 early 2004, and then it was subsequently upgraded again
11 in May, the May time frame of 2006.
12    Q.  So as far as you know -- correct me if I'm
13 wrong -- there were no hardware issues here that we're
14 talking about?
15    A.  None that I reviewed.
16    Q.  Where the processer went south or whatever,
17 I mean, whatever hardware issue could be?
18    A.  We did have, with the PCs that were refreshed
19 in -- or that were sent out in 2004, there was a
20 manufacturer's defect with Dell of the capacitors on
21 the machine, which prompted these machines to be
22 upgraded again in 2006.
23    Q.  But that was a Dell issue, right?
24    A.  That is correct, yes.
25    Q.  I don't like my Dell machine, but that's not

25

1  on the list here to be inquired about, so I'm not going
2  to ask you about that.
3     A.  Okay.
4     Q.  Is it fair to you to say those are the -- the
5  subjects you've identified are the ones you understood
6  you were supposed to speak to?
7     A.  I wasn't prompted to speak to them.  I was
8  prompted to speak about the hardware and what is
9  actually installed at the properties from a hardware
10 perspective.
11         As I said, it's not my department's
12 responsibility to troubleshoot the PC or to record
13 hardware failures or that kind of thing with a PC.  My
14 job is to procure the equipment, make sure it's
15 properly loaded with the right image, and see that it's
16 delivered to the property.  After that, the property
17 help desk does the -- walks the property through the
18 installation.
19         In the case of the 2006 upgrade, we
20 actually -- Dell contracted to have people go out on
21 site and do the installation for the property so that
22 they didn't have to do it again, because it was their
23 issue, their fault, their problem.
24    Q.  But, I mean, in terms of my deposition notice,
25 you've identified the topics you understood you were

KEVIN BARROR
2/18/2010

26

1  supposed to speak to? There aren't any other ones
2  you're --
3     A.  That is correct, yeah.
4     Q.  -- you're supposed to talk about today?
5     A.  That's correct.
6     Q.  Okay.  Well, then I have no further questions
7  of you, subject to whatever rulings the judge makes on
8  whatever issues I raise with the judge.  Okay?
9           MR. GARBARINO:  Can I just have a minute
10  to confer with my client?
11           MR. NATHANSON:  Sure.
12           (Recess was taken from 11:28 a.m. to
13  11:30 a.m.)
14           MR. GARBARINO:  Kevin, thank you for
15  coming down here today.  I have no questions for you.
16           (11:30 a.m.)
17           (Exhibit No. 1 was marked.)
18
19
20
21
22           _____
                   KEVIN BARROR
23
24
25

27

1  STATE OF ARIZONA      )
                          ) SS.
2  COUNTY OF MARICOPA    )
3     BE IT KNOWN that the foregoing transcript was
4  taken before me, HALEY WESTRA, a Certified Court
5  Reporter in the State of Arizona; that the witness
6  before testifying was duly sworn by me to testify to
7  the whole truth; that the questions propounded to the
8  witness and the answers of the witness thereto were
9  taken down by me in shorthand and thereafter reduced to
10  print under my direction; at the witness's request,
11  notification was provided that the transcript was
12  available to read and sign; that the foregoing pages
13  are a true and correct transcript of all proceedings,
14  all done to the best of my skill and ability.
15     I further certify that I am in no way related to
16  any of the parties hereto nor am I in any way
17  interested in the outcome hereof.
18     Dated at Phoenix, Arizona, this 21st day of
19  February, 2010.
20
21     _____
           HALEY WESTRA
22     AZ Certified Court Reporter No. 50762
23
24
25

*Best Western v. AV Inn Associates 1, LLC, et al.*
*Exhibit No. 15*

# EXHIBIT "15"

**KANA Log**

T-05050  Former BW Antelope Valley Inn, Lancaster, CA
Terry Wininger's KANA LOG (from prior to purchase by Harry Harooni)

1/5/05 Robert Mestepey, broker for buyer, Harry Harooni, called to say the sale is a go and they hope to close around the first of February. Asked if we could send something in writing confirming property still qualifies for auto transfer. I redated letter and faxed to Mr. Harooni with 2 pages of MA&A that need to be revised. I spoke with Mr. Harooni later to advise QA is due soon. He said he's set $500K aside and we won't recognize the place by March. /tw

1/7/05 Harry Harooni, buyer, called interested in fast tracking training. I told him RSM will give OSO, that he'll be required to attend VMMO & GM training. He wants to attend next session. (I checked with Jamie and VMMO is still available but GM is full). I let Harry know and asked him to call Jamie to schedule. I e-mailed him with a heads-up and e-mailed Mitch Van Wormer to ask if he would call Harry to discuss training, and also to discuss computer system (PMS?) as Harry said he needs a new one. /tw

1/31/05 Met with Harry Harooni, buyer /VM & nephew Kevin Refoua while in Phoenix for VMMO workshop. Discussed DMMR role, upcoming District Mtg, provided District VI staff contact info, etc. 2/2/05 I provided Harry with info on a couple of potential restaurant chain recommendations from Mem Dev, since he's looking for an operator for his restaurant. /tw

2/2/05 Harry Harooni, VM/buyer of property was in for VMMO and said that he really learned a lot and appreciated all of our assistance. He also inquired into ability to purchase some items at BOC, once downsizing occurs, ie flat screen monitors, desks, etc. Also offered to be a trial property for new processes/products to benefit both his property and BW. I passed this info on to Will Jansen and Ric Leutwyler. /tw

2/11/05 Harry Harooni called to say they are ready to fund loan but bank needs letter from us. I told him we could prepare a pre-sale letter and that should suffice. I turned file over to Nancy in Mem Svcs to prepare letter. /tw

2/15/05 I contacted Harry Harooni, buyer, with contact information for a restaurant franchise agent, Joe Wong (info furnished by Mark Watson), and also gave him Joel Manly's contact info, as he's looking for a good deal on furniture. (He'd asked if BWI was going to be selling any, when we consolidate our operations.) /tw

2/24/05 Harry Harooni, buyer, called to advise that they will close escrow tomorrow, and he'll take over operation on Monday. I asked him to submit proof of sale as soon as possible so we can finalize and have RSM come for OSO. He's going to contact Mitch, his RSM, on Monday, also. I gave him Joel Manly's contact info, for possible assistance with furniture. /tw

3/4/05 Michelle Orion took call from Harry Harooni, VM, 661-948-4651, and he said he had left you a couple of messages requesting help with these two matters. Harry put her on the phone with Kevin his nephew who is the information tech. for this property. Kevin asked for PMS, credit card and two-way info. Michelle explained that all of this was on mybestwestern.com, but she went ahead and emailed it to him also. Kevin did still indicate that he would like to talk to Denise Heinrichs please. He can be reached on his cell phone: 310-261-8660. Michelle e-mailed Denise and her response follows: I (Denise) just spoke with Kevin. Not sure who he was calling but I had no messages from either him or Harry. Was able to validate his direction to upgrade his NiteClerk system to NiteVision and then install the Two-Way interface. His CC issue is one that has to be resolved by REMco but I have escalated to them to resolve asap. /tw

3/18/05 I called and left voice message for Harry Harooni, new VM, 310-440-9181 requesting he fax copy of proof of sale today. We need it to finalize transaction. 3/21/05 Lenise called and faxed copy of closing statement, which I turned over to Nancy S. in Mem Svcs. /tw

CUT AND PASTE EMAIL TO DENISE: I received a call from Harry the owner of this hotel, and he said he had left you a couple of messages requesting help with these two matters. Harry put me on the phone with Kevin his nephew who is the information tech. for this property. Kevin asked for PMS, credit card and two-way info. I explained that all of this was on mybestwestern.com, but I went ahead and emailed it to him also. Kevin did still indicate that he would like to talk to you please. He can be reached on his cell phone: 310-261-8660. (logged in KANA 3/31/05)

4/15/05 Christine Chaney, 661-948-4651, called, saying she's been unable to speak with Denise Heinrichs, had left messages, and not gotten response. They have a technician working in NY to obtain a PMS system for the property, and he has questions for Denise, prior to making purchasing selection. They are up against time constraints to get this done. I placed a call to Denise's area right after talking with Christine and was told that Denise had just gotten off the



EXHIBIT NO. __2__
T. WININGER
1-5-2010
H. WESTRA, RPR

phone with the tech. for the property. I asked if Denise could contact Christine and fill her in on their discussion. She said that she would. /tw

8/30/05 I called for Harry Harooni, VM, but no answer, so called property and asked for GM. Christine Chaney is GM, but she wasn't available either, so I left her a voice message re letter to Mr. Harooni, requiring GM to attend training in Phoenix, ASAP, and asked her to call me back. /tw Kevin Refoua returned my call re GM training. I explained that it's mandatory, and unfortunately even though Christine has been at the property for 12 years and has CHS, she hadn't served in GM capacity or have CHA, so unless she wanted to try and test out, she'll need to attend class. I told them I think Sept may still have openings, but next class will be November. I asked him to go on web to get registration for and fax in to E&T. Once registration is confirmed they'll need to respond in writing to Cheryl Pollack's letter, letting her know training has been scheduled. /tw

10/3/05 I called and left voice message for VM, Harry Harooni, to let him know GM attendance at training extension was granted until Nov 05 class. If not attended in Nov, there will be $1200 admin fee and property will be restricted pending compliance by attending next available seminar, or property will be terminated. /tw

12/20/05 I called and left voice msg for Harry Harooni, VM, to let him know RC granted Extension requested on replacing wall covering in Bath/Vanity area as well as waiver on requirement for providing artwork behind the Front Desk because of window. /tw

2/27/06 Harry Harooni called quite beside himself because he's put $1.5 mil into the property since taking it over last year, and he's losing $100 K per month. His occupancy has dropped from that of previous owner, even though he's made major improvements to the property. He said he's just hired two new girls that are really good, but that someone has been closing him out in the res system. He needs help. I contacted Tom Wilson, Rev Mgr, and Mitch Van Wormer. 2/28/06 Tom and Mitch both contacted Harry. Tom will help get them properly loaded in Res. Mitch will go back out on Friday for additional training. (He said that he's given them several sales leads in the past, but no one ever seemed to follow up.) He discovered that the property had been closed out by someone from Feb 06 - Feb 07, so he reopened it 1/27/06. /tw 3/6/06 Mitch called to report he spent all day Friday at the property helping them adjust marketing messages, EDS, training, etc. He thinks everyone felt much more comfortable in how to make changes within the system now, and hopefully they're on the right track. /tw

5/4/06 I left msg for Harry Harooni re 60-day past due. He returned my call and said that he finally fired his alcoholic accounting person, and just hired a really good accountant. His GM missed the deadline for Government Contracts for this year, so he has to wait until this fall to resubmit and until January to get Gov Business back (80% of his business according to him). He's accomplished about 90% of his remodeling, but is running out of money, in the red every month. He's only been running 10-20% occupancy, and is beside himself. He's looking for any help he can get from anyone." I forwarded this info to Tom Johnson, CFO and he asked Rebecca to contact the VM. 5/8/06 Rebecca in A/R saind "I just spoke with Cheryl Dugan - GM at property and finalized everything. She is going to pay the 60 day amount this month. I advised her that due to their extenuating circumstances right now we are okay with them only paying the 60 day amount for the next couple of months until they can get caught up. I did tell her to make sure balances do not roll to 90 days. Notes have been updated. " /tw

5/9/06 Harry Harooni called to thank me for my efforts on his behalf regarding his finance situation. He said that Rebecca Altieri in finance was very nice, they had a long chat and she was most helpful. He really appreciated all we're doing for him. /tw

5/18/06 Harry Harooni called to thank me for helping with his account and said that Rebecca had contacted him. He's wondering if he can get some kind of a discount until Jan, when he will hopefully get his Gov. contract back. I told him he'd need to discuss with our CFO and gave him Tom's #. /tw
5/18/06 Harry called to ask for clarification on the ballots and how he should vote. I explained the process that took place and that it showed how Dir's & Gov's voted. Suggested he review and if he had questions on any specific issues he could contact his Gov or me for clarification. /tw
5/18/06 Harry said he and another associate will be coming to our District Meeting, so he'll see me in S.F. then. /tw

6/19/06 I called and left voice msg for Harry Harooni to let him know the BOD considered his request for waiver of partial fees through the end of the year, but unfortunately they denied the request. /tw

1/2/07 I called and left voice msg for Harry Harooni re ownership structure, need confirmation. He called Valerie back and said what we have is correct. 1/9/07 I called him back, left another message, to say we have and INC and LLC, need to know which is accurate and who owns how much of it. 1/12/07 Harry called me to say that the LLC is correct ownership. (He has two entities, and when he filled out the new form, couldn't remember which one applied.) /tw

2 of 4

1/12/07 I rec'd call form Harry Harooni upset with lack of support for corporate business. It took 6 months to put corporate rates in the system. When finally done he was only given a brief, sorry it slipped through the cracks response. (I'm not sure if that was WWS or RM though.) He said the hotel in Palmdale, 3 miles away, is getting lots of corporate business. He's invested 2.5 mil in his property and it has restaurant, bar, meeting space, etc. In his mind his property is better than the other one, and he doesn't understand why he's not having business driven to his hotel. ( I spoke with Ed Sawyers in Revenue Management after the call. Ed said that they'll take a look at how things are positioned in the system, to be sure he's set up appropriately and try to assist from there. I had put Mr. Harooni in contact with Lisa Cully at our District Meeting in May and she spent quite a bit of time with him and his manager then. This is his first venture in the hotel industry. Tom Wilson called me back to say he'll review Harry's current rate structure, etc. and then contact him to offer assistance in positioning himself properly, to take advantage of marketing opportunities.) /tw

4/23/07 I I've left a voice mail msg for the member, Harry Harooni, telling him I saw ad for sale of his hotel and reminding him that it's not wise to advertise the property "will" be eligible to auto transfer, since we won't actually know until sale closes if property is in good standing and qualifies. I asked him to call me to discuss. /tw

10/31/07 Kevin Refoua, VM's nephew, called asking for copy of MA&A, he faxed authorization from VM and we e-mailed it to him. 11/1/07 Harry Harooni, VM, called asking for help to change his QA score above 800. He's trying to "auto transfer" the property. His health isn't getting any better and he's put all of his money into this property, not realizing what he was getting himself into when he bought it 2 yrs ago. I explained that since it's more than 48 hrs since his inspection, we can't ask for it to be audited. His next inspection will be in about 90 days, and it takes two passing inspections to qualify for auto transfer. He wanted to pay for another inspection in about 2 wks. I explained that still wouldn't satisfy criteria for auto transfer, because it takes 2 in a row. /tw

11/5/07 I called Harry Harooni re past due annual dues. I explained that they need to be paid before end of month or BW will terminate in reservation system. He thanked me for telling him now, rather than after the fact. I'm sending him an invoice and he'll pay right away. /tw
11/5/07 I confirmed with Harry that I have permission to speak with potential buyer, Prakash Patel. He said that what he's going to propose is to sell 49% of the property now and once it qualifies again for auto transfer he'll sell the remaining 51% for $1. I wished him luck with his negotiations and asked him to keep me informed. /tw

11/12/07 VM called. His potential sale of property fell through. He asked about the possibility of doing a unit count decrease from 148 to 100. He said the additional units are on a separate parcel of land and he's thinking of trying to sell it off. His occupancy is never more than 50% anyway. It would give him some liquidity if he can get rid of the other part. I sent him a U/C decrease letter with requirements for submittal. We faxed and mailed as his Parkinson's is getting worse and he's going to Israel for some experimental treatment soon. /tw

12/18/07 Faxed VM re vote not counting during recent Advertising Ballot. /tw

1/7/07 Harry Harooni called to check on status of U/C decrease letter he submitted. I told him I turned it over to Member Care 12/26 for processing. I checked and it's been sent to our architect for opinion. Harry asked if there was any additional info needed. I told him I'd let him know, I didn't know if it needed to go to the Board for approval, but if so it may not be until February. /tw 1/14/08 Harry called to say he's come up with a couple of possible alternatives to making money, and may not have to go through with U/C decrease process after all. He asked me to put a hold on his request for decrease for about 3/4 weeks. I contacted Mem Care and asked her to put a hold on for one mth, and flag for follow-up with Harry at that time. /tw

2/1/08 Harry Harooni called upset about yesterday's QA assessment (score 681). He said 2 RSM's came to property as if they were looking for ways to fail him. He thought perhaps BW had another property applying for membership in his area. I told him that once in awhile we do send a second RSM on visits, but not for the reason he indicated, and as far as I know we don't have another hotel applicant in his area. He wanted to request a second inspection. I told him that typically rather than sending another RSM out someone in mgmt will review the photographs to confirm/validate report. I said I would request re-inspection on his behalf. I explained that since this is his second failing score in a row that he will be given the opportunity to come before the Board for a hearing to explain why he should not be terminated, or if he doesn't feel he can afford the additional expense of upgrading the property, once he is given a new design report that he might want to consider self terminating prior to Board Meeting in March. I contacted RSM Mgr who said he would call Harry, go over photos with him and if he still wanted another inspection there is a $1500 charge for that. I relayed that info to Harry. He then submitted an email request to be reinspected. I forwarded that to RSM Mgr & Managing Dir, QA. /tw

3/14/08 Harry called to say he's preparing his presentation (speech) for hearing. He asked me if he should go ahead now and order linens that are due Apr 1st, with his hearing scheduled for Apr 2. It is about 200K. If he's terminated he

would rather not spend the money now. I suggested he have PO's ready to go, and let BOD know that, if granted conditional extension, he'll order immediately. /tw

4/2/08 Met Harry Harooni briefly prior to his hearing in Phx. (He arrived a little late, but made it just in time to be called in meet with the BOD.) 4/7/08 I Called to let Harry know outcome of hearing. When I told him that he was terminated he asked why, and I told him I don't have that information, they only give me the result. He said that we would be hearing from his lawyer. I told him the only possible other recourse would be if there was significant new information that they Board was not aware of when they made their decision based on our reconsideration policy. I asked if he'd like to see that first, and he said he would, so I faxed it to him at the property./tw 4/8/08 Lisa called to say Mr. Harooni had not received reconsideration policy that I was to send yesterday. I assured her that I faxed it, but reverified fax number and resent. She wanted to know when they would be getting written notification of termination, and I told her the letter will probably go out by the end of this week. /tw

4/25/08 Lisa called concerned that they are being delayed in their transition to a new GDS system because BW locked them out of Amadeus. I explained that we turn properties off in all res systems once they are terminated by the board. I referred her to our GDS dept, to see if there was any way to help expedite their transition. Apparently because we locked them out their profile was removed and they have to rebuild it from scratch (or something to that effect). /tw

# EXHIBIT "16"

### Declaration of Lisa Wilkerson

## DECLARATION OF LISA WILKERSON

I, Lisa Wilkerson, under penalty of perjury of the laws of the United States, hereby declare the following:

1.      I have been in the hotel business for the last 15 years. I have worked at Oxford Inn & Suites, Essex House Hotel, Carlson Hotels, Holiday Inn and Best Western Antelope Valley Inn. I have held positions of Director of Sales, Director of Catering, Sales Manager, Wedding Coordinator, Corporate and Government Sales Director.

2.      When I first started working for Best Western Antelope Valley Inn as Director of Sales, I found many discrepancies when I started looking into the reservation system. Mitch (the hotel inspector) offered to come to the hotel to sort out the issues with the reservation system. While going through the system it was discovered, that the hotel had been closed out for at least 3 months prior. The problems with the reservation system continued for the next two years.

3.      In July of 2006, during the RFP (request for proposal for corporate accounts) season, a time when the hotel was getting all of its new accounts, we were constantly having problems getting the proper information loaded into the Best Western system so the companies could book the hotel in year 2007. As a result of these problems, some companies were unable to make the reservations with our hotel.

4.      As the time got close to the end of the RFP season, Cheryl Duggan and I went on a ten day sales trip and visited fifteen different companies and came back with 14 new accounts. Best Western made no attempts to solicit new accounts on the hotel's behalf.

5.      Best Western did not solicit the Aerospace Industry in Lancaster for potential clients and seemed unaware of its existence. Once Best Western Antelope Valley Inn solicited that industry on its own, it attributed to approximately 80% of the hotel's business.

6.      I attended the Chicago NBTA Conference during which Best Western was supposed to meet with different company representatives who made the decision whether they would use Best Western as the hotel for their employees. I was told by Scott (last name unknown) from Best Western's corporate that I was not allowed to speak to the company representatives myself and that only sales people from Best Western could contact them. When I got back to Best Western Antelope Valley Inn, I submitted to Best Western all the companies I wanted to solicit. Best Western didn't know about these companies or their contact persons and I had to provide all of that information myself. Most of the companies would not talk to Best Western sales people. Subsequently, when no progress was made by Best Western in soliciting these clients, I called them myself and majority of the companies ended up choosing our hotel for their corporate travel.

Exhibit "G"

7.      It is my opinion, that Best Western provided very little or no support in soliciting new business for Best Western Antelope Valley Inn. In addition, the ongoing problems with the reservation system interfered greatly with the hotel's business.


Executed this 30 day of April, 2009 at Lancaster, California.

*Lisa Wilkerson*

Lisa Wilkerson