# EXHIBIT "23"

**Deposition of Lloyd Nygaard (Continuation 5/15/10)**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


BEST WESTERN INTERNATIONAL,  )
INC.,                        )
                             )
        Plaintiffs,          )
                             )
v.                           )   No. CV 08-2274-PHX-DGC
                             )
AV INN ASSOCIATES 1, LLC, and )
HOOSHANG HAROONI,            )
                             )
        Defendants.          )
_____)

THIS UNCERTIFIED ROUGH DRAFT TRANSCRIPT CANNOT BE QUOTED IN
ANY PLEADING OR FOR ANY OTHER PURPOSE AND MAY NOT BE FILED
WITH ANY COURT.


DEPOSITION OF LLOYD NYGAARD, VOL. II

Phoenix, Arizona
March 15, 2010
9:52 a.m.


PREPARED FOR:
THE COURT
(ORIGINAL)

Reported by:
Thomas A. Woppert, RPR
Arizona CCR No. 50476


OTTMAR HOLIDAY & ASSOCIATES, INC.
(602)485-1488

**Page 2**

DEPOSITION OF LLOYD NYGAARD, VOL. II, taken on
March 15, 2010, commencing at 9:52 a.m., at the offices of
OTTMAR HOLIDAY & ASSOCIATES, INC., 2800 North Central
Avenue, Suite 150, Phoenix, Arizona, 85004, before THOMAS A.
WOPPERT, RPR, a Certified Court Reporter in the State of
Arizona.

COUNSEL APPEARING:
THE SCHLESINGER CONRAD LAW FIRM
By Ms. Kira A. Schlesinger
11811 North Tatum Boulevard, Suite 3037
Phoenix, Arizona  85028
Attorneys for Defendant/Counterclaimant
SHERMAN & HOWARD, LLC
By Mr. David W. Garbarino
2800 North Central Avenue, Suite 1100
Phoenix, Arizona  85004
Attorneys for Plaintiff/Counterdefendant

**Page 3**

I N D E X

WITNESS                                               PAGE
LLOYD NYGAARD
Examination by Ms. Schlesinger                          4

E X H I B I T S

EXHIBITS      DESCRIPTION                              PAGE
No. 3
No. 4
No. 5

**Page 4**

LLOYD NYGAARD,
called as a witness herein, having been first duly sworn,
was examined and testified as follows:

EXAMINATION

BY MS. SCHLESINGER:

Q.   Thank you for coming back Mr. Nygaard.  The good
news is I think this will be relatively brief.  I don't have
a whole lot of photos I want to go through, just to get a
flavor here.

     You recall your testimony last time that we met?

A.   Yes.

Q.   At least in general substance.

     I know that we had chatted briefly with regard to
the training and the types of cameras that are used for
these Q and A photos.  And by Q and A photos, you understand
that these are the photographs taken by the RSM that
eventually were used in front of the board of directors at
the termination hearing; is that correct?

A.   Yes.

Q.   You're good with that so far?

A.   Yes.

Q.   Okay.  So touching back on the cameras that are
used for these photographs, does Best Western issue a

**Page 5**

particular camera to the RSMs?

A.   Best Western issues cameras to the RSMs.  They
are replaced on an annual basis generally or every two years
as needed and generally are the selections of the best
digital camera that we use at that time, yes.

Q.   So the best digital camera that we use at that
time I'm afraid doesn't really narrow that down for me.

     Is the selection of the camera based on price?

A.   Price and other issues.  I have a lady that works
within our department that will test some cameras and then
make a selection and buy 10 for replacement for that year.

Q.   Okay.  And what's the resolution available on
those cameras?  In other words -- do you understand what I
mean, how many DPI?

A.   I understand your question, but I don't have an
answer for that because I'm not proficient in that area.

Q.   Okay.  Do you have somebody that does specific
training on photograph taking for your RSMs?

A.   The managers provide training to their RSMs on
photo taking.

Q.   Okay.  And by RSM, just for the record, we're
referring to the regional service managers?

A.   He's correct.

Q.   Such as Mitch Van Wormer and Cindy Bree?

A.   Yes.

6

1    Q.   Okay.  And you said that the managers provide
2    training to the RSMs?
3    A.   Yes.
4    Q.   With regard to taking photographs?
5    A.   Yes.
6    Q.   What training do the managers have?
7    A.   Simply on-the-job training and the utilization of
8    the cameras, that's all.
9    Q.   So basically however they decide is the right way
10   to do it works?
11   A.   Correct.
12   Q.   And then they show the RSMs the way they do it
13   and we're all good to go then?
14   A.   Yes.
15   Q.   So there is no professional training on how to do
16   these?
17   A.   That's correct.
18   Q.   Do you know if your RSMs are instructed to take
19   closeup photographs?
20   A.   The RSMs are instructed to take photographs that
21   represent what they're taking.  It could be far away, it
22   could be close up.
23   Q.   And is there any limit on how close they're
24   allowed to go to take a photograph?
25   A.   No.

7

1    Q.   Okay.  The photograph that's showing there on the
2    screen now, unfortunately these digital images were not
3    Bates stamped, so I'm going to do my best to describe it for
4    the record.  And I've attempted to correlate these back to
5    the report.  It is not abundantly clear for me if I've got
6    an exact correlation, so I'll appreciate your help if
7    something seems completely off to you and I've gotten the
8    wrong picture.  But it's my understanding that this
9    particular photograph was taken by Cindy Bree can you
10   confirm or deny that?
11   A.   No.
12   Q.   Okay.
13       MR. GARBARINO:  Kira, is there any way we can
14   just identify by the record of the -- the file number or the
15   file name?
16       MS. SCHLESINGER:  Well, to some degree we can
17   And for the record, I can say that it is -- but, see, it
18   says 3G.JP -- JP -- strike that -- 3.JPG.
19       MR. GARBARINO:  Uh-huh.
20       MS. SCHLESINGER:  Okay.  And this is from the
21   1/31, which is what leads me to believe that it was taken by
22   Cindy Bree.
23       MR. GARBARINO:  Okay.
24       MS. SCHLESINGER:  So for the record, that's
25   useful, you're right, David, but as far as what that is, I

8

1    mean, in other words, it's not Bates stamped, so I'm not
2    sure -- anyway --
3        MR. GARBARINO:  No, I just want to make it clear
4    for the record.  If we can just say, you know, this is --
5        MS. SCHLESINGER:  Sure.
6        MR. GARBARINO:  -- 3.JPG --
7        MS. SCHLESINGER:  Yeah.  I hadn't caught that.
8    That's a good point.
9    BY MS. SCHLESINGER:
10   Q.   I'm going to hand you, Mr. Nygaard, a copy which
11   will be made an exhibit.
12       MS. SCHLESINGER:  I'm going to mark this as
13   Exhibit 1 to this continued deposition.  I don't know,
14   Mr. Garbarino, if you think it's easier to continue the
15   exhibits.  I think there were two to his deposition
16   previously, which would make this Exhibit 3.
17       (Discussion off the record)
18       (Deposition Exhibit 3 marked for identification)
19   BY MS. SCHLESINGER:
20   Q.   Mr. Nygaard, do you recognize the report that
21   I've handed you as Exhibit 3?
22   A.   It would appear to be a Best Western North
23   America quality assurance report.
24   Q.   And would it further appear that that report was
25   written by Ms. Cindy Bree, ^BHA?

9

1    A.   Yes.
2    Q.   Okay.  And, to your knowledge, sir, was this
3    report then transmitted to the board of directors and used
4    in conjunction with a termination hearing regarding
5    Mr. Harooni's hotel?
6    A.   It would have been performed on the property,
7    submitted to Best Western and then used as a support
8    document in a board hearing; correct.
9    Q.   Okay and the image that's there on the screen, do
10   you recognize what that is?
11   A.   It is a picture of a telephone faceplate.
12   Q.   Okay.  That's it?
13   A.   Yes.
14   Q.   Okay.  And do you see a problem with that?  And
15   by that I mean, do you see where that would be any kind of a
16   demerit or any problem whatsoever?
17   A.   The only possible thing I would see as a
18   deficiency would be the logo indicating Best Western does
19   not appear to be in compliance.
20   Q.   In what manner?
21   A.   Distorted.
22   Q.   Well, okay.  I just was looking to see if that
23   could be a function of the photograph as its displayed up
24   there.  Is that possible, sir?
25   A.   Yes.

10

1      Q.   And the reason I'm going to say that is because,
2   if you look at the photograph on my screen, do you see that
3   that's different?
4      A.   Yes.
5      Q.   So it makes a difference on which screen it's put
6   up on?
7      A.   Correct.
8      Q.   Okay.  And in fact in the board hearings, I
9   believe you testified previously that the images were shown
10  on a wall; is that correct?
11     A.   On a screen on the wall, correct.
12     Q.   Okay.  So projected to some fairly good size at
13  some fair distance; is that correct?
14     A.   That's correct.
15     Q.   Okay.  And as you sit here, just between the
16  screen we're using here in this conference room, the screen
17  on my computer, those two are different, it's reasonable,
18  wouldn't you agree then, that it's going to be different and
19  to some degree distorted or at least portrayed differently
20  when it's put up on a screen in a boardroom for that
21  hearing, true?
22     A.   It could be, yes.
23     Q.   And that's the only problem you see with that, is
24  that on the screen -- I think what you're saying is that on
25  the screen in this conference room, the Best Western is

11

1   elongated, it doesn't have the squareness to it that it
2   would normally have?
3      A.   That is what I see.
4      Q.   Okay.  And I apologize, sir.  You're going to
5   need to bear with me a little bit because we've got a lot of
6   technology trying to mimic the conditions that might have
7   been seen by the board of directors, which was the
8   plaintiff, so we're doing the best we can here.
9           You'll see in a moment why I'm apologizing.  This
10  is going to be a second to try to get things moved around.
11          (Discussion off the record)
12  BY MS. SCHLESINGER:
13     Q.   Do you know where the Best Western emblems or
14  logos come from, Mr. Nygaard?  By that I mean, how does the
15  hotel owner obtain logos for use and display at their
16  hotels?
17     A.   Best Western has approved vendors for signage
18  programs, if that's the question that you're asking.
19     Q.   Sort of.  That's one answer.
20          Is it also true then that Best Western Supply
21  provides them?
22     A.   Best Western Supply can provide logo items,
23  that's correct.
24     Q.   Okay.  And when you say they were approved
25  vendors, would it be fair to say that, because Best Western

12

1   is a trademark emblem and copyrighted and all of that, I'm
2   sure, that these emblems would only be available through
3   either Best Western Supply or an approved vendor; fair?
4      A.   They could be purchased by any sign company, but
5   because of the things that you describe, we do have approved
6   vendors in which we suggest or require properties to go
7   through to purchase those signage or approved logo items.
8      Q.   And if somebody was selling logos that purported
9   to be Best Western logos that did not meet the criteria and
10  were not from an approved vendor or Best Western Supply
11  itself, would you imagine that Best Western would probably
12  prosecute and shut that down?  You don't want just anybody
13  selling those; right?
14          MR. GARBARINO:  Objection; form.
15          THE WITNESS:  Would you repeat the question?  I'm
16  sorry.
17  BY MS. SCHLESINGER:
18     Q.   Sure.
19          If a third party that was neither an approved
20  vendor nor Best Western Supply was selling logos just on the
21  street or things with logos on it, Best Western would
22  undoubtedly try to shut that down, wouldn't you agree?
23     A.   Yes.
24     Q.   Okay.  So the logos that are available to the
25  hotel owners most likely come from either an approved vendor

13

1   or Best Western Supply directly; is that fair to say?
2      A.   I would say they should come from there, yes.
3      Q.   I'm going to go ahead and just show it to you
4   this way because I think it might -- if you can see that,
5   sir, that might be a little bit easier.  Do you see that
6   photo?
7      A.   Yes.
8      Q.   Okay.  And do you recognize it, sir?
9      A.   I recognize a Best Western emblem on some type of
10  sign, yes.
11     Q.   Okay.  And did you see a problem with that
12  photograph, sir?
13          MR. GARBARINO:  Please let the record reflect
14  that he's now looking at your laptop.
15          MS. SCHLESINGER:  Yeah.  And I can try to get it
16  up on here.  It just looks like it's going to be kind of a
17  pain to do this.
18          Yeah this is just going to be real difficult.
19  BY MS. SCHLESINGER:
20     Q.   You can go ahead and look at the laptop for the
21  moment and let me know if you see something that seems to be
22  problematic there.
23          MR. GARBARINO:  Let me just -- is there any way
24  we can for the record identify what picture that is?
25          MS. SCHLESINGER:  Yeah, absolutely, at least I

14

1    think absolutely. We can try. Let me go back.
2    BY MS. SCHLESINGER:
3        Q.   This appears to be also taken on 1/31/2008 and I
4    believe that it is -- well it is 139.JPG.
5    BY MS. SCHLESINGER:
6        Q.   And going back to you Mr. Nygaard, did you see
7    anything that was the matter with that photo?  Do you see
8    any sort of there?
9        A.   I see what appear to be scratches and/or a smudge
10   of some type.  That's what I see.
11       Q.   Okay.  But the logo itself, it looks like the
12   appropriate Best Western logo?
13       A.   As I can see, correct.
14       Q.   Okay.  You testified previously that 1,000 points
15   are available for a Q and A assessment on brand standards;
16   correct?
17       A.   Yes.
18       Q.   And you further testified that a passing score is
19   800; is that correct?
20       A.   Yes.
21       Q.   Okay.  And do you recall according to Ms. Bree
22   and as reflected on Exhibit 3 to your deposition,
23   Mr. Harooni ended up with a score of 681; is that correct?
24       MR. GARBARINO:  Objection; form.
25       MS. SCHLESINGER:  On brand stand -- is that what

15

1    your objection is, Mr. Garbarino?
2        MR. GARBARINO:  Yes, because we need to clarify
3    where the --
4        MS. SCHLESINGER:  Sure.
5    BY MS. SCHLESINGER:
6        Q.   On brand standards, the point where we said 800
7    was a passing score, Mr. Harooni's hotel had a 681; is that
8    correct?
9        A.   No.
10       Q.   Okay.  I am looking on the first page here and it
11   says guest room/public areas.  Okay.  That's where I guess
12   I'm looking at as 681 and that a passing score would have
13   been 800; is that correct?
14       A.   Yes.
15       Q.   Okay.  And was there anyplace else that you see
16   that Mr. Harooni did not obtain a passing score based upon
17   that summary report that's the first page of Exhibit 3?
18       A.   Each of the other scores shown are above 800
19   points.
20       Q.   So they would be acceptable?
21       A.   Yes.
22       Q.   So the problem here as reflected on the summary
23   report of Exhibit 3 is the 681 score relating to guest rooms
24   and public areas; correct?
25       A.   Yes.

16

1        Q.   And that's what the photographs taken by Ms. Bree
2    reflect, are guest rooms and public areas; correct?
3        A.   A portion of the photographs would be for that.
4        Q.   Okay.  And what other portion would they be?
5        A.   Best Western regional service managers take
6    photographs for various departments at Best Western
7    including those for brand standards compliance like logos,
8    signage, et cetera, for design compliance, for overall guest
9    room photographs and for deficiencies.
10       Q.   All right.  So hopefully we'll be looking at some
11   of those here.
12           If you would look for me at -- and I'm afraid all
13   of these are -- seem to be noted as page one in this report.
14   There's like eight page ones here, so I'm going to direct
15   you to North American guest rooms Q and A assessment report
16   where it says, ceilings, walls, case goods, equipment, HVAC,
17   et cetera.  Do you see that page?
18       A.   Yes.
19       Q.   And you see the total guest room point loss is
20   36?
21       A.   Yes.
22       Q.   And it states that it was taken -- this report
23   was prepared by Ms. Cindy Bree, RSM, and she put CHA after
24   her name?  Do you see that?
25       A.   Yes.

17

1        Q.   Okay.  And under case goods, can you define for
2    me what case goods are?
3        A.   In our definition would be items in the guest
4    rooms like credenzas, armoires, nightstands.
5        Q.   Beds, end tables, headboards, that sort of thing?
6        A.   Headboards, yes.
7        Q.   And looking again -- drawing your attention again
8    to the screen here in the conference room, I note that, when
9    you look at this file, which is the file for 1/31, that
10   correlates or was produced by Ms. Cindy Bree at the time of
11   the inspection.  Would you agree based upon -- you see how
12   all of these pictures have the 1/31/2008 here?
13       MR. GARBARINO:  Objection; form.
14       MS. SCHLESINGER:  I'm sorry.  If you could just
15   help me out, David.  What's the objection?
16       MR. GARBARINO:  Well, you're describing this as a
17   file.
18       MS. SCHLESINGER:  It is.
19       MR. GARBARINO:  Okay.
20       MS. SCHLESINGER:  If I go up and I open this up
21   over here, it is a folder, file folder, if I can do this,
22   but again it's technologically a little tricky for me.
23       MR. GARBARINO:  Okay.  So you're saying it's a
24   file on your computer?
25       MS. SCHLESINGER:  Yeah, it's a folder.  It's all

18

1   of the photographs which we were supplied, if you see
2   here --
3       MR. GARBARINO:  Got you.
4       MS. SCHLESINGER:  -- for this property on that
5   date, and then there's separate folders for the other dates,
6   so that's what I'm trying to refer to.
7       MR. GARBARINO:  Now, what was your question?
8   BY MS. SCHLESINGER:
9       Q.   Okay.  So my question is as we go back here --
10  and, see, I just closed that up to try to get more room on
11  the screen.  As we go back here and you look through these,
12  can you point me out by row and picture -- if we call that
13  top one row one, row two, row three, can you point me out a
14  picture that would correlate to scratches and damage to
15  surface of furniture in 388 under the case goods heading?
16  And I'm kind of going to move forward and say what I think
17  is going on here is at various times -- you see how she's
18  taking a picture of the room number?
19      A.   Yes.
20      Q.   That's standard procedure for Best Western?
21      A.   Yes.
22      Q.   So if I go down here, I should come to room 388.
23  And there it is on the far right-hand side here, which is
24  listed as JPEG 125, would you agree?
25      A.   Yes.

19

1       Q.   Okay.  So going back here, the pictures
2   subsequent, I'm going to guess that that's going to show us
3   where she's talking about for damaged case goods.  Can you
4   point that out for me?
5       A.   I am thinking it would be the third -- the center
6   photograph in the second row down looks like it's of a
7   table, possibly no.  Move over one.
8       Q.   This one?
9       A.   Possibly, yes.  If you'd make that larger.  It's
10  hard to see.
11           Yes.
12      Q.   Okay.  And so that's what she's referring to,
13  scratches and damage to surface of furniture in 388, that
14  was a nine point deduction; is that --
15      A.   The photo I'm seeing shows a table with scratches
16  and finish damages on the sides of the table and also on the
17  leg correct.
18      Q.   Okay.  And do you also see a glare on that
19  photograph, sir?
20      A.   It would appear to be a glare, yes.
21      Q.   Okay.  And do you know what the lighting was in
22  the room at the time that she took this photograph?
23      A.   No.
24      Q.   You don't?
25           And you're not really sure what the camera was?

20

1       A.   No.
2       Q.   And you don't really know what training Ms. Bree
3   had; is that true?
4       A.   Only the regular training for an RSM, that's
5   correct.
6       Q.   Which is whatever her manager decided to tell
7   her, true?
8       A.   It's whatever the manager instructed and trained
9   her on, correct.
10      Q.   And we don't know what that would be exactly;
11  right?
12      A.   On-the-job training.
13      Q.   So it's whatever the manager decided to tell her?
14      A.   Correct.
15      Q.   And do you know is there any way to determine how
16  large this table is?
17      A.   From the photograph, no.
18      Q.   Okay.  So since we can't tell the size of the
19  table, you also can't tell how large the alleged damage is;
20  correct?
21      A.   Tables in guest rooms have a specific requirement
22  through Best Western, but that would not show how much of
23  this table or how large this table is, correct.
24      Q.   And since then we have no real perspective by
25  which to judge the alleged damage to the table; correct?

21

1       A.   Correct.
2       Q.   So it could be the size of a pencil lead, it
3   could be bigger, we don't know?
4       A.   It's obvious in the photograph that it's not the
5   size of a pencil lead.
6       Q.   Well, actually, sir, I actually thought that was
7   a pretty good analogy.  So to you it's obvious it's bigger
8   than that?
9       A.   Yes.
10      Q.   Okay.  And so this is one table in that room as
11  far as we can tell; right?
12      A.   Yes.
13      Q.   Okay.  And this picture number 127 reflects the
14  headboard and the two lamps and the bed with a picture over
15  it.  And do you see any damage from that angle, sir?
16      A.   No.
17      Q.   Okay.  So the overall appearance as reflected in
18  picture number 127 seems acceptable to you?
19      A.   That photograph may or may not be of one with a
20  deficiency.  It may be of one as I told you we take for
21  other reasons.
22      Q.   Okay.
23      A.   Design rather than compliance.
24      Q.   Sure.  Sure.  I appreciate that.  But as we go
25  back here, we see the room number 388 and the next picture

22

1    in sequence is an air grill and that says it's picture 126.
2    Then we have picture 127 as reflected right here. And then
3    you get to this one that is allegedly reflecting damage to a
4    table in the room, and that's picture number 128.
5        So based upon your testimony that it's Best
6    Western's practice to put a picture of the room number and
7    then sequentially the photographs from the room after it, is
8    it fair to say that that picture then, number 127, also
9    reflects room 388?
10    A.   Yes.
11    Q.   Okay. And that's the one you said there was no
12   damage on and in fact it might not be a picture reflecting
13   damage at all true?
14    A.   Correct.
15    Q.   Okay. Now, the next photograph I'd like to draw
16   your attention to is also in room 388. And in fact it is
17   this photograph here, which is photograph 126. And again,
18   sir, I'm going to ask you if you can tell me what that
19   depicts.
20    A.   It appears to show an air-conditioner grill that
21   would be dirty.
22    Q.   Okay. Is that dirt or is it dust?
23    A.   Either one, it's not clean.
24    Q.   Okay. Do you know how close that picture was
25   taken to the item?

23

1    A.   No.
2    Q.   Okay. Do you know if that -- do you know the
3    location of that air-conditioner grill? In other words, do
4    you know if it's on top of a ceiling, do you know if it's on
5    a floor, do you have any idea where it would be?
6    A.   I do not.
7    Q.   Okay. So you don't know if that's something that
8    a guest would be able to see or not?
9    A.   I would need to know -- I'd need to see the
10   picture of the room in order to tell me.
11    Q.   Let me go back and take a look at that because
12   that's the only picture that I see of the room and I can't
13   tell from that. Can you?
14    A.   No.
15    Q.   Okay. So looking at just this grill or the
16   picture here that Ms. Bree took, it's really difficult to
17   say whether that's something that a guest would notice or
18   not, isn't it?
19    A.   Yes.
20    Q.   And in fact as I understand it, Best Western does
21   not interview the guests and rather this is strictly
22   Ms. Bree goes in and says, okay, I think I'll take a picture
23   of that because I see something wrong with it?
24        MR. GARBARINO: Objection; form.
25

24

1    BY MS. SCHLESINGER:
2    Q.   Do you understand what I'm asking you?
3    A.   Best Western does not interview guests. Regional
4    service managers do assess guest room conditions, correct.
5    Q.   Okay. But let me ask you this, Mr. Nygaard.
6    Looking at this photograph here -- and I don't know if I can
7    do this. I don't know if this will do it. I don't know if
8    we can have -- if I can do this. I don't know if I can do
9    it in this program. It doesn't appear that I can.
10        I know on my computer at home I would be able
11   to -- and probably here I'd be able to open up -- in fact I
12   might take the time to do it as we go along, but I can open
13   up a computer program and I can zoom in on any particular
14   part of a photograph. Can you do that at home on your
15   computer?
16    A.   On some photographs there might be a zoom button,
17   correct.
18    Q.   Okay. And in some computer programs, you have
19   the capability of doing that?
20    A.   That's correct.
21    Q.   Okay. And have you had the experience, sir,
22   that, when you zoom in very closely, things tend to look
23   different than they would look to the naked eye? Would you
24   agree with that statement?
25    A.   If you zoom, it's closer. I don't understand

25

1    your question.
2    Q.   Okay. So if you zoom in very close on a speck of
3    dust, you can make that look like a dust ball, I mean, you
4    can make it look really big; right?
5    A.   Correct.
6    Q.   Okay. And that's different than what you might
7    notice standing in a room, true?
8    A.   It would be, correct.
9    Q.   Okay. So where you have a photograph such as
10   number 126, we don't know where that air vent was located
11   true?
12    A.   Not from this photograph, correct.
13    Q.   Right. And we don't know how close it was taken;
14   right?
15    A.   Correct.
16    Q.   And we don't know what the lighting was?
17    A.   Correct.
18    Q.   And we have no idea if a guest would notice it;
19   right?
20    A.   I'm not sure that that would be correct because,
21   if it's by the table, the guest may be close enough to that
22   that they would put their hand on it if they sat at the
23   table.
24    Q.   But you don't know, do you?
25    A.   I don't know.

26

```
1      Q.   You're speculating; right?
2      A.   That's correct.
3      Q.   And in fact Ms. Bree took nine points off for
4   something and this is the evidence that those nine points
5   were justified, that's what we've got as the evidence;
6   right?
7           MR. GARBARINO:  Objection; form.
8   BY MS. SCHLESINGER:
9      Q.   Do you understand my question?
10     A.   Yes.
11     Q.   Okay.
12     A.   Yes.
13     Q.   That's it, that's our evidence; is that correct?
14     A.   That's correct.
15     Q.   Ms. Bree did not testify at that board of
16  directors hearing, is that true?
17     A.   She was not in the audience or at the hearing for
18  this property, that's correct.
19     Q.   Okay.  So she didn't testify there?
20     A.   No.
21     Q.   Okay.  But when you rephrased it, I thought
22  perhaps there might be something I was missing in that
23  question.
24          So this is the evidence upon which the board of
25  directors concurred that nine points should not taken off?
```

27

```
1      A.   Correct.
2      Q.   Okay.
3           MR. GARBARINO:  Objection; form.  My objection is
4   I'm not sure you're stating the point amount there
5   correctly.
6           MS. SCHLESINGER:  Well, I believe I am.  I'm
7   looking at maintenance, top of AC scratched.
8           MR. GARBARINO:  I think that's --
9           MS. SCHLESINGER:  Oh, I'm sorry.
10          MR. GARBARINO:  -- a different room number.
11          MS. SCHLESINGER:  I'm sorry.  You're right,
12  absolutely right, AC grill vent dusty, 388, was six points.
13  I apologize.  But you would agree with the rest of the
14  statements; correct?
15          THE WITNESS:  Yes.
16  BY MS. SCHLESINGER:
17     Q.   Do you know how tall Ms. Bree is?
18     A.   No.
19     Q.   Do you know what her vision is?
20     A.   No.
21     Q.   Do you know if she wears glasses?
22     A.   Not that I recall.
23     Q.   You don't know then if she wears contacts?
24     A.   Correct.
25     Q.   Just out of curiosity, do you know what her IQ
```

28

```
1   is?  And I don't mean --
2           MR. GARBARINO:  Objection to form.
3   BY MS. SCHLESINGER:
4      Q.   I don't mean that flippantly.  I'm very serious.
5      A.   No.
6      Q.   Okay.
7           MS. SCHLESINGER:  Off the record.
8           (Discussion off the record)
9   BY MS. SCHLESINGER:
10     Q.   Continuing in room 388 for a moment, I'm showing
11  you a picture that is JPEG 129 of that folder.  And can you
12  tell me what is depicted there, Mr. Nygaard?
13     A.   What I see is a portion of the bath vanity sink
14  area, the vanity area and a plug in for a -- an apparent
15  hair dryer.
16     Q.   All right.  And do you see a problem there?
17     A.   I do not see a specific deficiency.
18     Q.   Okay.  We go on then and --
19          Oh, let me just clarify this.  Do you see that
20  the --
21          Scratch that.  I thought that was the handle of
22  the hair dryer for a moment.
23          I'm now showing you picture 130 JPEG.  Do you
24  recognize what that is, sir?
25     A.   It appears to be a hair dryer.
```

29

```
1      Q.   Okay.  And any particular problem there?
2      A.   I see chunks of dust in the grills.
3      Q.   Chunks?  Specks?  Do you have any way of telling
4   me how large or not large those are or how deep in they are
5   or if any normal person would ever notice that?  Do you have
6   any idea how large those chunks of dust are?
7           MR. GARBARINO:  Objection; form.
8   BY MS. SCHLESINGER:
9      Q.   Do you have any idea how large those pieces of
10  dust are, sir?
11     A.   Some of them almost clog the drain -- the grill,
12  so they are larger than specks and they are obvious.
13     Q.   Okay.  And do you have any idea -- first of all,
14  I would certainly disagree with your statement, but we're
15  not here to argue it.
16          Do you have any idea what angle that blow dryer
17  vent is facing?
18     A.   The hair dryer is in its holder on the guest --
19  on the bath vanity wall.  I don't understand your question.
20     Q.   Well, is it facing another wall?  Is it facing
21  across the sink?  Is it something the person would have to
22  lean down and look over at?  That's what I'm asking you.
23     A.   I don't know that.
24     Q.   You have no information with regard to that?
25     A.   No.
```

30

1    Q.  Okay. And you say that it's almost clogging the
2    vent. Okay. Do you know if a blow dryer with clogged vents
3    works?
4    A.  I would presume a clogged vent hair dryer would
5    work, yes.
6    Q.  Okay. So as far as you know, that's functional?
7    A.  Yes.
8    Q.  Okay. I will just tell you that it's been my
9    experience that if something gets caught in my blow dryer,
10   it doesn't work.
11        MR. GARBARINO:  Objection.
12   BY MS. SCHLESINGER:
13   Q.  You know, that's why I was asking the question.
14        MS. SCHLESINGER:  Why don't we take a moment's
15   break if we may.
16        MR. GARBARINO:  Okay.
17        (Recess)
18   BY MS. SCHLESINGER:
19   Q.  Okay. Mr. Nygaard, we were talking about this
20   vent that's depicted -- this blow dryer as depicted in JPEG
21   130. Do you have any idea how large the aperture on that
22   blow dryer is?
23   A.  No.
24   Q.  And I guess in the picture as it's shown on this
25   screen -- I don't have a ruler, but I do have an eight by 11

31

1    normal piece of paper. I'm trying to get some -- so
2    that's -- would you agree with me that that's probably about
3    16 inches?
4    A.  Yes.
5    Q.  -- based on that page I'm holding up against the
6    photo comes to just short of the beginning of the numbers
7    there, and so that blow dryer aperture would be better than
8    eight inches, right, eight-and-a-half by 11, so it's
9    probably nine inches across in this photo?
10   A.  Yes.
11   Q.  Is that right?
12   A.  Yes.
13   Q.  And so that's blown up and it's not life size,
14   would you agree with me?
15   A.  Correct.
16   Q.  Okay. So your chunks of dust are blown up beyond
17   life size; is that true?
18   A.  Yes.
19   Q.  Okay. So in real life -- you say -- you say that
20   in this paragraph, they're very visible, would you agree?
21   That's what your testimony was?
22   A.  Yes.
23   Q.  In re life we can't really tell how visible those
24   would be because we don't even know how big that blow dryer
25   is; right?

32

1    A.  Standard size for those hairdriers -- they're
2    called hand-held hairdriers, so they would fit in your hand.
3    Q.  So they're relatively small?
4    A.  Yes.
5    Q.  Okay. And I'm staking a standard yellow pencil,
6    right, and as blown up as this is, it is no bigger, would
7    you agree with me, sir, than the -- than the sharpened
8    portion of the yellow pencil?
9    A.  The shaved and sharpened portion, that's correct.
10   Q.  Okay. And so it's -- it's blown up, right?  So
11   it's hard to tell -- even trying to do all of that, it's
12   hard to tell how big in really is; right?
13        MR. GARBARINO:  Objection; form.
14   BY MS. SCHLESINGER:
15   Q.  Would you agree that that's difficult to get an
16   accurate kind of estimation on the size of a piece of dust
17   in the hair dryer?
18   A.  For me it's not because I'm familiar with the
19   hair dryer itself. And as I would take that hair dryer out
20   of its unit, I would see that every time I removed it from
21   the unit on the wall.
22   Q.  You would?
23   A.  Correct.
24   Q.  Any idea any standard guest would look at that?
25   A.  We record items like this as a guest would see

33

1    them.
2    Q.  No, sir. I'm going to ask a different question
3    then.
4    A.  Okay.
5    Q.  Have you ever interviewed a guest with regard to
6    their impression of blow dryer vents?
7    A.  No.
8    Q.  In fact have you ever interviewed guests with
9    regard to whether they notice the blow dryers specifically?
10   A.  No.
11   Q.  So you say that we record things like this as a
12   guest would see them. What support do you have for that
13   statement?
14   A.  None.
15   Q.  And in fact it would be just as easy to look
16   around the bathroom if you stood at the entrance to the
17   bathroom and have not taken a photograph of the inside
18   closeup of the blow dryer vent and said, gee, I didn't think
19   a guest would notice such a thing, I didn't notice it?
20        MR. GARBARINO:  Object to form.
21   BY MS. SCHLESINGER:
22   Q.  Is that true? A different RSM could have looked
23   in that bathroom and not noticed this; is that true?
24   A.  Would you repeat your questions?
25   Q.  Sure. Ms. Bree picked out to take this closeup

**34**

1   shot of the inside of a dryer -- hair dryer -- held-hand
2   dryer vent obviously since it's here; right?
3       A.   Yes.
4       Q.   Okay.  Is it possible that a different RSM could
5   have visited that same room and chosen not to take a
6   photograph of that?
7       A.   If another RSM did not see that, that is correct.
8       Q.   And we have no way of knowing whether another RSM
9   would have noticed that or not, true?
10      A.   Correct.
11      Q.   Okay.  And this photograph, sir, do you know what
12  that is of?
13      A.   That's a chrome -- I believe it's called a
14  escutcheon plate on a bathtub.
15      Q.   Okay.  And do you see a reflection in that
16  photograph, sir?
17      A.   There's either a reflection or missing -- it's
18  starting to brass, correct.
19      Q.   And you can't really tell which one is which?
20      A.   I see more brassing than I do a reflection.
21      Q.   Are you certain of that, though?  I mean, that's
22  your impression, but are you certain what you're looking at
23  there?
24      A.   That's what I see.
25      Q.   Okay.  But it could be reflection?

**35**

1       A.   Possibly.
2       Q.   Okay.  And I am now looking at the sequence of
3   rooms.  Do you see here on the screen in the conference room
4   here I've got the cursor right now on JPEG 76 which appears
5   to depict a room number 134?
6       A.   Correct.
7       Q.   Do you see that?
8            Okay.  So in the next row down at photograph 83,
9   we see the room number 163, so reasonably these photos in
10  between those two markers should be the room 134; is that
11  correct?
12      A.   If there are deficiencies contained within that
13  room, they generally would be behind the photograph of the
14  room number, correct.
15      Q.   Okay.  So in here?  Okay.  Because I wanted to
16  figure out -- do you know what you're looking at there, sir?
17      A.   I see a vanity top.
18      Q.   Okay.  And do you see anything particularly the
19  matter with that?
20      A.   From where I sit, I do not see an obvious
21  deficiency.
22      Q.   Okay.  So if you look at Exhibit 3 where it says
23  vanity counter, wash basin on that same picture we were --
24  on that same page we were looking at that had the hair dryer
25  vent issue noted and you look at capital vanity top damaged,

**36**

1   134, 15 points off, looking at this photograph, you don't
2   see what's being referred to; is that fair to say?
3       A.   I'm sorry.  I was looking for the proper place on
4   the report.
5       Q.   And you would like me to repeat myself?  That's
6   fine.
7       A.   And so what you said was in the guest rooms
8   portion, vanity, counter, wash basin, vanity top 134
9   damaged.
10      Q.   Vanity top damaged --
11      A.   Uh-huh.
12      Q.   -- 134, one times 15 equals 15.  Am I reading
13  that correctly?
14      A.   That's correct.
15      Q.   And so that's 15 points off for a damaged vanity
16  top in room 134?
17      A.   That's correct.
18      Q.   Okay.  And we're saying we believe this to be --
19  this picture 79 JPEG to be the vanity top in room 134;
20  correct?
21      A.   That shows a portion of the vanity top and it's
22  from behind room 134, that's correct.
23      Q.   Okay.  And you don't see any problem there?
24      A.   Not in that photograph, no.
25      Q.   Okay.  And do you think that could also be a

**37**

1   vanity top?
2       A.   That appears to be a closer view, correct.
3       Q.   So taking a very -- do you see -- first of all,
4   do you see any glare or reflection in that?
5       A.   At the bottom of the photograph, yes.
6       Q.   Okay.  And so, when you zoom in close, are you
7   going to agree with me that the flaw that she might have
8   been thinking were two light gold lines there?
9       A.   I see the two light gold lines that you see on
10  the left side of the photograph.  On the right side of the
11  photograph, I see black marks, several of them, as well.
12      Q.   And again this photograph's blown up.  Would you
13  agree it's very close?
14      A.   Yes.
15      Q.   It's taken very close?
16      A.   It's taken standing over the vanity, that's
17  correct.
18      Q.   And in fact those marks don't show in there at
19  all, do they?
20      A.   From this angle and relooking at that photograph,
21  I can see where they are, yes.
22      Q.   But you didn't notice them at first, did you?
23      A.   That's correct.
24      Q.   Okay.  So again we have no idea if a guest would
25  notice that or think that it was a deficiency, but Ms. Bree

## 38

1  decided to go in and take a closeup of it; correct?
2  A.  As I see these, if I was standing away from the
3  vanity, I might not see them.  If I am closer to the vanity,
4  I obviously saw them.
5  Q.  Well, no.  Let me rephrase that just so we can
6  clarify a little bit, sir.
7  You're not standing at the vanity at all, you're
8  sitting in the conference room; right?
9  A.  That's correct.
10  Q.  And you're looking at a photograph Ms. Bree took
11  zoomed in on what she perceived to be a deficiency, true?
12  MR. GARBARINO:  Objection; form.
13  THE WITNESS:  Zoomed in or closer, correct.
14  BY MS. SCHLESINGER:
15  Q.  Okay.  That you didn't notice when we first
16  looked at the room at all; right?
17  A.  I did not notice from the first photograph shown.
18  Q.  Okay.  And let me ask you this, sir.  Do you have
19  any idea what -- how is that 15-point -- how is that
20  determined?  How do they come up with 15 points versus five
21  points versus 20 points?
22  A.  The point values are set by Best Western and
23  they're set by the quality assurance department in
24  conjunction with working with member input on what is
25  important on these reports as well as committees as well as

## 39

1  staff, et cetera, so the point values are set by Best
2  Western working with others to determine what's important to
3  the guest.
4  Q.  You said member input; is that correct?
5  A.  Yes.
6  Q.  And another thing you said is committees;
7  correct?
8  A.  Yes.
9  Q.  So you said that you look at member input and
10  staff, and then -- I'm sorry, sir.  Did you tell me that you
11  interviewed guests to decide what the point value is or the
12  relative importance of any particular deficiency?
13  A.  No.
14  Q.  You do not interview guests?
15  A.  No.
16  Q.  So you're determining what's important to guests
17  without ever asking the guest; is that correct?
18  A.  Yes.
19  Q.  Okay.  Sir, have you stayed in many hotels in
20  your life?
21  A.  My definition of many would be more than 50 and
22  the answer to that is yes.
23  Q.  Okay.  And in your experience as a guest at a
24  hotel, have you ever on -- a leisure trip now, have you ever
25  gone around and inspected the back side of a satellite dish?

## 40

1  A.  As a guest, no.
2  Q.  Okay.  And would you consider whether or not that
3  back side of a satellite dish was in pristine condition to
4  be important to the quality of your stay?
5  A.  If I was a guest and saw anything that was faded,
6  damaged, scratched, et cetera, I would not appreciate the
7  overall quality of that property.
8  Q.  I'm showing you now, sir, photograph number 104
9  JPEG out of this same 1/31/2008 volume?
10  MS. SCHLESINGER:  And I guess we'll attach the
11  hard copies, Mr. Garbarino.  The disc?  I don't know how you
12  want to do this.
13  MR. GARBARINO:  Yeah, let's attach the disc.
14  MS. SCHLESINGER:  Okay.
15  MR. GARBARINO:  And you weren't happy with the
16  hard copies --
17  MS. SCHLESINGER:  Well, it's not that I wasn't
18  happy with them.
19  MR. GARBARINO:  And we're asking him questions
20  about, you know, digital pictures on a digital screen right
21  now, so I would prefer the disc.
22  MS. SCHLESINGER:  Okay.  I'm fine with that.
23  It's just the logistics of how to do it.
24  BY MS. SCHLESINGER:
25  Q.  In any event, so I'm looking at number 104 in the

## 41

1  volume of 1/31/2008 of the documents that were produced by
2  Best Western.
3  Aside from the pine needles that are -- I don't
4  know if you can see that.  Do you see pine needles in the
5  dish?  It looks like they've fallen from a tree.
6  A.  I see something in the mesh of the disc, correct.
7  Q.  Yeah.  I'll just tell you I believe that it's
8  pine needles.
9  But in any event, do you see any other problem
10  that would cause you to be disconcerted if you were a guest
11  at the hotel assuming that the satellite worked fine and
12  your picture of your television was fine and -- is there
13  something there that would cause you to go, oh, my gush, I'm
14  disconcerted with the quality of this hotel?
15  A.  I'm -- I'm not seeing anything with the dish
16  other than what you say, perhaps the messy landscaping
17  beneath, but I'm not sure what the photograph is trying to
18  show.
19  Q.  I move to strike the messy landscaping comment
20  because I'm asking about the dish.
21  A.  Would you reask about the dish then?
22  Q.  Sure.
23  Do you see anything about that satellite dish,
24  about the hardware on that satellite dish that would cause
25  you to be disconcerted as a guest regarding your stay at the

42

1  hotel on a leisure trip?
2      A.  No.
3      Q.  Okay.  And on a business trip other than for Best
4  Western, would you imagine that that's something that would
5  cause people alarm or concern?
6      A.  No.
7      Q.  Have you ever been that close to the back of a
8  satellite dish when you've stayed at a hotel, sir?
9      A.  No.
10         MR. GARBARINO:  Objection; form.
11         THE WITNESS:  No.
12         MS. SCHLESINGER:  What's the objection
13  Mr. Garbarino.
14         MR. GARBARINO:  I have no idea how close that is.
15  BY MS. SCHLESINGER:
16     Q.  Okay.  Have you ever looked at a satellite dish
17  from that angle, sir, when you've stayed at a hotel?
18     A.  Not that I recall.
19     Q.  Okay.  Do you now -- this -- in this proximity as
20  reflected in picture 103.JPG see that there may be some rust
21  on the back side of the bracket holding the satellite dish?
22     A.  Yes.
23     Q.  That you did not see previously in the other
24  picture, the ones taken from a little bit further away?
25     A.  Correct.

43

1      Q.  Okay.  And if you look at the report on -- and
2  again this is a page one, but it says, North American public
3  areas Q and A assessment report from 1/31/2008 by Ms. Cindy
4  Bree.  You go down to landscaping and fencing.  Do you see
5  the last line there under that maintenance category is
6  satellite dish on lawn is rusted?  Do you see that?
7      A.  Yes.
8      Q.  Okay.  And going over to the right-hand column
9  under point lost, we se the number 20, is that true?
10     A.  Yes.
11     Q.  Okay.  Do we have any idea what percentage the
12  satellite dish on lawn is rusted contributed to that
13  20-point loss?
14     A.  No.
15     Q.  You can't tell?
16     A.  No.
17     Q.  Do we have any way of figuring that out based
18  upon what's in this report?
19     A.  I do not.
20     Q.  Okay.  The other comments there are some planters
21  are empty; is that correct?
22     A.  Yes.
23     Q.  Do we know what is meant by empty?  Do you know
24  what that means?
25     A.  From the context of this wording, I would say

44

1  that there are planter areas that do not have plants within
2  them.
3      Q.  Okay.  I'm going to show you what I believe to be
4  the correlating photograph.  Would that be an empty -- this
5  is picture number 164 JPEG.  Would that be an empty planting
6  area?
7      A.  No.
8         MR. GARBARINO:  Objection; form.
9         MS. SCHLESINGER:  Again I'm going to ask you what
10  the objection is.
11         MR. GARBARINO:  I'm not sure that that picture is
12  representative of what you're saying.  I believe there is
13  another picture of an empty --
14         MS. SCHLESINGER:  And we'll get there.  Thank
15  you.  I just wanted to clarify what the objection was.
16  BY MS. SCHLESINGER:
17     Q.  I'm asking is this picture the one -- does that
18  say something about it's empty?  That picture does not show
19  an empty plant area?
20     A.  It does not.
21  BY MS. SCHLESINGER:
22     Q.  Okay.  And is it Best Western's policy and
23  requirement that every planting area have a certain number
24  of plants in it?
25     A.  No.

45

1      Q.  Is it written someplace that there must be plants
2  in every planting area on the property?
3      A.  No.
4      Q.  So that's not written anywhere to your knowledge?
5      A.  No.
6      Q.  So then -- oh, then I guess some planters are
7  empty wouldn't be a problem; right; some of them could be
8  empty depending on the time of year; right?
9      A.  Yes.
10     Q.  Okay.  So we're going to kind of move off and
11  say, well, maybe that's not the cause of a 20-point loss.
12         Lawn has areas missing grass, would that be worth
13  20 points do you think, sir?
14     A.  I'm not sure if that's worth 20 points.
15     Q.  Okay.
16     A.  By itself.
17     Q.  Okay.  So it's the cumulative total that somebody
18  decided was worth 20 points; is that what you're telling me?
19     A.  There is one group of comments and one point
20  loss, yes.
21     Q.  How do we decide what items go into this grouping
22  landscape, fencing, maintenance?
23     A.  There are detailed definitions within the quality
24  assurance manual that outline the deficiencies for this
25  area.

46

1      Q.   Okay.  And the quality assurance manual is
2   something that only RSMs have access to; is that true?
3      A.   No.  That information is on line for Best Western
4   members.
5      Q.   It's supposed to be, you mean?
6      A.   Yes.
7      Q.   And how many pages are on line?  How many
8   pages -- how many files -- how many pages are in this
9   on-line portal?
10      A.   I do not know that.
11      Q.   Do you have any idea how it's organized?
12      A.   This manual would be a portion of regional
13   services operations information.
14      Q.   Okay.  Do you know -- do you know the expression
15   drill down when you're looking on a computer, sometimes you
16   have to drill down through a file?  Does that make sense to
17   you?
18      A.   Yes.
19      Q.   Okay.  Do you know if I have to drill down to get
20   to the information that would describe for you what was in
21   this landscaping, fencing and maintenance category?
22      A.   No.
23      Q.   Do you have any idea how long it would take you
24   to try to find that information if you were a mere consumer?
25      A.   No.

47

1      Q.   More than five minutes?
2      A.   I doubt that long.
3      Q.   Do you have any idea, sir?
4      A.   No.
5      Q.   Then -- so you're speculating if I ask you any
6   timeframe; correct?
7      A.   Yes.
8      Q.   And this picture, is it fair to say that picture
9   166 is not a planting area, is it, sir?
10      A.   It does not appear to be.
11      Q.   So this one is not missing plants, it's just
12   missing a little bit of -- you can see there's grass there
13   and it looks like it's trying to grow in that section, but
14   there is some brown dirt, true?
15      A.   Yes.
16      Q.   Okay.  And there's a rock there?
17      A.   Yes.
18      Q.   Okay.  And this was taken in January; correct,
19   sir?
20      A.   Yes.
21      Q.   That's according to Ms. Bree's report taken on
22   the 31st of January; right?
23      A.   Yes.
24      Q.   Okay.  And in fact all of the photographs in her
25   report should have been taken on January 31st because that's

48

1   when -- all of the photographs supporting her report should
2   have been taken on January 31st; is that correct?
3      A.   That's correct.
4      Q.   Do you recall, sir, when we were looking at --
5   well, in fact I guess it would be kind of unfair to take
6   pictures at some point other than during the inspection,
7   wouldn't it?
8          MR. GARBARINO:  Objection; form.
9   BY MS. SCHLESINGER:
10      Q.   Wouldn't you agree?
11      A.   The photos taken would have been part of this
12   assessment, that's correct.
13      Q.   And the assessment began according to
14   Exhibit 3 -- if you turn to Exhibit 3, you will see that the
15   assessment date was 1/31/2008 at 14, colon, 52, colon, 46.
16   In other words, it was done on the 31st around 2:00 o'clock
17   in the afternoon; correct?
18      A.   That's what time the report was generated,
19   correct.
20      Q.   Okay.  So it was done on the 31st and all
21   photographs should have been done either in conjunction with
22   this walk-through or not, not at all; right?
23      A.   In conjunction with the official walk through for
24   this assessment, that's correct.
25      Q.   Okay.  And the reason for that is because the

49

1   hotel owner has an opportunity to walk with the --
2          Well, strike that.
3          I know this is very difficult to see on this one,
4   so I'm going to show it to you on my laptop.
5          Mr. Nygaard, I'm showing you the same photograph
6   that's up there.  It's picture number three JPEG that we
7   looking at earlier.  Do you see that on the laptop, sir?
8      A.   Yes.
9      Q.   Do you see the date stamp there, sir?
10      A.   Yes.
11      Q.   What's the date stamp there, sir?
12      A.   1/30/2008.
13      Q.   Okay.  It's not 1/31/2008; right?
14      A.   That's correct.
15      Q.   Okay.  So it's not a part of this -- or shouldn't
16   have been part of this report, is that true?
17      A.   No.
18      Q.   I beg your pardon?
19      A.   The official assessment date that when this
20   report was generated is 1/31/2008.  The official timeframe
21   of the assessment portion of our visits begins when the RSM
22   arrives at the property, which is generally the night
23   before, for example, to walk the --
24      Q.   That's okay.  I really don't need the examples.
25   I'd like to leave -- your saying to me that the official

50

1  time that the RSM begins their inspection is before the
2  inspection --
3          Let me see if I can phrase -- I understand you
4  were trying to give me some clarification, I but I want to
5  understand this step by step.
6          The RSM arrives at a hotel and that's when the
7  inspection begins even though the walk-through with the
8  hotel personnel doesn't begin until the following day?
9      A.   Component parts of the assessment, for example,
10  nighttime photographs, are taken the night before the
11  assessment.
12     Q.   Mr. Nygaard, is this photograph a nighttime
13  photograph?
14     A.   I said for example.
15     Q.   So --
16     A.   This also is an example of an apparent by the
17  screen I see up there logo distortion that was taken
18  possibly within the guest room of Cindy Bree.
19     Q.   So even though the report says that certain guest
20  rooms were infected, in fact the RSM is inspecting at least
21  one other guest room if they happen to stay overnight;
22  correct?
23     A.   Possibly. I'm not sure why this photograph was
24  taken.
25     Q.   And included in the report?

51

1      A.   Correct.
2      Q.   Okay. But your testimony today would be that the
3  actual inspection encompasses anything the RSM decides to
4  take note of from the time they get to the property;
5  correct?
6      A.   No, there are specific things that we need to
7  look for when we arrive at the property because the
8  inspection date concludes at the end of the walk-through and
9  a report is generated. We are not there on the day of the
10  assessment evening time to take the photos. We do spend the
11  evening prior to an assessment generally at the property
12  where we assess the next day.
13     Q.   Okay. So let me just understand this. Is it
14  required that an RSM come in and announce that, hi, I'm the
15  RSM inspector, I'm checking into your hotel now and I may
16  begin to observe things now? Do they make an announcement
17  similar that to the hotel owner?
18     A.   The RSMs call in advance to announce that they'll
19  be staying there. They announce who they are when they
20  check into the hotel and then through process will take
21  nighttime photographs. And that has been the process for a
22  number of years.
23     Q.   And are the hotel owners advised of this process
24  in that are they told that, from the moment the RSM hits the
25  property, they could take pictures of anything they think is

52

1  appropriate even though your walk-through isn't scheduled
2  until the following day?
3      A.   I'm not sure that the specific notification that
4  I will take nighttime photographs or other deficiencies are
5  made to the property.
6      Q.   So in other words it's very possible that the
7  hotel owner has no idea that the RSM is taking photographs
8  in advance of the date that is scheduled for the
9  walk-through; right?
10     A.   Correct.
11     Q.   I'm just got a couple of more items, then
12  we'll -- it should be over.
13          Looking at the next page in sequence of the
14  public areas -- looking at the next page in sequence of the
15  public areas Q and A assessment report from 1/31/2008 at 14,
16  colon, 52, colon, 46, which you tell me just happens to be
17  when she wrote the report, there is another maintenance room
18  number comment that says wood railing in three level
19  building has faded and scratched finish, walkways are
20  discolored, cracked and stained, rugs in front of some guest
21  room doors are worn. Do you see that entry, sir?
22     A.   Yes.
23     Q.   Did I read it correctly?
24     A.   Yes.
25     Q.   And for that collective problem, it says point

53

1  loss 20; correct?
2      A.   Yes.
3      Q.   Okay. Do we have any way of knowing how many
4  points are taken off for the rugs in front of some guest
5  room doors are worn?
6      A.   No.
7      Q.   Okay. Would you say that worn rugs in front of a
8  guest room door is a typical problem in Best Western hotels?
9      A.   No.
10     Q.   Okay. Would you say that wood railing in three
11  level building with faded or scratched finish is a typical
12  problem in Best Western hotels?
13     A.   No.
14     Q.   Okay. And because these items are not typical
15  problems with Best Western hotels, is it fair to say that
16  your manual -- your Q A assessment manual that you allege is
17  on line probably doesn't specifically set forth those
18  conditions; is that correct?
19     A.   Restate that question.
20     Q.   Sure. You told me that you can look in the Q A
21  quality assessments manual and figure out how many points
22  are going to be deducted. Wasn't that what you told me
23  earlier for a given condition?
24     A.   It will state what might fall within a deficient
25  category.

54

1    Q.   Okay. But it's not going to state wood railing
2  in three level building has faded and scratched finish,
3  true?
4    A.   True.
5    Q.   And it probably won't give a rugs in front of
6  some guest rooms door are worn category, true?
7    A.   True.
8    Q.   So Cindy Brec came up with those comments and
9  they were not something that you can look up in the manual,
10  also true?
11    A.   No. Within the manual, typical deficiencies
12  might be listed or faded or damaged wood railings or worn
13  rugs --
14    Q.   It might -- wait --
15    A.   -- or --
16    Q.   Sir, I'm sorry, I've got to stop you because by
17  your very terminology, what you're saying here is
18  speculative. Do you know for a fact that it says damaged
19  wood railings in your Q and A manual? As you sit here
20  today, do you know that?
21    A.   I do not recall that to be specific, no.
22    Q.   Okay. So when you say it may say that, that is
23  again pure speculation; right? You don't know?
24       MR. GARBARINO: Objection; form.
25

55

1  BY MS. SCHLESINGER:
2    Q.   Do you know that, sir?
3    A.   No.
4    Q.   So when you told me it may say this, the word may
5  designates speculation; right?
6    A.   Yes.
7    Q.   Okay. So you're just speculating? You have no
8  idea if that Q and A manual would list these things for a
9  reasonable person to go look them up; right?
10    A.   Correct.
11    Q.   Okay. And, sir, have you ever examined the
12  quality of a threshold that you walked over in a typical
13  public building?
14    A.   Repeat that question.
15    Q.   Sure. Have you ever examined a threshold that
16  you walk over in a public building?
17    A.   Can you -- I don't understand examine.
18    Q.   If we walk out here to the front of this
19  building, can you tell me -- which door did you come in,
20  sir? Did you park in the back in the parking garage?
21    A.   Yes.
22    Q.   And so you came in those copper doors on the back
23  side?
24    A.   Yes.
25    Q.   Did you stop and look at the threshold when you

56

1  walked in?
2    A.   No.
3    Q.   Okay. So you can't tell me if you noticed if
4  there are any scratches or otherwise?
5    A.   That's correct.
6    Q.   Okay. You know, I'm kind of wondering to say
7  door and threshold scratched, which is under Exhibit 3.
8  restaurant, slash, breakfast room doors, frames, hardware
9  and maintenance and they took 25 points off for that. Best
10  Western took off 25 points.
11    A.   Yes.
12    Q.   And I'm just kind of wondering if you personally,
13  sir, ever looked at thresholds as you walk into a building
14  and say, wow, that's really scratched, that's a problem.
15    A.   If I'm assessing, yes.
16    Q.   If you are visiting a public room -- a public
17  building, do you look at that?
18    A.   Not that I recall.
19    Q.   And do you know, sir, as you sit here today as a
20  point of fact whether or not door and thresholds scratched
21  is a category in your Q and A manual?
22    A.   I would need to see it.
23    Q.   So you don't know?
24    A.   Correct.
25    Q.   Okay. Do you know, sir, what the expression

57

1  extremely budget appearance means?
2       MR. GARBARINO: Objection; form.
3       MS. SCHLESINGER: Your objection, sir?
4       MR. GARBARINO: Can you just put it in context
5  for him? Is it on a particular page or --
6       MS. SCHLESINGER: I'm quoting and I'm quoting
7  from Exhibit 3 and I'll bring it back.
8  BY MS. SCHLESINGER:
9    Q.   But I'd just like to know first, as you sit here,
10  sir, what does the term extremely budget appearance mean?
11    A.   Cheap.
12    Q.   Would another way of saying cheap be inexpensive,
13  they're synonyms?
14    A.   Could be.
15    Q.   Okay. Best Western likes to bill itself as a not
16  overly expensive hotel; right?
17    A.   I've never heard that.
18    Q.   It's not an over-priced hotel, is it?
19    A.   Not to my knowledge.
20    Q.   Okay. So something that appears to be extremely
21  budget appearance, you define that as it would look cheap.
22  Cheap is a subjective term?
23    A.   It can be.
24    Q.   It is; right? You will define something looking
25  cheap differently than I will?

58

1   A.   Yes.
2   Q.   Is that fair?
3   A.   Yes.
4   Q.   So it's a subjective term?
5   A.   Yes.
6   Q.   And yet on the swimming pool, slash, leisure spa
7   page of Exhibit 3, Mr. Harooni lost 30 points in part, we
8   don't know what part I'm going to assume because it says
9   extremely budget appearance.
10       And then it says, phone cords strung across wall,
11  not connected.
12       Can you tell me, sir, is the extremely budget
13  appearance modifying the phone cord, vice versa?  Do you
14  know if those two phrases are connected based on what she
15  wrote here?
16  A.   No.
17  Q.   But there's 30 points off; right?
18  A.   Yes.
19  Q.   And you can't tell me whether it's for the
20  extremely budget appearance or for the phone cord or some
21  combination of those two?
22  A.   Correct.
23  Q.   Okay.  I've got a couple more things that I do
24  want to hit on before we wrap this up.
25       Do you recall, sir, last time that we talked we

59

1   chatted about a blue mark on a tub?  Do you recall that?
2        I'm sorry.  I'm having a hard time seeing this in
3   here.  Just a second.
4        Let me show you this on my computer again because
5   I'm having difficulty finding it on that screen and through
6   that -- the wonders of technology are getting the best of
7   me.
8        Do you see that photograph, sir?
9   A.   Yes.
10  Q.   And what does that generally depict, sir?
11  A.   It appears a tub bottom that's stained.
12  Q.   Do you think that it has blue paint on it, sir?
13  A.   No.
14  Q.   That's a reflection; right?
15  A.   It appears to me to be a reflection, yes.
16  Q.   It's a discoloration based on the photograph?  Do
17  you understand what I'm saying?  The discoloration is caused
18  by the mechanism of photographing it rather than do we think
19  there's really any coloration -- blue staining on the tub;
20  right?
21  A.   I believe that's correct, yes.
22  Q.   Okay.  So that picture depicts something that you
23  think is there and something we're pretty clear isn't,
24  right, the two types of coloration?
25  A.   Yes.

60

1   Q.   Okay.
2        MR. GARBARINO:  I'm not sure you said what
3   photograph that was.
4        MS. SCHLESINGER:  I was just going to because I
5   just switched it over.  Thank you.  That's because I pushed
6   it over to him too quickly.  And that photograph was number
7   76 from the folder that's generally 10/25/2007.  That's JPEG
8   76 of the documents that I guess are going to be Exhibit 4
9   to Mr. Nygaard's deposition.  The report was 3.  I think
10  that's right.  I will rely on our court reporter for that
11  information.
12  BY MS. SCHLESINGER:
13  Q.   Okay.  So in that photograph, we think that part
14  of the color issues are just a mechanism of the photography;
15  right?
16  A.   Yes.
17  Q.   Okay.  If find it on here, maybe I can put it up
18  over there better.
19       MR. GARBARINO:  Can you go off the record for
20  just a second?
21       MS. SCHLESINGER:  Certainly.
22       (Discussion off the record)
23  BY MS. SCHLESINGER:
24  Q.   Sir, can you tell me what's being shown now on
25  the screen in our conference room here?  Can you tell me

61

1   what that depicts?
2   A.   It appears to be a picture of either a swimming
3   pool or a spa area --
4   Q.   Okay.  And --
5   A.   -- and the coping or the walkway around it.
6   Q.   Okay.  And that's -- for reference it's JPEG 28
7   in the 1/31 volume of Exhibit 4, by volume and folder,
8   directory, whatever you want to call it, but it's from the
9   Cindy Bree 1/31 photographs.  And in fact, if you go down
10  just below where we were discussing the, quote, extremely
11  budget appearance, going down to swimming pool, spa,
12  whirlpool, do you see that?
13  A.   Yes.
14  Q.   Okay.  And do you know what color the tile is
15  based upon the picture that you're seeing there?  Do you
16  know what colors are in that tile?  There's a pattern there,
17  would you agree?
18  A.   Yes.
19  Q.   Okay.  Do you know what color those patterns are?
20  A.   I'm not good with colors.  If it's teal and
21  blue -- I don't know about teal.
22  Q.   Purple, blues?
23  A.   Purple, blue, yeah.
24  Q.   Okay.  And there's a shadow and a light
25  reflection in part of the photograph?

62

1      A.   Yes.
2      Q.   Okay. And then it's got water in it, so there's
3   more reflection going on?
4      A.   Yes.
5      Q.   Okay. Do you see anything in particular wrong
6   with that?
7      A.   I would look more at the three-foot depth sign
8   that's supposed to be white, but it's more discolored.
9      Q.   Okay. Ms. Bree states that the discoloration is
10  on the top edge of the tile in spa. Do you know what she's
11  referring to there?
12     A.   Well, it would look like the top edge of the tile
13  in the spa where it says three feet.
14     Q.   That's not the top edge, is it, sir.
15          Would you consider that to be the top edge? I'd
16  say that three feet is kind of in the center personally.
17          MR. GARBARINO: Objection to form.
18  BY MS. SCHLESINGER:
19     Q.   When you say top edge, do you know what she's
20  referring to with any certainty, sir?
21     A.   It's the top part of that tile.
22     Q.   Okay. She says hard water deposit and
23  discoloration on top edge of tile in spa. So you think that
24  the -- can you read the word -- the symbol up there for
25  foot, the FT?

63

1      A.   Yes.
2      Q.   Okay. So it's not that; right?
3           And then you see the water goes across the center
4   of the three. Would you agree with me, sir?
5      A.   Yes.
6      Q.   And there you can tell that it's a three; right?
7      A.   That's supposed to be a white tile --
8      Q.   How do you know that?
9      A.   -- with black letter.
10     Q.   How in the world do you know that? That's
11  fascinating. You told me a minute ago you couldn't even
12  tell what colors it was. Now its supposed to be white?
13          MR. GARBARINO: Objection to form.
14  BY MS. SCHLESINGER:
15     Q.   That's fascinating.
16          Do you know what color that tile is supposed to
17  be, sir, with any certainty as you sit here today?
18     A.   Of the tiles I've seen that depict depth markers,
19  they're generally white. I do not know the color that this
20  one is supposed to be or started being.
21     Q.   Okay. You've never seen that personally; right?
22     A.   That's correct.
23     Q.   And in fact Ms. Bree did not say that the depth
24  marker had a discoloration on it, she said hard water
25  deposit and discoloration on top edge of tile in spa;

64

1   correct?
2      A.   Yes.
3      Q.   So based on what she wrote in her report, you
4   have no idea, do you, if she was specifically referring to
5   the three-foot marker or to the other tile, true?
6      A.   The tile is tile, true.
7      Q.   Okay. And in fact, if she was referring
8   specifically to the three-foot marker, it would have been
9   handy to have said discoloration on top edge of three foot
10  marker tile in spa, wouldn't it have been? Wouldn't it be
11  handy if she'd been very specific so we knew what she was
12  talking about?
13     A.   She was specific to say the top edge of the tile.
14  That means the tile.
15     Q.   Okay.
16     A.   All of it.
17     Q.   Okay. So not just the three-foot marker? It's
18  really got nothing to do with that in particular; right?
19     A.   That was just my explanation.
20     Q.   Okay. And it doesn't correlate with what's
21  written in Ms. Bree's report; correct?
22     A.   Say that again.
23     Q.   I said, you cannot tell me if that -- your
24  interpretation necessarily correlates with what Ms. Bree
25  wrote in that Exhibit 3 sitting in front of you?

65

1      A.   The tile appears to be discolored.
2      Q.   Okay. And the tub that we were looking at a few
3   moments ago, when we looked at that tub and you agreed that
4   there was a color there, that had nothing to do as far as we
5   can tell with the actual color of the tub, it was a
6   mechanism of the photography; right?
7      A.   Yes.
8      Q.   Okay. But now your testimony is that this tile
9   is discolored but you've never seen the tile yourself; is
10  that true?
11     A.   Correct.
12     Q.   Okay. And you can't tell me what colors -- I'm
13  sorry. You can't tell me the color is within the tile or --
14  you can't tell me whether that's a pattern on the tile or
15  where the discoloration that she's talking about, can you?
16     A.   That's correct.
17     Q.   Okay. And given that it's difficult for you to
18  look at that photograph and tell me that, do you know if the
19  board of directors considered that there could be a problem
20  with the photograph?
21          MR. GARBARINO: Objection; form.
22  BY MS. SCHLESINGER:
23     Q.   Well, you were present at the board meeting;
24  correct?
25     A.   I do not recall being present.

66

1    Q.   Okay.  But you've been present at many board
2    meetings; right?
3    A.   Yes.
4    Q.   And do you know if they consider some of these
5    issues, well, gee, where is the.
6        So let me back up.  Let me ask -- strike that.
7    Let me ask this another way then.
8        During the board hearings, do they look at the
9    photographs submitted by the RSM?
10   A.   Yes.
11   Q.   Do they do that in the presence of the hotel
12   owner?
13   A.   Yes.
14   Q.   Do they ask the hotel owner questions such as,
15   hey, what color is that tile?
16   A.   No.
17   Q.   They don't?  They just say -- they look at this
18   report and they say 25 points off, because I think that's
19   what they took off for that?
20       Yeah, this spa issue that we're having a little
21   bit of a hard time even saying with any certainty what the
22   color of the tile is supposed to be was 25 points taken off.
23       Would the board member -- would the board of
24   directors, rather, look at that and consider what the
25   problems could be with the photograph before they deducted

67

1    and terminated the hotel membership?
2        Do you want me to rephrase that?
3    A.   Please.
4    Q.   Okay.  The board members sit there in a hearing
5    to determine whether or not the hotel membership will be
6    terminated; right?
7    A.   Yes.
8    Q.   And I think you told me that that hearing is
9    about half an hour.  How long does that hearing last, sir?
10   A.   I believe the time slot allowed is set at one
11   hour.  Members can take lesser or greater time than that.
12   Q.   And during -- what you're now testifying, that
13   doesn't sound -- I think there's some contradictory
14   testimony to that, but that's okay.
15       And what you're saying is the one hour there, do
16   the board members in determining whether or not to terminate
17   a hotel go through the report and ask the hotel owner about
18   the issues set forth there?
19   A.   I do not recall a board meeting where the report
20   is reviewed line by line with the property representative.
21   Q.   So, in other words, during the hearing to
22   determine whether or not termination of membership will
23   occur, the board of directors just kind of goes, okay, you
24   lost X number of points on such and such inspection; is that
25   right?

68

1    A.   The process, if I may, for a hearing is a -- an
2    administrative overview of why the property is in hearing,
3    for example, one score or two scores, why there they're, a
4    highlighted fact of where the points primarily were lost, an
5    overview of the property status.  The member is invited to
6    attend the session and explain their case, and then the
7    determination is made.
8    Q.   All right.  With that said, sir, the question
9    was, do the board of directors -- does the board of
10   directors accept the fact that the point loss is warranted
11   based upon the report from the RSM or do they look at the
12   evidence underlying the report and ask questions such as,
13   hey, what color was the tile before we deduct points from it
14   and just accept that the hotel has lost those points?
15       MR. GARBARINO:  Objection; form.
16       THE WITNESS:  The board may ask questions
17   relevant to the deficiencies recorded on the report and the
18   photographs that they see on the assessment.
19   BY MS. SCHLESINGER:
20   Q.   Okay.  And so the whole reason we're here today
21   is because you've testified that these photographs are shown
22   in front of the board of directors; right?
23   A.   That's correct.
24   Q.   Okay.  And were you -- you say you -- now you say
25   you aren't sure whether you were at the hearing for

69

1    Mr. Harooni?
2    A.   That's correct.
3    Q.   All right.  Well, let me see if we can come back
4    to that because I believe you had testified previously that
5    you were there and that's what's causing me a little bit of
6    confusion here.
7        But in any event -- okay.  So you're telling me
8    that these pictures are shown but nobody really questions
9    what the picture is of, they just sort of accept the fact
10   that the hotel owner in this case, for example, would have
11   lost the points primarily in the guest room and public room
12   areas and they discuss from there?
13       MR. GARBARINO:  Objection; form.
14   BY MS. SCHLESINGER:
15   Q.   Is that correct, sir?
16   A.   You need to repeat your question, please.
17   Q.   Okay.  You told me that the board of directors
18   will look at where the point loss primarily occurred; right?
19   A.   They can see that, correct.
20   Q.   Okay.  And in this case, the point loss -- we've
21   agreed earlier at the outset of this deposition that the
22   point loss was primarily in the guest room and public areas;
23   correct?
24   A.   Yes.
25   Q.   Okay.  So based upon your testimony and your

70

1    understanding of the process, once they see that the point
2    loss is 681, they may glance through these pictures that are
3    being shown to them during the hearing but they don't really
4    go in and look at this line by line; correct? They don't
5    look at the report and compare it to photographs; is that
6    true?
7         MR. GARBARINO: Objection; form.
8         THE WITNESS: That's --
9    BY MS. SCHLESINGER:
10        Q.   Is it true, sir, that the board of directors
11   during one of these termination hearings do not look at the
12   photographs and compare it to the report line by line?
13        A.   That's correct.
14        Q.   Okay.  So if there's a problem with the
15   photographs or the RSM's assessment in that it's just plain
16   off, the board does not go through and carefully analyze
17   that; is that true?
18        MR. GARBARINO: Objection; form.
19   BY MS. SCHLESINGER:
20        Q.   It could be that the RSM is just mistaken as to
21   whether that is a patterned tile or a hard water issue;
22   true?
23        A.   Correct.
24        Q.   In fact, Ms. Cindy Bree has no training in pool
25   maintenance per se, she doesn't know chemical analysis of

71

1    pools and does not conduct chemical analysis; is that true?
2         A.   Correct.
3         Q.   Okay.  So she really couldn't say whether it's a
4    hard water buildup on anything else for that matter; right?
5         A.   Correct.
6         Q.   Okay.  There's just one more area that I want to
7    touch on, then I believe we're going to be calling it a day
8    and --
9         Mr. Nygaard, if you'll recall, we discussed a
10   photograph that looks like that in the last deposition and
11   you told me you couldn't tell me what that was of.  Do you
12   recall that testimony?
13        A.   Yes.
14        Q.   Remember that problem?  That's what led us here
15   back today?
16        A.   Yes.
17        Q.   I'm wishing that hadn't happened.  I'm sorry.
18        Okay.  So as we go through here -- okay.  There
19   we go.  There's our picture -- our infamous picture up on
20   the top of our screens here in our conference room.  Can you
21   now tell me what that's a picture of, sir?
22        A.   I cannot.
23        Q.   Okay.  You don't see any particular deficiency
24   based on that photograph?
25        A.   From what I see on the screen, no.

72

1         Q.   Okay.  We were talking a little bit earlier, sir,
2    regarding the, quote, case goods and things like thresholds
3    and we discussed the relative size of some alleged damage on
4    a table in one of the rooms that Ms. Bree saw.  Do you
5    recall those discussions today?
6         A.   Yes.
7         Q.   Okay.  I wanted to check with you and ask you --
8    case goods, that's something that Best Western Supply
9    provides for cost; right?
10        A.   Best Western Supply can sell case goods, correct.
11        Q.   Okay.  And so, if the RSM picks out particular
12   items that are case goods, then in theory the hotel owner
13   could just go to Best Western and purchase that and replace
14   it by paying Best Western for that particular item and
15   rectify the problem; correct?
16        A.   Correct.
17        Q.   Do you know if they sell thresholds, sir?
18        A.   I do not specifically know that.
19        Q.   Okay.
20        Oh, by the way, you had mentioned to me, sir,
21   that you thought that the problem with the telephone issue
22   was actually that the --
23        Oh, strike that because it's going to take me too
24   long to find it.
25        I'm going to go ahead and mark because we have

73

1    also been discussing this 10/25 report.  I'm going to go
2    ahead and mark this as what I would believe would then be
3    Exhibit 5.
4         That's simply the report from Mitch Van Wormer
5    dated 10/25 from which some of these pictures are coming and
6    I wanted to go through it real quickly.
7         Can you hand that to me real quickly?  I just
8    hope I didn't hand you the wrong copy of the document.  I've
9    annotated and I --
10        Thank you, sir.
11        A.   Uh-huh.
12        Q.   Ms. Bree testified that it is Best Western's goal
13   to ensure that the hotel membership is not terminated.
14   Would you agree with that, sir?
15        A.   Ask the question again, please.
16        Q.   Does Best Western have the goal of trying to
17   prevent termination where it can easily do so based on the
18   standards or room conditions, et cetera?
19        A.   Best Western's goal is to provide that
20   memberships are maintained if they maintain certain
21   standards.  We have programs --
22        Q.   Okay.
23        A.   -- to assist members to continue with that
24   membership.
25        Q.   Okay.  So if there's something that's very

NYGAARD(ROUGH)
3/16/2010

74

1    easily -- if the -- if the RSM can help the member when
2    they're out with a step that would take maybe two minutes to
3    correct, do you think it would be Best Western's policy to
4    take points off for that two-minute fix or fix it right
5    then; just say, hey, if you just move that, it can be fixed?
6    Do you think Best Western would want to just say we can fix
7    this this instant, let's fix it and I won't write you up for
8    it, or do they go in there and try to write people up?
9        A.   Best Western's assessment program during the
10   course of the assessment is to record deficiencies as they
11   exist on the day that we're there.
12       Q.   In looking at that photograph, sir, can you tell
13   me what it depicts?
14       A.   It is a photograph of a chair and there's
15   something different on the seat of the chair, I'm not sure
16   what.
17       Q.   Okay. So you can't really tell based on that
18   photograph?
19       A.   No?
20       Q.   So you'll agree that overall based upon some of
21   the wording in the --
22            Strike that.
23            Would you agree, sir, that some of the wording in
24   these reports is a little unclear when it comes to some of
25   the descriptions by the RSM of the perceived problems?

75

1        A.   The wording is provided by the RSM and their
2    phrases to represent the deficiency. I don't know if it's
3    clear or unclear to them. I'm sure it's clear.
4        Q.   To the RSM it's clear?
5        A.   Yes.
6        Q.   But it wasn't necessarily clear to you or I as we
7    sat here today, would you agree with that?
8        A.   Correct.
9        Q.   Okay. And would you agree that the photographs
10   are not -- it's not always clear what the RSM was taking a
11   picture of, true?
12       A.   True.
13       Q.   So to some degree, the board of directors, even
14   if they are completely purely motivated, needs to just sort
15   of take the RSM's word for what conditions existed at the
16   hotel; correct?
17       A.   The board of directors accept the report and the
18   deficiencies in their review of the continuation of the
19   membership.
20       Q.   Okay. And so it ultimately --
21            Strike that.
22            In putting together these reports and these
23   assessments and taking the photographs that they choose, the
24   RSM then has a lot of control over whether or not a hotel is
25   deemed to be deficient or not, would you agree?

76

1        A.   Yes.
2        Q.   And the RSM's choice of what to look at and what
3    to photograph has a large impact on the board of director's
4    conclusion with regard to terminating the membership; true?
5            MR. GARBARINO:  Objection; form.
6            THE WITNESS:  Say it again, please.
7            MS. SCHLESINGER:  Will you read that back please,
8    sir.
9            (Pending question read back by the reporter)
10           MR. GARBARINO:  Same objection.
11   BY MS. SCHLESINGER:
12       Q.   Do you understand my question, Mr. Nygaard?
13       A.   No, I do not.
14       Q.   Okay. You told me a moment ago that the board of
15   directors needs to accept what the RSM says with regard to
16   the condition of a hotel; correct?
17       A.   Needs to accept?
18       Q.   The board of directors accepts the condition of
19   the hotel as reported in the quality assurance assessments
20   and depicted in the photographs taken by the RSM?
21       A.   Correct.
22       Q.   Okay. So if the RSM chooses to take a photograph
23   very close up of dust in a hand-held dryer or chooses to
24   look at the bathroom and say, yeah, I think it looks pretty
25   clean and neat, that's completely within the RSM's

77

1    discretion; correct?
2        A.   Yes.
3        Q.   And that then goes up the chain to the board of
4    directors, who relies upon what the RSM reports and makes a
5    determination whether or not to terminate the hotel?
6            MR. GARBARINO:  Objection to form.
7    BY MS. SCHLESINGER:
8        Q.   Do I have that process right?
9            MR. GARBARINO:  Same objection.
10   BY MS. SCHLESINGER:
11       Q.   Do you understand my question?
12       A.   The board of directors uses the RSM information
13   as a part of their determination, yes.
14       Q.   Okay.
15           MS. SCHLESINGER:  And, Counsel, what was your
16   objection there?
17           MR. GARBARINO:  You asked him about whether the
18   board relied. I'm not sure that he has the knowledge to say
19   what the board relied upon in making their decision.
20           MS. SCHLESINGER:  Fair enough.
21   BY MS. SCHLESINGER:
22       Q.   In fact, do you know to what degree the board
23   relies upon the evidence presented by the RSM or -- on other
24   thoughts? Do you know that?
25       A.   No.

78

```
 1      Q.   Okay.
 2           MS. SCHLESINGER:  And I think that we covered
 3   that last time actually, Mr. Garbarino.  So with that, if
 4   you'll give me just a moment.
 5           Go off the record.
 6           (Recess)
 7   BY MS. SCHLESINGER:
 8      Q.   Mr. Nygaard, can you tell me what that depicts?
 9           And this for the record is JPEG 71 out of the
10   10/25 folder.  These photographs should correlate with
11   Mr. Van Wormer's report from 10/25 .
12           Can you tell me what's depicted in that
13   photograph, sir?
14      A.   The photo shows a toilet, a bathroom vanity, a
15   sink, faucet, a vanity skirt, ice bucket.
16      Q.   All right.  And some nicely folded towels there?
17      A.   Yes.
18      Q.   With the little fan thing in the guest towel or
19   hand towel, whatever it is?
20      A.   Yes.
21      Q.   And does that look okay to you, sir?
22      A.   I would wonder why the skirting is of two color.
23   That's the only thing that I specifically see.
24      Q.   And actually can you tell from that angle whether
25   it's two toned or if it just cuts off there?
```

79

```
 1      A.   I can't really tell exactly what it is.  It's --
 2   it's different than the vanity top.
 3      Q.   Okay.  And the wall appears to have two tones,
 4   but that's based on shadow, too; correct?
 5      A.   The wall appears to be one color, but then
 6   there's shadow, yes.
 7      Q.   Okay.
 8      A.   To me.
 9      Q.   So you don't see anything that looks particularly
10   worn there, do you?
11      A.   Worn?
12      Q.   Yes.
13      A.   I cannot tell worn from that photo.
14      Q.   Okay.  And when we go back up -- let's see if I
15   can tell which room number this was in, but I can't, so.
16           Okay.  So you don't -- can't tell me as you sit
17   here what that picture was supposed to depict in terms of a
18   demerit?
19      A.   I cannot tell whether it was taken of a
20   deficiency or of a design or other matter.
21      Q.   Do you know, sir, what it costs Best Western to
22   take and produce these photographs?
23      A.   No.
24      Q.   It's correct to say that the member is charged
25   $1,500 for this inspection; correct?
```

80

```
 1      A.   Members are charged additional fees for
 2   reassessment, yes.
 3      Q.   And do you know if the inspection by Cindy Bree
 4   was a reassessment?
 5      A.   I'm -- I'm not sure of that.
 6      Q.   Well, it was taken -- if Mr. Van Wormer's
 7   inspection was on 10/25 of 2007 and Ms. Bree's was on 1/31
 8   of 2008, it's fair to say that was a reinspection; correct?
 9           MR. GARBARINO:  Objection; form.
10   BY MS. SCHLESINGER:
11      Q.   Is that correct, sir?
12      A.   I believe that's correct, yes.  That would be
13   called a probation inspection or assessment.
14      Q.   Okay.  And so Mr. Harooni would have been charged
15   $1,500 for that, true?
16      A.   Yes.
17      Q.   Okay.  And do you know, sir, what the cost to
18   Best Western to conduct that inspection was including
19   producing these photographs?
20      A.   The reassessment fee is calculated as a
21   cumulative total of RSM salaries, travel, food cost and
22   additional costs and associated costs would include the cost
23   of taking these photographs, yes.
24      Q.   Okay.  And these are digital?
25      A.   Yes.
```

81

```
 1      Q.   Okay.  So the camera costs a couple hundred bucks
 2   at the most?
 3      A.   The camera cost for a new camera would be about
 4   that amount, yes.
 5      Q.   Okay.  And they're used repeatedly constantly as a tool.
 6   They're the RSM's trade; right?
 7      A.   Yes.
 8      Q.   Okay.  And there's no film; right?
 9      A.   That's correct.
10      Q.   Okay.  So we're basically just talking about the
11   cost of an airline ticket and whatever food the RSM needs to
12   buy while she's there; right?
13      A.   Their salaries, payroll taxes, benefits, et
14   cetera.
15      Q.   Okay.  How much does an RSM make a year, do you
16   know?
17      A.   There's a salary range which I believe -- I do
18   not recall the total salary.
19      Q.   Can you give me an estimation?
20      A.   Yes, between 55 and $70,000 annually.
21      Q.   Plus benefits?
22      A.   Yes.
23      Q.   Do you have any openings?
24      A.   (No oral response).
25      Q.   I got you to smile finally.
```

NYGAARD(ROUGH)
3/16/2010

82

1          All right. I believe reserving for redirect,
2    sir. that I appreciate your time.
3          MR. GARBARINO: I don't have any questions.
4          MS. SCHLESINGER: All right. Thank you very
5    much --
6          MR. GARBARINO: Read and sign.
7          MS. SCHLESINGER: -- Mr. Nygaard.
8                (12:07 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25