# EXHIBIT "1"

(Declaration of Hooshang Harooni)

1 | Kira A. Schlesinger (State Bar No. 023450)
**THE SCHLESINGER CONRAD LAW FIRM**
2 | 11811 N. Tatum Blvd., Ste. 3031
Phoenix, Arizona 85028
3 | Tel: 602-615-6013
Fax: 602-441-5302
4 | E-Mail: Kira@SchlesingerConrad.com

5 | *Attorney for Defendant/Counterclaimant*
*Hooshang Harooni, and*
6 | *Defendant AV Inn Associates 1, LLC*

7

8 | UNITED STATES DISTRICT COURT

9 | FOR THE DISTRICT OF ARIZONA

10

11 | BEST WESTERN INTERNATIONAL, INC. ) No. CV 08 - 2274 - PHX-DGC

12 | Plaintiff,

13 | v.

DECLARATION OF HOOSHANG
HAROONI IN SUPPORT OF
OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT

14 | HOOSHANG  HAROONI AND AV INN
ASSOCIATES 1, LLC,

15 | Defendants.

16

17 | And Related Counterclaim

18

19 | I, Hooshang Harooni, declare as follows:

20 |     1.    I am over the age of eighteen and a defendant in the above referenced action.

21 | I have personal knowledge of the foregoing facts and would testify competently to them if

22 | called as a witness.

23 |     2.    My hotel was completely renovated from the time I purchased it. I disagree

24 | that the assessments done by Mitch Van Wormer and Cindy Bree were an accurate

25 | depiction of my hotel. In fact, AAA had recently upgraded the hotel from a 2 star to a 3

26 | star hotel at the time that these assessments by Best Westerns inspectors were performed.

27 |     3.    When I went before the Board of Directors to plead my case for a

28 | conditional extension or other continuation of the membership, the Board repeatedly asked

*(left margin vertical text)* The Schlesinger Conrad Law Firm



The Schlesinger Conrad Law Firm

1    me about the potential sale of my property and the value. Then, when they heard that I

2    had Parkinson's disease, they terminated the hearing abruptly. Also, I was given only

3    about 15 minutes to explain my position. I was not made aware that he was (or should

4    have been) entitled to counsel or other assistance. I recall that at the hearing, my

5    Parkinson's Disease was acting up, and I had difficulty speaking and controlling my

6    muscles. As soon as the Board of Directors heard that I was ill, they terminated the

7    hearing.

8        4.    As a result of Best Western's conduct, including but not limited to the lack

9    of assistance that I had relied upon and that I understood was available based upon the

10   documents and the representations of personnel including Terry Wininger, I was forced to

11   sell the hotel and property at a considerable loss.

12       5.    I also was forced to dissolve the S Corporation, AV Operations Group, Inc.

13   and cancel the limited liability company charter. This was done in October 2009.

14   Attached hereto are true and correct copies of the records from the California

15   Corporations Commission, attached to the Statement of Facts as Exhibit 7.

16       6.    The corporation had been an "S Corporation" under California law. The

17   losses were passed through the corporation to me.

18       7.    I hired Mr. Nathanson to file a counterclaim on behalf of my companies

19   prior to dissolving/canceling them. I was not aware until it was too late that he had not

20   done so.

21       8.    I was the sole shareholder of the corporation, and the managing member of

22   the limited liability company. My wife, Jila, was the other member but she has instructed

23   me to handle the matters related to the limited liability company.

24       9.    When I entered into the agreement with Best Western, I had reviewed the

25   hotel and had an experienced person review the financial aspects. I do not clearly recall if

26   I had the bylaws and rules and regulations. I do know that when I have attempted to read

27   these documents they are very dense, hard to read and very small, double-spaced text. At

28   the time that agreement was signed, I did not have access to the Quality Assurance

1  Manual that was later asserted as the basis for terminating my  membership. I was never
2  aware that I was agreeing to pay Best Western even if they kicked me out of the
3  membership. I never understood that I would be limited to membership fees after Best
4  Western treated me like they did and took away the whole purpose for the contract which
5  was to own a Best Western hotel.

6     10.   English is my second language.

7     11.   I did understand from the Membership Agreement and from talking to Best
8  Western personnel, including Terry Wininger, that Best Western provided services and
9  support to its members. It was my understanding that was why I was paying the
10  membership fees.

11     12.   I did not have counsel review the agreement before I signed it because I
12  believed that Best Western was interested in the welfare of its members and it was a
13  cooperative organization. I now know that they are really just out for the money. No one
14  at Best Western suggested that I should see an attorney. Also, I tried to negotiate the
15  contract a little bit, but Best Western told me that they would not negotiate because the
16  contract was the contract.

17     13.   When I bought the hotel I put the business entities in place, and for the
18  entire time I owned the hotel the control and ownership remained the same.

19     14.   The price of the hotel was $5.7 million. The down payment for that came
20  from a 1031 exchange on some property that I owned. The money invested in the hotel
21  was my personal money.

22     15.   I disclosed numerous invoices and financial records to my attorney, Phil
23  Nathanson. I am informed and believe that he disclosed these in this litigation. I am also
24  aware that thousands of documents have been disclosed by my expert, Mr. Elias Azia-
25  Lavi.

26     16.   After I bought the hotel, I asked Ms. Wininger where to get the furniture and
27  other things that I needed to renovate the hotel and I took all of her suggestions. I
28  purchased the furniture from the man she told me to get it from, and she told me the name

*The Schlesinger Conrad Law Firm*

DECLARATION OF HOOSHANG HAROONI IN SUPPORT OF OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

3

1   of the man on at least two occasions. This is one of the reasons I was so shocked when

2   Ms. Bree told me the furniture was no good.

3       17.    I repeatedly told Best Western that I was willing to do everything demanded

4   by the action plan that Best Western created, it simply was not enough. This is true even

5   though I told the Board at the hearing that if they would give me six months, I would do

6   everything that they ask and make the hotel just as they wanted.

7       18.    I personally lost millions in this venture, and I am now being sued

8   personally by creditors related to the hotel. My credit is ruined.

9       19.    I originally had an offer on the property for $ 6.8 million dollars, although I

10  had listed it at $ 8.9 million.    That offer was rejected because it was too low.  At the time

11  that I rejected that offer, because I still believed that I would retain the Best Western

12  standard.    The next offer that came in was for approximately $7 million, but once the

13  prospective buyer discovered that Best Western was pulling its name from the hotel, the

14  buyer backed out of the deal. Ultimately, I was forced to sell the property for

15  approximately $4.6 million, though I had paid much more for it and invested nearly

16  another $2 million in renovations. Best Western simply did not honor its commitments to

17  promote the hotel as promised in its documents and by its personnel

18      20.    The exhibits representing my tax returns, and the returns for my business

19  entities are true and correct copies of my records.

20      I declare under penalty of perjury under the laws of the State of Arizona that the

21  foregoing is true and correct and that this Declaration was executed in Los Angeles

22  California on April 27, 2010.

23

24                                  Hooshang Harooni

25

26

27

28

The Schlesinger Conrad Law Firm

1
2
3

CERTIFICATE OF SERVICE

4
5
6
7

I hereby certify that on this April 27, 2010, I caused to be transmitted by the CM/ECF e-file system a true and correct copy of the foregoing document Declaration of Hooshang Harooni in Support of Opposition to Plaintiff's Motion for Summary Judgment.

8
9

By _____/s/ Kira Schlesinger_____

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Schlesinger Conrad Law Firm

# EXHIBIT "2"

(Deposition of Cindy Bree)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

BEST WESTERN INTERNATIONAL,  )
INC., an Arizona non-profit  )
corporation,                 )
                             )
            Plaintiff,       )
                             )
   vs.                       ) No. CIV08-02274-PHX-DGC
                             )
AV INN ASSOCIATES 1, LLC, a  )
California limited liability )
company; HOOSHANG HAROONI,   )
                             )
            Defendants.      )
_____)


DEPOSITION OF CYNTHIA BREE

(VOLUME II)


Phoenix, Arizona
January 4, 2010
9:00 a.m.



PREPARED FOR:

ATTORNEY AT LAW
(COPY)


Reported by:

HALEY WESTRA, RPR

Arizona CCR No. 50762

75

DEPOSITION OF CYNTHIA BREE, VOLUME II, taken on January 4, 2010, commencing at 9:17 a.m., at OTTMAR HOLIDAY & ASSOCIATES, 2800 North Central Avenue, Phoenix, Arizona, before BRIEF WESTMA, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:
       THE NATHANSON LAW FIRM
       By:  Ms. Kira A. Schlesinger
       6945 East Bell Road, Suite 101
       Scottsdale, Arizona  85260
       Attorneys for Defendants
       SHERMAN & HOWARD, L.L.C.
       By:  Mr. David K. Catherine
       2800 North Central Avenue
       Phoenix, Arizona  85004-1043
       Attorneys for Plaintiff

       ALSO PRESENT:
       Ms. Portia Bree

76

I N D E X

WITNESS                                         PAGE
CYNTHIA BREE
       EXAMINATION BY MS. SCHLESINGER

                E X H I B I T S

EXHIBITS   DESCRIPTION                          MARKED
No. 4      North American Property Update,       1-4
           dated 12/29/05

No. 4      North American Property Update,       1-4
           dated 12/29/05

77

CYNTHIA BREE,
a witness herein, having been first duly sworn by the
Certified Reporter to speak the truth and nothing but
the truth, was examined and testified as follows:

EXAMINATION
BY MS. SCHLESINGER:
    Q.  Ms. Bree, as you recall, my name is Kira
Schlesinger.  I appreciate your coming back to finish
this up.  You recall that you're still under oath?
    A.  Yes, I do.
    Q.  To start with, I wanted to go over just a
couple of questions that I have from our previous
conversation, then we'll move forward, and the same
rules of the road apply.  If you do not understand a
question -- you were really good about that last
time -- please ask me to rephrase it -- if you need a
break or anything; otherwise, try to remember to use
"yes," "no" rather than "uh-huhs" or nodding of your
head.  Got it?
    A.  Yes.
    Q.  Last time when we were talking, I had asked
you regarding a prior deposition that you had given as
a Best Western agent, and you told me that you recalled
that the issue in that case was a design noncompliance

78

issue.  Do you recall that?
    A.  Yes.
    Q.  Do you recall the name of the case?
    A.  I don't recall.
    Q.  Do you recall where it was venued, and by
that, I mean, where was it?  Do you know?
    A.  Where the deposition was?
    Q.  Where did the case take place?  Was it here in
Phoenix?
    A.  No, in California.
    Q.  And where in California?
    A.  Monterey was where the hotel was.  I don't
know where the case was, if that makes sense.
    Q.  Do you recall what the name of the hotel was?
    A.  Magic Carpet.
    Q.  Thank you.
        Do you recall if it was in superior court
or federal court?
    A.  I don't have knowledge of that.
    Q.  You had also mentioned with regard to your
training, you had said that you had a CHA through the
education institute.  What is that?
    A.  A certified hotel administrator.
    Q.  No.  I apologize.  What is the education
institute?

79

1    A.  It's a lodging company that provides training
2  and support for the hotel industry.
3    Q.  Okay.  And what did the training consist of to
4  get your CHA?
5    A.  It consists of background check, educational
6  history, on-the-job training, and a series of classroom
7  workshops, and then a test.
8    Q.  Okay.  And what did the classroom workshops
9  entail?
10    A.  Learning the -- how do I explain this?  It was
11  just a couple eight-hour-long sessions on hotel
12  operations and whatever the test covers, the items that
13  the test covers.
14    Q.  I appreciate that.  What I'm trying to find
15  out is what was tested.  What was the training?  What
16  were the topics, the subject matters of this training?
17    A.  Just hotel operations.  I couldn't tell you
18  specific -- unless I had the manual in front of me.
19  But there's, like, different chapters on operations,
20  managing employees, labor situations, whatever --
21  whatever work there is to be done at a hotel, they
22  cover.
23    Q.  Did it specifically cover inspections for
24  hotels?
25    A.  No.

80

1    Q.  Did it cover things such as renovations to
2  hotels?
3    A.  That's just hard to answer a yes or no to that
4  because it's more informational, so if you got an
5  instructor that talked about renovations to hotels,
6  then, yeah, it covered that.
7    Q.  But it wasn't part of the curriculum?
8    A.  Again, I would -- I couldn't tell you
9  specifically unless I had, like, a list of the chapters
10  in the book.
11    Q.  It's been a long time?
12    A.  (Nodding head.)
13    Q.  Is that a "yes"?
14    A.  Yes, it has been a long time.
15    Q.  Do you recall if it covered reservation
16  systems?
17    A.  Yes, it does.
18    Q.  It did.  And what did it talk about with
19  regard to reservation systems?
20    A.  I couldn't tell you the specifics.  It just
21  gives you a background on how they work.
22    Q.  That's very vague.  I'm sorry.  A background
23  on how they work.  Can you be more specific than that?
24    A.  There's probably -- I couldn't tell you how
25  many different reservation systems, and they all work a

81

1  certain way, whether it's, you know, direct to the
2  hotel, or if it has to stop at another location for the
3  reservation to be checked, or, you know, is it
4  seamless, does the reservation go right through?
5  There's a lot of different variables, but I'm sure
6  they -- you know, they explain the basics of the
7  reservation system.
8    Q.  Do you know what the reservation system is
9  that was in place for Best Western at the time that
10  Harry owned the hotel?
11    A.  The reservation system that Best Western has
12  in place?
13    Q.  Correct.
14    A.  I don't know the name of it, as far as, you
15  know, it's a proprietary name called "LYNX," but
16  I don't that's a -- I don't think anybody else could
17  just go out and hook up to that.  That's, you know, a
18  Best Western connection only.  There's others that you
19  can buy if you're an independent hotel.
20    Q.  Such as Sabre?
21    A.  Right.
22    Q.  Okay.
23    A.  Pegasus.
24    Q.  So LYNX is a proprietary Best Western system?
25    A.  Right.

82

1    Q.  And did you have any specific training on
2  LYNX?
3    A.  Specific as in what?  What type of training?
4    Q.  Any training at all.
5    A.  Well, I can make a reservation.  That's
6  training.
7    Q.  Okay.  You also mentioned that you were in
8  billeting prior to joining Best Western, and you said
9  billeting, which is the government's hotel system.
10  What is involved with billeting?
11    A.  There are probably four or five different
12  components, and it just depends on -- I was at an Air
13  Force base, so I dealt with Air Force people who were
14  either just arriving to the Air Force base or had done
15  their tour and were leaving, and we also rented rooms
16  to people that were traveling or service people who
17  didn't want to live in the barracks.  They could rent a
18  room at the hotel.
19    Q.  Can you be more specific with regard to what
20  your job function was with regard to billeting?
21    A.  I worked as a desk clerk, and I worked in
22  housekeeping, I worked in maintenance, and I worked in
23  the accounting department.
24    Q.  When you say you "worked in housekeeping,"
25  what did you do?

83

```
 1      A.  Delivered laundry.
 2      Q.  And is that all?
 3      A.  Cleaned a room, you know.
 4      Q.  Occasionally?
 5      A.  Occasionally had to clean a room, yes.
 6      Q.  And you also said you worked at the front
 7   desk; is that right?
 8      A.  Yes.
 9      Q.  And what did that entail?
10      A.  Checking people in and out, paying their bill.
11      Q.  You were not in a management capacity then?
12      A.  I was not.
13      Q.  And were you responsible for inspecting the
14   rooms when you were in billeting for the government?
15      A.  Yes.
16      Q.  In which capacity did you do that, as
17   housekeeping?
18      A.  Actually, whatever -- it didn't matter.
19   Everybody inspected rooms.
20      Q.  Can you clarify that, please?  Everyone
21   inspected rooms?
22      A.  Any employee could be assigned to inspect
23   rooms.  It wasn't a specific job for me.
24      Q.  How frequently would you say you did that?
25      A.  Oh, my goodness.  I'd have to go back about
```

84

```
 1   25 years.  I could make a guess, but I shouldn't, so
 2   I couldn't tell you any more.
 3      Q.  I appreciate that.  It wasn't one of your
 4   normal job duties?
 5      A.  I didn't have -- I don't think I had normal
 6   job duties.
 7      Q.  Did you have any training in it in connection
 8   with your government job in billeting?
 9      A.  Any training with ...
10      Q.  Room inspections?
11      A.  Well, yes.
12      Q.  What was that?
13      A.  My supervisor explained what they were looking
14   for and how to do it.
15      Q.  And what did they explain?
16      A.  When you walked into a room, you, you know,
17   looked at the overall look, and then we also had to
18   make sure that there were specific items in the room.
19      Q.  All right.  With regard to your assignments
20   with Best Western, your work with Best Western, you had
21   mentioned that you were in charge of some areas in the
22   central California area and some in northern
23   California.  Do you recall that?
24      A.  Yes.
25      Q.  What was the criteria as to why certain hotels
```

85

```
 1   in the central or northern areas were assigned to you?
 2      A.  I'm sorry.  Say that one more time.
 3      Q.  What was the criteria for your being assigned
 4   to some in central and some in northern California?
 5      A.  At any given time, it could be where I lived,
 6   where somebody else lived.  The inspection schedule
 7   itself changes.
 8      Q.  Why does the inspection schedule change?
 9      A.  It's all based on a property's QA score and
10   their customer service scores.  So if either of those
11   drop, they could be put on a different schedule to meet
12   either more frequent or less frequent.
13      Q.  And is that when they would bring you in?
14      A.  Bring me in for ...
15      Q.  When a property's QA or satisfaction scores
16   dropped, was the hotel then assigned to you?
17      A.  No.
18      Q.  Then please explain when the inspection
19   schedule changes, how that brought certain hotels into
20   your realm.
21      A.  A hotel could have a bad customer service
22   score and put them in a category deemed critical care.
23   We don't want it to drop any further.  And if it's not
24   a hotel in my area and it needs to be done quickly, you
25   know, sometimes there's reasons for a manager to call
```

86

```
 1   me and say, "Can you pick up an extra property because
 2   so-and-so can't do it."
 3      Q.  Is that what happened in this case?
 4      A.  No.
 5      Q.  Did a manager call you and ask you to pick up
 6   an extra property in this case?
 7      A.  I don't recall how it became -- I may --
 8   I think I volunteered to pick up a couple extra
 9   properties.
10      Q.  Did you discuss those properties with anyone
11   prior to going out and visiting them?
12      A.  Yes.
13      Q.  With regard to Mr. Harooni's hotel -- and
14   again, I'm going to continue to refer to it that way
15   for ease of reference, if that's acceptable to you.
16      A.  (Nodding head.)
17      Q.  Is that a "yes"?
18      A.  Yes.
19      Q.  With regard to Mr. Harooni's property, did you
20   speak with anybody regarding the property before you
21   volunteered to take it?
22      A.  I don't recall.
23      Q.  Were you aware that the property had been on
24   the market for sale prior to your inspecting the
25   property?
```

87

1    A. No, I don't.
2    Q. Did you review anything in connection with
3    this property prior to inspecting it?
4    A. Yes, I did.
5    Q. And what was that?
6    A. Whatever previous QA assessment there was.
7    Q. Anything else?
8    A. Not that I recall.
9    Q. How many RSMs were working in the Fresno or
10   northern central California area at the time you took
11   this property on?
12   A. I don't have that information.
13   Q. How many total properties did you have at that
14   time, do you know --
15   A. I don't.
16   Q. -- prior to taking it on?
17   A. Off the top of my head, no idea.
18   Q. And where would I look for that information?
19   A. Probably somebody in the QA department. I'd
20   probably start out with Loyd Nygaard, and he would send
21   you in the right direction.
22   Q. Loyd Nygaard? Do you have a spelling on his
23   name?
24   A. First name or last name?
25   Q. The last name. I'm sorry.

88

1    A. N-A -- wait a minute. N-Y-G-A-A-R-D, and I'm
2    not positive about the A's.
3    Q. I appreciate that.
4    A. It might be one.
5    Q. At any time, did anyone, including
6    Mr. Nygaard, tell you that Mr. Harooni's property
7    needed to be vigorously inspected?
8    A. No.
9    Q. Did they tell you that -- strike that.
10          Do you have any idea if they offered this
11   property to any other RSM before you were assigned to
12   it?
13   A. I don't have knowledge of that.
14   Q. Would Mr. Nygaard know something like that?
15   A. I couldn't tell you. He might.
16   Q. What about your supervisor, Daryl Preece?
17   A. Again, I don't know. I really don't know.
18   Q. Did anyone tell you that there were problems
19   with this property before you inspected it?
20   A. I wouldn't use the word "problems." There
21   were things that I needed to know about, as far as, you
22   know, it scored a certain score before, and it had a
23   low customer service score.
24   Q. Did they -- I'm sorry.
25   A. I'm sorry.

89

1    Q. You paused, and I thought you were finished.
2          Did they tell you this prior to your
3    being assigned this inspection?
4    A. We receive a list of properties that are
5    typically -- you know, what's called "probation," so,
6    you know, it was on a list. That's about all I can
7    say.
8    Q. So you volunteered knowing that it was a
9    probationary property?
10   A. No. I actually volunteered to help out,
11   period. I don't -- when I volunteer to help out,
12   I don't say, "I want to go to San Diego," or "I want to
13   go to Las Vegas." I volunteer to help out, and I take
14   whatever properties are given to me.
15   Q. Do you have a -- I know that this property was
16   concerning -- I think it was District 6; is that right?
17   A. Yes.
18   Q. What district were you in prior to taking this
19   property on?
20   A. District 6.
21   Q. So you saw this list of properties that were
22   on probation prior to volunteering to help out?
23   A. The list is available with something that's
24   sent out to us by a person in the office, just, you
25   know, maybe quarterly or every three months,

90

1    Q. What's the purpose of sending that out?
2    A. So we're aware that a hotel may need an
3    inspection quicker than was originally planned.
4    Q. Who sends that list out?
5    A. There are -- it could be one of three people.
6    I have a support person, and then there's two other
7    people in the QA office or the regional services
8    offices that may or may not have done that.
9    Q. When you say "the regional services offices,"
10   what's the purpose of the regional services office?
11   A. To provide support to member hotels.
12   Q. And what types of support do they provide?
13   A. Training, revenue service, housekeeping
14   training, maintenance training, anything hotel-related.
15   Q. So revenue support would be something such as
16   assisting in generating revenue?
17   A. Not necessarily. More eyeballing rates,
18   making sure they're in line with the area.
19   Q. Let me ask you this, Ms. Bree. Have you ever
20   been trained in revenue support or services?
21   A. Yes.
22   Q. When was that?
23   A. During the regional service training.
24   Q. So it was a cursory class that was in one of
25   the chapters?

91

1      MR. GARBARINO: Objection, form.
2      A.   Not in conjunction -- or I don't know -- hold
3   on. It is part of what I think you're referring to.
4   the CHA, maybe, as a chapter. Is that what you meant?
5   BY MS. SCHLESINGER:
6      Q.   I'm asking you in what context you were
7   trained and what your training consisted of in this
8   area.
9      A.   Revenue -- revenue-generating ideas,
10  positioning in the marketplace, maybe rate strategies.
11  That's all I can remember right now.
12     Q.   So these are all things that you would be able
13  to provide to hotel owners to ensure that they stayed
14  at the top of the market or continuously generated
15  income and stayed as a Best Western property; is that
16  true?
17     A.   Yes.
18     Q.   Did you provide any of these services to
19  Mr. Harooni?
20     A.   What services?
21     Q.   Well, let's see, you just told me
22  revenue-generating ideas. Did you provide that to
23  Mr. Harooni?
24     A.   I don't recall doing that.
25     Q.   Positioning in the marketplace. Did you

92

1   discuss that with Mr. Harooni?
2      A.   I don't recall.
3      Q.   You don't recall doing it?
4      A.   I don't.
5      Q.   Rate strategies. Did you discuss that with
6   Mr. Harooni?
7      A.   I don't recall.
8      Q.   Not to your recollection?
9      A.   Not to my recollection.
10     Q.   Okay. When I asked you last time if you had
11  any hotels in the central California area, you said not
12  at this time, and I was wondering why not?
13     A.   As in right now or back then?
14     Q.   Well, let's take that apart. At that time,
15  did you have any other hotels in the central California
16  area?
17     A.   And by central California, where is your
18  cutoff?
19     Q.   Fair enough. This hotel was in the -- is it
20  high desert between -- I think it's -- do they call
21  that high desert, I think?
22     A.   I don't know.
23     Q.   It was in southern California between Nevada
24  and, say, Los Angeles, in that area, the Bakersfield,
25  Lancaster, Palmdale area.

93

1      A.   And, you know, I don't even consider that
2   central California, so, no, I did not have any other
3   properties that were regularly assigned to me.
4      Q.   Those hotels that were not regularly assigned
5   to you, what was the purpose of your handling them?
6      A.   I volunteered to help out because another RSM
7   left the area.
8      Q.   Was there any other reason that you, in
9   particular, were doing these hotel evaluations?
10     A.   No.
11     Q.   It wasn't because they were on probationary
12  status and needed a quick inspection?
13        MR. GARBARINO: Objection, form.
14     A.   No. Like I said before, I volunteered because
15  somebody left the area.
16  BY MS. SCHLESINGER:
17     Q.   Okay. You mentioned that there was a hiring
18  freeze at Best Western at that time; is that correct?
19     A.   Yes.
20     Q.   Let me make sure I understood you. So they
21  were not hiring people --
22     A.   Correct.
23     Q.   -- at that time?
24     A.   Correct.
25     Q.   And yet you later told me in the deposition

94

1   that you expected them to hire somebody to replace
2   Mitch Van Wormer. Do you recall that?
3      A.   I do.
4      Q.   If there was a hiring freeze, why would you
5   expect that they would hire somebody to replace him?
6      A.   I believe the hiring freeze came about a month
7   after -- or at some point after he left. So for a
8   period of time, yes, I expected Best Western to hire
9   somebody.
10     Q.   When did you find out that there was a hiring
11  freeze in relation to the date of this inspection, and
12  by that, I mean January 31st, 2008?
13     A.   I have no recollection.
14     Q.   Where would I find that information?
15     A.   You would have to call Best Western.
16     Q.   Would it be their regional services
17  department?
18     A.   Yes.
19     Q.   And so that would be Loyd Nygaard?
20     A.   Yes.
21     Q.   And you also said that there was a schedule
22  that you had for that time period; is that correct?
23     A.   A work schedule or ...
24     Q.   Yes.
25     A.   Yes.

95

1    Q.  And your regional services department would
2   have that information?
3    A.  Yes.
4    Q.  Do you know if that information has been
5   disclosed in this litigation?
6    A.  I do not.
7    Q.  Are certain items that you write down, do they
8   have a higher point value than other items?  Do you
9   understand my question?
10    A.  Not really.
11    Q.  Okay.  Would a broken towel rack, for example,
12   have a higher point value than a hair on a sheet?
13   Would the hotel end up losing more points for those two
14   items if they were both written down?
15    A.  Well, I don't think I understood the whole
16   question, but two different point losses.  You're
17   comparing apples to oranges.
18    Q.  At the end of the day, it's the total number
19   of points, is that correct, that a hotel has?
20    A.  The total number of points accumulated
21   subtracted from 1,000, to start off with.
22    Q.  And points are, here, a negative thing?
23    A.  Excuse me?
24    Q.  Points are regarded as a negative thing;
25   is that correct?

96

1    A.  Yes.
2    Q.  The way you're using it.
3        So if there was a broken towel rack, that
4   would be how many points off?  Do you know?
5    A.  I'm going to make a guess.  We did have some
6   changes recently, but I'm going to say to say 9 points.
7    Q.  And if there was a hair on a sheet or on a
8   bedspread or something, how many points would that be?
9    A.  And, again, in the last few years, it's
10   changed, so I can tell you right now it's 18, but it
11   could have been different at that point.
12    Q.  At the time that you did this inspection on
13   January 31st, 2008, were you aware that different items
14   would cost the hotel different amounts of points?
15    A.  Yes.
16    Q.  So if you wanted to fail a hotel, you could
17   focus on those things that were the higher points?
18        MR. GARBARINO:  Objection, form.
19   BY MS. SCHLESINGER:
20    Q.  Do you understand my question?
21    A.  Nope.
22    Q.  Is it within your ability to check more
23   closely those items that have higher point values?
24    A.  That's not the way the process works.
25    Q.  The question was, Are you able to do that?

97

1   Do you check some things or can you check some things
2   more closely?
3    A.  No.
4    Q.  You're not able to do that?
5    A.  I'm not real -- it's not -- I don't -- the
6   question is odd.  It doesn't match the function.
7    Q.  Do you think that there's ever things that you
8   overlook, whether intentionally or unintentionally, at
9   a hotel?
10    A.  Yes.
11    Q.  So you have the capacity to ensure that
12   certain categories of items are not overlooked, true?
13    A.  Could you repeat that one more time, please.
14    Q.  You have the capacity to ensure that certain
15   items in the hotel are not overlooked when you conduct
16   your inspections; is that true?
17    A.  Repeat it one more time, please.
18    Q.  You have the capacity to ensure that certain
19   items in a hotel are not overlooked during one of your
20   inspections, true?
21    A.  Well, I have the ability to see what I see and
22   hope that I don't miss anything.
23    Q.  So you are capable of focusing more
24   specifically on certain items to make sure you don't
25   overlook them, true?

98

1    A.  No.
2    Q.  You can't focus on certain items as opposed to
3   others, for any reason?
4    A.  I would not use those words.  I would not
5   focus on one thing.
6    Q.  What's the average number of miles that you
7   drive in a week?
8    A.  Are you talking right now?
9    Q.  If that's changed over time.  Let's start with
10   2008.
11    A.  I would have to look at my records.  In
12   volunteering, I probably had more miles, so I would say
13   it could be anywhere between 600 and 1,000.
14    Q.  And in, let's say, June of 2008, do you have
15   an estimate of how many miles you would have driven
16   that month?
17    A.  I don't.
18    Q.  Do you have -- do you write your car off for
19   tax purposes, your mileage?
20    A.  No.
21    Q.  Do you use your own car when you go on these
22   sessions?
23    A.  Yes.
24    Q.  Do you have an accountant?  That was a no, you
25   don't have an accountant?

CYNTHIA BREE, VOL.II
1/4/2010

99

1    A.   I do not.
2    Q.   You mentioned that not all of the hotel
3   properties that had been assigned to Mr. Van Wormer
4   were assigned to you when he left.  Do you know who
5   else they were assigned to?
6    A.   Other RSMs.
7    Q.   Do you have any knowledge of the -- strike
8   that.
9         Was this the only one of Mr. Van Wormer's
10  hotels that you picked up?
11   A.   Not to my knowledge.  I would have to look at
12  my schedule for that week, but I believe that there
13  were maybe three that I did that week.
14   Q.   Do you recall what the hotels were?
15   A.   I don't.
16   Q.   Do you know if those other two hotels that you
17  think might have been previously within
18  Mr. Van Wormer's territory, were those hotels in a
19  probationary status, to your knowledge?
20   A.   I don't recall.
21   Q.   It would have been on that list?
22   A.   Yes.
23   Q.   Okay.  That would have been within the
24  regional services management that we don't know if it
25  was produced in discovery, correct?

100

1    A.   Too many things there.
2    Q.   Have you personally given assessments that
3   caused other hotels to be terminated from the Best
4   Western membership?
5         MR. GARBARINO:  Objection, form.
6    A.   My assessment alone would not cause someone to
7   be terminated.
8   BY MS. SCHLESINGER:
9    Q.   Have you previously given assessments that
10  were the final straw, so to speak, in terminating a
11  Best Western membership?
12        MR. GARBARINO:  Objection, form.
13  BY MS. SCHLESINGER:
14   Q.   Do you understand the question?
15   A.   Yeah.  I don't have that knowledge.
16   Q.   When you volunteered for this hotel -- and
17  I may have asked you this, but I'm not sure I got a
18  clear answer.  When you volunteered for this, picking
19  up this hotel, did you discuss it with anyone prior to
20  your adding it into your assignments?
21   A.   Prior to adding it to my assignments, possibly
22  just my then supervisor Daryl.
23   Q.   And he would have given you a quick snapshot
24  of what was going on at the hotel?
25   A.   That, I don't recall.  I'm thinking more he

101

1   would have just said, "Hey, there's a couple hotels in
2   such and such an area.  Can you fill in."
3    Q.   I'm asking about this hotel specifically.
4   Did you discuss this specific hotel with anyone?
5    A.   Prior to scheduling it, I don't recall.
6    Q.   But you may have talked to Daryl Preece about
7   this particular hotel?
8    A.   I may have.
9    Q.   You mentioned something about your permanent
10  group of hotels.  Explain what a permanent group is,
11  please.
12   A.   Based on the region I live and where the other
13  RSMs live in my district, we are assigned a specific
14  number of hotels that are basically our core hotels
15  that we provide service to on a regular basis.
16   Q.   And when you say "regular basis," you actually
17  only go out and visit these hotels two times a year,
18  normally?
19   A.   For a QA assessment, normally two times a
20  year, but there's other reasons to visit.
21   Q.   What are those other reasons?
22   A.   Just -- now I can't think of the term that we
23  use.  It's called the PRV, and I can't think of what
24  that stands for off the top of my head.  But like a
25  public relations visit.

102

1    Q.   What does that mean?
2    A.   To check and see if they need anything.
3    Q.   Did you do anything like that with
4   Mr. Harooni's hotel?
5    A.   No.
6    Q.   How long was Mr. Harooni's hotel assigned to
7   you, Ms. Bree?
8    A.   For one assessment.
9    Q.   So you were brought in specifically for this
10  assessment?
11   A.   I volunteered to pick up some hotels when
12  Mitch Van Wormer left his area.
13   Q.   For this one specific assessment?
14   A.   I don't know what you mean by "this one
15  specific assessment."
16   Q.   You came in and did this assessment for this
17  hotel, and that's all you did, true?  You did nothing
18  else for the hotel; is that correct?
19   A.   Correct.
20   Q.   So you came in, you did this hotel for this
21  one specific assessment?
22   A.   Yes.
23   Q.   Were there any other hotels for which you did
24  only one assessment?
25   A.   Yes.

103

1    Q.  Which ones were those?

2    A.  I would have to look at my schedule to tell

3  you that, or my records.

4    Q.  So you don't really know, you're just saying

5  you think there must have been; is that correct?

6    A.  There was, because in the same vein that

7  I inspected Mr. Harooni's hotel, there were, for sure,

8  two others.

9    Q.  And when you say "in the same vein," you mean

10  probationary hotels for which you came in to do one

11  inspection?

12        MR. GARBARINO:  Objection, form.

13    A.  No.  I volunteered to fill in because another

14  RSM had left the area.

15  BY MS. SCHLESINGER:

16    Q.  And were those two hotels also terminated from

17  the Best Western membership?

18    A.  I have no knowledge of that.

19    Q.  Do you know if you gave them passing scores?

20    A.  I don't remember.

21    Q.  When was somebody hired to replace

22  Mr. Van Wormer?

23    A.  Boy, I think that would probably be something

24  I'd have to ask HR about.  I don't have any part in

25  hiring.

104

1    Q.  Okay.  How long was the hiring freeze?

2    A.  Also, I don't -- it might still be going on.

3    Q.  So to your knowledge, Mr. Van Wormer left in

4  the fall around November of 2007; is that correct?

5    A.  Actually, I don't remember.

6    Q.  Okay.  This hotel inspection that's at issue

7  in this litigation was in January of 2008.  How long

8  had you been assigned this hotel?  Do you recall?

9    A.  I don't.

10    Q.  Were you assigned all three of these hotels

11  that you think you volunteered for at the same time?

12    A.  Yes.

13    Q.  Did you do more than one inspection at any of

14  them?

15    A.  Not to my knowledge.

16    Q.  So when you told me previously that you

17  performed six assessments in southern California, that

18  was just an estimate or a guess?

19    A.  Yeah, I don't remember at what point I said

20  that.

21    Q.  You really don't have any personal knowledge,

22  as you sit here today, how many assessments you did in

23  the southern California area during the time frame of

24  November 2007 through, let's say, February of 2008, do

25  you?

105

1    A.  No, I don't remember how many I did.

2    Q.  You also mentioned that to find out what the

3  scores for these hotels, the ones that you did

4  inspections for during that time frame -- we'll use

5  November 2007 through February 2008 -- when I say "time

6  frame" right now, I'm talking about that.  For that

7  time frame, you mentioned that the scores that they

8  received would have been in a database.  Is that

9  database associated with the online bestwestern.com?

10    A.  No, it's not.

11    Q.  It's a separate database?

12    A.  Well, you know, actually, their -- as far as

13  our department and doing the assessment, it's stored in

14  a database, but every six months those scores are

15  compiled on a spreadsheet and actually posted on the

16  MemberWeb system.

17    Q.  So it's six months after the fact?

18    A.  Actually, I don't know how long it is, but at

19  some point, all of the member scores are posted on a

20  spreadsheet in MemberWeb.

21    Q.  Did anybody remind you of that prior to this

22  deposition?

23    A.  I don't know what you mean.

24    Q.  Did anybody remind you that the database was

25  supposed to be on the member website?

106

1    A.  Did anybody remind me?  No.

2    Q.  Do you regard it as part of your job function

3  to assist hotels in rectifying any areas that have

4  previously caused them to fail?

5    A.  Yes.

6    Q.  And just for clarification, you did not do

7  that with Mr. Harooni's hotel, did you?

8    A.  No, I did not.

9    Q.  You said before that you don't have the

10  authority to prevent a -- let me just read this couplet

11  back.  This is a rough draft, but let me -- just so

12  that you understand what I'm saying.

13        Last time when I asked you if you did

14  anything to stop the hotel owned by Mr. Harooni from

15  terminating, you said, no, you did not, and then you

16  said, "I don't have authority, let's say."  What did

17  you mean by that?  Do you know?

18    A.  Read that all back one more time.

19    Q.  Sure.  Going back, I'm looking at a question

20  that I asked you.  I said, "Did you envision that

21  Mr. Harooni's property would be terminated shortly

22  after your taking it over?"  You said, "No," I said,

23  "Did you recognize that was a possibility?"  And you

24  said, "Yes."  I said, "Okay, and did you do anything to

25  stop it, to try to prevent that from happening?  And

CYNTHIA BREE, VOL.II
1/4/2010

107

1    your answer was, "No, I didn't. I don't have
2    authority, let's say."
3           That's all you said, and I was wondering
4    what you meant by that "authority."
5       A.   I am not the person who says the property is
6    terminated. Part of my job is the QA assessment. It
7    just so happened that that property did not score above
8    800, which is passing.
9       Q.   But you just told me that it was part of your
10   job description to assist in keeping it from failing.
11   That's true? That's in your authority, right? In
12   fact, you told me last time that you --
13          MR. GARBARINO: Objection, form.
14   BY MS. SCHLESINGER:
15      Q.   In fact, you told me last time that you even
16   jumped in and cleaned toilets. Do you recall that
17   conversation?
18      A.   Yes.
19      Q.   So you do have the authority to try to help a
20   hotel from failing; is that true?
21      A.   I have the -- I don't necessarily use the word
22   "authority," but I have the knowledge and the
23   background to try and help a hotel when they're in
24   trouble.
25      Q.   And the responsibility? That's part of your

108

1    job description, right?
2       A.   Yes.
3       Q.   You're just telling me that you don't make the
4    final decision as to failing a hotel in terms of
5    sending out the letters or doing the board review, that
6    sort of thing?
7       A.   No, no, no, no, no. I don't have a final
8    decision on termination.
9       Q.   Okay. Now, you told me previously -- let me
10   just -- give me just a moment here.
11          MS. SCHLESINGER: Do you want to take a
12   quick five-minute break? We've been going for about
13   45 minutes or so.
14          (Recess was taken from 9:51 a.m. to
15   10:00 a.m.)
16   BY MS. SCHLESINGER:
17      Q.   You said that you had reviewed the previous
18   QA assessment. What you said, actually, was whatever
19   previous QA assessment there was, you would have
20   reviewed prior to doing this inspection; is that
21   correct?
22      A.   Yes.
23      Q.   Do you specifically recall reviewing any
24   quality assurance assessment, QA?
25      A.   QA, yeah, quality assurance.

109

1       Q.   Do you recall that for this hotel?
2       A.   I don't remember, you know, specifics about
3    it, but it's something that I would have done to prep
4    for the assessment.
5       Q.   Would you have done anything else to prep for
6    the assessment?
7       A.   Fill out my forms ahead of time with whatever
8    names I know, the hotel name, the date.
9       Q.   Do you review anything that pertains to the
10   future income or fee generation that's expected for a
11   particular property?
12      A.   I do not.
13      Q.   Do you have access to that information?
14      A.   To the fee generation?
15      Q.   Yes.
16      A.   No, I don't.
17      Q.   They expect an income from a particular
18   property?
19      A.   No, I don't. (sic)
20      Q.   Then how would you know if the revenues were
21   not on track for that property?
22      A.   I would probably look at a document that's
23   available online to the member at any time. It's
24   actually part of their own records, and it shows any
25   reservations that came in through Best Western

110

1    reservation system.
2           In looking at that, you can gauge what
3    the previous year's revenue was. And at any particular
4    time, you know, you could be down, but in January,
5    that's kind of a hard thing to look at, you know.
6    Actually, I don't remember doing that, but it is
7    available.
8       Q.   When you say it's "part of their own records,"
9    you have no personal knowledge in this case, do you,
10   ma'am, that Mr. Harooni or anyone at his hotel actually
11   had online access, do you?
12      A.   Had online access to MemberWeb or ...
13      Q.   Correct. You have no personal knowledge of
14   that, do you?
15      A.   I -- let's see. I would have to say that in
16   order for me to look up the things that I needed to do,
17   they had to be online.
18      Q.   That's a different answer than saying that
19   Mr. Harooni had access to that online. Do you have any
20   personal knowledge that they had access?
21      A.   No.
22      Q.   When you say that -- strike that.
23          Where would you see on a report if
24   something was work in progress? What would be the
25   title of a report that would note work in progress?

111

1      A.  The quality assurance assessment.

2      Q.  Are you referring to a summary report?

3      A.  No.  There's actually a update page.

4      Q.  For some reason, I have no idea why this --

5  off the record or not, I don't care -- my print came

6  out like that.  I have no idea.  This is an oversized

7  page.

8          MS. SCHLESINGER:  You are welcome, as far

9  as I'm concerned -- as you'll see, it's a blank half a

10  page here -- to cut that when we use it as an exhibit.

11  I believe this will be Exhibit 3 to Ms. Bree's

12  deposition.

13  BY MS. SCHLESINGER:

14      Q.  I'm going to ask you to take a look at this

15  first and see if this is the type of document that you

16  are referring to, ma'am?

17      A.  Yeah, this is what I was looking for, "North

18  American Property Update."

19          MS. SCHLESINGER:  I'm going to mark that

20  as Exhibit 3 to Ms. Bree's deposition.

21  BY MS. SCHLESINGER:

22      Q.  And can you point out for me -- in fact, if

23  you would, please, go ahead and circle where that would

24  say that there was work in progress?

25      A.  This is not the full document.  It looks like

112

1  it might be one page of either two or three.

2      Q.  Does it say anywhere on Exhibit 3 that there

3  is an additional page to it?

4      A.  Well, it could.  There's a 2 at the bottom.

5      Q.  Okay.

6      A.  Or a 3 at the top.  I'm not sure which to look

7  at.

8      Q.  It's actually a 31 that's been handwritten on

9  there.  Do you see that?

10      A.  Yeah.

11      Q.  Do you see that?

12      A.  Yeah.  So I would say there's a page before

13  this.

14      Q.  Is that the page you're referring to, ma'am?

15      A.  That's it.

16          MR. GARBARINO:  Are there any pages after

17  that?  Is it just two pages?

18          MS. SCHLESINGER:  We'll cross that bridge

19  when we come to it.  I don't believe that there are.

20  And, in fact, the next page that I have

21  in sequence is, again, numbered with a number 1 at the

22  bottom of it, so it's a little bit difficult to say

23  that those go together.

24          MR. GARBARINO:  This is what you just

25  handed me.  I don't think that's what we were looking

113

1  at.

2          MS. SCHLESINGER:  I'm sorry.  Sorry about

3  that.

4          MR. GARBARINO:  I have 31.

5          MS. SCHLESINGER:  This is it.

6          MR. GARBARINO:  Thank you.

7  BY MS. SCHLESINGER:

8      Q.  What is handwritten in the corner is 30 and

9  31, and they are marked sequentially numbers 1 and 2 at

10  the bottom right-hand corner.  Is that correct?

11      A.  Yes.

12      Q.  We're going to collectively mark that, then,

13  as Exhibit 3, which you said is a two-page document?

14      A.  I'm sorry.  Were you asking me?

15      Q.  Those pages go together, correct, Ms. Bree?

16      A.  Yes.

17      Q.  And you would expect that if there was a third

18  page, it would be marked in the right-hand corner as

19  page 3, correct?

20      A.  Probably down here.

21      Q.  Right, in the bottom right-hand corner would

22  be page 3.

23          Okay.  Does that look like a complete

24  report to you?

25      A.  Boy, it's hard to say.  It almost looks like

114

1  something's missing.  It may have changed enough over

2  the years that, you know -- if I had it in front of me

3  on the computer and scrolled through it, I'd say yes or

4  no.

5      Q.  Can you say what you think might be missing

6  from this?

7      A.  No, I can't.  I think that over time, this has

8  changed, this format has changed a bit.  So to go back

9  to it now is ...

10      Q.  To the best -- I'm sorry.

11      A.  To the best of my knowledge, it does look

12  like -- not a complete report.  This is just the

13  first -- maybe a few pages of the report.

14      Q.  What else would be included?  Do you know?

15      A.  Well, it's a whole QA report.  Every ...

16      Q.  We were -- okay.  I appreciate that.  Every --

17  I didn't mean to cut you off.

18      A.  Every section of the QA report.  This is just

19  one portion of it.

20      Q.  But this is the portion you were referring to

21  when you said it would note work in progress; is that

22  correct?

23      A.  Yes.

24      Q.  And can you circle for me on either page of

25  what's Exhibit 3 to this deposition where work in

115

1  progress is noted on this 10/25/2007 Best Western
2  American Quality Assurance System report by assessor
3  Mitch Van Wormer.
4      A.  (Witness complies.)
5      Q.  Do you want to hand that to me --
6      A.  Sure.
7      Q.  -- so I can see what you've circled.
8          Let the record reflect that it says,
9  "Work in Progress," states, "The work in progress rules
10 were explained and today there is no work in progress."
11 Do you see that in the words you've circled?
12     A.  Yes.
13     Q.  I read that correctly?
14     A.  Yes.
15     Q.  Okay.  So you had previously mentioned to me
16 that something would be marked down only if it had
17 already been noted.  Do you recall that?
18     A.  Something or something specific?
19     Q.  If you saw work that was being undertaken and
20 it had previously been noted as work in progress on a
21 report such as this, only then would a point be removed
22 or multiple points be removed for that sort of work in
23 progress.  Do you recall that?
24         MR. GARBARINO:  Objection, form.
25     A.  Are you asking me to remember what I said a

116

1  couple of days ago -- or a couple of weeks ago, because
2  I don't.
3  BY MS. SCHLESINGER:
4      Q.  Well, actually, yes, I was asking you to do
5  that.
6      A.  I don't remember what I said anymore.
7      Q.  Okay.  Actually, it was on 12/22 that you said
8  that.  For the record, this is that continuation.
9          I asked you if you saw stone being cut or
10 anything like that to upgrade lavatories or floors or
11 something, that would be considered work in progress.
12 I asked you since you recognize that it would be work
13 in progress, you wouldn't mark it down.  And I believe
14 your response was that, "If this work has been noted as
15 work in progress on a previous assessment, which is
16 defined in the four common sense principles that all
17 RSMs use, it would be noted." Does that refresh your
18 recollection?
19     A.  Yes.
20     Q.  Is that the case, that it's only that when
21 work in progress had been previously noted would you
22 then note it on a fresh report?
23     A.  That is not the only time.  There are rules in
24 place for probational properties where work in progress
25 is not used and if it -- and that's what you said -- if

117

1  it had been previously noted.
2      Q.  So if it's in probationary status, that means
3  you then review these things more harshly; is that
4  correct?
5          MR. GARBARINO:  Objection, form.
6      A.  No.
7  BY MS. SCHLESINGER:
8      Q.  So if it wasn't in a probationary status and
9  you saw new work or upgrades being done, you would not
10 take off points for that; is that correct?  Do I have
11 that right?
12     A.  Correct.
13     Q.  And if it was new work in progress, if it was
14 something being done to upgrade the property, would you
15 note that as a marginal item or make some note of it
16 someplace so that the next person reviewing it would
17 know and so that the hotel owner would know?
18     A.  That is something that should be on the
19 report.
20     Q.  And it would be on this report, what's been
21 marked as Exhibit 3?
22     A.  Yes.
23     Q.  You also mentioned on December 22nd, when last
24 we met, that the hotel owner could have called you and
25 you would have provided them with service following the

118

1  negative assessment.  Do you recall that?
2      A.  Uh-huh.  Yes, I do.
3      Q.  Did you ever offer your phone number or tell
4  them to call you, suggest that they call you?
5      A.  I don't recall.  That is a step that I would
6  like to take.  You know, I can't say, yes, I did it,
7  or, no, I didn't.  But it's more of a procedural thing
8  of saying, you know, this is the department where you
9  get your support.  I do leave a business card with my
10 phone number on it.
11     Q.  Did you suggest to Mr. Harooni that there were
12 any specific things that you could do to assist him if
13 he called?
14     A.  I don't recall.
15     Q.  So you may not have done that?
16     A.  I don't remember.
17     Q.  Is there a written job description of an RSM?
18     A.  I believe there is.
19     Q.  Do you know if that document has been produced
20 in this litigation?
21     A.  I do not know.
22     Q.  If you'll recall, Ms. Bree, there were a
23 couple of documents that were produced at the previous
24 deposition that you referred to as your less than
25 840 score property report.  Do you recall that?  Do you

119

1   recall briefly discussing that with me last time?
2       A.  Yes.
3       Q.  I'm going to hand you a copy.
4           MS. SCHLESINGER: I do have one for you;
5   although, I don't have a staple remover handy, so you
6   get it torn.
7   BY MS. SCHLESINGER:
8       Q.  Ms. Bree, do you recognize the report that
9   I put before you.
10          MS. SCHLESINGER: And I believe -- are
11  the bylaws Exhibit 1?
12          (Discussion off the record.)
13  BY MS. SCHLESINGER:
14      Q.  Ms. Bree, have you had an opportunity to
15  review this document?
16      A.  Yes.
17      Q.  And I believe that we were going down
18  previously, and I noted the name of "Jeff Hall, RSM" on
19  this report.  Do you see that in the first gray box
20  there on the report?
21      A.  Yes.
22      Q.  And at the time, you told me that Mr. Hall
23  was, quote, "in training."  Do you recall that?
24      A.  Yes.
25      Q.  Do you recall how long Mr. Hall was with Best

120

1   Western at the time of this assessment in January 2008?
2       A.  I do not know.
3       Q.  Do you know how it came to be that you had
4   Mr. Hall accompanying you during this assessment?
5       A.  My then supervisor, Daryl Preece, asked if
6   Jeff could observe me.
7       Q.  Had you met Mr. Hall previously?
8       A.  I had not.
9       Q.  Where did you meet up with him on that day?
10  Do you recall?
11      A.  I don't remember.
12      Q.  Do you have any explanation why, if he was
13  actually only a trainee, he has the designation of an
14  RSM behind his name?
15      A.  Repeat that one more time.
16      Q.  Sure.  Do you have any explanation if Mr. Hall
17  was actually only a trainee there is a designation
18  after his name of RSM?
19      A.  And what's the question?  Do I ...
20      Q.  Do you know why he has an RSM behind his name
21  if he was actually only a trainee?
22      A.  I typed it, so I have to say that's just what
23  I considered him.
24      Q.  So at the time you typed this, you did not
25  consider him a trainee but rather an RSM?

121

1       A.  I don't know how to answer that.  I typed in
2   the acronym RSM.
3       Q.  Going down this less than 840 score report
4   that's been attached as Exhibit 2, we had been talking
5   a little bit about the GRPA scores.  Do you recall or
6   can you direct me to where I would find how the GRPA
7   score of 681 was generated?
8       A.  It is the actual QA assessment.  Right below
9   that it describes or it shows 49 points for cleaning.
10  178 in maintenance, 79 capital, 13 updates.  Add that
11  all together, subtract it from 1,000, you get 681.
12      Q.  Let me stop you and say, What does "Capital"
13  represent?
14      A.  Those are items that are beyond repair, that
15  would have to be replaced, or something that is a large
16  amount of money to repair.
17      Q.  Can you give me an example?
18      A.  Sure.  If a property had a cracked window, you
19  can't -- you cannot repair the glass in the window.
20  The glass must be replaced.
21      Q.  And we agreed last time that, in fact, there
22  were no cracked windows at this hotel, correct?
23      A.  Correct.
24      Q.  I just want to make sure our record is
25  clear --

122

1       A.  Yes.
2       Q.  -- with regard to that since you go back to
3   that example.
4           Are there certain RSMs who are part of a
5   rapid reward -- a rapid assessment team that do more
6   rapid responses than other RSMs?
7       A.  No.  Each person is actually responsible
8   for -- if a property fails and needs a rapid response
9   visit, in most cases, it's the actual RSM that provided
10  that score that does the rapid response visit.
11      Q.  If you had mentioned to me -- let me just
12  strike that.
13          Let's clarify this.  Marginal points.
14  "Marginal" being something that is just a heads-up,
15  correct?
16      A.  Yes, that's correct.
17      Q.  So if something was, for example, a capital
18  category item -- something pretty significant, is how
19  I understood you to mean that, correct?
20      A.  Yes.
21      Q.  So if it was a capital that was in trouble,
22  it would be marked as a marginal point on the one
23  before, in theory, so that the owner of the hotel would
24  have an opportunity to correct that?  Does that make
25  sense?

CYNTHIA BREE, VOL. II
1/4/2010

127

1   A. Yes.
2   Q. -- in this case?
3      And you said he wanted an "immediate
4   reassessment." Did you provide that or any avenue to
5   obtain a reassessment?
6   A. Yes, I did.
7   Q. And what did you do?
8   A. I notified Daryl Preece, who was my supervisor
9   at that time, and also Terry Wininger, who is the
10  district manager of member relations for District 6.
11  Q. And what did you say to them? Or strike that.
12     In what manner did you notify them, by
13  what medium? Did you e-mail them? Did you call them?
14  What did you do?
15  A. Going back that long, I actually don't
16  remember specifically what I did.
17  Q. Would there be any record of your having
18  notified them?
19  A. Not to my knowledge.
20  Q. So you probably just did that orally?
21  A. I'm going to say -- probably in the essence of
22  time -- let me think. I would say that I called the
23  two of them.
24  Q. So you cannot -- can you prove that in any way
25  that you did that?

128

1   A. No.
2   Q. So as you sit here today, you think you called
3   them?
4   A. Yes.
5   Q. It states here that Mr. Harooni expressed some
6   concern that you were "taking points for landscaping."
7   Do you see that?
8   A. Yes.
9   Q. He said it wasn't fair?
10  A. Yes.
11  Q. Did you at any time go back out and look at
12  the landscaping in light of Mr. Harooni's comments?
13  A. No.
14  Q. Did you understand that this was January and
15  that the landscaping there consisted, among other
16  things, of roses?
17  A. Repeat that one more time.
18  Q. I said, Do you recall that the landscaping
19  there consisted of -- among other things, that it
20  included roses?
21  A. Without looking at it, I couldn't tell you
22  what was there anymore.
23  Q. Do you get any kind of allowance for seasonal
24  changes in vegetation, Ms. Bree?
25  A. Absolutely.

129

1   Q. So if something was not blooming because it
2   was the middle of winter, you wouldn't mark somebody
3   off for that; is that correct?
4   A. Provided that the plants are visibly alive.
5   Q. Do you have any knowledge that the plants were
6   not visibly alive here?
7   A. We could look at my pictures.
8   Q. Do you have those pictures?
9   A. I don't.
10  Q. So if I looked at the pictures -- because
11  I think that they are actually on a disk, and I'm not
12  sure. I'll have to take a break real quick and see.
13     If the plants were visibly alive, you
14  would not have marked it down, correct?
15  A. You know, like I said, I'd have to look.
16  Q. No, it's just a question.
17  A. You know, you can look at something -- you
18  know, we can look at these plants and decide they're
19  alive. So that's probably what I had to do there.
20  Q. So let me give you another for instance here.
21  If there was no bark in the landscaping, would that be
22  something you would mark down for?
23  A. Yes.
24  Q. Even if it was not called for in their design
25  plans?

130

1   A. Yes.
2   Q. You would mark it down even though it wasn't
3   called for in the design plans?
4   A. I don't know which design plans you're
5   speaking of.
6   Q. Landscaping design plans relevant to the
7   hotel. If those plants do not include bark, would you,
8   nevertheless, be able to write down for the lack of
9   bark when you go out and visit the hotel?
10  A. I didn't see any landscaping plans, so
11  I wouldn't have knowledge of that.
12  Q. So you would just mark it down?
13  A. Correct.
14  Q. Is there any protocol at Best Western that the
15  RSMs consider review or take into account the design
16  plans that have been approved by Best Western?
17  A. Say that one more time.
18  Q. Sure. Is there any protocol requiring RSMs to
19  take Best Western-approved design plans into
20  consideration before marking down various features at a
21  hotel?
22  A. It would depend on the situation.
23  Q. I think it's a "yes" or "no" question.
24  A. Oh.
25  Q. Is there a protocol where an RSM is required

131

1   to consider the approved design plans before marking
2   something down?
3       A.  You would reference them.
4       Q.  Ms. Bree, I'm sorry to cut you off, but it
5   really is. Are you aware of any protocol, requirement,
6   written policy, or other Best Western instruction to
7   the RSMs to consider the design plans that have been
8   approved by Best Western before marking anything down
9   at a hotel?  Are you aware of such a policy, plan,
10  written requirement?
11      A.  And when you're saying a design -- what are
12  you calling this design -- design report?
13      Q.  If there are approved design plans -- there is
14  a design department at Best Western?
15      A.  Yes.
16      Q.  Is that true?
17      A.  That's true.
18      Q.  And that design department takes a look at
19  various proposals or plans and says, yes, that will
20  meet Best Western standards, or, no, it won't; is that
21  your understanding?
22      A.  Yes.
23      Q.  So if the Best Western design department has
24  approved a plan, okay, does an RSM have a requirement
25  to review or consider that approved plan before going

132

1   out and doing an assessment on a hotel?
2       A.  Yes.
3       Q.  Did you do that in this instance, Ms. Bree?
4       A.  I don't recall if one was provided to me or
5   not.
6       Q.  Were you aware of whether or not this hotel
7   had submitted designs to the Best Western design
8   department?
9       A.  I don't have -- no, I don't have knowledge of
10  that.
11      Q.  And you did not look to see if that was the
12  case, did you?
13          MR. GARBARINO:  Objection, form.
14      A.  I -- again, I just -- I don't know any --
15  I just don't recall if there was a design report.
16  BY MS. SCHLESINGER:
17      Q.  Ms. Bree, let me ask you this another way.
18  Did you look to see, prior to going out to this
19  inspection, if there were any design reports?
20      A.  I do not recall.
21      Q.  But you told me earlier that the only thing
22  you looked at was the prior quality assurance report;
23  isn't that true?
24      A.  Yeah.  Yes.
25      Q.  So you did not look at any design reports or

133

1   any approved plans or anything of that nature with
2   regard to this hotel, did you?
3       A.  I don't remember.
4       Q.  Well, you wouldn't have told me it was the
5   only thing you looked at previously if, in fact, you
6   had looked at other things, would you have?
7       A.  You know, I don't know what to tell you.  This
8   is the first time you said "design report."  It was
9   long enough ago that I do not remember if I looked at a
10  design report.
11      Q.  But it was an accurate statement when you told
12  me earlier that the only thing you looked at was the
13  previous quality assurance report, correct?
14      A.  Yes.
15      Q.  The storage containers that are referenced in
16  Exhibit 2 at the top of page 2, do you recall what
17  those are?
18      A.  Vaguely.
19      Q.  What's your recollection?
20      A.  Well, if I wrote that there were storage
21  containers in the parking lot -- other than that,
22  I don't know.
23      Q.  So if there are storage containers in a
24  parking lot in connection with work in progress, would
25  that be something that would be acceptable on any kind

134

1   of short-term basis?
2       A.  On a short-term basis, yes, and provided the
3   condition of those storage containers is not in bad
4   shape, not rusted or have graffiti.
5       Q.  So, specifically, the only reasons it would
6   not be is if it was rusted or had graffiti?
7       A.  That might not be the only reason.
8       Q.  The rest of it would be whether or not you
9   thought it looked acceptable?
10      A.  Right.
11      Q.  And if they were there on a previous occasion
12  and approved -- because there was only two months
13  between the prior assessment and your assessment, true?
14  There was only two months, October 25th to January
15  31st?
16      A.  Right.
17      Q.  That was the time frame.
18      A.  Okay.
19      Q.  So you can understand, I'm sure, that work in
20  progress can go on for that period of time, and that
21  would be acceptable to Best Western?
22      A.  Work in progress is acceptable, yes.
23      Q.  Okay.  And storage containers can be necessary
24  for that; you would agree?
25      A.  Yes.

135

1      Q.  Do you think that -- strike that.
2          If the storage containers were
3  unacceptable to Best Western, is that something that
4  you would agree Best Western -- an RSM should flag so
5  that it can be corrected before points are taken off?
6      A.  What do you mean by "flag"?
7      Q.  Marginal or in some other manner noted and
8  brought to the attention of the hotel owner that it's
9  going to cost you points if you don't correct this
10  situation.
11      A.  And the actual question is, Did I do that?
12      Q.  Do you agree that a storage unit -- strike
13  that.  Let me rephrase it.  I see your confusion.
14          If you go out and see a storage unit that
15  has just been placed there and the owner tells you,
16  "Oh, that's just been there for a few days, and we're
17  doing this work over here, and it's going to be gone
18  shortly," would you let him know that if it wasn't, it
19  needs to be removed or attended to in some manner
20  before points are taken off for it?
21      A.  Yes.
22      Q.  Did you do that in this case?
23      A.  I've only visited the property once.
24      Q.  And you have no idea how long they were there
25  or not there?

136

1      A.  That would have been determined by speaking to
2  someone at the hotel.
3      Q.  Did you determine that in this case?
4      A.  I would have to say I did.
5      Q.  And on what are you basing that?
6      A.  Whatever conversation I may have had with the
7  hotel representatives.
8      Q.  So as you sit here today, you don't have any
9  specific recollection of such conversation?
10      A.  No, I don't remember the exact words.
11      Q.  Do you have a specific recollection of the
12  conversation taking place prior to your doing the
13  inspection?
14      A.  Not prior.  I would say more during.
15      Q.  You would say more during?
16      A.  As I -- if I was walking around the property,
17  I might -- I might ask, you know, "What are the storage
18  containers for?  How long have they been here?"
19      Q.  So you might have asked that?
20      A.  Yes.
21      Q.  You might not have?
22      A.  I might not have.
23      Q.  And did Mr. Harooni bring to your attention
24  that some of the landscape problems that you were
25  taking points from the hotel were affected by recent

137

1  weather conditions?
2      A.  He mentioned that it was wintertime and the
3  grass was normally dormant in the wintertime, and I do
4  not agree with that.
5      Q.  So this only pertains to grass, the
6  landscaping issues?  Is it your testimony that the only
7  issue there is grass?
8          MR. GARBARINO:  Objection, form.
9      A.  I would have to look at my pictures to
10  establish that.
11          MS. SCHLESINGER:  Let's go off the record
12  for just a moment.  Let me see if I can grab those real
13  quickly, and we'll try to get this wrapped up.
14          (Recess was taken from 10:44 p.m. to
15  10:52 p.m.)
16  BY MS. SCHLESINGER:
17      Q.  Ms. Bree, I do not have the photos with me
18  that I was hoping that I did, so we are not going to be
19  able to go over them.  I'm just going to ask you a
20  couple more questions with regard -- are you okay?
21      A.  Yeah, my eyes are watering.
22      Q.  Are you okay?
23      A.  Yes.
24      Q.  I know these deps are no fun, as a general
25  word, and I do appreciate your coming back out here.

138

1          We were talking about the roses, and,
2  unfortunately, I don't have photographs.  But are you
3  aware that roses are periodically cut back?
4      A.  Yes.
5      Q.  And that certainly wouldn't be something you
6  would take points off for, would it?
7      A.  No.
8      Q.  And if there was a landscaping contract, would
9  you want to flag any deficiencies for the owner so he
10  could notify his landscaper before taking points off?
11      A.  During the QA report, I actually just have to
12  report on what I see that day, so, really, you know, if
13  he's doing something for a landscaper -- unless he
14  specifically told me, I wouldn't have knowledge of
15  that.  I'd have to look at what is -- what I see on
16  that day.
17      Q.  Does Best Western have any policy of
18  encouraging consistency in their QA assessments?
19      A.  Yes.
20      Q.  What did you do to ensure that that policy was
21  maintained on the QA assessment that took place on
22  January 31st, 2008?
23      A.  I follow the four common sense principles.
24      Q.  The ones that you attempted to articulate last
25  time of following --

139

1           MR. GARBARINO: Objection. Sorry.
2    BY MS. SCHLESINGER:
3        Q.  -- of following your right hand and -- let me
4    go back to that since that was such an interesting
5    point.
6            While I'm doing this, when did you first
7    hear of this common sense principle?
8        A.  During my training.
9        Q.  And can you articulate today, as you sit here,
10   what your four common sense principles are?
11       A.  Yes.
12       Q.  Do you want to state those for me concisely?
13       A.  In going -- I will perform an assessment based
14   on the conditions that I see today. I will be fair and
15   accurate. I will use the term "marginal" on any item
16   that does not warrant a point loss, and I will take
17   into consideration any work in progress that has not
18   previously been noted as marginal or work in progress
19   on a previous assessment.
20       Q.  Okay. Thank you.
21          So looking at that 840 less report that
22   you prepared -- and you did prepare that Exhibit 2;
23   is that correct?
24       A.  Yes, I did.
25       Q.  Was there anything there noted as marginal on

140

1    the prior assessment? Do you see that, the score of
2    the previous assessment?
3        A.  Yes. It does not appear.
4        Q.  So is it your testimony today that as part of
5    your fair assessment, nothing warranted marginal;
6    everything was -- everything that you wrote down, not
7    one item was marginal? Do you understand what I'm
8    asking you?
9        A.  That on that day, that is what it looks like,
10   that, no, there were no marginal points taken.
11       Q.  Or even anything noted, for that matter,
12   correct?
13       A.  Well, no, but the notes wouldn't appear here.
14       Q.  Where would the notes appear, Ms. Bree?
15       A.  Within the body of the update page.
16       Q.  I'm handing you a document that is entitled,
17   "North American Property Update." It is marked in the
18   upper right-hand corner from pages 69 through 89,
19   I believe those are sequential. Can you take a look
20   and see if that's correct for me.
21       A.  (Witness complies).
22       Q.  Were those pages sequential, Ms. Bree?
23       A.  Yes.
24       Q.  Is that the report that you're referring to?
25       A.  Yes.

141

1        Q.  And as you look down --
2            MS. SCHLESINGER: I'm going to mark this,
3    then, as Exhibit 4, I believe, to Ms. Bree's
4    deposition.
5    BY MS. SCHLESINGER:
6        Q.  As you look down this report, then,
7    Ms. Bree -- well, let me start at the beginning.
8    I guess. You see there, it says, "Person Notified"?
9        A.  Yes.
10       Q.  And you prepared this report, right?
11       A.  Yes.
12       Q.  And under that, it says, "Lisa"?
13       A.  Yes.
14       Q.  Who was Lisa?
15       A.  The person who answered the phone when
16   I called to notify the hotel that I was coming.
17       Q.  And you say that it was 24 hours' notice, so
18   I'm going to presume -- well, I don't want to presume.
19          What date was it that you notified that
20   person?
21       A.  I would have to look at a calendar to see what
22   day of the week the 31st of January was, and it would
23   have been a 24-hour, but a business day. So the reason
24   I'm explaining that is because if it was on a Monday,
25   if the 31st was on a Monday, they would have been

142

1    notified on the previous business day, which would have
2    been Friday.
3        Q.  And in this instance -- I just looked at a
4    calendar -- will you -- I don't know if you want to
5    walk around here and look, but for January 2008, the
6    31st appears to have been a Thursday.
7        A.  Okay.
8        Q.  So that would mean that you would have given
9    them notice on the Wednesday prior?
10       A.  Wednesday the 30th.
11       Q.  So that would be the previous business day?
12       A.  Yes.
13       Q.  There was none of this four days or anything
14   that you were just referencing?
15       A.  No, no, no. No. 24 hours ahead.
16       Q.  And you have no idea who Lisa was, except
17   somebody that answered the phone; is that right?
18       A.  At the front desk.
19       Q.  Is there any policy or procedure that requires
20   that you notify management of the hotel that you are
21   coming for an inspection?
22       A.  They also receive a fax, and my normal
23   conversation with whoever answers the phone is, you
24   know, "Has the fax arrived? Does the manager or
25   owner -- is the manager or owner aware that I am

143

1    coming?"
2        Q.  Is there anything noted on this report, ma'am,
3    that says that they confirmed any fax --
4        A.  No.
5        Q.  -- or that you even asked about any fax?
6        A.  No, not on this report.
7        Q.  Is that recorded anywhere?
8        A.  The fax, the sending of the fax, I believe, is
9    recorded.
10       Q.  And where would that be?
11       A.  In the regional services department.
12       Q.  And do you know if that document was produced
13   in this litigation?
14       A.  I do not.  I do not know.
15       Q.  I understand.  How are the documents stored in
16   the regional services department?
17       A.  Which documents?
18       Q.  Documents such as faxes, fax transmission
19   reports.  Are those kept?
20       A.  I don't have any knowledge of that.
21       Q.  So you, yourself, did not send a fax?
22       A.  No, I did not.
23       Q.  So you actually have no personal knowledge
24   that such a fax was sent?
25       A.  I don't.

144

1        Q.  And you, again, write down here under "Names
2    of Participants & Position Titles," you again write
3    down, "Jeff Hall, RSM"; is that correct?
4        A.  Yes.
5        Q.  And is there anything there that indicates
6    Jeff Hall was actually present, because I don't see
7    anything here about Mr. Harooni being present?
8        A.  He was -- where it says "Names and
9    Participants" -- I'm sorry -- "Names of Participants &
10   Position Titles," this area is reserved for the people
11   that actually are on the physical site inspection and
12   walk through the hotel rooms, the hotel and the rooms.
13   In this case, Mr. Harooni did not attend.
14       Q.  So you have no knowledge if Mr. Harooni was
15   aware you were going to be there or not, do you?
16       A.  No, no, no, no.  That's not what I said.
17       Q.  No.  I'm asking if since he wasn't there in
18   attendance --
19       A.  He was --
20       Q.  Let me finish.
21       A.  Sorry.
22       Q.  Do you understand -- strike that.
23           On what basis do you state that
24   Mr. Harooni had notice if you talked only to Lisa and
25   he was not there at the time of the inspection?

145

1        A.  He was there at the beginning of the
2    assessment, where I sat -- but this specific -- again,
3    "Names and Participation" -- I'm sorry -- "Names of
4    Participants & Position Titles" are only for the people
5    who walk through the ten rooms and the public areas
6    that I inspect.  Mr. Harooni was present before and
7    after.
8        Q.  Is that noted anywhere here?
9        A.  On this specific page, it is not.
10       Q.  And the other document that's been listed as
11   Exhibit 2, the 850 score (sic), shows that you spoke to
12   him at some time there, but it also does not note at
13   what time Mr. Harooni's participation began, does it?
14       A.  No, it does not.
15       Q.  As we go down what's been marked as Exhibit 4,
16   page 69, do you see where it says, "Work in Progress"?
17       A.  Yes.
18       Q.  And you see there that it says "there is no
19   work in progress"?
20       A.  Yes.
21       Q.  Did you write that before or after speaking to
22   Mr. Harooni?
23       A.  After.
24       Q.  Did you speak to Mr. Van Wormer with regard to
25   that issue of work in progress?

146

1        A.  Not to my knowledge.
2        Q.  Did you speak with Mr. Preece regarding work
3    in progress?
4        A.  Not to my knowledge.
5        Q.  On the next page, which is marked on the upper
6    right-hand corner page 70 and the lower corner as 2,
7    it's captioned "Property 0505" -- I'm sorry -- "05050"
8    at 2:52 p.m. on 1/31/2008.  Under "Reassessed Rooms,"
9    do you see where it says that?
10       A.  Yes.
11       Q.  "On today's assessment no rooms were
12   identified for additional reassessment during the next
13   official QA visit."  During your QA visit -- that's
14   what this was, right?  This report was generated during
15   a QA visit, correct?
16       A.  Yes.
17       Q.  And "no rooms were identified for additional
18   reassessment," meaning, nothing needed to be rechecked;
19   is that correct?
20       A.  This reassessed room section is for specifics.
21   If there were -- if there were a deficiency that was,
22   for lack of a better term, that was just so bad that
23   you wouldn't want a customer to see it that way.
24   Because as regional service managers, we can point out
25   deficiencies, but we have no control over whether

147

1   they're corrected.
2       This is an area that would be used if --
3   if I can just use an example. If there was a bed that
4   had springs sticking out through it, and after a
5   physical inspection of the room, I would say that that
6   would be a detriment to any customer, and to ensure
7   that this is corrected properly. I'm going to write
8   this room number down, and on the next assessment, the
9   RSM will verify that this item had been corrected.
10    Q. Isn't that the general idea of all of the
11   things that you take points off for, to ensure that
12   they are corrected, Ms. Bree?
13       MR. GARBARINO: Objection, form.
14    A. In a perfect world, that would be the outcome
15   we'd hope for.
16   BY MS. SCHLESINGER:
17    Q. So in other words, if there is a point written
18   down, then isn't that something that you would normally
19   want to reinspect, to ensure that it was corrected?
20    A. Again, this would refer to items that are
21   above and beyond normal wear and tear, something that
22   would cause great concern to a customer.
23    Q. Do you write down things that do not cause
24   great concerns to customers?
25    A. Yes.

148

1    Q. So things that are pretty inconsequential?
2       MR. GARBARINO: Objection, form.
3    A. Guest-sensitive issues are -- is what I'm
4   speaking of.
5   BY MS. SCHLESINGER:
6    Q. "Rapid Response Visit Status: Not Required."
7   What does that mean?
8    A. In this particular case only, a rapid response
9   visit, which is done after a property scores less than
10   800, was provided to this property on November 7th,
11   which is not very many days after the original 10/25
12   less than 800 score. That is only offered to a member
13   property once in -- the time frame, I am not positive
14   of, I would have to be looking at my notes -- but it's
15   either one time in 12 months or one time in 18 months.
16   Because it was provided previously, my answer to this
17   question is that it is not required.
18    Q. Was it available, if he had asked for it?
19    A. I believe so, yeah.
20    Q. And what is a critical care program?
21    A. Critical care is a combination of a composite
22   score of three areas. Every member hotel within Best
23   Western has a QA score, and the QA score is given a
24   single digit number so that anywhere between 1 and 5,
25   1 being the low end, 5 being the high, and it's based

149

1   on the composite score of all Best Westerns.
2       The same thing is true with our guest
3   satisfaction score and the customer care or guest
4   survey score. All three of those are put together,
5   and each of them is assigned a single digit number.
6   Depending on what the average is of that number,
7   a property could be in critical care for having low
8   scores.
9    Q. So this hotel was not in critical care; is
10   that what that's indicating?
11    A. It was not.
12    Q. So it had at least relatively higher,
13   reasonable scores, correct?
14    A. It had -- well, that's all -- the only answer
15   I had in that case was no.
16    Q. And we mentioned before "Marginal Point
17   Total." There was nothing in this hotel that was
18   marginal, correct?
19    A. Correct.
20    Q. How had -- how would you determine -- let me
21   see if I can phrase this.
22       How would you determine that a patch of
23   ceiling rated a point loss?
24    A. When you walk into a room, a deficiency that
25   is noted is normally something that you or anyone else,

150

1   specifically a guest, would -- it's visible to the
2   guest. It's not something that you have to look at for
3   five minutes and try and figure out what it is. It's
4   just, you know, something that yells, screams at you,
5   "Here," you know.
6    Q. Yells or -- did it scream at you, Ms. Bree?
7   Let's try that one again.
8    A. It is -- it's just an item that you can see
9   with your eyes.
10    Q. So anything that you can see with your eyes,
11   you could theoretically write down for; is that right?
12       MR. GARBARINO: Objection, form.
13    A. No, that's not right.
14   BY MS. SCHLESINGER:
15    Q. Okay. Let's move on.
16    A. I didn't -- I did not explain that correctly.
17    Q. "Scratches and damage to surface of
18   furniture."
19    A. Are you looking at --
20    Q. I'm going on to the next one.
21    A. Okay.
22    Q. It says, "Case Goods." Case goods, is that
23   something that Best Western will supply to its members?
24   Case goods. Is that how you determine what's a case
25   good?

CYNTHIA BREE, VOL.II
1/4/2010

151

1    A.  A case good is furniture.
2    Q.  And that's something that can be purchased
3    from Best Western?
4    A.  From Best Western Supply, correct.
5    Q.  Do you know if Best Western Supply and Best
6    Western are the same company, just another department
7    of the same company?
8    A.  I believe so.
9    Q.  So when I say it can be purchased from Best
10   Western, that's accurate --
11   A.  Yes.
12   Q.  -- as far as you know?
13   A.  Yes.
14   Q.  So if there's scratches or damage to the
15   surface of furniture noted, then Best Western will be
16   happy to supply new ones to the member; is that
17   correct?
18   A.  That's provided -- the member is the one who
19   has to make that attempt.  Best Western is not just
20   going to send furniture.
21   Q.  Of course not.  They're going to be charged
22   for it, and they need to purchase it through Best
23   Western, but that's available; is that right?
24   A.  It's available.  It's not the only way that a
25   customer can get furniture.

152

1    Q.  The furniture here that you marked down for,
2    do you know if that was purchased at Best Western or
3    through some other outlet?
4    A.  I have no knowledge of that.
5    Q.  And the next item here is "Equipment, HVAC,
6    TV; AC grill vent dusty."  Did you climb up on the
7    stairs to look at that, Ms. Bree?
8         MR. GARBARINO:  Objection, form.  I would
9    just note for the record that the pictures are a part
10   of this report.
11        MS. SCHLESINGER:  I'm asking how she went
12   about finding it.  That's completely separate from the
13   pictures, sir.
14   A.  If I had the picture of room 388, I could
15   probably show you, but I don't believe any climbing was
16   involved.
17   BY MS. SCHLESINGER:
18   Q.  You don't have any specific recollection of
19   whether it was or not?
20   A.  If it was something I had to climb to get to?
21   Q.  How tall are you?
22   A.  Oh, maybe 5'4".
23   Q.  Where is the AC unit located in these rooms?
24   A.  In a specific room, I would have to see a
25   picture.  In a normal room, aside from this hotel, they

153

1    can be placed anywhere in the room.  Most common is
2    underneath a window.
3    Q.  So you don't have any specific recollection
4    about these AC units?
5    A.  Not without a picture in front of me.  I don't.
6    Q.  Do you have any recollection of how badly the
7    scratch -- how bad the scratches were?
8    A.  Recollection, no.  I would have to look at a
9    picture.
10   Q.  How do you determine when a scratch goes from
11   acceptable, to marginal, to points off?
12   A.  Just by looking at it and experience.
13   Q.  The reason I ask is I turn around here and
14   just arbitrarily go back and look at the windowsill
15   here, and I see some discolor on the paint, and I'm
16   wondering if that's the kind of thing that you would
17   just turn around and look at things in a room, follow
18   your right hand around, and say, "Oh, I can see this.
19   I can see this, I can see this, points off."  Is that
20   kind of how it works?
21        MR. GARBARINO:  Objection form.
22   A.  Kind of, but not really.
23   BY MS. SCHLESINGER:
24   Q.  How is it not really?
25   A.  Every situation is different, and, again,

154

1    I have to look at what I see in the room the day I am
2    there as if I were a customer that had just rented that
3    room and walked in.
4    Q.  And you'll agree with me, Ms. Bree, that
5    another RSM would have a different impression of the
6    room as a typical matter because they're going to look
7    at it from their own perspective?
8         MR. GARBARINO:  Objection, form.
9    A.  Not --
10   BY MS. SCHLESINGER:
11   Q.  Strike that.  He's objected.  I'll strike it.
12   A.  All right.
13   Q.  You said previously that somebody came and
14   asked -- or somebody -- strike that.
15        Somebody at Best Western comes to ask you
16   your opinion in regard to termination of a hotel's
17   membership; do you recall that?  In fact, you said,
18   "Boy, Yes."
19   A.  It is actually a spot that I have to fill out
20   on the less than 840 report.
21   Q.  Where is that, please?
22   A.  It is on the second page at the bottom after
23   all of the block lines.  "In your opinion, what level
24   of confidence do you have that this property has the
25   ability to maintain Best Western membership?"

CYNTHIA BREE, VOL.II
1/4/2010

155

1    Q. And is that the only indication that you give
2    to Best Western management that you believe a hotel
3    should be terminated?
4    A. Yes.
5    Q. And how is that number assigned?
6    A. I'm sorry?
7    Q. How do you come up with that number? Is it as
8    it states, "in your opinion"?
9    A. Yeah, exactly.
10   Q. Do you know if a reassessment was ever done in
11   this case, ma'am?
12   A. I don't.
13   Q. I'm just reviewing my notes real quickly to
14   see if there's anything else.
15        MS. SCHLESINGER: While I look at my
16   notes, I might redirect, but I think that's it for the
17   moment. I may have one or two last questions, but in
18   the interest of time, go ahead, if you'd like.
19        MR. GARBARINO: Let me just have a
20   second.
21        (Recess was taken from 11:20 a.m. to
22   11:21 a.m.)
23        MR. GARBARINO: I have no questions for
24   Ms. Bree.
25        MS. SCHLESINGER: And I've just got a

156

1    real quick couple just after reviewing my notes.
2    BY MS. SCHLESINGER:
3    Q. Do you recall what the temperature was that
4    day?
5    A. I do not.
6    Q. Is Best Western your sole source of income?
7    A. Yes.
8    Q. Are you married?
9    A. No.
10   Q. Do you know what Best Western Design
11   Excellence Program is?
12   A. Yes.
13   Q. What is that?
14   A. A design program that assisted member
15   properties with keeping in line with industry standards
16   and moving the brand along, updating any dated items
17   that may appear in rooms.
18   Q. Did Best Western have problems with regard to
19   keeping its image up at the time you did this
20   inspection in 2008, to your knowledge?
21        MR. GARBARINO: Objection, form.
22   BY MS. SCHLESINGER:
23   Q. Do you understand the question? Was it having
24   image problems at that time?
25        MR. GARBARINO: Same objection.

157

1        MS. SCHLESINGER: What's the objection?
2        MR. GARBARINO: I'm not sure you laid the
3    foundation that she would have knowledge about that.
4        MS. SCHLESINGER: Okay. But you objected
5    on form, not foundation. Would you like to change that
6    objection?
7        MR. GARBARINO: I thought a form
8    objection covered it all.
9        MS. SCHLESINGER: You're mistaken on that
10   point, as I understand it.
11   BY MS. SCHLESINGER:
12   Q. But with that said, you told me previously
13   that you stay in Best Western hotels frequently;
14   is that correct?
15   A. Yes.
16   Q. Are you familiar with the advertising done by
17   Best Western?
18   A. Yes.
19   Q. In a general sense?
20   A. Yes.
21   Q. Are you aware of Best Western having any
22   concerns regarding the image in the general public of
23   the Best Western brand in 2008?
24   A. I think in that period of time, there was
25   concern within the competitive set of the eight hotels

158

1    that Best Western allianced themselves with. In the
2    consumer's eyes. I think our rating had slipped a
3    little bit.
4    Q. So was there any additional pressure on the
5    RSMs to ensure that the quality assessments were done
6    meticulously?
7    A. There was emphasis on performing accurate
8    assessments and consistent assessments and to review
9    and assist with any customer service issues.
10   Q. I believe I'd asked you something previously,
11   so I don't want to reask the same question. Just one
12   second.
13        It's my recollection that you told me
14   that you didn't do anything specifically to ensure
15   consistency between your assessment and the prior
16   assessments; was that correct?
17        Strike that. I'm sure it's in the
18   record.
19        MS. SCHLESINGER: I'm almost finished.
20   Of course, I will give you another opportunity.
21   BY MS. SCHLESINGER:
22   Q. Were you working with Best Western on
23   February 29th, 2008?
24   A. Yes.
25   Q. Do you know who Joe Wilson might be?

CYNTHIA BREE, VOL.II
1/4/2010

159

1   A. Yes.

2   Q. Was he your manager?

3   A. February? He was not my manager; however,

4  when Mr. Preece left and there was no manager, then any

5  of the other five -- any of the other six managers I

6  would consider my immediate supervisor because I didn't

7  have one.

8   Q. You didn't have a supervisor in the beginning

9  of 2008?

10   A. I am not positive, but I believe Daryl left at

11  some point in the beginning of 2008.

12   Q. So you're not sure if Daryl Preece was your

13  manager at the time of the inspection?

14   A. On that specific date that you mentioned.

15   Q. Was he your manager on January 31st, 2008?

16   A. Yes.

17   Q. And at some point after that, but you're just

18  not exactly sure when he left and there was no regional

19  manager at the time?

20   A. Correct. Yes.

21   Q. So we've got that right?

22   A. Yes.

23   Q. And then Joe Wilson came in?

24   A. Joe Wilson has been a manager, but, again,

25  since Daryl may not have -- he may have left the

160

1  company by whatever date you said in February.

2   Q. February 29th, 2008.

3   A. And so any -- there are one manager for all --

4  one manager per seven districts. So at that point in

5  time, Joe was a manager, and I would have considered

6  him my supervisor had I needed a -- needed one.

7   Q. And what were the reasons why you would need a

8  manager?

9   A. I needed to ask for a day off or schedule --

10  you know, anything scheduling-wise.

11   Q. Or how about if there was a problem with a

12  hotel that you didn't feel capable of resolving?

13   A. Yes, I would possibly call a manager.

14   Q. Has that happened in your experience,

15  Ms. Bree, with Best Western?

16   A. Yes.

17   Q. Can you give me an example?

18   A. Oh, let's see -- of where I had to call a

19  manager because I was unsure of something?

20   Q. Correct.

21   A. Yeah, I had a property that is not in my area

22  but became on the critical care list, and because right

23  now I am the closest person to it, I was assigned to --

24  or was asked if I could pick up an extra property, and

25  I said yes. And then as I looked at part of the

161

1  customer service score that put them in this position,

2  I realized it wasn't correct and called my manager and

3  said, "I think we should look at this again because

4  I don't think it needs a visit," and that would be a

5  reason why I would call my manager.

6   Q. How many times as a -- strike that. I'm

7  sorry.

8     When someone is a trainee RSM, do you

9  know how many times they go out and observe before they

10  are made an RSM?

11   A. Not specifically, I don't.

12   Q. Was that the only occasion upon which you had

13  Mr. Hall observing you? And by "that occasion," I mean

14  the one on January 31st, 2008, at Mr. Harooni's hotel?

15   A. No. Jeff was with me for -- again, without

16  having a schedule in front of me -- that was so long

17  ago -- to the best of my knowledge, Jeff observed two

18  visits this week of the -- when we were in Lancaster,

19  and -- did you tell me the 31st was a Thursday?

20   Q. That's according to this, what I just looked

21  up.

22   A. So Jeff was with me Tuesday, Wednesday, and

23  Thursday, so the two assessments prior to that, and

24  then I also traveled with him at a different week, and

25  he was with me for three more assessments.

162

1   Q. So what were the other hotels in Lancaster

2  that you took Mr. Hall with you to?

3   A. We did not visit any other hotels in

4  Lancaster.

5   Q. I'm sorry, I -- I'm sorry, I -- "Jeff was with

6  me for -- again, without having a schedule in front of

7  me -- that was so long ago -- to the best of my

8  knowledge, Jeff observed two visits this week of the --

9  when we were in Lancaster." Do you want to tell me

10  what that was about?

11   A. So in the week of January 26th, is my guess,

12  that that was the Monday we visited -- Jeff and

13  I visited a hotel somewhere on Tuesday and somewhere

14  else on Wednesday and then Lancaster on Thursday.

15   Q. Were the other two hotels that you visited

16  with Mr. Hall on probationary status?

17   A. To the best of my knowledge, they were not.

18   Q. But that would be included in the schedule?

19   A. Yes.

20   Q. And the other documentation that you had

21  access to prior to doing this assessment, correct?

22   A. Yes.

23   Q. And you already testified you don't know

24  whether that was produced in this litigation or not,

25  correct?

163

1      A.  Correct.
2      Q.  Is there a particular test that somebody needs
3   to take in order to finally be awarded RSM status
4   through Best Western?
5      A.  It's actually a knowledge test and being
6   observed by a manager while you're doing a QA
7   assessment.
8      Q.  When you're training somebody, are you
9   particularly vigilant to make sure that you cover
10  everything that they will need to know?
11     A.  No.  I think first if -- regardless of who's
12  with me or not, it's doing the assessment the same way
13  every time.
14     Q.  Every time you do the assessment?
15     A.  Every time I do the assessment.
16     Q.  So you're marking your own personal
17  consistency?
18     A.  And Jeff being there, really, all he did was
19  observe.  It wasn't like I was walking around saying,
20  "Okay, now I'm going to look at the men's public
21  restroom." It wasn't like that.  I just did what
22  I normally did.  If Jeff had a question, he would write
23  it down, and we would talk about it later.
24     Q.  To your recollection, did Mr. Hall write
25  anything down for your discussion later after the

164

1   assessment on January 31st, 2008?
2      A.  Not that I would recall.
3          MS. SCHLESINGER:  I have no further
4   questions at this time.
5          MR. GARBARINO:  I have no further
6   questions.
7          MS. SCHLESINGER:  Thank you for your
8   cooperation, Ms. Bree.
9          MR. GARBARINO:  Read and sign.
10         (Exhibit Nos. 3 and 4 were marked.)
11         (11:34 p.m.)
12
13
14
15
16
          _____  _____     _____
17         CYNTHIA BREE
18
19
20
21
22
23
24
25

165

1   STATE OF ARIZONA      )
                          ) SS.
2   COUNTY OF MARICOPA    )
3       BE IT KNOWN that the foregoing transcript was
4   taken before me, HALEY WESTRA, a Certified Court
5   Reporter in the State of Arizona; that the witness
6   before testifying was duly sworn by me to testify to
7   the whole truth; that the questions propounded to the
8   witness and the answers of the witness thereto were
9   taken down by me in shorthand and thereafter reduced to
10  print under my direction; at the witness's request,
11  notification was provided that the transcript was
12  available to read and sign; that the foregoing pages
13  are a true and correct transcript of all proceedings,
14  all done to the best of my skill and ability.
15      I further certify that I am in no way related to
16  any of the parties hereto nor am I in any way
17  interested in the outcome hereof.
18      Dated at Phoenix, Arizona, this 12th day of
19  January, 2010.
20
21
          _____
          HALEY WESTRA
22        AZ Certified Court Reporter No. 50762
23
24
25

CYNTHIA BREE,

a witness herein, having been first duly sworn by the
Certified Reporter to speak the truth and nothing but
the truth, was examined and testified as follows:


EXAMINATION

BY MS. SCHLESINGER:

    Q.    Ms. Bree, my name is Kira Schlesinger.
I represent Harry Harooni and AV Inn Operations in this
matter, the defendants, slash, counterclaimants.  Are
you familiar with this litigation, ma'am?

    A.    Yes.

    Q.    Are you aware of what's going on?

    A.    Yes.

    Q.    Have you had an opportunity to read the
complaint and the counterclaim?

    A.    I'm not sure.

    Q.    Okay.  Have you been deposed before?

    A.    Yes.

    Q.    When was that?

    A.    I don't remember.  Within the last year,
maybe.

    Q.    And that was as a representative for Best
Western?

2

3

4

1  A. Yep.

2  Q. Are you willing to return to the Phoenix area

3  in order to do that?

4  A. Yes.

5  Q. Not the happiest moment, but we have a

6  discovery cutoff that might be imminent.

7        MR. GARABARINO: And my understanding is

8  that you'd also be amenable to telephonic or at least

9  consider telephonic.

10        MS. SCHLESINGER: I would consider it.

11  It's going to depend on how this goes. I'll make my

12  best efforts to inconvenience you as little as

13  possible, but depending on the nature of the case, and,

14  obviously, it's important to my client that we get it

15  right.

16  BY MS. SCHLESINGER:

17  Q. With that said, when did you join Best

18  Western?

19  A. 2002.

20  Q. And where had you been. You said you got your

21  horticulture degree in 1987?

22  A. No, 1982.

23  Q. Oh, okay.

24        MS. SCHLESINGER: I'm used to having my

25  thing over here to look at.

5

1        (Recess taken from 2:45 p.m. to

2  2:47 p.m.)

3  BY MS. SCHLESINGER:

4  Q. I appreciate your patience with that little

5  technical difficulty we were having.

6        So you said 1982 you got your degree; did

7  I get that right?

8  A. That's correct.

9  Q. And so then you joined Best Western in 2002.

10  What was going on in between there, between the time

11  you got your degree? Were you employed?

12  A. Yes, I was.

13  Q. Were you employed with any hotel franchise or

14  management or such?

15  A. Best Western and the Air Force, or government.

16  Q. So prior to working for Best Western, you

17  worked for the government?

18  A. Yes.

19  Q. In what capacity?

20  A. Billeting, which is their hotel.

21  Q. Oh, okay. Glad you explained that one. I've

22  never had anyone in the armed services in my family.

23        So did that give you the foundation,

24  then, for joining Best Western?

25  A. It did.

CYNTHIA BREE (ROUGH)
12/22/2009

6

1    Q. What position were you hired for initially by
2 Best Western?
3    A. Regional service manager.
4    Q. Is that the same position that you hold today?
5    A. Yes.
6    Q. Have your regions changed overtime?
7    A. Yes.
8    Q. What region were you originally hired for?
9    A. They don't really have a name. It's not like
10 I could -- I mean, central California is about the
11 easiest thing for me to say.
12    Q. And have you been in that -- strike that.
13       When did you stop representing the
14 central California district?
15    A. Last year.
16    Q. So during the times relevant to this
17 litigation, which was, what, 2004 to 2008, you were in
18 charge of the central California region?
19    A. Some of central and some of northern.
20    Q. How were the hotels divided up to have them be
21 your responsibility; in other words, how are they
22 allocated to one -- I keep getting titles wrong --
23 I apologize. What is your title?
24    A. RSM.
25    Q. RSM, regional services management?

7

1    A. Yeah.
2    Q. How are the hotels allocated to the various
3 RSMs working for Best Western?
4    A. Somebody from Phoenix from our department
5 looks at a map, and from between where you live and
6 where the properties are, they divide them up.
7    Q. Okay. So how many RSMs are there working in
8 the southwestern region? Do you know?
9    A. Not off the top of my head.
10    Q. But there is four that report to your
11 supervisor; is that correct?
12    A. Right now?
13    Q. Yes.
14    A. Five people report to a supervisor.
15    Q. And from the opening of what I'm going to
16 refer to as Mr. Harooni's property, or the hotel, until
17 2008, you were not assigned to his hotel; is that
18 correct?
19    A. Correct.
20    Q. And then sometime in 2008, that changed,
21 correct?
22    A. Yes.
23    Q. Were you assigned to his hotel for all
24 purposes in 2008?
25    A. No.

8

1    Q. What was the purpose for which you were
2 assigned to working with his hotel?
3    A. The person that previously had that territory
4 moved.
5    Q. And that would be Mitch Van Wormer?
6    A. Yes.
7    Q. And when I asked you if you were assigned to
8 it for all purposes, and you said no, let me ask you,
9 what were your duties with regard to the hotel at issue
10 in this litigation?
11    A. I was just asked to fill in and perform the
12 assessment.
13    Q. Okay. So was this an additional workload for
14 you?
15    A. No, I don't think so.
16    Q. So you had your set of hotels, correct?
17    A. Uh-huh.
18    Q. And you had to continue doing those?
19    A. Right.
20    Q. And then this one was added on top?
21    A. Yes.
22    Q. So it was additional work?
23    A. Well, I don't look at it that way. You know,
24 it's the same as what I do every day, so it's not
25 additional. I go to a different location, but the work

9

1 is the same.
2    Q. Where do you live?
3    A. Yuba City.
4    Q. Where is that?
5    A. California.
6    Q. Where is that?
7    A. North of Sacramento.
8    Q. So that's significantly far away from
9 Lancaster? It's, what, how many miles? Do you know?
10    A. No.
11    Q. How many other hotels do you have currently in
12 the central California area?
13    A. Currently, none, I don't think.
14    Q. How many other hotels did you have in 2008 in
15 the central California area?
16    A. It's almost impossible to answer that
17 question, because I moved around a lot. There were a
18 lot of -- we had a hiring freeze at Best Western, so.
19 But there was a large portion of California that did
20 not have an RSM.
21    Q. Was there any gap in time between the time
22 that Mr. Van Wormer left and the time that you took
23 over responsibilities with regard to the hotel at issue
24 in this litigation?
25    A. I'm not sure I understand that.

10

1    Q.  Sure.  And I didn't run through the rules in
2    the interest of time, but we're doing a great job so
3    far of letting me finish my questions.  I'm going to
4    try to let you finish your answer.  If you don't
5    understand my question, if that should occur, please,
6    please, please do what you just did.  Because if you
7    answer the question, I'm going to assume you understood
8    it.  Is that fair?
9    A.  Yes.
10   Q.  And from time to time your counsel -- oh,
11   I didn't ask.  Is he representing you in this
12   deposition?
13   A.  Yes.
14   Q.  From time to time, counsel may on object on
15   form or otherwise.  Unless he specifically instructs
16   you not answer, please go ahead and answer the
17   question.  If you do not understand it, I'll ask that
18   you just ask me to rephrase it.
19        If you nod your head -- and you haven't
20   done it yet -- but I told you, she can't take down head
21   nods.  I've seen court reporters try it.  It doesn't
22   work out real well, just like the "uh-huhs," "huh-uhs."
23   So to the best of your ability, please try to continue,
24   as you've been doing, giving a "yes," "no," Agree?
25   A.  Yes.

11

1        MR. GARABARINO:  And just for
2    clarification, what did she say with response to the
3    question about I'm respecting her?
4        MS. SCHLESINGER:  She said "yes."
5        MR. GARBARINO:  Great.  I just didn't
6    hear her.
7    BY MS. SCHLESINGER:
8    Q.  The other thing is I know we're very short on
9    time.  I'm going to do my best to get you out of here
10   with a couple minutes to spare with the understanding
11   we may need to continue this.
12        With that said, if you need to take a
13   break, please speak up.  Nothing is so critical you
14   should be miserable.  Okay?
15   A.  I will.  Thanks.
16   Q.  Were you compensated additionally for this
17   addition to your workload?
18   A.  No.
19   Q.  How is your compensation designed, Ms. Bree?
20   A.  I have a monthly salary.
21   Q.  Do you get any kind of bonus or commission or
22   reward at all in addition to that salary?
23   A.  If my bonus goals are met.
24   Q.  And what are your bonus goals?
25   A.  They're companywide based on customer service

12

1    scores and other things that the company sets up for
2    us.
3    Q.  Can you give me a little more specificity
4    other than the company sets up.  Sorry.
5    A.  If an RSM goes to an assessment, they're
6    e-mailed a survey to the loathing member to fill out
7    about the RSM.  There's that.  Percentage is also based
8    on our bonus.  We have a goal to sign up as many people
9    for the American Hotel Lodging Association 11 green
10   guidelines, filling out paperwork correct, getting
11   reports in on time, just general duties.
12   Q.  Okay.  What's the time frame for getting
13   reports in?
14   A.  Same day.
15   Q.  Same day?
16   A.  Yep.
17   Q.  Okay.  And when you say get them in, what's
18   the process by which you do that?
19   A.  Zip the file and send the pictures and the QA
20   assessment into an e-mail account.
21   Q.  An online portal?
22   A.  Yes.
23   Q.  And those reports, are those made available to
24   the hotel members?
25   A.  That website is not.

13

1    Q.  So the answer to my question is, no, those
2    reports are not available to the members?
3    A.  The report that I'm speaking of, I actually
4    leave with the member before I leave the hotel, in a
5    printed form.  It's, then, electronically submitted.
6    Q.  Do you go over the criteria for your
7    assessments with the hotel member at any time prior to
8    performing the assessment?
9    A.  The assessment criteria?
10   Q.  Yes.
11   A.  Yes.
12   Q.  Do you personally discuss the criteria with
13   them?
14   A.  Yes.
15   Q.  Before you do the report?
16   A.  Yes.
17   Q.  Did you ever discuss the hotel assessment
18   criteria with Mr. Harooni prior to doing any
19   assessments on his property?
20   A.  Yes.
21   Q.  Do you have a specific recollection of that?
22   A.  Yes, I do.
23   Q.  And when was that?
24   A.  On January 31st, before the assessment began,
25   before the walking through the hotel began.

14

1    Q.  January 31st of what year?

2    A.  2008.  That's a guess.  Right?

3    Q.  Okay.  Do you know the difference between a

4    guess and an estimate, Ms. Bree?

5    A.  Yes.

6    Q.  Okay.  If I ask you to tell me how long this

7    table is, you can kind of guess -- you can estimate it

8    rather?

9    A.  No, that would be a guess for me.

10   Q.  You could assess this desk by saying, okay,

11   it's about ... But if I asked you the size of my office

12   desk, that would be a wild guess, correct?

13   A.  Absolutely.

14   Q.  I'm entitled to your best estimate on things.

15   I do not want you to guess.  Is that clear?

16   A.  Yes.

17   Q.  So just for the record, if you give me a

18   answer, I'm going to assume it's by personal knowledge

19   or common knowledge or good faith estimate, but I do

20   not want you to guess.

21         So when you say it was January 31st,

22   2008, the date January 31st popped into your head

23   pretty clearly, it seems like.  Why do you have a

24   specific recollection of that date?

25   A.  I reviewed reports yesterday.

15

1    Q.  Did you review any other documents?

2    A.  No.

3    Q.  Did you bring those reports with you today?

4    A.  I did not.

5    Q.  Can you identify which reports it was that you

6    reviewed for me.

7    A.  David e-mailed me three documents, and then

8    I looked at pictures that were in a folder.

9    Q.  And what documents were they that he sent to

10   you?

11   A.  I do not know the title of the document.

12   I believe it was a statement.

13   Q.  When you say "a statement," what does that

14   mean?

15   A.  Someone gave a statement in regards to this

16   case.

17   Q.  Who was the someone?

18   A.  I don't remember.

19   Q.  What did that statement say?

20   A.  It was about their experience while they were

21   employed there.

22   Q.  Okay.  I'm sorry.  I'm fumbling around looking

23   for a pen, and I'm wondering if that was my pen that

24   went south.

25         Okay.  So you did review documents at the

16

1    request of your counsel; is that correct?

2    A.  Yes.

3    Q.  Or Best Western's counsel.

4         Do you have any input in hiring and

5    firing of other employees, Ms. Bree?

6    A.  No.

7    Q.  Do you make any decisions with regard to

8    corporate direction?

9    A.  I don't understand that.

10   Q.  Okay.  Do you have any input as to the

11   direction that Best Western is taking from, let's say,

12   a marketing perspective?

13   A.  No, I don't.

14   Q.  Do you have any people that report to you?

15   A.  No.

16   Q.  Do you report to others?

17   A.  Yes.

18   Q.  And they report to others?

19   A.  Yes.

20   Q.  So it's fair to say in your department, you're

21   at the bottom of the food chain?

22   A.  Yes.

23   Q.  No insult intended.

24   A.  Yes.

25   Q.  And do you have any voting rights or other

17

1    management duties with the corporation -- or with

2    the -- I guess it's not a corporation -- Best Western?

3    A.  I hear two questions there.  Number one, can

4    you repeat the first part.

5    Q.  Sure.  I'll just rephrase.  Do you have any

6    voting rights with regard to Best Western?

7    A.  No.

8    Q.  You don't supervise anyone?

9    A.  No.

10   Q.  You have no input in hiring and firing?

11   A.  No.

12   Q.  You are paid a salary?

13   A.  Yes.

14   Q.  If you do overtime, is that included in your

15   salary?

16   A.  Yes.

17   Q.  So you get overtime?

18   A.  No, it's included in my salary.  It's not

19   additional.

20   Q.  You're exempt?

21   A.  From overtime, you mean?

22   Q.  Yes.

23   A.  Yes.

24   Q.  But you have no decision-making authority

25   within Best Western; is that correct?

CYNTHIA BREE (ROUGH)
12/22/2009

18

1.   A.  It depends on what you're referring -- what
2   decision you're referring to.
3      Q.  Well, you give a report -- okay.  Fair enough.
4         If I understand your job duties, it is to
5   go out, inspect or do a quality assurance assessment on
6   the hotel, write a report, and send it in.  Fair
7   enough?
8      A.  Yes.
9      Q.  And it's up to you to decide whether something
10  passes or fails based upon your visual inspection and
11  your sense of whether something meets the Best Western
12  standards, correct?
13        MR. GARABARINO:  Objection, form.
14     A.  No.
15  BY MS. SCHLESINGER:
16     Q.  How do you make those determinations,
17  Ms. Bree?
18     A.  During an assessment, there is a premade out
19  form that has different areas within the hotel and
20  different point loss associated with if an item is
21  clean, broken, or -- I'm sorry -- dirty, broken, or in
22  worse condition.  All those point loss amounts are set
23  by somebody other than me.
24     Q.  All right.  Are you familiar with -- and
25  I guess we gave our copies away.

19

1        (Discussion off the record.)
2   BY MS. SCHLESINGER:
3      Q.  Ms. Bree, I'm handing you what was made
4   Exhibit 2 to Mr. Van Wormer's deposition, and ask you
5   if you're familiar with this.  It's actually two
6   documents stapled together.  Can you take a look at
7   that and tell me if you've seen that before.
8         Again, to expedite that, that is the
9   rules and regulations and attached bylaws for Best
10  Western.
11     A.  The second document is ...
12     Q.  The bylaws?
13     A.  The bylaws.  So, yes, I have seen these
14  before.
15     Q.  Is it within the rules and regulations that
16  the criteria for the assessments is set forth?
17     A.  Probably without looking in here, but
18  I couldn't answer that.  Can I look in here.
19     Q.  Take your time.
20     A.  And can you repeat your question one more
21  time.
22     Q.  I will as soon as you take a moment.  Take a
23  look at that and see if you recognize the assessment
24  criteria as being set forth.  You might want to look at
25  the example, 500 point something or other, or 700, in

20

1   that range.
2      A.  Yes, it does.
3      Q.  Okay.  And you say that that criteria, then,
4   we're going to -- let me ask you this -- strike that.
5   Let me ask you this.
6         Is there any place other than this
7   document in one form or another, but we'll say the
8   rules and regulations, are the criteria for assessments
9   set forth anywhere else, to your knowledge?
10     A.  There is a brand standards manual that has
11  also a bearing on an assessment.
12     Q.  When you say "a bearing," can you be more
13  clear than that?
14     A.  It's a portion of -- it's another document
15  called brand standards, and it tells a member hotel
16  what they need to have in a room, like how many towels,
17  how many cups, and that is part of the assessment as
18  well.
19     Q.  I'm sorry.  Actually, unless you want to
20  elaborate on your further question, there was no
21  question pending there.
22        Okay.  You had mentioned that you were
23  moved around in your job duties from central California
24  to northern California, et cetera; is that correct?
25     A.  Yes.

21

1      Q.  Were all RSMs, likewise, shifted around?
2      A.  I don't know.
3      Q.  To your knowledge, was anyone else shifted
4   around during the time that you've been employed with
5   Best Western?
6      A.  Yes.
7      Q.  Who is that?
8      A.  Almost every RSM last year.
9      Q.  And prior to 2008, are you familiar with
10  anybody being shifted around?
11     A.  Yes.
12     Q.  And who was that?
13     A.  You mean, name-wise, I don't know, but I know
14  areas are open occasionally and people are given an
15  opportunity to take a new area.
16     Q.  Do you know if Mr. Van Wormer had been moved
17  around?
18     A.  Yes.
19     Q.  And was that prior to 2008?
20     A.  I don't recall when he left the area, the
21  year.
22     Q.  How many inspections do you do on a weekly
23  basis?
24     A.  An average of three.
25     Q.  Do you need to fly to them, drive to them?

22

1    What do you do?
2      A.  I'd say 90 percent of them I drive to.
3      Q.  Were you able to drive to the hotel owned by
4    Mr. Harooni?
5      A.  Yes.
6      Q.  Long drive?
7      A.  Yes.
8      Q.  Do you recall how long that took you?
9      A.  No.
10     Q.  Okay.  Are you familiar with the area where
11   his hotel was located?
12     A.  With regards to what?
13     Q.  The type of neighborhood, the type of access,
14   what else was in the area.
15     A.  No.
16     Q.  Do you know what the address was?
17     A.  Like right now?
18     Q.  As you sit here today, I'm trying to find out
19   what you're familiarity was with it.
20     A.  No, I don't know the address.
21     Q.  Do you know if there were a lot of other
22   hotels in the area?
23     A.  As I was driving, I remember seeing other
24   hotels.  I couldn't tell you how many.
25     Q.  Do you know, were all of the hotels in the

23

1    vicinity of Mr. Harooni's hotel that were Best Western
2    hotels, were they also assigned to you when
3    Mr. Van Wormer left?
4      A.  Can you repeat that.
5      Q.  Sure.  Mr. Van Wormer testified for us that
6    there was another hotel, I think he said it was in
7    Palmdale or something to that effect -- I'd have to go
8    back and look specifically at what he said -- but we
9    will presume, for the sake of argument here, that there
10   are other hotels in the area of southern California
11   through Nevada, true?
12     A.  Yes.
13     Q.  That are Best Western properties?
14     A.  Yes.
15     Q.  Were those all assigned to you when he left?
16     A.  No.
17     Q.  Why was this one assigned to you?  Do you
18   know?
19     A.  I had extra time and volunteered to pick up
20   some of the slack.
21     Q.  In your experience with Best Western, how many
22   hotels that were in your authority, for which you were
23   the RSM, how many hotels have lost their membership
24   status?
25     A.  I couldn't give you a count.

24

1      Q.  A lot?  An estimate.
2      A.  I don't know.
3      Q.  Have you ever seen a hotel other than
4    Mr. Harooni's lose its membership status?
5      A.  Yes.
6      Q.  And if I asked you to go find that
7    information, where would you look?
8      A.  What information am I finding?
9      Q.  Which hotels -- how many hotels have lost
10   their status as a Best Western member in your tenure
11   with Best Western?
12           MR. GARABARINO:  Objection, form.
13     A.  I would have to ask my immediate supervisor.
14   I don't know how to do that.
15   BY MS. SCHLESINGER:
16     Q.  Who is your immediate supervisor?
17     A.  Merit Graham.
18     Q.  I'm sorry?
19     A.  Merit Graham.
20     Q.  M-E-R-I-T, G-R-A-H-A-M?
21     A.  Yes.
22     Q.  Is that a man or woman?
23     A.  Female.
24     Q.  It's a neat name.  Sometimes you can't tell.
25           Ms. Graham, how long has she been your

25

1    supervisor?
2      A.  A little over a year.
3      Q.  Okay.  Who was your supervisor at the time
4    that Mr. Harooni owned his hotel?
5      A.  Darrel Preece.
6      Q.  Where is Darrel Preece, ma'am?
7      A.  I don't know.
8      Q.  I mean, not this particular moment, but does
9    he still work for Best Western?
10     A.  No, he does not.
11     Q.  When did he leave?
12     A.  Sometime within the last two years.
13     Q.  Was there anybody in between Darrel Preece and
14   Merit Graham?
15     A.  No.
16     Q.  You said that you volunteered for
17   Mr. Harooni's hotel, that being your scope.  Is that
18   correct?
19     A.  Yes.
20     Q.  What was the next closest hotel geographically
21   to Mr. Harooni's that you had within your route?  Do
22   you understand my question?
23     A.  Are you asking me of my permanent group of
24   hotels, which one was the closest to Lancaster?
25     Q.  Not necessarily permanent, but at the time

CYNTHIA BREE (ROUGH)
12/22/2009

26

1   that you, quote, volunteered for this, which was the
2   closest hotel to Lancaster?
3      A.  I would actually have no way of answering that
4   question without looking back at a schedule for that
5   week.  I don't know where else I went that week.
6      Q.  No, no.  I didn't make myself clear then.
7   I don't want to know where else you went that week.
8          When Mr. Harooni's hotel was put in to
9   your realm of responsibility -- do you understand what
10  I mean so far?
11     A.  Uh-huh.
12     Q.  And you said you volunteered because you,
13  quote, had extra time, what other hotels were in this
14  Palmdale/Lancaster area, if any?
15     A.  There were, but like I said, I don't -- at the
16  time that I volunteered, I probably performed six
17  assessments in southern California, but I couldn't tell
18  you which ones they were without looking at a document
19  or schedule.
20     Q.  How long do you typically keep a hotel within
21  your realm of responsibility?
22     A.  Of the area, the territory that I'm assigned
23  to me, you know, from -- I don't know how to answer
24  that.  As long as they're a member, if it's in my area,
25  then I take care of it.

27

1     Q.  Does your area have flexible boundaries?
2     A.  Yes.
3     Q.  In other words, that will shift?
4     A.  Yes.
5     Q.  Are there any other hotels that you acquired
6  that had previously been Mr. Van Wormer's
7  responsibility at the time Mr. Van Wormer left?  Were
8  there any other hotels that you took over?
9     A.  There were other hotels I inspected.  You
10  know, we might have a -- need clarification.  When
11  I went to southern California to help out, these hotels
12  were not mine permanently.  It wasn't something that I
13  was going to do forever.
14     Q.  Did any of these other hotels receive less
15  than passing grades while you were helping out?
16     A.  I don't remember.
17     Q.  Where would I look for that information,
18  Ms. Bree?
19     A.  You'd have to find out the hotels that
20  I inspected during that time and see what the scores
21  were in our -- we have a database.
22     Q.  Do you take it seriously when a hotel is put
23  on probation?
24     A.  Yes.
25     Q.  Do you do anything to assist that hotel to

28

1   ensure that it does not fall into a termination mode?
2     A.  Yes.
3     Q.  What do you do?
4     A.  We have provide them with an action plan on
5  the areas that need attention within their hotel, and
6  if a hotel does not achieve an 800, there is a rapid
7  response visit performed.
8     Q.  Do you work closely with the rapid response
9  team?
10     A.  There is not a rapid response team.
11     Q.  Define for me, then, what a rapid response is.
12     A.  If I go to a property and it scores below 800,
13  a rapid response visit is something that is done to
14  help the member get back on track.
15     Q.  Do you have any knowledge of the rapid
16  response being done -- it's a little ambiguous.  I'm
17  sorry.  I'm going to have to backtrack, even though
18  I know we are in a hurry.
19          A rapid response, what does that entail?
20     A.  Going to a hotel that has scored less than 800
21  and assisting them in taking care of the areas that
22  cause them to fail.
23     Q.  What does assisting them mean?  Sorry.  It's
24  still pretty vague.
25     A.  Providing help if, you know, they don't know

29

1   how to clean a toilet, or, you know, whatever
2  deficiencies are pointed out, whether it be dirty or a
3  broken, I assist them in repairing or fixing or
4  cleaning or figuring out a way to make it better.
5     Q.  Since I'm pretty confident I can't picture you
6  going in there and physically cleaning a hotel --
7  I mean, a toilet.  It doesn't really quite fit your job
8  description, or does it?
9     A.  It does.
10     Q.  You physically go in there and clean the
11  toilets?
12     A.  It that's what I feel would benefit the
13  member, yes.
14     Q.  So you'll go to pretty big extremes to benefit
15  the member in this instance?
16     A.  Yes.
17     Q.  What did you do for Mr. Harooni?
18     A.  I assessed the property after it had failed
19  and after -- it had failed once and it had already
20  received a rapid response visit, and at that point,
21  I provided just an action plan.
22     Q.  Did you provide that in writing?
23     A.  Yes.
24     Q.  And do you know if that document has been
25  produced in this litigation?

30

1    A. I don't. I do not.
2    Q. What would he on that action plan?
3    A. Basically the same as the rapid response
4    visit. You know, do you know what the issues are, and
5    would you like help trying to correct them?
6    Q. Okay. So you basically took the rapid
7    response issues, turned them into an action plan, and
8    said, here you go?
9    A. Yes.
10   Q. And did you propose specific and concrete
11   solutions in order to help Mr. Harooni's hotel avoid
12   termination?
13   A. No.
14       MS. SCHLESINGER: I'm going to go off the
15   record for just a moment. I just want to speak to my
16   client real briefly.
17       (Recess was taken from 3:18 p.m. to
18   3:22 p.m.)
19   BY MS. SCHLESINGER:
20   Q. Ms. Bree, when you took over the
21   responsibilities as RSM of Mr. Harooni's hotel, did you
22   have any anticipated length of time that you thought
23   you would be responsible for this property?
24   A. No.
25   Q. You had a full load of properties that you

31

1    were already responsible for; is that true?
2    A. Yes.
3    Q. And then you took on this additional property?
4    A. Yes.
5    Q. And you envisioned it at that time as being
6    just an addition to your workload?
7    A. No.
8    Q. So did you envision that it was going to be
9    rotated out, that it was just a temporary?
10   A. I envisioned that Best Western would hire
11   someone to replace Mitch Van Wormer.
12   Q. Did you envision that Mr. Harooni's property
13   would be terminated shortly after your taking it over?
14   A. No.
15   Q. Did you recognize that was a possibility?
16   A. Yes.
17   Q. Okay. And did you do anything to stop it, to
18   try to prevent that from happening?
19   A. No, I didn't. I don't have authority, let's
20   say.
21   Q. So other than just putting the rapid response
22   assessment into a, quote, action plan, you didn't
23   really do anything else to assist Mr. Harooni from
24   having his property terminated as a member; is that
25   true?

32

1    A. Correct.
2    Q. And was there anyone else associated with Best
3    Western who took any steps to avoid termination of
4    membership for Mr. Harooni?
5    A. Not to my knowledge.
6    Q. So the answer is no?
7    A. I'm not aware, is a better answer.
8    Q. Do you think that you would have known had
9    somebody been working with him to try to avoid
10   termination?
11   A. Not necessarily.
12   Q. Is Best Western one of those companies that
13   the left hand doesn't know what the right hand is doing
14   all the time?
15   A. No.
16   Q. So then if steps are being taken to correct
17   problems at one of the hotels for which you are
18   responsible as an RSM, would it seem reasonable to you
19   that you would be informed of that?
20   A. Yes.
21   Q. But to the best of your knowledge, no steps
22   were being taken by anyone at Best Western to ensure
23   Mr. Harooni did not fall into a termination status,
24   true?
25   A. To the best of my knowledge.

33

1    Q. And you mentioned that the criteria upon which
2    you did your grading or assessment -- if I fall into
3    the grading expression, you'll understand I mean
4    assessment, right?
5    A. Yes.
6    Q. You'll agree that the document I handed you
7    that I mentioned was made as Exhibit 2, marked as
8    Exhibit 2 to Mr. Van Wormer's deposition, and I think
9    it's easier if we also mark it as Exhibit 1 to this
10   deposition, so we don't have to go running back and
11   forth to it, the rules and regulations. The criteria
12   for the assessments is set forth in those rules and
13   regulations, to the best of your knowledge?
14   A. Yes.
15   Q. And do you agree that the criteria for these
16   assessments is a bit subjective? Do you want me to
17   make that easier?
18   A. Please.
19   Q. I see the look on your face. Let's see if I
20   can clarify that for you.
21       For example, if you turn, for me, to, oh,
22   let's try document page BW 0949. You'll see in the
23   bottom right-hand corner, there's some document numbers
24   BW. Right-hand corner. This one happens to also be
25   marked as page 15 in the right-hand bottom corner, and

34

1   its got a subheading at the top, chapter Roman numeral
2   9. Do you see that, Ms. Bree?
3       A. Yes.
4       Q. And as you go down here, let's pick 900.6.
5   Do you see those subheadings on the left-hand column?
6       A. Yes.
7       Q. And at 900.6, do you see where it says, each
8   guest room, dot, dot, dot?
9       A. Yes.
10      Q. "Each guest room shall be numbered with easily
11  distinguishable uniform numbers, doors, locks, and
12  hardware shall be regularly inspected for easy,
13  efficient, operation and good appearance." Do you see
14  that?
15      A. Yes.
16      Q. Have you read that correctly?
17      A. Yes.
18      Q. Can you define for me what "good appearance"
19  means?
20      A. That would mean no dirt, no scratches, no
21  dents.
22      Q. And is that defined here someplace for me?
23      A. It could possibly be in the rest of the
24  document.
25      Q. Can you point that out for me --

35

1       A. I don't know.
2       Q. -- where good appearance is defined as a term
3   or condition?
4       A. I'd have to look through the whole thing.
5       Q. When was the last time looked to see where
6   good appearance was defined?
7       A. I have not.
8       Q. So as you apply that term in everyday working
9   conditions, would you agree that good appearance means.
10  Do you think it looks okay? Do you, Ms. Bree, think it
11  looks okay?
12      A. Yes.
13          MR. GARABARINO: Objection, form.
14  BY MS. SCHLESINGER:
15      Q. So that's a subjective term, is it not,
16  Ms. Bree?
17      A. Yes.
18      Q. And as we go through this manual, we're going
19  to find other locations where subjective terms are
20  used. For example, if you turn to BW 0946, which is
21  backwards a page or two, and you see 700.7, is the
22  number on that midway down, on the right-hand column,
23  on what is also marked as page 12 of the under rules
24  and regulations under chapter 7. Do you see that?
25      A. Yes.

36

1       Q. It says, "Appropriate attractive landscaping
2   shall be provided." Do you know as you sit here today
3   whether the term "appropriate" or "attractive" are
4   defined anywhere by Best Western?
5       A. I do not know.
6       Q. As you apply those terms in your everyday
7   work, would you agree that that is a subjective term?
8       A. No.
9       Q. No? "Appropriate" and "attractive." Who
10  determines what is attractive, Ms. Bree? You?
11      A. No.
12      Q. No? Tell me where that's defined that
13  somebody else is making that determination if something
14  is attractive or not?
15      A. Tell you -- I'm sorry what was that?
16      Q. Where is that defined? If that's an objective
17  term that you are not personally deciding if it meets
18  that criteria or not, tell me where in the manual,
19  where the definition, where the objective criteria for
20  what attractive is located in Best Western's documents?
21      A. I don't know.
22      Q. So have you looked at that definition that may
23  or may not be supplied by Best Western to be objective?
24  Have you looked at it recently?
25      A. Have I looked at it -- I'm not sure

37

1   I understand that.
2       Q. If you are telling me it's not your personal
3   opinion of whether something is appropriate and
4   attractive, okay, if there is some objective outside
5   criteria, I want to know where it is, what it is, where
6   it's at, ma'am.
7       A. In my training, in the training I received to
8   be an RSM.
9       Q. And are the hotel owners made privy to that
10  training? Do they have access to that criteria you say
11  you're applying?
12      A. If they were hired as an RSM for Best Western
13  and went through the training, yes.
14      Q. So your hotel operator, your hotel owner has
15  no way of knowing what qualifies as an attractive
16  component as defined in 700.7 of this Exhibit 1 to your
17  deposition; is that fair?
18          MR. GARABARINO: Objection, form.
19      A. I'm sorry. You'd have to repeat that.
20  BY MS. SCHLESINGER:
21      Q. How would a hotel owner be able to determine
22  before you tell him, oh, that's unattractive, how would
23  they know if something was going to meet the criteria
24  or not?
25          MR. GARABARINO: Objection, form.

38

1    A.  Maybe common sense.
2    BY MS. SCHLESINGER:
3    Q.  So will you agree with me, ma'am, that common
4    sense, in my view, is not necessarily common sense in
5    somebody else's view?
6    A.  I would agree.
7    Q.  So in other words, they have no way of knowing
8    whether you'll determine something's attractive or not;
9    is that fair?
10       MR. GARABARINO:  Objection, form.
11   A.  No.
12   BY MS. SCHLESINGER:
13   Q.  Again, I ask you, Is there an objective
14   criteria to which they can refer and to which they have
15   access?
16   A.  In design documents, there very well may be.
17   I don't have those in front of me.
18   Q.  Ma'am, these headings that are on here,
19   Chapter 7, for example, says, building grounds and
20   public areas.  Does that pertain to design.
21   maintenance, or Best Western's standards?  What does it
22   apply to?
23   A.  The building, whatever physical building there
24   is of the hotel, and whatever buildings are around it.
25   The grounds is what it is built on, and public area is

39

1    anything a guest can see.
2    Q.  Okay.  So let me ask you this, then.  You say
3    this relates to the design criteria.  So if you have
4    plans that were approved by the Best Western design
5    group -- right, you're familiar with that group?
6    A.  Yes.
7    Q.  And I may not have the words just right, but
8    you know we're talking about the people that look at
9    the plans, say, yep, that's acceptable, you can go
10   forward, and we're going to say it meets Best Western's
11   standards.  So if you've got plans and upgrade features
12   that were approved by Best Western, will you then say
13   that it is, per se, appropriate and you would never go
14   out and mark it down under those circumstances; is that
15   fair?
16       MR. GARABARINO:  Objection, form.
17   A.  No.
18   BY MS. SCHLESINGER:
19   Q.  No, it's not fair?  If it's something to be
20   approved by Best Western from the design perspective.
21   but when you go out to the hotel, you, nevertheless,
22   might write it down because you say it's not
23   attractive; does that ever happened?
24   A.  Yes.
25   Q.  What would you define as, quote, debris --

40

1    strike that.
2        In an interior corridor on a hotel,
3    people frequently put out trays or other refuge from
4    their hotel rooms, would you agree with that?  Hotel
5    guests frequently set something outside their door,
6    true?
7    A.  No.
8    Q.  If they have room service, they stick the tray
9    outside?
10   A.  If the hotel has room service, right.
11   Q.  Okay.  So in other instances, they may unwrap
12   a package and set it outside for the maids to pick up?
13   That can happen, right?
14   A.  Sure.
15   Q.  And you would agree that if the hotel
16   inspected -- if the hotel management inspected a
17   corridor every 10 minutes, it can still happen prior to
18   an inspector coming out, true?
19   A.  What is it that could happen?
20   Q.  Somebody could set something outside the hotel
21   door?
22   A.  Yes.
23   Q.  So when we look at 700.13 on BW 0947, at the
24   top, it says, "interior corridor carpeting shall be
25   vacuumed daily and be free of wrinkles, litter, debris,

41

1    and clutter."  If there was something sitting outside
2    that had been placed outside by a hotel guest, you
3    would recognize that these things can happen and you
4    wouldn't mark somebody down for it; is that true?
5    A.  That's true.
6    Q.  Okay.  And, similarly, if the hotel is
7    undertaking good faith efforts to renovate and
8    refurbish a hotel, there's going to be debris
9    associated with such an enterprise, true?
10   A.  Yes.
11   Q.  And you certainly wouldn't want to mark
12   somebody down for their good faith efforts to renovate
13   and repair the hotel, correct?
14   A.  Correct.
15   Q.  So you would never do that?
16   A.  I would have to have a specific instance.
17   Q.  Did you do that with Mr. Harooni's hotel,
18   ma'am?
19   A.  Did I do what?
20   Q.  Mark it down due to accuchomons associated
21   with renovations or repairs for the hotel?
22       MR. GARABARINO:  Objection, form.
23   A.  Not to my knowledge.
24   BY MS. SCHLESINGER:
25   Q.  So if you saw a stone being cut or anything

42

1   like that to upgrade lavatories or floors or something,
2   this work in progress, you would not have marked it
3   down for that?
4           MR. GARABARINO:  Objection, form.
5       A.  The Best Western bylaws do state that we have
6   a category called work in progress.  If this work has
7   been noted as work in progress on a previous
8   assessment, which is defined in the four common sense
9   principals that all RSMs use, it would be noted.
10  BY MS. SCHLESINGER:
11      Q.  What does that mean, "it would be noted"?
12      A.  It would probably have -- it would have a
13  point loss.
14      Q.  Did Mr. Van Wormer ever speak to you about
15  renovations and remediations taking place at
16  Mr. Harooni's hotel?
17      A.  No.
18      Q.  Did you ever notice that these things were
19  being undertaken at the hotel while you were out
20  inspecting it?
21      A.  Not to my knowledge.
22      Q.  How many times did you inspect Mr. Harooni's
23  hotel, ma'am?
24      A.  One.
25      Q.  So one you wrote up an action plan and that

43

1   these things need to be fixed, and that was the end of
2   it, as far as you were concerned?
3           MR. GARABARINO:  Objection, form.
4   BY MS. SCHLESINGER:
5       Q.  Is that true?
6       A.  No.
7       Q.  I asked you previously but maybe
8   I misunderstood you, what other steps did you take to
9   ensure Mr. Harooni's hotel membership was not
10  terminated?
11      A.  What you said before was did I expect that.
12  There's a difference between if I expected something to
13  happen versus what I did.  So if at any time a hotel
14  representative from this hotel would have called me,
15  I would have provided them with service.
16      Q.  Is it your testimony today, ma'am, that you
17  did not take any affirmative steps to assist the hotel
18  ownership with meeting Best Western's standards?
19      A.  Could you repeat that question.
20      Q.  Sure.  Is it your testimony today that you, as
21  an RSM, do not have any duty to take affirmative steps
22  to ensure a hotel membership is not terminated?
23          MR. GARABARINO:  Objection, form.
24      A.  I am sorry.  I don't understand that question.
25

44

1   BY MS. SCHLESINGER:
2       Q.  Do you take any affirmative steps to ensure a
3   hotel membership is not terminated?
4           MR. GARABARINO:  Same objection.
5   BY MS. SCHLESINGER:
6       Q.  Do you understand that question, Ms. Bree?
7       A.  No, I don't.  I've said that three times.
8   I do not understand this question.
9       Q.  Okay.  Do you know what the word "affirmative"
10  means?
11      A.  Could you please tell me how you're using it
12  in the sentence.
13      Q.  All right.  By affirmative here, I mean, do
14  you initiate any steps to ensure that a hotel
15  membership is not terminated?  Do you take any action,
16  reach out and try to make sure that doesn't happen?
17          MR. GARABARINO:  Same objection.
18      A.  I have.
19  BY MS. SCHLESINGER:
20      Q.  Did you in this case?
21      A.  Yeah, I think I did.
22      Q.  You told me before you did an action plan.
23  Anything else?
24      A.  While I'm at the hotel, I always tell people,
25  if there's anything you need from me, if I can clarify

45

1   anything, if you'd like to review this.
2       Q.  Who did you tell in this case, ma'am?
3       A.  I was sitting at the table with -- the general
4   manager.  I believe his name was Kevin.  I don't know
5   his last name.  Mr. Harooni was at the table.  And my
6   coworker Jeff Hall was there.  I do not remember if
7   there was anybody else at the table.
8       Q.  Tell me about Jeff Hall.  Who is he?
9       A.  A coworker.
10      Q.  What does that mean?
11      A.  He's an RSM.
12      Q.  What was he doing there?
13      A.  Observing me.
14      Q.  Was he in training?
15      A.  Yes.
16      Q.  How many people did you train as RSMs during
17  your tenure with Best Western?
18      A.  Maybe four or five.
19      Q.  This was just kind of a parallel inspection,
20  so to say; is that correct?
21      A.  I don't know what a parallel inspection is.
22      Q.  They do the inspection, they kind of also do
23  the inspection or watch you do it?
24      A.  No, he does not do the inspection.  He's an
25  observer.

46

1    Q.  He's just observing you?
2    A.  Yes.
3    Q.  And did Jeff Hall, at that time, was he
4    designated as trainee?
5    A.  Yes.
6    Q.  Did he become an RSM, to your knowledge?
7    A.  Yes.
8    Q.  Is he still with Best Western today?
9    A.  Yes.
10   Q.  And he was present at the time you alleged
11   that you explained that you would offer additional --
12   let me backtrack and clarify that.  Hold on.
13        It's your testimony that you sat down
14   with Kevin, you don't remember his name, did you
15   remember his title?
16   A.  He was the general manager.
17   Q.  Okay.  And Mr. Harooni?
18   A.  Yes.
19   Q.  With Mr. Hall?
20   A.  Yes.
21   Q.  And yourself?
22   A.  Yes.
23   Q.  And was that on January 31st, 2008?
24   A.  Yes.
25   Q.  And you sat down where with them?

47

1    A.  In the lobby, at a table.
2    Q.  And was this before or after the completion of
3    your inspection?
4    A.  Before and after.
5    Q.  And what specifically did you tell Mr. Harooni
6    prior to the inspection taking place?
7    A.  I do not remember specifics of what I said
8    that day.  I have a normal ...
9    Q.  Spiel?
10   A.  Yeah, exactly.
11   Q.  Will you give me your normal spiel, please.
12   A.  I review the previous assessment, ask them if
13   they have any questions about it, ask what from the
14   last assessment they have addressed or corrected, if
15   there's been any improvements to the hotel, if they
16   have any rooms out of order, if there's any work going
17   on, and if -- we also normally look at customer service
18   records.  Again, it's basically whatever that member
19   asks for or choses to talk about.
20   Q.  So when you said it was your normal spiel,
21   what you really mean is it's adjusted on a case-by-case
22   basis?
23   A.  Right.
24   Q.  So in other words, you do not have a set
25   speech that you give them prior to your assessment?

48

1    A.  Not a speech, no, no.  I follow a document
2    that -- just to remind me to touch on basics.
3    Q.  Were you given that document prior to your
4    assuming responsibility as an RSM for the Harooni
5    property?
6    A.  The document that I was just referring to is a
7    document that I create.
8    Q.  Okay.  So it's all in your control what's on
9    that document?
10   A.  Actually, maybe I shouldn't have used the word
11   document, but there's -- I just take a form and, you
12   know, it just reminds me to ask if there's any rooms
13   out of order or ask if there's any improvements.
14   Q.  What do you mean by "room out of order"?  What
15   does that mean?
16   A.  If there are rooms that for any reason would
17   not be rented to a normal customer that day.
18   Q.  And so if a room was -- if a room did not meet
19   your view of an acceptable room, then it should not be
20   rented to a customer, right?
21        MR. GARABARINO:  Objection, form.
22   A.  Say that one more time.
23   BY MS. SCHLESINGER:
24   Q.  Okay.  A room out of order, you said, if for
25   any reason -- let me run this back.  Let me see if I

49

1    get this correct.
2        You said, and I think I'm quoting here,
3    if there are rooms for any reason that would not be
4    rented to a normal customer that day, that would be a
5    room that was out of order, correct?
6    A.  Yes.
7    Q.  What would be the reasons why a room would not
8    be rented to a normal customer?
9    A.  The hotel could have cleaned the carpets, and
10   the carpets could be wet.  They could have been doing
11   repairs maybe for damage.  I mean, there's various
12   reasons.
13   Q.  How many rooms -- I'm sorry, did I cut you
14   off?
15   A.  No.
16   Q.  I don't want to do that.  I thought you were
17   finished.  I lost my train of thought.
18        How many rooms do you inspect when you do
19   one of your assessments?
20   A.  Ten.
21   Q.  And what are the components of the room that
22   you inspect?  What items are you looking for?
23   A.  Everything, anything.
24   Q.  Well, we'll assume that it has four walls.
25   That's a good start.  Can you narrow it down a little

50

1   bit for me.
2       A.   Within my training, and along with the forms
3   that I use while I'm performing the assessment, and as
4   part of the four common sense principals, I follow my
5   right hand around the room, and, you know, there's
6   items that are typically in a guest room, and I expect
7   them to be there.
8       Q.   You've used that term a couple of to times
9   now, this "four common sense principals." Tell me what
10  those are, please.
11      A.   That I'm going to perform a fair and accurate
12  assessment today and look at the hotel as if I were a
13  guest checking in. I look at it in the condition it is
14  in today. I, again, follow my right hand around the
15  room. If it has an on-and-off switch or is supposed to
16  work a certain way, I also make sure it works that way.
17  There is consideration taken for work in progress as
18  long as that work in progress was not mentioned on a
19  previous assessment. Was that four?
20      Q.   They aren't bulleted. It seems rather
21  narrative to me, so I can't tell you if there's four.
22      A.   Oh, and if there is an item in the room that
23  is considered marginal in nature, it is basically a
24  heads-up, like, you know, this could cause you problems
25  in the future if you do not attend to it. Those are

51

1   also noted on the report.
2       Q.   I'm going to take a couple of those items
3   here. When you say something is "marginal," give me an
4   example.
5       A.   You could have a seam on wallpaper just
6   starting to split. If that was left unattended for any
7   length of time, it would become a deficiency.
8       Q.   Do you have any experience, training, or
9   expertise in design of hotel rooms?
10      A.   Yes.
11      Q.   What's that?
12      A.   I have a design degree.
13      Q.   That's in horticulture, you said?
14      A.   Yes.
15      Q.   Back that up. Tell me how horticulture
16  relates to design hotel rooms?
17      A.   That you learn basic design skills.
18      Q.   Okay. Are you familiar with how to apply
19  wallpaper?
20      A.   Yes.
21      Q.   From a professional standpoint?
22      A.   No.
23      Q.   Have you ever repaired wallpaper?
24      A.   Yes.
25      Q.   In a hotel?

52

1       A.   Yes.
2       Q.   Give me an example.
3       A.   I had a room in the hotel I was a general
4   manager of, and somebody wanted to show -- wanted an
5   example of how to repair wallpaper.
6       Q.   And with no training or expertise in doing
7   this and no knowledge of how to apply wallpaper, you
8   jumped in and said, here's how to fix it?
9       A.   Yes.
10      Q.   Okay. And let me ask you this. Would you
11  know the difference between wallpaper that may have --
12  well, let me ask you this. What's the width that is
13  permissible in a seam in the wallpaper?
14      A.   I don't know the answer to that.
15      Q.   That's one of those, you'd know it if you see
16  it?
17      A.   I mean, I don't know that I've ever read a
18  guideline saying, this is how much space is in between
19  a seam.
20      Q.   So if you think it's too much, then it's just
21  something that you're going to flag; is that fair?
22      A.   It's like comparing apples to oranges. We
23  were talking about peeling wallpaper and now we're
24  talking about a seam.
25      Q.   Well, how do you determine if it's -- you said

53

1   a seam -- actually, no, I don't think we were talking
2   about peeling wallpaper, but if that's what your
3   interpretation is. I believe I asked you for example
4   of something that was marginal, and you said you could
5   have a seam on wallpaper just starting to split.
6       A.   Okay.
7       Q.   So we're not talking about seams on wallpaper?
8       A.   Well, I'm saying, you know, it's starting to
9   peel from the wall.
10      Q.   Okay.
11      A.   So maybe the glue hasn't stuck properly.
12      Q.   And how do you determine if it's peeling?
13  In other words, I'm trying to find out if you have
14  objective criteria to which you refer when something is
15  marginal?
16          MR. GARABARINO: Objection, form.
17      A.   It's visual.
18  BY MS. SCHLESINGER:
19      Q.   So it's, in your opinion, it's marginal?
20      A.   No, it's visual. You can see it. I have to
21  be able to point to something and say, do you see this?
22      Q.   And if they disagree, do you write it up
23  anyway?
24      A.   Yes.
25      Q.   So if a pillow is not fluffed -- because

54

1  I noticed that that's one of your criteria in your
2  bylaws, that the pillows are to be fluffed -- plumped.
3  I believe is the word they used. Do you recall that?
4      A. No.
5      Q. Are you familiar with that?
6      A. No.
7      Q. Have you ever written somebody up for
8  unplumped pillows?
9          MR. GARABARINO: Objection, form.
10  BY MS. SCHLESINGER:
11      Q. Have you written somebody up for failing to
12  have their pillows plumped on their bed?
13      A. No.
14      Q. If a hotel is on probation, does anybody with
15  Best Western come to you to ask your opinion with
16  regard to termination of its hotel's membership?
17      A. Boy. Yes.
18      Q. Did they in the case of Mr. Harooni's hotel?
19      A. I don't remember.
20      Q. Was Mr. Harooni ever rude or in any way
21  unprofessional toward you?
22      A. Yes.
23      Q. In what way?
24      A. After I presented the assessment with the less
25  than 800 score, he was very agitated and -- just

55

1  visibly, you know, agitated. I don't know what else to
2  say.
3      Q. Being visibly agitated is unprofessional, in
4  your opinion?
5          MR. GARABARINO: Objection, form.
6      A. Yeah, in this instance, I believe it was.
7  I have, you know, a reason to say that. Yes.
8  BY MS. SCHLESINGER:
9      Q. Do tell. What's your reason to say that?
10      A. I just -- I felt like I was getting, you know,
11  questioned and second guessed and told that what I did
12  was wrong, and it wasn't a low-key discussion, it was
13  more of a heated -- you know, the conversation was
14  unpleasant.
15      Q. Is it possible that it was, quote, heated
16  because he was so very, very concerned about losing his
17  membership?
18          MR. GARABARINO: Objection, form.
19      A. I don't have that knowledge.
20  BY MS. SCHLESINGER:
21      Q. Do you have any documentation as to what you
22  told Mr. Harooni at any time during the one inspection
23  that you conducted? And, I mean, obviously, aside from
24  the actual assessment form.
25      A. No.

56

1      Q. So in other words, you cannot substantiate
2  that you told him anything with Mr. Kevin Refoua or
3  otherwise; is that correct?
4          MR. GARABARINO: Object to form.
5      A. Can you repeat that one more time.
6  BY MS. SCHLESINGER:
7      Q. Sure. Can you provide any evidence of the
8  conversations you alleged occurred between you and
9  Mr. Harooni?
10          MR. GARABARINO: Objection, form. Same
11  objection.
12      A. I may have, and without looking at this
13  document, I may have transferred some of the comments
14  to what we call a less than 840 report, which was
15  included in my document.
16  BY MS. SCHLESINGER:
17      Q. Okay. And would you think that that less than
18  840 report would be relevant to whether or not a
19  hotel's membership is terminated?
20          MR. GARABARINO: Objection, form.
21      A. I believe it might be part it.
22  BY MS. SCHLESINGER:
23      Q. So it has an impact?
24      A. It does. It has an impact.
25      Q. Do you know if that document was produced in

57

1  this litigation?
2          MR. GARABARINO: It was one of the
3  documents we provided to you today.
4          MS. SCHLESINGER: Today? We're just now
5  getting these documents? Okay. And I appreciate that.
6  I appreciate that they're there. I'm just going, okay,
7  where is this?
8  BY MS. SCHLESINGER:
9      Q. Is this the document to which you were
10  referring to, Ms. Bree?
11          MS. SCHLESINGER: Are these two copies?
12  What am I looking at here?
13          MR. GARABARINO: Off the record for a
14  second.
15          (Recess was taken from 3:57 p.m. to
16  4:02 p.m.)
17  BY MS. SCHLESINGER:
18      Q. Back on the record. And as I said, Ms. Bree,
19  in the interest of time, and that you need to catch a
20  cab, but my client he said don't worry about it from
21  his perspective, we were just talking about you told me
22  that you only were out to the hotel one time; is that
23  correct?
24      A. That's correct.
25      Q. Okay. And you said that at that time,

58

1    Mr. Harooni was, quote, agitated; is that also correct?
2        A.   At the end of the assessment, when I gave him
3    the paperwork.
4        Q.   Are you aware that Mr. Harooni has
5    Parkinson's?
6        A.   I believe he told me that.
7        Q.   Are you familiar with some of the symptoms of
8    Parkinson's?
9        A.   I am not.
10       Q.   Agitation and inability to control muscles
11   being one of them, did you know that?
12       A.   No.
13       Q.   If you had know that, would you have taken
14   that into account and had some perspective for his
15   conduct?
16       A.   No.
17       Q.   No? You wouldn't have cared?
18           MR. GARABARINO: Objection, form.
19       A.   I did not say I would not care. I said I did
20   not know that.
21   BY MS. SCHLESINGER:
22       Q.   Okay. But I'm asking you, if you had known
23   it, would that change your impression of Mr. Harooni's
24   demeanor at the time that he saw this negative report?
25       A.   No.

59

1        Q.   No? Do you consider yourself a picky person,
2    Ms. Bree?
3        A.   Depends on what you're talking about. I'm
4    picky when it comes to food.
5        Q.   What kind of hotels do you stay in?
6        A.   I stay at a Best Western every night.
7        Q.   Do you travel for pleasure?
8        A.   Sometimes, yes.
9        Q.   Do you stay at Best Western's then?
10       A.   Yes, I do.
11       Q.   Do you get a discount?
12       A.   Depends on what day of the week it is or where
13   I'm staying.
14       Q.   You told me that you were only there on one
15   occasion. Does this report -- let me make sure I grab
16   the right one. Does this report look familiar to you
17   as something -- and I don't mean to flick it at you.
18   I just didn't want to knock my water over. Does that
19   report look familiar to you?
20       A.   Yes.
21       Q.   And you were telling me you might have
22   transferred some of your conversation to this report.
23   Let me ask you this. Did Mr. Harooni ever see this
24   report prior to this litigation, to your knowledge?
25       A.   Which report?

60

1        Q.   This less than 840 score property report?
2        A.   I do not have knowledge of that.
3        Q.   Did you ever hand it to him?
4        A.   No.
5            MS. SCHLESINGER: I'm going to mark this
6    as, what, Exhibit 3 -- 2 to this deposition?
7            THE COURT REPORTER: This will be 2.
8    BY MS. SCHLESINGER:
9        Q.   I'm going to mark this report, which we
10   received just prior to the deposition beginning today.
11   It will be marked as Exhibit 2 to your deposition. I'd
12   like to go through this real briefly, and then we are
13   going to need to continue or you will not get out of
14   here at time.
15           I see this name, second person, there's
16   Jeff Hall. He's designated as an RSM on page 1 of this
17   Exhibit 2. Do you see that?
18       A.   Yes.
19       Q.   Is there a reason that it was not indicated
20   that he was in training?
21       A.   No.
22       Q.   Would it be common practice to indicate that
23   you had a trainee along?
24       A.   No.
25       Q.   Did anybody ever tell Mr. Harooni that

61

1    Mr. Hall was a trainee?
2        A.   I don't know.
3        Q.   So as far as he knows, there was two of you
4    there inspecting, correct?
5        A.   No, that's not correct. But I don't know that
6    I specifically said. Jeff is a trainee. I am more
7    likely to say, Jeff is observing how I perform an
8    assessment.
9        Q.   Okay. So from Mr. Harooni's perspective, is
10   there anything that would have indicated to him that
11   Mr. Hall -- strike that.
12           Did you ever define what Mr. Hall's
13   position at that assessment was to Mr. Harooni?
14       A.   Yes.
15       Q.   And that's what you just said, you said he was
16   observing you?
17       A.   Correct.
18       Q.   And you have here previous RSM. What's the
19   purpose of including that information on this report?
20           MR. GARABARINO: Objection, form.
21       A.   I don't know. It's something internal.
22   BY MS. SCHLESINGER:
23       Q.   Did Mr. Van Wormer have any discussions with
24   you about Harry as an individual --
25       A.   No.

62

1    Q.  -- prior to your doing this report?
2    A.  No.
3    Q.  Did you confirm at any time that Christine had
4    the title or authority as a general manager of the
5    hotel?
6    A.  I don't know who Christine is specifically.
7    I see her name here.
8    Q.  So you have no idea who that was?
9    A.  Actually, she was the housekeeper, but I think
10   this form has a spot for a person's name.
11   Q.  So as far as you know, it's not accurate to
12   say --
13   A.  No, in my other assessment, in the part that
14   I leave with the member, it is spelled out there that
15   Christine was part of housekeeping.
16   Q.  So it's not accurate to say -- this form is
17   not accurate, in other words?
18   A.  No. I just noticed that.
19   Q.  So you agree this form is not accurate?
20   A.  Sorry.  On that one specific line.
21   Q.  That's what we're referring to, right?
22   A.  Yes.
23   Q.  And as you go down, it says, assessment date,
24   and that is the 1/31/2008 that you mentioned.  Now, you
25   said that the property at issue here was on

63

1    probationary status as of that date; is that correct?
2    A.  That, I actually don't know.
3    Q.  Okay.  Because I don't see anything here that
4    would indicate that, and I'm just wondering if it's
5    something you would put on there?
6    A.  No.
7    Q.  As we go down -- and, again, we are going to
8    need to continue this -- but as we go down, I see brand
9    standards listed as today's was 1,000; is that correct?
10   A.  Yes.
11   Q.  Where do you get your GRPA total?  What is
12   that based upon?  What does that stand for, first of
13   all?
14   A.  Guest room public area.
15   Q.  Where does that come from?  What criteria go
16   into that?  I see a number here of 681.  How is that
17   number calculated?
18   A.  During the assessment of the rooms and the
19   public area, if there is a deficiency noted, it carries
20   a point loss.  At the end of the assessment, the
21   computer program takes care of -- you know, if I tell
22   it, for instance, the window's broken, it has a point
23   loss associated with it, and however many windows are
24   broken gets added up and it tallies in the final score.
25   Q.  There were no windows broken at

64

1    Mr. Harooni's --
2    A.  No.
3    Q.  -- property, that was just an example??
4    A.  Just an example.
5    Q.  Let's make sure we still let each other
6    finish.
7           So you give your opinion on what things
8    should be minus points and then plug that data into the
9    computer that then calculates the numeric total; is
10   that correct?
11          MR. GARABARINO:  Objection, form.
12   A.  I do not give my opinion.
13   BY MS. SCHLESINGER:
14   Q.  No, you write down whether something is
15   appropriate, whether it's orderly or clean or
16   attractive, you write that down and determine if it's a
17   point off or not, correct?
18          MR. GARABARINO:  Objection, form.
19   A.  I don't determine if it's -- I don't even
20   know how to explain this.  It's a form we use.  You
21   know, you walk through the room.  Again, if the window
22   is broken, I make a little checkmark next to window.
23   Does that window need -- well, a window is not a good
24   example.
25

65

1    BY MS. SCHLESINGER:
2    Q.  I agree.  How about dust in a corner?
3    A.  That's an even worse example.
4    Q.  Why is that?
5    A.  Because I couldn't -- you can't fix dust in a
6    corner, you can only clean it.
7    Q.  Is that not something that you would write
8    something down for?
9    A.  There's three terms that we use.  It's either
10   clean, broken, or needs to be replaced, so I can't say
11   there's dust in a hallway that needs to be replaced.
12   Q.  No, but where would you put that then?
13   A.  Where would I put what?
14   Q.  If you wanted to mark something down for dust
15   in a corner, would that show up on your report, your
16   assessment?
17   A.  Yes.
18   Q.  Under which category would that show up?
19   A.  Where is the dust?
20   Q.  In the corner of a room.
21   A.  In the corner of a room, it would go into the
22   guest room, as long as it's within the sleeping area,
23   it would go in the guest room category under floor
24   covering.
25   Q.  I don't see a category here for floor

66

1   covering, ma'am.
2          MR. GARABARINO: Objection, form.
3   BY MS. SCHLESINGER:
4      Q.  So where would it go on this form?
5      A.  On this form, it's included in the cleaning
6   total.
7      Q.  So every time you see dust, you can write that
8   down, is that correct, and take points off for it?
9   Is that right?
10         MR. GARABARINO: Objection, form.
11     A.  Let me repeat this. Every time I see dust,
12  and then what was the rest of it?
13  BY MS. SCHLESINGER:
14     Q.  You can, at least in theory, give the hotel a
15  point off for that.
16     A.  It's not a point off, it's whatever is
17  predetermined for that specific area.
18     Q.  But you can give them a demerit?
19         MR. GARABARINO: Objection, form.
20     A.  It's not a demerit.
21  BY MS. SCHLESINGER:
22     Q.  Okay. I'm going to call this deposition at
23  this point and continue it to a later date, because
24  clearly it is now 4:15. We're getting some
25  communication issues, shall I say, and as much as I

67

1   would like to continue it, I am going to ask that you
2   do not speak with counsel or otherwise about the
3   conversation here today or with anyone else.
4          MR. GARABARINO: I'm not sure that that's
5   appropriate.
6          MS. SCHLESINGER: I'm entitled to ask.
7   I would like to continue this on the same
8   terms that we have today, and the only reason we're
9   calling it is so Ms. Bree can get home tonight.
10         MR. GARABARINO: And in addition to you
11  wanting to go home as well, correct?
12         MS. SCHLESINGER: I don't care. I can be
13  here all night.
14         MR. GARABARINO: Well, it's up to
15  Ms. Bree. What would you prefer to do? Would you
16  prefer to continue this and take your chances with
17  getting a later flight, if one's even available, or
18  would you prefer continuing this sometime between now
19  and January 8th?
20         THE WITNESS: If I can be assured there's
21  a flight I can catch. I have a bigger problem with
22  continuing between now and the 8th, because I have
23  airline tickets bought, I have lots of plans
24         MS. SCHLESINGER: I'm sorry, but I'm not
25  a travel agent. I cannot guarantee you a flight out of

68

1   here or anything else, and I do not want to represent
2   to you that you're going to make some flight. I have
3   no idea what the flights to Sacramento are.
4          All I ask is that you don't discuss this
5   matter with counsel between now and the 8th. That's
6   apparently caused a big problem.
7          I really would like to have my witness
8   from what she remembers and not having you review
9   anything additional, unless you'd like to bring them
10  with. You know, I think it's perfectly reasonable to
11  request, since we're calling it, so you can get home.
12         MR. GARABARINO: Let's go off the record.
13         (Discussion off the record.)
14         MS. SCHLESINGER: Back on the record.
15  Ms. Bree has, if I am not mischaracterizing, said that
16  she would make extraordinary efforts to try to change
17  her flight schedule. It is December 22nd at 4:20.
18  To make your flight, you've got to go. This is going
19  to take more than another half an hour, by any stretch
20  of anyone's imagination. I'm going to ask that you use
21  your best good faith efforts to come back and testify
22  genuinely as to what you remember today rather than
23  reviewing anything additional, et cetera, and I have
24  represented to you that I will also give my best good
25  faith efforts to accommodate your scheduling.

69

1   I understand it is the holidays. We'll do our best.
2          And with that said, I'm off the record,
3   and we'll continue this deposition at a future date.
4          MR. GARABARINO: Do we and read and sign
5   now or after the second deposition?
6          MS SCHLESINGER: Afterwards, generally.
7   (4:20 p.m.)